1
~~1~~
2
~~2~~
3
~~3~~
4
~~4~~
5
~~5~~
6
~~6~~
7
~~7~~
8
~~8~~
9
~~9~~
10
~~10~~
11
~~11~~
12
~~12~~
13
~~13~~
14
~~14~~
15
~~15~~
16
~~16~~
17
~~17~~
18
~~18~~
19
~~19~~
20
~~20~~
21
~~21~~
22
~~22~~
23
~~23~~
24
~~24~~
25
~~25~~
26
27
28

John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California  94111-4500
Telephone:  415/263-7000
Facsimile:  415/263-7010
Email: jfiero@pszjlaw.com
        lcantor@pszjlaw.com
        tkapur@pszjlaw.com

and

Brad T. Summers (OSB No. 911116)
David W. Criswell (OSB No. 925930)
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone:  503/228-2525
Facsimile:  503/295-1058
Email: tsummers@balljanik.com
        dcriswell@balljanik.com

Attorneys for Debtor Arlie & Company

~~Albert N. Kennedy~~, ~~OSB No. 821429 (Lead Attorney)~~

~~Direct Dial:   (503) 802-2013~~
~~Facsimile:    (503) 972-3713~~
~~E-Mail:      al.kennedy@tonkon.com~~
~~Michael W. Fletcher~~, ~~OSB No. 010448~~
~~Direct Dial:  (503) 802-2169~~
~~Facsimile:    (503) 972-3869~~
~~E-Mail:      michael.fletcher@tonkon.com~~
~~TONKON TORP LLP~~
~~1600 Pioneer Tower~~
~~888 S.W. Fifth Avenue~~
~~Portland, OR  97204~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

~~Attorneys for Debtor~~ IN THE **UNITED STATES**

**BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

**~~Page 1 of 43~~** - ~~DEBTOR'S DISCLOSURE STATEMENT (July 1, 2010)~~



In re:

Arlie & Company,

**ARLIE & COMPANY,**

Debtor.

Case No. 10-60244-aer11

Chapter 11

**DEBTOR'S'S FIRST AMENDED DISCLOSURE STATEMENT (July 1, 2010IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)**

**Disclosure Statement Hearing**
Date:      TBD
Time:      TBD
Place:     United States Bankruptcy Court
               405 E. 8th Avenue, #2600
               Eugene, Oregon 97401
Judge:    Honorable Albert E. Radcliffe

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
1
2
2
3
3
4
4
5
5
6
6
7
7
8
8
9
9
10
10
11
11
12
12
13
13
14
14
15
15
16
16
17
17
18
18
19
19
20
20
21
21
22
22
23
23
24
24
25
25
26
27
28

Page 2 of 43 - DEBTOR'S DISCLOSURE STATEMENT (July 1, 2010)

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, Oregon 97204
503-221-1440

2

FIRST AMENDED DISCLOSURE STATEMENT
(JANUARY 10, 2011)

**TABLE OF CONTENTS**~~I. INTRODUCTION AND SUMMARY OF PLAN~~

~~A.    INTRODUCTION~~

I.    INTRODUCTION ........................................................................................... 1

    A.    Information Regarding the Plan ........................................................ 2

        1.    The Plan is the Governing Document ................................. 2

        2.    Source of Information .......................................................... 2

        3.    Warning Regarding Federal and State Income Tax Consequences of the Plan ................................................. 2

        4.    Bankruptcy Court Approval ................................................ 3

    B.    Voting Instructions .......................................................................... 3

        1.    How to Vote ......................................................................... 3

        2.    Who May Vote ..................................................................... 3

    C.    Confirmation ................................................................................... 4

    D.    Disclaimers ..................................................................................... 6

II.    PLAN OVERVIEW ................................................................................... 7

    A.    Introduction ..................................................................................... 7

    B.    Treatment of Claims ....................................................................... 9

III.    OVERVIEW OF CHAPTER 11 CASE ................................................. 18

    A.    Background ................................................................................... 18

        1.    Description of the Debtor .................................................. 18

        2.    Management ....................................................................... 19

        3.    Events Precipitating the Debtor's Filing ......................... 20

        4.    Plan  Projections ............................................................... 20

    B.    Summary of Events During the Chapter 11 Case .......................... 20

        1.    "First Day" Pleadings ....................................................... 20

        2.    Filing of Schedules, Meeting of Creditors and Bar Date ............... 21

        3.    The Official Committee of Unsecured Creditors .............. 21

        4.    Retention of Professionals ................................................ 23

        5.    First Day Orders ................................................................ 24

        6.    Cash Collateral .................................................................. 24

        7.    Sale of Debtor's College Park Property and Non-Core Assets ............ 24

        8.    Agreement with The Fifth Third Bank .............................. 25

        9.    Agreement with Umpqua Bank .......................................... 26

        10.    Agreement with Century Bank .......................................... 27

        11.    The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement ............ 27

    C.    Pending and Future Transactions .................................................. 29

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.     Sale of the Hawaii Koa Wood Forest ........................................ 29
2.     VA Hospital Transaction .......................................................... 29
IV.    ASSETS AND LIABILITIES ........................................................... 30
    A.    Real Property Assets ........................................................... 30
       1.    Crescent Village - Building A ..................................... 30
       2.    Crescent Village - Building B ..................................... 31
       3.    Crescent Village -Building D ...................................... 31
       4.    Crescent Village - 23 acres raw land ........................... 31
       5.    Crescent Village Lots ................................................... 31
       6.    Woodburn (4.11 acres raw land) .................................. 32
       7.    College Park (938.2 acres raw land) ............................ 32
       8.    Westlane Shopping Center ........................................... 32
       9.    Garden Valley Shopping Center ................................... 32
       10.   West 11th & Obie ....................................................... 32
       11.   My Coffee .................................................................. 32
       12.   Oil Can Henry's .......................................................... 33
       13.   Willow Creek .............................................................. 33
       14.   Hawaii Land ............................................................... 33
       15.   Natron Land ............................................................... 33
       16.   2890 Chad Drive (the BLM Office Building) ............... 33
       17.   2892 Crescent Ave. ..................................................... 34
       18.   650 Goodpasture (Goodpasture Island Radio Tower) ... 34
       19.   4480 G Hwy 101 N. .................................................... 34
       20.   3082 Kinney Loop ...................................................... 34
       21.   3108 Kinney Loop ...................................................... 34
       22.   2850 Kinney Loop ...................................................... 34
       23.   3032 Kinney Loop ...................................................... 35
       24.   Kinney Loop Lots ....................................................... 35
       25.   3058 Kinney Loop ...................................................... 35
       26.   2909 Lord Byron Place ................................................ 35
       27.   2915 Lord Byron Place ................................................ 35
       28.   2931 Lord Byron Place ................................................ 36
       29.   2977 Lord Byron Place ................................................ 36
       30.   2993 Lord Byron Place ................................................ 36
       31.   2843 Lord Byron Place ................................................ 36
       32.   2853 Lord Byron Place ................................................ 36
       33.   2863 Lord Byron Place ................................................ 36

| | | | |
|---|---|---|---|
| 34. | 2873 Lord Byron Place | ........................................................... | 36 |
| 35. | 2883 Lord Byron Place | ........................................................... | 36 |
| 36. | Hangar 272 | ...................................................................... | 37 |
| 37. | Hangar 246 | ...................................................................... | 37 |
| 38. | 2960 and 3110 Kinney Loop | | 37 |
| 39. | Unencumbered Real Property | ............................................. | 37 |

B. Personal Property Assets ............................................................. 37
    1. Cash and Accounts Receivable ............................... 37
    2. Bankruptcy Claim Filed Against Roberts Construction ....... 37
    3. State Court Claims Against Michael Roberts and Mark Roberts ... 38
    4. Potential Claims Against Umpqua Bank ................... 39
    5. Tonkon Claims ...................................................... 40
    6. Other Claims/Avoidance Actions ............................ 41
C. Liabilities – Secured Creditors ................................................... 41
    1. Bank of America ................................................... 41
    2. Century Bank ....................................................... 41
    3. Siuslaw Bank ....................................................... 42
    4. Summit Bank ........................................................ 42
    5. Umpqua Bank ....................................................... 42
    6. Washington Federal Savings ................................... 42
    7. "BLM" Individuals ................................................ 43
    8. Property Tax Lien Claimants ................................. 43
D. Liabilities – Unsecured Creditors ............................................... 43
E. Liabilities – Administrative Expenses .......................................... 43

V. DESCRIPTION OF PLAN OF REORGANIZATION ..................... 44
A. Unclassified Claims ................................................................... 44
B. Classified Claims and Interests .................................................. 45
    1. Class 1 (Other Priority Claims) ............................. 45
    2. Class 2 (Allowed Secured Claim of BofA) .............. 46
        (a) Class 2.1 – Building A Loan. .................... 46
        (b) Class 2.2 – Building D Loan. .................... 47
        (c) Treatment of Bank of America's Cash Collateral Accounts. .... 47
    3. Class 3 (Allowed Secured Claims of Century Bank) .... 48
    4. Class 4 (Allowed Secured Claim of Pioneer) ......... 49
    5. Class 5 (Allowed Secured Claims of Siuslaw Bank) .... 50
        (a) Class 5.1 – Crescent Village Lots Loan. .... 50
        (b) Class 5.2 - 2850 Kinney Loop Loan. ........ 51
        (c) Class 5.3 - 2960 Kinney Loop Loan. ........ 52
        (d) Class 5.4 - 3082 Kinney Loop Loan. ........ 53

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(e)     Class 5.5 - 3108 Kinney Loop Loan.................................54
(f)     Class 5.6 - Florence Medical Building Loan.....................55
(g)     Class 5.7 – Kinney Loop Lots Loan...............................56
(h)     Class 5.8 – Natron Land Loan.....................................56
(i)     Treatment of Siuslaw Bank's Cash Collateral Account........57

6.     Class 6 (Summit Bank) ..................................................57

(a)     Class 6.1 – Road Radio Tower Loan..............................58
(b)     Class 6.2 – Guaranty Claim.......................................58
(c)     Treatment of Summit Bank's Cash Collateral Account......59

7.     Class 7 (Umpqua Bank) ...............................................60

(a)     Class 7.1 – Westlane Loan.........................................61
(b)     Class 7.2 - West 11th Land Loan. ...............................61
(c)     Class 7.3 – 2892 Crescent Ave. Loan. .........................62
(d)     Class 7.4 Woodburn and College Park Loan. .................63
(e)     Class 7.5 – Roseburg Loan #1.....................................64
(f)     Class 7.6 – Roseburg Loan #2.....................................65
(g)     Class 7.7 – Oil Can Henry's Loan. ..............................66
(h)     Class 7.8 – My Coffee Loan........................................67
(i)     Class 7.9 – Building B Loan. .....................................67
(j)     Class 7.10 – Grumman Hangar Loan. ...........................68
(k)     Class 7.11 – 3032 Kinney Loop Loan. ..........................68
(l)     Class 7.12 - Crescent Village Land Loan. ......................69
(m)     Refinance of Properties Encumbered by Umpqua Bank's Liens. .....69
(n)     Sale of Collateral Free and Clear of Umpqua Bank's Liens and
         Application of Excess Proceeds.....................................70
(o)     Payment of Umpqua Bank Fees. ..................................71
(p)     Property Taxes. ......................................................71
(q)     Waiver of Claims by Debtor and Reorganized Debtor. .......71
(r)     Treatment of Umpqua Bank's Cash Collateral Account......71
(s)     Use of Rents Generated From Umpqua Properties. ...........72
(t)     Guarantees. ...........................................................72
(u)     Additional Documents. .............................................72

8.     Class 8 (Washington Federal Savings) ............................72

(a)     Class 8.1 –Lord Byron Loan. .....................................72
(b)     Treatment of Washington Federal's Cash Collateral Account......74
(c)     Treatment of the Washington Federal Unsecured Claim. .....74

9.     Class 9 (BLM Secured Creditors)..................................74

(a)     Class 9.1 – Francis Cline. .........................................74
(b)     Class 9.2 – William Greenhoot. ..................................75
(c)     Class 9.3 – McKillop II Limited Partnership. ..................75
(d)     Class 9.4 – Karen Merwin. .........................................76
(e)     Class 9.5 – Alice Smith. ............................................77
(f)     Class 9.6 – Linda Trickey..........................................77

10.     Class 10 (Property Tax Lien Claims)...............................78

11.     Class 11 (Small Unsecured Claims) ...............................78

12.     Class 12 (General Unsecured Claims). ............................78

13.     Class 13 (Interests)...................................................78

C.     Executory Contracts and Unexpired Leases ........................79

D.     Conditions to Confirmation and Effectiveness of the Plan...........79

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E. Sources of Funding for the Plan.................................................................. 80

F. Effect of Confirmation .................................................................................. 81

　1. Discharge .......................................................................................... 81

　2. Revesting, Operation of Business .................................................... 81

　3. Injunction .......................................................................................... 81

　4. Modification of the Plan; Revocation or Withdrawal of the Plan ...... 82

　5. Retention of Jurisdiction .................................................................. 82

　6. United States Trustee Fees .............................................................. 83

VI. LIQUIDATION ANALYSIS ..................................................................................... 83

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 84

A. General Tax Considerations ........................................................................ 84

B. Federal Income Tax Consequences to the Debtor ...................................... 86

C. Federal Income Tax Consequences to the Holders of an Allowed Claim ... 87

D. Consequences to the Interest Holders ........................................................ 88

E. Information Reporting and Backup Withholding ........................................... 88

F. Importance of obtaining professional tax assistance ................................... 89

VIII. ACCEPTANCE AND CONFIRMATION OF THE PLAN ......................................... 89

A. Confirmation Hearing .................................................................................. 89

B. Requirements of Confirmation ..................................................................... 89

C. Feasibility .................................................................................................... 90

D. Risk Factors ................................................................................................ 90

　1. General Financial Market Conditions ............................................... 90

　2. Projected Financial Results .............................................................. 90

E. Cram Down .................................................................................................. 91

F. Alternatives to Confirmation of the Plan ...................................................... 91

IX. RECOMMENDATION AND CONCLUSION ............................................................. 92

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibits

**Exhibit A**                          Plan

**Exhibit B**                          Partial list of the non-core assets currently being marketed by the Debtor for sale

**Exhibit C**                          Financial Projections

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**I.**

INTRODUCTION

On January 20, 2010 (the "Petition Date"), Arlie & Company ("the "Debtor"" or "Arlie") filed "Arlie") commenced the above-captioned bankruptcy case by filing a voluntary petition under Chapter chapter 11 of Title title 11 of the United States Code (the "Bankruptcy Code"). On July 1, 2010, Debtor Filed its Plan of Reorganization with the Bankruptcy Court ("Plan"). This Disclosure Statement ("Disclosure Statement") describes various transactions contemplated under the Plan, including the manner in which Claims and Interests will be satisfied. A copy of the Plan is attached hereto as Exhibit 1. You are urged to review the Plan and, if appropriate, consult with counsel about the Plan and its impact on your legal rights before voting on the Plan. Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to such terms in the Plan or the Bankruptcy Code.

This Disclosure Statement has been prepared by Debtor based upon its knowledge and information in Debtor's books and records. The information contained herein has been prepared in good faith, based upon information available. The information concerning the Plan has not been subject to a verified audit. Debtor believes this Disclosure Statement complies with the requirements of the Bankruptcy Code.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and the delivery of this Disclosure Statement shall not imply that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date of the material relied on in preparation of this Disclosure Statement was compiled. The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. Each holder of a Claim is encouraged to read, consider and carefully analyze the terms and provisions of the Plan.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan. Nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtor or any other party,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or be deemed conclusive advice on the tax or other legal effects of the reorganization on the holders of Claims or Interests.This Disclosure Statement is submitted in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016.  The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on _____, 2010 at _____.  That hearing will be held at"Bankruptcy Code").  The Debtor's case is being administered in the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, #2600, Eugene, Oregon 97401 before the Honorable Albert E. Radcliffe.  The hearing on confirmation may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement made at the hearing or any adjournment thereof.

A ballot has been enclosed with this Disclosure Statement for use in voting on the Plan.  In order to be tabulated for purposes of determining whether the Plan has been accepted or rejected, ballots must be received at the address indicated on the ballot no later than 4:00 p.m. on _____, 2010.

**B.**    **BRIEF SUMMARY OF PLAN**This Disclosure Statement (the "Disclosure Statement") contains information with respect to the *First Amended Plan of Reorganization (January 10, 2011)* (the "Plan") proposed by the Debtor.  A copy of the Plan is attached hereto as **Exhibit** 1.  The following description of the Plan is intended as a summary only and is qualified in its entirety by reference to the Plan.  The Plan is further described later in this Disclosure Statement.  Debtor urges each holder of a Claim to carefully review the entire Plan, together with this Disclosure Statement, before voting on**A.  Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan.

The Effective Date of the Plan will be the later or November 1, 2010 or the first day of the first month following the day on which the Confirmation Order becomes a Final Order.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.  The Debtor has examined various alternatives, and based on information contained in this Disclosure Statement and for the reasons set forth below, the Debtor has concluded that the Plan provides the best recovery to creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters:  (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed reorganization of the Debtor pursuant to the terms of the Plan, and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(3) the proposed distribution to Creditors and holders of Claims against the Debtor.  The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important.  In order for the Plan to be accepted by a Class of Claims or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan.  Those alternatives may not provide for a distribution of as much value to holders of Allowed Claims and Interests as the Plan.  Accordingly, the Debtor urges you to accept the Plan by completing and returning the enclosed ballot no later than 5:00 p.m. on _____, 2011.

### A.    INFORMATION REGARDING THE PLAN

#### 1.    The Plan is the Governing Document

Although the Debtor believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein, which are controlling.  You are urged to read the Plan and not just this Disclosure Statement.

#### 2.    Source of Information

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor or its professionals, or has been obtained from the Debtor's records, except where otherwise specifically noted.  None of the Debtor's attorneys, accountants or other professionals make any representation regarding that information.  The Debtor does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy.  The Debtor has, however, attempted to present the information accurately and fairly, and the Debtor believes that the information is substantially accurate.  The assumptions underlying the projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor's best estimate as to

what it expects will happen. Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor's control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the Bankruptcy Court hearing to determine the adequacy of the Disclosure Statement.

**3. Warning Regarding Federal and State Income Tax Consequences of the Plan**

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim. Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

**4. Bankruptcy Court Approval**

Following a hearing held on _____, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

**B. VOTING INSTRUCTIONS**

**1. How to Vote**

A ballot is enclosed herewith for Creditors to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan, sign your name, and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 5:00 p.m. prevailing Pacific Time on _____, 2011 at the following address:**

Arlie & Company Plan Balloting
c/o Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
(ph) 415-263-7000

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described, it will not be counted.  If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

**2.    Who May Vote**

The Plan divides the Claims of Creditors into 13 Classes.  There is one Class of Interests. The Classes are as follows:  Class 1 (Other Priority Claims), Class 2 (Bank of America), Class 3 (Century Bank), Class 4 (Pioneer), Class 5 (Siuslaw Bank), Class 6 (Summit Bank), Class 7 (Umpqua Bank), Class 8 (Washington Federal Savings), Class 9 (BLM Secured Creditors), Class 10 (Property Tax Lien Claims), Class 11 (Small Unsecured Claims), Class 12 (General Unsecured Claims), and Class 13 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan.  Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

Class 13 is not impaired and therefore is deemed to have accepted the Plan.  All other Classes are impaired under the Plan, and holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim.  Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan.  The Ballot form which you received does not constitute a proof of Claim.

**C.    CONFIRMATION**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization.  At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code.  If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan.  The Debtor believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class.  As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the plan by such class, so long as the plan meets the statutory requirements set forth by section 1129(b) of the Bankruptcy Code.  This procedure is called a "cram down."  The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any impaired Class rejects the Plan.

The Bankruptcy Court has set _____, 2011 as the hearing date to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied.  The hearing on confirmation will be held before the Honorable Albert E. Radcliffe at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, #2600, Eugene, Oregon 97401.  This hearing may be continued from time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.  Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

Objections must be served upon:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Los Angeles, California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(1) The Debtor:

Arlie & Company
2911 Tennyson Avenue, Suite 400
Eugene, Oregon 97408
Attn:  John Musumeci
Telephone:  (541) 344-5500

(2) Counsel for the Debtor:

John D. Fiero, Esq.
Linda F. Cantor, Esq.
Teddy M. Kapur, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA  94111
Telephone:  (415) 263-7000
           and

Brad T. Summers, Esq.
David W. Criswell, Esq.
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone:  (503) 228-2525

(3) Counsel for the Committee:

Douglas R. Schultz, Esq.
Gleaves Swearingen Potter & Scott LLP
PO Box 1147
Eugene, OR 97440-1147
Telephone:  (541) 686-8833

(4) The Office of the United States Trustee:

P. Rebecca Kamitsuka, Esq.
Attorney for the United States Trustee
Wayne L. Morse Courthouse
405 E. 8th Avenue, Suite 1100
Eugene, OR  97401-2706
Telephone:  (541) 465-6330

**D.      DISCLAIMERS**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR

UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.

PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS DISCLOSURE

STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN

SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE

NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S

BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  *SEE* 11 U.S.C.  § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  ***IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.***

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

**II.**

**PLAN OVERVIEW**

**A.      INTRODUCTION**

The Plan contemplates that the Reorganized Debtor will continue to operate its business in the ordinary course and pay and satisfy its obligations under the Plan from available cash, exit financing made available upon confirmation, from the net operating income generated from the Reorganized Debtor's continued business operations, and from the sale or refinancing of assets of the Reorganized Debtor from time to time.

A core aspect of the Debtor's business is marketing and selling real property acquired by Debtor from time to time.  Following the Effective Date,. The Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to provide funds for the Reorganized Debtor's continued operating expenses and to provide funds to make payments required under the Plan.

In addition to marketing and selling its real property assets in the ordinary course of its business, the Reorganized Debtor has committed in the Plan to market and sell or refinance non-core assets on an accelerated basis as is necessary or appropriate to ensure that the Reorganized Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

will have sufficient funds to make all payments required of the Reorganized Debtor under the Plan. A partial list of the non-core assets currently being marketed by the Debtor for sale is attached hereto as **Exhibit B**. Without limiting the preceding, if at any time the Reorganized Debtor determines that it may not have sufficient funds on hand to make any upcoming payment required under the Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of its non-core assets sufficient to raise the funds necessary to make the required Plan payment.

The Plan further provides that until all Allowed Claims have been paid in full, Reorganized Debtor will not repurchase any stock or make or pay any distributions or dividends to its shareholders on account of their stock, except for distributions necessary to meet the income tax obligations of its shareholders arising from the income of Debtor or Reorganized Debtor. In addition, until all Allowed Claims have been paid in full, Reorganized Debtor will not increase the salary of either Suzanne Arlie or John Musumeci. Finally, Reorganized Debtor will not pay any bonuses to any of its employees at any time that Debtor is not in full compliance with the terms of the Plan.

EachExcept as otherwise provided in the Plan, each secured creditor will retain its security interest in and liens on its Collateral with the same priority such security interest and liens had on the Petition Date. Each Claim will be a Secured Claim up to the value of the property securing the Claim unless the Claimant elects treatment under 11 U.S.C. § 1111(b). To the extent that Gartland, Nelson has an Allowed Secured Claim, its Allowed Secured Claim will be paid from the Collateral securing its Allowed Secured Claim. All other securedSecured creditors will be paid the full amount of their Allowed Secured Claims in Cash over time with interest, as more fully set forth in the Plan.

Each holder of a Small Unsecured Claim (an Unsecured Claim equal to or less than $2,000) will be paid the full amount of its Small Unsecured Claim within 60 days following the Effective Date.

Each holder of a General Unsecured Claim will be paid the full amount of its General Unsecured Claim in Cash within five years after the Effective Date. In addition, within 3 years after the Effective Date, the Reorganized Debtor will pay at least 50% of the principal amount of each General Unsecured Claim. Interest will accrue from the EffectivePetition Date on each General

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Unsecured Claim until such Claim is paid in full at a uniform annual interest rate of 3.5%.  At the time the Reorganized Debtor makes any principal payment on a General Unsecured Claim, the Reorganized Debtor will also pay all accrued but unpaid interest then owing on the General Unsecured Claim.

Existing Interests in the Debtor will be preserved.

All post-petition and Administrative Expense Claims will be paid in full on the Effective Date or the date on which such Claim becomes Allowed, whichever is later.

All unexpired leases and executory contracts which have not previously been rejected, or which are not otherwise subject to a prior Bankruptcy Court order or a pending motion before the Bankruptcy Court, will be assumed by the Reorganized Debtor through the Plan as of the Effective Date.

Existing Interests in Debtor will be preserved.  Until all Allowed Claims have been paid in full, Reorganized Debtor will not repurchase any stock or make or pay any distributions or dividends to its shareholders on account of their stock, except for distributions necessary to meet the income tax obligations of its shareholders arising from the income of Debtor or Reorganized Debtor. In addition, until all Allowed Claims have been paid in full, Reorganized Debtor will not pay any bonuses to Suzanne Arlie or John Musumeci, or increase the salary of either Suzanne Arlie or John Musumeci.

In the event that any Class of creditors does not accept the Plan, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise modify the Plan.

**C.    BRIEF EXPLANATION OF CHAPTER 11**

Chapter 11 of the Bankruptcy Code is the principal reorganization provision of the Bankruptcy Code.  Pursuant to Chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest.

The formulation and confirmation of a plan of reorganization is the principal purpose of a Chapter 11 case.  A plan of reorganization sets forth a proposed method for compensating the holders of claims and interests in the debtor.  A claim or interest is impaired under a plan of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

reorganization if the plan provides that the legal, equitable or contractual rights of the holder of such claim or interest are altered.  A holder of an impaired claim or interest is entitled to vote to accept or reject the plan.  Chapter 11 does not require all holders of claims and interests to vote in favor of a plan in order for the Bankruptcy Court to confirm it.  However, the Bankruptcy Court must find that the plan meets a number of statutory tests before it may approve the plan.  These tests are designed to protect the interests of holders of claims or interests who do not vote to accept the plan, but who will nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

An official committee of unsecured creditors is appointed by the United States Trustee's office in most Chapter 11 cases to, among other things, negotiate the plan of reorganization on behalf of the unsecured creditors of the debtor.  A committee of unsecured creditors was appointed by the United States Trustee in this case.

**II.    VOTING PROCEDURES AND CONFIRMATION OF A PLAN**

**A.    BALLOTS AND VOTING DEADLINE**

A ballot to be used for voting to accept or reject the Plan is enclosed with each copy of this Disclosure Statement mailed to all creditors entitled to vote.  After carefully reviewing this Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by voting in favor or against the Plan on the enclosed ballot as directed below.

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than 4:00 p.m. Pacific Time, on _____, 2010 by Debtor at the following address:

Tonkon Torp LLP,
Attention:  Michael W. Fletcher
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204-2099

or via facsimile transmission to Michael W. Fletcher at (503) 972-3869.

Holders of each Claim that was scheduled by Debtor or with respect to which a Proof of Claim has been Filed will receive ballots and are permitted to vote based on the amount of the Proof of Claim.  If no Proof of Claim has been Filed, then the vote will be based on the amount scheduled by Debtor in its Schedules.  Holders of Disputed Claims who have settled their dispute

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with Debtor are entitled to vote the settled amount of their Claim.  The Bankruptcy Code provides that such votes will be counted unless the Claim has been disputed, disallowed, disqualified or suspended prior to computation of the vote on the Plan.  The Claim to which an objection has been Filed is not allowed to vote unless and until the Bankruptcy Court rules on the objection.  The Bankruptcy Code provides that the Bankruptcy Court may, if requested to do so by the holder of such Claim, estimate or temporarily allow a Disputed Claim for the purposes of voting on the Plan.

If a person holds Claims in more than one Class entitled to vote on the Plan, such person will be entitled to complete and return a ballot for each Class.  If you do not receive a ballot or if a ballot is damaged or lost, please contact:

Tonkon Torp LLP
Attention:  Tammy Brown
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204-2099
Telephone number:  (503) 802-2169

All persons entitled to vote on the Plan may cast their vote for or against the Plan by completing, dating and signing the enclosed ballot and returning it, by First Class Mail or hand delivery, to Debtor at the address indicated above.  In order to be counted, all ballots must be executed and received at the above address no later than 4:00 p.m. Pacific Time on _____, 2010.  Any ballots received after 4:00 p.m. Pacific Time on _____, 2010 will not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan.

Ballots may be received by Debtor by facsimile transmission to Tonkon Torp LLP, Attention:  Michael W. Fletcher at (503) 972-3869.  Ballots sent by facsimile transmission will be counted if faxed by 4:00 p.m. Pacific Time on _____, 2010.

When a ballot is signed and returned without further instruction regarding acceptance or rejection of the Plan, the signed ballot shall be counted as a vote accepting the Plan.  When a ballot is returned indicating acceptance or rejection of the Plan but is unsigned, the unsigned ballot will not be included in any calculation to determine whether parties entitled to vote on the Plan have voted to accept or reject the Plan.  When a ballot is returned without indicating the amount of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claim, the amount shall be as set forth on Debtor's Schedules or any Proof of Claim Filed with respect to such Claim.

**B.    PARTIES ENTITLED TO VOTETREATMENT OF CLAIMS**

Pursuant to Section 1126 of the Bankruptcy Code, each Class of impaired Claims or Interests that is not deemed to reject the Plan is entitled to vote to accept or reject the Plan.  Any holder of an Allowed Claim that is in an impaired Class under the Plan, and whose Class is not deemed to reject the Plan, is entitled to vote.  A Class of Claims or Interests is "impaired" unless the legal, equitable and contractual rights of the holders of Claims or Interests in that Class are left unaltered by the Plan or if the Plan reinstates the Claims held by members of such Class by (1) curing any defaults, (2) reinstating the maturity of such Claim, (3) compensating the holder of such Claim for damages that result from the reasonable reliance on any contractual provision of law that allows acceleration of such Claim, and (4) otherwise leaving unaltered any legal, equitable or contractual right of which the Claim entitles the holder of such Claim.  Because of their favorable treatment, Classes that are not impaired are conclusively presumed to accept the Plan.  Accordingly, it is not necessary to solicit votes from the holders of Claims in Classes that are not impaired.

Classes of Claims or Interests that will not receive or retain any money or property under a Plan on account of such Claims or Interests are deemed, as a matter of law under Section 1126(g) of the Bankruptcy Code, to have rejected the Plan and are likewise not entitled to vote on the Plan.  There are no such Classes of Claims or Interests under the Plan.

Class 1 (Other Priority Claims) is not impaired and therefore is deemed to have accepted the Plan.  All other Classes of Claims and Interests are impaired under the Plan, and holders of Claims or Interests in those Classes are entitled to vote to accept or reject the Plan.

**C.    VOTES REQUIRED FOR CLASS ACCEPTANCE OF THE PLAN**

As a condition to confirmation, the Bankruptcy Code requires that each impaired Class of Claims or Interests accepts the Plan, subject to the exceptions described below in the section entitled "Cram Down of the Plan."  At least one impaired Class of Claims must accept the Plan in order for the Plan to be confirmed.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

For a Class of Claims to accept a plan, Section 1126 of the Bankruptcy Code requires acceptance by creditors that hold at least two-thirds in dollar amount and a majority in number of the Allowed Claims of such Class, in both cases counting only those claims actually voting to accept or reject the plan.  The holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.  If the Plan is confirmed, the Plan will be binding with respect to all holders of Claims and Interest in each Class, including Classes and members of Classes that did not vote or that voted to reject the Plan.

**D.    "CRAM DOWN" OF THE PLAN**

If the Plan is not accepted by all of the impaired Classes of Claims, the Plan may still be confirmed by the Bankruptcy Court pursuant to Section 1129(b) of the Bankruptcy Code's "Cram Down" provision if the Plan has been accepted by at least one impaired Class of Claims, without counting the acceptances of any Insiders of Debtor, and the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class of Claims or Interests.  Debtor believes that the Plan can be confirmed even if it is not accepted by all impaired Classes of Claims.

**E.    CONFIRMATION HEARING**

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on _____, 2010, at _____.  The Confirmation Hearing will be held at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, #2600, Eugene, Oregon 97401, before the Honorable Albert E. Radcliffe, United States Bankruptcy Judge.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of the creditors of Debtor.  At that time, Debtor will submit a report to the Bankruptcy Court concerning the votes for acceptance or rejection of the Plan by the persons entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objections to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and received by counsel for Debtor no later than

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

~~, 2010, by 4:00 p.m. Pacific Time.  Unless an objection to confirmation is timely filed and received, it may not be considered by the Bankruptcy Court.~~

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan.

| | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| N/A | Allowed Administrative Expense Claims | Estimated Recovery on Allowed Claims in this category:  100% | Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. |
| N/A | Allowed Priority Tax Claims | Estimated Recovery on Allowed Claims in this category:  100% | Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed. |
| 1 | Allowed Other Priority Claims | Estimated Recovery on Allowed Claims in this Class: 100%  **IMPAIRED**  **ENTITLED TO VOTE** | Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim). |
| 2 | Allowed Secured Claims of BofA | Estimated Recovery on Allowed Claims in this Class: 100%  **IMPAIRED**  **ENTITLED TO VOTE** | Class 2.1 (Building A Loan) and Class 2.2 (Building D Loan)<br>BofA will retain its security interests in and liens upon its Collateral and receive new promissory notes in the amount of the present value of its Allowed Claims.  BofA's Allowed Class 2.2 Claim is limited to the amount of the Building D Value; excess amounts owed under the Building D Loan are treated as Class 12 Claims.  The promissory notes will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | a balloon payment of all unpaid principal and interest due on the Maturity Date. Reorganized Debtor will use the Building A Cash Collateral to pay past due Property Taxes on Building A and retain and use the remainder for general operating purposes. Reorganized Debtor will use the Building D Cash Collateral to pay past due Property Taxes on Building D and the remainder will be retained in a segregated BofA account for payment of Property Taxes, capital expenses, tenant improvements, maintenance, improvements or other expenses directly pertaining to the improvement of Building D or the sale, lease and marketing of Building D. |
| 3 | Allowed Secured Claim of Century Bank | Estimated Recovery on Allowed Claims in this Class: 100% **IMPAIRED** **ENTITLED TO VOTE** | Century Bank will retain its security interests and liens upon its Collateral that secures the 3058 Kinney Loop Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| 4 | Allowed Secured Claim of Pioneer | Estimated Recovery on Allowed Claims in this Class: 100% **IMPAIRED** **ENTITLED TO VOTE IF CLAIM ALLOWED BY FINAL ORDER OF THE BANKRUPTCY COURT** **(CLAIM IS DISPUTED; DEBTOR TO FILE OBJECTION AND ADVERSARY PROCEEDING REGARDING THE DISPUTED LIEN IN THE NEAR TERM)** . | If and to the extent Pioneer is determined by Final Order of the Bankruptcy Court to have a valid, perfected interest in or lien upon property of the Debtor, Pioneer will retain its security interests and liens upon its Collateral that secures the Pioneer Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, the Reorganized Debtor shall have pre-paid at least 50% of the principal of Pioneer's Allowed Claim. At the time of any such pre-payment, the Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer note. If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order of the Bankruptcy Court, the Pioneer Claim will be treated as a Class 12 Claim. |
| 5 | Allowed Secured Claims of Siuslaw Bank | Estimated Recovery on Allowed Claims in this Class: 100% | Class 5.1 – Crescent Village Lots Loan. Siuslaw Bank will retain its security interests and liens upon its Collateral that secures the Crescent Village Lots Loan and receive a new promissory note in the amount of |

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| | | IMPAIRED<br><br>ENTITLED TO VOTE | the present value of its Allowed Claim.  The promissory note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots note.  Notwithstanding the foregoing, in the event Reorganized Debtor consummates the VA Sale prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots note, including all accrued and unpaid interest then owing under the Crescent Village Lots note, and shall utilize 20% of the Excess Sale Proceeds to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note) as determined by agreement of Reorganized Debtor and Siuslaw Bank.<br><br>Class 5.2 (2850 Kinney Loop Loan), Class 5.3 (2960 Kinney Loop Loan), Class 5.4 (3082 Kinney Loop Loan), Class 5.5 (3108 Kinney Loop Loan)<br>For each of these Classes, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures each loan and receive a new promissory note in the amount of the present value of each Allowed Claim.  Each promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Class 5.6 – Florence Medical Building Loan.<br>Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan and receive a new promissory note in the amount of the present value of its Allowed Claim.  The Florence note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  on the Effective Date, Reorganized Debtor shall pay down the Florence note to the original principal amount of the Florence Medical Building Loan.  The Reorganized Debtor will then make monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Class 5.7 (Kinney Loop Lots Loan) and Class 5.8 (Natron Land Loan)<br>Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan and Natron Land Loan and receive a new promissory note |

Left margin: PACHULSKI STANG ZIEHL & JONES LLP — ATTORNEYS AT LAW — LOS ANGELES, CALIFORNIA

Line numbers 1–28

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| | | | in the amount of the present value of each Allowed Claim. Each note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of each note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under each note.<br><br>Reorganized Debtor will use the Siuslaw cash collateral to pay any past due Property Taxes on the Collateral securing the Class 5 Claims.  All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 6 | Allowed Secured Claims of Summit Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 6.1 – Road Radio Tower Loan.<br>Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan and receive a new promissory note in the amount of the present value of its Allowed Claim.  The Radio Tower note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Class 6.2 – Guaranty Claim.<br>Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty and receive a new promissory note in the amount of the present value of the amount owing under the Churchill Media Guaranty.  The Guaranty note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  Within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty note.  At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note.  In the event Reorganized Debtor pays or satisfies the Guaranty note, Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.<br><br>Reorganized Debtor will use the Summit Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 6 Claims.  All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| 7 | Allowed Secured Claims of Umpqua Bank | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | Class 7.1 (Westlane Loan.), Class 7.2 (West 11th Land Loan), Class 7.3 (2892 Crescent Ave. Loan.) and Class 7.4 (Woodburn and College Park Loan) <br> For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under the respective loans related to the Westlane Property, West 11th Land Property, 2892 Crescent Ave., and Woodburn Property/College Park Property (the "Sell or Return Properties"). <br><br> Reorganized Debtor shall have 6 months after the Effective Date to either (a) enter into a letter of intent for the sale of each of the Sell or Return Properties (other than the College Park Property) at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the property to Umpqua Bank, subject to any and all past due and current Property Taxes, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the particular Sell or Return Property within the time limits set forth in the immediately preceding sentence, 2/3rds of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and 1/3 of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). <br><br> With respect to Class 7.4, subject to the reduction of debt owing against the College Park Property from the College Park Sale and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property, as of the Effective Date the Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein). <br><br> Class 7.5 (Roseburg Loan #1), Class 7.6 (Roseburg Loan #2), and Class 7.7 (Oil Can Henry's Loan). <br> For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the Roseburg Loan #1, Roseburg Loan #2, and Oil Can Henry's |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| | | | Loan.<br><br>On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to bring each loan current by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the property. Thereafter, interest will accrue on the each loan at a fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly amortizing payments of principal and interest on each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>With respect to Class 7.5, Reorganized Debtor may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building.<br><br>Class 7.8 (My Coffee Loan) Class 7.9 (Building B Loan), and Class 7.10 (Grumman Hangar Loan)<br>For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the My Coffee Loan, Building B Loan and Grumman Hangar Loan.<br><br>Interest will accrue on the principal amount owing on each loan at a fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Additionally, the non-default interest that accrued on each loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.<br><br>Class 7.11 (3032 Kinney Loop Loan) and Class 7.12 (Crescent Village Land Loan)<br>For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the 3032 Kinney Loop Loan and Crescent Village Land Loan.<br><br>As of the Effective Date, each loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the each loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes |

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|-----------|-------------|------------------------|----------------|
| | | | (less any previously paid real estate taxes included therein).<br><br>Treatment of Umpqua Bank's Cash Collateral Account. Provided the College Park Sale is consummated prior to the Effective Date, the balance of funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.<br><br>Reorganized Debtor may refinance any property that is the Collateral of Umpqua Bank provided it has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided Umpqua Bank receives the applicable Arlie Debt Amount plus the applicable Umpqua Proceeds.<br><br>Reorganized Debtor may sell properties free and clear of the Umpqua Bank liens, claims and encumbrances provided it pay the applicable Umpqua Debt Amount and the Umpqua Proceeds Share to be used as set forth in the Plan. Umpqua Bank shall provide partial release of liens, claims and encumbrances for a specific piece of property provided it receives 110% of the Arlie Debt Amount associated with such piece of property.<br><br>Umpqua Bank Fees shall be paid on a pro rata basis upon the sale or refinance of any property of Debtor that secures a Class 7 Claim.<br><br>Unless otherwise stated in the Plan, Property Taxes will be no more than 2 years past due on Collateral of the Debtor securing the Class 7 Claims.<br><br>On the Effective Date Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and managers for actions (or in-actions) that occurred before the Effective Date.  The Arlie Debt Amounts and the Umpqua Fees will not be subject to reduction by defense, counterclaim, or claim of |

**TREATMENT OF CLAIMS CHART**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | **TREATMENT OF CLAIMS CHART** | | |
|---|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | | **Plan Treatment** |
| | | | | recoupment by Debtor or Reorganized Debtor.<br><br>Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of a Umpqua Bank Loan for defaults under or relating to the Umpqua Bank loans the occurred before the Effective Date and any such claims are deemed waived, released and extinguished.<br><br>Umpqua Bank's Cash Collateral shall be allocated for use as follows:  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments unpaid non-default interest on Roseburg Loan #1 and #2 and on Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property of Reorganized Debtor that is Umpqua Bank's Collateral and not subject to a sale or refinance agreement.<br><br>All guarantees of Debtor's obligations to Umpqua Bank shall continue to guaranty Reorganized Debtor's obligations to Umpqua Bank under the Plan.<br><br>Reorganized Debtor may use all rents generated from properties securing Umpqua Bank obligations for any purpose, without restriction. |
| | Allowed Claims of Washington Federal Savings | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | | Washington Federal will have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between the Lord Byron Collateral Value and the Washington Claim Amount.<br><br>Washington Federal's Class 8 Claim shall be satisfied by the delivery of 5 promissory notes to Washington Federal. Each Lord Byron note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Each Lord Byron note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  The Lord Byron Notes shall be assumable by a purchaser of a Lord Byron Property, subject to reasonable |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **TREATMENT OF CLAIMS CHART** | | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| | | | approval by Washington Federal. <br><br> The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date. <br><br> Reorganized Debtor will use the Washington Federal Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 8 Claims.  All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 9 | Allowed Claims of BLM Secured Creditors | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | Class 9.1 (Francis Cline), Class 9.2 (William Greenhoot), Class 9.3 (McKillop II Limited Partnership), Class 9.4 (Karen Merwin), Class 9.5 (Alice Smith), and Class 9.6 (Linda Trickey) <br> Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  Each BLM Secured Creditor has an Allowed Claim in the amount of all outstanding principal, accrued non-default interest, and reasonable fees and costs owing as of the Effective Date under each BLM Secured Creditor's loan.  The Class 9 Claims are secured by a deed of trust on the BLM Office Building. <br><br> On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deeds in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under each BLM Secured Creditor's loan.  Notwithstanding the foregoing, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvements and any necessary rezoning services, if requested, upon terms to be agreed upon by the BLM Secured Creditors and Reorganized Debtor. |
| 10 | Property Tax Lien Claims | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law.  Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim. |
| 11 | Small Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** | Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date. |

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | **Plan Treatment** |
| | | **ENTITLED TO VOTE** | |
| 12 | General Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim.  Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date. |
| 13 | Interests | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**UNIMPAIRED**<br><br>**DEEMED TO ACCEPT THE PLAN** | Existing Interests in Debtor will be preserved. |

### III.

### OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case.  Copies of all relevant court papers are on file with the Bankruptcy Court.

**A.** ~~III.~~ **BACKGROUND** ~~AND GENERAL INFORMATION~~
~~A.        ARLIE & COMPANY~~

**1.        Description of the Debtor**

~~Arlie & Company~~ ~~is an Oregon corporation formed in 1991 by Suzanne Arlie.  Ms. Arlie is the sole shareholder, sole director and President of Arlie.  Arlie~~ The Debtor is a real estate development and management company based in Eugene, Oregon ~~committed to environmentally friendly development practices~~.  Arlie owns over 30 properties in Oregon (most of which are in or

around Lane County~~, Oregon) and owns~~) together with approximately 5,590 acres of investment property on the Big Island of Hawaii. (the "Hawaii Property").  Arlie is an Oregon corporation formed in 1991 by Suzanne Arlie.

~~Arlie's~~The Debtor's largest development project is known as Crescent Village.  ~~Phase 1 of Crescent Village was completed in 2009.~~  Crescent Village is Eugene''s first planned urban village, and is a mixed-use development that includes residences (apartments and townhouses), retail stores, restaurants and office buildings.  ~~Arlie's offices are located in the Inkwell Building in Crescent Village.~~ Additional information regarding the Crescent Village development is available at www.crescent-village.com.  Phase 1 of Crescent Village was completed in 2009.

The Debtor''s revenues consist primarily of rental payments from residential and commercial tenants and from sales of real property from time to time.  Debtor''s expenses consist primarily of debt service payments and operating expenses.

~~Although Arlie's assets are substantially greater than its liabilities, Arlie began experiencing cash-flow problems in 2008, when Arlie's general contractor for Crescent Village (Roberts Construction) filed a Chapter 7 liquidation proceeding and subsequently failed to pay many of its sub-contractors.  To ensure the successful completion of Crescent Village, Arlie paid significant amounts to various sub-contractors who had been working for Roberts Construction, even though Arlie had already paid for the work through Roberts Construction.~~

~~In addition to the Roberts Construction matter, the general downturn in the economy and the tightening of the credit markets has further hampered Arlie's cash flow.  These factors have made it more difficult for Arlie to attract and retain tenants and to close sales transactions.~~

~~Pre-Petition, Arlie attempted to negotiate with a number of its secured lenders (including its largest secured creditor, Umpqua Bank) to re-structure its debt obligations so that Arlie could continue to pay off of its obligations on a current basis.  However, these negotiations were mostly unsuccessful.  Accordingly, to ensure its long term success and survival, Arlie filed its Chapter 11 petition on January 20, 2010.~~
~~B.    MANAGEMENT~~

**2.    Management**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtor's current management team is set forth below. Each member of the Debtor's management team will continue with the Debtor post-confirmation.

1.    Suzanne Arlie; President, Owner and Sole Director

Suzanne Arlie; President, Owner and Sole Director - Suzanne Arlie oversees the operations of Arlie.  Ms. Arlie has been the President of Arlie since its inception.  Ms. Arlie will continue to serve as President of the Reorganized Debtor and will continue to receive a base salary of $18,750 per month..

John Musumeci; Executive Vice President - John Musumeci oversees Arlie's land acquisitions and sales.  Mr. Musumeci brings over 30 years experience as a business owner and property developer.  Mr. Musumeci has been employed by Arlie since the company's inception.  Mr. Musumeci will continue to be employed by the Reorganized Debtor.

2.    Scott Diehl; Vice President and Chief Financial Officer

Scott Diehl; Vice President and Chief Financial Officer - Scott Diehl brings over 30 years of experience in financial services and public accounting to Arlie.  Mr. Diehl is responsible for managing Arlie's general operations, finance, asset management, and strategic planning.  Mr. Diehl's career includes 8 years as a Certified Public Account in Kansas and Oregon.  Mr. Diehl also has worked 20 years as Controller and Finance Director in the newspaper industry where he also did performed real estate development tasks for the Guard Publishing Company.  Mr. Diehl holds a Bachelor of Science degree in Business from Washburn University.  Mr. Diehl will continue to be employed by the Reorganized Debtor and will continue to receive a base salary of $16,958 per month.

3.    John Musumeci; Executive Vice President Events Precipitating the Debtor's Filing

John Musumeci oversees Arlie's land acquisitions and sales.  Mr. Musumeci brings over 30 years experience as a business owner and property developer.  Mr. Musumeci has been employed by Arlie since the company's inception.    Mr. Musumeci will continue to be employed by the Reorganized Debtor and will continue to receive a base salary of $18,750 per month.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## C. FINANCIAL PERFORMANCE/PROJECTIONS

Although the value of Arlie's assets is substantially greater than its liabilities, Arlie began experiencing cash-flow problems in 2008, when the general contractor for Crescent Village (Roberts Construction) filed a Chapter 7 liquidation case and subsequently failed to pay many of its sub-contractors. To ensure the successful completion of Crescent Village, Arlie was forced to pay significant amounts to various sub-contractors who had been working for Roberts Construction even though Arlie already had paid for the work once when it paid Roberts Construction.

In addition to the Roberts Construction matter, the general downturn in the economy and credit markets further hampered Arlie's cash flow. These factors have made it more difficult for Arlie to (a) attract and retain tenants and (b) close sales transactions.

Exhibit 2 attached hereto contains, in summary fashion, certain historical financial information for Debtor, including a balance sheet and income statement of Debtor as of December 31, 2008, December 31, 2009, the petition date (January 20, 2010), and May 31, Pre-petition, Arlie attempted to negotiate with a number of its secured lenders (including its largest secured creditor, Umpqua Bank) to re-structure its debt obligations. However, these negotiations were mostly unsuccessful, and Arlie filed its chapter 11 petition on January 20, 2010.

### 4. Plan Projections

Exhibit 3C attached hereto presents in summary fashion Debtor's projected income statements (adjusted to a cash basis) and cash flow projections through December 31, 2014.April 25, 2016.

### B. IV. THE BANKRUPTCYSUMMARY OF EVENTS DURING THE CHAPTER 11 CASE

#### A. THE FILING

Debtor filed its voluntary Chapter 11 petition on January 20, 2010.

#### B. POST-PETITION DEVELOPMENTS

The following is a summary of important events that have taken place since the Petition Date.

##### 1. Cash Collateral; "First Day Orders" Pleadings

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

~~After the filing of the petition, Debtor was able to obtain the use of cash collateral through July 31, 2010 from its lenders who have a security interest in Debtor's cash. Debtor has since been operating under a court entered cash collateral order and is currently working with its lenders to extend the period covered by the cash collateral order. In addition, the Bankruptcy Court entered a number of "first-day" orders requested by Debtor. These orders authorized Debtor to:~~ ~~pay employees their accrued prepetition wages, salaries, compensation, expenses, benefits and related taxes (in amounts up to the priority limits permitted by the Bankruptcy Code); continue Debtor's~~ ~~existing utility services, including determining an adequate amount of utility deposits; retain Tonkon Torp LLP as Debtor's general bankruptcy counsel; and refund pre-petition security deposits in the~~ ~~ordinary course of Debtor's business.~~

The day after the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

- *Debtor's Motion for Order Authorizing Payment of Prepetition Wages, Salaries, Compensation, Expenses, Benefits, and Related Taxes, and to Continue Employee Benefits Postpetition* (Docket No. 7);

- *Debtor's Motion for Order Determining Adequate Assurance to Utility Companies* (Docket No. 8);

- *Debtor's Motion Seeking Authority to Refund Prepetition Security Deposits to Tenants* (Docket No. 9);

- *Debtor's Motion For Temporary and Final Authority to Use Cash Collateral* (Docket No. 12);

- *Debtor's Motion for Order Authorizing Use of Existing Bank Accounts* (Docket No. 14); and

- *Motion for Extension of Time to File Schedules and Statement of Financial Affairs* (Docket No. 19).

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on January 27, 2010. Following the hearing on the First Day Pleadings, the Bankruptcy Court entered several orders related to the First Day Pleadings on January 29, 2010, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.** ~~Employment of Professionals~~**Filing of Schedules, Meeting of Creditors and Bar Date**

~~In addition to authorizing Debtor to retain Tonkon Torp LLP as Debtor's general bankruptcy counsel, the Bankruptcy Court entered orders authorizing Debtor to employ: John Brown as a consultant for Debtor; Burr, Pilger Mayer, Inc. as accountants for Debtor; Thorp, Purdy, Jewett, Urness & Wilkinson P.C. as special purpose counsel for Debtor; Rethink LLP as special purpose counsel for Debtor; and Michael P. Kearney P.C. as special purpose counsel for Debtor.~~

On February 18, 2010, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court (Docket Nos. 102 and 103).  The Schedules provide detailed information regarding the Debtor's assets and liabilities, as well as other information about its business. The Schedules were amended on February 26, 2010 (Docket No. 102), March 17, 2010 (Docket No. 140), April 22, 2010 (Docket No. 154), May 17, 2010 (Docket No. 172), and October 29, 2010 (Docket No. 328).  Amendments to the Statement of Financial Affairs were filed on February 25, 2010 (Docket No. 113) and March 17, 2010 (Docket No. 139).

In addition, on March 4, 2010 the United States Trustee conducted the Section 341(a) meeting of creditors in the Debtor's chapter 11 case.  The Bankruptcy Court set June 2, 2010 as the deadline for non-Governmental Units to file proofs of Claim in the Bankruptcy Case, and July 19, 2010 as the deadline for Governmental Units to file proofs of Claim.  The Debtor has filed monthly operating reports commencing with January 2010 (Docket No. 137), and continues to file such reports.

**3.** **The Official Committee of Unsecured Creditors** ~~Committee~~

On or about January 25, 2010, the Office of the United States Trustee appointed ~~a committee of unsecured creditors.  The following creditors serve on the committee:~~an Official Committee of Unsecured Creditors (the "Committee") to serve in this case (Docket Nos. 33 and 62).  The United States Trustee added an additional member to the Committee on or about January 25, 2010 (Docket No. 98).

The current members of the Committee are as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| James R. Hanks (Chair) | 4765 Village Plaza Loop, Suite 201 |
| Gregory Brokaw | 1 East Broadway, Suite 300 |
| JRH Transportation Engineering | Eugene, OR  97401 |
| ~~Rowell Brokaw Architects, PC~~ | ~~Eugene, OR  97401~~ |

| David E. Bomar | 100 W. 13th Avenue |
| Mike Broadsword | PO Box 1067 |
| Balzhiser & Hubbard Engineers, Inc. | Eugene, OR  97401 |
| ~~Eugene Sand & Gravel / Eugene Sand~~ Construction | ~~Eugene, OR  97440~~ |
| Jerry Vicars | P.O. Box 42173 |
| Fabrication & Mechanical Group, Inc. | Eugene, OR 97404 |

~~The committee is represented by Douglas Schultz of Gleaves, Swearingen, Potter & Scott LLP, P.O. Box 1147, Eugene, OR  97440.~~

The Plan provides that to the extent that one or more members of the ~~unsecured creditors' committee~~Unsecured Creditors' Committee agrees to continue to serve on the ~~unsecured creditors' committee~~Unsecured Creditors' Committee following the Effective Date, the ~~unsecured creditors' committee~~Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such ~~unsecured creditors' committee~~Unsecured Creditors' Committee.  For so long as such ~~unsecured creditors' committee~~Unsecured Creditors' Committee remains in existence, the Reorganized Debtor will provide to the ~~unsecured creditors' committee~~Unsecured Creditors' Committee a quarterly compliance certificate executed by the ~~CFO of~~Chief Financial Officer of the Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan.  If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor ~~will in such compliance certificate~~shall state what steps are being taken to remedy or cure any non-compliance with the Plan.  In addition, provided that the members of the continuing ~~unsecured creditors' committee~~Unsecured Creditors' Committee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

have executed in favor of the Reorganized Debtor a confidentiality and non-disclosure agreement, in form and substance satisfactory to the Reorganized Debtor in its reasonable discretion, the Reorganized Debtor ~~will~~shall provide annual reviewed financial statements to the ~~unsecured creditors' committee~~Unsecured Creditors' Committee.  Upon payment in full of all Allowed General Unsecured Claims, the ~~unsecured creditors' committee will~~Unsecured Creditors' Committee shall automatically cease to exist.  During the existence of the ~~unsecured creditors' committee, the unsecured creditors' committee~~Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the ~~unsecured creditors' committee, and~~Unsecured Creditors' Committee, and the Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period.

### 4.    Retention of Professionals

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Tonkon Torp LLP, as general bankruptcy counsel (Docket No. 11), which employment was approved on January 29, 2010;

- Thorp Purdy Jewett Urness & Wilkinson P.C., as special purpose counsel (Docket No. 73), which employment was approved on March 4, 2010;

- Burr Pilger Mayer, Inc., as accountants (Docket No. 74), which employment was approved on March 19, 2010;

- Michael P. Kearney P.C., as special purpose counsel (Docket No. 75), which employment was approved on March 4, 2010;

- John Brown, as consultant (Docket No. 76), whose employment was approved on March 19, 2010;

- Rethink LLP as special purpose counsel (Docket No. 77), which employment was approved on March 4, 2010;

- Ball Janik LLP ("Ball Janik"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 269), which employment was approved on November 23, 2010; and

- Pachulski Stang Ziehl & Jones LLP ("PSZJ"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 272), which employment was approved on November 24, 2010.

On September 30, 2010, the Debtor filed the *Substitution of Counsel and Notice of Appearance* (Docket No. 259), pursuant to which the Debtor substituted PSZJ and Ball Janik for its existing general bankruptcy counsel, Tonkon Torp LLP.  A dispute subsequently arose between Tonkon Torp and the Debtor regarding the transfer of the Debtor's records.  On October 19, 2010,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Debtor filed an adversary proceeding to compel Tonkon Torp to turnover the Debtor's property (Case No. 10-06232-aer).  The parties consensually resolved their dispute, and on November 11, 2010, the Debtor filed a notice of dismissal of the adversary case without prejudice.

The following two employment applications remain pending before the Court.  On December 17, 2010, the Debtor filed an application to employ Kibel Green Inc. as the Debtor's Real Estate Plan Consultant and Interest Rate Expert (Docket No. 361); and on December 21, 2010, the Debtor filed an application to employ Powell Valuation Inc as a real estate appraiser (Docket No. 364).  On December 29, 2010, Umpqua Bank filed an objection to the Debtor's retention of Powell Valuation Inc. (Docket No. 366).  In response to concerns raised by the U.S. Trustee, the Debtor filed amended applications to employ Kibel Green Inc. (Docket No. 377) and Powell Valuation Inc (Docket No. 383).  A hearing on the Kibel Green Inc. and the Powell Valuation Inc employment applications was set for January 26, 2011.

The Bankruptcy Court authorized the Committee to retain Douglas Schultz and Gleaves Swearingen Potter & Scott LLP as its legal counsel by order entered on January 29, 2010.

## 5.    First Day Orders

On January 29, 2010, the Court entered a number of "first-day" orders requested by Debtor.  These orders authorized Debtor to:  pay employees their accrued prepetition wages, salaries, compensation, expenses, benefits and related taxes (in amounts up to the priority limits permitted by the Bankruptcy Code); continue Debtor's existing utility services, including determining an adequate amount of utility deposits; and refund pre-petition security deposits in the ordinary course of Debtor's business.

## 6.    Cash Collateral

The Court has entered a series of cash collateral orders that have allowed the Debtor to use cash collateral from its lenders who have a security interest in the Debtor's cash.  Most recently on December 2, 2010, the Court entered an order authorizing the Debtor to continue using the cash collateral until the earlier of (i) the effective date of a plan confirmed in this case, (ii) in accordance with further court order, or (iii) Debtor's failure to comply with any term of this Order with respect to a Lender and Debtor's failure to substantially cure said act of non-conformity within five business

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Los Angeles, California

days after notice by such Lender to Debtor, (iv) the appointment of a Chapter 11 bankruptcy trustee or examiner, or (v) conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

**7.** 4.    ~~Sales of~~**Sale of Debtor's College Park Property and Non-Core Assets**~~.~~

Since the Petition Date, the Debtor has ~~continued to market~~identified and begun marketing for sale ~~many~~most of its non-core assets, and is in discussions with various parties regarding the potential sale of certain of these assets. ~~If any of these assets are to be sold prior to Plan confirmation, Debtor will file with the court a motion seeking approval to sell such assets. Information on potential or pending sales may be obtained by contacting Debtor's CFO, Scott Diehl~~A partial listing of the non-core assets currently being marketed by the Debtor for sale is attached hereto as **Exhibit B**.

The sale of the Debtor's College Park property is an example of a sale of a non-core asset. On October 15, 2010, the Court entered an order authorizing the Debtor to sell approximately 315 acres of the Debtor's College Park property to the City of Eugene. The sale of this property has closed.

Another example is the pending sale of the Debtor's Natron Land to the Springfield School District for $1.2 million. Such sale was noticed to creditors on December 31, 2010 and is expected to generate $167,000 of unencumbered cash.

**8.    Agreement with The Fifth Third Bank**

The Fifth Third Bank ("Fifth Third") is the holder of a guaranty executed by the Debtor whereby the Debtor guaranteed the obligations of Arlie Air, LLC (a wholly owned subsidiary of the Debtor) ("Arlie Air"). Arlie Air was unable to satisfy its obligations to Fifth Third. Arlie Air's sole asset (an airplane) was subject to Fifth Third's lien. The airplane has been sold and the net proceeds were paid to Fifth Third. After paying the net proceeds to Fifth Third, a deficiency remained of approximately $1,300,000. In return for Arlie Air's full cooperation in selling the airplane and paying the net proceeds to Fifth Third, Fifth Third has agreed to reduce its General Unsecured Claim against the Debtor to $1,000,000, provided that the Debtor's Plan provides for the payment of such Claim in full with an interest rate of the higher of 3.5% per annum or the interest rate allowed to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

General Unsecured Claims under the Plan.  Because the Plan proposes to pay General Unsecured Claims in full and provides for a 3.5% per annum interest rate, Fifth Third will have an Allowed General Unsecured Claim in the amount of $1,000,000 (the "Fifth Third Allowed Claim"), which will be paid in the same manner and with the same interest rate as all other Allowed General Unsecured Claims.  Under this compromise, Fifth Third's Allowed General Unsecured Claim is not subject to any objection, reduction or subordination.

Following the Effective Date, Fifth Third shall be granted an option to reduce the amount of the Fifth Third Allowed Claim to $600,000 in consideration for (i) a cash payment of $600,000 (the "Fifth Third Payoff"), or (ii) a secured interest in the Debtor's Puueo Forest and Puueo Estate in Hawaii (the "Fifth Third Hawaii Interest"); provided, however, that the decision to deliver either the Fifth Third Payoff or the Fifth Third Hawaii Interest shall be in the Reorganized Debtor's sole discretion.

**9.      Agreement with Umpqua Bank**

On December 23, 2010, the Debtor participated in a settlement conference with Umpqua Bank before the Honorable Elizabeth Perris, United States Bankruptcy Judge.  As a result of that settlement conference and subsequent negotiations between the parties, the Debtor and Umpqua Bank agreed to the terms of a settlement that were entered on the Bankruptcy Court record on December 30, 2010 (the "Umpqua Bank Settlement").  In general terms, the Umpqua Bank Settlement divides the Debtor's property encumbered by Umpqua Bank loans into three groups:  (1) sell or return properties, with respect to which the Debtor will enter into a letter of intent for the sale of such properties within six months following the Effective Date, or else transfer title to the properties to Umpqua Bank; (2) retain and service debt properties, which the Debtor will keep and the loans for which the Debtor will make monthly principle and interest payments at 4.5% interest until the loans mature five years following the Effective Date; and (3) retain and accrue properties, which the Debtor will keep and the loans for which the Debtor will not be required to make payments (which accrue interest at 4.5%) until three years following the Effective Date, at which point the Debtor will be required to pay down 50% of the balance due together with the accrued

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

interest.  The loans pertaining to the retain and accrue properties will mature five years following the Effective Date.

As part of the Umpqua Bank Settlement, confirmation of the Plan will be conditioned on approval of a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's obligations to Umpqua Bank.  In connection therewith, all claims against Umpqua Bank and its officers and employees are waived and released.  Additionally, the Debtor and the guarantors will acknowledge that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable.  Umpqua Bank will waive all claims under the original guaranties in exchange for such new promises and acknowledgments from the guarantors.  These and additional terms of the Umpqua Bank Settlement are incorporated fully in the Plan.

## 10. Agreement with Century Bank

On December 30, 2010, the Debtor filed its *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370) to resolve its lender/borrower relationship with Century Bank on the properties located at  2843, 2853, 2863, 2873 and 2883 Lord Byron Place in Eugene, Oregon (the "Improved Properties").  To resolve their dispute regarding these properties, the Debtor and Century Bank have agreed to stipulate that:  (1) the Improved Properties shall be transferred to Century Bank by agreed-upon deeds in lieu of foreclosure; (2) the balance of the Century Bank cash collateral account will be delivered to Century Bank; (3) the Debtor will only continue to use cash collateral as consented to by Century Bank and not for the Debtor's general overhead; (4) any deficiency claim of Century Bank relating to loans secured by the Improved Properties shall be waived; and (5) Century Bank shall have relief from stay.  A stipulated order that incorporates these terms was filed with the December 30 Notice of Intent and such notice is pending before the Court.

## 11. The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement

The Debtor's exclusive period for filing a plan of reorganization under Bankruptcy Code Section 1121(b) (the "Plan Filing Period") was originally set to expire on May 20, 2010.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Accordingly, the Debtor's 60-day period to solicit and obtain acceptances of its plan under Bankruptcy Code section 1121(c) (the "Solicitation Period") would have expired 60 days later.

On or about April 22, 2010, the Debtor filed its *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* (Docket No. 156) seeking to extend the Plan Filing Period to July 1, 2010, and the Solicitation Period to September 1, 2010. The Debtor cited the case's complexity and the numerous parties and assets involved as reasons for the requested extension. The Committee supported the motion. The Office of the United States Trustee took no position. No creditor offered written opposition to the motion, and the Court approved the requested extensions at a hearing that took place on May 12, 2010, and entered its *Amended Order on Court's Case Management Conference Setting Deadlines for Filing Plan and Disclosure Statement* (Docket Nos. 165 and 167) (the "First Extension Order").

On July 1, 2010, the Debtor filed *Debtor's Plan of Reorganization (July 1, 2010)* (the "First Plan") (Docket No. 185) along with an accompanying *Debtor's Disclosure Statement (July 1, 2010)* (Docket No. 186). The basic elements of the First Plan were the restructuring of secured debt on core holdings, the sale of non-core holdings over time, and the payment of unsecured creditors in full over time, with the equity in the Debtor being retained by Ms. Arlie. In response to oppositions filed regarding the disclosure statement (Docket Nos. 226 through 230), on August 20, 2010 the Debtor filed the *Debtor's Response to Disclosure Statement Objections* (Docket No. 235), which included as an exhibit an amended disclosure statement (as amended, the "First Disclosure Statement").

At the disclosure statement hearing that took place on August 24, 2010, the Court did not approve the First Disclosure Statement because Debtor's counsel represented to the Court that negotiations with creditors were continuing. The Court set September 15, 2010 as the new deadline for filing an amended disclosure statement and plan (Docket No. 241).

On September 9, 2010, the Debtor filed *Debtor's Motion for Extension of Time to File Amended Disclosure Statement and Amended Plan* (Docket No. 247) seeking an additional month in which to file a plan in order to allow continued negotiations with creditors. The Court granted the motion on September 10, 2010 pursuant to its *Order Extending Deadline for Debtor to File*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Amended Disclosure Statement and Amended Plan of Reorganization* (Docket No. 248), which ordered the Debtor to file an amended plan and amended disclosure statement by October 15, 2010.

Also on September 10, 2010, counsel for Suzanne Arlie and John Musumeci filed a motion seeking an additional extension of exclusivity in order to address certain issues relevant to them personally raised by Umpqua Bank (Docket No. 249).  Tonkon Torp filed an opposition to the motion on the Debtor's behalf (Docket No. 252).

As a result of PSZJ and Ball Janik's retention on or about September 30, 2010 to replace Tonkon Torp LLP as the Debtor's general bankruptcy counsel, the Debtor on October 8, 2010 filed *Debtor's Motion to Extend Exclusivity (11 U.S.C. § 1121) and Deadline to File Amended Plan and Amended Disclosure Statement* (Docket No. 276).  The Court denied the motion at a hearing on October 20, 2010 and ordered the parties in interest to file a plan and disclosure statement by December 31, 2010 (Docket No. 319).

As a result of the settlement between the Debtor and Umpqua Bank that was entered on the record on December 30, 2010, the Court extended the deadline for only the Debtor and Bank of America to file a plan and disclosure statement to January 10, 2011 (Docket No. 371).

### C.    PENDING AND FUTURE TRANSACTIONS

#### 1.    Hawaii Koa Wood Forest

As part of its effort to generate cash to make payments due on the Effective Date and provide the Reorganized Debtor with additional operating capital, the Debtor will either sell in a sealed bid auction to the highest bidder free and clear of liens, claims and encumbrances the West Hilo Tree Farm (described in more detail below) or refinance the property.  Any sale or refinance of this native Acacia Koa forest land is expected to generate substantial cash for the Debtor's reorganization.

Over the years, the Debtor has had numerous inquiries about the West Hilo Tree Farm from timber management organizations, forest products companies, investors, state agencies, and even conservationists.  The Debtor expects that the high bidder at any sale would likely seek to make an initial cash payment, to be followed by an additional cash payment to be due upon receipt of appropriate harvesting entitlements.  Thus, upon a sale, title would likely pass for a discounted price, subject to increase upon the purchaser's receipt of harvesting entitlements.  The Debtor has

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

extensive experience with the West Hilo Tree Farm and the economic benefits that can be derived from the property with appropriate harvest permitting.  The Reorganized Debtor will make itself available to the purchaser in order to speed the entitlement process.

**2.      VA Hospital Transaction**

The U.S. Department of Veterans Affairs (the "Veteran's Administration") is considering a portion of the Debtor's Crescent Village property in Eugene as the site for its proposed 143,000-square-foot medical clinic, including an ambulatory surgery center.  According to reports in the *Register Guard*, "the facility would cost up to $40 million and employ up to 200.  It would be a boon to Lane County's 35,000 veterans who now must drive hours to Portland or Roseburg if they need specialized services." *Register Guard*, "Eugene Remains in Running for VA Clinic After All," Sept. 9, 2010, page A1; *see Register Guard*, "Back in the VA race: VA still considering a clinic site in Eugene," Sept. 13, 2010, page A6.

Such a deal with the Veteran's Administration could potentially result in many millions of dollars of net sale proceeds, after payment of the claims of Siuslaw Bank, which has a lien against the relevant property.  Although there can be no guarantees, the Debtor is working with the Veteran's Administration and the City of Eugene to accommodate the Veteran's Administration's requests and is optimistic that the Veteran's Administration will select the Debtor's location for its medical clinic.

**IV.** ~~V.~~

**ASSETS AND LIABILITIES**

~~Exhibit 2 attached presents in summary fashion Debtor's balance sheet as of December 31, 2008, December 31, 2009, the petition date (January 20, 2010), and May 31, 2010.~~

**A.      REAL PROPERTY ASSETS**

The Debtor'~~'~~s assets consist primarily of real property in Lane, Douglas, and Multnomah Counties in Oregon and real property on the Big Island of Hawaii.  The current value of the Debtor'~~'~~s real property is uncertain, as market conditions continue to fluctuate.  The valuations set forth below are the good faith estimates of the Debtor, based on a variety of sources available to the Debtor.  ~~Additional information on any of Debtor's real property may be requested by contacting~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

~~Debtor's CFO, Scott Diehl.  Also, information on Debtor~~'Information regarding the Debtor's Crescent Village development in Eugene, Oregon can be obtained by visiting www.crescent-village.com.  ~~A~~Below is a description of the Debtor''s major real property holdings ~~is as follows:~~ :

### 1.    Crescent Village - Building A~~.~~

Building A is a four story mixed-use building located in the Debtor''s Crescent Village development.  Building A was completed in 2008, and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor.  The apartments are fully leased.  The retail space is partially leased.  The ~~value of Building A is approximately $15,600,000.  The~~ debt against this property is held by Bank of America.  Bank of America contends that the leasing cost for the vacant retail space will total approximately $300,000.  Because the Debtor uses an in-house team to market Crescent Village, it believes that the leasing cost for the vacant retail space will be significantly less than Bank of America's estimates.  The Debtor estimates, based on cost of construction, that the value of Building A is approximately $15,600,000.  Bank of America (based on an appraisal that has not been shared with Debtor) contends the property is worth approximately $10,380,000.

### 2.    Crescent Village - Building B~~.~~

Building B is a four story mixed-use building located in Debtor''s Crescent Village development.  Building B was completed in ~~2008,~~2008 and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor.  The apartments are fully leased.  The retail space is partially leased.  The Debtor believes the value of Building B is approximately $15,800,000.  The debt against this property is held by Umpqua Bank.

### 3.    Crescent Village -Building D~~.~~

Building D (known as the Inkwell Building) is a four story mixed -use building located in the Debtor''s Crescent Village development.  Building D was completed in 2009.  Building D has offices on floors 2 through 4, and retail space ~~below~~on the ground floor.  The office space is approximately ~~55~~58% leased by the Debtor and ~~two~~four other commercial tenants.  The retail space is currently vacant.  ~~The value of Building D is~~Since the Petition Date, the Debtor has leased approximately ~~$7,300,000.~~ 2,100 square feet of previously vacant office space.  The debt against

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

this property is held by Bank of America.  The Debtor estimates, based on cost of construction, that the value of Building D is approximately $4,200,000.

### 4.  Crescent Village - ~~30~~23 acres raw land~~.~~

Crescent Village contains ~~30~~23 acres of raw land zoned general office and R-4, generally located at Coburg ~~Rd.~~Road and Crescent Avenue in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $~~17,000,000.~~20,000,000.  The debt against this property is held by Umpqua Bank.

### 5.  Crescent Village Lots~~.~~

Crescent Village Lots 4, 10, 11, ~~12~~12, and 13 ~~contains~~contain raw land zoned general office and R-4, generally located at Coburg ~~Rd.~~Road and Crescent Avenue in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $~~12,800,000.~~11,800,000.  The debt against ~~this property~~Lots 10, 11, 12, and 13 is held by Siuslaw Bank.  Summit Bank has a security interest in Crescent Village Lot 4.

### 6.  Woodburn (4.11 acres raw land)~~.~~

Woodburn contains 4.11 acres of land zoned CG, generally located at 2450 Country Club ~~Rd.~~Road in Woodburn, Oregon.  The land is adjacent to the I-5 freeway across from the Woodburn Outlet Mall.  The Debtor estimates that the value of this land is approximately $~~2,150,000.~~1,650,000.  The debt against this property is held by Umpqua Bank.

### 7.  College Park (938.2 acres raw land)~~.~~

College Park contains 938.2 acres of raw land in Eugene, Oregon, 450 of which qualify for public facilities zoning.  The Debtor estimates that the value of this land is approximately $~~40,000,000.~~27,000,000.  The debt against this property is held by Umpqua Bank.

The Debtor has obtained Court approval to sell approximately 315 acres of the College Park property to the City of Eugene for approximately $1,500,000.

### 8.  Westlane Shopping Center~~.~~

Westlane is a commercial shopping center located in Veneta, Oregon.  Westlane consists of retail and office space.  The retail and office space is partially leased.  The value of Westlane is approximately $~~10,400,000.~~9,500,000.  The debt against this property is held by Umpqua Bank.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9.      **Garden Valley Shopping Center.**

Garden Valley is a commercial shopping center located in Roseburg, Oregon.  Garden Valley consists of retail space.  The retail space is two-thirds leased.  The value of Garden Valley is approximately $4,600,000.  The debt against this property is held by Umpqua Bank.

10.      **West 11th & Obie.**

West 11th & Obie is land zoned commercial industrial and C-4, generally located at 3802-3810 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $2,500,000.1,600,000.  The debt against this property is held by Umpqua Bank.

11.      **My Coffee.**

My Coffee is a commercial building located at 3808 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of the building is approximately $670,000.700,000.  The debt against this property is held by Umpqua Bank.

12.      **Oil Can Henry's.**

Oil Can Henry's is a commercial building located at 3804 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $870,000.  The debt against this property is held by Umpqua Bank.

13.      **Willow Creek.**

Willow Creek contains 7.22 acres of raw land generally located at West 11th & Willow Creek in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $2,100,000. The debt against this property is held by Summit Bank.

14.      **Hawaii Land**

The Debtor owns approximately 5,589 acres of land on the Big Island of Hawaii.  The debt against 5,226 acres of this property (the "West Hilo Tree Farm") is held byDebtor's real estate assets in Hawaii diversify the Debtor's investment portfolio.  The Hawaii Property primarily is comprised of native Acacia Koa forests. Pioneer Asset Investments Limited of Hong Kong. ("Pioneer") asserts a lien against 5,226 acres of this property (the "West Hilo Tree Farm"), but the Debtor believes the lien is void because it was recorded after the Petition Date and therefore violates the

automatic stay pursuant to section 362(a)(4) of the Bankruptcy Code.  The Debtor intends to file an adversary complaint to invalidate Pioneer's lien against the property.

The Debtor estimates that the value of the West Hilo Tree Farm ranges from approximately $29,000,000 to $50,000,000.  The remaining 363 acres (the "Puueo Estate" and the "Puueo Forest") are unencumbered.  The Debtor estimates that the value of ~~this~~the Puueo ~~property~~Estate and the Puueo Forest ranges from approximately $2,500,000 to $13,000,000.  ~~A summary of the Hawaii property is set forth on Exhibit 4 attached hereto.~~

### 15.    Natron Land~~.~~

Natron contains 15 acres of raw land zoned light-medium industrial and I-2, generally located at Bob Straub Parkway in Springfield, Oregon.  Based on the pending agreement to sell this land, the Debtor estimates that ~~the~~its value ~~of this land is~~at approximately $~~1,500,000.~~1,200,000.  The debt against this property is held by Siuslaw Bank.

### 16.    2890 Chad Drive (the BLM Office Building)~~.~~

2890 Chad Drive is an office building located at 2890 Chad Drive in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $~~5,100,000.~~8,000,000.  The debt against this property is held collectively by Alice Smith, Francis Cline, Herbert McKillop, Karen Merwin, Linda Trickey, and William Greenhoot (referred to in the Plan as the "BLM Secured Creditors").

### 17.    2892 Crescent Ave.

2892 Crescent Ave. is an office building located at 2892 Crescent Avenue in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $3,250,000.  The debt against this property is held by Umpqua Bank.

### 18.    650 Goodpasture (Goodpasture Island Radio Tower)~~.~~

650 Goodpasture is contains land and a radio tower located at 650~~-~~ Goodpasture Island Drive in Eugene, Oregon.  The Debtor estimates that the value of this land and tower is approximately $460,000.  The debt against this property is held by Summit Bank.

### 19.    4480 G Hwy 101 N.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4480 G Hwy 101 N. is a medical office building located at 3480 Hwy 101 N. in Florence, Oregon. The Debtor estimates that the value of this building is approximately $1,800,000.2,100,000. The debt against this property is held by Siuslaw Bank.

**20. 3082 Kinney Loop.**

3082 Kinney Loop, Eugene, Oregon contains a rental residence on .77 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $650,000.450,000. The debt against this property is held by Siuslaw Bank.

**21. 3108 Kinney Loop.**

3108 Kinney Loop, Eugene, Oregon contains a rental residence on .43 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $370,000.250,000. The debt against this property is held by Siuslaw Bank.

**22. 2850 Kinney Loop.**

2850 Kinney Loop, Eugene, Oregon contains a rental residence on .46 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $400,000.250,000. The debt against this property is held by Siuslaw Bank.

**23. 3032 Kinney Loop.**

3032 Kinney Loop, Eugene, Oregon contains .49 acres. The Debtor estimates that the value of this property is approximately $420,000.250,000. The debt against this property is held by Umpqua Bank.

**24. Kinney Loop Lots.**

3004 Kinney Loop, Eugene, Oregon contains .45 acres;. The Debtor estimates that the value of this property is approximately $380,000. 2834 Kinney Loop, Eugene, Oregon contains .46 acres and is a rental residence, which is currently rented. The Debtor estimates that the value of this property is approximately $390,000. 28012802/2804 Kinney Loop, Eugene, Oregon contains .28 acres. The Debtor estimates that the value of this property is approximately $490,000. 2802 and 2804 Kinney Loop are rental residences and both are currently rented. 3018 Kinney Loop2729 Coburg Road, Eugene, Oregon contains a residence on .43.34 acres;. The Debtor estimates that the value of this property is approximately $370,000. 2960 and 3110 Kinney Loop592,416. 2743

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Coburg Road, Eugene, Oregon, contains .4017 acres.  The Debtor estimates that the value of this property is approximately $800,000.296,208.  The debt against these properties is held by Siuslaw Bank.

### 25.    3058 Kinney Loop.

3058 Kinney Loop, Eugene, Oregon contains .40 acres.  The Debtor estimates that the value of this property is approximately $340,000.  The debt against this property is held by Century Bank.

### 26.    2909 Lord Byron Pl.Place

2909 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $400,000.300,000.  The debt against this property is held by Washington Federal Savings.

### 27.    2915 Lord Byron Pl.Place

2915 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $405,000.300,000.  The debt against this property is held by Washington Federal Savings.

### 28.    2931 Lord Byron Pl.Place

2931 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $415,000.300,000.  The debt against this property is held by Washington Federal Savings.

### 29.    2977 Lord Byron Pl.Place

2977 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $385,000.300,000.  The debt against this property is held by Washington Federal Savings.

### 30.    2993 Lord Byron Pl.Place

2903 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $420,000.300,000.  The debt against this property is held by Washington Federal Savings.

### 31.    2843 Lord Byron Pl.Place

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2843 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $~~395,000.~~300,000.  The debt against this property is held by Century Bank.

### 32.    **2853 Lord Byron ~~Pl.~~Place**

2853 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $~~415,000.~~300,000.  The debt against this property is held by Century Bank.

### 33.    **2863 Lord Byron ~~Pl.~~Place**

2863 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $~~380,000.~~300,000.  The debt against this property is held by Century Bank.

### 34.    **2873 Lord Byron ~~Pl.~~Place**

2873 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $~~380,000.~~300,000.  The debt against this property is held by Century Bank.

### 35.    **2883 Lord Byron ~~Pl.~~Place**

2883 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $~~345,000.~~300,000.  The debt against this property is held by Century Bank.

### 36.    **Hangar ~~272~~272**

Hangar 272 is an airplane hangar located at 28737 Grumman Dr., Eugene, Oregon.  The Debtor estimates that the value of this hangar is approximately $~~360,000.~~420,000.  The debt against this property is held by Umpqua Bank.

### 37.    **Hangar ~~246~~246**

Hangar 246 is an airplane hangar located at the 90363 Boeing Dr., Eugene, Oregon.  The Debtor estimates that the value of this hangar is approximately $~~50,000.~~90,000.  There is no debt against this property.

### 38.    **2960 and 3110 Kinney Loop~~.~~**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2960 and 3110 Kinney Loop, Eugene, Oregon contains .40 acres.  The Debtor estimates that the value of this property is approximately $800,000.    The debt against this property is held by Siuslaw Bank.

### 39.    Unencumbered Real Property

In addition to the properties described above, the Debtor owns various unencumbered real property that, in the aggregate, has a value exceeding $3,000,000.  As set forth on **Exhibit B**, this unencumbered property includes Crescent Village Lot 9 (which the Debtor values at approximately $1,000,000), 3004 Kinney Loop (bare land; Lot 3000) (which Debtor values at approximately $380,000) and numerous lots on Lord Byron Place in Eugene, Oregon (which collectively are valued at approximately $1,500,000).  The Debtor also owns approximately 363 acres of unencumbered property in Hawaii (22 acres generally referred to as the Puueo Estate, and 341 acres generally referred to as the Puueo Forest).

## B.    PERSONAL PROPERTY ASSETS.

### 1.    1.    Cash and Accounts Receivable.

The Debtor's personal property assets consist primarily of cash and accounts receivable.  See Exhibit 2 for internally prepared balance sheets of Debtor summarizing Debtor's assetsA significant portion of the Debtor's cash is subject to the cash collateral orders entered in this Case.

### 2.    2.    Bankruptcy Claim Filed Against Roberts Construction.

Arlie has filed claims aggregating over $3,400,000 against Roberts Construction in the Roberts Prof. Const. Svcs., Inc. bankruptcy case (Case No. 08-60615-fra7) (the "Roberts Case"). Arlie cannot at this time accurately estimate exactly how much Arlie will recover on its claims. However, based upon conversations with the trustee of the case, Arlie understands that the trustee intends to make an interim distribution to creditors in the near future (60—90 days), and that Arlie's share of the interim distribution will likely be $100,000 to $150,000.  There have been approximately $7.7 million in claims filed in the case, and the Debtor's share is approximately 44%.

On or about November 30, 2010, the trustee of the Roberts Case, Ronald R. Sticka, released three checks to the Debtor in the amounts of $36,715.91, $76,755.64 and $56,286.54 (for a total of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

$169,758.09).  Soon after Trustee Sticka announced that it would pay this interim dividend to the Debtor, Bank of America and Umpqua Bank notified the Debtor that they believed they possessed valid liens against the distributions.

Pursuant to the Court's August 19, 2010 order in this Case, Trustee Sticka withheld $47,851.64 from the November 30 distributions to the Debtor and paid that amount directly to the law firm Gartland, Nelson, McCleery, Wade & Walloch, P.C. ("Gartland, Nelson") on account of services provided to the Debtor with respect to the Roberts Case.  Gartland, Nelson held the distribution in its trust account, and on December 7, 2010 filed a motion requesting authority to disburse the funds to its general account as full payment of its secured claim against the Debtor (Docket No. 355).  This motion remains pending before the Court.

**3.        3.        State Court Claims Against Michael Roberts and Mark Roberts.**

On December 30, 2009, Arlie filed a State Court complaint in Lane County Circuit Court (Case No. 160928625) seeking over $1,000,000 in damages against Michael Roberts and Mark Roberts in connection with losses suffered by Arliethe Debtor on its Crescent Village project.  The Roberts brothers were owners and officers of Roberts Professional Construction Services, Inc. (""Roberts Construction""), which was the general contractor on Arlie''s Crescent Village project.  Roberts Construction defaulted on its obligations to Arlie and filed for bankruptcy protection.  Arlie has also has asserted claims against Roberts Construction in the Roberts Construction bankruptcy proceeding (see above), but the claims asserted by Arlie in the Lane County Circuit Court action are asserted against the Roberts bothers individually.

The claim against Michael Roberts is for fraud and alter ego.  The fraud cause of action is based on evidence that Michael Roberts caused Roberts Construction to over-bill Arlie for work done on the Crescent Village project.  That is, Michael Roberts knowingly caused invoices to be sent to Arlie on the Crescent Village project for work that had not been performed.  Arlie relied on these inflated invoices that Michael Roberts caused to be sent to them and paid these invoices.  Arlie suffered damages when Roberts Construction went out of business and Arlie was forced to pay twice for this work.  The alter ego claim against Michael and Mark Roberts is based on the fact that the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Roberts brothers disregarded the corporate form of Roberts Construction and used the assets and resources of Roberts Construction for their own personal benefit (such as financing personal investments in Bend, Oregon) and did not treat Roberts Construction as an entity which was separate from themselves.

On February 25, 2010, the Roberts brothers removed ~~this~~the case to the Roberts Construction bankruptcy proceeding. ~~Arlie is in the process of attempting to have~~Debtor filed a motion to remand the case ~~remanded~~ back to Lane County Circuit Court. By order filed on July 6, 2010, Judge Alley denied the motion to remand. The adversary proceeding (10-06068-fra) was administratively transferred from the Roberts Construction bankruptcy case to this Case. On August 11, 2010, Judge Alley approved the parties' stipulated discovery schedule, which provides for the completion of discovery by February 28, 2011, and a five-day trial to commence on or after April 28, 2011.

**4.** ~~4.~~ **Potential Claims Against Umpqua Bank**~~.~~

The Debtor is investigating and evaluating potential claims against Umpqua Bank arising out of (a) Roberts Construction'~~"~~s fraudulent billing for the Crescent Village Building B construction, for which Robert Brink acted as Umpqua Bank'~~"~~s lead inspector, and (b) Umpqua Bank'~~"~~s course of conduct in connection with a series of loans made or proposed to be made to Arlie in 2009.

On August 19, 2010, the Court entered its *Order Regarding Debtor's Motion for Rule 2004 Examination of Umpqua Bank* (Docket No. 219), which provided for the production of certain paper files maintained by Umpqua Bank related to Mr. Robert Brink, a construction loan officer at Umpqua Bank who, based on information and belief, was indicted for and pled guilty to, among other malfeasance, filing inspection reports certifying that construction was underway on a Bend, Oregon developer's projects, when in fact it was not, and overstating construction progress (thereby resulting in overpayment of the contractors). Such discovery was initiated by the Debtor because some of its own construction at Crescent Village was subject to substantial overpayments to its contractor (Roberts Construction) who subsequently went bankrupt – after Mr. Brink issued similar progress certifications to Umpqua Bank. The height of construction at Crescent Village was roughly the same time during which Mr. Brink had committed malfeasance related to the Bend, Oregon project and other matters while working at Umpqua Bank.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Through an investigation undertaken in this case, Arlie is informed and believes that Umpqua

2  Bank knew in early November 2007 that Mr. Brink submitted false inspection reports pertaining to

3  other projects funded by the bank that allowed developers and contractors to fraudulently divert

4  funds.  Similarly, based on information and belief, Mr. Brink submitted false and misleading

5  inspection reports in connection with Umpqua Bank's loan on Building B in Crescent Village, where

6  the contractor also fraudulently diverted construction funds.  As a result of Roberts Construction's

7  intentional overbilling and Roberts Construction's subsequent bankruptcy filing, Arlie suffered

8  uncompensated losses of over $3 million and substantial consequential damages.  The losses that

9  Arlie suffered as a result of Roberts Construction's overbilling were a substantial factor in causing

10  Arlie to file its chapter 11 petition.

11  These facts support claims against Umpqua Bank for concealment, negligence and negligent

12  misrepresentation.  To the extent it can be demonstrated that Mr. Brink knew about the overbilling at

13  Crescent Village, the Debtor also would have strong claims against Umpqua Bank for aiding and

14  abetting the Roberts Construction fraud.  At this time, it is difficult to estimate the approximate value

15  of such claims or the costs of pursuing them.  Umpqua Bank denies that Debtor has any claim

16  against Umpqua Bank.

17  Pursuant to the Umpqua Bank Settlement, confirmation of the Plan will be conditioned on

18  approval of a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's

19  obligations to Umpqua Bank under which all claims against Umpqua Bank and its officers and

20  employees are waived and released.

21  **5.**      **Tonkon Claims**

22  The Debtor's working relationship with Tonkon Torp LLP in August and September 2010

23  was marked by communication difficulties.  The impact of these difficulties became more severe

24  after objections were filed to the Debtor's Disclosure Statement.  Ultimately, the Debtor determined

25  that the best path for its reorganization efforts mandated the replacement of Tonkon Torp as chapter

26  11 bankruptcy counsel.

27  **6.**      ~~5.~~      **Other Claims/Avoidance Actions**~~.~~

28

Other than potential claims against Umpqua Bank that are being released as part of the Plan, the Plan preserves all of the Debtor's claims and causes of action, known or unknown, and all of the Debtor's claims and causes of actions (including any potential Avoidance Actions) remain assets of the Reorganized Debtor, and the Reorganized Debtor may pursue such claims and rights of action, as appropriate, in accordance with what is in the Reorganized Debtor's best interests.  Except as set forth in this Disclosure Statement, the Debtor is not currently aware of any pending material claims or causes of actions it may have that are likely to constitute material assets of the Debtor's estate.

## C.    LIABILITIES – SECURED CREDITORS

### 1.    Bank of America.

The Debtor has two loans with Bank of America.  One loan (the "Building A Loan") is secured by Crescent Village Building A.  The other loan (the "Building D Loan") is secured by Crescent Village Building D.  As of the Petition Date, the Debtor owed approximately $9,000,000 on the Building A Loan and approximately $5,400,000 on the Building D Loan.

### 2.    Century Bank.

The Debtor has seven loans with Century Bank.  Six of the loans are secured, and the seventh loan (a $200,000 line of credit loan) is unsecured.  As of the Petition Date, the Debtor owed a total of approximately $2,200,000 on the Century Bank loans.  The loans range from approximately $200,000 to approximately $365,000.  Each of the secured loans is secured by separate real property of the Debtor.  One secured loan is secured by a house located at 3058 Kinney Loop in Eugene, Oregon, and the other five secured loans are secured by separate townhomes located on Lord Byron Place in Eugene, Oregon.  The loans range from approximately $240,000 to approximately $365,000.  As of the Petition Date, Debtor owed a total of approximately $2,000,000 on the Century Bank loans.  As discussed above in Section III. B., the Debtor and Century Bank have agreed to resolve their lender/borrower relationship on the five townhomes located on Lord Byron Place pursuant to the *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370), filed by the Debtor on December 30,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2010.  A stipulated order that incorporates the terms of the settlement was filed with the December 30 Notice of Intent and such notice is pending before the Court.

3.    Pioneer Asset Investment Limited of Hong Kong.

Debtor has a $1,500,000 loan with Pioneer Asset Investment Limited of Hong Kong, secured by approximately 5,226 acres of land on the Big Island of Hawaii.

### 3. 4. Siuslaw Bank.

The Debtor has eight loans with Siuslaw Bank.  Each loan is secured by separate real property of the Debtor.  The loans range from approximately $95,000 to approximately $4,300,000.  As of the Petition Date, the Debtor owed a total of approximately $8,000,000 on the Siuslaw Bank loans.

### 4. 5. Summit Bank.

The Debtor has one loan with Summit Bank hasthat is secured by the real property and improvements in Eugene, Oregon commonly referred to as the Goodpasture Island Radio Tower.  As of the Petition Date, the Debtor owed approximately $340,000 on the Summit Bank loan.

Additionally, the Debtor has guaranteed a $1,850,000 line of credit issued by Summit Bank to Churchill Media LLC, which guaranty obligations are secured by the Debtor's vacant land of Debtor in Crescent Village and by the Debtor's vacant land of Debtor located at W. 11th & Willow Creek in Eugene, Oregon.

### 5. 6. Umpqua Bank.

The Debtor has twelve loans with Umpqua Bank.  Each loan is secured by separate real property of Debtor.  All of Umpqua' Bank's loans are cross-defaulted, cross-collateralized, and are secured by multiple parcels of real property, improvements thereon, and rents and income therefrom.  The loans range from approximately $190,000 to approximately $10,200,000.  As of the Petition Date, the Debtor owed a total of approximately $29,000,000 on the Umpqua Bank loans.

### 6. 7. Washington Federal Savings.

The Debtor has five loans with Washington Federal Savings.  Each of the five loans is secured by a separate townhome located on Lord Byron Place in Eugene, Oregon.  The loans range

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

from approximately $390,000 to approximately $420,000.  As of the Petition Date, the Debtor owed a total of approximately $2,000,000 on the Washington Federal Savings loans.

### 7. 8. "BLM" Individuals.

Francis Cline, William Greenhoot, Herbert McKillop, Karen Merwin, Alice Smith and Linda Trickey (the "BLM Individuals") collectively financed the Debtor's acquisition of the office/warehouse campus located at 2890 Chad Drive in Eugene, Oregon (referred to as the "BLM Office Building").  The Debtor has a separate loan with each BLM Individual.  Each loan is secured by the BLM Office Building.  As of the Petition Date, the Debtor owed a total of approximately $4,350,000 on such loans.

### 8. 9. Property Tax Lien Claimants.

As of the Petition Date, the Debtor had unpaid property taxes of approximately $870,000 secured by statutory liens on the Debtor's real property.

### D.    LIABILITIES — UNSECURED CREDITORS

The Plan contains two classes of unsecured creditors:  a convenience class of creditors holding Small Unsecured Claims (an Unsecured Claim of $2,000 or less) and a class of creditors holding General Unsecured Claims.  Debtor estimates that the total amount of Allowed Small Unsecured Claims will be approximately $50,000, and that the total amount of Allowed General Unsecured Claims (including any Deficiency Claims of secured creditors) will range frombe approximately $1,700,000 to $2,700,000. 5,400,000.

Although Pioneer Asset Investment Limited of Hong Kong asserts that its $1,500,000 loan to the Debtor is secured by approximately 5,226 acres of land on the Big Island of Hawaii, the lien was recorded after the Petition Date and is thus void as a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code.  The Debtor intends to file a adversary complaint to invalidate Pioneer's lien against the property.  Accordingly, the Debtor believes that the Pioneer has a General Unsecured Claim of approximately $1,500,000, which is included in the Debtor's estimate of approximately $5,400,000 of total Allowed General Unsecured Claims.

### E.    LIABILITIES — ADMINISTRATIVE EXPENSES

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

~~Debtor has retained Tonkon Torp LLP as its counsel in this case~~As discussed above in section III.B.4, the Debtor has ~~also~~ retained a number of ~~other~~ professionals ~~(see "Employment of Professionals" summary set forth previously in this Disclosure Statement)~~in the case.  In addition, the Debtor is responsible for payment of the fees and expenses of counsel for the ~~unsecured creditor's committee.  Debtor anticipates that it will incur approximately $250,000 to $300,000 in professional fees and expenses through confirmation of the Plan.~~Committee.

**V.**

~~VI.        DESCRIPTION OF PLAN OF REORGANIZATION~~**DESCRIPTION OF PLAN OF REORGANIZATION**

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below.  The discussion of the Plan that follows constitutes a summary only and should not be relied upon for voting purposes.  You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtor.  If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

### A.        UNCLASSIFIED CLAIMS

Administrative Expense Claims and Priority Tax Claims are not classified.

An "Administrative Expense Claim" is a Claim against the Debtor ~~constituting an expense of administration of the Bankruptcy Case allowed under Section 503(b~~that is entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses of preserving the estate and operating Debtor's businesses during the Case, any indebtedness or obligations incurred by the Debtor during the pendency of the Case in connection with the rendition of services to the Debtor, and compensation for legal and other professional services and reimbursement of expenses and statutory fees payable to the United States Trustee.

Each holder of an Allowed Administrative Expense ~~Claims will~~Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which ~~any~~ such ~~Administrative Expense~~ Claim becomes ~~an~~ Allowed ~~Claim.  However, the~~, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing ~~liabilities~~obligations incurred in the ordinary course of business ~~(including amounts owed to vendors and suppliers that have sold products or furnished services to Debtor after the Petition Date) will be paid in accordance with the written~~by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular ~~transactions~~transaction, and any ~~other~~ agreements relating thereto.

A "~~"~~Priority Tax Claim"~~"~~ is a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.  The Debtor is not aware of any Priority Tax Claims ~~will~~.  Each holder of an Allowed Priority Tax Claim shall be paid ~~in full on the later of the Effective Date or the date on which any such Priority Tax Claim becomes an Allowed Claim~~by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed.

~~Fees~~In addition, any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor ~~will~~shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until ~~the~~this case is closed.~~.~~ by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

## B.    CLASSIFIED CLAIMS AND INTERESTS

The Plan divides Creditors and Interest Holders into Classes.  Creditors with similar Claims are placed in the same Class.  A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class.  The following summary of distributions under the Plan to Classified Claims and Interests is subject to, and is qualified in its entirety by reference to, the Plan attached hereto as **Exhibit ~~1.~~A.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.    **Class 1 (Other Priority Claims)**

Class 1 consists of all Allowed Other Priority Claims.  An ""Other Priority Claim"" is a claimClaim against the Debtor for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code (other than an Administrative Expense Claim or a Priority Tax Claim).  Debtor is unaware of any unpaid Other Priority Claims.  Class 1 Claims will be paid in full on the Effective DateClass 1 is impaired.  Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

Class 1 is unimpaired and is not entitled to vote on the Plan.  The holders of Class 1 Claims are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy Code to have accepted the Plan.

2.    **Class 2 through 9 (Lender's(Allowed Secured Claims)Claim of BofA)**

Class 2 through 9 consists of the Allowed Secured Claims of Debtor's lenders.  Each of Class 2 through 9 is impaired under the Plan.  The Class 2 through 9 Claims will be paid in full with interest over time as described in detail in the attached PlanBank of American, N.A. ("BofA").  Class 2 is impaired.  The Class 2 Claim of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described.  Each property of Debtor that is Collateral of BofA shall serve as Collateral for each of BofA's Class 2 Claims.  As security for BofA's Class 2 Claims, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

*(a)    Class 2.1 – Building A Loan.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

BofA will have an Allowed Class 2.1 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA's Class 2.1 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building A Note") in the amount of the present value of the amount of the Allowed Class 2.1 Claim. The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Building A Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(b)      *Class 2.2 – Building D Loan.*

BofA will have an Allowed Claim (the "BofA Claim") in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,376,088.93 (the "Building D Loan"), which loan is partially secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

known as Crescent Village Building D ("Building D").  BofA shall have an Allowed Class 2.2 Claim in the amount of the Building D Value; the remainder of the BofA Claim shall be a Class 12 Claim.

BofA's Class 2.2 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building D Note") in the amount of the present value of the Allowed Class 2.2 Claim.  The Building D Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building D Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Building D Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(c)    *Treatment of Bank of America's Cash Collateral Accounts.*

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A.  The remainder of the Building A Cash Collateral will be retained and used by Reorganized Debtor for its general operating purposes.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D.  The remainder of the Building D Cash Collateral shall be retained in a segregated BofA account to be used for Property Taxes, capital expenses, tenant improvements, maintenance, improvements, or other expenses directly pertaining to the improvement of Building D or the sale, lease or marketing of Building D.

**3.    Class ~~10~~3 (Allowed Secured ~~Claim~~Claims of ~~Gartland, Nelson).~~Century Bank)**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Class 10 consists of the Allowed Secured Claim of the law firm of Gartland, Nelson, McCleery, Wade & Walloch, P.C ("Gartland, Nelson").  Gartland, Nelson has made a Claim against Debtor in the total amount of $79,877.16 for pre-petition legal services provided to Arlie.  Garland, Nelson has claimed an attorneys' lien under ORS 87.445 in the amount of $47,851.64 related to services provided with respect to the Robert's Construction bankruptcy case.  To the extent that Gartland, Nelson has an Allowed Secured Claim, its Allowed Secured Claim will be paid from the Collateral (if any) securing its claim.

Class 3 consists of the Allowed Secured Claims of Century Bank.  Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the present value of the Allowed Class 3 Claim (the "3058 Kinney Loop Note").  The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum (or such other rate as determined by the Court) and will be payable by Reorganized Debtor as follows. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth)

day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.    ~~Class 11 (Property Tax Lien Claims)~~**Class 4 (Allowed Secured Claim of Pioneer)**

Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer"). The Class 4 Secured Claim of Pioneer is disputed.  If and to the extent Pioneer is determined by Final Order of the Bankruptcy Court to have a valid, perfected security interest in or lien upon property of the Debtor, it's Claim will be impaired and Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Pioneer to Debtor on or about on or about September 12, 2008 in the original principal amount of $1,500,000 (the "Pioneer Loan').

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Pioneer's Allowed Class 4 Claim shall be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount of the present value of the Pioneer Class 4 Claim.  The Pioneer Note will bear interest at a fixed rate of 4.5% per annum.  The Pioneer Note will be payable by Reorganized Debtor as follows:

The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order of the Bankruptcy Court, the Pioneer Claim will be treated as a Class 12 Claim.

**5.        Class 5 (Allowed Secured Claims of Siuslaw Bank)**

Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.  Class 5 is impaired.  The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans. Each loan is separately classified and treated as hereinafter described.

*(a)        Class 5.1 – Crescent Village Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the present value of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots Note.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the

2   Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the

3   Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all

4   accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize

5   twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such

6   other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building

7   Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and

8   Siuslaw Bank.

9           *(b)      Class 5.2 - 2850 Kinney Loop Loan.*

10          Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued

11  non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date

12  (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and

13  Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or

14  about on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop

15  Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon

16  commonly referred to as 2850 Kinney Loop.

17          As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and

18  liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the

19  same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the

20  Collateral in good repair and insure the Collateral to its full usable value.

21          Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw

22  Bank (the "2850 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.2

23  Claim.  The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be

24  payable by Reorganized Debtor as follows.

25          Commencing on the first (but no later than the tenth) day of the first month following the

26  Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter

27  through and including the 36th month following the Effective Date, Reorganized Debtor will make

28  interest only payments on the 2850 Kinney Loop Note.  Commencing on the first (but no later than

the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 2850 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2850 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(c)     Class 5.3 - 2960 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.3 Claim.  The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the tenth) day of each month thereafter until the 2960 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2960 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(d)*       *Class 5.4 - 3082 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.4 Claim.  The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 3082 Kinney Loop Note has been paid in full,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3082 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(e)* *Class 5.5 - 3108 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.5 Claim. The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 3108 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3108 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(f)     *Class 5.6 - Florence Medical Building Loan.*

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

As Collateral for the Class 5.6 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.6 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Florence Note") in the amount of the present value of the Allowed Class 5.6 Claim.  The Florence Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

On the Effective Date, Reorganized Debtor shall pay down the Florence Note to the original principal amount of the Florence Medical Building Loan.  Thereafter, commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Florence Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Los Angeles, California

Florence Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Florence Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(g)    *Class 5.7 – Kinney Loop Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the present value of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

The Kinney Loop Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Kinney Loop Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Kinney Loop Lots Note.

(h)    *Class 5.8 – Natron Land Loan.*

Siuslaw Bank will have an Allowed Class 5.8 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

about on or about February 21, 2008 in the original principal amount of $945,000 (the "Natron Land Loan"), which loan is secured by Debtor's real property and improvements in Springfield, Oregon known as South 60th Street and commonly referred to by Debtor as the Natron Vacant Land.  In the event a sale of the Natron Vacant Land has not been consummated prior to the Effective Date, the Class 5.8 Claim shall be addressed as follows.

As Collateral for the Class 5.8 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Natron Land Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.8 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Natron Note") in the amount of the present value of the Allowed Class 5.8 Claim, payable by Reorganized Debtor as follows.

The Natron Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Natron Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Natron Note.  Notwithstanding the foregoing, the Natron Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(i)    Treatment of Siuslaw Bank's Cash Collateral Account.*

On the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay  any past due Property Taxes on the Collateral securing the Class 5 Claims.  Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

**6.    Class 6 (Summit Bank)**

Class 6 consists of the Allowed Secured Claims of Summit Bank.  Class 6 is impaired.  The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a)  *Class 6.1 – Road Radio Tower Loan.*

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the present value of the Allowed Class 6.1 Claim. The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

(b)  *Class 6.2 – Guaranty Claim.*

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek).

Summit Bank will have an Allowed Class 6.2 claim in the amount of the present value of the amount owing by Debtor under the Churchill Media Guaranty.  Summit Bank's Class 6.2 Claim will be satisfied by delivery of a promissory note to Summit Bank (the "Guaranty Note"), payable by Reorganized Debtor as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty Note.  At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note.  All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note.  In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

(c)     *Treatment of Summit Bank's Cash Collateral Account.*

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims.  Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

### 7.    Class 7 (Umpqua Bank)

Class 7 consists of the Allowed Secured Claims of Umpqua Bank.  Class 7 is impaired.  The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described.  The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs (the "Umpqua Bank Fees") as allowed by Umpqua Bank's existing loan documents with Debtor.  Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of a Umpqua Bank Loan for defaults under or relating to the Umpqua Bank loans that occurred before the Effective Date and any such Claims shall be deemed waived, released and extinguished.  Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross defaulted and cross collateralized.  Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such security documents, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect.  Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan, and Debtor and/or Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral.  Without limiting the preceding, in the event and to the extent that any provision of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

(a)    *Class 7.1 – Westlane Loan.*

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property").  Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the Westlane Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

(b)    *Class 7.2 - West 11th Land Loan.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under the unpaid principal balance that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property").  Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

(c)    *Class 7.3 – 2892 Crescent Ave. Loan.*

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

*(d)    Class 7.4 Woodburn and College Park Loan.*

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred to as 2450 Country Club Road, Marion County (the "Woodburn Property"). The Woodburn Property secures $931,750 of the outstanding amounts owing under the Woodburn and College Park Loan. The College Park Property secures the remaining amounts

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

owing under the Woodburn and College Park Loan.  Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

Subject to the reduction of debt owing against the College Park Property from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case (the "College Park Sale") and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property described above, as of the Effective Date the Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein (the "College Park Pay Down").

The accrued non-default interest and reasonable fees and costs owing as of the Effective Date on the College Park Loan will be due and payable upon a sale or refinancing of the College Park Land.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*(e)    Class 7.5 – Roseburg Loan #1.*

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property").  Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property.  Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 shall be deemed waived or released.  Thereafter, interest will accrue on the Roseburg Loan #1 at a fixed rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Reorganized Debtor may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building.

*(f)    Class 7.6 – Roseburg Loan #2*

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that

certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property.  Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2.  Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2 shall be deemed waived or released.  Thereafter, interest will accrue on the Roseburg Loan #2 at a fixed rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(g)      Class 7.7 – Oil Can Henry's Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property").  Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property.  Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan shall be deemed waived or released.  Thereafter, interest will accrue on the Oil Can

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Henry's Loan at the rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(h)      <em>Class 7.8 – My Coffee Loan.</em>

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property").  Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

Interest will accrue on the principal amount owing on the My Coffee Loan at a fixed rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

(i)      <em>Class 7.9 – Building B Loan.</em>

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:230406.9

77

FIRST AMENDED DISCLOSURE STATEMENT
(JANUARY 10, 2011)

commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

Interest will accrue on the principal amount owing on the Building B Loan at a fixed rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

(j)        Class 7.10 – Grumman Hangar Loan.

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property").  Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

As of the Effective Date, interest on the Grumman Hangar Loan will accrue at a fixed rate of 4.5% per annum and will be paid as follows.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

        *(k)*     *Class 7.11 – 3032 Kinney Loop Loan.*

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop").  Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the 3032 Kinney Loop Loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

        *(l)*     *Class 7.12 - Crescent Village Land Loan.*

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property").  Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the Crescent Village Land Loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

        *(m)*     *Refinance of Properties Encumbered by Umpqua Bank's Liens.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Reorganized Debtor may refinance any of the property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount associated with such property plus the applicable Umpqua Proceeds Share (as defined below).

(n)    *Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.*

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, Reorganized Debtor may from time to time sell a property free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount associated with such property has been paid or will be paid upon such sale.  In addition to the Arlie Debt Amount, a share of any sale proceeds in excess of the Arlie Debt Amount (the "Umpqua Proceeds Share") will be retained for Umpqua Bank's account as follows.  For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any sale proceeds in excess of the Arlie Debt Amount will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of such excess proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Notwithstanding the foregoing, upon tender of the Arlie Debt Amount associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of liens, claims and encumbrances related to specific pieces of property of Debtor that serves as Collateral for all of Umpqua Bank's Class 7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claims, provided that 110% of the Arlie Debt Amount associated with such specific piece of property (on a pro rata basis determined in light of the comparative value of the property to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

*(o)     Payment of Umpqua Bank Fees.*

Upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportion share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

*(p)     Property Taxes.*

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

*(q)     Waiver of Claims by Debtor and Reorganized Debtor.*

The Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor.  On the Effective Date, Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers, and managers for actions (or in-actions) that occurred before the Effective Date.

*(r)     Treatment of Umpqua Bank's Cash Collateral Account.*

Provided the College Park Sale is consummated prior to the Effective Date, the balance of funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

*(s)   Use of Rents Generated From Umpqua Properties.*

Commencing on the Effective Date, Reorganized Debtor may utilize all rents generated from the properties securing the Umpqua Bank loans for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

*(t)   Guarantees.*

All guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan.

*(u)   Additional Documents.*

On the Effective Date, Reorganized Debtor will execute and deliver to Umpqua Bank such documents as Umpqua Bank reasonably requires to effectuate the terms of the Plan.

**8.   Class 8 (Washington Federal Savings)**

Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal"). Class 8 is impaired. The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

*(a)   Class 8.1 –Lord Byron Loan.*

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan"). The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral").  The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the aggregate amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date (the "Washington Claim Amount").  Washington Federal shall have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

Washington Federal's Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, each in the amount of $300,000:  the 2909 Lord Byron Note, the 2915 Lord Byron Note, the 2931 Lord Byron Note, the 2977 Lord Byron Note and the 2993 Lord Byron Note (individually, a "Lord Byron Note" and collectively, the "Lord Byron Notes").  Each Lord Byron Note will bear interest at a fixed rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date.  Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property.  Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal.

(b)    *Treatment of Washington Federal's Cash Collateral Account.*

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 Claims.   Any amounts remaining in the account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

(c)    *Treatment of the Washington Federal Unsecured Claim.*

The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.

**9.    Class 9 (BLM Secured Creditors)**

Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  The Class 9 Claims are secured by a deed of trust on Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

(a)    *Class 9.1 – Francis Cline.*

Francis Cline will have an Allowed Class 9.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Cline as of the Effective Date under that certain loan made by Ms. Cline to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Cline Loan"), which loan is secured by a deed of trust on BLM Office Building.  The Class 9.1 Claim shall be treated as follows.

On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under the Cline Loan.  Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested. In such event, Ms. Cline will retain her security interest in and lien upon the BLM Office Building with the same priority and to the same extent such security had as of the Petition Date, and the Reorganized Debtor shall maintain the BLM office Building in good repair and insure the BLM Office Building to its full usable value pending a sale.

*(b)    Class 9.2 – William Greenhoot.*

William Greenhoot will have an Allowed Class 9.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Mr. Greenhoot as of the Effective Date under that certain loan made by Mr. Greenhoot to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Greenhoot Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Greenhoot Loan and the Class 9.2 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(c)    Class 9.3 – McKillop II Limited Partnership.*

The McKillop II Limited Partnership ("McKillop") will have an Allowed Class 9.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Partnership as of the Effective Date under those certain loans made by Herbert McKillop to Debtor on or about on or about November 4, 2008 in the original principal amounts of $120,000 and $1,453,482 (collectively, the "McKillop Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the McKillop Loan and the Class 9.3 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(d)    Class 9.4 – Karen Merwin.*

Karen Merwin will have an Allowed Class 9.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Merwin as of the Effective Date under that certain loan made by Ms. Merwin to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Merwin Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Merwin Loan and the Class 9.4 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(e)* *Class 9.5 – Alice Smith.*

Alice Smith will have an Allowed Class 9.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Smith as of the Effective Date under that certain loan made by Ms. Smith to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Smith Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Smith Loan and the Class 9.5 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(f)* *Class 9.6 – Linda Trickey.*

Linda Trickey will have an Allowed Class 9.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Trickey as of the Effective Date under that certain loan made by Ms. Trickey to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Trickey Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Trickey Loan and the Class 9.6 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

### 10.    Class 10 (Property Tax Lien Claims)

Class 1110 consists of all Allowed Property Tax Lien Claims.  A Property Tax Lien Claim is a Claim of any governmental unit for ad valorem property taxes or similar impositions that is secured by a statutory lien on any of Debtor's property (real or personal).  Class 11Class 10 is impaired.  Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law.  Each Class 1110 Claimant willshall be paid the full amount of its Allowed Class 1110 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

### 11.    5.  Class 1211 (Small Unsecured Claims)

Class 1211 consists of all Allowed Small Unsecured Claims.  A Small Unsecured Claim is any Unsecured Claim that is equal to or less than $2,000 (or that has been reduced by election in writing to $2,000)Class 11 is impaired.  Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

### 12.    Class 12 (General Unsecured Claims).

Class 12 consists of all Allowed General Unsecured Claims.  Class 12 is impaired.  Each holder of a Class 12 Claim will be paid the full amount of such holder's Class 12 Claim within 60 days of the Effective Date, or 30 days of when the Claim becomes an Allowed Claim, whichever is later.

6.    Class 13 (General Unsecured Claims)Class 13 consists of all Allowed General Unsecured Claims.  Class 13 is impaired.  Each holder of a Class 13 Claim will be paid the full amount of its Class 13 Claim within five years after the Effective Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor will pay at least 50% of the principal amount of each Class 13 Claim.  Interest will accrue from the Effective Date on each

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Class 13 ClaimClass 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claim isClaims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim.  Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on any Class 13a General Unsecured Claim, Reorganized Debtor willshall also pay all accrued but unpaid interest then owing on the Class 13 Claimsuch General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

### 13.    7. Class 1413 (Interests)

Class 13 consists of the Interests holders in Debtor.  Debtor has only one Interest holder, Ms. Suzanne Arlie.  Class 14 is impaired.  Class 14 Interests will be preserved.  Until all Allowed Claims have been paid in full, Debtor will not repurchase any stock or make or pay any distributions or dividends to holders of Class 14 Interests on account of their Interests in Debtor, except for tax distributions necessary to meet income tax obligations arising from income attributable to Debtor.  In addition, until all Allowed Claims have been paid in full, Reorganized Debtor will not increase the salary of Ms. Arlie or John Musumeci.  Finally, Reorganized Debtor will not pay any bonuses to any of its employees at any time that Debtor is not in full compliance with the terms of the Plan.

Class 13 consists of all Interests.  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

### C.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code gives the Debtor the right, after commencement of its Chapter 11 Case, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  Generally, an ""executory contract"" is a contract under which material performance (other than the payment of money) is still due by each party.  The Plan provides that except as may otherwise be provided, all executory contracts and unexpired leases that have not previously been rejected, orof Debtor which are not otherwise subject to a prior Bankruptcy Court order or a pending motion before the Bankruptcy Court, are assumed by Reorganized Debtor as of the Effective Date.on the Effective Date.  The Confirmation Order shall constitute an order

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for or subject to other Court Order or pending motion. Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment. If an executory contract or unexpired lease is or has been rejected, the creditor may file a Proof of Claim for damages resulting from such rejection.  The Plan provides that a Proof of Claim with respect to any such Claim Rejection Claims must be Filed no later than 30 days after approval of the Bankruptcy Court of the rejection of the relevant the entry of the order rejecting the executory contract or unexpired lease or 30 days after the Effective Date entry of the Confirmation Order, whichever is sooner.  Any such Claim Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable, to the extent that such Claim is finally treated as an Allowed Claim.  To the extent Debtor rejects an unexpired lease of nonresidential real property, the Claim for damages resulting from such rejection will be limited to the amount allowed under the Bankruptcy Code.

Upon assumption of an executory contract or unexpired lease, Debtor must cure or provide adequate assurance of prompt cure of any monetary defaults.  The Plan provides that Reorganized Debtor will promptly cure any monetary defaults for executory contracts and unexpired leases being assumed and will perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**D.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

Article XI of the Plan provides lists of conditions that must occur in order for the Plan to be confirmed and for the Plan become effective.  The following are conditions precedent to the confirmation of this Plan:  (1) the Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor; and (2) the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

The following are conditions precedent to the occurrence of the Effective Date:  (1) the Confirmation Date shall have occurred; (2) the Confirmation Order shall have become a Final Order; (3) no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending; and (4) the Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

**E.    SOURCES OF FUNDING FOR THE PLAN**

The Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, a new loan in the amount of $615,000 to be made on the Effective Date to Reorganized Debtor by Siuslaw Bank, the net operating income generated from the Reorganized Debtor's continued business operations and from the future sale or refinancing of assets of the Reorganized Debtor from time to time.  A core aspect of the Debtor's business is marketing and selling real property acquired by the Debtor from time to time.  The Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan.  Such sales may occur without further order of the Bankruptcy Court.

Without limiting the preceding and except as set forth with respect to a particular Creditor under the Plan, the Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral the Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral.  Any excess net proceeds from the sale or refinancing of such Collateral shall be paid to the Reorganized Debtor (or as otherwise directed by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Reorganized Debtor) and may be used by the Reorganized Debtor to fund the Reorganized Debtor's continued business operations and to fund payments required under this Plan.  Such sales or refinancing may occur without further order of the Bankruptcy Court.

In addition to marketing and selling its real property assets in the ordinary course of its business, the Reorganized Debtor may market and sell or refinance its non-core assets on an accelerated basis as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Debtor under this Plan.  Without limiting the preceding, if at any time the Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of the Reorganized Debtor's non-core assets to raise the funds necessary to make the required Plan payment.  Such auctions and sales may occur without further order of the Bankruptcy Court.

## F.   ~~D.~~ EFFECT OF CONFIRMATION

### 1.   **Discharge**

The treatment of, and consideration received by, holders of Allowed Claims pursuant to the Plan ~~of Reorganization~~ will be in full satisfaction, release and discharge of their respective Claims against ~~Debtor.  The Confirmation Order shall discharge Debtor from any liability that arose before the Effective Date as provided in Sections 524 and 1141 of the Bankruptcy Code, and any debt and liability of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not:  (a) a Proof of Claim based on such debt or liability is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt or liability is Allowed; or (c) the holder of the Claim based on such debt or liability has accepted the Plan~~the Debtor.  Except as otherwise expressly provided in the Plan, the confirmation of the Plan shall, provided that the Effective Date shall have occurred, discharge all Claims to the fullest extent authorized or provided for by the Bankruptcy Code, including, without limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof.

### 2.   **Revesting, Operation of Business**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

AllExcept as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all forfeited escrow deposits not yet returned to Debtor, shall revest in Reorganized Debtor on the Effective Date, free and clear of all rights, claims, liens, charges, encumbrances and interests, except as otherwise provided in the Plan encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

### 3.    Injunction

Except as otherwise expressly provided in the Plan, all persons who have held, hold or may hold Claims, or who may have held, hold or may hold any Interest, are permanently enjoined from and after the Effective Date from (a) commencing or continuing in any manner any action or other proceedings of any kind with respect to any Claims or Interests against Reorganized Debtor; (b) enforcing, attaching, collecting or recovering by any manner or any means any judgment, award, decree or order against Reorganized Debtor; (c) creating, perfecting or enforcing any encumbrances of any kind against Reorganized Debtor with respect to any such Claim except as specifically set forth in the Plan; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due to Debtor, Reorganized Debtor or its property; and (e) proceeding in any manner in any place whatsoever that does not conform to, does not comply with, or is inconsistent with the provisions of the Plan or the order confirming the Plan.

If the Plan is confirmed, the effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**4.**    **Modification of the Plan; Revocation or Withdrawal of the Plan**

~~Subject~~The Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code~~, Debtor reserves the right to alter, amend or modify the Plan before its~~ and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order. After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the ~~alteration, amendment or modification does not adversely affect the~~ treatment of holders of Claims and Interests under the Plan~~.~~ is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

**5.**    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order ~~or the Effective Date having occurred~~, the Bankruptcy Court shall retain ~~exclusive~~ jurisdiction ~~over all matters arising out of or relating to the Chapter 11 Case, including, but not limited to, the following matters:  (a) to hear and determine any pending applications for the rejection of executory contracts or unexpired leases, and the allowance of Claims resulting therefrom; (b) to determine any adversary proceedings, applications, contested matters or other litigative matters pending on the Effective Date or Filed prior to the closing of the case; (c) to ensure that distributions to holders of Allowed Claims are accomplished; (d) to hear and determine objections to or requests for estimations of Claims, including any objections to the classification of any Claim, and to allow, disallow and/or estimate any Claim in whole or in part; (e) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (f) to issue any~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

~~appropriate orders in aid of execution of the Plan or to enforce the Confirmation Order and/or the discharge, or the effect of such discharge, provided to Debtor; (g) to hear and determine any applications to modify the Plan, to cure~~ any defect or omission ~~or to reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order; (h) to hear and determine all applications for~~of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:  (a) to resolve controversies and disputes regarding any Avoidance Action, (b) to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests, (c) to determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals ~~or members of the creditors committee under the Bankruptcy Code; (i) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan; (j) to hear and determine other issues presented or arising under the Plan; (k) to hear and determine any other matters related hereto and not inconsistent with Chapter 11 of the Bankruptcy Code; and (l~~employed in this Bankruptcy Case, (d) to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code, (e) to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan, (f) to resolve controversies and disputes regarding the interpretation of this Plan, (g) to implement the provisions of this Plan and enter orders in aid of confirmation, (h) to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and (i) to enter a final decree closing ~~the Chapter 11~~this Bankruptcy Case.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

### 6.    United States Trustee Fees

The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted or dismissed.  After confirmation, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Reorganized Debtor shall serve on the United States Trustee a ~~monthly~~quarterly financial report for each month, or portion thereof, that the case remains open.  The ~~monthly~~quarterly financial report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the Plan.

### VI. ~~VII.~~

### LIQUIDATION ANALYSIS

~~A plan of reorganization cannot be confirmed unless the Bankruptcy Court finds that the plan is in the "best interest of creditors" of holders of claims against, and interests in, the debtor subject to such plan.  The best interest test is satisfied if the plan provides each dissenting or non-voting member of each impaired class with a recovery not less than the recovery such member would receive if the debtor was liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 Trustee.  In applying the "best interest" test, the Bankruptcy Court would ascertain the hypothetical recovery in a Chapter 7 proceeding to secured creditors, priority claimants, general unsecured creditors and equity interest holders.  The hypothetical Chapter 7 recoveries would then be compared with the distribution offered to each class of claims or interests under the plan to determine that the plan satisfied the "best interest" test set forth in the Bankruptcy Code.~~

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy Court must determine, with respect to such Class, that each holder of a Claim or Interest will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests Test."

The Debtor believes the Plan is in the best interest of creditors because the Debtor"s Plan provides for the payment in full to all of its creditors with interest over a relatively short period of time.  Consequently, the Plan provides each dissenting or non-voting member of each impaired Class with a recovery not less than the recovery such member would receive if the Debtor was liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 Trustee.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**VII.** ~~VIII.~~

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

CIRCULAR 230 DISCLAIMER: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.

### A.    GENERAL TAX CONSIDERATIONS

The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan.  This discussion is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of an Allowed Claim or any Interest holder.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.  This discussion does not address aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim subject to special treatment under federal income tax laws (such as foreign taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans, and other tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.  Furthermore, this summary does not address federal taxes other than income taxes.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial or administrative changes or interpretations enacted or promulgated ~~after the date hereof~~ could alter or modify the discussion set

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

forth below with respect to the federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.  No ruling has been requested or obtained from the Internal Revenue Service (the ""IRS"") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  This discussion is not binding on the IRS or the courts and no assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.  No representations or assurances are being made to the holders of Allowed Claims or the Interest holders with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based upon the individual circumstances pertaining to a particular holder of an Allowed Claim or an Interest holder.  Each holder of an Allowed Claim and each or Interest holder is strongly urged to consult with its own tax advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

Any discussion of federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any federal tax penalties that may be imposed on such person.  Each holder of an Allowed Claim and each Interest holder should seek advice based on its particular circumstances from an independent tax advisor.

## B.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR

The Debtor is a corporation that has elected to be treated as an S corporation (as defined in IRC Section 1361) for federal income tax purposes.  As an S corporation, the Debtor is not itself generally subject to federal income tax.  Instead, each Interest holder, as a shareholder of the Debtor, is required to include its pro- rata share of the income, gain, loss, and deduction recognized by the Debtor in the Interest holder's own income tax returns.  Accordingly, since it is unlikely there will

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

be any direct federal income tax liability at the Debtor level under the Plan, it appears there are no federal income tax consequences to the Debtor under the Plan.

Under the IRC, a taxpayer generally will recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) satisfied, over (b) the sum of the amount of cash paid and the fair market value of any new consideration given in satisfaction of the indebtedness.  However, IRC Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court.  In the case of an entity taxable as a corporation, eligibility for the Bankruptcy Exception is determined at the corporate level.  If the Bankruptcy Exception applies (with the effect that the taxpayer excludes its COD Income from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain of its tax attributes by the amount of COD Income excluded from gross income pursuant to the Bankruptcy Exception.  The ~~attributes of the taxpayer that are reduced include~~ reduction includes any net operating loss for the taxable year of the discharge (which, with respect to an S corporation, includes certain losses that have been blocked at the shareholder level by the basis limitation rule), net operating loss carryovers from prior years, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards.  Except for the net operating loss and basis reductions, these attribute reductions generally have limited application to S corporations.

Whether the Debtor will realize any COD Income on the debt restructuring contemplated by the Plan depends on whether the restructuring of any debt constitutes a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the corresponding Treasury Regulations.  For a deemed taxable exchange to occur with respect to a debt, the modification to the debt must be "significant" as such term is defined in the applicable Treasury Regulations.  If the modification to a debt obligation of the Debtor is "significant," the Debtor will realize COD Income in an amount equal to the amount, if any, by which the "issue price" of the new debt (i.e., the "modified debt")

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

is less than the "adjusted issue price" of the old debt. Accordingly, if the restructuring of any debt of the Debtor is treated as a deemed taxable exchange (even though each modified debt will have a principal amount equal to its corresponding old debt), the Debtor will realize COD Income if such modified debt does not bear "adequate stated interest." The realization of COD Income by the Debtor will result in tax attribute reductions because of its exclusion under the Bankruptcy Exception.

## C.    FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF AN ALLOWED CLAIM

Under the Plan, the debt owed by the Debtor to particular holders of Allowed Claims will be restructured. If the modification to the debt is "significant," as such term is defined in the applicable Treasury Regulations, the restructured debt will be treated as received by such holder in a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001.

With respect to a deemed taxable exchange, a holder of an Allowed Claim will generally recognize gain or loss in connection with the exchange if the holder's adjusted tax basis in the old debt does not equal the issue price of the modified debt. If the issue price of the modified debt is greater than the holder's adjusted tax basis in the debt, the holder will recognize taxable income as a result of the deemed exchange. Since each modified debt will have a principal amount equal to its corresponding old debt, a holder of an Allowed Claim generally should not recognize any gain or loss on a deemed taxable exchange of such debt unless either (1) the modified debt does not have adequate stated interest or (2) the tax basis in the debt is different from the issue price of the modified debt. Any gain or loss recognized will be long-term or short-term capital gain or loss, or ordinary income or loss, depending upon factors specific to each holder of an Allowed Claim, including but not limited to: (1) whether the Claim (or a portion thereof) is attributable to principal or interest, (2) the origin of the Claim, (3) whether the holder of the Claim reports income on the accrual or cash basis method, and (4) whether the holder of the Claim has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The principal amount of certain restructured debt may include accrued but unpaid interest. A holder of an Allowed Claim not previously required to include in its taxable income any accrued but

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

unpaid interest on such Claim may be treated as receiving taxable interest to the extent the modified debt received is allocable to such accrued but unpaid interest.

## D.   CONSEQUENCES TO THE INTEREST HOLDERS

The Interests are not restructured in the Plan.  Accordingly, except for any loss ~~attribute~~attributable to a reduction at the Interest holder level (as discussed above), the Plan has no material federal income tax consequences to the Interest holders.

## E.   INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS.  Moreover, under certain circumstances, a holder of a Claim may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against the holder's United States federal income tax liability, and the holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## F.   IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH HOLDER OF AN

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ALLOWED CLAIM AND THE INTEREST HOLDER IS URGED TO CONSULT ITS TAX ADVISOR ABOUT THE FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN, INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.
## ~~IX.~~    ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on _____, ~~2010~~2011 at _____.  The hearing will be held at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, #2600, Eugene, Oregon 97401 before the Honorable Albert E. Radcliffe, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of creditors and Interest holders of the Debtor.  The Debtor will submit a report to the Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.  Any objection to confirmation of the Plan must be timely filed as stated ~~in Section II.E~~ above.

### B.    REQUIREMENTS OF CONFIRMATION

At the hearing on confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of the Bankruptcy Code have been satisfied.  If all of the provisions of Section 1129 are met, then the Bankruptcy Court may enter an order confirming the Plan.  The Debtor believes the Plan satisfies all of the requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan has been proposed and is made in good faith.

### C.    FEASIBILITY

The Debtor believes that confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or a need for a further financial reorganization of ~~Debtor~~the Debtor.  The Debtor has identified and is marketing for sale most of its non-core assets (see **Exhibit B**) to ensure that the Debtor will have sufficient funds to continue its operations and to fund required Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

payments.  The projections of the Debtor's post-confirmation business and sales, attached hereto as **Exhibit** ~~3~~C show sufficient earnings and cash flow from operations and sales or refinancing of real property to support and meet the ongoing financial needs of the Debtor and the Plan.  The projections indicate that the Plan as proposed by the Debtor is feasible and that the Debtor will be financially viable after confirmation of the Plan.

### D.    RISK FACTORS

There are a number of risks associated with the Debtor's proposed Plan.  Each creditor should carefully consider those risks in evaluating its vote on the Debtor's Plan.  All of the risks associated with the Debtor's Plan are too numerous to identify, however, a few of those risks are set forth below.

#### 1.    General Financial Market Conditions

The disruption of numerous major financial institutions and the resulting crisis in the financial markets has rippled through the economy, impacting the real estate industry in particular.  It is possible that this financial market may continue to make it very difficult for qualified buyers or lessees to obtain affordable financing, which could have a significant adverse impact on the Debtor.

#### 2.    Projected Financial Results

The Debtor's projected financial results reflect management's best estimate of the Debtor's future financial performance based on currently known facts and hypothetical assumptions about, among other matters, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, real estate, and general business and economic conditions.  Many of these factors are beyond the Debtor's control ~~of Debtor~~.  As a consequence, the Debtor's actual financial results may differ significantly from the Debtor's projections.

### E.    CRAM DOWN

As discussed previously, a court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the cram down requirements set forth in Section 1129(b) of the Bankruptcy Code.  In the event that any impaired Class of Claims does not accept the Plan, the Debtor hereby requests that the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise permit the Debtor to modify the Plan.

### F.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed, the Debtor or another party in interest may attempt to formulate or propose a different plan or plans of reorganization.  Such plans might involve a reorganization and continuation of the Debtor's business, a sale of the Debtor's businesses's business as a going concern, an orderly liquidation of the Debtor's assets or any combination thereof.  If no Plan of Reorganization is determined by the Bankruptcy Court to be confirmable, the Chapter 11 case may be converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.

In a liquidation, a Chapter 7 Trustee would be appointed with the purpose of liquidating the assets of the Debtor.  Typically, in a liquidation, assets are sold for less than their going concern value and, accordingly, the return to creditors and Interest holders is generally less than the return in a reorganization, which derives the value to be distributed in a Plan from the business as a going concern.  Proceeds from liquidation would be distributed to creditors and Interest holders of the Debtor in accordance with the priorities set forth in the Bankruptcy Code.  Given the nature of Debtor's assets, the Debtor believes that it would be impossible for a trustee to maximize the value of the assets.  The Debtor further believes that a trustee would require two to three years to market, sell and close sales for all of the Debtor's properties.  Therefore, it is unlikely that distributions would be made to unsecured creditors in less than three years and distributions could take five years.

As the Plan is a full payment plan, the Debtor believes there is no currently available alternative that would offer holders of Claims and Interests in the Debtor better treatment or a greater return than the Plan offers such holders of Claims and Interests, and urges all parties entitled to vote on the Plan to vote to accept the Plan.

### IX. X.

### RECOMMENDATION AND CONCLUSION

Please read this Disclosure Statement and Based on the foregoing, the Debtor believes that the Plan is in the best interests of Creditors and urges Creditors to vote to accept the Plan carefully.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

After reviewing all the information and making an informed decision, please vote by using the enclosed ballot.

DATED this 1st10th day of July, 2010January, 2011.

Respectfully submitted,

ARLIE & COMPANY

By: /s/ Scott Diehl
     Scott Diehl, Chief Financial Officer

Presented by:
TONKON TORP LLP

PACHULSKI STANG ZIEHL & JONES LLP
By  /s/ John D. Fiero
John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)

By /s/ Michael W. Fletcher
   Albert N. Kennedy, OSB No. 821429
   Michael W. Fletcher, OSB No. 010448
   Attorneys for Debtor
-and-

BALL JANIK LLP
David W. Criswell (OSB No. 925930)
Brad T. Summers (OSB No. 911116)

**Exhibit A**

# EXHIBIT 1

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28

# EXHIBIT 2

# EXHIBIT 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT 4

**Plan**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Exhibit C**

**Financial Projections**

**CERTIFICATE OF SERVICE**

I ~~hereby~~, Diane H. Hinojosa, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action.  My business address is 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California.

I certify that ~~I~~on January 10, 2011, I caused to be served ~~the foregoing~~ **DEBTOR**~~'~~**'S FIRST AMENDED DISCLOSURE STATEMENT** ~~(July 1, 2010)~~ ~~on the parties indicated as "ECF" on the attached List of Interested Parties by~~**IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)** by means of electronic ~~means through the Court's Case Management/Electronic Case File system on the date set forth below.~~ transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

~~In addition, I served the foregoing on the parties indicated as "Non-ECF" on the attached List of Interested Parties:~~

~~☑ by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each attorney's last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below;~~

~~☐ by causing a copy thereof to be hand-delivered to said attorneys at each attorney's last-known office address on the date set forth below;~~

~~☐ by sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to each attorney's last-known address on the date set forth below; or~~

~~☐ by faxing a copy thereof to each attorney at his last-known facsimile number on the date set forth below.~~

~~DATED:  July 1, 2010.~~

~~TONKON TORP LLP~~

~~By /s/ Michael W. Fletcher~~
~~Albert N. Kennedy, OSB No. 821429~~
~~Michael W. Fletcher, OSB No. 010448~~
~~Attorneys for Debtor~~

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 10, 2011, at Los Angeles, California.

_/s/ Diane H. Hinojosa_____
Diane H. Hinojosa

033739.00003/2148833v7

Document comparison by Workshare Professional on Tuesday, January 11, 2011 10:34:43 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:/Documents and Settings/jet/Desktop/compare/DEBTOR'S DISCLOSURE STATEMENT (July 1, 2010).doc |
| Description | DEBTOR'S DISCLOSURE STATEMENT (July 1, 2010) |
| Document 2 ID | file://C:/Documents and Settings/jet/Desktop/compare/Arlie Disclosure Statement_v9.DOC |
| Description | Arlie Disclosure Statement_v9 |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 1428 |
| Deletions | 614 |
| Moved from | 47 |
| Moved to | 47 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 2136 |

1  John D. Fiero (CA Bar No. 136557)
2  Linda F. Cantor (CA Bar No. 153762)
   Teddy M. Kapur (CA Bar No. 242486)
3  PACHULSKI STANG ZIEHL & JONES LLP
   150 California Street, 15th Floor
4  San Francisco, California  94111-4500
   Telephone:  415/263-7000
5  Facsimile:  415/263-7010
   Email: jfiero@pszjlaw.com
6          lcantor@pszjlaw.com
7          tkapur@pszjlaw.com

8  and

9  Brad T. Summers (OSB No. 911116)
   David W. Criswell (OSB No. 925930)
10 BALL JANIK LLP
   101 SW Main Street, Suite 1100
11 Portland, Oregon  97204-3219
   Telephone:  503/228-2525
12 Facsimile:  503/295-1058
13 Email: tsummers@balljanik.com
          dcriswell@balljanik.com
14
15 Attorneys for Debtor Arlie & Company

        UNITED STATES BANKRUPTCY COURT
16
        FOR THE DISTRICT OF OREGON
17

| In re | Case No. 10-60244-aer11 |
|---|---|
| **ARLIE & COMPANY,** | Chapter 11 |
| Debtor. | **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)** |
| | **Disclosure Statement Hearing** |
| | Date:  TBD |
| | Time:  TBD |
| | Place:  United States Bankruptcy Court |
| | 405 E. 8th Avenue, #2600 |
| | Eugene, Oregon 97401 |
| | Judge:  Honorable Albert E. Radcliffe |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................1

    A.     Information Regarding the Plan.................................................................2

        1.     The Plan is the Governing Document ..........................................2

        2.     Source of Information ...................................................................2

        3.     Warning Regarding Federal and State Income Tax Consequences of the Plan ...................................................................2

        4.     Bankruptcy Court Approval..........................................................3

    B.     Voting Instructions ...................................................................................3

        1.     How to Vote ..................................................................................3

        2.     Who May Vote...............................................................................3

    C.     Confirmation ............................................................................................4

    D.     Disclaimers ..............................................................................................6

II.    PLAN OVERVIEW..............................................................................................7

    A.     Introduction..............................................................................................7

    B.     Treatment of Claims ................................................................................9

III.   OVERVIEW OF CHAPTER 11 CASE ............................................................ 18

    A.     Background ............................................................................................ 18

        1.     Description of the Debtor.............................................................18

        2.     Management.................................................................................19

        3.     Events Precipitating the Debtor's Filing.....................................20

        4.     Plan  Projections .........................................................................20

    B.     Summary of Events During the Chapter 11 Case ................................. 20

        1.     "First Day" Pleadings .................................................................20

        2.     Filing of Schedules, Meeting of Creditors and Bar Date...............................21

        3.     The Official Committee of Unsecured Creditors...........................21

        4.     Retention of Professionals..........................................................23

        5.     First Day Orders..........................................................................24

        6.     Cash Collateral ...........................................................................24

        7.     Sale of Debtor's College Park Property and Non-Core Assets.......................24

        8.     Agreement with The Fifth Third Bank ........................................25

        9.     Agreement with Umpqua Bank ...................................................26

        10.    Agreement with Century Bank .....................................................27

        11.    The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement.....................................................................27

    C.     Pending and Future Transactions.......................................................... 29

        1.     Sale of the Hawaii Koa Wood Forest ..........................................29

        2.     VA Hospital Transaction ............................................................29

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

IV.   ASSETS AND LIABILITIES................................................................................30

      A.   Real Property Assets................................................................................30

           1.    Crescent Village - Building A.......................................................30
           2.    Crescent Village - Building B........................................................31
           3.    Crescent Village -Building D........................................................31
           4.    Crescent Village - 23 acres raw land.............................................31
           5.    Crescent Village Lots....................................................................31
           6.    Woodburn (4.11 acres raw land)..................................................32
           7.    College Park (938.2 acres raw land).............................................32
           8.    Westlane Shopping Center............................................................32
           9.    Garden Valley Shopping Center....................................................32
           10.   West 11th & Obie.........................................................................32
           11.   My Coffee.....................................................................................32
           12.   Oil Can Henry's............................................................................33
           13.   Willow Creek................................................................................33
           14.   Hawaii Land.................................................................................33
           15.   Natron Land..................................................................................33
           16.   2890 Chad Drive (the BLM Office Building).................................33
           17.   2892 Crescent Ave........................................................................34
           18.   650 Goodpasture (Goodpasture Island Radio Tower) ...................34
           19.   4480 G Hwy 101 N........................................................................34
           20.   3082 Kinney Loop.........................................................................34
           21.   3108 Kinney Loop.........................................................................34
           22.   2850 Kinney Loop.........................................................................34
           23.   3032 Kinney Loop.........................................................................35
           24.   Kinney Loop Lots..........................................................................35
           25.   3058 Kinney Loop.........................................................................35
           26.   2909 Lord Byron Place..................................................................35
           27.   2915 Lord Byron Place..................................................................35
           28.   2931 Lord Byron Place..................................................................36
           29.   2977 Lord Byron Place..................................................................36
           30.   2993 Lord Byron Place..................................................................36
           31.   2843 Lord Byron Place..................................................................36
           32.   2853 Lord Byron Place..................................................................36
           33.   2863 Lord Byron Place..................................................................36
           34.   2873 Lord Byron Place..................................................................36
           35.   2883 Lord Byron Place..................................................................36

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

36. Hangar 272 ..................................................................................37
37. Hangar 246 ..................................................................................37
38. 2960 and 3110 Kinney Loop ........................................................37
39. Unencumbered Real Property ......................................................37

B. Personal Property Assets ........................................................................37
   1. Cash and Accounts Receivable .....................................................37
   2. Bankruptcy Claim Filed Against Roberts Construction .................37
   3. State Court Claims Against Michael Roberts and Mark Roberts .....38
   4. Potential Claims Against Umpqua Bank .......................................39
   5. Tonkon Claims ............................................................................40
   6. Other Claims/Avoidance Actions .................................................41

C. Liabilities – Secured Creditors ................................................................41
   1. Bank of America .........................................................................41
   2. Century Bank ..............................................................................41
   3. Siuslaw Bank ..............................................................................42
   4. Summit Bank ..............................................................................42
   5. Umpqua Bank ..............................................................................42
   6. Washington Federal Savings ........................................................42
   7. "BLM" Individuals ......................................................................43
   8. Property Tax Lien Claimants .......................................................43

D. Liabilities – Unsecured Creditors ............................................................43
E. Liabilities – Administrative Expenses ......................................................43

V. DESCRIPTION OF PLAN OF REORGANIZATION ..........................................44
   A. Unclassified Claims ................................................................................44
   B. Classified Claims and Interests ................................................................45
      1. Class 1 (Other Priority Claims) ...................................................45
      2. Class 2 (Allowed Secured Claim of BofA) ...................................46
         (a) Class 2.1 – Building A Loan. ...........................................46
         (b) Class 2.2 – Building D Loan. ..........................................47
         (c) Treatment of Bank of America's Cash Collateral Accounts. .............47
      3. Class 3 (Allowed Secured Claims of Century Bank) .....................48
      4. Class 4 (Allowed Secured Claim of Pioneer) ...............................49
      5. Class 5 (Allowed Secured Claims of Siuslaw Bank) .....................50
         (a) Class 5.1 – Crescent Village Lots Loan. ...........................50
         (b) Class 5.2 - 2850 Kinney Loop Loan. ................................51
         (c) Class 5.3 - 2960 Kinney Loop Loan. ................................52
         (d) Class 5.4 - 3082 Kinney Loop Loan. ................................53
         (e) Class 5.5 - 3108 Kinney Loop Loan. ................................54
         (f) Class 5.6 - Florence Medical Building Loan. ....................55
         (g) Class 5.7 – Kinney Loop Lots Loan. .................................56

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

|  | (h) | Class 5.8 – Natron Land Loan. | 56 |
|  | (i) | Treatment of Siuslaw Bank's Cash Collateral Account. | 57 |
| 6. | | Class 6 (Summit Bank) | 57 |
|  | (a) | Class 6.1 – Road Radio Tower Loan. | 58 |
|  | (b) | Class 6.2 – Guaranty Claim. | 58 |
|  | (c) | Treatment of Summit Bank's Cash Collateral Account. | 59 |
| 7. | | Class 7 (Umpqua Bank) | 60 |
|  | (a) | Class 7.1 – Westlane Loan. | 61 |
|  | (b) | Class 7.2 - West 11th Land Loan. | 61 |
|  | (c) | Class 7.3 – 2892 Crescent Ave. Loan. | 62 |
|  | (d) | Class 7.4 Woodburn and College Park Loan. | 63 |
|  | (e) | Class 7.5 – Roseburg Loan #1. | 64 |
|  | (f) | Class 7.6 – Roseburg Loan #2. | 65 |
|  | (g) | Class 7.7 – Oil Can Henry's Loan. | 66 |
|  | (h) | Class 7.8 – My Coffee Loan. | 67 |
|  | (i) | Class 7.9 – Building B Loan. | 67 |
|  | (j) | Class 7.10 – Grumman Hangar Loan. | 68 |
|  | (k) | Class 7.11 – 3032 Kinney Loop Loan. | 68 |
|  | (l) | Class 7.12 - Crescent Village Land Loan. | 69 |
|  | (m) | Refinance of Properties Encumbered by Umpqua Bank's Liens. | 69 |
|  | (n) | Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds. | 70 |
|  | (o) | Payment of Umpqua Bank Fees. | 71 |
|  | (p) | Property Taxes. | 71 |
|  | (q) | Waiver of Claims by Debtor and Reorganized Debtor. | 71 |
|  | (r) | Treatment of Umpqua Bank's Cash Collateral Account. | 71 |
|  | (s) | Use of Rents Generated From Umpqua Properties. | 72 |
|  | (t) | Guarantees. | 72 |
|  | (u) | Additional Documents. | 72 |
| 8. | | Class 8 (Washington Federal Savings) | 72 |
|  | (a) | Class 8.1 –Lord Byron Loan. | 72 |
|  | (b) | Treatment of Washington Federal's Cash Collateral Account. | 74 |
|  | (c) | Treatment of the Washington Federal Unsecured Claim. | 74 |
| 9. | | Class 9 (BLM Secured Creditors) | 74 |
|  | (a) | Class 9.1 – Francis Cline. | 74 |
|  | (b) | Class 9.2 – William Greenhoot. | 75 |
|  | (c) | Class 9.3 – McKillop II Limited Partnership. | 75 |
|  | (d) | Class 9.4 – Karen Merwin. | 76 |
|  | (e) | Class 9.5 – Alice Smith. | 77 |
|  | (f) | Class 9.6 – Linda Trickey. | 77 |
| 10. | | Class 10 (Property Tax Lien Claims) | 78 |
| 11. | | Class 11 (Small Unsecured Claims) | 78 |
| 12. | | Class 12 (General Unsecured Claims). | 78 |
| 13. | | Class 13 (Interests) | 78 |
| C. | | Executory Contracts and Unexpired Leases | 79 |
| D. | | Conditions to Confirmation and Effectiveness of the Plan | 79 |
| E. | | Sources of Funding for the Plan | 80 |
| F. | | Effect of Confirmation | 81 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | |
|---|---|---|
| 1. | Discharge | 81 |
| 2. | Revesting, Operation of Business | 81 |
| 3. | Injunction | 81 |
| 4. | Modification of the Plan; Revocation or Withdrawal of the Plan | 82 |
| 5. | Retention of Jurisdiction | 82 |
| 6. | United States Trustee Fees | 83 |

| | | |
|---|---|---|
| VI. | LIQUIDATION ANALYSIS | 83 |
| VII. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 84 |
| | A. General Tax Considerations | 84 |
| | B. Federal Income Tax Consequences to the Debtor | 86 |
| | C. Federal Income Tax Consequences to the Holders of an Allowed Claim | 87 |
| | D. Consequences to the Interest Holders | 88 |
| | E. Information Reporting and Backup Withholding | 88 |
| | F. Importance of obtaining professional tax assistance | 89 |
| VIII. | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 89 |
| | A. Confirmation Hearing | 89 |
| | B. Requirements of Confirmation | 89 |
| | C. Feasibility | 90 |
| | D. Risk Factors | 90 |
| | 1. General Financial Market Conditions | 90 |
| | 2. Projected Financial Results | 90 |
| | E. Cram Down | 91 |
| | F. Alternatives to Confirmation of the Plan | 91 |
| IX. | RECOMMENDATION AND CONCLUSION | 92 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Exhibits**

| | |
|---|---|
| **Exhibit A** | Plan |
| **Exhibit B** | Partial list of the non-core assets currently being marketed by the Debtor for sale |
| **Exhibit C** | Financial Projections |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# I.

## **INTRODUCTION**

On January 20, 2010 (the "Petition Date"), Arlie & Company (the "Debtor" or "Arlie") commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor's case is being administered in the United States Bankruptcy Court for the District of Oregon before the Honorable Albert E. Radcliffe. This Disclosure Statement (the "Disclosure Statement") contains information with respect to the *First Amended Plan of Reorganization (January 10, 2011)* (the "Plan") proposed by the Debtor. A copy of the Plan is attached hereto as **Exhibit A**. Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor has examined various alternatives, and based on information contained in this Disclosure Statement and for the reasons set forth below, the Debtor has concluded that the Plan provides the best recovery to creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed reorganization of the Debtor pursuant to the terms of the Plan, and (3) the proposed distribution to Creditors and holders of Claims against the Debtor. The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important. In order for the Plan to be accepted by a Class of Claims or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan. Those alternatives may not provide for a distribution of as much value to holders of Allowed Claims and Interests as the Plan. Accordingly, the Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

urges you to accept the Plan by completing and returning the enclosed ballot no later than 5:00 p.m. on _____, 2011.

### A.    INFORMATION REGARDING THE PLAN

#### 1.    The Plan is the Governing Document

Although the Debtor believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein, which are controlling.  You are urged to read the Plan and not just this Disclosure Statement.

#### 2.    Source of Information

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor or its professionals, or has been obtained from the Debtor's records, except where otherwise specifically noted.  None of the Debtor's attorneys, accountants or other professionals make any representation regarding that information.  The Debtor does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy.  The Debtor has, however, attempted to present the information accurately and fairly, and the Debtor believes that the information is substantially accurate.  The assumptions underlying the projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor's best estimate as to what it expects will happen.  Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor's control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met.  Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the Bankruptcy Court hearing to determine the adequacy of the Disclosure Statement.

#### 3.    Warning Regarding Federal and State Income Tax Consequences of the Plan

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim.  Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 4.    Bankruptcy Court Approval

Following a hearing held on _____, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan.  Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan.  The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

### B.    VOTING INSTRUCTIONS

### 1.    How to Vote

A ballot is enclosed herewith for Creditors to use in voting on the Plan.  To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan, sign your name, and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 5:00 p.m. prevailing Pacific Time on _____, 2011 at the following address:**

> Arlie & Company Plan Balloting
> c/o Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, California  94111-4500
> (ph) 415-263-7000

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described, it will not be counted.  If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

### 2.    Who May Vote

The Plan divides the Claims of Creditors into 13 Classes.  There is one Class of Interests. The Classes are as follows:  Class 1 (Other Priority Claims), Class 2 (Bank of America), Class 3 (Century Bank), Class 4 (Pioneer), Class 5 (Siuslaw Bank), Class 6 (Summit Bank), Class 7 (Umpqua Bank), Class 8 (Washington Federal Savings), Class 9 (BLM Secured Creditors), Class 10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(Property Tax Lien Claims), Class 11 (Small Unsecured Claims), Class 12 (General Unsecured Claims), and Class 13 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan.  Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

Class 13 is not impaired and therefore is deemed to have accepted the Plan.  All other Classes are impaired under the Plan, and holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim.  Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan.  The Ballot form which you received does <u>not</u> constitute a proof of Claim.

## C.    <u>CONFIRMATION</u>

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization.  At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code.  If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan.  The Debtor believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class.  As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the plan by such class, so long as the plan meets the statutory requirements set forth by section 1129(b) of the Bankruptcy Code. This procedure is called a "cram down." The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any impaired Class rejects the Plan.

The Bankruptcy Court has set _____, 2011 as the hearing date to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The hearing on confirmation will be held before the Honorable Albert E. Radcliffe at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, #2600, Eugene, Oregon 97401. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

Objections must be served upon:

(1) The Debtor:

Arlie & Company
2911 Tennyson Avenue, Suite 400
Eugene, Oregon 97408
Attn: John Musumeci
Telephone: (541) 344-5500

(2) Counsel for the Debtor:

John D. Fiero, Esq.
Linda F. Cantor, Esq.
Teddy M. Kapur, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and

Brad T. Summers, Esq.
David W. Criswell, Esq.
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone:  (503) 228-2525

(3) Counsel for the Committee:

Douglas R. Schultz, Esq.
Gleaves Swearingen Potter & Scott LLP
PO Box 1147
Eugene, OR 97440-1147
Telephone:  (541) 686-8833

(4) The Office of the United States Trustee:

P. Rebecca Kamitsuka, Esq.
Attorney for the United States Trustee
Wayne L. Morse Courthouse
405 E. 8th Avenue, Suite 1100
Eugene, OR  97401-2706
Telephone:  (541) 465-6330

D.    **DISCLAIMERS**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  *IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING*.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## II.

## **PLAN OVERVIEW**

### A.    **INTRODUCTION**

The Plan contemplates that the Reorganized Debtor will continue to operate its business in the ordinary course and pay and satisfy its obligations under the Plan from available cash, exit financing made available upon confirmation, from the net operating income generated from the Reorganized Debtor's continued business operations, and from the sale or refinancing of assets of the Reorganized Debtor.

A core aspect of the Debtor's business is marketing and selling real property.  The Reorganized Debtor will continue to market and sell real property assets in the ordinary course of business to provide funds for the Reorganized Debtor's continued operating expenses and to provide funds to make payments required under the Plan.

In addition to marketing and selling its real property assets in the ordinary course of business, the Reorganized Debtor has committed in the Plan to market and sell or refinance non-core assets as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Reorganized Debtor under the Plan.  A partial list of the non-core assets currently being marketed by the Debtor for sale is attached hereto as **Exhibit B**.  Without limiting the preceding, if at any time the Reorganized Debtor determines that it may not have sufficient funds on hand to make any upcoming payment required under the Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of its non-core assets sufficient to raise the funds necessary to make the required Plan payment.

Except as otherwise provided in the Plan, each secured creditor will retain its security interest in and liens on its Collateral with the same priority such security interest and liens had on the Petition Date.  Each Claim will be a Secured Claim up to the value of the property securing the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claim unless the Claimant elects treatment under 11 U.S.C. § 1111(b). Secured creditors will be paid the full amount of their Allowed Secured Claims in Cash over time with interest, as more fully set forth in the Plan.

Each holder of a Small Unsecured Claim (an Unsecured Claim equal to or less than $2,000) will be paid the full amount of its Small Unsecured Claim within 60 days following the Effective Date.

Each holder of a General Unsecured Claim will be paid the full amount of its General Unsecured Claim in Cash within five years after the Effective Date. In addition, within 3 years after the Effective Date the Reorganized Debtor will pay at least 50% of the principal amount of each General Unsecured Claim. Interest will accrue from the Petition Date on each General Unsecured Claim until such Claim is paid in full at a uniform annual interest rate of 3.5%. At the time the Reorganized Debtor makes any principal payment on a General Unsecured Claim, the Reorganized Debtor will also pay all accrued but unpaid interest then owing on the General Unsecured Claim.

Existing Interests in the Debtor will be preserved.

All post-petition and Administrative Expense Claims will be paid in full on the Effective Date or the date on which such Claim becomes Allowed, whichever is later.

All unexpired leases and executory contracts which have not previously been rejected, or which are not otherwise subject to a prior Bankruptcy Court order or a pending motion before the Bankruptcy Court, will be assumed by the Reorganized Debtor through the Plan as of the Effective Date.

In the event that any Class of creditors does not accept the Plan, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise modify the Plan.

## B.    TREATMENT OF CLAIMS

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan.

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| N/A | Allowed Administrative Expense Claims | Estimated Recovery on Allowed Claims in this category: 100% | Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. |
| N/A | Allowed Priority Tax Claims | Estimated Recovery on Allowed Claims in this category: 100% | Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed. |
| 1 | Allowed Other Priority Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim). |
| 2 | Allowed Secured Claims of BofA | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | <u>Class 2.1 (Building A Loan) and Class 2.2 (Building D Loan)</u><br>BofA will retain its security interests and liens upon its Collateral and receive new promissory notes in the amount of the present value of its Allowed Claims.  BofA's Allowed Class 2.2 Claim is limited to the amount of the Building D Value; excess amounts owed under the Building D Loan are treated as Class 12 Claims.  The promissory notes will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Reorganized Debtor will use the Building A Cash Collateral to pay past due Property Taxes on Building A and retain and use the remainder for general operating purposes.<br><br>Reorganized Debtor will use the Building D Cash Collateral |

FIRST AMENDED DISCLOSURE STATEMENT
(JANUARY 10, 2011)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | to pay past due Property Taxes on Building D and the remainder will be retained in a segregated BofA account for payment of Property Taxes, capital expenses, tenant improvements, maintenance, improvements or other expenses directly pertaining to the improvement of Building D or the sale, lease and marketing of Building D. |
| 3 | Allowed Secured Claim of Century Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Century Bank will retain its security interests and liens upon its Collateral that secures the 3058 Kinney Loop Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| 4 | Allowed Secured Claim of Pioneer | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE IF CLAIM ALLOWED BY FINAL ORDER OF THE BANKRUPTCY COURT**<br><br>**(CLAIM IS DISPUTED; DEBTOR TO FILE OBJECTION AND ADVERSARY PROCEEDING REGARDING THE DISPUTED LIEN IN THE NEAR TERM)** . | If and to the extent Pioneer is determined by Final Order of the Bankruptcy Court to have a valid, perfected security interest in or lien upon property of the Debtor, Pioneer will retain its security interests in and liens upon its Collateral that secures the Pioneer Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, the Reorganized Debtor shall have pre-paid at least 50% of the principal of Pioneer's Allowed Claim. At the time of any such pre-payment, the Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer note.<br><br>If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order of the Bankruptcy Court, the Pioneer Claim will be treated as a Class 12 Claim. |
| 5 | Allowed Secured Claims of Siuslaw Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 5.1 – Crescent Village Lots Loan.<br>Siuslaw Bank will retain its security interests and liens upon its Collateral that secures the Crescent Village Lots Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The promissory note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots note. Notwithstanding the foregoing, in the event Reorganized |

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| **TREATMENT OF CLAIMS CHART** | | | |
| | | | Debtor consummates the VA Sale prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots note, including all accrued and unpaid interest then owing under the Crescent Village Lots note, and shall utilize 20% of the Excess Sale Proceeds to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note) as determined by agreement of Reorganized Debtor and Siuslaw Bank.

Class 5.2 (2850 Kinney Loop Loan), Class 5.3 (2960 Kinney Loop Loan), Class 5.4 (3082 Kinney Loop Loan), Class 5.5 (3108 Kinney Loop Loan)
For each of these Classes, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures each loan and receive a new promissory note in the amount of the present value of each Allowed Claim. Each promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Class 5.6 – Florence Medical Building Loan.
Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The Florence note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: on the Effective Date, Reorganized Debtor shall pay down the Florence note to the original principal amount of the Florence Medical Building Loan. The Reorganized Debtor will then make monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Class 5.7 (Kinney Loop Lots Loan) and Class 5.8 (Natron Land Loan)
Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan and Natron Land Loan and receive a new promissory note in the amount of the present value of each Allowed Claim. Each note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of each note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under each note. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment | |
| | | | Reorganized Debtor will use the Siuslaw cash collateral to pay any past due Property Taxes on the Collateral securing the Class 5 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes | |
| 6 | Allowed Secured Claims of Summit Bank | Estimated Recovery on Allowed Claims in this Class: 100%  **IMPAIRED**  **ENTITLED TO VOTE** | <u>Class 6.1 – Road Radio Tower Loan.</u><br>Summit Bank will retain its security interests and liens upon its Collateral that secures the Radio Tower Loan and receive a new promissory note in the amount of the present value of its Allowed Claim. The Radio Tower note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br><u>Class 6.2 – Guaranty Claim.</u><br>Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty and receive a new promissory note in the amount of the present value of the amount owing under the Churchill Media Guaranty. The Guaranty note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty note. At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note. In the event Reorganized Debtor pays or satisfies the Guaranty note, Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.<br><br>Reorganized Debtor will use the Summit Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 6 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes | |
| 7 | Allowed Secured Claims of Umpqua Bank | Estimated Recovery on Allowed Claims in this Class: 100%  **IMPAIRED**  **ENTITLED TO VOTE** | <u>Class 7.1 (Westlane Loan.), Class 7.2 (West 11th Land Loan), Class 7.3 (2892 Crescent Ave. Loan.) and Class 7.4 (Woodburn and College Park Loan)</u><br>For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under the respective loans related to the Westlane Property, West 11th Land Property, 2892 Crescent Ave., and Woodburn Property/College Park Property (the "Sell or Return | |

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | Properties"). |

**TREATMENT OF CLAIMS CHART**

Reorganized Debtor shall have 6 months after the Effective Date to either (a) enter into a letter of intent for the sale of each of the Sell or Return Properties (other than the College Park Property) at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the property to Umpqua Bank, subject to any and all past due and current Property Taxes, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the particular Sell or Return Property within the time limits set forth in the immediately preceding sentence, 2/3rds of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and 1/3 of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

With respect to Class 7.4, subject to the reduction of debt owing against the College Park Property from the College Park Sale and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property, as of the Effective Date the Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein).

Class 7.5 (Roseburg Loan #1), Class 7.6 (Roseburg Loan #2), and Class 7.7 (Oil Can Henry's Loan).
For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the Roseburg Loan #1, Roseburg Loan #2, and Oil Can Henry's Loan.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to bring each loan current by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the property.  Thereafter, interest will accrue on the each loan at a fixed rate of 4.5% per annum.  Reorganized Debtor will make equal monthly amortizing payments of principal and interest on each loan

**TREATMENT OF CLAIMS CHART**

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| | | | With respect to Class 7.5, Reorganized Debtor may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building. |
| | | | Class 7.8 (My Coffee Loan) Class 7.9 (Building B Loan), and Class 7.10 (Grumman Hangar Loan) For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the My Coffee Loan, Building B Loan and Grumman Hangar Loan. |
| | | | Interest will accrue on the principal amount owing on each loan at a fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Additionally, the non-default interest that accrued on each loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date. |
| | | | Class 7.11 (3032 Kinney Loop Loan) and Class 7.12 (Crescent Village Land Loan) For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the 3032 Kinney Loop Loan and Crescent Village Land Loan. |
| | | | As of the Effective Date, each loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the each loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein). |
| | | | Treatment of Umpqua Bank's Cash Collateral Account. Provided the College Park Sale is consummated prior to the Effective Date, the balance of funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## TREATMENT OF CLAIMS CHART

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement. |

Reorganized Debtor may refinance any property that is the Collateral of Umpqua Bank provided it has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided Umpqua Bank receives the applicable Arlie Debt Amount plus the applicable Umpqua Proceeds.

Reorganized Debtor may sell properties free and clear of the Umpqua Bank liens, claims and encumbrances provided it pay the applicable Umpqua Debt Amount and the Umpqua Proceeds Share to be used as set forth in the Plan. Umpqua Bank shall provide partial release of liens, claims and encumbrances for a specific piece of property provided it receives 110% of the Arlie Debt Amount associated with such piece of property.

Umpqua Bank Fees shall be paid on a pro rata basis upon the sale or refinance of any property of Debtor that secures a Class 7 Claim.

Unless otherwise stated in the Plan, Property Taxes will be no more than 2 years past due on Collateral of the Debtor securing the Class 7 Claims.

On the Effective Date Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and managers for actions (or in-actions) that occurred before the Effective Date. The Arlie Debt Amounts and the Umpqua Fees will not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor.

Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of a Umpqua Bank Loan for defaults under or relating to the Umpqua Bank loans the occurred before the Effective Date and any such claims are deemed waived, released and extinguished.

Umpqua Bank's Cash Collateral shall be allocated for use

## TREATMENT OF CLAIMS CHART

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | as follows:  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments unpaid non-default interest on Roseburg Loan #1 and #2 and on Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property of Reorganized Debtor that is Umpqua Bank's Collateral and not subject to a sale or refinance agreement.<br><br>All guarantees of Debtor's obligations to Umpqua Bank shall continue to guaranty Reorganized Debtor's obligations to Umpqua Bank under the Plan.<br><br>Reorganized Debtor may use all rents generated from properties securing Umpqua Bank obligations for any purpose, without restriction. |
| | Allowed Claims of Washington Federal Savings | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Washington Federal will have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between the Lord Byron Collateral Value and the Washington Claim Amount.<br><br>Washington Federal's Class 8 Claim shall be satisfied by the delivery of 5 promissory notes to Washington Federal. Each Lord Byron note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Each Lord Byron note will be secured by a security interest and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  The Lord Byron Notes shall be assumable by a purchaser of a Lord Byron Property, subject to reasonable approval by Washington Federal.<br><br>The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.<br><br>Reorganized Debtor will use the Washington Federal Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 8 Claims.  All amounts remaining will be retained and used by Reorganized Debtor |

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|---|
| **Class No.** | **Description** | **Estimate of Recoveries** | | **Plan Treatment** |
| | | | | for general operating purposes |
| 9 | Allowed Claims of BLM Secured Creditors | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | | <u>Class 9.1 (Francis Cline), Class 9.2 (William Greenhoot), Class 9.3 (McKillop II Limited Partnership), Class 9.4 (Karen Merwin), Class 9.5 (Alice Smith), and Class 9.6 (Linda Trickey)</u> <br> Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  Each BLM Secured Creditor has an Allowed Claim in the amount of all outstanding principal, accrued non-default interest, and reasonable fees and costs owing as of the Effective Date under each BLM Secured Creditor's loan.  The Class 9 Claims are secured by a deed of trust on the BLM Office Building. <br><br> On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deeds in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under each BLM Secured Creditor's loan.  Notwithstanding the foregoing, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvements and any necessary rezoning services, if requested, upon terms to be agreed upon by the BLM Secured Creditors and Reorganized Debtor. |
| 10 | Property Tax Lien Claims | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | | Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law.  Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim. |
| 11 | Small Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | | Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date. |
| 12 | General Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | | Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim.  Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds |

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | are available. At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim. Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest. All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date. |
| 13 | Interests | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**UNIMPAIRED**<br><br>**DEEMED TO ACCEPT THE PLAN** | Existing Interests in Debtor will be preserved. |

TREATMENT OF CLAIMS CHART

## III.

## OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case. Copies of all relevant court papers are on file with the Bankruptcy Court.

### A.    BACKGROUND

#### 1.    Description of the Debtor

The Debtor is a real estate development and management company based in Eugene, Oregon. Arlie owns over 30 properties in Oregon (most of which are in or around Lane County) together with approximately 5,590 acres of investment property on the Big Island of Hawaii (the "Hawaii Property"). Arlie is an Oregon corporation formed in 1991 by Suzanne Arlie.

The Debtor's largest development project is known as Crescent Village. Crescent Village is Eugene's first planned urban village, and is a mixed-use development that includes residences (apartments and townhouses), retail stores, restaurants and office buildings. Additional information regarding the Crescent Village development is available at www.crescent-village.com. Phase 1 of Crescent Village was completed in 2009.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtor's revenues consist primarily of rental payments from residential and commercial tenants and from sales of real property from time to time. Debtor's expenses consist primarily of debt service payments and operating expenses.

## 2. **Management**

The Debtor's current management team is set forth below. Each member of the Debtor's management team will continue with the Debtor post-confirmation.

Suzanne Arlie; President, Owner and Sole Director - Suzanne Arlie oversees the operations of Arlie. Ms. Arlie has been the President of Arlie since its inception. Ms. Arlie will continue to serve as President of the Reorganized Debtor.

John Musumeci; Executive Vice President - John Musumeci oversees Arlie's land acquisitions and sales. Mr. Musumeci brings over 30 years experience as a business owner and property developer. Mr. Musumeci has been employed by Arlie since the company's inception. Mr. Musumeci will continue to be employed by the Reorganized Debtor.

Scott Diehl; Vice President and Chief Financial Officer - Scott Diehl brings over 30 years of experience in financial services and public accounting to Arlie. Mr. Diehl is responsible for managing Arlie's general operations, finance, asset management, and strategic planning. Mr. Diehl's career includes 8 years as a Certified Public Account in Kansas and Oregon. Mr. Diehl also has worked 20 years as Controller and Finance Director in the newspaper industry where he performed real estate development tasks for the Guard Publishing Company. Mr. Diehl holds a Bachelor of Science degree in Business from Washburn University. Mr. Diehl will continue to be employed by the Reorganized Debtor.

## 3. **Events Precipitating the Debtor's Filing**

Although the value of Arlie's assets is substantially greater than its liabilities, Arlie began experiencing cash-flow problems in 2008, when the general contractor for Crescent Village (Roberts Construction) filed a Chapter 7 liquidation case and subsequently failed to pay many of its sub-contractors. To ensure the successful completion of Crescent Village, Arlie was forced to pay significant amounts to various sub-contractors who had been working for Roberts Construction even though Arlie already had paid for the work once when it paid Roberts Construction.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In addition to the Roberts Construction matter, the general downturn in the economy and credit markets further hampered Arlie's cash flow. These factors have made it more difficult for Arlie to (a) attract and retain tenants and (b) close sales transactions.

Pre-petition, Arlie attempted to negotiate with a number of its secured lenders (including its largest secured creditor, Umpqua Bank) to re-structure its debt obligations. However, these negotiations were mostly unsuccessful, and Arlie filed its chapter 11 petition on January 20, 2010.

### 4. Plan Projections

**Exhibit C** attached hereto presents in summary fashion Debtor's projected income statements (adjusted to a cash basis) and cash flow projections through April 25, 2016.

### B. SUMMARY OF EVENTS DURING THE CHAPTER 11 CASE

The following is a summary of important events that have taken place since the Petition Date.

### 1. "First Day" Pleadings

The day after the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

- *Debtor's Motion for Order Authorizing Payment of Prepetition Wages, Salaries, Compensation, Expenses, Benefits, and Related Taxes, and to Continue Employee Benefits Postpetition* (Docket No. 7);

- *Debtor's Motion for Order Determining Adequate Assurance to Utility Companies* (Docket No. 8);

- *Debtor's Motion Seeking Authority to Refund Prepetition Security Deposits to Tenants* (Docket No. 9);

- *Debtor's Motion For Temporary and Final Authority to Use Cash Collateral* (Docket No. 12);

- *Debtor's Motion for Order Authorizing Use of Existing Bank Accounts* (Docket No. 14); and

- *Motion for Extension of Time to File Schedules and Statement of Financial Affairs* (Docket No. 19).

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on January 27, 2010. Following the hearing on the First Day Pleadings, the Bankruptcy Court entered several

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

orders related to the First Day Pleadings on January 29, 2010, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

## 2.    Filing of Schedules, Meeting of Creditors and Bar Date

On February 18, 2010, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court (Docket Nos. 102 and 103). The Schedules provide detailed information regarding the Debtor's assets and liabilities, as well as other information about its business. The Schedules were amended on February 26, 2010 (Docket No. 102), March 17, 2010 (Docket No. 140), April 22, 2010 (Docket No. 154), May 17, 2010 (Docket No. 172), and October 29, 2010 (Docket No. 328). Amendments to the Statement of Financial Affairs were filed on February 25, 2010 (Docket No. 113) and March 17, 2010 (Docket No. 139).

In addition, on March 4, 2010 the United States Trustee conducted the Section 341(a) meeting of creditors in the Debtor's chapter 11 case. The Bankruptcy Court set June 2, 2010 as the deadline for non-Governmental Units to file proofs of Claim in the Bankruptcy Case, and July 19, 2010 as the deadline for Governmental Units to file proofs of Claim. The Debtor has filed monthly operating reports commencing with January 2010 (Docket No. 137), and continues to file such reports.

## 3.    The Official Committee of Unsecured Creditors

On or about January 25, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in this case (Docket Nos. 33 and 62). The United States Trustee added an additional member to the Committee on or about January 25, 2010 (Docket No. 98).

The current members of the Committee are as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| James R. Hanks (Chair)<br>JRH Transportation Engineering | 4765 Village Plaza Loop, Suite 201<br>Eugene, OR  97401 |
|---|---|
| Gregory Brokaw<br>Rowell Brokaw Architects, PC | 1 East Broadway, Suite 300<br>Eugene, OR  97401 |
| David E. Bomar<br>Balzhiser & Hubbard Engineers, Inc. | 100 W. 13th Avenue<br>Eugene, OR  97401 |
| Mike Broadsword<br>Eugene Sand & Gravel / Eugene Sand Construction | PO Box 1067<br>Eugene, OR  97440 |
| Jerry Vicars<br>Fabrication & Mechanical Group, Inc. | P.O. Box 42173<br>Eugene, OR 97404 |

The Plan provides that to the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee.  For so long as such Unsecured Creditors' Committee remains in existence, the Reorganized Debtor will provide to the Unsecured Creditors' Committee a quarterly compliance certificate executed by the Chief Financial Officer of the Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan.  If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan.  In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of the Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to the Reorganized Debtor in its reasonable discretion, the Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee.  Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist.  During the existence of the

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and the Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period.

### 4.    Retention of Professionals

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Tonkon Torp LLP, as general bankruptcy counsel (Docket No. 11), which employment was approved on January 29, 2010;

- Thorp Purdy Jewett Urness & Wilkinson P.C., as special purpose counsel (Docket No. 73), which employment was approved on March 4, 2010;

- Burr Pilger Mayer, Inc., as accountants (Docket No. 74), which employment was approved on March 19, 2010;

- Michael P. Kearney P.C., as special purpose counsel (Docket No. 75), which employment was approved on March 4, 2010;

- John Brown, as consultant (Docket No. 76), whose employment was approved on March 19, 2010;

- Rethink LLP as special purpose counsel (Docket No. 77), which employment was approved on March 4, 2010;

- Ball Janik LLP ("Ball Janik"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 269), which employment was approved on November 23, 2010; and

- Pachulski Stang Ziehl & Jones LLP ("PSZJ"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 272), which employment was approved on November 24, 2010.

On September 30, 2010, the Debtor filed the *Substitution of Counsel and Notice of Appearance* (Docket No. 259), pursuant to which the Debtor substituted PSZJ and Ball Janik for its existing general bankruptcy counsel, Tonkon Torp LLP.  A dispute subsequently arose between Tonkon Torp and the Debtor regarding the transfer of the Debtor's records.  On October 19, 2010, the Debtor filed an adversary proceeding to compel Tonkon Torp to turnover the Debtor's property (Case No. 10-06232-aer).  The parties consensually resolved their dispute, and on November 11, 2010, the Debtor filed a notice of dismissal of the adversary case without prejudice.

The following two employment applications remain pending before the Court.  On December 17, 2010, the Debtor filed an application to employ Kibel Green Inc. as the Debtor's Real Estate Plan Consultant and Interest Rate Expert (Docket No. 361); and on December 21, 2010, the Debtor filed an application to employ Powell Valuation Inc as a real estate appraiser (Docket No. 364).  On

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

December 29, 2010, Umpqua Bank filed an objection to the Debtor's retention of Powell Valuation Inc. (Docket No. 366).  In response to concerns raised by the U.S. Trustee, the Debtor filed amended applications to employ Kibel Green Inc. (Docket No. 377) and Powell Valuation Inc (Docket No. 383).  A hearing on the Kibel Green Inc. and the Powell Valuation Inc employment applications was set for January 26, 2011.

The Bankruptcy Court authorized the Committee to retain Douglas Schultz and Gleaves Swearingen Potter & Scott LLP as its legal counsel by order entered on January 29, 2010.

**5.    First Day Orders**

On January 29, 2010, the Court entered a number of "first-day" orders requested by Debtor. These orders authorized Debtor to:  pay employees their accrued prepetition wages, salaries, compensation, expenses, benefits and related taxes (in amounts up to the priority limits permitted by the Bankruptcy Code); continue Debtor's existing utility services, including determining an adequate amount of utility deposits; and refund pre-petition security deposits in the ordinary course of Debtor's business.

**6.    Cash Collateral**

The Court has entered a series of cash collateral orders that have allowed the Debtor to use cash collateral from its lenders who have a security interest in the Debtor's cash.  Most recently on December 2, 2010, the Court entered an order authorizing the Debtor to continue using the cash collateral until the earlier of (i) the effective date of a plan confirmed in this case, (ii) in accordance with further court order, or (iii) Debtor's failure to comply with any term of this Order with respect to a Lender and Debtor's failure to substantially cure said act of non-conformity within five business days after notice by such Lender to Debtor, (iv) the appointment of a Chapter 11 bankruptcy trustee or examiner, or (v) conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

**7.    Sale of Debtor's College Park Property and Non-Core Assets**

Since the Petition Date, the Debtor has identified and begun marketing for sale most of its non-core assets, and is in discussions with various parties regarding the potential sale of certain of these assets.  A partial listing of the non-core assets currently being marketed by the Debtor for sale is attached hereto as **Exhibit B**.

The sale of the Debtor's College Park property is an example of a sale of a non-core asset. On October 15, 2010, the Court entered an order authorizing the Debtor to sell approximately 315 acres of the Debtor's College Park property to the City of Eugene. The sale of this property has closed.

Another example is the pending sale of the Debtor's Natron Land to the Springfield School District for $1.2 million. Such sale was noticed to creditors on December 31, 2010 and is expected to generate $167,000 of unencumbered cash.

### 8.    Agreement with The Fifth Third Bank

The Fifth Third Bank ("Fifth Third") is the holder of a guaranty executed by the Debtor whereby the Debtor guaranteed the obligations of Arlie Air, LLC (a wholly owned subsidiary of the Debtor) ("Arlie Air"). Arlie Air was unable to satisfy its obligations to Fifth Third. Arlie Air's sole asset (an airplane) was subject to Fifth Third's lien. The airplane has been sold and the net proceeds were paid to Fifth Third. After paying the net proceeds to Fifth Third, a deficiency remained of approximately $1,300,000. In return for Arlie Air's full cooperation in selling the airplane and paying the net proceeds to Fifth Third, Fifth Third has agreed to reduce its General Unsecured Claim against the Debtor to $1,000,000, provided that the Debtor's Plan provides for the payment of such Claim in full with an interest rate of the higher of 3.5% per annum or the interest rate allowed to General Unsecured Claims under the Plan. Because the Plan proposes to pay General Unsecured Claims in full and provides for a 3.5% per annum interest rate, Fifth Third will have an Allowed General Unsecured Claim in the amount of $1,000,000 (the "Fifth Third Allowed Claim"), which will be paid in the same manner and with the same interest rate as all other Allowed General Unsecured Claims. Under this compromise, Fifth Third's Allowed General Unsecured Claim is not subject to any objection, reduction or subordination.

Following the Effective Date, Fifth Third shall be granted an option to reduce the amount of the Fifth Third Allowed Claim to $600,000 in consideration for (i) a cash payment of $600,000 (the "Fifth Third Payoff"), or (ii) a secured interest in the Debtor's Puueo Forest and Puueo Estate in Hawaii (the "Fifth Third Hawaii Interest"); provided, however, that the decision to deliver either the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Fifth Third Payoff or the Fifth Third Hawaii Interest shall be in the Reorganized Debtor's sole discretion.

## 9.    **Agreement with Umpqua Bank**

On December 23, 2010, the Debtor participated in a settlement conference with Umpqua Bank before the Honorable Elizabeth Perris, United States Bankruptcy Judge.  As a result of that settlement conference and subsequent negotiations between the parties, the Debtor and Umpqua Bank agreed to the terms of a settlement that were entered on the Bankruptcy Court record on December 30, 2010 (the "Umpqua Bank Settlement").  In general terms, the Umpqua Bank Settlement divides the Debtor's property encumbered by Umpqua Bank loans into three groups:  (1) sell or return properties, with respect to which the Debtor will enter into a letter of intent for the sale of such properties within six months following the Effective Date, or else transfer title to the properties to Umpqua Bank; (2) retain and service debt properties, which the Debtor will keep and the loans for which the Debtor will make monthly principle and interest payments at 4.5% interest until the loans mature five years following the Effective Date; and (3) retain and accrue properties, which the Debtor will keep and the loans for which the Debtor will not be required to make payments (which accrue interest at 4.5%) until three years following the Effective Date, at which point the Debtor will be required to pay down 50% of the balance due together with the accrued interest.  The loans pertaining to the retain and accrue properties will mature five years following the Effective Date.

As part of the Umpqua Bank Settlement, confirmation of the Plan will be conditioned on approval of a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's obligations to Umpqua Bank.  In connection therewith, all claims against Umpqua Bank and its officers and employees are waived and released.  Additionally, the Debtor and the guarantors will acknowledge that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable.  Umpqua Bank will waive all claims under the original guaranties in exchange for such new promises and acknowledgments from the guarantors.  These and additional terms of the Umpqua Bank Settlement are incorporated fully in the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**10.    Agreement with Century Bank**

On December 30, 2010, the Debtor filed its *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370) to resolve its lender/borrower relationship with Century Bank on the properties located at 2843, 2853, 2863, 2873 and 2883 Lord Byron Place in Eugene, Oregon (the "Improved Properties"). To resolve their dispute regarding these properties, the Debtor and Century Bank have agreed to stipulate that: (1) the Improved Properties shall be transferred to Century Bank by agreed-upon deeds in lieu of foreclosure; (2) the balance of the Century Bank cash collateral account will be delivered to Century Bank; (3) the Debtor will only continue to use cash collateral as consented to by Century Bank and not for the Debtor's general overhead; (4) any deficiency claim of Century Bank relating to loans secured by the Improved Properties shall be waived; and (5) Century Bank shall have relief from stay. A stipulated order that incorporates these terms was filed with the December 30 Notice of Intent and such notice is pending before the Court.

**11.    The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement**

The Debtor's exclusive period for filing a plan of reorganization under Bankruptcy Code Section 1121(b) (the "Plan Filing Period") was originally set to expire on May 20, 2010. Accordingly, the Debtor's 60-day period to solicit and obtain acceptances of its plan under Bankruptcy Code section 1121(c) (the "Solicitation Period") would have expired 60 days later.

On or about April 22, 2010, the Debtor filed its *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* (Docket No. 156) seeking to extend the Plan Filing Period to July 1, 2010, and the Solicitation Period to September 1, 2010. The Debtor cited the case's complexity and the numerous parties and assets involved as reasons for the requested extension. The Committee supported the motion. The Office of the United States Trustee took no position. No creditor offered written opposition to the motion, and the Court approved the requested extensions at a hearing that took place on May 12, 2010, and entered its *Amended Order on Court's Case Management Conference Setting Deadlines for Filing Plan and Disclosure Statement* (Docket Nos. 165 and 167) (the "First Extension Order").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    On July 1, 2010, the Debtor filed *Debtor's Plan of Reorganization (July 1, 2010)* (the "First

2  Plan") (Docket No. 185) along with an accompanying *Debtor's Disclosure Statement (July 1, 2010)*

3  (Docket No. 186).  The basic elements of the First Plan were the restructuring of secured debt on

4  core holdings, the sale of non-core holdings over time, and the payment of unsecured creditors in full

5  over time, with the equity in the Debtor being retained by Ms. Arlie.  In response to oppositions filed

6  regarding the disclosure statement (Docket Nos. 226 through 230), on August 20, 2010 the Debtor

7  filed the *Debtor's Response to Disclosure Statement Objections* (Docket No. 235), which included

8  as an exhibit an amended disclosure statement (as amended, the "First Disclosure Statement").

9    At the disclosure statement hearing that took place on August 24, 2010, the Court did not

10  approve the First Disclosure Statement because Debtor's counsel represented to the Court that

11  negotiations with creditors were continuing.  The Court set September 15, 2010 as the new deadline

12  for filing an amended disclosure statement and plan (Docket No. 241).

13    On September 9, 2010, the Debtor filed *Debtor's Motion for Extension of Time to File*

14  *Amended Disclosure Statement and Amended Plan* (Docket No. 247) seeking an additional month in

15  which to file a plan in order to allow continued negotiations with creditors.  The Court granted the

16  motion on September 10, 2010 pursuant to its *Order Extending Deadline for Debtor to File*

17  *Amended Disclosure Statement and Amended Plan of Reorganization* (Docket No. 248), which

18  ordered the Debtor to file an amended plan and amended disclosure statement by October 15, 2010.

19    Also on September 10, 2010, counsel for Suzanne Arlie and John Musumeci filed a motion

20  seeking an additional extension of exclusivity in order to address certain issues relevant to them

21  personally raised by Umpqua Bank (Docket No. 249).  Tonkon Torp filed an opposition to the

22  motion on the Debtor's behalf (Docket No. 252).

23    As a result of PSZJ and Ball Janik's retention on or about September 30, 2010 to replace

24  Tonkon Torp LLP as the Debtor's general bankruptcy counsel, the Debtor on October 8, 2010 filed

25  *Debtor's Motion to Extend Exclusivity (11 U.S.C. § 1121) and Deadline to File Amended Plan and*

26  *Amended Disclosure Statement* (Docket No. 276).  The Court denied the motion at a hearing on

27  October 20, 2010 and ordered the parties in interest to file a plan and disclosure statement by

28  December 31, 2010 (Docket No. 319).

As a result of the settlement between the Debtor and Umpqua Bank that was entered on the record on December 30, 2010, the Court extended the deadline for only the Debtor and Bank of America to file a plan and disclosure statement to January 10, 2011 (Docket No. 371).

## C.    PENDING AND FUTURE TRANSACTIONS

### 1.    Hawaii Koa Wood Forest

As part of its effort to generate cash to make payments due on the Effective Date and provide the Reorganized Debtor with additional operating capital, the Debtor will either sell in a sealed bid auction to the highest bidder free and clear of liens, claims and encumbrances the West Hilo Tree Farm (described in more detail below) or refinance the property.  Any sale or refinance of this native Acacia Koa forest land is expected to generate substantial cash for the Debtor's reorganization.

Over the years, the Debtor has had numerous inquiries about the West Hilo Tree Farm from timber management organizations, forest products companies, investors, state agencies, and even conservationists.  The Debtor expects that the high bidder at any sale would likely seek to make an initial cash payment, to be followed by an additional cash payment to be due upon receipt of appropriate harvesting entitlements.  Thus, upon a sale, title would likely pass for a discounted price, subject to increase upon the purchaser's receipt of harvesting entitlements.  The Debtor has extensive experience with the West Hilo Tree Farm and the economic benefits that can be derived from the property with appropriate harvest permitting.  The Reorganized Debtor will make itself available to the purchaser in order to speed the entitlement process.

### 2.    VA Hospital Transaction

The U.S. Department of Veterans Affairs (the "Veteran's Administration") is considering a portion of the Debtor's Crescent Village property in Eugene as the site for its proposed 143,000-square-foot medical clinic, including an ambulatory surgery center.  According to reports in the *Register Guard*, "the facility would cost up to $40 million and employ up to 200.  It would be a boon to Lane County's 35,000 veterans who now must drive hours to Portland or Roseburg if they need specialized services." *Register Guard*, "Eugene Remains in Running for VA Clinic After All," Sept. 9, 2010, page A1; *see Register Guard*, "Back in the VA race: VA still considering a clinic site in Eugene," Sept. 13, 2010, page A6.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Such a deal with the Veteran's Administration could potentially result in many millions of dollars of net sale proceeds, after payment of the claims of Siuslaw Bank, which has a lien against the relevant property. Although there can be no guarantees, the Debtor is working with the Veteran's Administration and the City of Eugene to accommodate the Veteran's Administration's requests and is optimistic that the Veteran's Administration will select the Debtor's location for its medical clinic.

## IV.

## ASSETS AND LIABILITIES

### A.     REAL PROPERTY ASSETS

The Debtor's assets consist primarily of real property in Lane, Douglas, and Multnomah Counties in Oregon and real property on the Big Island of Hawaii. The current value of the Debtor's real property is uncertain, as market conditions continue to fluctuate. The valuations set forth below are the good faith estimates of the Debtor, based on a variety of sources available to the Debtor. Information regarding the Debtor's Crescent Village development in Eugene, Oregon can be obtained by visiting www.crescent-village.com. Below is a description of the Debtor's major real property holdings:

### 1.     Crescent Village - Building A

Building A is a four story mixed-use building located in the Debtor's Crescent Village development. Building A was completed in 2008, and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor. The apartments are fully leased. The retail space is partially leased. The debt against this property is held by Bank of America. Bank of America contends that the leasing cost for the vacant retail space will total approximately $300,000. Because the Debtor uses an in-house team to market Crescent Village, it believes that the leasing cost for the vacant retail space will be significantly less than Bank of America's estimates. The Debtor estimates, based on cost of construction, that the value of Building A is approximately $15,600,000. Bank of America (based on an appraisal that has not been shared with Debtor) contends the property is worth approximately $10,380,000.

### 2.     Crescent Village - Building B

Building B is a four story mixed-use building located in Debtor's Crescent Village development. Building B was completed in 2008 and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor. The apartments are fully leased. The retail space is partially leased. The Debtor believes the value of Building B is approximately $15,800,000. The debt against this property is held by Umpqua Bank.

### 3. Crescent Village -Building D

Building D (known as the Inkwell Building) is a four story mixed-use building located in the Debtor's Crescent Village development. Building D was completed in 2009. Building D has offices on floors 2 through 4, and retail space on the ground floor. The office space is approximately 58% leased by the Debtor and four other commercial tenants. The retail space is currently vacant. Since the Petition Date, the Debtor has leased approximately 2,100 square feet of previously vacant office space. The debt against this property is held by Bank of America. The Debtor estimates, based on cost of construction, that the value of Building D is approximately $4,200,000.

### 4. Crescent Village - 23 acres raw land

Crescent Village contains 23 acres of raw land zoned general office and R-4, generally located at Coburg Road and Crescent Avenue in Eugene, Oregon. The Debtor estimates that the value of this land is approximately $20,000,000. The debt against this property is held by Umpqua Bank.

### 5. Crescent Village Lots

Crescent Village Lots 4, 10, 11, 12, and 13 contain raw land zoned general office and R-4, generally located at Coburg Road and Crescent Avenue in Eugene, Oregon. The Debtor estimates that the value of this land is approximately $11,800,000. The debt against Lots 10, 11, 12, and 13 is held by Siuslaw Bank. Summit Bank has a security interest in Crescent Village Lot 4.

### 6. Woodburn (4.11 acres raw land)

Woodburn contains 4.11 acres of land zoned CG, generally located at 2450 Country Club Road in Woodburn, Oregon. The land is adjacent to the I-5 freeway across from the Woodburn Outlet Mall. The Debtor estimates that the value of this land is approximately $1,650,000. The debt against this property is held by Umpqua Bank.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 7.   College Park (938.2 acres raw land)

College Park contains 938.2 acres of raw land in Eugene, Oregon, 450 of which qualify for public facilities zoning.  The Debtor estimates that the value of this land is approximately $27,000,000.  The debt against this property is held by Umpqua Bank.

The Debtor has obtained Court approval to sell approximately 315 acres of the College Park property to the City of Eugene for approximately $1,500,000.

### 8.   Westlane Shopping Center

Westlane is a commercial shopping center located in Veneta, Oregon.  Westlane consists of retail and office space.  The retail and office space is partially leased.  The value of Westlane is approximately $9,500,000.  The debt against this property is held by Umpqua Bank.

### 9.   Garden Valley Shopping Center

Garden Valley is a commercial shopping center located in Roseburg, Oregon.  Garden Valley consists of retail space.  The retail space is two-thirds leased.  The value of Garden Valley is approximately $4,600,000.  The debt against this property is held by Umpqua Bank.

### 10.   West 11th & Obie

West 11th & Obie is land zoned commercial industrial and C-4, generally located at 3802-3810 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $1,600,000.  The debt against this property is held by Umpqua Bank.

### 11.   My Coffee

My Coffee is a commercial building located at 3808 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of the building is approximately $700,000.  The debt against this property is held by Umpqua Bank.

### 12.   Oil Can Henry's

Oil Can Henry's is a commercial building located at 3804 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $870,000.  The debt against this property is held by Umpqua Bank.

### 13.   Willow Creek

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Willow Creek contains 7.22 acres of raw land generally located at West 11th & Willow Creek in Eugene, Oregon. The Debtor estimates that the value of this land is approximately $2,100,000. The debt against this property is held by Summit Bank.

### 14.    Hawaii Land

The Debtor owns approximately 5,589 acres of land on the Big Island of Hawaii. The Debtor's real estate assets in Hawaii diversify the Debtor's investment portfolio. The Hawaii Property primarily is comprised of native Acacia Koa forests. Pioneer Asset Investments Limited of Hong Kong ("Pioneer") asserts a lien against 5,226 acres of this property (the "West Hilo Tree Farm"), but the Debtor believes the lien is void because it was recorded after the Petition Date and therefore violates the automatic stay pursuant to section 362(a)(4) of the Bankruptcy Code. The Debtor intends to file an adversary complaint to invalidate Pioneer's lien against the property.

The Debtor estimates that the value of the West Hilo Tree Farm ranges from approximately $29,000,000 to $50,000,000. The remaining 363 acres (the "Puueo Estate" and the "Puueo Forest") are unencumbered. The Debtor estimates that the value of the Puueo Estate and the Puueo Forest ranges from approximately $2,500,000 to $13,000,000.

### 15.    Natron Land

Natron contains 15 acres of raw land zoned light-medium industrial and I-2, generally located at Bob Straub Parkway in Springfield, Oregon. Based on the pending agreement to sell this land, the Debtor estimates that its value at approximately $1,200,000. The debt against this property is held by Siuslaw Bank.

### 16.    2890 Chad Drive (the BLM Office Building)

2890 Chad Drive is an office building located at 2890 Chad Drive in Eugene, Oregon. The Debtor estimates that the value of this building is approximately $8,000,000. The debt against this property is held collectively by Alice Smith, Francis Cline, Herbert McKillop, Karen Merwin, Linda Trickey, and William Greenhoot (referred to in the Plan as the "BLM Secured Creditors").

### 17.    2892 Crescent Ave.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2892 Crescent Ave. is an office building located at 2892 Crescent Avenue in Eugene, Oregon. The Debtor estimates that the value of this building is approximately $3,250,000. The debt against this property is held by Umpqua Bank.

### 18.    650 Goodpasture (Goodpasture Island Radio Tower)

650 Goodpasture is contains land and a radio tower located at 650 Goodpasture Island Drive in Eugene, Oregon. The Debtor estimates that the value of this land and tower is approximately $460,000. The debt against this property is held by Summit Bank.

### 19.    4480 G Hwy 101 N.

4480 G Hwy 101 N. is a medical office building located at 3480 Hwy 101 N. in Florence, Oregon. The Debtor estimates that the value of this building is approximately $2,100,000. The debt against this property is held by Siuslaw Bank.

### 20.    3082 Kinney Loop

3082 Kinney Loop, Eugene, Oregon contains a rental residence on .77 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $450,000. The debt against this property is held by Siuslaw Bank.

### 21.    3108 Kinney Loop

3108 Kinney Loop, Eugene, Oregon contains a rental residence on .43 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $250,000. The debt against this property is held by Siuslaw Bank.

### 22.    2850 Kinney Loop

2850 Kinney Loop, Eugene, Oregon contains a rental residence on .46 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $250,000. The debt against this property is held by Siuslaw Bank.

### 23.    3032 Kinney Loop

3032 Kinney Loop, Eugene, Oregon contains .49 acres. The Debtor estimates that the value of this property is approximately $250,000. The debt against this property is held by Umpqua Bank.

### 24.    Kinney Loop Lots

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3004 Kinney Loop, Eugene, Oregon contains .45 acres. The Debtor estimates that the value of this property is approximately $380,000. 2834 Kinney Loop, Eugene, Oregon contains .46 acres and is a rental residence, which is currently rented. The Debtor estimates that the value of this property is approximately $390,000. 2802/2804 Kinney Loop, Eugene, Oregon contains .28 acres. The Debtor estimates that the value of this property is approximately $490,000. 2802 and 2804 Kinney Loop are rental residences and both are currently rented. 2729 Coburg Road, Eugene, Oregon contains .34 acres. The Debtor estimates that the value of this property is approximately $592,416. 2743 Coburg Road, Eugene Oregon, contains .17 acres. The Debtor estimates that the value of this property is approximately $296,208. The debt against these properties is held by Siuslaw Bank.

### 25.    3058 Kinney Loop

3058 Kinney Loop, Eugene, Oregon contains .40 acres. The Debtor estimates that the value of this property is approximately $340,000. The debt against this property is held by Century Bank.

### 26.    2909 Lord Byron Place

2909 Lord Byron Place, Eugene, Oregon is a townhouse. The Debtor estimates that the value of this property is approximately $300,000. The debt against this property is held by Washington Federal Savings.

### 27.    2915 Lord Byron Place

2915 Lord Byron Place, Eugene, Oregon is a townhouse. The Debtor estimates that the value of this property is approximately $300,000. The debt against this property is held by Washington Federal Savings.

### 28.    2931 Lord Byron Place

2931 Lord Byron Place, Eugene, Oregon is a townhouse. The Debtor estimates that the value of this property is approximately $300,000. The debt against this property is held by Washington Federal Savings.

### 29.    2977 Lord Byron Place

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2977 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Washington Federal Savings.

### 30.    **2993 Lord Byron Place**

2903 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Washington Federal Savings.

### 31.    **2843 Lord Byron Place**

2843 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

### 32.    **2853 Lord Byron Place**

2853 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

### 33.    **2863 Lord Byron Place**

2863 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

### 34.    **2873 Lord Byron Place**

2873 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

### 35.    **2883 Lord Byron Place**

2883 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

### 36.    **Hangar 272**

Hangar 272 is an airplane hangar located at 28737 Grumman Dr., Eugene, Oregon.  The Debtor estimates that the value of this hangar is approximately $420,000.  The debt against this property is held by Umpqua Bank.

### 37.    **Hangar 246**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Hangar 246 is an airplane hangar located at the 90363 Boeing Dr., Eugene, Oregon. The Debtor estimates that the value of this hangar is approximately $90,000. There is no debt against this property.

### 38.    2960 and 3110 Kinney Loop

2960 and 3110 Kinney Loop, Eugene, Oregon contains .40 acres. The Debtor estimates that the value of this property is approximately $800,000. The debt against this property is held by Siuslaw Bank.

### 39.    Unencumbered Real Property

In addition to the properties described above, the Debtor owns various unencumbered real property that, in the aggregate, has a value exceeding $3,000,000. As set forth on **Exhibit B**, this unencumbered property includes Crescent Village Lot 9 (which the Debtor values at approximately $1,000,000), 3004 Kinney Loop (bare land; Lot 3000) (which Debtor values at approximately $380,000) and numerous lots on Lord Byron Place in Eugene, Oregon (which collectively are valued at approximately $1,500,000). The Debtor also owns approximately 363 acres of unencumbered property in Hawaii (22 acres generally referred to as the Puueo Estate, and 341 acres generally referred to as the Puueo Forest).

### B.    PERSONAL PROPERTY ASSETS

#### 1.    Cash and Accounts Receivable

The Debtor's personal property assets consist primarily of cash and accounts receivable. A significant portion of the Debtor's cash is subject to the cash collateral orders entered in this Case.

#### 2.    Bankruptcy Claim Filed Against Roberts Construction

Arlie has filed claims aggregating over $3,400,000 against Roberts Construction in the Roberts Prof. Const. Svcs., Inc. bankruptcy case (Case No. 08-60615-fra7) (the "Roberts Case"). Arlie cannot at this time estimate exactly how much Arlie will recover on its claims. There have been approximately $7.7 million in claims filed in the case, and the Debtor's share is approximately 44%.

On or about November 30, 2010, the trustee of the Roberts Case, Ronald R. Sticka, released three checks to the Debtor in the amounts of $36,715.91, $76,755.64 and $56,286.54 (for a total of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

$169,758.09).  Soon after Trustee Sticka announced that it would pay this interim dividend to the Debtor, Bank of America and Umpqua Bank notified the Debtor that they believed they possessed valid liens against the distributions.

Pursuant to the Court's August 19, 2010 order in this Case, Trustee Sticka withheld $47,851.64 from the November 30 distributions to the Debtor and paid that amount directly to the law firm Gartland, Nelson, McCleery, Wade & Walloch, P.C. ("Gartland, Nelson") on account of services provided to the Debtor with respect to the Roberts Case.  Gartland, Nelson held the distribution in its trust account, and on December 7, 2010 filed a motion requesting authority to disburse the funds to its general account as full payment of its secured claim against the Debtor (Docket No. 355).  This motion remains pending before the Court.

**3.    State Court Claims Against Michael Roberts and Mark Roberts**

On December 30, 2009, Arlie filed a State Court complaint in Lane County Circuit Court (Case No. 160928625) seeking over $1,000,000 in damages against Michael Roberts and Mark Roberts in connection with losses suffered by the Debtor on its Crescent Village project.  The Roberts brothers were owners and officers of Roberts Professional Construction Services, Inc. ("Roberts Construction"), which was the general contractor on Arlie's Crescent Village project.  Roberts Construction defaulted on its obligations to Arlie and filed for bankruptcy protection.  Arlie also has asserted claims against Roberts Construction in the Roberts Construction bankruptcy proceeding (see above), but the claims asserted by Arlie in the Lane County Circuit Court action are asserted against the Roberts bothers individually.

The claim against Michael Roberts is for fraud and alter ego.  The fraud cause of action is based on evidence that Michael Roberts caused Roberts Construction to over-bill Arlie for work done on the Crescent Village project.  That is, Michael Roberts knowingly caused invoices to be sent to Arlie on the Crescent Village project for work that had not been performed.  Arlie relied on these inflated invoices that Michael Roberts caused to be sent to them and paid these invoices.  Arlie suffered damages when Roberts Construction went out of business and Arlie was forced to pay twice for this work.  The alter ego claim against Michael and Mark Roberts is based on the fact that the Roberts brothers disregarded the corporate form of Roberts Construction and used the assets and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

resources of Roberts Construction for their own personal benefit (such as financing personal investments in Bend, Oregon) and did not treat Roberts Construction as an entity which was separate from themselves.

On February 25, 2010, the Roberts brothers removed the case to the Roberts Construction bankruptcy proceeding. Debtor filed a motion to remand the case back to Lane County Circuit Court. By order filed on July 6, 2010, Judge Alley denied the motion to remand. The adversary proceeding (10-06068-fra) was administratively transferred from the Roberts Construction bankruptcy case to this Case. On August 11, 2010, Judge Alley approved the parties' stipulated discovery schedule, which provides for the completion of discovery by February 28, 2011, and a five-day trial to commence on or after April 28, 2011.

### 4.    Potential Claims Against Umpqua Bank

The Debtor is investigating and evaluating potential claims against Umpqua Bank arising out of (a) Roberts Construction's fraudulent billing for the Crescent Village Building B construction, for which Robert Brink acted as Umpqua Bank's lead inspector, and (b) Umpqua Bank's course of conduct in connection with a series of loans made or proposed to be made to Arlie in 2009.

On August 19, 2010, the Court entered its *Order Regarding Debtor's Motion for Rule 2004 Examination of Umpqua Bank* (Docket No. 219), which provided for the production of certain paper files maintained by Umpqua Bank related to Mr. Robert Brink, a construction loan officer at Umpqua Bank who, based on information and belief, was indicted for and pled guilty to, among other malfeasance, filing inspection reports certifying that construction was underway on a Bend, Oregon developer's projects, when in fact it was not, and overstating construction progress (thereby resulting in overpayment of the contractors). Such discovery was initiated by the Debtor because some of its own construction at Crescent Village was subject to substantial overpayments to its contractor (Roberts Construction) who subsequently went bankrupt – after Mr. Brink issued similar progress certifications to Umpqua Bank. The height of construction at Crescent Village was roughly the same time during which Mr. Brink had committed malfeasance related to the Bend, Oregon project and other matters while working at Umpqua Bank.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Through an investigation undertaken in this case, Arlie is informed and believes that Umpqua Bank knew in early November 2007 that Mr. Brink submitted false inspection reports pertaining to other projects funded by the bank that allowed developers and contractors to fraudulently divert funds. Similarly, based on information and belief, Mr. Brink submitted false and misleading inspection reports in connection with Umpqua Bank's loan on Building B in Crescent Village, where the contractor also fraudulently diverted construction funds. As a result of Roberts Construction's intentional overbilling and Roberts Construction's subsequent bankruptcy filing, Arlie suffered uncompensated losses of over $3 million and substantial consequential damages. The losses that Arlie suffered as a result of Roberts Construction's overbilling were a substantial factor in causing Arlie to file its chapter 11 petition.

These facts support claims against Umpqua Bank for concealment, negligence and negligent misrepresentation. To the extent it can be demonstrated that Mr. Brink knew about the overbilling at Crescent Village, the Debtor also would have strong claims against Umpqua Bank for aiding and abetting the Roberts Construction fraud. At this time, it is difficult to estimate the approximate value of such claims or the costs of pursuing them. Umpqua Bank denies that Debtor has any claim against Umpqua Bank.

Pursuant to the Umpqua Bank Settlement, confirmation of the Plan will be conditioned on approval of a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's obligations to Umpqua Bank under which all claims against Umpqua Bank and its officers and employees are waived and released.

### 5.    Tonkon Claims

The Debtor's working relationship with Tonkon Torp LLP in August and September 2010 was marked by communication difficulties. The impact of these difficulties became more severe after objections were filed to the Debtor's Disclosure Statement. Ultimately, the Debtor determined that the best path for its reorganization efforts mandated the replacement of Tonkon Torp as chapter 11 bankruptcy counsel.

### 6.    Other Claims/Avoidance Actions

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Other than potential claims against Umpqua Bank that are being released as part of the Plan, the Plan preserves all of the Debtor's claims and causes of action, known or unknown, and all of the Debtor's claims and causes of actions (including any potential Avoidance Actions) remain assets of the Reorganized Debtor, and the Reorganized Debtor may pursue such claims and rights of action, as appropriate, in accordance with what is in the Reorganized Debtor's best interests.  Except as set forth in this Disclosure Statement, the Debtor is not currently aware of any pending material claims or causes of actions it may have that are likely to constitute material assets of the Debtor's estate.

## C.    LIABILITIES – SECURED CREDITORS

### 1.    Bank of America

The Debtor has two loans with Bank of America.  One loan (the "Building A Loan") is secured by Crescent Village Building A.  The other loan (the "Building D Loan") is secured by Crescent Village Building D.  As of the Petition Date, the Debtor owed approximately $9,000,000 on the Building A Loan and approximately $5,400,000 on the Building D Loan.

### 2.    Century Bank

The Debtor has seven loans with Century Bank.  Six of the loans are secured, and the seventh loan (a $200,000 line of credit loan) is unsecured.  As of the Petition Date, the Debtor owed a total of approximately $2,200,000 on the Century Bank loans.  The loans range from approximately $200,000 to approximately $365,000.  Each of the secured loans is secured by separate real property of the Debtor.  One secured loan is secured by a house located at 3058 Kinney Loop in Eugene, Oregon, and the other five secured loans are secured by separate townhomes located on Lord Byron Place in Eugene, Oregon.  As discussed above in Section III. B., the Debtor and Century Bank have agreed to resolve their lender/borrower relationship on the five townhomes located on Lord Byron Place pursuant to the *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370), filed by the Debtor on December 30, 2010.  A stipulated order that incorporates the terms of the settlement was filed with the December 30 Notice of Intent and such notice is pending before the Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 3.   Siuslaw Bank

The Debtor has eight loans with Siuslaw Bank. Each loan is secured by separate real property of the Debtor. The loans range from approximately $95,000 to approximately $4,300,000. As of the Petition Date, the Debtor owed a total of approximately $8,000,000 on the Siuslaw Bank loans.

### 4.   Summit Bank

The Debtor has one loan with Summit Bank that is secured by the real property and improvements in Eugene, Oregon commonly referred to as the Goodpasture Island Radio Tower. As of the Petition Date, the Debtor owed approximately $340,000 on the Summit Bank loan.

Additionally, the Debtor has guaranteed a $1,850,000 line of credit issued by Summit Bank to Churchill Media LLC, which guaranty obligations are secured by the Debtor's vacant land in Crescent Village and by the Debtor's vacant land located at W. 11th & Willow Creek in Eugene, Oregon.

### 5.   Umpqua Bank

The Debtor has twelve loans with Umpqua Bank. All of Umpqua Bank's loans are cross-defaulted, cross-collateralized, and are secured by multiple parcels of real property, improvements thereon, and rents and income therefrom. The loans range from approximately $190,000 to approximately $10,200,000. As of the Petition Date, the Debtor owed a total of approximately $29,000,000 on the Umpqua Bank loans.

### 6.   Washington Federal Savings

The Debtor has five loans with Washington Federal Savings. Each of the five loans is secured by a separate townhome located on Lord Byron Place in Eugene, Oregon. The loans range from approximately $390,000 to approximately $420,000. As of the Petition Date, the Debtor owed a total of approximately $2,000,000 on the Washington Federal Savings loans.

### 7.   "BLM" Individuals

Francis Cline, William Greenhoot, Herbert McKillop, Karen Merwin, Alice Smith and Linda Trickey (the "BLM Individuals") collectively financed the Debtor's acquisition of the office/warehouse campus located at 2890 Chad Drive in Eugene, Oregon (referred to as the "BLM

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Office Building"). The Debtor has a separate loan with each BLM Individual. Each loan is secured by the BLM Office Building. As of the Petition Date, the Debtor owed a total of approximately $4,350,000 on such loans.

### 8. Property Tax Lien Claimants

As of the Petition Date, the Debtor had unpaid property taxes of approximately $870,000 secured by statutory liens on the Debtor's real property.

### D. LIABILITIES – UNSECURED CREDITORS

The Plan contains two classes of unsecured creditors:  a convenience class of creditors holding Small Unsecured Claims (an Unsecured Claim of $2,000 or less) and a class of creditors holding General Unsecured Claims. Debtor estimates that the total amount of Allowed Small Unsecured Claims will be approximately $50,000, and that the total amount of Allowed General Unsecured Claims (including any Deficiency Claims of secured creditors) will be approximately $5,400,000.

Although Pioneer Asset Investment Limited of Hong Kong asserts that its $1,500,000 loan to the Debtor is secured by approximately 5,226 acres of land on the Big Island of Hawaii, the lien was recorded after the Petition Date and is thus void as a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code. The Debtor intends to file a adversary complaint to invalidate Pioneer's lien against the property. Accordingly, the Debtor believes that the Pioneer has a General Unsecured Claim of approximately $1,500,000, which is included in the Debtor's estimate of approximately $5,400,000 of total Allowed General Unsecured Claims.

### E. LIABILITIES – ADMINISTRATIVE EXPENSES

As discussed above in section III. B. 4, the Debtor has retained a number of professionals in the case. In addition, the Debtor is responsible for payment of the fees and expenses of counsel for the Committee.

### V.

### DESCRIPTION OF PLAN OF REORGANIZATION

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan that follows

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

constitutes a summary only and should not be relied upon for voting purposes. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtor. If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

## A.   UNCLASSIFIED CLAIMS

Administrative Expense Claims and Priority Tax Claims are not classified.

An "Administrative Expense Claim" is a Claim against the Debtor that is entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses of preserving the estate and operating Debtor's businesses during the Case, any indebtedness or obligations incurred by the Debtor during the pendency of the Case in connection with the rendition of services to the Debtor, and compensation for legal and other professional services and reimbursement of expenses and statutory fees payable to the United States Trustee.

Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

A "Priority Tax Claim" is a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code. The Debtor is not aware of any Priority Tax Claims. Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:230406.9

44

FIRST AMENDED DISCLOSURE STATEMENT
(JANUARY 10, 2011)

In addition, any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date. After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court. This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

## B.    CLASSIFIED CLAIMS AND INTERESTS

The Plan divides Creditors and Interest Holders into Classes. Creditors with similar Claims are placed in the same Class. A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class. The following summary of distributions under the Plan to Classified Claims and Interests is subject to, and is qualified in its entirety by reference to, the Plan attached hereto as **Exhibit A**.

### 1.    Class 1 (Other Priority Claims)

Class 1 consists of all Allowed Other Priority Claims. An "Other Priority Claim" is a Claim against the Debtor for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code (other than an Administrative Expense Claim or a Priority Tax Claim). Class 1 is impaired. Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

### 2.    Class 2 (Allowed Secured Claim of BofA)

Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA"). Class 2 is impaired. The Class 2 Claim of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described. Each property of Debtor that is Collateral of BofA shall serve as Collateral for each of BofA's Class 2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claims.  As security for BofA's Class 2 Claims, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

(a)      *Class 2.1 – Building A Loan.*

BofA will have an Allowed Class 2.1 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA's Class 2.1 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building A Note") in the amount of the present value of the amount of the Allowed Class 2.1 Claim.  The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Building A Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(b)      *Class 2.2 – Building D Loan.*

BofA will have an Allowed Claim (the "BofA Claim") in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,376,088.93 (the "Building D Loan"), which loan is partially secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D"). BofA shall have an Allowed Class 2.2 Claim in the amount of the Building D Value; the remainder of the BofA Claim shall be a Class 12 Claim.

BofA's Class 2.2 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building D Note") in the amount of the present value of the Allowed Class 2.2 Claim. The Building D Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building D Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Building D Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

*(c)* *Treatment of Bank of America's Cash Collateral Accounts.*

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A. The remainder of the Building A Cash Collateral will be retained and used by Reorganized Debtor for its general operating purposes.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D. The remainder of the Building D Cash Collateral shall be retained in a segregated BofA account to be used for Property Taxes, capital

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

expenses, tenant improvements, maintenance, improvements, or other expenses directly pertaining to the improvement of Building D or the sale, lease or marketing of Building D.

### 3. Class 3 (Allowed Secured Claims of Century Bank)

Class 3 consists of the Allowed Secured Claims of Century Bank. Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the present value of the Allowed Class 3 Claim (the "3058 Kinney Loop Note"). The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum (or such other rate as determined by the Court) and will be payable by Reorganized Debtor as follows. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**4.** **Class 4 (Allowed Secured Claim of Pioneer)**

Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer"). The Class 4 Secured Claim of Pioneer is disputed. If and to the extent Pioneer is determined by Final Order of the Bankruptcy Court to have a valid, perfected security interest in or lien upon property of the Debtor, it's Claim will be impaired and Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Pioneer to Debtor on or about on or about September 12, 2008 in the original principal amount of $1,500,000 (the "Pioneer Loan').

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Pioneer's Allowed Class 4 Claim shall be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount of the present value of the Pioneer Class 4 Claim. The Pioneer Note will bear interest at a fixed rate of 4.5% per annum. The Pioneer Note will be payable by Reorganized Debtor as follows:

The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note.

If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order of the Bankruptcy Court, the Pioneer Claim will be treated as a Class 12 Claim.

**5.**    **Class 5 (Allowed Secured Claims of Siuslaw Bank)**

Class 5 consists of the Allowed Secured Claims of Siuslaw Bank. Class 5 is impaired. The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans. Each loan is separately classified and treated as hereinafter described.

*(a)*    *Class 5.1 – Crescent Village Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the present value of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots Note.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank.

*(b)    Class 5.2 - 2850 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.2 Claim.  The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 2850 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2850 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(c)    *Class 5.3 - 2960 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.3 Claim.  The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 2960 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2960 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all

unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2960

Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw

Payoff Proceeds.

*(d)    Class 5.4 - 3082 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued

non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date

(as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and

Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or

about on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney

Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon

commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and

liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the

same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the

Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw

Bank (the "3082 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.4

Claim.  The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be

payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the

Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter

through and including the 36th month following the Effective Date, Reorganized Debtor will make

interest only payments on the 3082 Kinney Loop Note.  Commencing on the first (but no later than

the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than

the tenth) day of each month thereafter until the 3082 Kinney Loop Note has been paid in full,

Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the

3082 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all

unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3082

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw

Payoff Proceeds.

*(e)    Class 5.5 - 3108 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued

non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date

(as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and

Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or

about on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney

Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon

commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and

liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the

same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the

Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw

Bank (the "3108 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.5

Claim.  The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be

payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the

Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter

through and including the 36th month following the Effective Date, Reorganized Debtor will make

interest only payments on the 3108 Kinney Loop Note.  Commencing on the first (but no later than

the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than

the tenth) day of each month thereafter until the 3108 Kinney Loop Note has been paid in full,

Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the

3108 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all

unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(f)     *Class 5.6 - Florence Medical Building Loan.*

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

As Collateral for the Class 5.6 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.6 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Florence Note") in the amount of the present value of the Allowed Class 5.6 Claim. The Florence Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

On the Effective Date, Reorganized Debtor shall pay down the Florence Note to the original principal amount of the Florence Medical Building Loan. Thereafter, commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Florence Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Florence Note has been paid in full, Reorganized Debtor will make equal monthly amortizing

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

payments of principal and interest on the Florence Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(g)    *Class 5.7 – Kinney Loop Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the present value of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

The Kinney Loop Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Kinney Loop Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Kinney Loop Lots Note.

(h)    *Class 5.8 – Natron Land Loan.*

Siuslaw Bank will have an Allowed Class 5.8 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about February 21, 2008 in the original principal amount of $945,000 (the "Natron Land

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Loan"), which loan is secured by Debtor's real property and improvements in Springfield, Oregon known as South 60th Street and commonly referred to by Debtor as the Natron Vacant Land.  In the event a sale of the Natron Vacant Land has not been consummated prior to the Effective Date, the Class 5.8 Claim shall be addressed as follows.

As Collateral for the Class 5.8 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Natron Land Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.8 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Natron Note") in the amount of the present value of the Allowed Class 5.8 Claim, payable by Reorganized Debtor as follows.

The Natron Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Natron Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Natron Note.  Notwithstanding the foregoing, the Natron Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(i)    Treatment of Siuslaw Bank's Cash Collateral Account.*

On the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay  any past due Property Taxes on the Collateral securing the Class 5 Claims.  Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

**6.    Class 6 (Summit Bank)**

Class 6 consists of the Allowed Secured Claims of Summit Bank.  Class 6 is impaired.  The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

*(a)    Class 6.1 – Road Radio Tower Loan.*

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the present value of the Allowed Class 6.1 Claim. The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

*(b)        Class 6.2 – Guaranty Claim.*

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek)**.**

Summit Bank will have an Allowed Class 6.2 claim in the amount of the present value of the amount owing by Debtor under the Churchill Media Guaranty. Summit Bank's Class 6.2 Claim will be satisfied by delivery of a promissory note to Summit Bank (the "Guaranty Note"), payable by Reorganized Debtor as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty Note. At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note. All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note. In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

*(c)* *Treatment of Summit Bank's Cash Collateral Account.*

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims. Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

### 7.    Class 7 (Umpqua Bank)

Class 7 consists of the Allowed Secured Claims of Umpqua Bank. Class 7 is impaired. The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described. The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs (the "Umpqua Bank Fees") as allowed by Umpqua Bank's existing loan documents with Debtor. Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of a Umpqua Bank Loan for defaults under or relating to the Umpqua Bank loans that occurred before the Effective Date and any such Claims shall be deemed waived, released and extinguished. Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross defaulted and cross collateralized. Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such security documents, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect. Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan, and Debtor and/or Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral. Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  of the Plan shall control and take precedence.

2      As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan

3  is the amount of principal and the then accrued and outstanding non-default interest owing on the

4  Umpqua loan associated with such property.

5                          *(a)      Class 7.1 – Westlane Loan.*

6      Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued

7  non-default interest and reasonable fees and costs (excluding any late payment fees) under that

8  certain loan made by Umpqua Bank to Debtor on or about on or about February 12, 2002 in the

9  original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among

10  other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as

11  88330 N. Territorial Road (the "Westlane Property").  Umpqua Bank's Class 7.1 Claim shall be

12  satisfied as follows.

13      Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into

14  a letter of intent for the sale of the Westlane Property at a price in excess of the Arlie Debt Amount

15  for such property, provided that any such sale must close within two (2) months after the execution

16  of the letter of intent, or (b) transfer title to the Westlane Property to Umpqua Bank, subject to any

17  and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably

18  agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the

19  Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be

20  deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the

21  Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds

22  (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained

23  by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be

24  for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other

25  than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

26                          *(b)      Class 7.2 - West 11th Land Loan.*

27      Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued

28  non-default interest and reasonable fees and costs (excluding any late payment fees) under the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

unpaid principal balance that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property"). Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

*(c)      Class 7.3 – 2892 Crescent Ave. Loan.*

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

a letter of intent for the sale of 2892 Crescent Avenue at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

*(d)      Class 7.4 Woodburn and College Park Loan.*

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred to as 2450 Country Club Road, Marion County (the "Woodburn Property").  The Woodburn Property secures $931,750 of the outstanding amounts owing under the Woodburn and College Park Loan.  The College Park Property secures the remaining amounts owing under the Woodburn and College Park Loan.  Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price in excess of the Arlie Debt Amount

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

Subject to the reduction of debt owing against the College Park Property from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case (the "College Park Sale") and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property described above, as of the Effective Date the Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein (the "College Park Pay Down").

The accrued non-default interest and reasonable fees and costs owing as of the Effective Date on the College Park Loan will be due and payable upon a sale or refinancing of the College Park Land.

*(e)      Class 7.5 – Roseburg Loan #1.*

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property"). Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property. Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 shall be deemed waived or released. Thereafter, interest will accrue on the Roseburg Loan #1 at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Reorganized Debtor may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building.

*(f)    Class 7.6 – Roseburg Loan #2*

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property. Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:230406.9

65

FIRST AMENDED DISCLOSURE STATEMENT
(JANUARY 10, 2011)

Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2.  Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2 shall be deemed waived or released.  Thereafter, interest will accrue on the Roseburg Loan #2 at a fixed rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

*(g)*     *Class 7.7 – Oil Can Henry's Loan.*

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property").  Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property.  Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan shall be deemed waived or released.  Thereafter, interest will accrue on the Oil Can Henry's Loan at the rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(h)    *Class 7.8 – My Coffee Loan.*

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property"). Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

Interest will accrue on the principal amount owing on the My Coffee Loan at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

(i)    *Class 7.9 – Building B Loan.*

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

Interest will accrue on the principal amount owing on the Building B Loan at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

following the Effective Date and continuing on the first (but no later than the tenth) day of each

month thereafter through and including the Maturity Date, Reorganized Debtor will make equal

monthly amortizing payments of principal and interest on the outstanding principal amount of the

Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid

principal and interest due on the Maturity Date.  Additionally, the non-default interest that accrued

on the Building B Loan between the Petition Date and the Effective Date shall be due and payable

on the Maturity Date.

*(j)*      *Class 7.10 – Grumman Hangar Loan.*

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued

non-default interest and reasonable fees and costs (excluding any late payment fees) under that

certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal

amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things,

Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737

Grumman Drive (the "Grumman Hangar Property").  Umpqua Bank's Class 7.10 Claim shall be

satisfied as follows.

As of the Effective Date, interest on the Grumman Hangar Loan will accrue at a fixed rate of

4.5% per annum and will be paid as follows.  Commencing on the first (but no later than the tenth)

day of the first month following the Effective Date and continuing on the first (but no later than the

tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor

will make equal monthly amortizing payments of principal and interest on the outstanding principal

amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon

payment of all unpaid principal and interest due on the Maturity Date.  Additionally, the non-default

interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date

shall be due and payable on the Maturity Date.

*(k)*      *Class 7.11 – 3032 Kinney Loop Loan.*

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued

non-default interest and reasonable fees and costs (excluding any late payment fees) under that

certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop").  Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the 3032 Kinney Loop Loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

*(l)      Class 7.12 - Crescent Village Land Loan.*

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property").  Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the Crescent Village Land Loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

*(m)      Refinance of Properties Encumbered by Umpqua Bank's Liens.*

Reorganized Debtor may refinance any of the property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Arlie Debt Amount associated with such property plus the applicable Umpqua Proceeds Share (as defined below).

> (n)    *Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.*

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, Reorganized Debtor may from time to time sell a property free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount associated with such property has been paid or will be paid upon such sale.  In addition to the Arlie Debt Amount, a share of any sale proceeds in excess of the Arlie Debt Amount (the "Umpqua Proceeds Share") will be retained for Umpqua Bank's account as follows.  For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any sale proceeds in excess of the Arlie Debt Amount will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Notwithstanding the foregoing, upon tender of the Arlie Debt Amount associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of liens, claims and encumbrances related to specific pieces of property of Debtor that serves as Collateral for all of Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt Amount associated with such specific piece of property (on a pro rata basis determined in light of the comparative value of the property to be sold

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

*(o)    Payment of Umpqua Bank Fees.*

Upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportion share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

*(p)    Property Taxes.*

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

*(q)    Waiver of Claims by Debtor and Reorganized Debtor.*

The Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor.  On the Effective Date, Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers, and managers for actions (or in-actions) that occurred before the Effective Date.

*(r)    Treatment of Umpqua Bank's Cash Collateral Account.*

Provided the College Park Sale is consummated prior to the Effective Date, the balance of funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

*(s)      Use of Rents Generated From Umpqua Properties.*

Commencing on the Effective Date, Reorganized Debtor may utilize all rents generated from the properties securing the Umpqua Bank loans for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

*(t)      Guarantees.*

All guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan.

*(u)      Additional Documents.*

On the Effective Date, Reorganized Debtor will execute and deliver to Umpqua Bank such documents as Umpqua Bank reasonably requires to effectuate the terms of the Plan.

**8.      Class 8 (Washington Federal Savings)**

Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal"). Class 8 is impaired. The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

*(a)      Class 8.1 –Lord Byron Loan.*

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan"). The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral"). The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Washington Federal will have Allowed Claims in the aggregate amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date (the "Washington Claim Amount"). Washington Federal shall have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

Washington Federal's Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, each in the amount of $300,000: the 2909 Lord Byron Note, the 2915 Lord Byron Note, the 2931 Lord Byron Note, the 2977 Lord Byron Note and the 2993 Lord Byron Note (individually, a "Lord Byron Note" and collectively, the "Lord Byron Notes"). Each Lord Byron Note will bear interest at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date. Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date. Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable to such property.  Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal.

(b) *Treatment of Washington Federal's Cash Collateral Account.*

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 Claims.   Any amounts remaining in the account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

(c) *Treatment of the Washington Federal Unsecured Claim.*

The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.

### 9. Class 9 (BLM Secured Creditors)

Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  The Class 9 Claims are secured by a deed of trust on Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

(a) *Class 9.1 – Francis Cline.*

Francis Cline will have an Allowed Class 9.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Cline as of the Effective Date under that certain loan made by Ms. Cline to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Cline Loan"), which loan is secured by a deed of trust on BLM Office Building.  The Class 9.1 Claim shall be treated as follows.

On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

satisfaction of all obligations owing under the Cline Loan.  Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested. In such event, Ms. Cline will retain her security interest in and lien upon the BLM Office Building with the same priority and to the same extent such security had as of the Petition Date, and the Reorganized Debtor shall maintain the BLM office Building in good repair and insure the BLM Office Building to its full usable value pending a sale.

*(b)      Class 9.2 – William Greenhoot.*

William Greenhoot will have an Allowed Class 9.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Mr. Greenhoot as of the Effective Date under that certain loan made by Mr. Greenhoot to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Greenhoot Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Greenhoot Loan and the Class 9.2 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(c)      Class 9.3 – McKillop II Limited Partnership.*

The McKillop II Limited Partnership ("McKillop") will have an Allowed Class 9.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the Partnership as of the Effective Date under those certain loans made by Herbert McKillop to Debtor on or about on or about November 4, 2008 in the original principal amounts of $120,000 and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:230406.9

75

FIRST AMENDED DISCLOSURE STATEMENT
(JANUARY 10, 2011)

$1,453,482 (collectively, the "McKillop Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the McKillop Loan and the Class 9.3 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(d)    Class 9.4 – Karen Merwin.*

Karen Merwin will have an Allowed Class 9.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Merwin as of the Effective Date under that certain loan made by Ms. Merwin to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Merwin Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Merwin Loan and the Class 9.4 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*(e)*      *Class 9.5 – Alice Smith.*

Alice Smith will have an Allowed Class 9.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Smith as of the Effective Date under that certain loan made by Ms. Smith to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Smith Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Smith Loan and the Class 9.5 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(f)*      *Class 9.6 – Linda Trickey.*

Linda Trickey will have an Allowed Class 9.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Trickey as of the Effective Date under that certain loan made by Ms. Trickey to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Trickey Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Trickey Loan and the Class 9.6 Claim.

Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

### 10.    Class 10 (Property Tax Lien Claims)

Class 10 consists of all Allowed Property Tax Lien Claims.  Class 10 is impaired.  Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

### 11.    Class 11 (Small Unsecured Claims)

Class 11 consists of all Allowed Small Unsecured Claims.  Class 11 is impaired.  Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

### 12.    Class 12 (General Unsecured Claims).

Class 12 consists of all Allowed General Unsecured Claims.  Class 12 is impaired.  Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

### 13.    Class 13 (Interests)

Class 13 consists of all Interests.  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## C.  **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The Bankruptcy Code gives the Debtor the right, after commencement of its Chapter 11 Case, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  Generally, an "executory contract" is a contract under which material performance (other than the payment of money) is still due by each party.  The Plan provides that except as may otherwise be provided, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date.  The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for or subject to other Court Order or pending motion.  Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment.

Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner.  Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

## D.  **CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

Article XI of the Plan provides lists of conditions that must occur in order for the Plan to be confirmed and for the Plan become effective.  The following are conditions precedent to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

confirmation of this Plan: (1) the Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor; and (2) the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

The following are conditions precedent to the occurrence of the Effective Date: (1) the Confirmation Date shall have occurred; (2) the Confirmation Order shall have become a Final Order; (3) no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending; and (4) the Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

## E.   SOURCES OF FUNDING FOR THE PLAN

The Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, a new loan in the amount of $615,000 to be made on the Effective Date to Reorganized Debtor by Siuslaw Bank, the net operating income generated from the Reorganized Debtor's continued business operations and from the future sale or refinancing of assets of the Reorganized Debtor from time to time. A core aspect of the Debtor's business is marketing and selling real property acquired by the Debtor from time to time. The Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan. Such sales may occur without further order of the Bankruptcy Court.

Without limiting the preceding and except as set forth with respect to a particular Creditor under the Plan, the Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral the Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral. Any excess net proceeds from the sale or refinancing of such Collateral shall be paid to the Reorganized Debtor (or as otherwise directed by the Reorganized Debtor) and may be used by the Reorganized Debtor to fund the Reorganized Debtor's continued business operations and to fund payments required under this Plan. Such sales or refinancing may occur without further order of the Bankruptcy Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In addition to marketing and selling its real property assets in the ordinary course of its business, the Reorganized Debtor may market and sell or refinance its non-core assets on an accelerated basis as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Debtor under this Plan.  Without limiting the preceding, if at any time the Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of the Reorganized Debtor's non-core assets to raise the funds necessary to make the required Plan payment.  Such auctions and sales may occur without further order of the Bankruptcy Court.

## F.    EFFECT OF CONFIRMATION

### 1.    Discharge

The treatment of, and consideration received by, holders of Allowed Claims pursuant to the Plan will be in full satisfaction, release and discharge of their respective Claims against the Debtor. Except as otherwise expressly provided in the Plan, the confirmation of the Plan shall, provided that the Effective Date shall have occurred, discharge all Claims to the fullest extent authorized or provided for by the Bankruptcy Code, including, without limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof.

### 2.    Revesting, Operation of Business

Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all forfeited escrow deposits not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

### 3.    Injunction

If the Plan is confirmed, the effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.

### 4.    Modification of the Plan; Revocation or Withdrawal of the Plan

The Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order.  After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

### 5.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:  (a) to resolve controversies and disputes regarding any Avoidance Action, (b) to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests, (c) to determine requests for payment of Claims entitled to priority under Section 507(a) of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed in this Bankruptcy Case, (d) to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code, (e) to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan, (f) to resolve controversies and disputes regarding the interpretation of this Plan, (g) to implement the provisions of this Plan and enter orders in aid of confirmation, (h) to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and (i) to enter a final decree closing this Bankruptcy Case.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

### 6.    **United States Trustee Fees**

The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted or dismissed.  After confirmation, the Reorganized Debtor shall serve on the United States Trustee a quarterly financial report for each month, or portion thereof, that the case remains open.  The quarterly financial report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the Plan.

### VI.

### LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy Court must determine, with respect to such Class, that each holder of a Claim or Interest will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests Test."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtor believes the Plan is in the best interest of creditors because the Debtor's Plan provides for the payment in full to all of its creditors with interest over a relatively short period of time. Consequently, the Plan provides each dissenting or non-voting member of each impaired Class with a recovery not less than the recovery such member would receive if the Debtor was liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 Trustee.

## VII.

### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

CIRCULAR 230 DISCLAIMER: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.

### A.    GENERAL TAX CONSIDERATIONS

The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan. This discussion is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of an Allowed Claim or any Interest holder. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion does not address aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim subject to special treatment under federal income tax laws (such as foreign taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans, and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  other tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.

2  Furthermore, this summary does not address federal taxes other than income taxes.

3      This discussion is based on existing provisions of the Internal Revenue Code of 1986, as

4  amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and

5  current administrative rulings and court decisions.  Legislative, judicial or administrative changes or

6  interpretations enacted or promulgated could alter or modify the discussion set forth below with

7  respect to the federal income tax consequences of the Plan.  Any such changes or interpretations may

8  be retroactive and could significantly affect the federal income tax consequences of the Plan.  No

9  ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to

10  any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect

11  thereto.  This discussion is not binding on the IRS or the courts and no assurance can be given that

12  the IRS will not assert, or that a court will not sustain, a different position than any position

13  discussed herein.  No representations or assurances are being made to the holders of Allowed Claims

14  or the Interest holders with respect to the federal income tax consequences described herein.

15      Accordingly, the following summary of certain federal income tax consequences of the Plan

16  is for informational purposes only and is not a substitute for careful tax planning or advice based

17  upon the individual circumstances pertaining to a particular holder of an Allowed Claim or an

18  Interest holder.  Each holder of an Allowed Claim or Interest is strongly urged to consult with its

19  own tax advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

20      Any discussion of federal tax issues set forth in this Disclosure Statement was written solely

21  in connection with the confirmation of the Plan to which the transactions described in this Disclosure

22  Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any

23  person and is not intended or written to be used, and cannot be used, by any person for the purpose

24  of avoiding any federal tax penalties that may be imposed on such person.  Each holder of an

25  Allowed Claim and each Interest holder should seek advice based on its particular circumstances

26  from an independent tax advisor.

27

28

**B.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR**

The Debtor is a corporation that has elected to be treated as an S corporation (as defined in IRC Section 1361) for federal income tax purposes.  As an S corporation, the Debtor is not itself generally subject to federal income tax.  Instead, each Interest holder, as a shareholder of the Debtor, is required to include its pro rata share of the income, gain, loss, and deduction recognized by the Debtor in the Interest holder's own income tax returns.  Accordingly, since it is unlikely there will be any direct federal income tax liability at the Debtor level under the Plan, it appears there are no federal income tax consequences to the Debtor under the Plan.

Under the IRC, a taxpayer generally will recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) satisfied, over (b) the sum of the amount of cash paid and the fair market value of any new consideration given in satisfaction of the indebtedness.  However, IRC Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court.  In the case of an entity taxable as a corporation, eligibility for the Bankruptcy Exception is determined at the corporate level.  If the Bankruptcy Exception applies (with the effect that the taxpayer excludes its COD Income from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain of its tax attributes by the amount of COD Income excluded from gross income pursuant to the Bankruptcy Exception.  The reduction includes any net operating loss for the taxable year of the discharge (which, with respect to an S corporation, includes certain losses that have been blocked at the shareholder level by the basis limitation rule), net operating loss carryovers from prior years, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards.  Except for the net operating loss and basis reductions, these attribute reductions generally have limited application to S corporations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Whether the Debtor will realize any COD Income on the debt restructuring contemplated by the Plan depends on whether the restructuring of any debt constitutes a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the corresponding Treasury Regulations. For a deemed taxable exchange to occur with respect to a debt, the modification to the debt must be "significant" as such term is defined in the applicable Treasury Regulations. If the modification to a debt obligation of the Debtor is "significant," the Debtor will realize COD Income in an amount equal to the amount, if any, by which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted issue price" of the old debt. Accordingly, if the restructuring of any debt of the Debtor is treated as a deemed taxable exchange (even though each modified debt will have a principal amount equal to its corresponding old debt), the Debtor will realize COD Income if such modified debt does not bear "adequate stated interest." The realization of COD Income by the Debtor will result in tax attribute reductions because of its exclusion under the Bankruptcy Exception.

## C.    FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF AN ALLOWED CLAIM

Under the Plan, the debt owed by the Debtor to particular holders of Allowed Claims will be restructured. If the modification to the debt is "significant," as such term is defined in the applicable Treasury Regulations, the restructured debt will be treated as received by such holder in a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001.

With respect to a deemed taxable exchange, a holder of an Allowed Claim will generally recognize gain or loss in connection with the exchange if the holder's adjusted tax basis in the old debt does not equal the issue price of the modified debt. If the issue price of the modified debt is greater than the holder's adjusted tax basis in the debt, the holder will recognize taxable income as a result of the deemed exchange. Since each modified debt will have a principal amount equal to its corresponding old debt, a holder of an Allowed Claim generally should not recognize any gain or loss on a deemed taxable exchange of such debt unless either (1) the modified debt does not have adequate stated interest or (2) the tax basis in the debt is different from the issue price of the modified debt. Any gain or loss recognized will be long-term or short-term capital gain or loss, or

ordinary income or loss, depending upon factors specific to each holder of an Allowed Claim, including but not limited to: (1) whether the Claim (or a portion thereof) is attributable to principal or interest, (2) the origin of the Claim, (3) whether the holder of the Claim reports income on the accrual or cash basis method, and (4) whether the holder of the Claim has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The principal amount of certain restructured debt may include accrued but unpaid interest. A holder of an Allowed Claim not previously required to include in its taxable income any accrued but unpaid interest on such Claim may be treated as receiving taxable interest to the extent the modified debt received is allocable to such accrued but unpaid interest.

### D.     CONSEQUENCES TO THE INTEREST HOLDERS

The Interests are not restructured in the Plan. Accordingly, except for any loss attributable to a reduction at the Interest holder level (as discussed above), the Plan has no material federal income tax consequences to the Interest holders.

### E.     INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, under certain circumstances, a holder of a Claim may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the holder's United States federal income tax liability, and the holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**F.     IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM AND THE INTEREST HOLDER IS URGED TO CONSULT ITS TAX ADVISOR ABOUT THE FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN, INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**VIII.**

**ACCEPTANCE AND CONFIRMATION OF THE PLAN**

**A.     CONFIRMATION HEARING**

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on _____, 2011 at _____.  The hearing will be held at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, #2600, Eugene, Oregon 97401 before the Honorable Albert E. Radcliffe, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of creditors and Interest holders of the Debtor.  The Debtor will submit a report to the Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.  Any objection to confirmation of the Plan must be timely filed as stated above.

**B.     REQUIREMENTS OF CONFIRMATION**

At the hearing on confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of the Bankruptcy Code have been satisfied.  If all of the provisions of Section 1129 are met, then the Bankruptcy Court may enter an order confirming the Plan.  The Debtor believes the

Plan satisfies all of the requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan has been proposed and is made in good faith.

### C.    FEASIBILITY

The Debtor believes that confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or a need for a further financial reorganization of the Debtor.  The Debtor has identified and is marketing for sale most of its non-core assets (see **Exhibit B**) to ensure that the Debtor will have sufficient funds to continue its operations and to fund required Plan payments.  The projections of the Debtor's post-confirmation business and sales, attached hereto as **Exhibit C** show sufficient earnings and cash flow from operations and sales or refinancing of real property to support and meet the ongoing financial needs of the Debtor and the Plan.  The projections indicate that the Plan as proposed by the Debtor is feasible and that the Debtor will be financially viable after confirmation of the Plan.

### D.    RISK FACTORS

There are a number of risks associated with the Debtor's proposed Plan.  Each creditor should carefully consider those risks in evaluating its vote on the Debtor's Plan.  All of the risks associated with the Debtor's Plan are too numerous to identify, however, a few of those risks are set forth below.

#### 1.    General Financial Market Conditions

The disruption of numerous major financial institutions and the resulting crisis in the financial markets has rippled through the economy, impacting the real estate industry in particular.  It is possible that this financial market may continue to make it very difficult for qualified buyers or lessees to obtain affordable financing, which could have a significant adverse impact on the Debtor.

#### 2.    Projected Financial Results

The Debtor's projected financial results reflect management's best estimate of the Debtor's future financial performance based on currently known facts and hypothetical assumptions about, among other matters, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, real estate, and general business and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

economic conditions.  Many of these factors are beyond the Debtor's control.  As a consequence, the Debtor's actual financial results may differ significantly from the Debtor's projections.

### E.    CRAM DOWN

As discussed previously, a court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the cram down requirements set forth in Section 1129(b) of the Bankruptcy Code.  In the event that any impaired Class of Claims does not accept the Plan, the Debtor hereby requests that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise permit the Debtor to modify the Plan.

### F.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed, the Debtor or another party in interest may attempt to formulate or propose a different plan or plans of reorganization.  Such plans might involve a reorganization and continuation of the Debtor's business, a sale of the Debtor's business as a going concern, an orderly liquidation of the Debtor's assets or any combination thereof.  If no Plan of Reorganization is determined by the Bankruptcy Court to be confirmable, the Chapter 11 case may be converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.

In a liquidation, a Chapter 7 Trustee would be appointed with the purpose of liquidating the assets of the Debtor.  Typically in a liquidation, assets are sold for less than their going concern value and, accordingly, the return to creditors and Interest holders is generally less than the return in a reorganization, which derives the value to be distributed in a Plan from the business as a going concern.  Proceeds from liquidation would be distributed to creditors and Interest holders of the Debtor in accordance with the priorities set forth in the Bankruptcy Code.  Given the nature of Debtor's assets, the Debtor believes that it would be impossible for a trustee to maximize the value of the assets.  The Debtor further believes that a trustee would require two to three years to market, sell and close sales for all of the Debtor's properties.  Therefore, it is unlikely that distributions would be made to unsecured creditors in less than three years and distributions could take five years.

As the Plan is a full payment plan, the Debtor believes there is no currently available alternative that would offer holders of Claims and Interests in the Debtor better treatment or a greater

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  return than the Plan offers such holders of Claims and Interests, and urges all parties entitled to vote

2  on the Plan to vote to accept the Plan.

3                                         IX.

4                  **RECOMMENDATION AND CONCLUSION**

5          Based on the foregoing, the Debtor believes that the Plan is in the best interests of Creditors

6  and urges Creditors to vote to accept the Plan. After reviewing all the information and making an

7  informed decision, please vote by using the enclosed ballot.

8  DATED this 10th day of January, 2011.

9

10                                              Respectfully submitted,

11                                         ARLIE & COMPANY

12

13                                         By: _____
                                           Scott Diehl, Chief Financial Officer

14

15  Presented by:

16  PACHULSKI STANG ZIEHL & JONES LLP
    By   /s/ John D. Fiero
17  John D. Fiero (CA Bar No. 136557)
    Linda F. Cantor (CA Bar No. 153762)
18  Teddy M. Kapur (CA Bar No. 242486)

19  -and-

20  BALL JANIK LLP
    David W. Criswell (OSB No. 925930)
21  Brad T. Summers (OSB No. 911116)

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
Email: jfiero@pszjlaw.com
        lcantor@pszjlaw.com
        tkapur@pszjlaw.com

and

Brad T. Summers (OSB No. 911116)
David W. Criswell (OSB No. 925930)
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone: 503/228-2525
Facsimile: 503/295-1058
Email: tsummers@balljanik.com
        dcriswell@balljanik.com

Attorneys for Debtor Arlie & Company

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| In re | Case No. 10-60244-aer11 |
| **ARLIE & COMPANY,** | Chapter 11 |
| Debtor. | **DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)** |
| | <u>Hearing</u> |
| | Date: TBD |
| | Time: TBD |
| | Place: United States Bankruptcy Court |
| | 405 E. 8th Avenue, #2600 |
| | Eugene, Oregon 97401 |
| | Judge: Honorable Albert E. Radcliffe |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** .................................................................. 1

1.1    "Administrative Expense Claim" ............................................ 1

1.2    "Agent". ................................................................................ 1

1.3    "Allowed". ............................................................................ 1

1.4    "Avoidance Actions". ........................................................... 2

1.5    "Bankruptcy Case". .............................................................. 2

1.6    "Bankruptcy Code". .............................................................. 2

1.7    "Bankruptcy Court". ............................................................. 2

1.8    "Bankruptcy Rules". ............................................................. 2

1.9    "BLM Secured Creditors" ..................................................... 2

1.10   "Building D Value" ............................................................... 2

1.11   "Business Day". .................................................................... 3

1.12   "Cash" ................................................................................... 3

1.13   "Claim". ................................................................................ 3

1.14   "Class". ................................................................................. 3

1.15   "Collateral". .......................................................................... 3

1.16   "Confirmation Date". ............................................................ 3

1.17   "Confirmation Hearing" ........................................................ 3

1.18   "Confirmation Order". ........................................................... 3

1.19   "Creditor". ............................................................................ 3

1.20   "Debtor". ............................................................................... 3

1.21   "Deficiency Claim" ............................................................... 3

1.22   "Disclosure Statement". ........................................................ 4

1.23   "Disputed Claim". ................................................................. 4

1.24   "Effective Date". ................................................................... 4

1.25   "Entity" ................................................................................. 4

1.26   "Excess Sale Proceeds" ......................................................... 4

1.27   "Filed". ................................................................................. 4

1.28   "Final Order". ....................................................................... 4

1.29   "General Unsecured Claim". ................................................. 4

1.30   "Interests". ............................................................................ 5

1.31   "Lord Byron Collateral Value" ............................................. 5

1.32   "Maturity Date". ................................................................... 5

1.33   "Non-core assets" ................................................................. 5

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.34 "Other Priority Claim"...................................................................5

1.35 "Petition Date"..............................................................................5

1.36 "Plan"...........................................................................................5

1.37 "Priority Tax Claim".....................................................................5

1.38 "Pro Rata"....................................................................................5

1.39 "Property Tax".............................................................................5

1.40 "Property Tax Lien Claim"............................................................5

1.41 "Rejection Claim"..........................................................................5

1.42 "Reorganized Debtor"...................................................................6

1.43 "Roberts Distributions".................................................................6

1.44 "Schedules"..................................................................................6

1.45 "Scheduled Amounts"...................................................................6

1.46 "Secured Claim"............................................................................6

1.47 "Small Unsecured Claim"..............................................................6

1.48 "Tonkon Claims"..........................................................................6

1.49 "Unsecured Claim".......................................................................6

**ARTICLE II UNCLASSIFIED CLAIMS** .................................................1

2.1 Administrative Expense Claims.......................................................1

2.2 Priority Tax Claims.  .....................................................................1

2.3 Bankruptcy Fees.  ........................................................................1

**ARTICLE III CLASSIFICATION** .........................................................1

3.1 Class 1 (Other Priority Claims).......................................................2

3.2 Class 2 (BofA)...............................................................................2

3.3 Class 3 (Century Bank)..................................................................2

3.4 Class 4 (Pioneer)...........................................................................2

3.5 Class 5 (Siuslaw Bank)..................................................................2

3.6 Class 6 (Summit Bank).  ...............................................................2

3.7 Class 7 (Umpqua Bank).................................................................2

3.8 Class 8 (Washington Federal Savings)...........................................2

3.9 Class 9 (BLM Secured Creditors)...................................................2

3.10 Class 10 (Property Tax Lien Claims)..............................................2

3.11 Class 11 (Small Unsecured Claims)................................................2

3.12 Class 12 (General Unsecured Claims).............................................2

3.13 Class 13 (Interests)........................................................................2

**ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** ........3

4.1 Class 1 (Other Priority Claims).......................................................3

4.2 Class 2 (Allowed Secured Claims of BofA).....................................3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | |
|---|---|---|
| 4.3 | Class 3 (Allowed Secured Claim of Century Bank) | 5 |
| 4.4 | Class 4 (Allowed Secured Claim of Pioneer).. | 6 |
| 4.5 | Class 5 (Allowed Secured Claims of Siuslaw Bank) | 7 |
| 4.6 | Class 6 (Summit Bank).. | 15 |
| 4.7 | Class 7 (Umpqua Bank).. | 17 |
| 4.8 | Class 8 (Washington Federal Savings). | 30 |
| 4.9 | Class 9 (BLM Secured Creditors). | 32 |
| 4.10 | Class 10 (Property Tax Lien Claims) | 35 |
| 4.11 | Class 11 (Small Unsecured Claims).. | 36 |
| 4.12 | Class 12 (General Unsecured Claims).. | 36 |
| 4.13 | Class 13 (Interests) | 36 |

**ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS** ... 36

| | | |
|---|---|---|
| 5.1 | Distributions by Debtor. | 36 |
| 5.2 | Disputed Claims; Objections to Claims | 36 |
| 5.3 | Subsequent Allowance of Disputed Claims. | 37 |
| 5.4 | Unclaimed Distributions. | 37 |

**ARTICLE VI MEANS FOR EXECUTION OF PLAN** ... 37

| | | |
|---|---|---|
| 6.1 | Continued Business Operations. | 37 |
| 6.2 | Siuslaw Loan. | 38 |
| 6.3 | Operating Revenues.. | 38 |
| 6.4 | Sales or Refinancing of Real Property Collateral.. | 38 |
| 6.5 | Marketing and Sales of Non-Core Assets. | 39 |
| 6.6 | Setoffs. | 39 |
| 6.7 | Corporate Action. | 39 |
| 6.8 | Saturday, Sunday, or Legal Holiday. | 40 |
| 6.9 | Deposits. | 40 |
| 6.10 | Event of Default; Remedy.. | 40 |
| 6.11 | Continuation of Unsecured Creditors' Committee. | 40 |

**ARTICLE VII EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ... 41

| | | |
|---|---|---|
| 7.1 | Assumption and Rejection.. | 41 |
| 7.2 | Assignment. | 41 |
| 7.3 | Rejection Claims. | 42 |
| 7.4 | Compensation and Benefit Programs. | 42 |

**ARTICLE VIII EFFECT OF CONFIRMATION** ... 42

| | | |
|---|---|---|
| 8.1 | Binding Effect. | 42 |
| 8.2 | Discharge and Permanent Injunction | 43 |
| 8.3 | Limitation of Liability. | 43 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

8.4    Exculpation.. ................................................................................................ 43

**ARTICLE IX RETENTION OF JURISDICTION** .................................................. 44

9.1    Jurisdiction of the Bankruptcy Court. ......................................................... 44

9.2    Failure of Bankruptcy Court to Exercise Jurisdiction................................. 45

**ARTICLE X ADMINISTRATIVE PROVISIONS** ................................................. 45

10.1    Modification or Withdrawal of the Plan.. .................................................. 45

10.2    Revocation or Withdrawal of Plan............................................................. 45

10.3    Modification of Payment Terms. ............................................................... 45

10.4    Nonconsensual Confirmation. .................................................................. 46

10.5    Compromise of Controversies.. ............................................................... 46

10.6    Final Decree. ............................................................................................ 46

**ARTICLE XI CONDITIONS PRECEDENT TO CONFIRMATION** ...................... 46

**AND CONSUMMATION OF THE PLAN** ........................................................... 46

11.1    Conditions to Confirmation. ..................................................................... 46

11.2    Conditions to Effective Date .................................................................... 46

11.3    Waiver of Conditions................................................................................ 47

**ARTICLE XII MISCELLANEOUS PROVISIONS** .............................................. 47

12.1    Revesting................................................................................................. 47

12.2    Rights of Action. ...................................................................................... 47

12.3    Governing Law.. ....................................................................................... 47

12.4    Withholding and Reporting Requirements. .............................................. 47

12.5    Time.. ....................................................................................................... 48

12.6    Section 1146(c) Exemption. .................................................................... 48

12.7    Severability.. ............................................................................................ 49

12.8    Successors and Assigns........................................................................... 49

12.9    Notices to Claim and Interest Holders. s. ................................................ 49

12.10    Post Effective-Date Notices.................................................................... 49

12.11    Retiree Benefits. ..................................................................................... 49

12.12    Provisions Enforceable. ......................................................................... 50

12.13    Recordable Order. .................................................................................. 50

12.14    Plan Controls........................................................................................... 50

12.15    Delivery of Promissory Notes................................................................. 50

12.16    Effectuating Documents and Further Transactions................................. 51

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:230606.7

iv

FIRST AMENDED PLAN OF REORGANIZATION
(JANUARY 10, 2011)

Arlie & Company, as debtor and debtor-in-possession ("Debtor"), proposes the following Plan of Reorganization (the "Plan") pursuant to Section 1121(a) of Title 11 of the United States Code.

The Plan provides for the repayment in full of Debtor's obligations to its Creditors.  A Disclosure Statement is enclosed herewith to assist you in understanding the Plan and making an informed judgment concerning its terms.

## ARTICLE I

### DEFINITIONS

Definitions of certain terms used in the Plan are set forth below.  Other terms are defined in the text of the Plan or in the text of the Disclosure Statement.  In either case, when a defined term is used, the first letter of each word in the defined term is capitalized.  Terms used and not defined in the Plan or the Disclosure Statement shall have the meanings given in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires.  The meanings of all terms shall be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined.  The words "herein," "hereof," "hereto," "hereunder," and others of similar import, refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  Captions and headings to articles, sections and exhibits are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation of the Plan.  The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.1     "Administrative Expense Claim" means any Claim entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

1.2     "Agent" means any shareholder, director, officer, employee, partner, member, agent, attorney, accountant, advisor or other representative of any person or entity (solely in their respective capacities as such, and not in any other capacity).

1.3     "Allowed" means, when used to modify the term Claim or Administrative Expense Claim, either a proof of which has been properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the Schedules as liquidated in amount and not disputed or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

contingent or an Administrative Expense Claim that the Debtor has received by the applicable bar date, and, in each case, a Claim or Administrative Expense Claim as to which no objection to the allowance thereof, or motion to estimate for purposes of allowance, shall have been Filed on or before any applicable period of limitation that may be fixed by the Bankruptcy Code, the Bankruptcy Rules and/or the Bankruptcy Court, or as to which any objection, or any motion to estimate for purposes of allowance, shall have been so Filed, to the extent (a) such objection is resolved between such claimant and either the Debtor or the Reorganized Debtor or (b) such Claim is allowed by a Final Order.

1.4    "Avoidance Actions" means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law (including, without limitation, Sections 506(c), 510, 542, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code or equivalent provisions of applicable non-bankruptcy law), equity or otherwise.

1.5    "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code with respect to Debtor, pending in the District of Oregon, administered as *In Arlie & Company,* Case No. 10-60244-aer11.

1.6    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

1.7    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any proceeding therein, including the United States District Court for the District of Oregon, to the extent that the reference to the Bankruptcy Case or any proceeding therein is withdrawn.

1.8    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended and promulgated under Section 2075, Title 28, of the United States Code, and the local rules and standing orders of the Bankruptcy Court.

1.9    "BLM Secured Creditors" means each of Francis Cline, William Greenhoot, McKillop II Limited Partnership, Karen Merwin, Alice Smith and Linda Trickey.

1.10    "Building D Value" means $4,200,000.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.11    "Business Day" means a day other than a Saturday, Sunday, any legal holiday as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are authorized or required by law to be closed.

1.12    "Cash" means lawful currency of the United States of America and equivalents, including, without limitation, checks, wire transfers and drafts.

1.13    "Claim" means (a) any right to payment from Debtor arising before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective Date for breach of performance if such breach gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.14    "Class" means one of the classes of Claims or Interests defined in Article III hereof.

1.15    "Collateral" means any property in which Debtor has an interest that is subject to a lien or security interest securing the payment of an Allowed Secured Claim.

1.16    "Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Clerk of the Bankruptcy Court.

1.17    "Confirmation Hearing" means the hearing or hearings to consider confirmation of the Plan under Section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned from time to time.

1.18    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.19    "Creditor" means any entity holding a Claim against Debtor.

1.20    "Debtor" means Arlie & Company, as Debtor and Debtor-in-Possession in the Bankruptcy Case.

1.21    "Deficiency Claim" has the meaning set forth in the sentence following the definition of "Secured Claim."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.22    "Disclosure Statement" means Debtor's Disclosure Statement as amended, modified, restated or supplemented from time to time, pertaining to the Plan.

1.23    "Disputed Claim" means a Claim with respect to which a Proof of Claim has been timely Filed or deemed timely Filed under applicable law, and as to which an objection, timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for filing such objections by order of the Bankruptcy Court, and has not been denied by a Final Order and which Claim has not been estimated or temporarily allowed by the Bankruptcy Court on timely motion by the holder of such Claim.  If an objection related to the allowance of only a part of a Claim has been timely Filed or deemed timely Filed, such Claim shall be a Disputed Claim only to the extent of the objection.

1.24    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all conditions to the occurrence of the Effective Date set forth in Article 11.2 of this Plan have been either satisfied or waived but in no event later than April 25, 2010.

1.25    "Entity" shall have the meaning ascribed to it by Section 101(15) of the Bankruptcy Code.

1.26    "Excess Sale Proceeds" means proceeds from the sale of property of the Debtor after payment of all debt secured by such property, Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses.

1.27    "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

1.28    "Final Order" means an order or judgment entered on the docket by the Clerk of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties that has not been reversed, stayed, modified or amended and as to which the time for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for rehearing shall have expired.

1.29    "General Unsecured Claim" means any Unsecured Claim that is not otherwise classified under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.30   "Interests" means an equity security of the Debtor within the meaning of Section 101(16) of the Bankruptcy Code.

1.31   "Lord Byron Collateral Value" means $1,500,000.

1.32   "Maturity Date" means the fifth anniversary of the Effective Date.

1.33   "Non-core assets" means those real property assets of Reorganized Debtor identified by Reorganized Debtor from time to time in its sole discretion as assets that are not core to Reorganized Debtor's long-term business success.

1.34   "Other Priority Claim" means any Claim for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

1.35   "Petition Date" means January 20, 2010, the date on which the petition commencing this Bankruptcy Case was Filed.

1.36   "Plan" means this Plan of Reorganization, as amended, modified, restated or supplemented from time to time.

1.37   "Priority Tax Claim" means a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.38   "Pro Rata" means a proportionate share, so that the ratio of (a) the amount of property distributed on account of any Allowed Claim, or retained on account of a Disputed Claim, in a Class, to (b) the amount distributed on account of all Allowed Claims, or allocated to on account of all disputed claims, in such Class, is the same as the ratio (x) such Claim bears to (y) the total amount of all Claims (including Disputed Claims in their respective Disputed Claim Amounts) in such Class.

1.39   "Property Tax" means *ad valorem* property taxes or similar impositions by a governmental unit on property of the Debtor.

1.40   "Property Tax Lien Claim" means the Secured Claim of any governmental unit for Property Taxes that are secured by statutory liens on any of Debtor's property (real or personal).

1.41   "Rejection Claim" means a Claim arising from the rejection of an unexpired lease or executory contract.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.42    "Reorganized Debtor" means Debtor from and after the Effective Date.

1.43    "Roberts Distributions" means any and all distributions made to Debtor or Reorganized Debtor from the Bankruptcy estate of In re: Roberts Prof. Const. Svcs., Inc. (Case No. 08-60615-fra7).

1.44    "Schedules" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as amended, modified, restated or supplemented from time to time.

1.45    "Scheduled Amounts" means the Claim amounts as set forth in Debtor's Schedules.

1.46    "Secured Claim" means any Claim against Debtor held by any entity, including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code.  Unless otherwise provided in the Plan, the unsecured portion, if any, of such Claim shall be treated as a General Unsecured Claim and shall be referred to herein as "Deficiency Claim."

1.47    "Small Unsecured Claim" means any Unsecured Claim that is equal to or less than $2,000, or that has been reduced by election in writing to $2,000, provided that such written election shall be served on Debtor not later than the first date fixed by the Bankruptcy Court for the filing of acceptances or rejections of the Plan.

1.48    "Tonkon Claims" means all of the Debtor's claims for relief and causes of action, whether legal or equitable, against Tonkon Torp LLP, whether sounding in contract or tort specifically including but not limited to professional negligence related to Tonkon Torp LLP's representation of the Debtor at any time.

1.49    "Unsecured Claim" means a Claim that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Property Tax Lien Claim, or a Secured Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## ARTICLE II

## UNCLASSIFIED CLAIMS

2.1    <u>Administrative Expense Claims</u>.  Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

2.2    <u>Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. §  511, over a period ending not later than five years after the date on which such claim was assessed.

2.3    <u>Bankruptcy Fees</u>.  Any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

## ARTICLE III

## CLASSIFICATION

For purposes of this Plan, Claims (except those treated under Article II are classified as provided below.  A Claim is classified in a particular Class only to the extent that such Claim

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class.

        3.1     <u>Class 1 (Other Priority Claims)</u>.  Class 1 consists of all Allowed Other Priority Claims.

        3.2     <u>Class 2 (BofA)</u>.  Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA").

        3.3     <u>Class 3 (Century Bank)</u>.  Class 3 consists of the Allowed Secured Claims of Century Bank.

        3.4     <u>Class 4 (Pioneer)</u>.  Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer").

        3.5     <u>Class 5 (Siuslaw Bank)</u>.  Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.

        3.6     <u>Class 6 (Summit Bank)</u>.  Class 6 consists of the Allowed Secured Claims of Summit Bank.

        3.7     <u>Class 7 (Umpqua Bank)</u>.  Class 7 consists of the Allowed Secured Claims of Umpqua Bank.

        3.8     <u>Class 8 (Washington Federal Savings)</u>.  Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal").

        3.9     <u>Class 9 (BLM Secured Creditors)</u>.  Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.

        3.10    <u>Class 10 (Property Tax Lien Claims)</u>.  Class 10 consists of all Allowed Property Tax Lien Claims.

        3.11    <u>Class 11 (Small Unsecured Claims)</u>.  Class 11 consists of all Allowed Small Unsecured Claims.

        3.12    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all Allowed General Unsecured Claims.

        3.13    <u>Class 13 (Interests)</u>.  Class 13 consists of all Interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ARTICLE IV**

**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

4.1    <u>Class 1 (Other Priority Claims)</u>.  Class 1 is impaired. Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

4.2    <u>Class 2 (Allowed Secured Claims of BofA)</u>.  Class 2 is impaired.  The Class 2 Claim of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described.  Each property of Debtor that is Collateral of BofA shall serve as Collateral for each of BofA's Class 2 Claims.  As security for BofA's Class 2 Claims, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

4.2.1    <u>Class 2.1 – Building A Loan</u>.

BofA will have an Allowed Class 2.1 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA's Class 2.1 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building A Note") in the amount of the present value of the amount of the Allowed Class 2.1 Claim.  The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Building A Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

### 4.2.2    Class 2.2 – Building D Loan.

BofA will have an Allowed Claim (the "BofA Claim") in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,376,088.93 (the "Building D Loan"), which loan is partially secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D"). BofA shall have an Allowed Class 2.2 Claim in the amount of the Building D Value; the remainder of the BofA Claim shall be a Class 12 Claim.

BofA's Class 2.2 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building D Note") in the amount of the present value of the Allowed Class 2.2 Claim. The Building D Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building D Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

than the tenth) day of each month thereafter until the Building D Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.2.3    Treatment of Bank of America's Cash Collateral Accounts.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A. The remainder of the Building A Cash Collateral will be retained and used by Reorganized Debtor for its general operating purposes.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D. The remainder of the Building D Cash Collateral shall be retained in a segregated BofA account to be used for Property Taxes, capital expenses, tenant improvements, maintenance, improvements, or other expenses directly pertaining to the improvement of Building D or the sale, lease or marketing of Building D.

4.3    Class 3 (Allowed Secured Claim of Century Bank)

Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the present value of the Allowed Class 3 Claim (the "3058 Kinney Loop Note"). The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum (or such other rate as determined by the Court) and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.4     Class 4 (Allowed Secured Claim of Pioneer). The Class 4 Secured Claim of Pioneer is disputed. If and to the extent Pioneer is determined by Final Order of the Bankruptcy Court to have a valid, perfected security interest in or lien upon property of the Debtor, Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Pioneer to Debtor on or about on or about September 12, 2008 in the original principal amount of $1,500,000 (the "Pioneer Loan'").

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Pioneer's Allowed Class 4 Claim shall be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount of the present value of the Pioneer Class 4 Claim. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Pioneer Note will bear interest at a fixed rate of 4.5% per annum.  The Pioneer Note will be payable by Reorganized Debtor as follows:

The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note

If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order of the Bankruptcy Court, the Pioneer Claim will be treated as a Class 12 Claim.

4.5    <u>Class 5 (Allowed Secured Claims of Siuslaw Bank).</u>  Class 5 is impaired.  The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans.  Each loan is separately classified and treated as hereinafter described.

4.5.1    <u>Class 5.1 – Crescent Village Lots Loan</u>.

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the present value of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots Note.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank..

4.5.2    Class 5.2 – 2850 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.2 Claim.  The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 2850 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2850 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.5.3    Class 5.3 – 2960 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.3 Claim. The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 2960 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2960 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.5.4        Class 5.4 – 3082 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.4 Claim. The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 3082 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3082 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.5.5    Class 5.5 – 3108 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.5 Claim.  The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the 3108 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3108 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.5.6    Class 5.6 – Florence Medical Building Loan.

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

As Collateral for the Class 5.6 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.6 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Florence Note") in the amount of the present value of the Allowed Class 5.6 Claim.  The Florence Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

On the Effective Date, Reorganized Debtor shall pay down the Florence Note to the original principal amount of the Florence Medical Building Loan.  Thereafter, commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Florence Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Florence Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Florence Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.5.7    Class 5.7 – Kinney Loop Lots Loan.

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the present value of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

The Kinney Loop Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Kinney Loop Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Kinney Loop Lots Note.

4.5.8        Class 5.8 – Natron Land Loan.

Siuslaw Bank will have an Allowed Class 5.8 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about February 21, 2008 in the original principal amount of $945,000 (the "Natron Land Loan"), which loan is secured by Debtor's real property and improvements in Springfield, Oregon known as South 60th Street and commonly referred to by Debtor as the Natron Vacant Land.  In the event a sale of the Natron Vacant Land has not been consummated prior to the Effective Date, the Class 5.8 Claim shall be addressed as follows.

As Collateral for the Class 5.8 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Natron Land Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.8 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Natron Note") in the amount of the present value of the Allowed Class 5.8 Claim, payable by Reorganized Debtor as follows.

The Natron Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Natron Note.  At the time

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Natron Note. Notwithstanding the foregoing, the Natron Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.5.9    Treatment of Siuslaw Bank's Cash Collateral Account.

On the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay any past due Property Taxes on the Collateral securing the Class 5 Claims. Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

4.6    Class 6 (Summit Bank). Class 6 is impaired. The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

4.6.1    Class 6.1 – Road Radio Tower Loan.

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the present value of the Allowed Class 6.1 Claim. The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note.  Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

4.6.2        Class 6.2 – Guaranty Claim.

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek)**.**

Summit Bank will have an Allowed Class 6.2 claim in the amount of the present value of the amount owing by Debtor under the Churchill Media Guaranty.  Summit Bank's Class 6.2 Claim will be satisfied by delivery of a promissory note to Summit Bank (the "Guaranty Note"), payable by Reorganized Debtor as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty Note.  At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note.  All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Summit Bank in reduction of the principal owing on the Guaranty Note.  In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

4.6.3    Treatment of Summit Bank's Cash Collateral Account.

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims.  Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

4.7    Class 7 (Umpqua Bank).  Class 7 is impaired.  The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described.  The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs (the "Umpqua Bank Fees") as allowed by Umpqua Bank's existing loan documents with Debtor.  Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of a Umpqua Bank Loan for defaults under or relating to the Umpqua Bank loans that occurred before the Effective Date and any such Claims shall be deemed waived, released and extinguished.  Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, all of which

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

liens and security interests are and will continue to be cross-defaulted and cross collateralized. Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such security documents, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect. Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan, and Debtor and/or Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral. Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

### 4.7.1    Class 7.1 – Westlane Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property"). Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the Westlane Property to Umpqua Bank,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

4.7.2    Class 7.2 - West 11th Land Loan.

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under the unpaid principal balance that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property").  Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

4.7.3      Class 7.3 – 2892 Crescent Ave. Loan.

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.7.4    Class 7.4 Woodburn and College Park Loan.

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred to as 2450 Country Club Road, Marion County (the "Woodburn Property").  The Woodburn Property secures $931,750 of the outstanding amounts owing under the Woodburn and College Park Loan.  The College Park Property secures the remaining amounts owing under the Woodburn and College Park Loan.  Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property including, without limitation, the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount and Property Taxes will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:230606.7

21

FIRST AMENDED PLAN OF REORGANIZATION
(JANUARY 10, 2011)

Subject to the reduction of debt owing against the College Park Property from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case (the "College Park Sale") and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property described above, as of the Effective Date the Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein (the "College Park Pay Down").

The accrued non-default interest and reasonable fees and costs owing as of the Effective Date on the College Park Loan will be due and payable upon a sale or refinancing of the College Park Land.

### 4.7.5    Class 7.5 – Roseburg Loan #1.

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property"). Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property. Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 shall be deemed waived or released. Thereafter, interest will accrue on the Roseburg Loan #1 at a fixed rate of 4.5% per annum. Commencing on the first (but no

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Reorganized Debtor may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building.

### 4.7.6    Class 7.6 – Roseburg Loan #2

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property. Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2. Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2 shall be deemed waived or released. Thereafter, interest will accrue on the Roseburg Loan #2 at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.7.7        Class 7.7 – Oil Can Henry's Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property").  Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property.  Any default, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan shall be deemed waived or released.  Thereafter, interest will accrue on the Oil Can Henry's Loan at the rate of 4.5% per annum.  Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.7.8        Class 7.8 – My Coffee Loan.

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property").  Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Interest will accrue on the principal amount owing on the My Coffee Loan at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

4.7.9    Class 7.9 – Building B Loan.

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

Interest will accrue on the principal amount owing on the Building B Loan at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.7.10    Class 7.10 – Grumman Hangar Loan.

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property"). Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

As of the Effective Date, interest on the Grumman Hangar Loan will accrue at a fixed rate of 4.5% per annum and will be paid as follows. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

4.7.11    Class 7.11 – 3032 Kinney Loop Loan.

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop"). Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the 3032 Kinney Loop Loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the

Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

### 4.7.12    Class 7.12 - Crescent Village Land Loan.

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property").  Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the Crescent Village Land Loan will bear simple interest at the rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

### 4.7.13    Refinance of Properties Encumbered by Umpqua Bank's Liens.

Reorganized Debtor may refinance any of the property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount associated with such property plus the applicable Umpqua Proceeds Share (as defined below).

### 4.7.14    Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, Reorganized Debtor may from time to time sell a property free and clear of any liens, claims and encumbrances of Umpqua Bank provided

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

that the Arlie Debt Amount associated with such property has been paid or will be paid upon such sale.  In addition to the Arlie Debt Amount, a share of any sale proceeds in excess of the Arlie Debt Amount (the "Umpqua Proceeds Share") will be retained for Umpqua Bank's account as follows.  For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3/) of any sale proceeds in excess of the Arlie Debt Amount will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any sale proceeds in excess of the Arlie Debt Amount will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Notwithstanding the foregoing, upon tender of the Arlie Debt Amount associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of liens, claims and encumbrances related to specific pieces of property of Debtor that serves as Collateral for all of Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt Amount associated with such specific piece of property (on a pro rata basis determined in light of the comparative value of the property to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

4.7.15    Payment of Umpqua Bank Fees.

Upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportion share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

4.7.16    Property Taxes.

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

4.7.17    Waiver of Claims by Debtor and Reorganized Debtor.

The Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor.  On the Effective Date, Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers, and managers for actions (or in-actions) that occurred before the Effective Date.

4.7.18    Treatment of Umpqua Bank's Cash Collateral Account.

Provided the College Park Sale is consummated prior to the Effective Date, the balance of funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

4.7.19    Use of Rents Generated From Umpqua Properties.

Commencing on the Effective Date, Reorganized Debtor may utilize all rents generated from the properties securing the Umpqua Bank loans for any purpose without restriction

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

including, without limitation, for general overhead and general administrative expenses.

### 4.7.20    Guarantees.

All guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan.

### 4.7.21    Additional Documents.

On the Effective Date, Reorganized Debtor will execute and deliver to Umpqua Bank such documents as Umpqua Bank reasonably requires to effectuate the terms of the Plan.

4.8    Class 8 (Washington Federal Savings).  Class 8 is impaired.  The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

### 4.8.1    Class 8.1 –Lord Byron Loan..

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan").  The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral").  The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the aggregate amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date (the "Washington Claim Amount").  Washington Federal shall have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

Washington Federal's Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, each in the amount of $300,000:  the 2909 Lord Byron Note, the 2915 Lord Byron Note, the 2931 Lord Byron Note, the 2977 Lord Byron Note and the 2993 Lord Byron Note (individually, a "Lord Byron Note" and collectively, the "Lord Byron

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Notes"). Each Lord Byron Note will bear interest at a fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes. Commencing on the first (but no later than the tenth) day of the 37th month after the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date. Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date. Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property. Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal.

        4.8.2        <u>Treatment of Washington Federal's Cash Collateral Account</u>.

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 Claims. Any amounts remaining in the account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 4.8.3    Treatment of the Washington Federal Unsecured Claim.

The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.

4.9    **Class 9 (BLM Secured Creditors)**.  Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  The Class 9 Claims are secured by a deed of trust on Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

Class 9.1 – Francis Cline.

Francis Cline will have an Allowed Class 9.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Cline as of the Effective Date under that certain loan made by Ms. Cline to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Cline Loan"), which loan is secured by a deed of trust on BLM Office Building.  The Class 9.1 Claim shall be treated as follows.

On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under the Cline Loan.  Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested. In such event, Ms. Cline will retain her security interest in and lien upon the BLM Office Building with the same priority and to the same extent such security had as of the Petition Date, and the Reorganized Debtor shall maintain the BLM office Building in good repair and insure the BLM Office Building to its full usable value pending a sale.

Class 9.2 – William Greenhoot.

William Greenhoot will have an Allowed Class 9.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Mr. Greenhoot as of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Effective Date under that certain loan made by Mr. Greenhoot to Debtor on or about on or about

November 4, 2008 in the original principal amount of $347,065 (the "Greenhoot Loan"), which loan

is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes

on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the

BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer

title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in

such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and

complete satisfaction of the all obligations owing under the Greenhoot Loan and the Class 9.2

Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors,

Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement

and any necessary rezoning services, if requested, upon such terms as may be agreed to by and

between the BLM Secured Creditors and the Reorganized Debtor.

<u>Class 9.3 – McKillop II Limited Partnership</u>.

The McKillop II Limited Partnership ("McKillop") will have an Allowed Class 9.3

Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs

owing to the Partnership as of the Effective Date under those certain loans made by Herbert

McKillop to Debtor on or about on or about November 4, 2008 in the original principal amounts of

$120,000 and $1,453,482 (collectively, the "McKillop Loan"), which loan is secured by a deed of

trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes

on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the

BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer

title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in

such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and

complete satisfaction of the all obligations owing under the McKillop Loan and the Class 9.3 Claim.

Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized

Debtor will market the BLM Office Building for sale and provide tenant improvement and any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

.Class 9.4 – Karen Merwin.

Karen Merwin will have an Allowed Class 9.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Merwin as of the Effective Date under that certain loan made by Ms. Merwin to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Merwin Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Merwin Loan and the Class 9.4 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

Class 9.5 – Alice Smith.

Alice Smith will have an Allowed Class 9.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Smith as of the Effective Date under that certain loan made by Ms. Smith to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Smith Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Smith Loan and the Class 9.5 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

Class 9.6 – Linda Trickey.

Linda Trickey will have an Allowed Class 9.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Trickey as of the Effective Date under that certain loan made by Ms. Trickey to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Trickey Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the BLM Secured Creditors of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Trickey Loan and the Class 9.6 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

4.10    Class 10 (Property Tax Lien Claims). Class 10 is impaired. Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.11    <u>Class 11 (Small Unsecured Claims)</u>.  Class 11 is impaired.  Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

4.12    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 is impaired.  Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre-petition or post-petition default interest or post-petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

4.13    <u>Class 13 (Interests)</u>.  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

**ARTICLE V**

**PROVISIONS GOVERNING DISTRIBUTIONS**

5.1    <u>Distributions by Debtor</u>.  The Reorganized Debtor shall administer Claims and make distributions in respect of Allowed Claims.  Distributions to be made by the Reorganized Debtor may be made by any person designated or retained by the Reorganized Debtor to serve as disbursing agent without the need for any further order of the Bankruptcy Court.

5.2    <u>Disputed Claims; Objections to Claims</u>  Only Claims that are Allowed shall be entitled to distributions under the Plan.  No Cash or other property shall be distributed under the Plan on account of any Disputed Claim, or a portion of any such Claim, unless and until such Disputed Claim becomes an Allowed Claim.  Debtor reserves the right to contest and object to any Claims and previously Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts that are specifically referenced herein, are not listed in the Schedules, are listed therein as disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount than the Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

currently believes is validly due and owing. All Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the Bankruptcy Court may otherwise order.

5.3     Subsequent Allowance of Disputed Claims. The holder of a Disputed Claim that becomes Allowed in full or in part subsequent to the Effective Date shall receive Cash distributions (including any make-up distributions) on the next applicable distribution date following the allowance of such Disputed Claim.

5.4     Unclaimed Distributions. Any entity which fails to claim any Cash distribution within one hundred twenty (120) days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan and the Reorganized Debtor shall be authorized to cancel any distribution that is not timely claimed. Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Reorganized Debtor, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Upon forfeiture, the claim of any Creditor with respect to such funds shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and such Creditors shall have no claim whatsoever against the Reorganized Debtor or any holder of an Allowed Claim to whom distributions are made by the Reorganized Debtor.

## ARTICLE VI

## MEANS FOR EXECUTION OF PLAN

6.1     Continued Business Operations From and after the Effective Date, the Reorganized Debtor shall continue to engage in business with the goal of maximizing the value of its assets and, subject to the provisions of the Plan governing distributions and the retention of jurisdiction provisions hereof, the Reorganized Debtor shall continue such business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The Reorganized Debtor shall be authorized, without limitation, to use and dispose of its assets, to insure its assets, to borrow money, to employ and compensate agents, to reconcile and object to Claims, and to make distributions to Creditors in accordance with the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

6.2    <u>Siuslaw Loan</u>  On the Effective Date Siuslaw Bank will loan the Reorganized Debtor the amount of $615,000 (the "New Siuslaw Loan").  The New Siuslaw Loan shall bear interest at a fixed per annum rate of 5.5% and shall be secured by security interests and liens upon the Florence Medical Building with the same priority as the liens and security interests securing the Florence Medical Building Note.  On the Funding Date, Reorganized Debtor shall establish a separate cash reserve account at Siuslaw Bank into which will be deposited funds sufficient to satisfy the first six (6) months of payments on account of Class 5 Claims under the Plan. Reorganized Debtor shall make interest only payments on the New Siuslaw Loan commencing on the first (but no later than the tenth) day of the first month following the date Reorganized Debtor obtains the New Siuslaw Loan (the "Funding Date") and continuing on the first (but no later than the tenth) day of each month thereafter through and including the 36th month following the Funding Date.  Commencing on the first (but no later than the tenth) day of the 37th month after the Funding Date and continuing on the first (but no later than the tenth) day of each month thereafter until the New Siuslaw Loan has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the New Siuslaw Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

6.3    <u>Operating Revenues.</u>  Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, the net operating income generated from Reorganized Debtor's continued business operations, and from the future sale or refinancing of assets of Reorganized Debtor from time to time.  A core aspect of Debtor's business is marketing and selling real property acquired by Debtor from time to time.  Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan.  Such sales may occur without further order of the Bankruptcy Court.

6.4    <u>Sales or Refinancing of Real Property Collateral</u>.  Without limiting Article 6.2 above, and except as set forth with respect to a particular Creditor under the Plan, Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Collateral Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral. Any excess net proceeds from the sale or refinancing of such Collateral shall be paid to Reorganized Debtor (or as otherwise directed by Reorganized Debtor) and may be used by Reorganized Debtor to fund Reorganized Debtor's continued business operations and to fund payments required under this Plan. Such sales or refinancing may occur without further order of the Bankruptcy Court.

6.5    <u>Marketing and Sales of Non-Core Assets</u>. In addition to marketing and selling its real property assets in the ordinary course of its business, Reorganized Debtor may market and sell its non-core assets on an accelerated basis as is necessary or appropriate to ensure that Reorganized Debtor will have sufficient funds to make all payments required of Debtor under this Plan. Without limiting the preceding, if at any time Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, Reorganized Debtor will before such payment is due sell at public auction one or more of Reorganized Debtor's Non-core assets to raise the funds necessary to make the required Plan payment. Such auctions and sales may occur without further order of the Bankruptcy Court.

6.6    <u>Setoffs</u>. Reorganized Debtor may, but shall not be required to, set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which Debtor or Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim Debtor or Reorganized Debtor may have against such holder.

6.7    <u>Corporate Action</u>. Upon entry of the Confirmation Order by the Clerk of the Bankruptcy Court, all actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the execution, delivery, and performance of all documents and agreements relating to the Plan, and any of the foregoing. On the Effective Date, the appropriate officers of Reorganized Debtor are authorized and directed to execute and deliver any and all agreements, documents, and instruments contemplated by the Plan and/or the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:230606.7

39

FIRST AMENDED PLAN OF REORGANIZATION
(JANUARY 10, 2011)

6.8    <u>Saturday, Sunday, or Legal Holiday</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.9    <u>Deposits</u>.  All utilities holding a utility deposit obtained as a result of this Bankruptcy Case shall immediately after the Effective Date return or refund such utility deposit to Reorganized Debtor.  At the sole option of Reorganized Debtor, Reorganized Debtor may apply any such utility deposit that has not been refunded to Reorganized Debtor in satisfaction of any payments due or to become due from Reorganized Debtor to a utility holding such a utility deposit.  All escrow deposits made by prospective purchasers of property of the Debtor that were forfeited pursuant to contract or applicable law (the "Forfeited Escrow Deposits") and not yet returned to Debtor, shall be turned over to Reorganized Debtor immediately after the Effective Date for its own account.

6.10    <u>Event of Default; Remedy</u>.  Any material failure by Reorganized Debtor to perform any term of this Plan, which failure continues for a period of ten Business Days following receipt by Reorganized Debtor of written notice of such default from the holder of an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon the occurrence of an Event of Default, the holder of an Allowed Claim to whom performance is due shall have all rights and remedies granted by law, this Plan or any agreement between the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with respect to one Creditor shall not be an Event of Default with respect to any other Creditor.

6.11    <u>Continuation of Unsecured Creditors' Committee</u>.  To the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee.  For so long as such Unsecured Creditors' Committee remains in existence, Reorganized Debtor will provide to the Unsecured Creditors' Committee a quarterly compliance certificate executed by the Chief Financial Officer of Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan.  If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan.  In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to Reorganized Debtor in its reasonable discretion, Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee.  Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist.  During the existence of the Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period.

## ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     Assumption and Rejection.  Except as may otherwise be provided, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date.  The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for or subject to other Court Order or pending motion.  Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

7.2     Assignment.  To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

effectuate such assignment.

7.3    <u>Rejection Claims</u>.  Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner.  Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

7.4    <u>Compensation and Benefit Programs</u>.  Except to the extent restricted by the Plan, all employee compensation and benefit plans, policies and programs of Debtor applicable generally to its employees as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, stock incentive plans, and life, accidental death and dismemberment insurance plans, shall continue in full force and effect, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate any of the foregoing arrangements.

**ARTICLE VIII**

**EFFECT OF CONFIRMATION**

8.1    <u>Binding Effect</u>.  The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtor and the estate assets, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the commencement of the Bankruptcy Case.  The distributions made pursuant to this Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made.  Confirmation of the Plan shall bind and govern the acts of the Reorganized Debtor whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

8.2    <u>Discharge and Permanent Injunction</u>  Except as otherwise set forth in the Plan, confirmation of the Plan shall discharge the Debtor from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan.  As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under Sections 524(a) and 1141 of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtor or the Reorganized Debtor, except as otherwise set forth in this Plan.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.  Nothing contained in the foregoing discharge shall, to the full extent provided under Section 524(e) of the Bankruptcy Code, affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtor that is discharged under the Plan.

8.3    <u>Limitation of Liability</u>.  The Debtor and the Reorganized Debtor and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

8.4    <u>Exculpation</u>.  The Debtor, the Reorganized Debtor and each of their respective Agents, shall not be liable to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after

the Petition Date in connection with the Bankruptcy Case or the negotiation, formulation,

development, proposal, disclosure, confirmation or implementation of the Plan and in all respects

shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and

responsibilities under the Plan, provided, however, that the foregoing provisions shall have no affect

on the Tonkon Claims or the liabilities of any person that resulted from any such act or omission that

is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to

have constituted negligence, breach of fiduciary duty or willful misconduct.

## ARTICLE IX

## RETENTION OF JURISDICTION

9.1     Jurisdiction of the Bankruptcy Court.  Notwithstanding the entry of the

Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant

to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:

(a)     to resolve controversies and disputes regarding any Avoidance Action,

(b)     to classify the Claim or Interest of any Creditor or stockholder,

reexamine Claims or Interests which have been owed for voting purposes and determine any

objections that may be Filed to Claims or Interests,

(c)     to determine requests for payment of Claims entitled to priority under

Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in

favor of professionals employed in this Bankruptcy Case,

(d)     to avoid transfers or obligations to subordinate Claims under Chapter 5

of the Bankruptcy Code,

(e)     to approve the assumption, assignment or rejection of an executory

contract or an unexpired lease pursuant to this Plan,

(f)     to resolve controversies and disputes regarding the interpretation of

this Plan,

(g)     to implement the provisions of this Plan and enter orders in aid of

confirmation,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(h)    to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and

(i)    to enter a final decree closing this Bankruptcy Case.

9.2    <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>.  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## ARTICLE X

## ADMINISTRATIVE PROVISIONS

10.1    <u>Modification or Withdrawal of the Plan</u>.  Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order.  After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

10.2    <u>Revocation or Withdrawal of Plan</u>.  Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

10.3    <u>Modification of Payment Terms</u>.  The Debtor may modify the treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such Claim or Interest at any time after the Effective Date upon the prior written consent of the person whose Allowed Claim or Interest treatment is being adversely affected.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

10.4    <u>Nonconsensual Confirmation</u>.  Debtor shall request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except subsection 1129(a)(8), are met.

10.5    <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distributions, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of Debtor.

10.6    <u>Final Decree</u>.  At any time following the Effective Date, the Reorganized Debtor shall be authorized to file a motion for the entry of a final decree closing the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code.

**ARTICLE XI**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

11.1    <u>Conditions to Confirmation</u>.  The following are conditions precedent to the confirmation of this Plan:

11.1.1    The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor; and

11.1.2    The Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

11.2    <u>Conditions to Effective Date</u>.  The following are conditions precedent to the occurrence of the Effective Date:

11.2.1    The Confirmation Date shall have occurred;

11.2.2    The Confirmation Order shall have become a Final Order;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

11.2.3    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending;

11.2.4    The Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

11.3    <u>Waiver of Conditions</u>.  Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by the Debtor at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

**ARTICLE XII**

**MISCELLANEOUS PROVISIONS**

12.1    <u>Revesting</u>.  Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all forfeited escrow deposits not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

12.2    <u>Rights of Action</u>.  Except as otherwise expressly provided herein, any claims, rights, interests, causes of action, defenses, counterclaims, cross-claims, third-party claims, or rights of offset, recoupment, subrogation or subordination including, without limitation, the Tonkon Claims, claims under Section 550(a) of the bankruptcy Code or any of the sections referenced therein (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall remain assets of Reorganized Debtor.  Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with what is in its best interests and for its benefit.

12.3    <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal laws are applicable, the laws of the State of Oregon shall govern the construction and implementation of the Plan, and all rights and obligations arising under the Plan.

12.4    <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, Debtor and Reorganized

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtor shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authorities and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification and information requirements. Entities entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as Reorganized Debtor may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable Reorganized Debtor to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law. Pursuant to Section 346(f) of the Bankruptcy Code, the Reorganized shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. Notwithstanding any other provision of this Plan, each holder of an Allowed Claim that has received a distribution of Cash shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution.

12.5    Time. Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included. The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of the next succeeding day which is a Business Day.

12.6    Section 1146(c) Exemption. Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the revesting, transfer or sale of any real property of Debtor or Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan, including without limitation the sale of any real property by Debtor or Reorganization Debtor (in Hawaii, Oregon or otherwise) pursuant to and in performance of Reorganized Debtors obligations under this Plan, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any city, county or governmental unit in

which any instrument, including any deed conveying any of Reorganized Debtor's interest in any of its real property, hereunder is to be recorded shall, be ordered and directed to accept such instrument without requiring the payment of any conveyance fee, documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax or fee.

12.7    Severability.  In the event that any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provisions of the Plan.  To the extent that any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the confirmation of the Plan existing by reason of such provision.

12.8    Successors and Assigns.  The provisions of the Plan shall bind Debtor, Reorganized Debtor and all holders of Claims and Interests, and their respective successors, heirs and assigns.

12.9    Notices to Claim and Interest Holders.  Notices to Persons holding a Claim or Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if none was filed, at the address set forth in the Schedules.

12.10    Post Effective-Date Notices.  Following the Effective Date, notices will only be served on the Reorganized Debtor, the Office of the United States Trustee and those persons who file with the Court and serve upon the Reorganized Debtor a request, which includes such person's name, contact person, address, telephone number and facsimile number, that such person receive notice of post-Effective Date matters.  Persons who had previously filed with the Bankruptcy Court requests for special notice of the proceedings and other filings in the Bankruptcy Case will not receive notice of post-Effective Date matters unless such persons file a new request with the Bankruptcy Court.

12.11    Retiree Benefits.  On or after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code, maintained or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

established by Debtor prior to the Effective Date, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate the foregoing arrangements.

12.12  Provisions Enforceable.  The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan is valid and enforceable in accordance with its terms.

12.13  Recordable Order.  The Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications or other supporting documents.

12.14  Plan Controls.  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, or any other instrument or agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall control and take precedence.

12.15  Delivery of Promissory Notes.  To the extent that this Plan provides for Reorganized Debtor to deliver a promissory note to a Secured Creditor in connection with an Allowed Secured Claim, except as otherwise specifically provided in this Plan or in any note or document delivered in connection with this Plan, this Plan and any note or other document delivered in connection herewith shall replace and supersede all pre-petition notes, loan agreements, trust deeds, security documents or other documents executed by Debtor in connection with the obligations giving rise to the Allowed Claim.  Unless otherwise provided in this Plan, each Creditor will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Accordingly, unless otherwise provided in this Plan, the validity and priority of any trust deed or other security document executed in connection with the obligations giving rise to the Creditor's Allowed Claim will not be impaired by this Plan.  However, except as otherwise specifically provided in this Plan, to the extent that any such trust deed or other security document contains any provisions that impose any covenants, requirements or obligations on Debtor or Reorganized Debtor that are not specifically provided for or contained in, or are otherwise inconsistent with, this Plan, then such provisions shall be of no force and effect.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1         12.16  Effectuating Documents and Further Transactions.  Debtor and Reorganized

2    Debtor shall execute, deliver, file or record such contracts, instruments, assignments, and other

3    agreements or documents, and take or direct such actions, as may be necessary or appropriate to

4    effectuate and further evidence the terms and conditions of this Plan.

5    DATED this 10th day of January 2011.

6                         Respectfully submitted,

7                         ARLIE & COMPANY

10               By  X _____
                     Scott Diehl, Chief Financial Officer

12   PACHULSKI STANG ZIEHL & JONES LLP

15   By /s/ John D. Fiero
     John D. Fiero, (CA Bar No. 136557)

16        Linda F. Cantor, (CA Bar No. 153762)
     Attorneys for Debtor

**CERTIFICATE OF SERVICE**

I, Diane H. Hinojosa, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action.  My business address is 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California.

I certify that on January 10, 2011, I caused to be served the **DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)** by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 10, 2011, at Los Angeles, California.

　　　　　　　　　　　　　　　 /s/ *Diane H. Hinojosa* 　　　　　
　　　　　　　　　　　　　　　 Diane H. Hinojosa

# EXHIBIT B

**Exhibit B**

**Arlie Company - Non Core Properties**
**January 1, 2011 - April 25, 2016**

| Property Location | Acres | S/F |
|---|---|---|
| | | |
| Akolea Forest (W of Hilo, Hawaii) | 681.30 | 29,677,428 |
| Pu'ueo Estate (NW of Hilo, Hawaii) | 22.23 | 968,339 |
| | | |
| Crescent Village Lot 4 Commerical Land | | |
| (NW Corner Shadow View & Crescent) | 0.82 | 35,719 |
| West 11th @ Willow Creek Ind. Land | 7.18 | 312,761 |
| | | |
| Crescent Village Lots 10, 11, 12, 13 (Medical | | |
| Clinic/General Office Land) | 7.20 | 306,000.00 |
| Bob Straub Parkway (SE Springfield) | 15.45 | 673,002 |
| Coburg Road (3 Lots Future Comm.) | 0.78 | 34,000 |
| | | |
| South LCC (In County Plan, S of ridgeline) | 150.00 | 6,534,000 |
| North LCC (In Metro Plan, N of ridgeline) | 450.00 | 8,712,000 |
| Woodburn Comm. Lot (I-5 @ Hwy 214) | 4.90 | 213,444 |
| West 11th @ Obie St (3 Comm. Lots) | 2.45 | 106,722 |
| 2892 Crescent Avenue | n/a | 13,699 |
| | | |
| 2909 Lord Byron | n/a | 2,319.00 |
| 2915 Lord Byron | n/a | 2,455.00 |
| 2931 Lord Byron | n/a | 2,720.00 |
| 2977 Lord Byron | n/a | 2,234.00 |
| 2993 Lord Byron | n/a | 2,713.00 |
| | | |
| Crescent Village Lot 9 (Commercial/Hsg) | | |
| (NW Corner Shadow View & Tennyson) | 0.65 | 28,314.00 |
| Lord Byron - E side 8 Lots | n/a | n/a |
| Lord Byron - W side 19 Lots | n/a | n/a |
| 3004 Kinney Loop (Lot 3000) | 0.45 | 19,602.00 |
| Arlie Hanger - 90362 Boeing Drive | Land Lease | |

# EXHIBIT C

**TO BE FILED.**

**CERTIFICATE OF SERVICE**

I, Diane H. Hinojosa, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action.  My business address is 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California.

I certify that on January 10, 2011, I caused to be served **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)** by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 10, 2011, at Los Angeles, California.

_____ /s/ *Diane H. Hinojosa* _____
Diane H. Hinojosa

## File a Plan:

10-60244-aer11 Arlie & Company

Assets: y

Help Desk:    (503) 326-1510    (541) 431-4005   Toll Free (866) 777-0442   Info   LBFs   Comments

### U.S. Bankruptcy Court

### District of Oregon

Notice of Electronic Filing

The following transaction was received from LINDA F CANTOR entered on 1/10/2011 at 6:05 PM PST and filed on 1/10/2011

| | |
|---|---|
| **Case Name:** | Arlie & Company |
| **Case Number:** | 10-60244-aer11 |
| **Document Number:** | 391 |

**Docket Text:**
First Amended Disclosure Statement Filed by Debtor Arlie & Company (Re:[390] First Amended Chapter 11 Plan of Reorganization Filed by Debtor Arlie & Company). (CANTOR, LINDA)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Arlie - Amd Disclosure Statement.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=994365958 [Date=1/10/2011] [FileNumber=9817021-0]
[02a9506a94563bdae9605349b37214c90299384ed72ca412f328e1ba6be0709bd9f1
3a2ffd977409e2134dd3f0ae36a6bb6c6584f48225c3fc736d17c5d2b29b]]

**10-60244-aer11 Notice will be electronically mailed via ECF to:**

JOHN D ALBERT on behalf of Creditor Siuslaw Bank
darlene@albertandtweet.com, beth@albertandtweet.com

JOHN F BARG on behalf of Interested Party John Musuemci
jfb@bcltlaw.com, cgw@bcltlaw.com

LINDA F CANTOR on behalf of Debtor Arlie & Company
lcantor@pszjlaw.com

CONRAD K CHIU on behalf of Creditor Fifth Third Bank
cchiu@daypitney.com

BRADLEY S COPELAND on behalf of Creditor Summit Bank
bcopeland@agsprp.com, soconnor@agsprp.com

JOHN D FIERO on behalf of Debtor Arlie & Company

jfiero@pszjlaw.com, ocarpio@pszjlaw.com;ksuk@pszjlaw.com;azaragoza@pszjlaw.com

MICHAEL W FLETCHER on behalf of Creditor Tonkon Torp LLP
michael.fletcher@tonkon.com, tammy.brown@tonkon.com

THOMAS A HUNTSBERGER on behalf of Counter-Claimant Mark Roberts
tom@tahpc.com

Thomas A Huntsberger on behalf of Defendant Mark Roberts
thuntsberger@ecf.epiqsystems.com

P REBECCA KAMITSUKA on behalf of U.S. Trustee US Trustee, Eugene

TEDDY M KAPUR on behalf of Debtor Arlie & Company
tkapur@pszjlaw.com, slee@pszjlaw.com

MICHAEL P KEARNEY on behalf of Debtor Arlie & Company
mpk@kearneyatlaw.com, mholley@agsprp.com

ALBERT N KENNEDY on behalf of Creditor Tonkon Torp LLP
al.kennedy@tonkon.com, leslie.hurd@tonkon.com;larissa.stec@tonkon.com

JUSTIN D LEONARD on behalf of Debtor Arlie & Company
jleonard@bjllp.com, jweisenbach@balljanik.com

JOHN CASEY MILLS on behalf of Creditor Umpqua Bank
casey.mills@millernash.com, brenda.hale@millernash.com

WILSON C MUHLHEIM on behalf of Creditor Century Bank
ecf@mb-lawoffice.com

P SCOTT McCLEERY on behalf of Creditor Gartland, Nelson, McCleery, Wade & Walloch, P.C.
scottm@gartlandnelsonlaw.com, kassiea@gartlandnelsonlaw.com

FRANK F McGINN on behalf of Creditor Iron Mountain Information Management, Inc.
ffm@bostonbusinesslaw.com

ANDREW P PARKS on behalf of Creditor Summit Bank
aparks@agsprp.com, lstevenson@agsprp.com

TERESA H PEARSON on behalf of Creditor Umpqua Bank
teresa.pearson@millernash.com, lisa.conrad@millernash.com;brenda.hale@millernash.com

DANIEL P PEPPLE on behalf of Creditor Bank of America
dpepple@pjcs.com, dawnanderson9@pjcs.com;jsteinert@pjcs.com

JACKSON SCHMIDT on behalf of Creditor Bank of America
jacksonschmidt@pjcs.com, dawnanderson9@pjcs.com;jsteinert@pjcs.com

DOUGLAS R SCHULTZ on behalf of Creditor Committee Unsecured Creditors Committee

schultz@gleaveslaw.com, kirsten@gleaveslaw.com

BRAD T SUMMERS on behalf of Debtor Arlie & Company
tsummers@balljanik.com, akimmel@balljanik.com

US Trustee, Eugene
USTPRegion18.EG.ECF@usdoj.gov

PATRICK W WADE on behalf of Creditor Washington Federal Savings
hhecfb@hershnerhunter.com

HEATHER M WALLOCH on behalf of Creditor Gartland, Nelson, McCleery, Wade & Walloch, P.C.
heatherw@gartlandnelsonlaw.com, kassiea@gartlandnelsonlaw.com

GILBERT B WEISMAN on behalf of Creditor American Express Bank FSB
notices@becket-lee.com

DOUGLAS R WILKINSON on behalf of Counter-Defendant 2911 Tennyson Avenue, LLC
doug@thorp-purdy.com, skelley@thorp-purdy.com

**10-60244-aer11 Notice will not be electronically mailed via ECF to:**

David E. Bomar
Balzhiser & Hubbard Engineers, Inc.
100 W 13th Ave
Eugene, OR 97401

Mike Broadsword
Eugene Sand & Gravel
POB 1067
Eugene, OR 97440

Gregory Brokaw
Rowell Brokaw Architects, PC
1 East Broadway #300
Eugene, OR 97401

JOHN C FISHER on behalf of Defendant Mark Roberts
767 Willamette St #201
Eugene, OR 97401

James R. Hanks
JRH Transportation Engineering
4765 Village Plaza Lp #201
Eugene, OR 97401

NW Natural Gas Co
,

JONATHAN POLLAND on behalf of Debtor Arlie & Company
Rethink LLP

465 California St #310
San Francisco, CA 94104

JONATHAN POLLAND on behalf of Plaintiff 2911 Tennyson Avenue, LLC
Rethink LLP
465 California St #310
San Francisco, CA 94104

Micheal Roberts
1919 Myers Road
Eugene, OR 97401

Jerry Vicars
Fabrication & Mechanical Group Inc
POB 42173
Eugene, OR 97404

WmThomas Construction
POB 2409
Florence, OR 97439