John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
Email: jfiero@pszjlaw.com
 lcantor@pszjlaw.com
 tkapur@pszjlaw.com

and

Brad T. Summers (OSB No. 911116)
David W. Criswell (OSB No. 925930)
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone: 503/228-2525
Facsimile: 503/295-1058
Email: tsummers@balljanik.com
 dcriswell@balljanik.com

Attorneys for Debtor Arlie & Company

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| In re | Case No. 10-60244-aer11 |
|---|---|
| **ARLIE & COMPANY,** | Chapter 11 |
| Debtor. | **DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S ~~FIRST~~SECOND AMENDED PLAN OF REORGANIZATION (~~JANUARY 10,~~FEBRUARY 14, 2011)** |
| | ~~Disclosure Statement~~ Hearing |
| | Date: ~~TBD~~April 4, 2011 |
| | Time: ~~TBD~~10:00 a.m. |
| | Place: United States Bankruptcy Court 405 E. 8th Avenue, Courtroom #~~2600~~6 Eugene, Oregon 97401 |
| | Judge: Honorable ~~Albert E~~Frank R. ~~Radcliffe~~Alley |

# ~~TABLE OF CONTENTS~~Table of Contents

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Information Regarding the Plan | 2 |
| | 1. The Plan is the Governing Document | 2 |
| | 2. Source of Information | 2 |
| | 3. Warning Regarding Federal and State Income Tax Consequences of the Plan | 2 |
| | 4. Bankruptcy Court Approval | 3 |
| | B. Voting Instructions | 3 |
| | 1. How to Vote | 3 |
| | 2. Who May Vote | ~~3~~4 |
| | C. Confirmation | 4 |
| | D. Disclaimers | 6 |
| II. | PLAN OVERVIEW | 7 |
| | A. Introduction | 7 |
| | B. Treatment of Claims | ~~8~~9 |
| III. | OVERVIEW OF CHAPTER 11 CASE | ~~18~~23 |
| | A. Background | ~~18~~23 |
| | 1. Description of the Debtor | ~~18~~23 |
| | 2. Management | ~~19~~23 |
| | 3. Events Precipitating the Debtor's Filing | ~~19~~24 |
| | 4. Plan Projections | ~~20~~24 |
| | B. Summary of Events During the Chapter 11 Case | ~~20~~24 |
| | 1. "First Day" Pleadings | ~~20~~25 |
| | 2. Filing of Schedules, Meeting of Creditors and Bar Date | ~~21~~25 |
| | 3. The Official Committee of Unsecured Creditors | ~~21~~26 |
| | 4. Retention of Professionals | ~~23~~27 |
| | 5. First Day Orders | ~~24~~29 |
| | 6. Cash Collateral | ~~24~~29 |
| | 7. Sale of Debtor's College Park Property and Non-Core Assets | ~~24~~29 |
| | 8. Agreement with The Fifth Third Bank | ~~25~~30 |
| | 9. Agreement with Umpqua Bank | ~~26~~31 |
| | 10. Agreement with Century Bank | ~~27~~32 |
| | 11. The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement | ~~27~~32 |
| | C. Pending and Future Transactions | ~~29~~34 |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

|   |     |     |                                                              |      |
|---|-----|-----|--------------------------------------------------------------|------|
|   |     | 1.  | ~~Sale of the~~ Hawaii Koa Wood Forest                       | ~~29~~34 |
|   |     | 2.  | VA Hospital Transaction                                       | ~~29~~35 |
| IV. | ASSETS AND LIABILITIES |  |                                          | ~~30~~36 |
|   | A.  |     | Real Property Assets                                         | ~~30~~36 |
|   |     | 1.  | Crescent Village - Building A                                | ~~30~~36 |
|   |     | 2.  | Crescent Village - Building B                                | ~~30~~37 |
|   |     | 3.  | Crescent Village -Building D                                 | ~~31~~37 |
|   |     | 4.  | Crescent Village - 23 acres raw land                         | ~~31~~37 |
|   |     | 5.  | Crescent Village Lots                                        | ~~31~~37 |
|   |     | 6.  | Woodburn (4.11 acres raw land)                              | ~~31~~37 |
|   |     | 7.  | College Park (~~938.2~~623.2 acres raw land)                | ~~32~~38 |
|   |     | 8.  | Westlane Shopping Center                                     | ~~32~~38 |
|   |     | 9.  | Garden Valley Shopping Center                                | ~~32~~38 |
|   |     | 10. | West 11th & Obie                                            | ~~32~~38 |
|   |     | 11. | My Coffee                                                    | ~~32~~38 |
|   |     | 12. | Oil Can Henry's                                             | ~~32~~39 |
|   |     | 13. | Willow Creek                                                 | ~~32~~39 |
|   |     | 14. | Hawaii Land                                                 | ~~33~~39 |
|   |     | 15. | ~~Natron Land~~                                            | ~~33~~ |
|   |     | ~~16.~~ | 2890 Chad Drive (the BLM Office Building)              | ~~33~~39 |
|   |     | 16. | 2892 Crescent Ave.                                          | 40 |
|   |     | 17. | ~~2892 Crescent Ave.~~                                     | ~~33~~ |
|   |     | ~~18.~~ | 650 Goodpasture (Goodpasture Island Radio Tower)      | ~~34~~40 |
|   |     | ~~19.~~18. | 4480 G Hwy 101 N.                                   | ~~34~~40 |
|   |     | 19. | 3082 Kinney Loop                                            | 40 |
|   |     | 20. | ~~3082~~3108 Kinney Loop                                   | ~~34~~40 |
|   |     | 21. | ~~3108~~2850 Kinney Loop                                   | ~~34~~40 |
|   |     | 22. | ~~2850~~3032 Kinney Loop                                   | ~~34~~40 |
|   |     | 23. | ~~3032~~ Kinney Loop ~~34~~ Lots                           | 41 |
|   |     | 24. | ~~Kinney Loop Lots~~                                       | ~~34~~ |
|   |     | ~~25.~~ | 3058 Kinney Loop                                       | ~~35~~41 |
|   |     | ~~26.~~25. | 2909 Lord Byron Place                               | ~~35~~41 |
|   |     | ~~27.~~26. | 2915 Lord Byron Place                               | ~~35~~41 |
|   |     | ~~28.~~27. | 2931 Lord Byron Place                               | ~~35~~41 |
|   |     | ~~29.~~28. | 2977 Lord Byron Place                               | ~~35~~42 |
|   |     | ~~30.~~29. | 2993 Lord Byron Place                               | ~~36~~42 |
|   |     | ~~31.~~ | ~~2843 Lord Byron Place~~                              | ~~36~~ |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

32.   2853 Lord Byron Place ................................................................ 36

33.   2863 Lord Byron Place ................................................................ 36

34.   2873 Lord Byron Place ................................................................ 36

35. 30. 2843, 2853, 2863, 2873 and 2883 Lord Byron Place ................ 36 42

36. 31. Hangar 272 ............................................................................. 36 42

37. 32. Hangar 246 ............................................................................. 36 42

38. 33. 2960 and 3110 Kinney Loop .................................................. 37 42

39. 34. Unencumbered Real Property .................................................. 37 42

B.   Personal Property Assets .................................................................... 37 43

    1.   Cash and Accounts Receivable ................................................. 37 43

    2.   Bankruptcy Claim Filed Against Roberts Construction ............ 37 43

    3.   State Court Claims Against Michael Roberts and Mark Roberts .... 38 44

    4.   Potential Claims Against Umpqua Bank ................................... 39 45

    5.   Tonkon Claims .......................................................................... 40 46

    6.   Other Claims/Avoidance Actions .............................................. 40 47

C.   Liabilities – Secured Creditors ........................................................... 41 47

    1.   Bank of America ........................................................................ 41 47

    2.   Century Bank ............................................................................. 41 47

    3.   Siuslaw Bank ............................................................................. 42 47

    4.   Summit Bank ............................................................................. 42 48

    5.   Umpqua Bank ............................................................................ 42 48

    6.   Washington Federal Savings ..................................................... 42 48

    7.   "BLM" Individuals .................................................................... 42 48

    8.   Property Tax Lien Claimants ..................................................... 43 49

D.   Liabilities – Unsecured Creditors ....................................................... 43 49

E.   Liabilities – Administrative Expenses ................................................. 43 49

V.   DESCRIPTION OF PLAN OF REORGANIZATION ................................ 43 49

A.   Unclassified Claims ............................................................................ 44 50

B.   Classified Claims and Interests ........................................................... 45 51

    1.   Class 1 (Other Priority Claims) ................................................ 45 51

    2.   Class 2 (Allowed Secured Claim of BofA) ............................... 45 51

        (a)   Class 2.1 – Building A Loan. .......................................... 46

        (b)   Class 2.2 – Building D Loan. .......................................... 46

        (c)   Treatment of Bank of America's Cash Collateral Accounts. .... 47

    3.   Class 3 (Allowed Secured Claims of Century Bank) ................ 48 54

    4.   Class 4 (Allowed Secured Claim of Pioneer) ........................... 49 55

    5.   Class 5 (Allowed Secured Claims of Siuslaw Bank) ................ 50

        (a)   Class 5.1 – Crescent Village Lots Loan. ......................... 50

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

(b)   Class 5.2 – 2850 Kinney Loop Loan. .......................................... 51
(c)   Class 5.3 – 2960 Kinney Loop Loan. .......................................... 52
(d)   Class 5.4 – 3082 Kinney Loop Loan. .......................................... 53
(e)   Class 5.5 – 3108 Kinney Loop Loan. .......................................... 54
(f)   Class 5.6 – Florence Medical Building Loan. ............................. 55
(g)   Class 5.7 – Kinney Loop Lots Loan. ........................................... 56
(h)   Class 5.8 – Natron Land Loan. ................................................... 56
(i)   Treatment of Siuslaw Bank's Cash Collateral Account. ........... 57

6.    Class 6 (Summit Bank) ............................................................................. 57 63
      (a)   Class 6.1 – Road Radio Tower Loan. .......................................... 57
      (b)   Class 6.2 – Guaranty Claim. ....................................................... 58
      (c)   Treatment of Summit Bank's Cash Collateral Account. ........... 59

7.    Class 7 (Umpqua Bank) ............................................................................ 60
      (a)   Class 7.1 – Westlane Loan. .......................................................... 61
      (b)   Class 7.2 – West 11th Land Loan. ............................................... 61
      (c)   Class 7.3 – 2892 Crescent Ave. Loan. ......................................... 62
      (d)   Class 7.4 Woodburn and College Park Loan. ............................ 63
      (e)   Class 7.5 – Roseburg Loan #1. .................................................... 64
      (f)   Class 7.6 – Roseburg Loan #2 ..................................................... 65
      (g)   Class 7.7 – Oil Can Henry's Loan. ............................................. 66
      (h)   Class 7.8 – My Coffee Loan. ....................................................... 67
      (i)   Class 7.9 – Building B Loan. ....................................................... 67
      (j)   Class 7.10 – Grumman Hangar Loan. ......................................... 68
      (k)   Class 7.11 – 3032 Kinney Loop Loan. ........................................ 68
      (l)   Class 7.12 – Crescent Village Land Loan. .................................. 69
      (m)   Refinance of Properties Encumbered by Umpqua Bank's Liens. ... 69
      (n)   Sale of Collateral Free and Clear of Umpqua Bank's Liens and
            Application of Excess Proceeds. .................................................. 70
      (o)   Payment of Umpqua Bank Fees. .................................................. 71
      (p)   Property Taxes. ............................................................................ 71
      (q)   Waiver of Claims by Debtor and Reorganized Debtor. ............. 71
      (r)   Treatment of Umpqua Bank's Cash Collateral Account. ........... 71
      (s)   Use of Rents Generated From Umpqua Properties. .................... 72
      (t)   Guarantees. .................................................................................. 72
      (u)   Additional Documents. ................................................................ 72

8.    Class 8 (Washington Federal Savings) ..................................................... 72 79
      (a)   Class 8.1 – Lord Byron Loan. ..................................................... 72
      (b)   Treatment of Washington Federal's Cash Collateral Account. ... 74
      (c)   Treatment of the Washington Federal Unsecured Claim. .......... 74

9.    Class 9 (BLM Secured Creditors) ............................................................. 74 81
      (a)   Class 9.1 – Francis Cline. ........................................................... 74
      (b)   Class 9.2 – William Greenhoot. ................................................. 75
      (c)   Class 9.3 – McKillop II Limited Partnership. ........................... 75
      (d)   Class 9.4 – Karen Merwin. ......................................................... 76
      (e)   Class 9.5 – Alice Smith. .............................................................. 77
      (f)   Class 9.6 – Linda Trickey. ........................................................... 77

10.   Class 10 (Property Tax Lien Claims) ........................................................ 78 85

11.   Class 11 (Small Unsecured Claims) .......................................................... 78 85

12.   Class 12 (General Unsecured Claims). ...................................................... 78 85

13.   Class 13 (Interests) .................................................................................... 78 86

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

C.      Executory Contracts and Unexpired Leases ....................... ~~79~~86

D.      Conditions to Confirmation and Effectiveness of the Plan ......... ~~79~~87

E.      Sources of Funding for the Plan ................................. ~~80~~87

F.      Effect of Confirmation .......................................... ~~81~~88

    1.      Discharge ................................................ ~~81~~88

    2.      Revesting, Operation of Business ......................... ~~81~~89

    3.      Injunction ............................................... ~~81~~89

    4.      Limitation of Liability and Exculpation .................. 89

    5.      Modification of the Plan; Revocation or Withdrawal of the Plan ... ~~82~~90

    ~~5.~~6.      Retention of Jurisdiction ............................ ~~82~~90

    ~~6.~~7.      United States Trustee Fees ........................... ~~83~~91

VI.     LIQUIDATION ANALYSIS ............................................ ~~83~~91

VII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........ ~~84~~92

A.      General Tax Considerations ...................................... ~~84~~93

B.      Federal Income Tax Consequences to the Debtor ................... ~~86~~94

C.      Federal Income Tax Consequences to the Holders of an Allowed Claim ... ~~87~~95

D.      Consequences to the Interest Holders ............................ ~~88~~96

E.      Information Reporting and Backup Withholding .................... ~~88~~96

F.      Importance of obtaining professional tax assistance ............. ~~89~~97

VIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN ........................ ~~89~~97

A.      Confirmation Hearing ............................................ ~~89~~97

B.      Requirements of Confirmation .................................... ~~89~~98

C.      Feasibility ..................................................... ~~90~~98

D.      Risk Factors .................................................... ~~90~~98

    1.      General Financial Market Conditions ...................... ~~90~~99

    2.      Projected Financial Results .............................. ~~90~~99

E.      Cram Down ....................................................... ~~91~~99

F.      Alternatives to Confirmation of the Plan ........................ ~~91~~99

IX.     RECOMMENDATION AND CONCLUSION ................................... ~~92~~100

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibits

Exhibit A              Plan

Exhibit B      Partial list of the non-core assets currently being marketed

                by the Debtor for sale

Exhibit C      Historical Operating Results

Exhibit D      Financial Projections

FIRSTSECOND AMENDED DISCLOSURE STATEMENT
(JANUARY 10.FEBRUARY 14, 2011)

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.

## INTRODUCTION

On January 20, 2010 (the "Petition Date"), Arlie & Company (the "Debtor" or "Arlie") commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor's case is being administered in the United States Bankruptcy Court for the District of Oregon before the Honorable ~~Albert E. Radcliffe~~Frank R. Alley.  This Disclosure Statement (the "Disclosure Statement") contains information with respect to the *~~First~~Second Amended Plan of Reorganization (~~January 10,~~February 14, 2011)* (the "Plan") proposed by the Debtor.  A copy of the Plan is attached hereto as **Exhibit A**.  Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.  The Debtor has examined various alternatives, and based on information contained in this Disclosure Statement and for the reasons set forth below, the Debtor has concluded that the Plan provides the best recovery to creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters:  (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed reorganization of the Debtor pursuant to the terms of the Plan, and (3) the proposed distribution to Creditors and holders of Claims against the Debtor.  The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important.  In order for the Plan to be accepted by a Class of Claims or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan.  Those alternatives may not provide for a distribution

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

of as much value to holders of Allowed Claims and Interests as the Plan.  Accordingly, the Debtor urges you to accept the Plan by completing and returning the enclosed ballot no later than 5:00 p.m. on ~~_____,~~March 28, 2011.

### A.    INFORMATION REGARDING THE PLAN

#### 1.    The Plan is the Governing Document

Although the Debtor believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein, which are controlling.  You are urged to read the Plan and not just this Disclosure Statement.

#### 2.    Source of Information

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor or its professionals, or has been obtained from the Debtor's records, except where otherwise specifically noted.  None of the Debtor's attorneys, accountants or other professionals make any representation regarding that information.  The Debtor does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy.  The Debtor has, however, attempted to present the information accurately and fairly, and the Debtor believes that the information is substantially accurate.  The assumptions underlying the projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor's best estimate as to what it expects will happen.  Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor's control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met.  Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the Bankruptcy Court hearing to determine the adequacy of the Disclosure Statement.

#### 3.    Warning Regarding Federal and State Income Tax Consequences of the Plan

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim.  Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

### 4.    Bankruptcy Court Approval

~~Following a hearing held on _____, the Bankruptcy Court~~*Pursuant to the Order Conditionally Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejections of Plan; and Notice of Disclosure and Confirmation Hearings* dated January 31, 2011 (the "Disclosure Statement Notice and Order"), the Bankruptcy Court conditionally approved this Disclosure Statement ~~as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan.  Under section 1125 of the Bankruptcy Code, this~~, subject to its consideration of objections as set forth in paragraphs 1 and 3 of the Disclosure Statement Notice and Order.  (A copy of the Disclosure Statement Notice and Order is being mailed to you herewith.)  This conditional Bankruptcy Court approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan.  The Bankruptcy Court has not, however, approved the Plan itself, nor ~~conducted a detailed investigation into~~finally approved the contents of this Disclosure Statement.

### B.    VOTING INSTRUCTIONS

### 1.    How to Vote

A ballot is enclosed herewith for Creditors to use in voting on the Plan.  To vote on the Plan, (a) indicate on the enclosed ballot that you accept or you reject the Plan, (b) identify the class in which your claim is classified, (c) sign your name, and (d) mail the ballot ~~in the envelope provided for this purpose~~to the address set forth below.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 5:00 p.m. prevailing Pacific Time on ~~_____,~~March 28, 2011 at the following address:**

Arlie & Company Plan Balloting
c/o Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, California  94111-4500
(ph) 415-263-7000

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described, it will not be counted.  If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

### 2.    Who May Vote

The Plan divides the Claims of Creditors into 13 Classes.  There is one Class of Interests. The Classes are as follows:  Class 1 (Other Priority Claims), Class 2 (Bank of America), Class 3 (Century Bank), Class 4 (Pioneer), Class 5 (Siuslaw Bank), Class 6 (Summit Bank), Class 7 (Umpqua Bank), Class 8 (Washington Federal Savings), Class 9 (BLM Secured Creditors), Class 10 (Property Tax Lien Claims), Class 11 (Small Unsecured Claims), Class 12 (General Unsecured Claims), and Class 13 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan.  Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

Class 13 is not impaired and therefore is deemed to have accepted the Plan.  All other Classes are impaired under the Plan, and holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim.  Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan.  The Ballot form which you received does <u>not</u> constitute a proof of Claim.

### C.    CONFIRMATION

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtor believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class. As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the plan by such class, so long as the plan meets the statutory requirements set forth by section 1129(b) of the Bankruptcy Code. This procedure is called a "cram down." The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any impaired Class rejects the Plan.

The Bankruptcy Court has set ~~_____,~~**April 4,** 2011 **at 10:00 a.m.** as the hearing date and time for final approval of the Disclosure Statement and to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The ~~hearing on confirmation~~Confirmation Hearing will be held before the Honorable ~~Albert E. Radcliffe~~Frank R. Alley at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, ~~#2600,~~Courtroom #6, Eugene, Oregon 97401. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below ~~on or before the date set forth in the Notice of~~

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

~~Confirmation Hearing sent to you with this~~ ~~Disclosure Statement and~~ ~~the Plan.~~no later than **5:00**

**p.m. prevailing Pacific Time on March 28, 2011.**

Objections must be served upon:

(1) The Debtor:

Arlie & Company
2911 Tennyson Avenue, Suite 400
Eugene, Oregon 97408
Attn:  John Musumeci
Telephone:  (541) 344-5500

(2) Counsel for the Debtor:

John D. Fiero, Esq.
Linda F. Cantor, Esq.
Teddy M. Kapur, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA  94111
Telephone:  (415) 263-7000

and

Brad T. Summers, Esq.
David W. Criswell, Esq.
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone:  (503) 228-2525

(3) Counsel for the Committee:

Douglas R. Schultz, Esq.
Gleaves Swearingen Potter & Scott LLP
PO Box 1147
Eugene, OR 97440-1147
Telephone:  (541) 686-8833

(4) The Office of the United States Trustee:

P. Rebecca Kamitsuka, Esq.
Attorney for the United States Trustee
Wayne L. Morse Courthouse
405 E. 8th Avenue, Suite 1100
Eugene, OR  97401-2706
Telephone:  (541) 465-6330

**D.    DISCLAIMERS**

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. ***IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING***.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## II.

## PLAN OVERVIEW

### A.    INTRODUCTION

The Plan contemplates that the Reorganized Debtor will continue to operate its business in the ordinary course and pay and satisfy its obligations under the Plan from available cash, exit financing made available upon confirmation, from the net operating income generated from the Reorganized Debtor's continued business operations, and from the sale or refinancing of assets of the Reorganized Debtor.

~~A core aspect of the Debtor's business is marketing and selling real property.~~ The Reorganized Debtor will continue to ~~market and~~ sell real property assets in the ordinary course of

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

business to provide funds for the Reorganized Debtor's continued operating expenses and to provide funds to make payments required under the Plan.

In addition to ~~marketing and~~ selling its real property assets in the ordinary course of business, the Reorganized Debtor has committed in the Plan to ~~market and~~ sell or refinance non-core assets as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Reorganized Debtor under the Plan.  A partial list of the non-core assets currently ~~being marketed~~ for sale by the Debtor ~~for sale~~ is attached hereto as **Exhibit B**. Without limiting the preceding, if at any time the Reorganized Debtor determines that it may not have sufficient funds on hand to make any upcoming payment required under the Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of its non-core assets sufficient to raise the funds necessary to make the required Plan payment.

Except as otherwise provided in the Plan, each secured creditor will retain its security interest in and liens on its Collateral with the same priority such security interest and liens had on the Petition Date.  Each Claim will be a Secured Claim up to the value of the property securing the Claim unless the Claimant elects treatment under 11 U.S.C. § 1111(b).  Secured creditors will be paid the full amount of their Allowed Secured Claims in Cash over time with interest, as more fully set forth in the Plan.

Each holder of a Small Unsecured Claim (an Unsecured Claim equal to or less than $2,000) will be paid the full amount of its Small Unsecured Claim within 60 days following the Effective Date.

Each holder of a General Unsecured Claim will be paid the full amount of its General Unsecured Claim in Cash within five years after the Effective Date.  In addition, within 3 years after the Effective Date the Reorganized Debtor will pay at least 50% of the principal amount of each General Unsecured Claim.  Interest will accrue from the Petition Date on each General Unsecured Claim until such Claim is paid in full at a uniform annual interest rate of 3.5%.  At the time the Reorganized Debtor makes any principal payment on a General Unsecured Claim, the Reorganized Debtor will also pay all accrued but unpaid interest then owing on the General Unsecured Claim.

Existing Interests in the Debtor will be preserved.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

All post-petition and Administrative Expense Claims will be paid in full on the Effective Date or the date on which such Claim becomes Allowed, whichever is later.

All unexpired leases and executory contracts which have not previously been rejected, or which are not otherwise set forth in the Plan Supplement, subject to a prior Bankruptcy Court order or a pending motion before the Bankruptcy Court, will be assumed by the Reorganized Debtor through the Plan as of the Effective Date.

In the event that any Class of creditors does not accept the Plan, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise modify the Plan.

### B. TREATMENT OF CLAIMS

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan.

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| N/A | Allowed Administrative Expense Claims | Estimated Recovery on Allowed Claims in this category: 100% | Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. |
| N/A | Allowed Priority Tax Claims | Estimated Recovery on Allowed Claims in this category: 100% | Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed. |
| 1 | Allowed Other Priority Claims | Estimated Recovery on Allowed Claims in this Class: 100% | Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has |

DOCS_LA:230406.9230999.2

FIRSTSECOND AMENDED DISCLOSURE STATEMENT (JANUARY 10,FEBRUARY 14, 2011)

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| | | | TREATMENT OF CLAIMS CHART | | | |
| --- | --- | --- | --- |
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | IMPAIRED<br><br>ENTITLED TO VOTE | agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim). |
| 2 | Allowed Secured Claims of BofA | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 2.1 (Building A Loan) and Class 2.2 (Building D Loan)<br>BofA will retain its security interests and liens upon its Collateral and receive new promissory notes.<br><br>BofA will receive a promissory note in the amount of the present value of its Allowed Claims. BofA's Allowed Class 2.2 Claim is limited to the amount of the Building D Value; excess amounts owed under the Building D Loan are treated as Class 12 Claims. The promissory notes 2.1 Claim. The note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>BofA's Class 2.2 Claim shall be satisfied by the delivery of two promissory notes – one in the amount of the Building D value ("Building D Note 1") and one for the difference between the Allowed Class 2.2 Claim and the Building D Value ("Building D Note 2").<br><br>The Building D- Note 1 will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 24 months, thereafter equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. To extent that the loan to value ratio of the loan represented by the Building D Note 1 exceeds 75% of the value of Building D (which, for these purposes shall be valued as of the 24th month following the Effective Date after applying an 8% cap rate to the net operating income of Building D), Reorganized Debtor shall make a cash paydown of the Building D Note 1 in the amount necessary to reduce such loan to value ratio to 75%. Reorganized Debtor shall establish on the Effective Date a $405,000 reserve account |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | for tenant improvements associated with future leasing activities related to Building D ("the Building D Reserve") which shall be funded with $205,000 cash derived from the BofA cash collateral account and $200,000 from the Roberts Distributions. BofA shall retain its liens and security interests in Building D, which shall serve as security for amounts due under the Building D Note 1 only. Aside from the $200,000 contribution to the Building D Reserve, BofA shall have no claim to any other Roberts Distributions. |
| | | | The Building D Note 2 will bear interest at a fixed rate of 3.5% per annum and will be payable in two installments: (a) one half of the principal plus all then accrued interest on the 37th month after the Effective Date, and (b) all remaining amounts owed thereunder being due on the Maturity Date. The Building D Note 2 is unsecured, but shall be cross-defaulted with the Building D Note 1. |
| | | | Reorganized Debtor will use the Building A Cash Collateral to pay past due Property Taxes on Building A and use the remainder. The remainder will either be contributed to the Building D Reserve, or will be retained and used by Reorganized Debtor for general operating purposes. |
| | | | Reorganized Debtor will use the Building D Cash Collateral to pay past due Property Taxes on Building D and the remainder will be retained in a segregated BofA account for payment of Property Taxes, capital expenses, tenant improvements, maintenance, improvements or other expenses directly pertaining to the improvement of Building D or the sale, lease and marketing of Building D. either be contributed to the Building D Reserve, or will be retained and used by Reorganized Debtor for general operating purposes. |

The chart header reads: **TREATMENT OF CLAIMS CHART**

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| | | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment | |
| 3 | Allowed Secured Claim of Century Bank | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE | Century Bank will retain its security interests and liens upon its Collateral that secures the 3058 Kinney Loop Loan and ~~will~~ receive a new promissory note in the amount ~~of the present value~~ of its Allowed Claim. The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. | |
| 4 | Allowed Secured Claim of Pioneer | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE IF CLAIM ALLOWED BY FINAL ORDER ~~OF THE BANKRUPTCY COURT~~  (CLAIM IS DISPUTED; DEBTOR ~~TO FILE~~FILED AN OBJECTION AND AN ADVERSARY PROCEEDING REGARDING THE DISPUTED LIEN ~~IN THE NEAR TERM~~ON FEBRUARY 1, 2011)~~.~~ | If and to the extent Pioneer is determined by Final Order ~~of the Bankruptcy Court~~ to have a valid, perfected security interest in or lien upon property of the Debtor, Pioneer will retain its security interests and liens upon its Collateral that secures the Pioneer Loan and receive a new promissory note in the amount ~~of the present value~~ of its Allowed Claim. The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, the Reorganized Debtor shall have pre-paid at least 50% of the principal of Pioneer's Allowed Claim. At the time of any such pre-payment, the Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer note.  If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order ~~of the Bankruptcy Court~~, the Pioneer Claim will be treated as a Class 12 Claim. | |
| 5 | Allowed Secured Claims of Siuslaw Bank | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE | Class 5.1 – Crescent Village Lots Loan. Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan and receive a new promissory note in the amount ~~of the present value~~ of its Allowed Claim. The promissory note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots note. Notwithstanding the | |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| | | | TREATMENT OF CLAIMS CHART |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | foregoing, in the event Reorganized Debtor consummates the VA Sale prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots note, including all accrued and unpaid interest then owing under the Crescent Village Lots note, and shall utilize 20% of the Excess Sale Proceeds to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note) as determined by agreement of Reorganized Debtor and Siuslaw Bank. |
| | | | Class 5.2 (2850 Kinney Loop Loan), Class 5.3 (2960 Kinney Loop Loan), Class 5.4 (3082 Kinney Loop Loan), Class 5.5 (3108 Kinney Loop Loan) |
| | | | For each of these Classes, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures each loan and receive a new promissory note in the amount of the present value of each Allowed Claim.  Each promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| | | | Class 5.6 – Florence Medical Building Loan. |
| | | | Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan and receive a new promissory note in the amount of the present value of its Allowed Claim.  The Florence note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  on the Effective Date, Reorganized Debtor shall pay down the Florence note to the original principal amount of the Florence Medical Building Loan.  The Reorganized Debtor will then make monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| | | | Class 5.7 (Kinney Loop Lots Loan) and Class 5.8 (Natron Land Loan) |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| | | | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan and ~~Natron Land Loan and~~ receive a new promissory note in the amount of ~~the present value of each~~its Allowed Claim.  ~~Each~~The note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of ~~each~~the note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under ~~each~~the note.<br><br>Reorganized Debtor will use the Siuslaw cash collateral to pay any past due Property Taxes on the Collateral securing the Class 5 Claims.  All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 6 | Allowed Secured Claims of Summit Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 6.1 – Road Radio Tower Loan.<br>Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan and receive a new promissory note in the amount ~~of the present value~~ of its Allowed Claim.  The Radio Tower note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Class 6.2 – Guaranty Claim.<br>Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty and receive a new promissory note in the amount ~~of the present value of the amount~~ owing under the Churchill Media Guaranty.  The Guaranty note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  ~~Within 3 years~~<br><br>The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum, and will be payable in full on the Maturity Date.  In addition, Reorganized Debtor shall pre-pay a portion of the Guaranty Note through the sale or turnover of the |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | TREATMENT OF CLAIMS CHART | | |
| | | | Willow Creek Property as follows. Reorganized Debtor shall have six (6) months after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty note. At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note. In the event to enter into a letter of intent for the sale of the Willow Creek Property, provided that any such sale must close within two (2) months after the execution of the letter of intent. The Willow Creek Property net sale proceeds (after payment of Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses) will be applied to pay down the Guaranty Note. In the event a sale is not effectuated as set forth above, Reorganized Debtor shall transfer title to the Willow Creek Property to Summit Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Summit Bank, and the amount outstanding under the Guaranty Note shall be reduced by the assessed value of the Willow Creek Property. "Assessed value" shall mean the value ascribed to the Willow Creek Property as agreed to by the Reorganized Debtor and Summit Bank and, if no such agreement is reached, such value as determined by the Bankruptcy Court. All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note. In the event that Reorganized Debtor pays or satisfies the Guaranty note. Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation. Reorganized Debtor will use the Summit Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 6 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 7 | Allowed | Estimated Recovery on | Class 7.1 (Westlane Loan.), Class 7.2 (West 11th Land |

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | **TREATMENT OF CLAIMS CHART** | |
| | Secured Claims of Umpqua Bank | Allowed Claims in this Class: 100% <br><br> IMPAIRED <br><br> ENTITLED TO VOTE | Loan), Class 7.3 (2892 Crescent Ave. Loan.) and Class 7.4 (Woodburn and College Park Loan) <br><br> For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under the respective loans related to the Westlane Property, West 11th Land Property, 2892 Crescent Ave., and Woodburn Property/College Park Property~~(the "~~. The Westlane Property, West 11th Land Property, 2892 Crescent Ave., and the Woodburn Property are referred to herein as the "Buy, Sell or Return Properties"~~).~~ <br><br> Reorganized Debtor shall have 6 months after the Effective Date to either (a) enter into a letter of intent for the sale of ~~each of~~ the Buy, Sell or Return Properties ~~(other than the College Park Property)~~ at a price for cash at closing in excess of the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, ~~or (b) transfer title to the property~~(b) purchase the Buy, Sell or Return Properties at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such properties, or (c) transfer title to the Buy, Sell or Return Properties to Umpqua Bank, subject to any and all past due and current Property Taxes, in which case any remaining liability for the Arlie Debt Amount ~~for such property including, without limitation, the~~and Umpqua Bank Fees. for such property shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the particular Buy, Sell or Return Property within the time limits set forth in the immediately preceding sentence, 2/3rds of any sale proceeds in excess of the Arlie Debt Amount~~and,~~ Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by Reorganized Debtor for its own account, and 1/3 of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of a Buy, Sell or Return Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and |

| | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase. |
| | | | With respect to Class 7.4, subject to the reduction of debt owing against the College Park Property from the College Park Sale and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property, as of the Effective Date the the Arlie Debt Amount for the Woodburn Property shall be $845,000 together with 25% of accrued and unpaid interest on the Woodburn and College Park Loan. The Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes (less any previously paid real estate taxes included therein). The College Park Pay Down will not include application from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above. The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate). |
| | | | Class 7.5 (Roseburg Loan #1), Class 7.6 (Roseburg Loan #2), and Class 7.7 (Oil Can Henry's Loan). For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees)applicable Umpqua Fees under each of the Roseburg Loan #1, Roseburg Loan #2, and Oil Can Henry's Loan. |
| | | | On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to bring each loan current by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the property. Thereafter, interest will accrue on the each loan at a simple fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | TREATMENT OF CLAIMS CHART |
| | | | amortizing payments of principal and interest on each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and applicable Umpqua Bank Fees due on the Maturity Date.

With respect to Class 7.5, Reorganized Debtor may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made..

Class 7.8 (My Coffee Loan) Class 7.9 (Building B Loan), and Class 7.10 (Grumman Hangar Loan) For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the My Coffee Loan, Building B Loan and Grumman Hangar Loan.

Interest will accrue on the principal amount owing on each loan at a fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on each loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

Class 7.11 (3032 Kinney Loop Loan) and Class 7.12 (Crescent Village Land Loan) For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | outstanding principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under each of the 3032 Kinney Loop Loan and Crescent Village Land Loan. |
| | | | As of the Effective Date, each loan will bear simple interest at the _simple fixed_ rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the each loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein). |
| | | | Treatment of Umpqua Bank's Cash Collateral Account. Provided the College Park Sale is consummated prior to the Effective Date, the balance of _good_ funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, _provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made,_ (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank _which will be subject to Umpqua Bank's security interest,_ to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| | TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment | |
| | | | Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement. | |
| | | | Provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may refinance any property that is the Collateral of Umpqua Bank provided it has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided Umpqua Bank receives the applicable Arlie Debt Amount plus the applicable and Umpqua Proceeds Bank Fees. | |
| | | | Provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may sell properties free and clear of the Umpqua Bank liens, claims and encumbrances provided it pay the applicable Umpqua Debt Amount and the applicable Umpqua Proceeds Share to be used as set forth in the Plan. Bank Fees. | |
| | | | To the extent the sale or refinancing of a property that is the Collateral of Umpqua Bank exceeds the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "Arlie Excess Proceeds") will be divided as follows: For a sale within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of the Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and one-third (1/3) of the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). | |
| | | | Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its | |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | **TREATMENT OF CLAIMS CHART** |

liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial release of liens, claims and encumbrances for a specific piece of property provided it receives 110% of the Arlie Debt Amount and Umpqua Bank Fees associated with such piece of property.

Unless otherwise provided in the Plan, Umpqua Bank Fees shall be paid on a pro rata basis upon the sale or refinance of any property of Debtor that secures a Class 7 Claim.

Unless otherwise stated in the Plan, Property Taxes will be no more than 2 years past due on Collateral of the Debtor securing the Class 7 Claims.

On Effective on the Effective Date (a) Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and managers employees for any and all actions (or inactions) that occurred before the Effective Date. The, (b) the Arlie Debt Amounts and the Umpqua Fees will not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor.

Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of a Umpqua Bank Loan for defaults under or relating to the Umpqua Bank loans the occurred before the Effective Date and any such claims are deemed waived, released and extinguished.

Umpqua Bank's Cash Collateral shall be allocated for use as follows: (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments unpaid non-default interest on Roseburg Loan #1 and #2 and on Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank to be used at Reorganized Debtor's discretion solely for debt service or taxes on property of Reorganized Debtor that is Umpqua

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| | | TREATMENT OF CLAIMS CHART | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | ~~Bank's Collateral and not subject to a sale or refinance agreement.~~ |
| | | | ~~All guarantees of Debtor's,~~ (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor~~'s obligations to Umpqua Bank under the Plan.~~ to Umpqua Bank, as such obligations have been modified by the Plan, and (d) subject to the provisions of Article 4.7 of the Plan, Umpqua Bank will not make a demand on the Debtor and the guarantors for defaults that occurred before the Effective Date. |
| | | | ~~Reorganized Debtor may use all~~All rents generated from the properties securing the Umpqua Bank ~~obligations~~laons may be used by Reorganized Debtor for any purpose, without restriction including, without limitation, for general overhead and general administrative expenses. |
| | Allowed Claims of Washington Federal Savings | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE | Washington Federal will have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between the Lord Byron Collateral Value and the Washington Claim Amount.  Washington Federal's Class 8 Claim shall be satisfied by the delivery of 5 promissory notes to Washington Federal~~.~~ as follows:  (i) the 2909 Lord Byron Note in the principal amount of $279,600, (ii) the 2915 Lord Byron Note in the principal amount of $296,000, (iii) the 2931 Lord Byron Note in the principal amount of $327,950, (iv) the 2977 Lord Byron Note in the principal amount of $269,350, and (v) the 2993 Lord Byron Note in the principal amount of $327,100.  Each Lord Byron note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Each Lord Byron note will be secured by a security interest and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  The Lord Byron Notes shall |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | **TREATMENT OF CLAIMS CHART** |
| | | | be assumable by a purchaser of a Lord Byron Property, subject to reasonable approval by Washington Federal.<br><br>The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.<br><br>Reorganized Debtor will use the Washington Federal Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 8 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 9 | Allowed Claims of BLM Secured Creditors | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 9.1 (Francis Cline), Class 9.2 (William Greenhoot), Class 9.3 (McKillop II Limited Partnership), Class 9.4 (Karen Merwin), Class 9.5 (Alice Smith), and Class 9.6 (Linda Trickey)<br><br>Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors. Each BLM Secured Creditor has an Allowed Claim in the amount of all outstanding principal, accrued non-default interest, and reasonable fees and costs owing as of the Effective Date under each BLM Secured Creditor's loan. The Class 9 Claims are secured by a deed of trust on the BLM Office Building.<br><br>On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deeds in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under each BLM Secured Creditor's loan. Notwithstanding the foregoing, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvements and any necessary rezoning services, if requested, upon terms to be agreed upon by the BLM Secured Creditors and Reorganized Debtor. |
| 10 | Property Tax Lien Claims | Estimated Recovery on Allowed Claims in this | Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | **TREATMENT OF CLAIMS CHART** | |
| | | Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim. |
| 11 | Small Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date. |
| 12 | General Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim.  Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date. |
| 13 | Interests | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>UNIMPAIRED<br><br>DEEMED TO ACCEPT THE PLAN | Existing Interests in Debtor will be preserved. |

### III.

### OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case.  Copies of all relevant court papers are on file with the Bankruptcy Court.

### A.    **BACKGROUND**

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

## 1.    Description of the Debtor

The Debtor is a real estate ~~development~~_investment_ and management company based in Eugene, Oregon.  Arlie owns over 30 properties in Oregon (most of which are in or around Lane County) together with approximately 5,590 acres of investment property on the Big Island of Hawaii (the "Hawaii Property").  Arlie is an Oregon corporation formed in 1991 by Suzanne Arlie.

The Debtor's largest ~~development~~_real estate_ project is known as Crescent Village.  Crescent Village is Eugene's first planned urban village, and is a mixed-use ~~development~~_project_ that includes residences (apartments and townhouses), retail stores, restaurants and office buildings.  Additional information regarding the Crescent Village ~~development~~_project_ is available at www.crescent-village.com.  Phase 1 of Crescent Village was completed in 2009.

The Debtor's revenues consist primarily of rental payments from residential and commercial tenants and from sales of real property from time to time.  Debtor's expenses consist primarily of debt service payments and operating expenses.

## 2.    Management

The Debtor's current management team is set forth below.  Each member of the Debtor's management team will continue with the Debtor post-confirmation.

<u>Suzanne Arlie; President, Owner and Sole Director</u> - Suzanne Arlie oversees the operations of Arlie.  Ms. Arlie has been the President of Arlie since its inception.  Ms. Arlie will continue to serve as President of the Reorganized Debtor.

<u>John Musumeci; Executive Vice President</u> - John Musumeci oversees Arlie's land ~~acquisitions~~ and ~~sales~~_real estate investments_.  Mr. Musumeci brings over 30 years experience as a business owner and ~~property developer~~_real estate investor_.  Mr. Musumeci has been employed by Arlie since the company's inception.  Mr. Musumeci will continue to be employed by the Reorganized Debtor.

<u>Scott Diehl; Vice President and Chief Financial Officer</u> - Scott Diehl brings over 30 years of experience in financial services and public accounting to Arlie.  Mr. Diehl is responsible for managing Arlie's general operations, finance, asset management, and strategic planning.  Mr. Diehl's career includes 8 years as a Certified Public Account in Kansas and Oregon.  Mr. Diehl also

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

has worked 20 years as Controller and Finance Director in the newspaper industry where he performed real estate development tasks for the Guard Publishing Company.  Mr. Diehl holds a Bachelor of Science degree in Business from Washburn University.  Mr. Diehl will continue to be employed by the Reorganized Debtor.

### 3.    Events Precipitating the Debtor's Filing

Although the value of Arlie's assets is substantially greater than its liabilities, Arlie began experiencing cash-flow problems in 2008, when the general contractor for Crescent Village (Roberts Construction) filed a Chapter 7 liquidation case and subsequently failed to pay many of its sub-contractors.  To ensure the successful completion of Crescent Village, Arlie was forced to pay significant amounts to various sub-contractors who had been working for Roberts Construction even though Arlie already had paid for the work once when it paid Roberts Construction.

In addition to the Roberts Construction matter, the general downturn in the economy and credit markets further hampered Arlie's cash flow.  These factors have made it more difficult for Arlie to (a) attract and retain tenants and (b) close sales transactions.

Pre-petition, Arlie attempted to negotiate with a number of its secured lenders (including its largest secured creditor, Umpqua Bank) to re-structure its debt obligations.  However, these negotiations were mostly unsuccessful, and Arlie filed its chapter 11 petition on January 20, 2010.

### 4.    Plan  Projections

**Exhibit ~~C~~D** attached hereto presents in summary fashion Debtor's projected income statements (adjusted to a cash basis) and cash flow projections through April 25, 2016.

### B.    SUMMARY OF EVENTS DURING THE CHAPTER 11 CASE

The following is a summary of important events that have taken place since the Petition Date.

### 1.    "First Day" Pleadings

The day after the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

- *Debtor's Motion for Order Authorizing Payment of Prepetition Wages, Salaries, Compensation, Expenses, Benefits, and Related Taxes, and to Continue Employee Benefits Postpetition* (Docket No. 7);

- *Debtor's Motion for Order Determining Adequate Assurance to Utility Companies* (Docket No. 8);

- *Debtor's Motion Seeking Authority to Refund Prepetition Security Deposits to Tenants* (Docket No. 9);

- *Debtor's Motion For Temporary and Final Authority to Use Cash Collateral* (Docket No. 12);

- *Debtor's Motion for Order Authorizing Use of Existing Bank Accounts* (Docket No. 14); and

- *Motion for Extension of Time to File Schedules and Statement of Financial Affairs* (Docket No. 19).

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on January 27, 2010.  Following the hearing on the First Day Pleadings, the Bankruptcy Court entered several orders related to the First Day Pleadings on January 29, 2010, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

## 2.    Filing of Schedules, Meeting of Creditors and Bar Date

On February 18, 2010, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court (Docket Nos. 102 and 103).  The Schedules provide detailed information regarding the Debtor's assets and liabilities, as well as other information about its business. The Schedules were amended on February 26, 2010 (Docket No. 102), March 17, 2010 (Docket No. 140), April 22, 2010 (Docket No. 154), May 17, 2010 (Docket No. 172), and October 29, 2010 (Docket No. 328).  Amendments to the Statement of Financial Affairs were filed on February 25, 2010 (Docket No. 113) and March 17, 2010 (Docket No. 139).

In addition, on March 4, 2010 the United States Trustee conducted the Section 341(a) meeting of creditors in the Debtor's chapter 11 case.  The Bankruptcy Court set June 2, 2010 as the deadline for non-Governmental Units to file proofs of Claim in the Bankruptcy Case, and July 19,

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

DOCS_LA:230406.9230999.2

100

FIRSTSECOND AMENDED DISCLOSURE STATEMENT
(JANUARY 10,FEBRUARY 14, 2011)

2010 as the deadline for Governmental Units to file proofs of Claim. The Debtor has filed monthly operating reports commencing with January 2010 (Docket No. 137), and continues to file such reports.

### 3.    The Official Committee of Unsecured Creditors

On or about January 25, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in this case (Docket Nos. 33 and 62). The United States Trustee added an additional member to the Committee on or about January 25, 2010 (Docket No. 98).

The current members of the Committee are as follows:

| | |
|---|---|
| James R. Hanks (Chair) <br> JRH Transportation Engineering | 4765 Village Plaza Loop, Suite 201 <br> Eugene, OR 97401 |
| Gregory Brokaw <br> Rowell Brokaw Architects, PC | 1 East Broadway, Suite 300 <br> Eugene, OR 97401 |
| David E. Bomar <br> Balzhiser & Hubbard Engineers, Inc. | 100 W. 13th Avenue <br> Eugene, OR 97401 |
| Mike Brown <br> Eugene Sand & Gravel / Eugene Sand Construction | P.O. Box 1067 <br> Eugene, OR 97440 |
| Jerry Vicars <br> Fabrication & Mechanical Group, Inc. | P.O. Box 42173 <br> Eugene, OR 97404 |

The Plan provides that to the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee. For so long as such Unsecured Creditors' Committee remains in existence, the Reorganized Debtor will provide to the Unsecured Creditors' Committee a quarterly compliance certificate executed by the Chief Financial Officer of the Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with

the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan.  If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan.  The first such compliance certificate shall be delivered to the Unsecured Creditors' Committee 45 days after the end of the third month following the Effective Date and each quarterly compliance certificate shall be delivered 45 days after the end of each subsequent three month period, unless another quarterly schedule is agreed to by and between the Reorganized Debtor and the Creditors' Committee.  In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of the Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to the Reorganized Debtor in its reasonable discretion, the Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee. Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist.  During the existence of the Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and the Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period, in the ordinary course of business, provided that any dispute concerning such fees and expenses shall be resolved by the Bankruptcy Court or other court of competent jurisdiction.

### 4.    Retention of Professionals

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Tonkon Torp LLP, as general bankruptcy counsel (Docket No. 11), which employment was approved on January 29, 2010;

- Thorp Purdy Jewett Urness & Wilkinson P.C., as special purpose counsel (Docket No. 73), which employment was approved on March 4, 2010;

- Burr Pilger Mayer, Inc., as accountants (Docket No. 74), which employment was approved on March 19, 2010;

- Michael P. Kearney P.C., as special purpose counsel (Docket No. 75), which employment was approved on March 4, 2010;

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

- John Brown, as consultant (Docket No. 76), whose employment was approved on March 19, 2010;

- Rethink LLP as special purpose counsel (Docket No. 77), which employment was approved on March 4, 2010;

- Ball Janik LLP ("Ball Janik"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 269), which employment was approved on November 23, 2010; and

- Pachulski Stang Ziehl & Jones LLP ("PSZJ"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 272), which employment was approved on November 24, 2010.

- Kibel Green Inc. as Real Estate Plan Consultant and Interest Rate Expert (Docket No. 377), which employment was approved on February 4, 2011.

- Powell Valuation Inc as Real Estate Appraiser (Docket No. 383), which employment was approved on February 4, 2011.

On September 30, 2010, the Debtor filed the *Substitution of Counsel and Notice of Appearance* (Docket No. 259), pursuant to which the Debtor substituted PSZJ and Ball Janik for its existing general bankruptcy counsel, Tonkon Torp LLP.  A dispute subsequently arose between Tonkon Torp and the Debtor regarding the transfer of the Debtor's records.  On October 19, 2010, the Debtor filed an adversary proceeding to compel Tonkon Torp to turnover the Debtor's property (Case No. 10-06232-aer).  The parties consensually resolved their dispute, and on November 11, 2010, the Debtor filed a notice of dismissal of the adversary case without prejudice.

The following two employment applications remain pending before the Court.  On December 17, 2010, the Debtor filed an application to employ Kibel Green Inc. as the Debtor's Real Estate Plan Consultant and Interest Rate Expert (Docket No. 361); and on December 21, 2010, the Debtor filed an application to employ Powell Valuation Inc as a real estate appraiser (Docket No. 364).  On December 29, 2010, Umpqua Bank filed an objection to the Debtor's retention of Powell Valuation Inc. (Docket No. 366).  In response to concerns raised by the U.S. Trustee, the Debtor filed amended applications to employ Kibel Green Inc. (Docket No. 377) and Powell Valuation Inc (Docket No.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

383).  A hearing on the Kibel Green Inc. and the Powell Valuation Inc employment applications was set for January 26, 2011.

The Bankruptcy Court authorized the Committee to retain Douglas Schultz and Gleaves Swearingen Potter & Scott LLP as its legal counsel by order entered on January 29, 2010.

### 5.  First Day Orders

On January 29, 2010, the Court entered a number of "first-day" orders requested by Debtor. These orders authorized Debtor to:  pay employees their accrued prepetition wages, salaries, compensation, expenses, benefits and related taxes (in amounts up to the priority limits permitted by the Bankruptcy Code); continue Debtor's existing utility services, including determining an adequate amount of utility deposits; and refund pre-petition security deposits in the ordinary course of Debtor's business.

### 6.  Cash Collateral

The Court has entered a series of cash collateral orders that have allowed the Debtor to use cash collateral from its lenders who have a security interest in the Debtor's cash.  Most recently onOn December 2, 2010, the Court entered an order authorizing the Debtor to continue using the cash collateral until the earlier of (i) the effective date of a plan confirmed in this case, (ii) in accordance with further court order, or (iii) Debtor's failure to comply with any term of this Order with respect to a Lender and Debtor's failure to substantially cure said act of non-conformity within five business days after notice by such Lender to Debtor, (iv) the appointment of a Chapter 11 bankruptcy trustee or examiner, or (v) conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

On February 1, 2011, the Debtor lodged the *Stipulated Order Amending Order Authorizing Use of Cash Collateral and Granting Adequate Protection* (the "Stipulated Cash Collateral Order") and filed a letter with the Court regarding the same (Docket No. 418).  The Stipulated Cash Collateral Order supplements the Court's December 2 cash collateral order with budgets that extend the Debtor's use of cash collateral through April 2011.  The Stipulated Cash Collateral Order was agreed to and executed by the Committee and each of the lenders with an asserted interest in the cash collateral, namely Bank of America, Siuslaw Bank, Summit Bank, Umpqua Bank, and

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

Washington Federal Savings.  The Stipulated Cash Collateral Order was approved by Order of the Bankruptcy Court dated February 14, 2011 (Docket No. 446).

### 7.    Sale of Debtor's College Park Property and Non-Core Assets

Since the Petition Date, the Debtor has identified and begun marketing for sale most of its non-core assets, and is in discussions with various parties regarding the potential sale of certain of these assets.  A partial listing of the non-core assets currently being marketed by the Debtor for sale is attached hereto as **Exhibit B**.

The sale of the Debtor's College Park property is an example of a sale of a non-core asset. On October 15, 2010, the Court entered an order authorizing the Debtor to sell approximately 315 acres of the Debtor's College Park property to the City of Eugene.  The sale of this property has closed.

Another example isOther examples include the pending sale of the Debtor's Natron Land to the Springfield School District for $1.2 million. Such sale was noticed to creditors on December 31, 2010 and (Docket No. 375) and the pending sale of eight lots of Crescent Village, Second Addition (Docket Nos. 409 and 410) for a total amount of $400,000.  The Court approved the sale to the Springfield School District on February 2, 2011, and it is expected to generate $167,000 of unencumbered cash.  The motion for authority to sell the Crescent Village lots will be heard by the Court on February 14, 2011.

### 8.    Agreement with The Fifth Third Bank

The Fifth Third Bank ("Fifth Third") is the holder of a guaranty executed by the Debtor whereby the Debtor guaranteed the obligations of Arlie Air, LLC (a wholly owned subsidiary of the Debtor) ("Arlie Air").  Arlie Air was unable to satisfy its obligations to Fifth Third.  Arlie Air's sole asset (an airplane) was subject to Fifth Third's lien.  The airplane has been sold and the net proceeds were paid to Fifth Third.  After paying the net proceeds to Fifth Third, a deficiency remained of approximately $1,300,000.  In return for Arlie Air's full cooperation in selling the airplane and paying the net proceeds to Fifth Third, Fifth Third has agreed to reduce its General Unsecured Claim against the Debtor to $1,000,000, provided that the Debtor's Plan provides for the payment of such Claim in full with an interest rate of the higher of 3.5% per annum or the interest rate allowed to

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

General Unsecured Claims under the Plan. Because the Plan proposes to pay General Unsecured Claims in full and provides for a 3.5% per annum interest rate, Fifth Third will have an Allowed General Unsecured Claim in the amount of $1,000,000 (the "Fifth Third Allowed Claim"), which will be paid in the same manner and with the same interest rate as all other Allowed General Unsecured Claims. Under this compromise, Fifth Third's Allowed General Unsecured Claim is not subject to any objection, reduction or subordination.

~~Following the Effective Date,~~ Additionally, the Debtor will seek Bankruptcy Court approval of a compromise under which it may grant Fifth Third ~~shall be granted~~ an option to reduce the amount of the Fifth Third Allowed Claim to $600,000 in consideration for (i) a cash payment of $600,000 (the "Fifth Third Payoff"), or (ii) a secured interest in the Debtor's Puueo Forest and Puueo Estate in Hawaii (the "Fifth Third Hawaii Interest"); provided, however, that the decision to deliver either the Fifth Third Payoff or the Fifth Third Hawaii Interest shall be in the Reorganized Debtor's sole discretion.

### 9.  Agreement with Umpqua Bank

On December 23, 2010, the Debtor participated in a settlement conference with Umpqua Bank before the Honorable Elizabeth Perris, United States Bankruptcy Judge. As a result of that settlement conference and subsequent negotiations between the parties, the Debtor and Umpqua Bank agreed to the terms of a settlement that were entered on the Bankruptcy Court record on December 30, 2010 (the "Umpqua Bank Settlement"). In general terms, the Umpqua Bank Settlement divides the Debtor's property encumbered by Umpqua Bank loans into three groups: (1) sell or return properties, with respect to which the Debtor will enter into a letter of intent for the sale of such properties within six months following the Effective Date, or else transfer title to the properties to Umpqua Bank; (2) retain and service debt properties, which the Debtor will keep and the loans for which the Debtor will make monthly ~~principle~~ principal and interest payments at 4.5% interest until the loans mature five years following the Effective Date; and (3) retain and accrue properties, which the Debtor will keep and the loans for which the Debtor will not be required to make payments (which accrue interest at 4.5%) until three years following the Effective Date, at which point the Debtor will be required to pay down 50% of the balance due together with the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

accrued interest.  The loans pertaining to the retain and accrue properties will mature five years following the Effective Date.  By subsequent agreement, Umpqua Bank agreed that the Debtor may also purchase a sell and return property under the conditions set forth in the Plan.

As part of the Umpqua Bank Settlement, confirmation of the Plan will beis conditioned on approval of a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's obligations to Umpqua Bank.  In connection therewith, waiving and releasing all claims against Umpqua Bank and its officers and employees are waived and released.  Additionally, the Debtor and the guarantors will acknowledge that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable.  Umpqua Bank will waive all claims under the original guaranties in exchange for such new promises and acknowledgments from the guarantors.  These and additional terms ofagree that it will not make a demand on the Debtor or the guarantors for defaults that occurred before the Effective Date.  While the Umpqua Bank Settlement areis incorporated fully in the Plan and is already the subject of a settlement entered into on the record before United States Bankruptcy Judge Elizabeth Perris, the Debtor, Umpqua Bank and the guarantors will execute a written settlement agreement containing the release terms and the covenant not to make a demand described above , all to be become effective as of the Effective Date.

### 10.    Agreement with Century Bank

On December 30, 2010, the Debtor filed its *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370) to resolve its lender/borrower relationship with Century Bank (the "Century Bank Settlement") on the properties located at  2843, 2853, 2863, 2873 and 2883 Lord Byron Place in Eugene, Oregon (the "Improved Properties").  To resolve their dispute regarding these properties, the Debtor and Century Bank have agreed to stipulate that: The Court approved the Century Bank Settlement on February 2, 2011 pursuant to its *Order Approving Stipulation Between Debtor and Century Bank to Provide Deeds in Lieu of Foreclosure, Surrender of Cash Collateral and Grant Relief From Stay to Implement.*  The Century Bank Settlement provides, (1) the Improved Properties shall be transferred to Century Bank by agreed-upon deeds in lieu of foreclosure; (2) the balance of the Century Bank cash collateral account will be delivered to

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Century Bank; (3) the Debtor will only continue to use cash collateral as consented to by Century Bank and not for the Debtor's general overhead; (4) any deficiency claim of Century Bank relating to loans secured by the Improved Properties shall be waived; and (5) Century Bank shall have relief from stay. ~~A stipulated order that incorporates these terms was filed with the December 30 Notice of Intent and such notice is pending before the Court~~ In order to reimburse Century Bank for rent and security deposits tenants made on the Improved Properties, the Reorganized Debtor also will pay Century Bank $5,300 following the Effective Date.

**11.    The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement**

The Debtor's exclusive period for filing a plan of reorganization under Bankruptcy Code Section 1121(b) (the "Plan Filing Period") was originally set to expire on May 20, 2010. Accordingly, the Debtor's 60-day period to solicit and obtain acceptances of its plan under Bankruptcy Code section 1121(c) (the "Solicitation Period") would have expired 60 days later.

On or about April 22, 2010, the Debtor filed its *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* (Docket No. 156) seeking to extend the Plan Filing Period to July 1, 2010, and the Solicitation Period to September 1, 2010. The Debtor cited the case's complexity and the numerous parties and assets involved as reasons for the requested extension. The Committee supported the motion. The Office of the United States Trustee took no position. No creditor offered written opposition to the motion, and the Court approved the requested extensions at a hearing that took place on May 12, 2010, and entered its *Amended Order on Court's Case Management Conference Setting Deadlines for Filing Plan and Disclosure Statement* (Docket Nos. 165 and 167) (the "First Extension Order").

On July 1, 2010, the Debtor filed *Debtor's Plan of Reorganization (July 1, 2010)* (the "First Plan") (Docket No. 185) along with an accompanying *Debtor's Disclosure Statement (July 1, 2010)* (Docket No. 186). The basic elements of the First Plan were the restructuring of secured debt on core holdings, the sale of non-core holdings over time, and the payment of unsecured creditors in full over time, with the equity in the Debtor being retained by Ms. Arlie. In response to oppositions filed regarding the disclosure statement (Docket Nos. 226 through 230), on August 20, 2010 the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Debtor filed the *Debtor's Response to Disclosure Statement Objections* (Docket No. 235), which included as an exhibit an amended disclosure statement (as amended, the "First Disclosure Statement").

At the disclosure statement hearing that took place on August 24, 2010, the Court did not approve the First Disclosure Statement because Debtor's counsel represented to the Court that negotiations with creditors were continuing. The Court set September 15, 2010 as the new deadline for filing an amended disclosure statement and plan (Docket No. 241).

On September 9, 2010, the Debtor filed *Debtor's Motion for Extension of Time to File Amended Disclosure Statement and Amended Plan* (Docket No. 247) seeking an additional month in which to file a plan in order to allow continued negotiations with creditors. The Court granted the motion on September 10, 2010 pursuant to its *Order Extending Deadline for Debtor to File Amended Disclosure Statement and Amended Plan of Reorganization* (Docket No. 248), which ordered the Debtor to file an amended plan and amended disclosure statement by October 15, 2010.

Also on September 10, 2010, counsel for Suzanne Arlie and John Musumeci filed a motion seeking an additional extension of exclusivity in order to address certain issues relevant to them personally raised by Umpqua Bank (Docket No. 249). Tonkon Torp filed an opposition to the motion on the Debtor's behalf (Docket No. 252).

~~As a result of~~Following PSZJ and Ball Janik's retention on or about September 30, 2010 to replace Tonkon Torp LLP as the Debtor's general bankruptcy counsel, the Debtor on October 8, 2010 filed *Debtor's Motion to Extend Exclusivity (11 U.S.C. § 1121) and Deadline to File Amended Plan and Amended Disclosure Statement* (Docket No. 276). The Court denied the motion at a hearing on October 20, 2010 and ordered the parties in interest to file a plan and disclosure statement by December 31, 2010 (Docket No. 319).

As a result of the settlement between the Debtor and Umpqua Bank that was entered on the record on December 30, 2010, the Court extended the deadline for only the Debtor and Bank of America to file a plan and disclosure statement to January 10, 2011 (Docket No. 371). On January 10, 2011, the Debtor filed *Debtor's First Amended Plan of Reorganization (January 10, 2011) (Docket No. 392), as well as Debtor's First Amended Disclosure Statement in Support of Debtor's*

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

*First Amended Plan of Reorganization (January 10, 2011)* (Docket No. 393).  On January 31, 2011, the Court entered its *Order Conditionally Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan; And Notice of Disclosure and Confirmation Hearings,* which set the hearing on the plan and disclosure statement for April 4, 2011.  On February 14, 2011, the Debtor filed *Debtor's Second Amended Plan of Reorganization (February 14, 2011),* as well as *Debtor's Second Amended Disclosure Statement in Support of Debtor's First Amended Plan of Reorganization (February 14, 2011)*

### C.    PENDING AND FUTURE TRANSACTIONS

#### 1.    Hawaii Koa Wood Forest

As part of its effort to generate cash to make payments due on the Effective Date and provide the Reorganized Debtor with additional operating capital, the Debtor will either sell in a sealed bid auction to the highest bidder free and clear of liens, claims and encumbrances the West Hilo Tree Farm (described in more detail below) or refinance the property.  Any sale or refinance of this native Acacia Koa forest land is expected to generate substantial cash for the Debtor's reorganization.

On February 3, 2011, the Debtor filed a motion seeking an order (i) approving bidding procedures for the sale of the West Hilo Tree Farm, (ii) approving the proposed forms of asset purchase agreement, sale notice, and sale order to be used in connection with the sale, (iii) approving the manner of sale free and clear, and (iv) scheduling a sale hearing date to consider final approval of the sale (Docket No. 426).  The motion requests that an auction of the West Hilo Tree Farm be held on April 1, 2011 and that a hearing to approve the sale of the West Hilo Tree Farm be held on April 4, 2011.  The motion is pending before the Court and will be heard on March 2, 2011.

Over the years, the Debtor has had numerous inquiries about the West Hilo Tree Farm from timber management organizations, forest products companies, investors, state agencies, and even conservationists.  The Debtor expects that the high bidder at any sale would likely seek to make an initial cash payment, to be followed by an additional cash payment to be due upon receipt of appropriate harvesting entitlements.  Thus, upon a sale, title would likely pass for a discounted price, subject to increase upon the purchaser's receipt of harvesting entitlements.  The Debtor has extensive experience with the West Hilo Tree Farm and the economic benefits that can be derived

from the property with appropriate harvest permitting.  The Reorganized Debtor will make itself available to the purchaser in order to speed the entitlement process.

### 2.    VA Hospital Transaction

The U.S. Department of Veterans Affairs (the "Veteran's Administration") is considering a portion of the Debtor's Crescent Village property in Eugene as the site for its proposed 143,000-square-foot medical clinic, including an ambulatory surgery center.  According to reports in the *Register Guard*, "the facility would cost up to $40 million and employ up to 200.  It would be a boon to Lane County's 35,000 veterans who now must drive hours to Portland or Roseburg if they need specialized services." *Register Guard*, "Eugene Remains in Running for VA Clinic After All," Sept. 9, 2010, page A1; *see Register Guard*, "Back in the VA race: VA still considering a clinic site in Eugene," Sept. 13, 2010, page A6.

Such a deal with the Veteran's Administration could potentially result in many millions of dollars of net sale proceeds, after payment of the claims of Siuslaw Bank, which has a lien against the relevant property.  Although there can be no guarantees, the Debtor is working with the Veteran's Administration and the City of Eugene to accommodate the Veteran's Administration's requests and is optimistic that the Veteran's Administration will select the Debtor's location for its medical clinic.

### IV.

### ASSETS AND LIABILITIES

### A.    REAL PROPERTY ASSETS

The Debtor's assets consist primarily of real property in Lane, Douglas, and Multnomah Counties in Oregon and real property on the Big Island of Hawaii.  The current value of the Debtor's real property is uncertain, as market conditions continue to fluctuate.  The valuations set forth below are the good faith estimates of the Debtor, based on a variety of sources available to the Debtor.  Information regarding the Debtor's Crescent Village ~~development~~project in Eugene, Oregon can be obtained by visiting www.crescent-village.com.  Below is a description of the Debtor's major real property holdings:

### 1.    Crescent Village - Building A

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Building A is a four story mixed-use building located in the Debtor's Crescent Village ~~development~~project. Building A was completed in 2008, and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor. The apartments are fully leased. The retail space is partially leased. The debt against this property is held by Bank of America. Bank of America contends that the leasing cost for the vacant retail space will total approximately $300,000. Because the Debtor uses an in-house team to market Crescent Village, it believes that the leasing cost for the vacant retail space will be significantly less than Bank of America's estimates. The Debtor estimates, based on cost of construction, that the value of Building A is approximately $15,600,000. Bank of America (based on an appraisal that has not been shared with Debtor) contends the property is worth approximately $10,380,000.

### 2.    Crescent Village - Building B

Building B is a four story mixed-use building located in Debtor's Crescent Village ~~development~~project. Building B was completed in 2008 and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor. The apartments are fully leased. The retail space is partially leased. The Debtor believes the value of Building B is approximately $15,800,000. The debt against this property is held by Umpqua Bank.

### 3.    Crescent Village -Building D

Building D (known as the Inkwell Building) is a four story mixed-use building located in the Debtor's Crescent Village ~~development~~project. Building D was completed in 2009. Building D has offices on floors 2 through 4, and retail space on the ground floor. The office space is approximately 58% leased by the Debtor and four other commercial tenants. The retail space is currently vacant. Since the Petition Date, the Debtor has leased approximately 2,100 square feet of previously vacant office space. The debt against this property is held by Bank of America. ~~The~~Based on Bank of America's claimed value for Building D, the Debtor estimates ~~, based on cost of construction,~~ that ~~the~~its value ~~of Building D~~ is approximately $~~4,200,000.~~4,000,000.

### 4.    Crescent Village - 23 acres raw land

Crescent Village contains 23 acres of raw land zoned general office and R-4, generally located at Coburg Road and Crescent Avenue in Eugene, Oregon. The Debtor estimates that the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

value of this land is approximately $~~20,000,000.~~15,000,000.  The debt against this property is held by Umpqua Bank.

### 5.    Crescent Village Lots

Crescent Village Lots 4, 10, 11, 12, and 13 contain raw land zoned general office and R-4, generally located at Coburg Road and Crescent Avenue in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $~~11,800,000.~~11,000,000.  The debt against Lots 10, 11, 12, and 13 is held by Siuslaw Bank.  Summit Bank has a security interest in Crescent Village Lot 4.

### 6.    Woodburn (4.11 acres raw land)

Woodburn contains 4.11 acres of land zoned CG, generally located at 2450 Country Club Road in Woodburn, Oregon.  The land is adjacent to the I-5 freeway across from the Woodburn Outlet Mall.  The Debtor estimates that the value of this land is approximately $1,650,000.  The debt against this property is held by Umpqua Bank.

### 7.    College Park (~~938.2~~623.2 acres raw land)

~~College Park contains 938.2~~The Debtor sold approximately 315 acres of the College Park property to the City of Eugene for $1,500,000 and retains approximately 623.2 acres of raw land ~~in Eugene, Oregon, 450 of which qualify for public facilities zoning~~.  The Debtor estimates that the value of ~~this~~the remaining College Park land is approximately $~~27,000,000.~~18,808,000.  The debt against this property is held by Umpqua Bank.

~~The Debtor has obtained Court approval to sell~~ approximately 315 acres of the College Park property to the City of Eugene for ~~approximately $1,500,000.~~

### 8.    Westlane Shopping Center

Westlane is a commercial shopping center located in Veneta, Oregon.  Westlane consists of retail and office space.  The retail and office space is partially leased.  The Debtor estimates that the value of Westlane is approximately $~~9,500,000~~9,600,000.  The debt against this property is held by Umpqua Bank.

### 9.    Garden Valley Shopping Center

Garden Valley is a commercial shopping center located in Roseburg, Oregon.  Garden Valley consists of retail space.  The retail space is two-thirds leased.  The Debtor estimates that the value of

DOCS_LA:~~230406.9~~230999.2

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Garden Valley is approximately $~~4,600,000.~~5,100,000.  The debt against this property is held by Umpqua Bank.

### 10.    West 11th & Obie

West 11th & Obie is land zoned commercial industrial and C-4, generally located at 3802-3810 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $1,600,000.  The debt against this property is held by Umpqua Bank.

### 11.    My Coffee

My Coffee is a commercial building located at 3808 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of the building is approximately $700,000.  The debt against this property is held by Umpqua Bank.

### 12.    Oil Can Henry's

Oil Can Henry's is a commercial building located at 3804 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $870,000.  The debt against this property is held by Umpqua Bank.

### 13.    Willow Creek

Willow Creek contains 7.22 acres of raw land generally located at West 11th & Willow Creek in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $~~2,100,000.~~1,500,000.  The debt against this property is held by Summit Bank.

### 14.    Hawaii Land

The Debtor owns approximately 5,589 acres of land on the Big Island of Hawaii.  The Debtor's real estate assets in Hawaii diversify the Debtor's investment portfolio.  The Hawaii Property primarily is comprised of native Acacia Koa forests.  Pioneer Asset Investments Limited of Hong Kong ("Pioneer") asserts a lien against 5,226 acres of this property (the "West Hilo Tree Farm"), but the Debtor believes the lien is void because it was recorded after the Petition Date and therefore violates the automatic stay pursuant to section 362(a)(4) of the Bankruptcy Code.  ~~The~~On February 1, 2011, the Debtor ~~intends to file~~filed an objection and adversary complaint to invalidate Pioneer's lien against the property (Adversary Proceeding No. 11-06018) (the "Pioneer Adversary").

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

The Debtor estimates that the value of the West Hilo Tree Farm, once permitted for logging, ranges from approximately $29,000,000 to $50,000,000.  The remaining 363 acres (the "Puueo Estate" and the "Puueo Forest") are unencumbered.  The Debtor estimates that the value of the Puueo Estate and the Puueo Forest ranges from approximately $2,500,000 to $13,000,000.

### ~~15.~~ ~~Natron Land~~

~~Natron contains 15 acres of raw land zoned light-medium industrial and I-2, generally located at Bob Straub Parkway in Springfield, Oregon.  Based on the pending agreement to sell this land, the Debtor estimates that its value at approximately $1,200,000.  The debt against this property is held by Siuslaw Bank.~~

### 15.   ~~16.~~ 2890 Chad Drive (the BLM Office Building)

2890 Chad Drive is an office building located at 2890 Chad Drive in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $~~8,000,000.~~5,100,000.  The debt against this property is held collectively by Alice Smith, Francis Cline, Herbert McKillop, Karen Merwin, Linda Trickey, and William Greenhoot (referred to in the Plan as the "BLM Secured Creditors").

### 16.   ~~17.~~ 2892 Crescent Ave.

2892 Crescent Ave. is an office building located at 2892 Crescent Avenue in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $3,250,000.  The debt against this property is held by Umpqua Bank.

### 17.   ~~18.~~ 650 Goodpasture (Goodpasture Island Radio Tower)

650 Goodpasture is contains land and a radio tower located at 650 Goodpasture Island Drive in Eugene, Oregon.  The Debtor estimates that the value of this land and tower is approximately $460,000.  The debt against this property is held by Summit Bank.

### 18.   ~~19.~~ 4480 G Hwy 101 N.

4480 G Hwy 101 N. is a medical office building located at 3480 Hwy 101 N. in Florence, Oregon.  The Debtor estimates that the value of this building is approximately $2,100,000.  The debt against this property is held by Siuslaw Bank.

### 19.   ~~20.~~ 3082 Kinney Loop

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

3082 Kinney Loop, Eugene, Oregon contains a rental residence on .77 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $450,000. The debt against this property is held by Siuslaw Bank.

### **20.** ~~21.~~ **3108 Kinney Loop**

3108 Kinney Loop, Eugene, Oregon contains a rental residence on .43 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $250,000. The debt against this property is held by Siuslaw Bank.

### **21.**    ~~22.~~ **2850 Kinney Loop**

2850 Kinney Loop, Eugene, Oregon contains a rental residence on .46 acres. The residence is currently rented. The Debtor estimates that the value of this property is approximately $250,000. The debt against this property is held by Siuslaw Bank.

### **22.** ~~23.~~ **3032 Kinney Loop**

3032 Kinney Loop, Eugene, Oregon contains .49 acres. The Debtor estimates that the value of this property is approximately $250,000. The debt against this property is held by Umpqua Bank.

### **23.**    ~~24.~~ **Kinney Loop Lots**

3004 Kinney Loop, Eugene, Oregon contains .45 acres. The Debtor estimates that the value of this property is approximately $~~380,000.~~250,000. 2834 Kinney Loop, Eugene, Oregon contains .46 acres and is a rental residence, which is currently rented. The Debtor estimates that the value of this property is approximately $~~390,000.~~250,000. 2802/2804 Kinney Loop, Eugene, Oregon contains .28 acres. The Debtor estimates that the value of this property is approximately $490,000. 2802 and 2804 Kinney Loop are rental residences and both are currently rented. 2729 Coburg Road, Eugene, Oregon contains .34 acres. The Debtor estimates that the value of this property is approximately $592,416. 2743 Coburg Road, Eugene Oregon, contains .17 acres. The Debtor estimates that the value of this property is approximately $296,208. The debt against these properties is held by Siuslaw Bank.

### **24.**    ~~25.~~ **3058 Kinney Loop**

3058 Kinney Loop, Eugene, Oregon contains .40 acres. The Debtor estimates that the value of this property is approximately $340,000. The debt against this property is held by Century Bank.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

### 25. 26. 2909 Lord Byron Place

2909 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.279,600.  The debt against this property is held by Washington Federal Savings.

### 26. 27. 2915 Lord Byron Place

2915 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.296,000.  The debt against this property is held by Washington Federal Savings.

### 27. 28. 2931 Lord Byron Place

2931 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.327,950.  The debt against this property is held by Washington Federal Savings.

### 28. 29. 2977 Lord Byron Place

2977 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.269,350.  The debt against this property is held by Washington Federal Savings.

### 29. 30. 2993 Lord Byron Place

2903 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.327,100.  The debt against this property is held by Washington Federal Savings.

### 30. 31. 28432843, 2853, 2863, 2873 and 2883 Lord Byron Place

2843 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

### 32. 2853 Lord Byron Place

2853 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $300,000.  The debt against this property is held by Century Bank.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

### 33.      2863 Lord Byron Place

2863 Lord Byron Place, Eugene, Oregon is a townhouse. The Debtor estimates that the value of this property is approximately $300,000. The debt against this property is held by Century Bank.

### 34.      2873 Lord Byron Place

2873 Lord Byron Place, Eugene, Oregon is a townhouse. The Debtor estimates that the value of this property is approximately $300,000. The debt against this property is held by Century Bank.

### 35.      2883 Lord Byron Place

2883 Lord Byron Place, Eugene, Oregon is a townhouse. The Debtor estimates that the value of this property is approximately $300,000. The debt against this property is held by Century Bank.

Pursuant to the Century Bank Settlement discussed in Section III.B.10 above, the properties located at 2843, 2853, 2863, 2873 and 2883 Lord Byron Place in Eugene, Oregon have been transferred to Century Bank by agreed-upon deeds in lieu of foreclosure.

### 31.      36. Hangar 272

Hangar 272 is an airplane hangar located at 28737 Grumman Dr., Eugene, Oregon. The Debtor estimates that the value of this hangar is approximately $420,000.494,000. The debt against this property is held by Umpqua Bank.

### 32.      37. Hangar 246

Hangar 246 is an airplane hangar located at the 90363 Boeing Dr., Eugene, Oregon. The Debtor estimates that the value of this hangar is approximately $90,000. There is no debt against this property.

### 33.      38. 2960 and 3110 Kinney Loop

2960 and 3110 Kinney Loop, Eugene, Oregon contains .40 acres. The Debtor estimates that the value of this property is approximately $800,000. The debt against this property is held by Siuslaw Bank.

### 34.      39. Unencumbered Real Property

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

In addition ~~to the properties described above~~, the Debtor owns various unencumbered real property that, in the aggregate, has a value exceeding $3,000,000. ~~As set forth on **Exhibit B,** this~~This unencumbered property includes Crescent Village Lot 9 (which the Debtor values at approximately $1,000,000), 3004 Kinney Loop (bare land; Lot 3000) (which Debtor values at approximately $~~380,000) and~~250,000), and the Puueo Estate and Puueo Forest (which collectively are valued at approximately between $2,500,000 and $13,000,000).  Additionally, the Debtor believes that the West Hilo Tree Farm will be unencumbered as a result of the Pioneer Adversary (discussed in Section IV.A.14 above) and has sought authority to sell such property free and clear of liens, claims and interests as discussed above (see Section II.C.1.).

Moreover, the Debtor owns numerous lots on Lord Byron Place in Eugene, Oregon (which collectively are valued at approximately $~~1,500,000).  The Debtor also owns approximately 363 acres of unencumbered property in Hawaii (22 acres generally referred to as the Puueo Estate, and 341 acres generally referred to as the Puueo Forest).~~1,300,000).  The Debtor has entered into purchase and sale agreements for the sale of eight unencumbered townhouse lots located on the east side of Lord Byron Place for a total of $400,000 (*see* Docket Nos. 409 and 410).  These sales are in escrow pending Court approval.  The Debtor owns an additional 18 unencumbered townhouse lots located on the west side of Lord Byron Place (which collectively are valued at approximately $900,000).

B.    **PERSONAL PROPERTY ASSETS**

1.    **Cash and Accounts Receivable**

The Debtor's personal property assets consist primarily of cash and accounts receivable.  A significant portion of the Debtor's cash is subject to the cash collateral orders entered in this Case.

2.    **Bankruptcy Claim Filed Against Roberts Construction**

Arlie has filed claims aggregating over $3,400,000 against Roberts Construction in the Roberts Prof. Const. Svcs., Inc. bankruptcy case (Case No. 08-60615-fra7) (the "Roberts Case").  Arlie cannot at this time estimate exactly how much Arlie will recover on its claims.  There have been approximately $7.7 million in claims filed in the case, and the Debtor's share is approximately 44%.

On or about November 30, 2010, the trustee of the Roberts Case, Ronald R. Sticka, released three checks to the Debtor in the amounts of $36,715.91, $76,755.64 and $56,286.54 (for a total of $169,758.09).  Soon after Trustee Sticka announced that it would pay this interim dividend to the Debtor, Bank of America and Umpqua Bank notified the Debtor that they believed they possessed valid liens against the distributions.

Pursuant to the Court's August 19, 2010 order in this Case, Trustee Sticka withheld $47,851.64 from the November 30 distributions to the Debtor and paid that amount directly to the law firm Gartland, Nelson, McCleery, Wade & Walloch, P.C. ("Gartland, Nelson") on account of services provided to the Debtor with respect to the Roberts Case.  On December 7, 2010, Gartland, Nelson held the distribution in its trust account, and on December 7, 2010 filed a motion requesting authority to disburse the funds to its general account as full payment of its secured claim against the Debtor (Docket No. 355). This motion remains pending before the Court, and the Court granted the motion on January 26, 2011 pursuant to its *Order Allowing Payment of Secured Claim*.

### 3. State Court Claims Against Michael Roberts and Mark Roberts

On December 30, 2009, Arlie filed a State Court complaint in Lane County Circuit Court (Case No. 160928625) seeking over $1,000,000 in damages against Michael Roberts and Mark Roberts in connection with losses suffered by the Debtor on its Crescent Village project.  The Roberts brothers were owners and officers of Roberts Professional Construction Services, Inc. ("Roberts Construction"), which was the general contractor on Arlie's Crescent Village project. Roberts Construction defaulted on its obligations to Arlie and filed for bankruptcy protection.  Arlie also has asserted claims against Roberts Construction in the Roberts Construction bankruptcy proceeding (see above), but the claims asserted by Arlie in the Lane County Circuit Court action are asserted against the Roberts bothers individually.

The claim against Michael Roberts is for fraud and alter ego.  The fraud cause of action is based on evidence that Michael Roberts caused Roberts Construction to over-bill Arlie for work done on the Crescent Village project.  That is, Michael Roberts knowingly caused invoices to be sent to Arlie on the Crescent Village project for work that had not been performed.  Arlie relied on these inflated invoices that Michael Roberts caused to be sent to them and paid these invoices.  Arlie

suffered damages when Roberts Construction went out of business and Arlie was forced to pay twice for this work.  The alter ego claim against Michael and Mark Roberts is based on the fact that the Roberts brothers disregarded the corporate form of Roberts Construction and used the assets and resources of Roberts Construction for their own personal benefit (such as financing personal investments in Bend, Oregon) and did not treat Roberts Construction as an entity which was separate from themselves.

On February 25, 2010, the Roberts brothers removed the case to the Roberts Construction bankruptcy proceeding.  Debtor filed a motion to remand the case back to Lane County Circuit Court.  By order filed on July 6, 2010, Judge Alley denied the motion to remand.  The adversary proceeding (10-06068-fra) was administratively transferred from the Roberts Construction bankruptcy case to this Case.  On August 11, 2010, Judge Alley approved the parties' stipulated discovery schedule, which ~~provides~~provided for the completion of discovery by February 28, 2011, and a five-day trial to commence on or after April 28, 2011.  On December 10, 2010, Judge Alley approved extensions of the discovery schedule.  Currently, discovery will be completed by April 29, 2011, a pre-trial conference will take place on June 9, 2011, and the trial will commence on July 18, 2011.

### 4.    Potential Claims Against Umpqua Bank

The Debtor ~~is investigating~~investigated and ~~evaluating~~evaluated potential claims against Umpqua Bank arising out of (a) Roberts Construction's fraudulent billing for the Crescent Village Building B construction, for which Robert Brink acted as Umpqua Bank's lead inspector, and (b) Umpqua Bank's course of conduct in connection with a series of loans made or proposed to be made to Arlie in 2009.

On August 19, 2010, the Court entered its *Order Regarding Debtor's Motion for Rule 2004 Examination of Umpqua Bank* (Docket No. 219), which provided for the production of certain paper files maintained by Umpqua Bank related to Mr. Robert Brink, a construction loan officer at Umpqua Bank who, based on information and belief, was indicted for and pled guilty to, among other malfeasance, filing inspection reports certifying that construction was underway on a Bend, Oregon developer's projects, when in fact it was not, and overstating construction progress (thereby

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

resulting in ~~overpayment of the contractors~~overpayments).  Such discovery was initiated by the Debtor because some of its own construction at Crescent Village was subject to substantial overpayments to its contractor (Roberts Construction) who subsequently went bankrupt ~~after~~and Mr. Brink issued ~~similar~~ progress certifications to Umpqua Bank. ~~The~~ during the height of construction at Crescent Village ~~was~~ roughly at the same time during which Mr. Brink had committed malfeasance related to the Bend, Oregon project ~~and other matters while working at Umpqua Bank~~.

Through an investigation undertaken in this case, Arlie is informed and believes that Umpqua Bank knew in early November 2007 that Mr. Brink submitted false inspection reports pertaining to other projects funded by the bank that allowed developers and contractors to fraudulently divert funds.  Similarly, based on information and belief, Mr. Brink submitted false and misleading inspection reports in connection with Umpqua Bank's loan on Building B in Crescent Village, where the contractor also fraudulently diverted construction funds.  As a result of Roberts Construction's intentional overbilling and Roberts Construction's subsequent bankruptcy filing, Arlie asserts that it suffered uncompensated losses of over $3 million and substantial consequential damages.  The losses that Arlie asserts that it suffered as a result of Roberts Construction's overbilling were a substantial factor in causing Arlie to file its chapter 11 petition.

~~These~~Arlie asserts that these facts support claims against Umpqua Bank for concealment, negligence and negligent misrepresentation.  To the extent it can be demonstrated that Mr. Brink knew about the overbilling at Crescent Village, the Debtor also asserts it would have strong claims against Umpqua Bank for aiding and abetting the Roberts Construction fraud.  At this time, it is difficult to estimate the approximate value of such claims or the costs of pursuing them. ~~Umpqua Bank denies~~

Umpqua Bank asserts that Debtor had the duty and capacity to monitor its own projects, that Debtor certified to Umpqua Bank the progress of construction and construction payments when making draw requests, and Umpqua Bank vehemently denies Mr. Brink did anything wrong on the Crescent Village project, that Umpqua Bank had any duty to inform Debtor about Mr. Brink's activities on any other project, and that Debtor has any claim against Umpqua Bank.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Pursuant to the Umpqua Bank Settlement, confirmation of the Plan ~~will be~~is conditioned on~~approval of~~ a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's obligations to Umpqua Bank under which all claims against Umpqua Bank and its officers and employees are waived and released.

### 5.  Tonkon Claims

The Debtor's working relationship with Tonkon Torp LLP in August and September 2010 was marked by communication difficulties.  The impact of these difficulties became more severe after objections were filed to the Debtor's Disclosure Statement.  Ultimately, the Debtor determined that the best path for its reorganization efforts mandated the replacement of Tonkon Torp as chapter 11 bankruptcy counsel.

### 6.  Other Claims/Avoidance Actions

Other than potential claims against Umpqua Bank that are being released as part of the Plan, the Plan preserves all of the Debtor's claims and causes of action, known or unknown, and all of the Debtor's claims and causes of actions (including any potential Avoidance Actions) remain assets of the Reorganized Debtor, and the Reorganized Debtor may pursue such claims and rights of action, as appropriate, in accordance with what is in the Reorganized Debtor's best interests.  Except as set forth in this Disclosure Statement, the Debtor is not currently aware of any pending material claims or causes of actions it may have that are likely to constitute material assets of the Debtor's estate.

### C.  LIABILITIES – SECURED CREDITORS

### 1.  Bank of America

The Debtor has two loans with Bank of America.  One loan (the "Building A Loan") is secured by Crescent Village Building A.  The other loan (the "Building D Loan") is secured by Crescent Village Building D.  As of the Petition Date, the Debtor owed approximately $9,000,000 on the Building A Loan and approximately $5,400,000 on the Building D Loan.

### 2.  Century Bank

The Debtor has seven loans with Century Bank.  Six of the loans are secured, and the seventh loan (a $200,000 line of credit loan) is unsecured.  As of the Petition Date, the Debtor owed a total of approximately $2,200,000 on the Century Bank loans.  The loans range from approximately

$200,000 to approximately $365,000.  Each of the secured loans is secured by separate real property of the Debtor.  One secured loan is secured by a house located at 3058 Kinney Loop in Eugene, Oregon, and the other five secured loans are secured by separate townhomes located on Lord Byron Place in Eugene, Oregon.  As discussed above in Section III. B., the Debtor and Century Bank have ~~agreed to resolve~~resolved their lender/borrower relationship on the five townhomes located on Lord Byron Place ~~pursuant to the *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370), filed by the Debtor on December 30, 2010.  A stipulated order that incorporates the terms of the settlement was filed with the December 30 Notice of Intent and such notice is pending before the Court~~.

### 3.    Siuslaw Bank

The Debtor has eight loans with Siuslaw Bank.  Each loan is secured by separate real property of the Debtor.  The loans range from approximately $95,000 to approximately $4,300,000. As of the Petition Date, the Debtor owed a total of approximately $8,000,000 on the Siuslaw Bank loans.

### 4.    Summit Bank

The Debtor has one loan with Summit Bank that is secured by the real property and improvements in Eugene, Oregon commonly referred to as the Goodpasture Island Radio Tower.  As of the Petition Date, the Debtor owed approximately $340,000 on the Summit Bank loan.

Additionally, the Debtor has guaranteed a $1,850,000 line of credit issued by Summit Bank to Churchill Media LLC, which guaranty obligations are secured by the Debtor's vacant land in Crescent Village and by the Debtor's vacant land located at W. 11th & Willow Creek in Eugene, Oregon.

### 5.    Umpqua Bank

The Debtor has twelve loans with Umpqua Bank.  All of Umpqua Bank's loans are cross-defaulted, cross-collateralized, and are secured by multiple parcels of real property, improvements thereon, and rents and income therefrom.  The loans range from approximately $190,000 to approximately $10,200,000.  As of the Petition Date, the Debtor owed a total of approximately $29,000,000 on the Umpqua Bank loans.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

### 6.    Washington Federal Savings

The Debtor has five loans with Washington Federal Savings.  Each of the five loans is secured by a separate townhome located on Lord Byron Place in Eugene, Oregon.  The loans range from approximately $390,000 to approximately $420,000.  As of the Petition Date, the Debtor owed a total of approximately $2,000,000 on the Washington Federal Savings loans.

### 7.    "BLM" Individuals

Francis Cline, William Greenhoot, Herbert McKillop, Karen Merwin, Alice Smith and Linda Trickey (the "BLM Individuals") collectively financed the Debtor's acquisition of the office/warehouse campus located at 2890 Chad Drive in Eugene, Oregon (referred to as the "BLM Office Building").  The Debtor has a separate loan with each BLM Individual.  Each loan is secured by the BLM Office Building.  As of the Petition Date, the Debtor owed a total of approximately $4,350,000 on such loans.

### 8.    Property Tax Lien Claimants

As of the Petition Date, the Debtor had unpaid property taxes of approximately $870,000 secured by statutory liens on the Debtor's real property.

### D.    LIABILITIES – UNSECURED CREDITORS

The Plan contains two classes of unsecured creditors:  a convenience class of creditors holding Small Unsecured Claims (an Unsecured Claim of $2,000 or less) and a class of creditors holding General Unsecured Claims.  It is the Debtor ~~estimates~~'s belief that the total amount of Allowed Small Unsecured Claims will be approximately $50,000, and that the total amount of Allowed General Unsecured Claims (including any Deficiency Claims of secured creditors) will be approximately $~~5,400,000.~~5,400,000, provided that these amounts may vary depending on the outcome of claims litigation.

Although Pioneer Asset Investment Limited of Hong Kong asserts that its $1,500,000 loan to the Debtor is secured by approximately 5,226 acres of land on the Big Island of Hawaii, the lien was recorded after the Petition Date and is thus void as a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code.  ~~The Debtor intends to file a adversary complaint~~On February 1, 2011, the Debtor filed the Pioneer Adversary to invalidate Pioneer's lien against the property.

Accordingly, the Debtor believes that the Pioneer has a General Unsecured Claim of approximately $1,500,000, which is included in the Debtor's estimate of approximately $5,400,000 of total Allowed General Unsecured Claims.

### E.    LIABILITIES – ADMINISTRATIVE EXPENSES

As discussed above in section III. B. 4, the Debtor has retained a number of professionals in the case.  In addition, the Debtor is responsible for payment of the fees and expenses of counsel for the Committee.

### V.

### DESCRIPTION OF PLAN OF REORGANIZATION

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below.  The discussion of the Plan that follows constitutes a summary only and should not be relied upon for voting purposes.  You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtor.  If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

### A.    UNCLASSIFIED CLAIMS

Administrative Expense Claims and Priority Tax Claims are not classified.

An "Administrative Expense Claim" is a Claim against the Debtor that is entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses of preserving the estate and operating Debtor's businesses during the Case, any indebtedness or obligations incurred by the Debtor during the pendency of the Case in connection with the rendition of services to the Debtor, and compensation for legal and other professional services and reimbursement of expenses and statutory fees payable to the United States Trustee.

Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

A "Priority Tax Claim" is a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.  The Debtor is not aware of any Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. §  511, over a period ending not later than five years after the date on which such claim was assessed.

In addition, any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

## B.    CLASSIFIED CLAIMS AND INTERESTS

The Plan divides Creditors and Interest Holders into Classes.  Creditors with similar Claims are placed in the same Class.  A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class.  The following summary of distributions under the Plan to Classified Claims and Interests is subject to, and is qualified in its entirety by reference to, the Plan attached hereto as **Exhibit A**.

### 1.    Class 1 (Other Priority Claims)

Class 1 consists of all Allowed Other Priority Claims.  An "Other Priority Claim" is a Claim against the Debtor for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code (other than an Administrative Expense Claim or a Priority Tax

Claim).  Class 1 is impaired.  Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

**2.      Class 2 (Allowed Secured Claim of BofA)**

Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA").  Class 2 is impaired.  The Class 2 Claim of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described.  Each property of Debtor that is Collateral of BofA shall serve as Collateral for each of BofA's Class 2 Claims.  As security for BofA's Class 2 Claims, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

*(a)      Class 2.1 – Building A Loan.*

BofA will have an Allowed Class 2.1 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA's Class 2.1 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building A Note") in ~~the amount of the present value of~~ the amount of the Allowed Class 2.1 Claim.  The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note.  Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter until the Building A Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(b)      <em>Class 2.2 – Building D Loan.</em>

BofA will have an Allowed Claim (the "~~BofA~~Class 2.2 Claim") in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the ~~Effective~~Petition Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,376,088.93 (the "Building D Loan"), which loan is ~~partially~~ secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D").  ~~BofA shall have an Allowed Class 2.2 Claim in the amount of the Building D Value; the remainder of the BofA Claim shall be a Class 12 Claim.~~

BofA's Class 2.2 Claim shall be satisfied by the delivery of a~~two~~ promissory ~~note to BofA (the "Building D Note")~~notes –one in the amount of the ~~present value~~Building D Value ("Building D Note 1") and one for the difference between the amount of the Allowed Class 2.2 Claim and the Building D Value ("Building D Note 2").  ~~The~~

Building D Note 1 shall have the following attributes: (a) it will bear interest at a fixed rate of 4.5% per annum ~~and will be payable by Reorganized Debtor as follows.Commencing~~; (b) commencing on the ~~first (but no later than the~~tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~tenth~~)~~ day of each month thereafter through and including the ~~36~~24th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building D Note.  ~~Commencing~~ 1; (c) commencing on the ~~first (but no later than the~~tenth~~)~~ day of the ~~37~~25th month after the Effective Date and continuing on the ~~first (but no~~

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

later than the tenth) day of each month thereafter until the Building D Note 1 has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building AD Note 1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.; (d) to the extent that the loan to value ratio of the loan represented by the Building D Note 1 exceeds 75% of the value of Building D (which, for these purposes shall be valued as of the 24th month following the Effective Date after applying an 8% cap rate to the net operating income of Building D), the Reorganized Debtor shall make a cash paydown of the Building D Note 1 in the amount necessary to reduce such loan to value ratio to 75%; (e) the Reorganized Debtor shall establish on the Effective Date a $405,000 reserve account for tenant improvements associated with future leasing activities related to Building D ("the Building D Reserve") which shall be funded with $205,000 cash derived from the BofA cash collateral account and $200,000 from the Roberts Distributions.  BofA shall retain its liens and security interests in Building D, which shall serve as security for amounts due under the Building D Note 1 only.  Aside from the $200,000 contribution to the Building D Reserve, BofA shall have no claim to any other Roberts Distributions.

The Building D Note 2 shall have the following attributes: (a) it will bear interest at a fixed rate of 3.5% per annum; (b) it will be payable in two installments with the first installment of one half of the principal plus all then accrued interest being due on the tenth day of the 37th month after the Effective Date, and the second installment of all remaining amounts owed thereunder being due on the Maturity Date.  There shall be no security for the Building D Note 2, but it shall be cross-defaulted with the Building D Note 1.

*(c)*     *Treatment of Bank of America's Cash Collateral Accounts.*

On the Effective Date, Reorganized Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A.  The remainder of the Building A Cash Collateral will be either contributed to the Building D Reserve as described in Article 4.2.2 or retained and used by Reorganized Debtor for its general operating purposes.

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

On the Effective Date, Reorganized Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D. The remainder of the Building D Cash Collateral ~~shall be retained in a segregated BofA account to be used for Property Taxes, capital expenses, tenant improvements, maintenance, improvements, or other expenses directly pertaining to the improvement of Building D or the sale, lease or marketing of Building D~~ will be either contributed to the Building D Reserve as described in Article 4.2.2 or retained and used by Reorganized Debtor for its general operating purposes.

### 3.    Class 3 (Allowed Secured Claims of Century Bank)

Class 3 consists of the Allowed Secured Claims of Century Bank. Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the ~~present value of the~~ Allowed Class 3 Claim (the "3058 Kinney Loop Note"). The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum ~~(or such other rate as determined by the Court)~~ and will be payable by Reorganized Debtor as follows.

Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

interest only payments on the 3058 Kinney Loop Note.  Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

### 4. Class 4 (Allowed Secured Claim of Pioneer)

Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer"). The Class 4 Secured Claim of Pioneer is disputed.  If and to the extent Pioneer is determined by Final Order ~~of the Bankruptcy Court~~ to have a valid, perfected security interest in or lien upon property of the Debtor, ~~it's~~its Claim will be impaired and Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Pioneer to Debtor ~~on or about~~ on or about September 12, 2008 in the original principal amount of $1,500,000 (the "Pioneer Loan').

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Pioneer's Allowed Class 4 Claim shall be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount ~~of the present value~~ of the Pioneer Class 4 Claim.  The Pioneer Note will bear interest at a fixed rate of 4.5% per annum.  The Pioneer Note will be payable by Reorganized Debtor as follows:

The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note.  At the time of any such

pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note.

If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order ~~of the Bankruptcy Court~~, the Pioneer Claim will be treated as a Class 12 Claim.

### 5.    Class 5 (Allowed Secured Claims of Siuslaw Bank)

Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.  Class 5 is impaired.  The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans. Each loan is separately classified and treated as hereinafter described.

*(a)    Class 5.1 – Crescent Village Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount ~~of the present value~~ of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots Note.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank.

(b)      Class 5.2 - 2850 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the present value of the Allowed Class 5.2 Claim. The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the first (but no later than the tenth) day of the first month following the Effective Date and continuing on the first (but no later than the tenth) day of each month thereafter

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note.  Commencing on ~~the first (but no later than the tenth)~~ the tenth day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter until the 2850 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2850 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(c)    Class 5.3 - 2960 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor ~~on or about~~ on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount ~~of the present value~~ of the Allowed Class 5.3 Claim.  The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

interest only payments on the 2960 Kinney Loop Note.  Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than~~ ~~the~~ tenth~~)~~ day of each month thereafter until the 2960 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2960 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(d)    Class 5.4 - 3082 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor ~~on or about~~ on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount ~~of the present value~~ of the Allowed Class 5.4 Claim.  The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note.  Commencing on ~~the first (but no later than~~

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

the tenth) day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth) day of each month thereafter until the 3082 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3082 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(e)*      *Class 5.5 - 3108 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount ~~of the present value~~ of the Allowed Class 5.5 Claim.  The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the ~~first (but no later than the~~ tenth) day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth) day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note.  Commencing on ~~the first (but no later than the tenth)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than~~

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

~~the~~ tenth~~)~~ day of each month thereafter until the 3108 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3108 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(f)    *Class 5.6 - Florence Medical Building Loan.*

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

As Collateral for the Class 5.6 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.6 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Florence Note") in the amount ~~of the present value~~ of the Allowed Class 5.6 Claim.  The Florence Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

On the Effective Date, Reorganized Debtor shall pay down the Florence Note to the original principal amount of the Florence Medical Building Loan.  Thereafter, commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Florence

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Note.  Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter until the Florence Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Florence Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

(g)     *Class 5.7 – Kinney Loop Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount ~~of the present value~~ of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

The Kinney Loop Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Kinney Loop Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Kinney Loop Lots Note.

~~(h)     *Class 5.8 – Natron Land Loan.*~~

~~Siuslaw Bank will have an Allowed Class 5.8 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date~~

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

(as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about February 21, 2008 in the original principal amount of $945,000 (the "Natron Land Loan"), which loan is secured by Debtor's real property and improvements in Springfield, Oregon known as South 60th Street and commonly referred to by Debtor as the Natron Vacant Land.  In the event a sale of the Natron Vacant Land has not been consummated prior to the Effective Date, the Class 5.8 Claim shall be addressed as follows.

As Collateral for the Class 5.8 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Natron Land Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.8 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Natron Note") in the amount of the present value of the Allowed Class 5.8 Claim, payable by Reorganized Debtor as follows.

The Natron Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Natron Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Natron Note.  Notwithstanding the foregoing, the Natron Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(h)    (i) *Treatment of Siuslaw Bank's Cash Collateral Account.*

On the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay  any past due Property Taxes on the Collateral securing the Class 5 Claims.  Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

6.    **Class 6 (Summit Bank)**

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Class 6 consists of the Allowed Secured Claims of Summit Bank. Class 6 is impaired. The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

(a) *Class 6.1 – Road Radio Tower Loan.*

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount ~~of the present value~~ of the Allowed Class 6.1 Claim. The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note. Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

(b)    Class 6.2 – Guaranty Claim.

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek, hereinafter referred to as the "Willow Creek Property").

Summit Bank will have an Allowed Class 6.2 claim in the amount of the present value of the amount owing by Debtor under the Churchill Media Guaranty.  As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value. Summit Bank's Class 6.2 Claim will be satisfied by the delivery of a promissory note in the amount of the Allowed Class 6.2 Claim to Summit Bank (the "Guaranty Note"), payable by Reorganized Debtor as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum, and will be payable in full on the Maturity Date.  In addition, within 3 years Reorganized Debtor shall pre-pay a portion of the Guaranty Note through the sale or turnover of the Willow Creek Property as follows.  Reorganized Debtor shall have six (6) months after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty Note.  At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note.  to enter into a letter of intent for the sale of the Willow Creek Property, provided that any such sale must close within two (2) months after the execution of the letter of intent.  The Willow Creek Property net sale proceeds (after payment of Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses) will be applied to pay down the Guaranty Note.  In the event a sale is not effectuated as

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

set forth above, Reorganized Debtor shall transfer title to the Willow Creek Property to Summit Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Summit Bank, and the amount outstanding under the Guaranty Note shall be reduced by the assessed value of the Willow Creek Property. For purposes of this Article 4.6.2, "assessed value" shall mean the value ascribed to the Willow Creek Property as agreed to by the Reorganized Debtor and Summit Bank and, if no such agreement is reached, such value as determined by the Bankruptcy Court.

All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note. In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

*(c)      Treatment of Summit Bank's Cash Collateral Account.*

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims. Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

**7.      Class 7 (Umpqua Bank)**

Class 7 consists of the Allowed Secured Claims of Umpqua Bank. Class 7 is impaired. The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described. The total amount of each

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs (the "Umpqua Bank Fees") as allowed by Umpqua Bank's existing loan documents with Debtor as of the Effective Date and allocated in accordance with Article 4.7.15 of the Plan (the "Umpqua Bank Fees"). Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of aan Umpqua Bank Loan for events or defaults under or relating to the Umpqua Bank loans that occurred before the Effective Date and any such Claimsevents or defaults shall be deemed waived, released and extinguished, provided that such pre-Effective Date waiver shall not apply to defaults continuing after the Effective Date that materially harm or affect the value of Umpqua Bank's interest in the real property Collateral. Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral (including assets generated or purchased after the Effective Date but perfected before the Petition Date) with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross -defaulted and cross collateralized. Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such loan and security documents provided by Debtor to Umpqua Bank as amended, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect. Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan, and Debtor and/or. Without limiting the foregoing, such amendments will include having the following financial reports provided to Umpqua Bank (all in such form as reasonably required by Umpqua Bank): 45 days after the end of each calendar quarter, internally prepared financial statements (including balance sheet and cash flow statement); 120 days after each year end, internally prepared financial statements; annual financial statements 120 days after year end and copies of corporate tax returns with schedules when filed and

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

copies of non-residential lease agreements after they are signed.  In addition, Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral.  Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

*(a)    Class 7.1 – Westlane Loan.*

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property").  Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price ~~in excess of~~for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, ~~or (b~~(b) purchase the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property or (c) transfer title to the Westlane Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property ~~including, without limitation, the~~and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the ~~Arlie Debt Amount and~~ sum of (a) reasonable commissions, closing and transaction costs including, without limitation, legal and marketing expenses (collectively, the "Closing Costs"), (b) the applicable Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). Any sale or purchase by Reorganized Debtor of the Westlane Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

*(b)      Class 7.2 - West 11th Land Loan.*

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~ applicable Umpqua Bank Fees under the unpaid principal balance that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property").  Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price ~~in excess of the~~ for cash at closing in an amount that will pay Umpqua Bank the applicable Arlie Debt Amount and Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, ~~or (b~~(b) purchase the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:~~230406.9~~230999.2

100

~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~JANUARY 10,~~FEBRUARY 14, 2011)

agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property ~~including, without limitation, the~~and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3~~)~~ of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount ~~and~~, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the West 11th Land Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

*(c)    Class 7.3 – 2892 Crescent Ave. Loan.*

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price ~~in excess of~~for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, ~~or (b~~(b) purchase 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property ~~including, without limitation,~~and the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3~~/~~) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount ~~and,~~ (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of 2892 Crescent Avenue shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

*(d)      Class 7.4 Woodburn and College Park Loan.*

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred to as 2450 Country Club Road, Marion County (the "Woodburn Property").  ~~The Woodburn Property secures $931,750 of the outstanding amounts owing under the Woodburn and College Park Loan.  The College Park Property secures the remaining amounts owing under the Woodburn and College Park Loan.~~ Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

PACHULSKI STANG ZIEHL & JONES LLP

Attorneys at Law

Los Angeles, California

DOCS_LA:~~230406.9~~230999.2

100

~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~JANUARY 10,~~FEBRUARY 14, 2011)

The Arlie Debt Amount for the Woodburn Property shall be $845,000 together with 25% of accrued and unpaid interest on the Woodburn and College Park Loan. Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price for cash at closing in an amount in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, or (b)(b) purchase the Woodburn Property at a price for cash at closing in an amount in excess of the Arlie Debt Amount for such property, or (c) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property including, without limitation, theand the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount and, Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan)7.2 or a Class 7.3 Claim. Any sale or purchase by Reorganized Debtor of the Woodburn Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount has been or will be paid upon such sale or purchase.

Subject to the reduction of debt owing against the College Park Property from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case (the "College Park Sale") and the reduction of debt owing against the Woodburn Property from the disposition of the Woodburn Property described above, asAs of the Effective Date, the remainder of the Woodburn and College Park Loan shall bearhave a non-default simple interest at a fixed interest rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "College Park Pay Down"). The College Park Pay Down will not include application from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above. The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate).

The accrued non-default interest and reasonable fees and costs owing as of the Effective Date on the College Park Loan will be due and payable upon a sale or refinancing of the College Park Land.

(e)    <i>Class 7.5 – Roseburg Loan #1.</i>

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees)applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property"). Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property. Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 before the Effective Date shall be deemed waived or released. Thereafter, the non-default interest will accrue on the Roseburg Loan #1 at a simple fixed rate of 4.5% per annum. Commencing on the first (but no later than the tenth) day of the first month

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

In accordance with paragraph 4.7.18 of the Plan, Reorganized Debtor may use up to $457,000 of good funds in the Umpqua Cash Collateral Account ~~funds~~ for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made.

*(f)    Class 7.6 – Roseburg Loan #2*

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~ applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property.  Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2.  Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2 before the Effective Date shall be deemed waived or released.  Thereafter, interest will accrue on the Roseburg Loan #2 at a simple fixed rate of 4.5% per annum.  Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no~~

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

~~later than the~~ tenth~~)~~ day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest **and applicable Umpqua Bank Fees** due on the Maturity Date.

*(g)    Class 7.7 – Oil Can Henry's Loan.*

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~**applicable Umpqua Bank Fees** under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property").  Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use **good** funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property.  Any default **interest**, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan **before the Effective Date** shall be deemed waived or released.  Thereafter, interest will accrue on the Oil Can Henry's Loan at the **simple fixed** rate of 4.5% per annum.  Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest **and applicable Umpqua Bank Fees** due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*(h)    Class 7.8 – My Coffee Loan.*

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property").  Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

~~Interest will accrue on the principal amount owing~~As of the Effective Date, the non-default interest rate on the My Coffee Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

*(i)    Class 7.9 – Building B Loan.*

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the Building B Loan will accrue at a simple fixed rate of 4.5% per annum.  Interest will accrue on the principal amount owing on the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Building B Loan at a fixed rate of 4.5% per annum.  Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

*(j)      Class 7.10 – Grumman Hangar Loan.*

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property").  Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest on the Grumman Hangar Loan will accrue at a simple fixed rate of 4.5% per annum ~~and will be paid as follows~~.  Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

*(k)      Class 7.11 – 3032 Kinney Loop Loan.*

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop").  Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the 3032 Kinney Loop Loan will ~~bear simple interest~~be fixed at the simple rate of 4.5% per annum ~~and~~.  The Allowed Class 7.11 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

(l)      *Class 7.12 - Crescent Village Land Loan.*

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and ~~reasonable fees and costs (excluding any late payment fees)~~applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property").  Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the Crescent Village Land Loan will ~~bear simple interest~~be fixed at the simple rate of 4.5% per annum ~~and~~.  The Allowed Class 7.12 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

property (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

(m)    *Refinance of Properties Encumbered by Umpqua Bank's Liens.*

Provided that no Event of Default has occurred that is not timely cured, Reorganized Debtor may ~~refinance any of the~~ satisfy an Arlie Debt Amount through a refinancing of the applicable property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount and Umpqua Bank Fees associated with such property ~~plus the applicable Umpqua Proceeds Share (as defined below)~~. To the extent that such refinancing is in excess of the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) applicable Umpqua Bank Fees, the net excess financing proceeds shall be distributed in accordance with paragraph 4.7.14 of this Plan.

(n)    *Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.*

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, and provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may from time to time sell a property for cash at closing free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and Umpqua Bank Fees associated with such property has been paid or will be paid upon such sale. ~~In addition to~~To the extent that the sale proceeds exceed the sum of (a) the Arlie Debt Amount, ~~a share of any sale proceeds in excess of the Arlie Debt Amount~~(b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "~~Umpqua~~Arlie Excess Proceeds ~~Share~~") will be ~~retained for Umpqua Bank's account~~divided as follows~~.~~: For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of ~~any sale proceeds in excess of~~the Arlie ~~Debt Amount~~Excess Proceeds will be retained by Reorganized Debtor for its own account, and one-third (1/3) of ~~such excess sale proceeds~~the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any ~~sale proceeds in excess of the~~ Arlie ~~Debt Amount~~Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of ~~such excess sale proceeds~~any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of ~~its~~ liens~~, claims and encumbrances~~ related to ~~specific pieces of property of Debtor~~a portion of each parcel that serves as Collateral for ~~all of~~ Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt Amount and the Umpqua Bank Fees associated with such specific ~~piece~~portion of ~~property~~parcel (on a pro rata basis determined in light of the comparative value of the ~~property~~portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

       *(o)*    *Payment of Umpqua Bank Fees.*

~~Upon~~Unless otherwise provided by the Plan, upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a ~~proportion~~proportionate share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

       *(p)*    *Property Taxes.*

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

(q)    ~~Waiver~~Settlement of Claims by and Among Debtor ~~and~~, Reorganized Debtor and Umpqua Bank.

~~The~~Upon confirmation of this Plan and effective as of the Effective Date, (a) the Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor. ~~On the Effective Date,~~, (b) Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers~~,~~ and ~~managers for actions (or in-actions)~~employees for any and all actions (or in-actions) that occurred before the Effective Date, (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan, and (d) subject to the provisions of paragraph 4.7 hereof, Umpqua Bank will not make a demand on the Debtor and the guarantors for defaults that occurred before the Effective Date.

*(r)      Treatment of Umpqua Bank's Cash Collateral Account.*

~~Provided~~With respect to the College Park Sale ~~is consummated prior to the Effective Date~~, the balance of good funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, provided that (i) Umpqua Bank shall have a security interest in such Roseburg improvements, (ii) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (iii) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank, which will be subject to Umpqua Bank's security interest, to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

*(s)      Use of Rents Generated From Umpqua Properties.*

Commencing on the Effective Date, ~~Reorganized Debtor may utilize~~ all rents generated from the properties securing the Umpqua Bank loans may be used by the Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

*(t)      Guarantees.*

~~All guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan.~~

DOCS_LA:~~230406.9~~230999.2

~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT
(~~JANUARY 10,~~FEBRUARY 14, 2011)

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

~~(u)     Additional Documents.~~

~~On the Effective Date, Reorganized Debtor will execute and deliver to Umpqua Bank such documents as Umpqua Bank reasonably requires to effectuate the terms of the Plan.~~

## 8.    Class 8 (Washington Federal Savings)

Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal").  Class 8 is impaired.  The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

### (a)     Class 8.1 –Lord Byron Loan.

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan").  The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral").  The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the ~~aggregate~~ amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date as allowed by the Lord Byron Loan documents (the "Washington Claim Amount"). Washington Federal shall have a Secured Class 8 ~~Claims~~Claim in the aggregate amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

The Washington Federal~~'s~~ Secured Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, ~~each in the amount of $300,000:~~ as follows: the 2909 Lord Byron Note, in the principal amount of $279,600, the 2915 Lord Byron Note, in the principal amount of $296,000, the 2931 Lord Byron Note, in the principal amount of $327,950, the 2977 Lord Byron Note in the principal amount of $269,350, and the 2993 Lord Byron Note in the principal amount of $327,100 (individually, a "Lord Byron Note" and collectively, the "Lord Byron Notes").

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

Each Lord Byron Note will bear simple interest at a fixed rate of 4.5% per annum.  Commencing on the ~~first (but no later than the~~ tenth~~)~~ day of the first month following the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes.  Commencing on ~~the first (but no later than~~ the tenth~~)~~ day of the 37th month after the Effective Date and continuing on the ~~first (but no later than the~~ tenth~~)~~ day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date.  Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property.  Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal.

>    (b)    *Treatment of Washington Federal's Cash Collateral Account.*

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 ~~Claims~~Claim.   Any amounts remaining in the cash collateral bank account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

>    (c)    *Treatment of the Washington Federal Unsecured Claim.*

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

The Washington Federal Unsecured Claim shall bear simple interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.

### 9. Class 9 (BLM Secured Creditors)

Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors. Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors. The Class 9 Claims are secured by a deed of trust on Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

*(a)     Class 9.1 – Francis Cline.*

Francis Cline will have an Allowed Class 9.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Cline as of the Effective Date under that certain loan made by Ms. Cline to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Cline Loan"), which loan is secured by a deed of trust on BLM Office Building. The Class 9.1 Claim shall be treated as follows.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under the Cline Loan. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested. ~~In such event, Ms. Cline will retain her security interest in and lien upon the BLM Office Building with the same priority and to the same extent such security had as of the Petition Date, and the Reorganized Debtor shall maintain the BLM office Building in good repair and insure the BLM Office Building to its full usable value pending a sale.~~

*(b)     Class 9.2 – William Greenhoot.*

William Greenhoot will have an Allowed Class 9.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Mr. Greenhoot as of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Effective Date under that certain loan made by Mr. Greenhoot to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Greenhoot Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Greenhoot Loan and the Class 9.2 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(c)     Class 9.3 – McKillop II Limited Partnership.*

The McKillop II Limited Partnership ("McKillop") will have an Allowed Class 9.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the Partnership as of the Effective Date under those certain loans made by Herbert McKillop to Debtor on or about on or about November 4, 2008 in the original principal amounts of $120,000 and $1,453,482 (collectively, the "McKillop Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the McKillop Loan and the Class 9.3 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement

and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

(d)      *Class 9.4 – Karen Merwin.*

Karen Merwin will have an Allowed Class 9.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Merwin as of the Effective Date under that certain loan made by Ms. Merwin to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Merwin Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Merwin Loan and the Class 9.4 Claim.  Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

(e)      *Class 9.5 – Alice Smith.*

Alice Smith will have an Allowed Class 9.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Smith as of the Effective Date under that certain loan made by Ms. Smith to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Smith Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Smith Loan and the Class 9.5 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

(f)    *Class 9.6 – Linda Trickey.*

Linda Trickey will have an Allowed Class 9.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Trickey as of the Effective Date under that certain loan made by Ms. Trickey to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Trickey Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the ~~BLM Secured Creditors~~Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Trickey Loan and the Class 9.6 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

**10.    Class 10 (Property Tax Lien Claims)**

Class 10 consists of all Allowed Property Tax Lien Claims. Class 10 is impaired. Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

### 11. Class 11 (Small Unsecured Claims)

Class 11 consists of all Allowed Small Unsecured Claims.  Class 11 is impaired.  Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

### 12. Class 12 (General Unsecured Claims).

Class 12 consists of all Allowed General Unsecured Claims.  Class 12 is impaired.  Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

### 13. Class 13 (Interests)

Class 13 consists of all Interests.  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

### C. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code gives the Debtor the right, after commencement of its Chapter 11 Case, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  Generally, an "executory contract" is a contract under which material performance (other than the payment of money) is still due by each party.  The Plan provides that except as may otherwise be provided in the Plan Supplement, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date.  The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for or subject

to other Court Order or pending motion.  Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment.

Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner.  Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

### D.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

Article XI of the Plan provides lists of conditions that must occur in order for the Plan to be confirmed and for the Plan become effective.  The following are conditions precedent to the confirmation of this Plan:  (1) the Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor; and (2) the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor; and (3) A written settlement agreement shall have been executed by and among the Debtor, the guarantors of the Debtor's obligations to Umpqua Bank (the "Guarantors") and Umpqua Bank containing the following release terms and agreements not to make a demand, all of which shall be effective as of the Effective Date: (a) a waiver and release of all claims against Umpqua Bank and its officers and employees by Debtor and the Guarantors; (b) an acknowledgement by the Debtor and the Guarantors that the obligations to Umpqua Bank (as revised by the Plan) are without defense and

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

counterclaim and that the guaranties are fully enforceable; and (c) an agreement by Umpqua Bank that it will not make a demand on the Debtor or the Guarantors for defaults that occurred before the Effective Date.

The following are conditions precedent to the occurrence of the Effective Date: (1) the Confirmation Date shall have occurred; (2) the Confirmation Order shall have become a Final Order; (3) no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending; and (4) the Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

### E.    SOURCES OF FUNDING FOR THE PLAN

The Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, a new loan in the amount of $615,000 to be made on the Effective Date to Reorganized Debtor by Siuslaw Bank, the net operating income generated from the Reorganized Debtor's continued business operations and from the future sale or refinancing of assets of the Reorganized Debtor from time to time. A core aspect of the Debtor's business is marketing and selling real property acquired by the Debtor from time to time. The Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan. Such sales may occur without further order of the Bankruptcy Court.

Without limiting the preceding and except as set forth with respect to a particular Creditor under the Plan, the Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral the Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral. AnyExcept as set forth with respect to a particular Creditor under the Plan, any excess net proceeds from the sale or refinancing of such Collateral shall be paid to the Reorganized Debtor (or as otherwise directed by the Reorganized Debtor) and may be used by the Reorganized Debtor to fund the Reorganized Debtor's continued business operations and to fund payments required under this Plan. Such sales or refinancing may occur without further order of the Bankruptcy Court.

In addition to marketing and selling its real property assets in the ordinary course of its business, the Reorganized Debtor may market and sell or refinance its non-core assets on an accelerated basis as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Debtor under this Plan.  Without limiting the preceding, if at any time the Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of the Reorganized Debtor's non-core assets to raise the funds necessary to make the required Plan payment.  Such auctions and sales may occur without further order of the Bankruptcy Court.

### F.  EFFECT OF CONFIRMATION

#### 1.  Discharge

The treatment of, and consideration received by, holders of Allowed Claims pursuant to the Plan will be in full satisfaction, release and discharge of their respective Claims against the Debtor. Except as otherwise expressly provided in the Plan, the confirmation of the Plan shall, provided that the Effective Date shall have occurred, discharge all Claims to the fullest extent authorized or provided for by the Bankruptcy Code, including, without limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof.

#### 2.  Revesting, Operation of Business

Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all ~~forfeited escrow deposits~~ _Arlie Escrow Deposits_ not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

#### 3.  Injunction

If the Plan is confirmed, the effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.

## 4.     Limitation of Liability and Exculpation

The Debtor and the Reorganized Debtor and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

The Debtor, the Reorganized Debtor and each of their respective Agents, shall not be liable to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Bankruptcy Case or the negotiation, formulation, development, proposal, disclosure, confirmation or implementation of the Plan and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan, provided, however, that the foregoing provisions shall have no affect on the Tonkon Claims or the liabilities of any person that resulted from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted negligence, breach of fiduciary duty or willful misconduct

## 5.     4.  Modification of the Plan; Revocation or Withdrawal of the Plan

The Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order.  After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided,

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

### **6.    5. Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:  (a) to resolve controversies and disputes regarding any Avoidance Action, (b) to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests, (c) to determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed in this Bankruptcy Case, (d) to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code, (e) to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan, (f) to resolve controversies and disputes regarding the interpretation of this Plan, (g) to implement the provisions of this Plan and enter orders in aid of confirmation, (h) to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and (i) to enter a final decree closing this Bankruptcy Case.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

### **7.    6. United States Trustee Fees**

The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted or dismissed.  After confirmation, the Reorganized Debtor shall serve on the United States Trustee a quarterly financial report for each month, or portion thereof, that the case remains open.  The quarterly financial report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the Plan.

## VI.

## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy Court must determine, with respect to such Class, that each holder of a Claim or Interest will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests Test."

The Debtor believes the Plan is in the best interest of creditors because the Debtor's Plan provides for the payment in full to all of its creditors with interest over a relatively short period of time.  Consequently, the Plan provides each dissenting or non-voting member of each impaired Class with a recovery not less than the recovery such member would receive if the Debtor was liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 Trustee.  Moreover, If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made on account of Allowed Claims than those provided for in the Plan because (i) the Debtor's assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be involved in the appointment and activities of a trustee, (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

executory contracts in connection with a cessation of the Debtor's operations; and (iv) the liquidation of the Debtor's assets would be undertaken by personnel lacking the skill and experience of the Debtor's personnel, to say nothing of the lack of familiarity with the specific parcels to be sold.

## VII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

CIRCULAR 230 DISCLAIMER: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.

### A.    GENERAL TAX CONSIDERATIONS

The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan.  This discussion is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of an Allowed Claim or any Interest holder.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.  This discussion does not address aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim subject to special treatment under federal income tax laws (such as foreign taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans, and other tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.  Furthermore, this summary does not address federal taxes other than income taxes.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial or administrative changes or interpretations enacted or promulgated could alter or modify the discussion set forth below with respect to the federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan. No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. This discussion is not binding on the IRS or the courts and no assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein. No representations or assurances are being made to the holders of Allowed Claims or the Interest holders with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based upon the individual circumstances pertaining to a particular holder of an Allowed Claim or an Interest holder. Each holder of an Allowed Claim or Interest is strongly urged to consult with its own tax advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

Any discussion of federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any federal tax penalties that may be imposed on such person. Each holder of an Allowed Claim and each Interest holder should seek advice based on its particular circumstances from an independent tax advisor.

## B.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR

The Debtor is a corporation that has elected to be treated as an S corporation (as defined in IRC Section 1361) for federal income tax purposes. As an S corporation, the Debtor is not itself generally subject to federal income tax. Instead, each Interest holder, as a shareholder of the Debtor,

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

is required to include its pro rata share of the income, gain, loss, and deduction recognized by the Debtor in the Interest holder's own income tax returns. Accordingly, since it is unlikely there will be any direct federal income tax liability at the Debtor level under the Plan, it appears there are no federal income tax consequences to the Debtor under the Plan.

Under the IRC, a taxpayer generally will recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) satisfied, over (b) the sum of the amount of cash paid and the fair market value of any new consideration given in satisfaction of the indebtedness. However, IRC Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court. In the case of an entity taxable as a corporation, eligibility for the Bankruptcy Exception is determined at the corporate level. If the Bankruptcy Exception applies (with the effect that the taxpayer excludes its COD Income from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain of its tax attributes by the amount of COD Income excluded from gross income pursuant to the Bankruptcy Exception. The reduction includes any net operating loss for the taxable year of the discharge (which, with respect to an S corporation, includes certain losses that have been blocked at the shareholder level by the basis limitation rule), net operating loss carryovers from prior years, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards. Except for the net operating loss and basis reductions, these attribute reductions generally have limited application to S corporations.

Whether the Debtor will realize any COD Income on the debt restructuring contemplated by the Plan depends on whether the restructuring of any debt constitutes a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the corresponding Treasury Regulations. For a deemed taxable exchange to occur with respect to a debt, the modification to the debt must be "significant" as such term is defined in the applicable Treasury Regulations. If the modification to a

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

debt obligation of the Debtor is "significant," the Debtor will realize COD Income in an amount equal to the amount, if any, by which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted issue price" of the old debt. Accordingly, if the restructuring of any debt of the Debtor is treated as a deemed taxable exchange (even though each modified debt will have a principal amount equal to its corresponding old debt), the Debtor will realize COD Income if such modified debt does not bear "adequate stated interest." The realization of COD Income by the Debtor will result in tax attribute reductions because of its exclusion under the Bankruptcy Exception.

## C.   FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF AN ALLOWED CLAIM

Under the Plan, the debt owed by the Debtor to particular holders of Allowed Claims will be restructured. If the modification to the debt is "significant," as such term is defined in the applicable Treasury Regulations, the restructured debt will be treated as received by such holder in a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001.

With respect to a deemed taxable exchange, a holder of an Allowed Claim will generally recognize gain or loss in connection with the exchange if the holder's adjusted tax basis in the old debt does not equal the issue price of the modified debt. If the issue price of the modified debt is greater than the holder's adjusted tax basis in the debt, the holder will recognize taxable income as a result of the deemed exchange. Since each modified debt will have a principal amount equal to its corresponding old debt, a holder of an Allowed Claim generally should not recognize any gain or loss on a deemed taxable exchange of such debt unless either (1) the modified debt does not have adequate stated interest or (2) the tax basis in the debt is different from the issue price of the modified debt. Any gain or loss recognized will be long-term or short-term capital gain or loss, or ordinary income or loss, depending upon factors specific to each holder of an Allowed Claim, including but not limited to: (1) whether the Claim (or a portion thereof) is attributable to principal or interest, (2) the origin of the Claim, (3) whether the holder of the Claim reports income on the accrual or cash basis method, and (4) whether the holder of the Claim has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

DOCS_LA:230406.9230999.2

100

FIRSTSECOND AMENDED DISCLOSURE STATEMENT
(JANUARY 10,FEBRUARY 14, 2011)

The principal amount of certain restructured debt may include accrued but unpaid interest. A holder of an Allowed Claim not previously required to include in its taxable income any accrued but unpaid interest on such Claim may be treated as receiving taxable interest to the extent the modified debt received is allocable to such accrued but unpaid interest.

### D.    CONSEQUENCES TO THE INTEREST HOLDERS

The Interests are not restructured in the Plan. Accordingly, except for any loss attributable to a reduction at the Interest holder level (as discussed above), the Plan has no material federal income tax consequences to the Interest holders.

### E.    INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, under certain circumstances, a holder of a Claim may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the holder's United States federal income tax liability, and the holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### F.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE INTEREST

HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH HOLDER OF AN

ALLOWED CLAIM AND THE INTEREST HOLDER IS URGED TO CONSULT ITS TAX

ADVISOR ABOUT THE FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN, INCOME

AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.

## ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on

~~,~~April 4, 2011 at ~~_____~~10:00 a.m..  The hearing will be held at the United States

Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, ~~#2600,~~Courtroom #6, Eugene,

Oregon 97401 before the Honorable ~~Albert E. Radcliffe~~Frank R. Alley, United States Bankruptcy

Judge.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various

requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best

interest of creditors and Interest holders of the Debtor.  The Debtor will submit a report to the

Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the

parties entitled to vote thereon.  Any objection to confirmation of the Plan must be timely filed as

stated above.

### B.    REQUIREMENTS OF CONFIRMATION

At the hearing on confirmation, the Bankruptcy Court will determine whether the provisions

of Section 1129 of the Bankruptcy Code have been satisfied.  If all of the provisions of Section 1129

are met, then the Bankruptcy Court may enter an order confirming the Plan.  The Debtor believes the

Plan satisfies all of the requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has

complied or will have complied with all of the requirements of Chapter 11, and that the Plan has

been proposed and is made in good faith.

### C.    FEASIBILITY

The Debtor believes that confirmation of the Plan is not likely to be followed by the

liquidation of the Debtor or a need for a further financial reorganization of the Debtor.  ~~The~~In

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

addition to the pending sale process for the West Hilo Tree Farm (which is expected to generate sale proceeds to help fund confirmation expenses and Effective Date payments, the Debtor has identified and is marketing for sale most of its non-core assets (see **Exhibit B**) to ensure that the Debtor will have sufficient funds to continue its operations and to fund required Plan payments). The results of the Debtors' operations for the years 2008 through 2010 are appended hereto as **Exhibit C**. The projections of the Debtor's post-confirmation business and sales, attached hereto as **Exhibit ~~C~~D,** show sufficient earnings and cash flow from operations and sales or refinancing of real property to support and meet the ongoing financial needs of the Debtor and the Plan. The projections indicate that the Plan as proposed by the Debtor is feasible and that the Debtor will be financially viable after confirmation of the Plan.

### D.    RISK FACTORS

There are a number of risks associated with the Debtor's proposed Plan. Each creditor should carefully consider those risks in evaluating its vote on the Debtor's Plan. All of the risks associated with the Debtor's Plan are too numerous to identify, however, a few of those risks are set forth below.

#### 1.    General Financial Market Conditions

The disruption of numerous major financial institutions and the resulting crisis in the financial markets has rippled through the economy, impacting the real estate industry in particular. It is possible that this financial market may continue to make it very difficult for qualified buyers or lessees to obtain affordable financing, which could have a significant adverse impact on the Debtor.

#### 2.    Projected Financial Results

The Debtor's projected financial results reflect management's best estimate of the Debtor's future financial performance based on currently known facts and hypothetical assumptions about, among other matters, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, real estate, and general business and economic conditions. Many of these factors are beyond the Debtor's control. As a consequence, the Debtor's actual financial results may differ significantly from the Debtor's projections.

### E.    CRAM DOWN

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

LOS ANGELES, CALIFORNIA

As discussed previously, a court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the cram down requirements set forth in Section 1129(b) of the Bankruptcy Code.  In the event that any impaired Class of Claims does not accept the Plan, the Debtor hereby requests that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise permit the Debtor to modify the Plan.

### F.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed, the Debtor or another party in interest may attempt to formulate or propose a different plan or plans of reorganization.  Such plans might involve a reorganization and continuation of the Debtor's business, a sale of the Debtor's business as a going concern, an orderly liquidation of the Debtor's assets or any combination thereof.  If no Plan of Reorganization is determined by the Bankruptcy Court to be confirmable, the Chapter 11 case may be converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.

In a liquidation, a Chapter 7 Trustee would be appointed with the purpose of liquidating the assets of the Debtor.  Typically in a liquidation, assets are sold for less than their going concern value and, accordingly, the return to creditors and Interest holders is generally less than the return in a reorganization, which derives the value to be distributed in a Plan from the business as a going concern.  Proceeds from liquidation would be distributed to creditors and Interest holders of the Debtor in accordance with the priorities set forth in the Bankruptcy Code.  Given the nature of Debtor's assets, the Debtor believes that it would be impossible for a trustee to maximize the value of the assets.  The Debtor further believes that a trustee would require two to three years to market, sell and close sales for all of the Debtor's properties.  Therefore, it is unlikely that distributions would be made to unsecured creditors in less than three years and distributions could take five years.

As the Plan is a full payment plan, the Debtor believes there is no currently available alternative that would offer holders of Claims and Interests in the Debtor better treatment or a greater return than the Plan offers such holders of Claims and Interests, and urges all parties entitled to vote on the Plan to vote to accept the Plan.

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Los Angeles, California

## IX.

## RECOMMENDATION AND CONCLUSION

Based on the foregoing, the Debtor believes that the Plan is in the best interests of Creditors and urges Creditors to vote to accept the Plan.  After reviewing all the information and making an informed decision, please vote by using the enclosed ballot.


DATED this ~~10~~14th day of ~~January~~February, 2011.

Respectfully submitted,

ARLIE & COMPANY

~~By:~~By   */s/ Scott Diehl*
Scott Diehl, Chief Financial Officer

Presented by:

PACHULSKI STANG ZIEHL & JONES LLP
By   */s/ John D. Fiero*
John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
  -and-
BALL JANIK LLP
David W. Criswell (OSB No. 925930)
Brad T. Summers (OSB No. ~~911116)~~91111)

# Exhibit A

## Plan

## Exhibit C

## Financial ProjectionsCERTIFICATE OF SERVICE

I, Diane H. Hinojosa, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action.  My business address is 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California.

I certify that on February 14, 2011, I caused to be served **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION (JANUARY 10, 2011)** by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on February 14, 2011, at Los Angeles, California.

_/s/ Diane H. Hinojosa_
Diane H. Hinojosa

1  John D. Fiero (CA Bar No. 136557)
   Linda F. Cantor (CA Bar No. 153762)
2  Teddy M. Kapur (CA Bar No. 242486)
   PACHULSKI STANG ZIEHL & JONES LLP
3  150 California Street, 15th Floor
   San Francisco, California  94111-4500
4  Telephone:  415/263-7000
   Facsimile:  415/263-7010
5  Email:jfiero@pszjlaw.com
   lcantor@pszjlaw.com
6  tkapur@pszjlaw.com

7  and

8  Brad T. Summers (OSB No. 911116)
   David W. Criswell (OSB No. 925930)
9  BALL JANIK LLP
   101 SW Main Street, Suite 1100
10 Portland, Oregon  97204-3219
   Telephone:  503/228-2525
11 Facsimile:  503/295-1058
   Email:tsummers@balljanik.com
12 dcriswell@balljanik.com

13 Attorneys for Debtor Arlie & Company

   **UNITED STATES BANKRUPTCY COURT**
14
   **FOR THE DISTRICT OF OREGON**
15

16 In re                                    | Case No. 10-60244-aer11

17 **ARLIE & COMPANY,**                     | Chapter 11

18 Debtor.                                  | **DEBTOR'S SECOND AMENDED
                                            | DISCLOSURE STATEMENT IN
19                                          | SUPPORT OF DEBTOR'S SECOND
                                            | AMENDED PLAN OF
                                            | REORGANIZATION (FEBRUARY 14,
20                                          | 2011)**

21                                          | **Hearing**

22                                          | Date:   April 4, 2011
                                            | Time:   10:00 a.m.
23                                          | Place:  United States Bankruptcy Court
                                            |         405 E. 8th Avenue
24                                          |         Courtroom #6
                                            |         Eugene, Oregon 97401
25                                          |         Judge:Honorable Frank R. Alley

26
27
28

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................... 1

    A.    Information Regarding the Plan ........................................................... 2

        1.    The Plan is the Governing Document ..................................2

        2.    Source of Information ...........................................................2

        3.    Warning Regarding Federal and State Income Tax Consequences of the Plan ....................................................2

        4.    Bankruptcy Court Approval ..................................................3

    B.    Voting Instructions .............................................................................. 3

        1.    How to Vote ...........................................................................3

        2.    Who May Vote .......................................................................4

    C.    Confirmation ........................................................................................ 4

    D.    Disclaimers ........................................................................................... 6

II. PLAN OVERVIEW ................................................................................................. 7

    A.    Introduction .......................................................................................... 7

    B.    Treatment of Claims ............................................................................ 9

III. OVERVIEW OF CHAPTER 11 CASE .............................................................. 23

    A.    Background ......................................................................................... 23

        1.    Description of the Debtor ....................................................23

        2.    Management ..........................................................................23

        3.    Events Precipitating the Debtor's Filing ............................24

        4.    Plan  Projections ..................................................................24

    B.    Summary of Events During the Chapter 11 Case ........................... 24

        1.    "First Day" Pleadings ..........................................................25

        2.    Filing of Schedules, Meeting of Creditors and Bar Date .................................25

        3.    The Official Committee of Unsecured Creditors .................26

        4.    Retention of Professionals ...................................................27

        5.    First Day Orders ...................................................................29

        6.    Cash Collateral .....................................................................29

        7.    Sale of Debtor's College Park Property and Non-Core Assets .......................29

        8.    Agreement with The Fifth Third Bank .................................30

        9.    Agreement with Umpqua Bank .............................................31

        10.    Agreement with Century Bank ..............................................32

        11.    The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement ..........................................32

    C.    Pending and Future Transactions ..................................................... 34

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

|  |  |  |  |
|---|---|---|---|
|  | 1. | Hawaii Koa Wood Forest | 34 |
|  | 2. | VA Hospital Transaction | 35 |
| IV. ASSETS AND LIABILITIES |  |  | 36 |
| A. | Real Property Assets |  | 36 |
|  | 1. | Crescent Village - Building A | 36 |
|  | 2. | Crescent Village - Building B | 37 |
|  | 3. | Crescent Village -Building D | 37 |
|  | 4. | Crescent Village - 23 acres raw land | 37 |
|  | 5. | Crescent Village Lots | 37 |
|  | 6. | Woodburn (4.11 acres raw land) | 37 |
|  | 7. | College Park (623.2 acres raw land) | 38 |
|  | 8. | Westlane Shopping Center | 38 |
|  | 9. | Garden Valley Shopping Center | 38 |
|  | 10. | West 11th & Obie | 38 |
|  | 11. | My Coffee | 38 |
|  | 12. | Oil Can Henry's | 39 |
|  | 13. | Willow Creek | 39 |
|  | 14. | Hawaii Land | 39 |
|  | 15. | 2890 Chad Drive (the BLM Office Building) | 39 |
|  | 16. | 2892 Crescent Ave. | 40 |
|  | 17. | 650 Goodpasture (Goodpasture Island Radio Tower) | 40 |
|  | 18. | 4480 G Hwy 101 N. | 40 |
|  | 19. | 3082 Kinney Loop | 40 |
|  | 20. | 3108 Kinney Loop | 40 |
|  | 21. | 2850 Kinney Loop | 40 |
|  | 22. | 3032 Kinney Loop | 40 |
|  | 23. | Kinney Loop Lots | 41 |
|  | 24. | 3058 Kinney Loop | 41 |
|  | 25. | 2909 Lord Byron Place | 41 |
|  | 26. | 2915 Lord Byron Place | 41 |
|  | 27. | 2931 Lord Byron Place | 41 |
|  | 28. | 2977 Lord Byron Place | 42 |
|  | 29. | 2993 Lord Byron Place | 42 |
|  | 30. | 2843, 2853, 2863, 2873 and 2883 Lord Byron Place | 42 |
|  | 31. | Hangar 272 | 42 |
|  | 32. | Hangar 246 | 42 |
|  | 33. | 2960 and 3110 Kinney Loop | 42 |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| | 34. | Unencumbered Real Property | 42 |
|---|---|---|---|
| B. | | Personal Property Assets | 43 |
| | 1. | Cash and Accounts Receivable | 43 |
| | 2. | Bankruptcy Claim Filed Against Roberts Construction | 43 |
| | 3. | State Court Claims Against Michael Roberts and Mark Roberts | 44 |
| | 4. | Potential Claims Against Umpqua Bank | 45 |
| | 5. | Tonkon Claims | 46 |
| | 6. | Other Claims/Avoidance Actions | 47 |
| C. | | Liabilities – Secured Creditors | 47 |
| | 1. | Bank of America | 47 |
| | 2. | Century Bank | 47 |
| | 3. | Siuslaw Bank | 47 |
| | 4. | Summit Bank | 48 |
| | 5. | Umpqua Bank | 48 |
| | 6. | Washington Federal Savings | 48 |
| | 7. | "BLM" Individuals | 48 |
| | 8. | Property Tax Lien Claimants | 49 |
| D. | | Liabilities – Unsecured Creditors | 49 |
| E. | | Liabilities – Administrative Expenses | 49 |
| V. DESCRIPTION OF PLAN OF REORGANIZATION | | | 49 |
| A. | | Unclassified Claims | 50 |
| B. | | Classified Claims and Interests | 51 |
| | 1. | Class 1 (Other Priority Claims) | 51 |
| | 2. | Class 2 (Allowed Secured Claim of BofA) | 51 |
| | 3. | Class 3 (Allowed Secured Claims of Century Bank) | 54 |
| | 4. | Class 4 (Allowed Secured Claim of Pioneer) | 55 |
| | 5. | Class 5 (Allowed Secured Claims of Siuslaw Bank) | 56 |
| | 6. | Class 6 (Summit Bank) | 63 |
| | 7. | Class 7 (Umpqua Bank) | 65 |
| | 8. | Class 8 (Washington Federal Savings) | 79 |
| | 9. | Class 9 (BLM Secured Creditors) | 81 |
| | 10. | Class 10 (Property Tax Lien Claims) | 85 |
| | 11. | Class 11 (Small Unsecured Claims) | 85 |
| | 12. | Class 12 (General Unsecured Claims) | 85 |
| | 13. | Class 13 (Interests) | 86 |
| C. | | Executory Contracts and Unexpired Leases | 86 |
| D. | | Conditions to Confirmation and Effectiveness of the Plan | 87 |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

|   |   | E. | Sources of Funding for the Plan | 87 |
|   |   | F. | Effect of Confirmation | 88 |
|   |   |   | 1. Discharge | 88 |
|   |   |   | 2. Revesting, Operation of Business | 89 |
|   |   |   | 3. Injunction | 89 |
|   |   |   | 4. Limitation of Liability and Exculpation | 89 |
|   |   |   | 5. Modification of the Plan; Revocation or Withdrawal of the Plan | 90 |
|   |   |   | 6. Retention of Jurisdiction | 90 |
|   |   |   | 7. United States Trustee Fees | 91 |

VI. LIQUIDATION ANALYSIS ......................................................................... 91

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................. 92

    A. General Tax Considerations ...................................................... 93

    B. Federal Income Tax Consequences to the Debtor ........................ 94

    C. Federal Income Tax Consequences to the Holders of an Allowed Claim ................ 95

    D. Consequences to the Interest Holders ...................................... 96

    E. Information Reporting and Backup Withholding .......................... 96

    F. Importance of obtaining professional tax assistance .................... 97

VIII. ACCEPTANCE AND CONFIRMATION OF THE PLAN ................................. 97

    A. Confirmation Hearing .............................................................. 97

    B. Requirements of Confirmation ................................................ 98

    C. Feasibility .............................................................................. 98

    D. Risk Factors .......................................................................... 98

        1. General Financial Market Conditions .......................... 99

        2. Projected Financial Results ...................................... 99

    E. Cram Down ............................................................................ 99

    F. Alternatives to Confirmation of the Plan ................................... 99

IX. RECOMMENDATION AND CONCLUSION ...................................................... 100

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Exhibits

Exhibit A        Plan

Exhibit B        Partial list of the non-core assets currently being marketed by the Debtor for sale

Exhibit C        Historical Operating Results

Exhibit D        Financial Projections

# I.

## **INTRODUCTION**

On January 20, 2010 (the "Petition Date"), Arlie & Company (the "Debtor" or "Arlie") commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor's case is being administered in the United States Bankruptcy Court for the District of Oregon before the Honorable Frank R. Alley. This Disclosure Statement (the "Disclosure Statement") contains information with respect to the *Second Amended Plan of Reorganization (February 14, 2011)* (the "Plan") proposed by the Debtor. A copy of the Plan is attached hereto as **Exhibit A**. Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor has examined various alternatives, and based on information contained in this Disclosure Statement and for the reasons set forth below, the Debtor has concluded that the Plan provides the best recovery to creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed reorganization of the Debtor pursuant to the terms of the Plan, and (3) the proposed distribution to Creditors and holders of Claims against the Debtor. The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important. In order for the Plan to be accepted by a Class of Claims or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan. Those alternatives may not provide for a distribution of as much value to holders of Allowed Claims and Interests as the Plan. Accordingly, the Debtor

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

urges you to accept the Plan by completing and returning the enclosed ballot no later than 5:00 p.m. on March 28, 2011.

### A.    INFORMATION REGARDING THE PLAN

#### 1.    The Plan is the Governing Document

Although the Debtor believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein, which are controlling.  You are urged to read the Plan and not just this Disclosure Statement.

#### 2.    Source of Information

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor or its professionals, or has been obtained from the Debtor's records, except where otherwise specifically noted.  None of the Debtor's attorneys, accountants or other professionals make any representation regarding that information.  The Debtor does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy.  The Debtor has, however, attempted to present the information accurately and fairly, and the Debtor believes that the information is substantially accurate.  The assumptions underlying the projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor's best estimate as to what it expects will happen.  Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor's control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met.  Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the Bankruptcy Court hearing to determine the adequacy of the Disclosure Statement.

#### 3.    Warning Regarding Federal and State Income Tax Consequences of the Plan

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim.  Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

**4.** **Bankruptcy Court Approval**

Pursuant to the *Order Conditionally Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejections of Plan; **and Notice of Disclosure and Confirmation Hearings*** dated January 31, 2011 (the "Disclosure Statement Notice and Order"), the Bankruptcy Court conditionally approved this Disclosure Statement, subject to its consideration of objections as set forth in paragraphs 1 and 3 of the Disclosure Statement Notice and Order. (A copy of the Disclosure Statement Notice and Order is being mailed to you herewith.) This conditional Bankruptcy Court approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor finally approved the contents of this Disclosure Statement.

**B.** **VOTING INSTRUCTIONS**

**1.** **How to Vote**

A ballot is enclosed herewith for Creditors to use in voting on the Plan. To vote on the Plan, (a) indicate on the enclosed ballot that you accept or you reject the Plan, (b) identify the class in which your claim is classified, (c) sign your name, and (d) mail the ballot to the address set forth below.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 5:00 p.m. prevailing Pacific Time on March 28, 2011 at the following address:**

> Arlie & Company Plan Balloting
> c/o Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, California  94111-4500
> (ph) 415-263-7000

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

## 2. <u>Who May Vote</u>

The Plan divides the Claims of Creditors into 13 Classes. There is one Class of Interests. The Classes are as follows: Class 1 (Other Priority Claims), Class 2 (Bank of America), Class 3 (Century Bank), Class 4 (Pioneer), Class 5 (Siuslaw Bank), Class 6 (Summit Bank), Class 7 (Umpqua Bank), Class 8 (Washington Federal Savings), Class 9 (BLM Secured Creditors), Class 10 (Property Tax Lien Claims), Class 11 (Small Unsecured Claims), Class 12 (General Unsecured Claims), and Class 13 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan. Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

Class 13 is not impaired and therefore is deemed to have accepted the Plan. All other Classes are impaired under the Plan, and holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form which you received does <u>not</u> constitute a proof of Claim.

## C. <u>CONFIRMATION</u>

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtor believes that the Plan

satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class. As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the plan by such class, so long as the plan meets the statutory requirements set forth by section 1129(b) of the Bankruptcy Code. This procedure is called a "cram down." The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any impaired Class rejects the Plan.

The Bankruptcy Court has set **April 4, 2011 at 10:00 a.m.** as the hearing date and time for final approval of the Disclosure Statement and to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing will be held before the Honorable Frank R. Alley at the United States Bankruptcy Court for the District of Oregon, 405 E. 8th Avenue, Courtroom #6, Eugene, Oregon 97401. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below no later than **5:00 p.m. prevailing Pacific Time on March 28, 2011**.

Objections must be served upon:

(1) The Debtor:

Arlie & Company
2911 Tennyson Avenue, Suite 400
Eugene, Oregon 97408
Attn: John Musumeci
Telephone: (541) 344-5500

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

(2) Counsel for the Debtor:

John D. Fiero, Esq.
Linda F. Cantor, Esq.
Teddy M. Kapur, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000

and

Brad T. Summers, Esq.
David W. Criswell, Esq.
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone: (503) 228-2525

(3) Counsel for the Committee:

Douglas R. Schultz, Esq.
Gleaves Swearingen Potter & Scott LLP
PO Box 1147
Eugene, OR 97440-1147
Telephone: (541) 686-8833

(4) The Office of the United States Trustee:

P. Rebecca Kamitsuka, Esq.
Attorney for the United States Trustee
Wayne L. Morse Courthouse
405 E. 8th Avenue, Suite 1100
Eugene, OR 97401-2706
Telephone: (541) 465-6330

### D.    **DISCLAIMERS**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR

UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.

PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THIS DISCLOSURE

STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN

SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE

NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S

BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE

INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT

CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. ***IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING***.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## II.

## PLAN OVERVIEW

### A.    INTRODUCTION

The Plan contemplates that the Reorganized Debtor will continue to operate its business in the ordinary course and pay and satisfy its obligations under the Plan from available cash, exit financing made available upon confirmation, from the net operating income generated from the Reorganized Debtor's continued business operations, and from the sale or refinancing of assets of the Reorganized Debtor.

The Reorganized Debtor will continue to sell real property assets in the ordinary course of business to provide funds for the Reorganized Debtor's continued operating expenses and to provide funds to make payments required under the Plan.

In addition to selling its real property assets in the ordinary course of business, the Reorganized Debtor has committed in the Plan to sell or refinance non-core assets as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Reorganized Debtor under the Plan.  A partial list of the non-core assets currently for sale by the Debtor is attached hereto as **Exhibit B**.  Without limiting the preceding, if at any time the Reorganized Debtor determines that it may not have sufficient funds on hand to make any upcoming payment required under the Plan, the Reorganized Debtor will before such payment is due refinance

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

or sell at public auction one or more of its non-core assets sufficient to raise the funds necessary to make the required Plan payment.

Except as otherwise provided in the Plan, each secured creditor will retain its security interest in and liens on its Collateral with the same priority such security interest and liens had on the Petition Date. Each Claim will be a Secured Claim up to the value of the property securing the Claim unless the Claimant elects treatment under 11 U.S.C. § 1111(b). Secured creditors will be paid the full amount of their Allowed Secured Claims in Cash over time with interest, as more fully set forth in the Plan.

Each holder of a Small Unsecured Claim (an Unsecured Claim equal to or less than $2,000) will be paid the full amount of its Small Unsecured Claim within 60 days following the Effective Date.

Each holder of a General Unsecured Claim will be paid the full amount of its General Unsecured Claim in Cash within five years after the Effective Date. In addition, within 3 years after the Effective Date the Reorganized Debtor will pay at least 50% of the principal amount of each General Unsecured Claim. Interest will accrue from the Petition Date on each General Unsecured Claim until such Claim is paid in full at a uniform annual interest rate of 3.5%. At the time the Reorganized Debtor makes any principal payment on a General Unsecured Claim, the Reorganized Debtor will also pay all accrued but unpaid interest then owing on the General Unsecured Claim.

Existing Interests in the Debtor will be preserved.

All post-petition and Administrative Expense Claims will be paid in full on the Effective Date or the date on which such Claim becomes Allowed, whichever is later.

All unexpired leases and executory contracts which have not previously been rejected, or which are not otherwise set forth in the Plan Supplement, subject to a prior Bankruptcy Court order or a pending motion before the Bankruptcy Court, will be assumed by the Reorganized Debtor through the Plan as of the Effective Date.

In the event that any Class of creditors does not accept the Plan, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise modify the Plan.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

**TREATMENT OF CLAIMS**

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan.

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| N/A | Allowed Administrative Expense Claims | Estimated Recovery on Allowed Claims in this category:  100% | Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. |
| N/A | Allowed Priority Tax Claims | Estimated Recovery on Allowed Claims in this category:  100% | Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed. |
| 1 | Allowed Other Priority Claims | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE | Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim). |
| 2 | Allowed Secured Claims of BofA | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE | **Class 2.1 (Building A Loan) and Class 2.2 (Building D Loan)** BofA will retain its security interests in and liens upon its Collateral and receive new promissory notes.  BofA will receive a promissory note in the amount of the Allowed Class 2.1 Claim.  The note will bear interest at 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| | | | TREATMENT OF CLAIMS CHART |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | all unpaid principal and interest due on the Maturity Date. |
| | | | BofA's Class 2.2 Claim shall be satisfied by the delivery of two promissory notes – one in the amount of the Building D value ("Building D Note 1") and one for the difference between the Allowed Class 2.2 Claim and the Building D Value ("Building D Note 2"). |
| | | | The Building D- Note 1 will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 24  months, thereafter equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  To extent that the loan to value ratio of the loan represented by the Building D Note 1 exceeds 75% of the value of Building D (which, for these purposes shall be valued as of the 24th month following the Effective Date after applying an 8% cap rate to the net operating income of Building D), Reorganized Debtor shall make a cash paydown of the Building D Note 1 in the amount necessary to reduce such loan to value ratio to 75%.  Reorganized Debtor shall establish on the Effective Date a $405,000 reserve account for tenant improvements associated with future leasing activities related to Building D ("the Building D Reserve") which shall be funded with $205,000 cash derived from the BofA cash collateral account and $200,000 from the Roberts Distributions.  BofA shall retain its liens and security interests in Building D, which shall serve as security for amounts due under the Building D Note 1 only.  Aside from the $200,000 contribution to the Building D Reserve, BofA shall have no claim to any other Roberts Distributions. |
| | | | The Building D Note 2 will bear interest at a fixed rate of 3.5% per annum and will be payable in two installments: (a) one half of the principal plus all then accrued interest on the 37th month after the Effective Date, and (b) all remaining amounts owed thereunder being due on the Maturity Date.  The Building D Note 2 is unsecured, but shall be cross-defaulted with the Building D Note 1. |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

## TREATMENT OF CLAIMS CHART

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | Reorganized Debtor will use the Building A Cash Collateral to pay past due Property Taxes on Building A.  The remainder will either be contributed to the Building D Reserve, or will be retained and used by Reorganized Debtor for general operating purposes.<br><br>Reorganized Debtor will use the Building D Cash Collateral to pay past due Property Taxes on Building D and the remainder will either be contributed to the Building D Reserve, or will be retained and used by Reorganized Debtor for general operating purposes. |
| 3 | Allowed Secured Claim of Century Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan and will receive a new promissory note in the amount of its Allowed Claim.  The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows:  monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| 4 | Allowed Secured Claim of Pioneer | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE IF CLAIM ALLOWED BY FINAL ORDER<br><br>(CLAIM IS DISPUTED; DEBTOR FILED AN OBJECTION AND AN ADVERSARY PROCEEDING REGARDING THE DISPUTED LIEN ON FEBRUARY 1, 2011) | If and to the extent Pioneer is determined by Final Order to have a valid, perfected security interest in or lien upon property of the Debtor, Pioneer will retain its security interests in and liens upon its Collateral that secures the Pioneer Loan and receive a new promissory note in the amount of its Allowed Claim.  The promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  Within 3 years after the Effective Date, the Reorganized Debtor shall have pre-paid at least 50% of the principal of Pioneer's Allowed Claim.  At the time of any such pre-payment, the Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer note.<br><br>If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order, the Pioneer Claim will be treated as a Class 12 Claim. |
| 5 | Allowed Secured Claims of Siuslaw Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED | Class 5.1 – Crescent Village Lots Loan.<br>Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan and receive a new promissory note in the amount of its Allowed Claim.  The promissory note will accrue interest |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| | | | TREATMENT OF CLAIMS CHART |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | ENTITLED TO VOTE | at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots note. Notwithstanding the foregoing, in the event Reorganized Debtor consummates the VA Sale prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots note, including all accrued and unpaid interest then owing under the Crescent Village Lots note, and shall utilize 20% of the Excess Sale Proceeds to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note) as determined by agreement of Reorganized Debtor and Siuslaw Bank. |
| | | | Class 5.2 (2850 Kinney Loop Loan), Class 5.3 (2960 Kinney Loop Loan), Class 5.4 (3082 Kinney Loop Loan), Class 5.5 (3108 Kinney Loop Loan) For each of these Classes, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures each loan and receive a new promissory note in the amount of each Allowed Claim. Each promissory note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. |
| | | | Class 5.6 – Florence Medical Building Loan. Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan and receive a new promissory note in the amount of its Allowed Claim. The Florence note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: on the Effective Date, Reorganized Debtor shall pay down the Florence note to the original principal amount of the Florence Medical Building Loan. The Reorganized Debtor will then make monthly payments of interest only for 36 months; |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Class 5.7 (Kinney Loop Lots Loan)<br>Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan and receive a new promissory note in the amount of its Allowed Claim. The note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. Within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the note.<br><br>Reorganized Debtor will use the Siuslaw cash collateral to pay any past due Property Taxes on the Collateral securing the Class 5 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 6 | Allowed Secured Claims of Summit Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 6.1 – Road Radio Tower Loan.<br>Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan and receive a new promissory note in the amount of its Allowed Claim. The Radio Tower note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.<br><br>Class 6.2 – Guaranty Claim.<br>Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty and receive a new promissory note in the amount owing under the Churchill Media Guaranty. The Guaranty note will bear interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. |

| | | | TREATMENT OF CLAIMS CHART |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum, and will be payable in full on the Maturity Date.  In addition, Reorganized Debtor shall pre-pay a portion of the Guaranty Note through the sale or turnover of the Willow Creek Property as follows.  Reorganized Debtor shall have six (6) months after the Effective Date to enter into a letter of intent for the sale of the Willow Creek Property, provided that any such sale must close within two (2) months after the execution of the letter of intent. The Willow Creek Property net sale proceeds (after payment of Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses) will be applied to pay down the Guaranty Note.  In the event a sale is not effectuated as set forth above, Reorganized Debtor shall transfer title to the Willow Creek Property to Summit Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Summit Bank, and the amount outstanding under the Guaranty Note shall be reduced by the assessed value of the Willow Creek Property. "Assessed value" shall mean the value ascribed to the Willow Creek Property as agreed to by the Reorganized Debtor and Summit Bank and, if no such agreement is reached, such value as determined by the Bankruptcy Court.<br><br>All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note.  In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.<br><br>Reorganized Debtor will use the Summit Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 6 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | **TREATMENT OF CLAIMS CHART** |
| 7 | Allowed Secured Claims of Umpqua Bank | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 7.1 (Westlane Loan.), Class 7.2 (West 11th Land Loan), Class 7.3 (2892 Crescent Ave. Loan.) and Class 7.4 (Woodburn and College Park Loan)<br>For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and applicable Umpqua Bank Fees under the respective loans related to the Westlane Property, West 11th Land Property, 2892 Crescent Ave., and Woodburn Property/College Park Property. The Westlane Property, West 11th Land Property, 2892 Crescent Ave., and the Woodburn Property are referred to herein as the "Buy, Sell or Return Properties".<br><br>Reorganized Debtor shall have 6 months after the Effective Date to either (a) enter into a letter of intent for the sale of the Buy, Sell or Return Properties at a price for cash at closing in excess of the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the Buy, Sell or Return Properties at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such properties, or (c) transfer title to the Buy, Sell or Return Properties to Umpqua Bank, subject to any and all past due and current Property Taxes, in which case any remaining liability for the Arlie Debt Amount and Umpqua Bank Fees for such property shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the particular Buy, Sell or Return Property within the time limits set forth in the immediately preceding sentence, 2/3rds of any sale proceeds in excess of the Arlie Debt Amount, Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by Reorganized Debtor for its own account, and 1/3 of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of a Buy, Sell or Return Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase. |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|-----------|-------------|------------------------|----------------|
| | | | With respect to Class 7.4, the Arlie Debt Amount for the Woodburn Property shall be $845,000 together with 25% of accrued and unpaid interest on the Woodburn and College Park Loan. The Woodburn and College Park Loan shall bear simple interest at a fixed rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes (less any previously paid real estate taxes included therein). The College Park Pay Down will not include application from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above. The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate). <br><br> Class 7.5 (Roseburg Loan #1), Class 7.6 (Roseburg Loan #2), and Class 7.7 (Oil Can Henry's Loan). <br> For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and applicable Umpqua Fees under each of the Roseburg Loan #1, Roseburg Loan #2, and Oil Can Henry's Loan. <br><br> On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to bring each loan current by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the property. Thereafter, interest will accrue on the each loan at a simple fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly amortizing payments of principal and interest on each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and applicable Umpqua Bank Fees due on the Maturity Date. <br><br> With respect to Class 7.5, Reorganized Debtor |

**TREATMENT OF CLAIMS CHART**

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| | | | TREATMENT OF CLAIMS CHART |
|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment |
| | | | may use up to $457,000 of the Umpqua Cash Collateral Account funds for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made.. |
| | | | Class 7.8 (My Coffee Loan) Class 7.9 (Building B Loan), and Class 7.10 (Grumman Hangar Loan) For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and reasonable fees and costs (excluding any late payment fees) under each of the My Coffee Loan, Building B Loan and Grumman Hangar Loan. |
| | | | Interest will accrue on the principal amount owing on each loan at a fixed rate of 4.5% per annum. Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of each loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on each loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date. |
| | | | Class 7.11 (3032 Kinney Loop Loan) and Class 7.12 (Crescent Village Land Loan) For each of these Classes, Umpqua Bank will have an Allowed Claim in the amount of all outstanding principal, accrued non-default interest and applicable Umpqua Bank Fees under each of the 3032 Kinney Loop Loan and Crescent Village Land Loan. |
| | | | As of the Effective Date, each loan will bear simple interest at the simple fixed rate of 4.5% per annum and will be payable in full on the |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| | | TREATMENT OF CLAIMS CHART | | |
|---|---|---|---|---|
| Class No. | Description | Estimate of Recoveries | Plan Treatment | |

Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the each loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes (less any previously paid real estate taxes included therein).

<u>Treatment of Umpqua Bank's Cash Collateral Account.</u>
Provided the College Park Sale is consummated prior to the Effective Date, the balance of good funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order): (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank which will be subject to Umpqua Bank's security interest, to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

Provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may refinance any property that is the Collateral of Umpqua Bank provided it has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | Umpqua Bank receives the applicable Arlie Debt Amount and Umpqua Bank Fees.<br><br>Provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may sell properties free and clear of the Umpqua Bank liens, claims and encumbrances provided it pay the applicable Umpqua Debt Amount and the applicable Umpqua Bank Fees.<br><br>To the extent the sale or refinancing of a property that is the Collateral of Umpqua Bank exceeds the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "Arlie Excess Proceeds") will be divided as follows: For a sale within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of the Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and one-third (1/3) of the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).<br><br>Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.<br><br>Umpqua Bank shall provide partial release of liens, claims and encumbrances for a specific piece of property provided it receives 110% of the Arlie Debt Amount and Umpqua Bank Fees associated with such piece of property.<br><br>Unless otherwise provided in the Plan, Umpqua Bank Fees shall be paid on a pro rata basis upon |

**TREATMENT OF CLAIMS CHART**

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | the sale or refinance of any property of Debtor that secures a Class 7 Claim. |
| | | | Unless otherwise stated in the Plan, Property Taxes will be no more than 2 years past due on Collateral of the Debtor securing the Class 7 Claims. |
| | | | Effective on the Effective Date (a) Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and employees for any and all actions (or in-actions) that occurred before the Effective Date, (b) the Arlie Debt Amounts and the Umpqua Fees will not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor, (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by the Plan, and (d) subject to the provisions of Article 4.7 of the Plan, Umpqua Bank will not make a demand on the Debtor and the guarantors for defaults that occurred before the Effective Date. |
| | | | All rents generated from the properties securing the Umpqua Bank laons may be used by Reorganized Debtor for any purpose, without restriction including, without limitation, for general overhead and general administrative expenses. |
| | Allowed Claims of Washington Federal Savings | Estimated Recovery on Allowed Claims in this Class: 100%  IMPAIRED  ENTITLED TO VOTE | Washington Federal will have Secured Class 8 Claims in the amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between the Lord Byron Collateral Value and the Washington Claim Amount.  Washington Federal's Class 8 Claim shall be satisfied by the delivery of 5 promissory notes to Washington Federal as follows:  (i) the 2909 Lord Byron Note in the principal amount of $279,600, (ii) the 2915 Lord Byron Note in the principal amount of $296,000, (iii) the 2931 Lord Byron Note in the principal amount of $327,950, (iv) the 2977 Lord Byron Note in the principal amount of $269,350, and (v) the 2993 Lord Byron Note in the principal amount of $327,100.  Each Lord Byron note will bear interest at a fixed |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

TREATMENT OF CLAIMS CHART

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | rate of 4.5% per annum and will be payable by Reorganized Debtor as follows: monthly payments of interest only for 36 months; thereafter, equal monthly amortizing payments of principal and interest based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Each Lord Byron note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date. The Lord Byron Notes shall be assumable by a purchaser of a Lord Byron Property, subject to reasonable approval by Washington Federal.<br><br>The Washington Federal Unsecured Claim shall bear interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.<br><br>Reorganized Debtor will use the Washington Federal Bank cash collateral to pay past due Property Taxes upon the Collateral securing the Class 8 Claims. All amounts remaining will be retained and used by Reorganized Debtor for general operating purposes |
| 9 | Allowed Claims of BLM Secured Creditors | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 9.1 (Francis Cline), Class 9.2 (William Greenhoot), Class 9.3 (McKillop II Limited Partnership), Class 9.4 (Karen Merwin), Class 9.5 (Alice Smith), and Class 9.6 (Linda Trickey)<br>Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors. Each BLM Secured Creditor has an Allowed Claim in the amount of all outstanding principal, accrued non-default interest, and reasonable fees and costs owing as of the Effective Date under each BLM Secured Creditor's loan. The Class 9 Claims are secured by a deed of trust on the BLM Office Building.<br><br>On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deeds in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

| Class No. | Description | Estimate of Recoveries | Plan Treatment |
|---|---|---|---|
| | | | **TREATMENT OF CLAIMS CHART** |
| | | | satisfaction of all obligations owing under each BLM Secured Creditor's loan. Notwithstanding the foregoing, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvements and any necessary rezoning services, if requested, upon terms to be agreed upon by the BLM Secured Creditors and Reorganized Debtor. |
| 10 | Property Tax Lien Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim. |
| 11 | Small Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date. |
| 12 | General Unsecured Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>IMPAIRED<br><br>ENTITLED TO VOTE | Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum. No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available. At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim. Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest. All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date. |
| 13 | Interests | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>UNIMPAIRED<br><br>DEEMED TO ACCEPT THE PLAN | Existing Interests in Debtor will be preserved. |

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

# III.

## OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case.  Copies of all relevant court papers are on file with the Bankruptcy Court.

### A.    BACKGROUND

#### 1.    Description of the Debtor

The Debtor is a real estate investment and management company based in Eugene, Oregon.  Arlie owns over 30 properties in Oregon (most of which are in or around Lane County) together with approximately 5,590 acres of investment property on the Big Island of Hawaii (the "Hawaii Property").  Arlie is an Oregon corporation formed in 1991 by Suzanne Arlie.

The Debtor's largest real estate project is known as Crescent Village.  Crescent Village is Eugene's first planned urban village, and is a mixed-use project that includes residences (apartments and townhouses), retail stores, restaurants and office buildings.  Additional information regarding the Crescent Village project is available at www.crescent-village.com.  Phase 1 of Crescent Village was completed in 2009.

The Debtor's revenues consist primarily of rental payments from residential and commercial tenants and from sales of real property from time to time.  Debtor's expenses consist primarily of debt service payments and operating expenses.

#### 2.    Management

The Debtor's current management team is set forth below.  Each member of the Debtor's management team will continue with the Debtor post-confirmation.

Suzanne Arlie; President, Owner and Sole Director - Suzanne Arlie oversees the operations of Arlie.  Ms. Arlie has been the President of Arlie since its inception.  Ms. Arlie will continue to serve as President of the Reorganized Debtor.

John Musumeci; Executive Vice President - John Musumeci oversees Arlie's land and real estate investments.  Mr. Musumeci brings over 30 years experience as a business owner and real

estate investor.  Mr. Musumeci has been employed by Arlie since the company's inception.

Mr. Musumeci will continue to be employed by the Reorganized Debtor.

Scott Diehl; Vice President and Chief Financial Officer - Scott Diehl brings over 30 years of

experience in financial services and public accounting to Arlie.  Mr. Diehl is responsible for

managing Arlie's general operations, finance, asset management, and strategic planning.  Mr.

Diehl's career includes 8 years as a Certified Public Account in Kansas and Oregon.  Mr. Diehl also

has worked 20 years as Controller and Finance Director in the newspaper industry where he

performed real estate development tasks for the Guard Publishing Company.  Mr. Diehl holds a

Bachelor of Science degree in Business from Washburn University.  Mr. Diehl will continue to be

employed by the Reorganized Debtor.

### 3. **Events Precipitating the Debtor's Filing**

Although the value of Arlie's assets is substantially greater than its liabilities, Arlie began

experiencing cash-flow problems in 2008, when the general contractor for Crescent Village (Roberts

Construction) filed a Chapter 7 liquidation case and subsequently failed to pay many of its sub-

contractors.  To ensure the successful completion of Crescent Village, Arlie was forced to pay

significant amounts to various sub-contractors who had been working for Roberts Construction even

though Arlie already had paid for the work once when it paid Roberts Construction.

In addition to the Roberts Construction matter, the general downturn in the economy and

credit markets further hampered Arlie's cash flow.  These factors have made it more difficult for

Arlie to (a) attract and retain tenants and (b) close sales transactions.

Pre-petition, Arlie attempted to negotiate with a number of its secured lenders (including its

largest secured creditor, Umpqua Bank) to re-structure its debt obligations.  However, these

negotiations were mostly unsuccessful, and Arlie filed its chapter 11 petition on January 20, 2010.

### 4. **Plan Projections**

**Exhibit D** attached hereto presents in summary fashion Debtor's projected income

statements (adjusted to a cash basis) and cash flow projections through April 25, 2016.

### B. **SUMMARY OF EVENTS DURING THE CHAPTER 11 CASE**

The following is a summary of important events that have taken place since the Petition Date.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

### 1. "First Day" Pleadings

The day after the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

- *Debtor's Motion for Order Authorizing Payment of Prepetition Wages, Salaries, Compensation, Expenses, Benefits, and Related Taxes, and to Continue Employee Benefits Postpetition* (Docket No. 7);

- *Debtor's Motion for Order Determining Adequate Assurance to Utility Companies* (Docket No. 8);

- *Debtor's Motion Seeking Authority to Refund Prepetition Security Deposits to Tenants* (Docket No. 9);

- *Debtor's Motion For Temporary and Final Authority to Use Cash Collateral* (Docket No. 12);

- *Debtor's Motion for Order Authorizing Use of Existing Bank Accounts* (Docket No. 14); and

- *Motion for Extension of Time to File Schedules and Statement of Financial Affairs* (Docket No. 19).

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on January 27, 2010. Following the hearing on the First Day Pleadings, the Bankruptcy Court entered several orders related to the First Day Pleadings on January 29, 2010, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

### 2. Filing of Schedules, Meeting of Creditors and Bar Date

On February 18, 2010, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court (Docket Nos. 102 and 103). The Schedules provide detailed information regarding the Debtor's assets and liabilities, as well as other information about its business. The Schedules were amended on February 26, 2010 (Docket No. 102), March 17, 2010 (Docket No. 140), April 22, 2010 (Docket No. 154), May 17, 2010 (Docket No. 172), and October 29, 2010

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

(Docket No. 328).  Amendments to the Statement of Financial Affairs were filed on February 25, 2010 (Docket No. 113) and March 17, 2010 (Docket No. 139).

In addition, on March 4, 2010 the United States Trustee conducted the Section 341(a) meeting of creditors in the Debtor's chapter 11 case.  The Bankruptcy Court set June 2, 2010 as the deadline for non-Governmental Units to file proofs of Claim in the Bankruptcy Case, and July 19, 2010 as the deadline for Governmental Units to file proofs of Claim.  The Debtor has filed monthly operating reports commencing with January 2010 (Docket No. 137), and continues to file such reports.

### 3.    The Official Committee of Unsecured Creditors

On or about January 25, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in this case (Docket Nos. 33 and 62). The United States Trustee added an additional member to the Committee on or about January 25, 2010 (Docket No. 98).

The current members of the Committee are as follows:

| | |
|---|---|
| James R. Hanks (Chair)<br>JRH Transportation Engineering | 4765 Village Plaza Loop, Suite 201<br>Eugene, OR  97401 |
| Gregory Brokaw<br>Rowell Brokaw Architects, PC | 1 East Broadway, Suite 300<br>Eugene, OR  97401 |
| David E. Bomar<br>Balzhiser & Hubbard Engineers, Inc. | 100 W. 13th Avenue<br>Eugene, OR  97401 |
| Mike Broadsword<br>Eugene Sand & Gravel / Eugene Sand<br>Construction | PO Box 1067<br>Eugene, OR  97440 |
| Jerry Vicars<br>Fabrication & Mechanical Group, Inc. | P.O. Box 42173<br>Eugene, OR 97404 |

The Plan provides that to the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee.  For so long as such Unsecured Creditors' Committee remains in existence, the Reorganized Debtor will provide to the Unsecured Creditors' Committee a quarterly compliance certificate executed by the Chief Financial Officer of the Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan.  If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan.  The first such compliance certificate shall be delivered to the Unsecured Creditors' Committee 45 days after the end of the third month following the Effective Date and each quarterly compliance certificate shall be delivered 45 days after the end of each subsequent three month period, unless another quarterly schedule is agreed to by and between the Reorganized Debtor and the Creditors' Committee.  In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of the Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to the Reorganized Debtor in its reasonable discretion, the Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee.  Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist.  During the existence of the Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period, in the ordinary course of business, provided that any dispute concerning such fees and expenses shall be resolved by the Bankruptcy Court or other court of competent jurisdiction.

### 4.    **Retention of Professionals**

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Tonkon Torp LLP, as general bankruptcy counsel (Docket No. 11), which employment was approved on January 29, 2010;

- Thorp Purdy Jewett Urness & Wilkinson P.C., as special purpose counsel (Docket No. 73), which employment was approved on March 4, 2010;

- Burr Pilger Mayer, Inc., as accountants (Docket No. 74), which employment was approved on March 19, 2010;

- Michael P. Kearney P.C., as special purpose counsel (Docket No. 75), which employment was approved on March 4, 2010;

- John Brown, as consultant (Docket No. 76), whose employment was approved on March 19, 2010;

- Rethink LLP as special purpose counsel (Docket No. 77), which employment was approved on March 4, 2010;

- Ball Janik LLP ("Ball Janik"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 269), which employment was approved on November 23, 2010; and

- Pachulski Stang Ziehl & Jones LLP ("PSZJ"), as general bankruptcy counsel (to replace Tonkon Torp LLP) (Docket No. 272), which employment was approved on November 24, 2010.

- Kibel Green Inc. as Real Estate Plan Consultant and Interest Rate Expert (Docket No. 377), which employment was approved on February 4, 2011.

- Powell Valuation Inc as Real Estate Appraiser (Docket No. 383), which employment was approved on February 4, 2011.

On September 30, 2010, the Debtor filed the *Substitution of Counsel and Notice of Appearance* (Docket No. 259), pursuant to which the Debtor substituted PSZJ and Ball Janik for its existing general bankruptcy counsel, Tonkon Torp LLP. A dispute subsequently arose between Tonkon Torp and the Debtor regarding the transfer of the Debtor's records. On October 19, 2010, the Debtor filed an adversary proceeding to compel Tonkon Torp to turnover the Debtor's property (Case No. 10-06232-aer). The parties consensually resolved their dispute, and on November 11, 2010, the Debtor filed a notice of dismissal of the adversary case without prejudice.

The Bankruptcy Court authorized the Committee to retain Douglas Schultz and Gleaves Swearingen Potter & Scott LLP as its legal counsel by order entered on January 29, 2010.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

### 5.    First Day Orders

On January 29, 2010, the Court entered a number of "first-day" orders requested by Debtor. These orders authorized Debtor to:  pay employees their accrued prepetition wages, salaries, compensation, expenses, benefits and related taxes (in amounts up to the priority limits permitted by the Bankruptcy Code); continue Debtor's existing utility services, including determining an adequate amount of utility deposits; and refund pre-petition security deposits in the ordinary course of Debtor's business.

### 6.    Cash Collateral

The Court has entered a series of cash collateral orders that have allowed the Debtor to use cash collateral from its lenders who have a security interest in the Debtor's cash.  On December 2, 2010, the Court entered an order authorizing the Debtor to continue using the cash collateral until the earlier of (i) the effective date of a plan confirmed in this case, (ii) in accordance with further court order, or (iii) Debtor's failure to comply with any term of this Order with respect to a Lender and Debtor's failure to substantially cure said act of non-conformity within five business days after notice by such Lender to Debtor, (iv) the appointment of a Chapter 11 bankruptcy trustee or examiner, or (v) conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

On February 1, 2011, the Debtor lodged the *Stipulated Order Amending Order Authorizing Use of Cash Collateral and Granting Adequate Protection* (the "Stipulated Cash Collateral Order") and filed a letter with the Court regarding the same (Docket No. 418).  The Stipulated Cash Collateral Order supplements the Court's December 2 cash collateral order with budgets that extend the Debtor's use of cash collateral through April 2011.  The Stipulated Cash Collateral Order was agreed to and executed by the Committee and each of the lenders with an asserted interest in the cash collateral, namely Bank of America, Siuslaw Bank, Summit Bank, Umpqua Bank, and Washington Federal Savings.  The Stipulated Cash Collateral Order was approved by Order of the Bankruptcy Court dated February 14, 2011 (Docket No. 446).

### 7.    Sale of Debtor's College Park Property and Non-Core Assets

Since the Petition Date, the Debtor has identified and begun marketing for sale most of its non-core assets, and is in discussions with various parties regarding the potential sale of certain of

these assets. A partial listing of the non-core assets currently being marketed by the Debtor for sale is attached hereto as **Exhibit B**.

The sale of the Debtor's College Park property is an example of a sale of a non-core asset. On October 15, 2010, the Court entered an order authorizing the Debtor to sell approximately 315 acres of the Debtor's College Park property to the City of Eugene. The sale of this property has closed.

Other examples include the sale of the Debtor's Natron Land to the Springfield School District for $1.2 million (Docket No. 375) and the pending sale of eight lots of Crescent Village, Second Addition (Docket Nos. 409 and 410) for a total amount of $400,000. The Court approved the sale to the Springfield School District on February 2, 2011, and it is expected to generate $167,000 of unencumbered cash. The motion for authority to sell the Crescent Village lots will be heard by the Court on February 14, 2011.

## 8.    Agreement with The Fifth Third Bank

The Fifth Third Bank ("Fifth Third") is the holder of a guaranty executed by the Debtor whereby the Debtor guaranteed the obligations of Arlie Air, LLC (a wholly owned subsidiary of the Debtor) ("Arlie Air"). Arlie Air was unable to satisfy its obligations to Fifth Third. Arlie Air's sole asset (an airplane) was subject to Fifth Third's lien. The airplane has been sold and the net proceeds were paid to Fifth Third. After paying the net proceeds to Fifth Third, a deficiency remained of approximately $1,300,000. In return for Arlie Air's full cooperation in selling the airplane and paying the net proceeds to Fifth Third, Fifth Third has agreed to reduce its General Unsecured Claim against the Debtor to $1,000,000, provided that the Debtor's Plan provides for the payment of such Claim in full with an interest rate of the higher of 3.5% per annum or the interest rate allowed to General Unsecured Claims under the Plan. Because the Plan proposes to pay General Unsecured Claims in full and provides for a 3.5% per annum interest rate, Fifth Third will have an Allowed General Unsecured Claim in the amount of $1,000,000 (the "Fifth Third Allowed Claim"), which will be paid in the same manner and with the same interest rate as all other Allowed General Unsecured Claims. Under this compromise, Fifth Third's Allowed General Unsecured Claim is not subject to any objection, reduction or subordination.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Additionally, the Debtor will seek Bankruptcy Court approval of a compromise under which it may grant Fifth Third an option to reduce the amount of the Fifth Third Allowed Claim to $600,000 in consideration for (i) a cash payment of $600,000 (the "Fifth Third Payoff"), or (ii) a secured interest in the Debtor's Puueo Forest and Puueo Estate in Hawaii (the "Fifth Third Hawaii Interest"); provided, however, that the decision to deliver either the Fifth Third Payoff or the Fifth Third Hawaii Interest shall be in the Reorganized Debtor's sole discretion.

### 9.    Agreement with Umpqua Bank

On December 23, 2010, the Debtor participated in a settlement conference with Umpqua Bank before the Honorable Elizabeth Perris, United States Bankruptcy Judge. As a result of that settlement conference and subsequent negotiations between the parties, the Debtor and Umpqua Bank agreed to the terms of a settlement that were entered on the Bankruptcy Court record on December 30, 2010 (the "Umpqua Bank Settlement"). In general terms, the Umpqua Bank Settlement divides the Debtor's property encumbered by Umpqua Bank loans into three groups: (1) sell or return properties, with respect to which the Debtor will enter into a letter of intent for the sale of such properties within six months following the Effective Date, or else transfer title to the properties to Umpqua Bank; (2) retain and service debt properties, which the Debtor will keep and the loans for which the Debtor will make monthly principal and interest payments at 4.5% interest until the loans mature five years following the Effective Date; and (3) retain and accrue properties, which the Debtor will keep and the loans for which the Debtor will not be required to make payments (which accrue interest at 4.5%) until three years following the Effective Date, at which point the Debtor will be required to pay down 50% of the balance due together with the accrued interest. The loans pertaining to the retain and accrue properties will mature five years following the Effective Date.  By subsequent agreement, Umpqua Bank agreed that the Debtor may also purchase a sell and return property under the conditions set forth in the Plan.

As part of the Umpqua Bank Settlement, confirmation of the Plan is conditioned on the Debtor and the guarantors of Arlie's obligations to Umpqua Bank waiving and releasing all claims against Umpqua Bank and its officers and employees.  Additionally, the Debtor and the guarantors will acknowledge that the obligations to Umpqua Bank (as revised by the Plan) are without defense

and counterclaim and that the guaranties are fully enforceable. Umpqua Bank will agree that it will not make a demand on the Debtor or the guarantors for defaults that occurred before the Effective Date.  While the Umpqua Bank Settlement is incorporated in the Plan and is already the subject of a settlement entered into on the record before United States Bankruptcy Judge Elizabeth Perris, the Debtor, Umpqua Bank and the guarantors will execute a written settlement agreement containing the release terms and the covenant not to make a demand described above , all to be become effective as of the Effective Date.

### 10.    **Agreement with Century Bank**

On December 30, 2010, the Debtor filed its *Notice of Debtor's Intent to Settle With Century Bank On Lord Byron Place Loans* (Docket No. 370) to resolve its lender/borrower relationship with Century Bank (the "Century Bank Settlement") on the properties located at  2843, 2853, 2863, 2873 and 2883 Lord Byron Place in Eugene, Oregon (the "Improved Properties").  The Court approved the Century Bank Settlement on February 2, 2011 pursuant to its *Order Approving Stipulation Between Debtor and Century Bank to Provide Deeds in Lieu of Foreclosure, Surrender of Cash Collateral and Grant Relief From Stay to Implement*.  The Century Bank Settlement provides, (1) the Improved Properties shall be transferred to Century Bank by agreed-upon deeds in lieu of foreclosure; (2) the balance of the Century Bank cash collateral account will be delivered to Century Bank; (3) the Debtor will only continue to use cash collateral as consented to by Century Bank and not for the Debtor's general overhead; (4) any deficiency claim of Century Bank relating to loans secured by the Improved Properties shall be waived; and (5) Century Bank shall have relief from stay.  In order to reimburse Century Bank for rent and security deposits tenants made on the Improved Properties, the Reorganized Debtor also will pay Century Bank $5,300 following the Effective Date.

### 11.    **The Exclusivity Period and the Prior Version of the Plan and Disclosure Statement**

The Debtor's exclusive period for filing a plan of reorganization under Bankruptcy Code Section 1121(b) (the "Plan Filing Period") was originally set to expire on May 20, 2010.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Accordingly, the Debtor's 60-day period to solicit and obtain acceptances of its plan under

Bankruptcy Code section 1121(c) (the "Solicitation Period") would have expired 60 days later.

On or about April 22, 2010, the Debtor filed its *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* (Docket No. 156) seeking to extend the Plan Filing Period to July 1, 2010, and the Solicitation Period to September 1, 2010. The Debtor cited the case's complexity and the numerous parties and assets involved as reasons for the requested extension. The Committee supported the motion. The Office of the United States Trustee took no position. No creditor offered written opposition to the motion, and the Court approved the requested extensions at a hearing that took place on May 12, 2010, and entered its *Amended Order on Court's Case Management Conference Setting Deadlines for Filing Plan and Disclosure Statement* (Docket Nos. 165 and 167) (the "First Extension Order").

On July 1, 2010, the Debtor filed *Debtor's Plan of Reorganization (July 1, 2010)* (the "First Plan") (Docket No. 185) along with an accompanying *Debtor's Disclosure Statement (July 1, 2010)* (Docket No. 186). The basic elements of the First Plan were the restructuring of secured debt on core holdings, the sale of non-core holdings over time, and the payment of unsecured creditors in full over time, with the equity in the Debtor being retained by Ms. Arlie. In response to oppositions filed regarding the disclosure statement (Docket Nos. 226 through 230), on August 20, 2010 the Debtor filed the *Debtor's Response to Disclosure Statement Objections* (Docket No. 235), which included as an exhibit an amended disclosure statement (as amended, the "First Disclosure Statement").

At the disclosure statement hearing that took place on August 24, 2010, the Court did not approve the First Disclosure Statement because Debtor's counsel represented to the Court that negotiations with creditors were continuing. The Court set September 15, 2010 as the new deadline for filing an amended disclosure statement and plan (Docket No. 241).

On September 9, 2010, the Debtor filed *Debtor's Motion for Extension of Time to File Amended Disclosure Statement and Amended Plan* (Docket No. 247) seeking an additional month in which to file a plan in order to allow continued negotiations with creditors. The Court granted the motion on September 10, 2010 pursuant to its *Order Extending Deadline for Debtor to File*

*Amended Disclosure Statement and Amended Plan of Reorganization* (Docket No. 248), which

ordered the Debtor to file an amended plan and amended disclosure statement by October 15, 2010.

Also on September 10, 2010, counsel for Suzanne Arlie and John Musumeci filed a motion

seeking an additional extension of exclusivity in order to address certain issues relevant to them

personally raised by Umpqua Bank (Docket No. 249).  Tonkon Torp filed an opposition to the

motion on the Debtor's behalf (Docket No. 252).

Following PSZJ and Ball Janik's retention on or about September 30, 2010 to replace

Tonkon Torp LLP as the Debtor's general bankruptcy counsel, the Debtor on October 8, 2010 filed

*Debtor's Motion to Extend Exclusivity (11 U.S.C. § 1121) and Deadline to File Amended Plan and*

*Amended Disclosure Statement* (Docket No. 276).  The Court denied the motion at a hearing on

October 20, 2010 and ordered the parties in interest to file a plan and disclosure statement by

December 31, 2010 (Docket No. 319).

As a result of the settlement between the Debtor and Umpqua Bank that was entered on the

record on December 30, 2010, the Court extended the deadline for only the Debtor and Bank of

America to file a plan and disclosure statement to January 10, 2011 (Docket No. 371).  On

January 10, 2011, the Debtor filed *Debtor's First Amended Plan of Reorganization (January 10,*

*2011)* (Docket No. 392), as well as *Debtor's First Amended Disclosure Statement in Support of*

*Debtor's First Amended Plan of Reorganization (January 10, 2011)* (Docket No. 393).  On January

31, 2011, the Court entered its *Order Conditionally Approving Disclosure Statement and Fixing*

*Time for Filing Acceptances or Rejections of Plan; And Notice of Disclosure and Confirmation*

*Hearings*, which set the hearing on the plan and disclosure statement for April 4, 2011.  On February

14, 2011, the Debtor filed *Debtor's Second Amended Plan of Reorganization (February 14, 2011)*,

as well as *Debtor's Second Amended Disclosure Statement in Support of Debtor's First Amended*

*Plan of Reorganization (February 14, 2011)*

## C.    PENDING AND FUTURE TRANSACTIONS

### 1.    Hawaii Koa Wood Forest

As part of its effort to generate cash to make payments due on the Effective Date and provide

the Reorganized Debtor with additional operating capital, the Debtor will either sell in a sealed bid

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

1  auction to the highest bidder free and clear of liens, claims and encumbrances the West Hilo Tree

2  Farm (described in more detail below) or refinance the property. Any sale or refinance of this native

3  Acacia Koa forest land is expected to generate substantial cash for the Debtor's reorganization.

4  On February 3, 2011, the Debtor filed a motion seeking an order (i) approving bidding

5  procedures for the sale of the West Hilo Tree Farm, (ii) approving the proposed forms of asset

6  purchase agreement, sale notice, and sale order to be used in connection with the sale, (iii) approving

7  the manner of sale free and clear, and (iv) scheduling a sale hearing date to consider final approval

8  of the sale (Docket No. 426). The motion requests that an auction of the West Hilo Tree Farm be

9  held on April 1, 2011 and that a hearing to approve the sale of the West Hilo Tree Farm be held on

10  April 4, 2011. The motion is pending before the Court and will be heard on March 2, 2011.

11  Over the years, the Debtor has had numerous inquiries about the West Hilo Tree Farm from

12  timber management organizations, forest products companies, investors, state agencies, and even

13  conservationists. The Debtor expects that the high bidder at any sale would likely seek to make an

14  initial cash payment, to be followed by an additional cash payment to be due upon receipt of

15  appropriate harvesting entitlements. Thus, upon a sale, title would likely pass for a discounted price,

16  subject to increase upon the purchaser's receipt of harvesting entitlements. The Debtor has

17  extensive experience with the West Hilo Tree Farm and the economic benefits that can be derived

18  from the property with appropriate harvest permitting. The Reorganized Debtor will make itself

19  available to the purchaser in order to speed the entitlement process.

20  **2.    VA Hospital Transaction**

21  The U.S. Department of Veterans Affairs (the "Veteran's Administration") is considering a

22  portion of the Debtor's Crescent Village property in Eugene as the site for its proposed 143,000-

23  square-foot medical clinic, including an ambulatory surgery center. According to reports in the

24  *Register Guard*, "the facility would cost up to $40 million and employ up to 200. It would be a boon

25  to Lane County's 35,000 veterans who now must drive hours to Portland or Roseburg if they need

26  specialized services." *Register Guard*, "Eugene Remains in Running for VA Clinic After All," Sept.

27  9, 2010, page A1; *see Register Guard*, "Back in the VA race: VA still considering a clinic site in

28  Eugene," Sept. 13, 2010, page A6.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Such a deal with the Veteran's Administration could potentially result in many millions of dollars of net sale proceeds, after payment of the claims of Siuslaw Bank, which has a lien against the relevant property. Although there can be no guarantees, the Debtor is working with the Veteran's Administration and the City of Eugene to accommodate the Veteran's Administration's requests and is optimistic that the Veteran's Administration will select the Debtor's location for its medical clinic.

## IV.

## ASSETS AND LIABILITIES

### A.    REAL PROPERTY ASSETS

The Debtor's assets consist primarily of real property in Lane, Douglas, and Multnomah Counties in Oregon and real property on the Big Island of Hawaii. The current value of the Debtor's real property is uncertain, as market conditions continue to fluctuate. The valuations set forth below are the good faith estimates of the Debtor, based on a variety of sources available to the Debtor. Information regarding the Debtor's Crescent Village project in Eugene, Oregon can be obtained by visiting www.crescent-village.com. Below is a description of the Debtor's major real property holdings:

### 1.    Crescent Village - Building A

Building A is a four story mixed-use building located in the Debtor's Crescent Village project. Building A was completed in 2008, and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor. The apartments are fully leased. The retail space is partially leased. The debt against this property is held by Bank of America. Bank of America contends that the leasing cost for the vacant retail space will total approximately $300,000. Because the Debtor uses an in-house team to market Crescent Village, it believes that the leasing cost for the vacant retail space will be significantly less than Bank of America's estimates. The Debtor estimates, based on cost of construction, that the value of Building A is approximately $15,600,000. Bank of America (based on an appraisal that has not been shared with Debtor) contends the property is worth approximately $10,380,000.

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

### 2. Crescent Village - Building B

Building B is a four story mixed-use building located in Debtor's Crescent Village project. Building B was completed in 2008 and consists of approximately 50 apartments on floors 2 through 4 and retail space on the ground floor. The apartments are fully leased. The retail space is partially leased. The Debtor believes the value of Building B is approximately $15,800,000. The debt against this property is held by Umpqua Bank.

### 3. Crescent Village -Building D

Building D (known as the Inkwell Building) is a four story mixed-use building located in the Debtor's Crescent Village project. Building D was completed in 2009. Building D has offices on floors 2 through 4, and retail space on the ground floor. The office space is approximately 58% leased by the Debtor and four other commercial tenants. The retail space is currently vacant. Since the Petition Date, the Debtor has leased approximately 2,100 square feet of previously vacant office space. The debt against this property is held by Bank of America. Based on Bank of America's claimed value for Building D, the Debtor estimates that its value is approximately $4,000,000.

### 4. Crescent Village - 23 acres raw land

Crescent Village contains 23 acres of raw land zoned general office and R-4, generally located at Coburg Road and Crescent Avenue in Eugene, Oregon. The Debtor estimates that the value of this land is approximately $15,000,000. The debt against this property is held by Umpqua Bank.

### 5. Crescent Village Lots

Crescent Village Lots 4, 10, 11, 12, and 13 contain raw land zoned general office and R-4, generally located at Coburg Road and Crescent Avenue in Eugene, Oregon. The Debtor estimates that the value of this land is approximately $11,000,000. The debt against Lots 10, 11, 12, and 13 is held by Siuslaw Bank. Summit Bank has a security interest in Crescent Village Lot 4.

### 6. Woodburn (4.11 acres raw land)

Woodburn contains 4.11 acres of land zoned CG, generally located at 2450 Country Club Road in Woodburn, Oregon. The land is adjacent to the I-5 freeway across from the Woodburn

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Outlet Mall.  The Debtor estimates that the value of this land is approximately $1,650,000.  The debt against this property is held by Umpqua Bank.

### 7.    College Park (623.2 acres raw land)

The Debtor sold approximately 315 acres of the College Park property to the City of Eugene for $1,500,000 and retains approximately 623.2 acres of raw land.  The Debtor estimates that the value of the remaining College Park land is approximately $18,808,000.  The debt against this property is held by Umpqua Bank.

### 8.    Westlane Shopping Center

Westlane is a commercial shopping center located in Veneta, Oregon.  Westlane consists of retail and office space.  The retail and office space is partially leased.  The Debtor estimates that the value of Westlane is approximately $9,600,000.  The debt against this property is held by Umpqua Bank.

### 9.    Garden Valley Shopping Center

Garden Valley is a commercial shopping center located in Roseburg, Oregon.  Garden Valley consists of retail space.  The retail space is two-thirds leased.  The Debtor estimates that the value of Garden Valley is approximately $5,100,000.  The debt against this property is held by Umpqua Bank.

### 10.    West 11th & Obie

West 11th & Obie is land zoned commercial industrial and C-4, generally located at 3802-3810 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of this land is approximately $1,600,000.  The debt against this property is held by Umpqua Bank.

### 11.    My Coffee

My Coffee is a commercial building located at 3808 W. 11th in Eugene, Oregon.  The Debtor estimates that the value of the building is approximately $700,000.  The debt against this property is held by Umpqua Bank.

### 12. **Oil Can Henry's**

Oil Can Henry's is a commercial building located at 3804 W. 11th in Eugene, Oregon. The Debtor estimates that the value of this building is approximately $870,000. The debt against this property is held by Umpqua Bank.

### 13. **Willow Creek**

Willow Creek contains 7.22 acres of raw land generally located at West 11th & Willow Creek in Eugene, Oregon. The Debtor estimates that the value of this land is approximately $1,500,000. The debt against this property is held by Summit Bank.

### 14. **Hawaii Land**

The Debtor owns approximately 5,589 acres of land on the Big Island of Hawaii. The Debtor's real estate assets in Hawaii diversify the Debtor's investment portfolio. The Hawaii Property primarily is comprised of native Acacia Koa forests. Pioneer Asset Investments Limited of Hong Kong ("Pioneer") asserts a lien against 5,226 acres of this property (the "West Hilo Tree Farm"), but the Debtor believes the lien is void because it was recorded after the Petition Date and therefore violates the automatic stay pursuant to section 362(a)(4) of the Bankruptcy Code. On February 1, 2011, the Debtor filed an objection and adversary complaint to invalidate Pioneer's lien against the property (Adversary Proceeding No. 11-06018) (the "Pioneer Adversary").

The Debtor estimates that the value of the West Hilo Tree Farm, once permitted for logging, ranges from approximately $29,000,000 to $50,000,000. The remaining 363 acres (the "Puueo Estate" and the "Puueo Forest") are unencumbered. The Debtor estimates that the value of the Puueo Estate and the Puueo Forest ranges from approximately $2,500,000 to $13,000,000.

### 15. **2890 Chad Drive (the BLM Office Building)**

2890 Chad Drive is an office building located at 2890 Chad Drive in Eugene, Oregon. The Debtor estimates that the value of this building is approximately $5,100,000. The debt against this property is held collectively by Alice Smith, Francis Cline, Herbert McKillop, Karen Merwin, Linda Trickey, and William Greenhoot (referred to in the Plan as the "BLM Secured Creditors").

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

### 16.    2892 Crescent Ave.

2892 Crescent Ave. is an office building located at 2892 Crescent Avenue in Eugene, Oregon.  The Debtor estimates that the value of this building is approximately $3,250,000.  The debt against this property is held by Umpqua Bank.

### 17.    650 Goodpasture (Goodpasture Island Radio Tower)

650 Goodpasture is contains land and a radio tower located at 650 Goodpasture Island Drive in Eugene, Oregon.  The Debtor estimates that the value of this land and tower is approximately $460,000.  The debt against this property is held by Summit Bank.

### 18.    4480 G Hwy 101 N.

4480 G Hwy 101 N. is a medical office building located at 3480 Hwy 101 N. in Florence, Oregon.  The Debtor estimates that the value of this building is approximately $2,100,000.  The debt against this property is held by Siuslaw Bank.

### 19.    3082 Kinney Loop

3082 Kinney Loop, Eugene, Oregon contains a rental residence on .77 acres.  The residence is currently rented.  The Debtor estimates that the value of this property is approximately $450,000.  The debt against this property is held by Siuslaw Bank.

### 20.    3108 Kinney Loop

3108 Kinney Loop, Eugene, Oregon contains a rental residence on .43 acres.  The residence is currently rented.  The Debtor estimates that the value of this property is approximately $250,000.  The debt against this property is held by Siuslaw Bank.

### 21.    2850 Kinney Loop

2850 Kinney Loop, Eugene, Oregon contains a rental residence on .46 acres.  The residence is currently rented.  The Debtor estimates that the value of this property is approximately $250,000.  The debt against this property is held by Siuslaw Bank.

### 22.    3032 Kinney Loop

3032 Kinney Loop, Eugene, Oregon contains .49 acres.  The Debtor estimates that the value of this property is approximately $250,000.  The debt against this property is held by Umpqua Bank.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

### 23. **Kinney Loop Lots**

3004 Kinney Loop, Eugene, Oregon contains .45 acres.  The Debtor estimates that the value of this property is approximately $250,000.  2834 Kinney Loop, Eugene, Oregon contains .46 acres and is a rental residence, which is currently rented.  The Debtor estimates that the value of this property is approximately $250,000.  2802/2804 Kinney Loop, Eugene, Oregon contains .28 acres. The Debtor estimates that the value of this property is approximately $490,000.  2802 and 2804 Kinney Loop are rental residences and both are currently rented.  2729 Coburg Road, Eugene, Oregon contains .34 acres.  The Debtor estimates that the value of this property is approximately $592,416.  2743 Coburg Road, Eugene Oregon, contains .17 acres.  The Debtor estimates that the value of this property is approximately $296,208.  The debt against these properties is held by Siuslaw Bank.

### 24. **3058 Kinney Loop**

3058 Kinney Loop, Eugene, Oregon contains .40 acres.  The Debtor estimates that the value of this property is approximately $340,000.  The debt against this property is held by Century Bank.

### 25. **2909 Lord Byron Place**

2909 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $279,600.  The debt against this property is held by Washington Federal Savings.

### 26. **2915 Lord Byron Place**

2915 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $296,000.  The debt against this property is held by Washington Federal Savings.

### 27. **2931 Lord Byron Place**

2931 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $327,950.  The debt against this property is held by Washington Federal Savings.

### 28.    <u>2977 Lord Byron Place</u>

2977 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $269,350.  The debt against this property is held by Washington Federal Savings.

### 29.    <u>2993 Lord Byron Place</u>

2903 Lord Byron Place, Eugene, Oregon is a townhouse.  The Debtor estimates that the value of this property is approximately $327,100.  The debt against this property is held by Washington Federal Savings.

### 30.    <u>2843, 2853, 2863, 2873 and 2883 Lord Byron Place</u>

Pursuant to the Century Bank Settlement discussed in Section III.B.10 above, the properties located at  2843, 2853, 2863, 2873 and 2883 Lord Byron Place in Eugene, Oregon have been transferred to Century Bank by agreed-upon deeds in lieu of foreclosure.

### 31.    <u>Hangar 272</u>

Hangar 272 is an airplane hangar located at 28737 Grumman Dr., Eugene, Oregon.  The Debtor estimates that the value of this hangar is approximately $494,000.  The debt against this property is held by Umpqua Bank.

### 32.    <u>Hangar 246</u>

Hangar 246 is an airplane hangar located at the 90363 Boeing Dr., Eugene, Oregon.  The Debtor estimates that the value of this hangar is approximately $90,000.  There is no debt against this property.

### 33.    <u>2960 and 3110 Kinney Loop</u>

2960 and 3110 Kinney Loop, Eugene, Oregon contains .40 acres.  The Debtor estimates that the value of this property is approximately $800,000.  The debt against this property is held by Siuslaw Bank.

### 34.    <u>Unencumbered Real Property</u>

In addition, the Debtor owns various unencumbered real property that, in the aggregate, has a value exceeding $3,000,000.  This unencumbered property includes Crescent Village Lot 9 (which the Debtor values at approximately $1,000,000), 3004 Kinney Loop (bare land; Lot 3000) (which

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Debtor values at approximately $250,000), and the Puueo Estate and Puueo Forest (which collectively are valued at approximately between $2,500,000 and $13,000,000). Additionally, the Debtor believes that the West Hilo Tree Farm will be unencumbered as a result of the Pioneer Adversary (discussed in Section IV.A.14 above) and has sought authority to sell such property free and clear of liens, claims and interests as discussed above (see Section II.C.1.).

Moreover, the Debtor owns numerous lots on Lord Byron Place in Eugene, Oregon (which collectively are valued at approximately $1,300,000). The Debtor has entered into purchase and sale agreements for the sale of eight unencumbered townhouse lots located on the east side of Lord Byron Place for a total of $400,000 (*see* Docket Nos. 409 and 410). These sales are in escrow pending Court approval. The Debtor owns an additional 18 unencumbered townhouse lots located on the west side of Lord Byron Place (which collectively are valued at approximately $900,000).

### B.    PERSONAL PROPERTY ASSETS

#### 1.    Cash and Accounts Receivable

The Debtor's personal property assets consist primarily of cash and accounts receivable. A significant portion of the Debtor's cash is subject to the cash collateral orders entered in this Case.

#### 2.    Bankruptcy Claim Filed Against Roberts Construction

Arlie has filed claims aggregating over $3,400,000 against Roberts Construction in the Roberts Prof. Const. Svcs., Inc. bankruptcy case (Case No. 08-60615-fra7) (the "Roberts Case"). Arlie cannot at this time estimate exactly how much Arlie will recover on its claims. There have been approximately $7.7 million in claims filed in the case, and the Debtor's share is approximately 44%.

On or about November 30, 2010, the trustee of the Roberts Case, Ronald R. Sticka, released three checks to the Debtor in the amounts of $36,715.91, $76,755.64 and $56,286.54 (for a total of $169,758.09). Soon after Trustee Sticka announced that it would pay this interim dividend to the Debtor, Bank of America and Umpqua Bank notified the Debtor that they believed they possessed valid liens against the distributions.

Pursuant to the Court's August 19, 2010 order in this Case, Trustee Sticka withheld $47,851.64 from the November 30 distributions to the Debtor and paid that amount directly to the

law firm Gartland, Nelson, McCleery, Wade & Walloch, P.C. ("Gartland, Nelson") on account of services provided to the Debtor with respect to the Roberts Case.  On December 7, 2010, Gartland, Nelson filed a motion requesting authority to disburse the funds to its general account as full payment of its secured claim against the Debtor (Docket No. 355), and the Court granted the motion on January 26, 2011 pursuant to its *Order Allowing Payment of Secured Claim*.

### 3.    State Court Claims Against Michael Roberts and Mark Roberts

On December 30, 2009, Arlie filed a State Court complaint in Lane County Circuit Court (Case No. 160928625) seeking over $1,000,000 in damages against Michael Roberts and Mark Roberts in connection with losses suffered by the Debtor on its Crescent Village project.  The Roberts brothers were owners and officers of Roberts Professional Construction Services, Inc. ("Roberts Construction"), which was the general contractor on Arlie's Crescent Village project. Roberts Construction defaulted on its obligations to Arlie and filed for bankruptcy protection.  Arlie also has asserted claims against Roberts Construction in the Roberts Construction bankruptcy proceeding (see above), but the claims asserted by Arlie in the Lane County Circuit Court action are asserted against the Roberts bothers individually.

The claim against Michael Roberts is for fraud and alter ego.  The fraud cause of action is based on evidence that Michael Roberts caused Roberts Construction to over-bill Arlie for work done on the Crescent Village project.  That is, Michael Roberts knowingly caused invoices to be sent to Arlie on the Crescent Village project for work that had not been performed.  Arlie relied on these inflated invoices that Michael Roberts caused to be sent to them and paid these invoices.  Arlie suffered damages when Roberts Construction went out of business and Arlie was forced to pay twice for this work.  The alter ego claim against Michael and Mark Roberts is based on the fact that the Roberts brothers disregarded the corporate form of Roberts Construction and used the assets and resources of Roberts Construction for their own personal benefit (such as financing personal investments in Bend, Oregon) and did not treat Roberts Construction as an entity which was separate from themselves.

On February 25, 2010, the Roberts brothers removed the case to the Roberts Construction bankruptcy proceeding.  Debtor filed a motion to remand the case back to Lane County Circuit

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Court. By order filed on July 6, 2010, Judge Alley denied the motion to remand. The adversary

proceeding (10-06068-fra) was administratively transferred from the Roberts Construction

bankruptcy case to this Case. On August 11, 2010, Judge Alley approved the parties' stipulated

discovery schedule, which provided for the completion of discovery by February 28, 2011, and a

five-day trial to commence on or after April 28, 2011. On December 10, 2010, Judge Alley

approved extensions of the discovery schedule. Currently, discovery will be completed by April 29,

2011, a pre-trial conference will take place on June 9, 2011, and the trial will commence on July 18,

2011.

### 4.    Potential Claims Against Umpqua Bank

The Debtor investigated and evaluated potential claims against Umpqua Bank arising out of

(a) Roberts Construction's fraudulent billing for the Crescent Village Building B construction, for

which Robert Brink acted as Umpqua Bank's lead inspector, and (b) Umpqua Bank's course of

conduct in connection with a series of loans made or proposed to be made to Arlie in 2009.

On August 19, 2010, the Court entered its *Order Regarding Debtor's Motion for Rule 2004

Examination of Umpqua Bank* (Docket No. 219), which provided for the production of certain paper

files maintained by Umpqua Bank related to Mr. Robert Brink, a construction loan officer at

Umpqua Bank who, based on information and belief, was indicted for and pled guilty to, among

other malfeasance, filing inspection reports certifying that construction was underway on a Bend,

Oregon developer's projects, when in fact it was not, and overstating construction progress (thereby

resulting in overpayments). Such discovery was initiated by the Debtor because some of its own

construction at Crescent Village was subject to substantial overpayments to its contractor (Roberts

Construction) who subsequently went bankrupt and Mr. Brink issued progress certifications to

Umpqua Bank during the height of construction at Crescent Village roughly at the same time during

which Mr. Brink had committed malfeasance related to the Bend, Oregon project.

Through an investigation undertaken in this case, Arlie is informed and believes that Umpqua

Bank knew in early November 2007 that Mr. Brink submitted false inspection reports pertaining to

other projects funded by the bank that allowed developers and contractors to fraudulently divert

funds. Similarly, based on information and belief, Mr. Brink submitted false and misleading

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

inspection reports in connection with Umpqua Bank's loan on Building B in Crescent Village, where the contractor also fraudulently diverted construction funds.  As a result of Roberts Construction's intentional overbilling and Roberts Construction's subsequent bankruptcy filing, Arlie asserts that it suffered uncompensated losses of over $3 million and substantial consequential damages. The losses that Arlie asserts that it suffered as a result of Roberts Construction's overbilling were a substantial factor in causing Arlie to file its chapter 11 petition.

Arlie asserts that these facts support claims against Umpqua Bank for concealment, negligence and negligent misrepresentation. To the extent it can be demonstrated that Mr. Brink knew about the overbilling at Crescent Village, the Debtor also asserts it would have strong claims against Umpqua Bank for aiding and abetting the Roberts Construction fraud.  At this time, it is difficult to estimate the approximate value of such claims or the costs of pursuing them.

Umpqua Bank asserts that Debtor had the duty and capacity to monitor its own projects, that Debtor certified to Umpqua Bank the progress of construction and construction payments when making draw requests, and Umpqua Bank vehemently denies Mr. Brink did anything wrong on the Crescent Village project, that Umpqua Bank had any duty to inform Debtor about Mr. Brink's activities on any other project, and that Debtor has any claim against Umpqua Bank.

Pursuant to the Umpqua Bank Settlement, confirmation of the Plan is conditioned on a settlement involving Umpqua Bank, the Debtor and the guarantors of Arlie's obligations to Umpqua Bank under which all claims against Umpqua Bank and its officers and employees are waived and released.

### 5.    Tonkon Claims

The Debtor's working relationship with Tonkon Torp LLP in August and September 2010 was marked by communication difficulties.  The impact of these difficulties became more severe after objections were filed to the Debtor's Disclosure Statement.  Ultimately, the Debtor determined that the best path for its reorganization efforts mandated the replacement of Tonkon Torp as chapter 11 bankruptcy counsel.

**6.** **Other Claims/Avoidance Actions**

Other than potential claims against Umpqua Bank that are being released as part of the Plan, the Plan preserves all of the Debtor's claims and causes of action, known or unknown, and all of the Debtor's claims and causes of actions (including any potential Avoidance Actions) remain assets of the Reorganized Debtor, and the Reorganized Debtor may pursue such claims and rights of action, as appropriate, in accordance with what is in the Reorganized Debtor's best interests. Except as set forth in this Disclosure Statement, the Debtor is not currently aware of any pending material claims or causes of actions it may have that are likely to constitute material assets of the Debtor's estate.

**C.** **LIABILITIES – SECURED CREDITORS**

**1.** **Bank of America**

The Debtor has two loans with Bank of America. One loan (the "Building A Loan") is secured by Crescent Village Building A. The other loan (the "Building D Loan") is secured by Crescent Village Building D. As of the Petition Date, the Debtor owed approximately $9,000,000 on the Building A Loan and approximately $5,400,000 on the Building D Loan.

**2.** **Century Bank**

The Debtor has seven loans with Century Bank. Six of the loans are secured, and the seventh loan (a $200,000 line of credit loan) is unsecured. As of the Petition Date, the Debtor owed a total of approximately $2,200,000 on the Century Bank loans. The loans range from approximately $200,000 to approximately $365,000. Each of the secured loans is secured by separate real property of the Debtor. One secured loan is secured by a house located at 3058 Kinney Loop in Eugene, Oregon, and the other five secured loans are secured by separate townhomes located on Lord Byron Place in Eugene, Oregon. As discussed above in Section III. B., the Debtor and Century Bank have resolved their lender/borrower relationship on the five townhomes located on Lord Byron Place.

**3.** **Siuslaw Bank**

The Debtor has eight loans with Siuslaw Bank. Each loan is secured by separate real property of the Debtor. The loans range from approximately $95,000 to approximately $4,300,000. As of the Petition Date, the Debtor owed a total of approximately $8,000,000 on the Siuslaw Bank loans.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

#### 4.    **Summit Bank**

The Debtor has one loan with Summit Bank that is secured by the real property and improvements in Eugene, Oregon commonly referred to as the Goodpasture Island Radio Tower.  As of the Petition Date, the Debtor owed approximately $340,000 on the Summit Bank loan.

Additionally, the Debtor has guaranteed a $1,850,000 line of credit issued by Summit Bank to Churchill Media LLC, which guaranty obligations are secured by the Debtor's vacant land in Crescent Village and by the Debtor's vacant land located at W. 11th & Willow Creek in Eugene, Oregon.

#### 5.    **Umpqua Bank**

The Debtor has twelve loans with Umpqua Bank.  All of Umpqua Bank's loans are cross-defaulted, cross-collateralized, and are secured by multiple parcels of real property, improvements thereon, and rents and income therefrom.  The loans range from approximately $190,000 to approximately $10,200,000.  As of the Petition Date, the Debtor owed a total of approximately $29,000,000 on the Umpqua Bank loans.

#### 6.    **Washington Federal Savings**

The Debtor has five loans with Washington Federal Savings.  Each of the five loans is secured by a separate townhome located on Lord Byron Place in Eugene, Oregon.  The loans range from approximately $390,000 to approximately $420,000.  As of the Petition Date, the Debtor owed a total of approximately $2,000,000 on the Washington Federal Savings loans.

#### 7.    **"BLM" Individuals**

Francis Cline, William Greenhoot, Herbert McKillop, Karen Merwin, Alice Smith and Linda Trickey (the "BLM Individuals") collectively financed the Debtor's acquisition of the office/warehouse campus located at 2890 Chad Drive in Eugene, Oregon (referred to as the "BLM Office Building").  The Debtor has a separate loan with each BLM Individual.  Each loan is secured by the BLM Office Building.  As of the Petition Date, the Debtor owed a total of approximately $4,350,000 on such loans.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

### 8. Property Tax Lien Claimants

As of the Petition Date, the Debtor had unpaid property taxes of approximately $870,000 secured by statutory liens on the Debtor's real property.

### D. LIABILITIES – UNSECURED CREDITORS

The Plan contains two classes of unsecured creditors: a convenience class of creditors holding Small Unsecured Claims (an Unsecured Claim of $2,000 or less) and a class of creditors holding General Unsecured Claims. It is the Debtor's belief that the total amount of Allowed Small Unsecured Claims will be approximately $50,000, and that the total amount of Allowed General Unsecured Claims (including any Deficiency Claims of secured creditors) will be approximately $5,400,000, provided that these amounts may vary depending on the outcome of claims litigation.

Although Pioneer Asset Investment Limited of Hong Kong asserts that its $1,500,000 loan to the Debtor is secured by approximately 5,226 acres of land on the Big Island of Hawaii, the lien was recorded after the Petition Date and is thus void as a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code. On February 1, 2011, the Debtor filed the Pioneer Adversary to invalidate Pioneer's lien against the property. Accordingly, the Debtor believes that the Pioneer has a General Unsecured Claim of approximately $1,500,000, which is included in the Debtor's estimate of approximately $5,400,000 of total Allowed General Unsecured Claims.

### E. LIABILITIES – ADMINISTRATIVE EXPENSES

As discussed above in section III. B. 4, the Debtor has retained a number of professionals in the case. In addition, the Debtor is responsible for payment of the fees and expenses of counsel for the Committee.

### V.

### DESCRIPTION OF PLAN OF REORGANIZATION

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan that follows constitutes a summary only and should not be relied upon for voting purposes. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtor. If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

## A.    UNCLASSIFIED CLAIMS

Administrative Expense Claims and Priority Tax Claims are not classified.

An "Administrative Expense Claim" is a Claim against the Debtor that is entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses of preserving the estate and operating Debtor's businesses during the Case, any indebtedness or obligations incurred by the Debtor during the pendency of the Case in connection with the rendition of services to the Debtor, and compensation for legal and other professional services and reimbursement of expenses and statutory fees payable to the United States Trustee.

Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

A "Priority Tax Claim" is a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.  The Debtor is not aware of any Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. §  511, over a period ending not later than five years after the date on which such claim was assessed.

In addition, any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court. This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

## B.    CLASSIFIED CLAIMS AND INTERESTS

The Plan divides Creditors and Interest Holders into Classes. Creditors with similar Claims are placed in the same Class. A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class. The following summary of distributions under the Plan to Classified Claims and Interests is subject to, and is qualified in its entirety by reference to, the Plan attached hereto as **Exhibit A**.

### 1.    Class 1 (Other Priority Claims)

Class 1 consists of all Allowed Other Priority Claims. An "Other Priority Claim" is a Claim against the Debtor for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code (other than an Administrative Expense Claim or a Priority Tax Claim). Class 1 is impaired. Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

### 2.    Class 2 (Allowed Secured Claim of BofA)

Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA"). Class 2 is impaired. The Class 2 Claim of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described. Each property of Debtor that is Collateral of BofA shall serve as Collateral for each of BofA's Class 2 Claims. As security for BofA's Class 2 Claims, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

*(a)      Class 2.1 – Building A Loan.*

BofA will have an Allowed Class 2.1 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA's Class 2.1 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building A Note") in the amount of the Allowed Class 2.1 Claim.  The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Building A Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

*(b)      Class 2.2 – Building D Loan.*

BofA will have an Allowed Claim (the "Class 2.2 Claim") in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Petition Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,376,088.93 (the "Building D Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D").

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

BofA's Class 2.2 Claim shall be satisfied by the delivery of two promissory notes –one in the amount of the Building D Value ("Building D Note 1") and one for the difference between the amount of the Allowed Class 2.2 Claim and the Building D Value ("Building D Note 2").

Building D Note 1 shall have the following attributes: (a) it will bear interest at a fixed rate of 4.5% per annum; (b) commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 24th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building D Note 1; (c) commencing on the tenth day of the 25th month after the Effective Date and continuing on the tenth day of each month thereafter until Building D Note 1 has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Building D Note 1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date; (d) to the extent that the loan to value ratio of the loan represented by the Building D Note 1 exceeds 75% of the value of Building D (which, for these purposes shall be valued as of the 24th month following the Effective Date after applying an 8% cap rate to the net operating income of Building D), the Reorganized Debtor shall make a cash paydown of the Building D Note 1 in the amount necessary to reduce such loan to value ratio to 75%; (e) the Reorganized Debtor shall establish on the Effective Date a $405,000 reserve account for tenant improvements associated with future leasing activities related to Building D ("the Building D Reserve") which shall be funded with $205,000 cash derived from the BofA cash collateral account and $200,000 from the Roberts Distributions.  BofA shall retain its liens and security interests in Building D, which shall serve as security for amounts due under the Building D Note 1 only.  Aside from the $200,000 contribution to the Building D Reserve, BofA shall have no claim to any other Roberts Distributions.

The Building D Note 2 shall have the following attributes: (a) it will bear interest at a fixed rate of 3.5% per annum; (b) it will be payable in two installments with the first installment of one half of the principal plus all then accrued interest being due on the tenth day of the 37th month after the Effective Date, and the second installment of all remaining amounts owed thereunder being due

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

on the Maturity Date.  There shall be no security for the Building D Note 2, but it shall be cross-defaulted with the Building D Note 1.

(c)      *Treatment of Bank of America's Cash Collateral Accounts.*

On the Effective Date, Reorganized Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A.  The remainder of the Building A Cash Collateral will be either contributed to the Building D Reserve as described in Article 4.2.2 or retained and used by Reorganized Debtor for its general operating purposes.

On the Effective Date, Reorganized Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D.  The remainder of the Building D Cash Collateral will be either contributed to the Building D Reserve as described in Article 4.2.2 or retained and used by Reorganized Debtor for its general operating purposes.

### 3.      Class 3 (Allowed Secured Claims of Century Bank)

Class 3 consists of the Allowed Secured Claims of Century Bank.  Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the Allowed Class 3 Claim (the "3058 Kinney Loop Note").  The 3058

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

### 4.    Class 4 (Allowed Secured Claim of Pioneer)

Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer"). The Class 4 Secured Claim of Pioneer is disputed. If and to the extent Pioneer is determined by Final Order to have a valid, perfected security interest in or lien upon property of the Debtor, its Claim will be impaired and Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Pioneer to Debtor on or about September 12, 2008 in the original principal amount of $1,500,000 (the "Pioneer Loan').

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Pioneer's Allowed Class 4 Claim shall be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount of the Pioneer Class 4 Claim. The Pioneer Note will bear interest at a fixed rate of 4.5% per annum. The Pioneer Note will be payable by Reorganized Debtor as follows:

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note.

If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order, the Pioneer Claim will be treated as a Class 12 Claim.

## 5. Class 5 (Allowed Secured Claims of Siuslaw Bank)

Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.  Class 5 is impaired.  The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans.  Each loan is separately classified and treated as hereinafter described.

### (a) Class 5.1 – Crescent Village Lots Loan.

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows:

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots Note.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank.

*(b)    Class 5.2 - 2850 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the Allowed Class 5.2 Claim. The 2850

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 2850 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2850 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(c)    *Class 5.3 - 2960 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the Allowed Class 5.3 Claim. The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 2960 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2960 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(d)       Class 5.4 - 3082 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount of the Allowed Class 5.4 Claim. The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Effective Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3082 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3082 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

*(e)    Class 5.5 - 3108 Kinney Loop Loan.*

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount of the Allowed Class 5.5 Claim. The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

the tenth day of each month thereafter until the 3108 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3108 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

(f)    *Class 5.6 - Florence Medical Building Loan.*

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

As Collateral for the Class 5.6 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.6 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Florence Note") in the amount of the Allowed Class 5.6 Claim.  The Florence Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

On the Effective Date, Reorganized Debtor shall pay down the Florence Note to the original principal amount of the Florence Medical Building Loan.  Thereafter, commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Florence Note.  Commencing on the tenth day of the 37th

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

month after the Effective Date and continuing on the tenth day of each month thereafter until the Florence Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Florence Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

*(g)     Class 5.7 – Kinney Loop Lots Loan.*

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

The Kinney Loop Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Kinney Loop Lots Note. At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Kinney Loop Lots Note.

*(h)     Treatment of Siuslaw Bank's Cash Collateral Account.*

On the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay  any past due Property Taxes on the Collateral

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

securing the Class 5 Claims.  Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

### 6.    Class 6 (Summit Bank)

Class 6 consists of the Allowed Secured Claims of Summit Bank.  Class 6 is impaired.  The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

*(a)    Class 6.1 – Road Radio Tower Loan.*

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the Allowed Class 6.1 Claim.  The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

(b)      *Class 6.2 – Guaranty Claim.*

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek, hereinafter referred to as the "Willow Creek Property")**.**

Summit Bank will have an Allowed Class 6.2 claim in the amount owing by Debtor under the Churchill Media Guaranty.  As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value. Summit Bank's Class 6.2 Claim will be satisfied by the delivery of a promissory note in the amount of the Allowed Class 6.2 Claim to Summit Bank (the "Guaranty Note") payable as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum, and will be payable in full on the Maturity Date.  In addition, Reorganized Debtor shall pre-pay a portion of the Guaranty Note through the sale or turnover of the Willow Creek Property as follows.  Reorganized Debtor shall have six (6) months after the Effective Date to enter into a letter of intent for the sale of the Willow Creek Property, provided that any such sale must close within two (2) months after the execution of the letter of intent.  The Willow Creek Property net sale proceeds (after payment of Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses) will be applied to pay down the Guaranty Note.  In the event a sale is not effectuated as set forth above, Reorganized Debtor shall transfer title to the Willow Creek Property to Summit Bank, subject to any and all past due and current Property Taxes, by non-merger deed in

lieu in such form as reasonably agreeable to Reorganized Debtor and Summit Bank, and the amount outstanding under the Guaranty Note shall be reduced by the assessed value of the Willow Creek Property. For purposes of this Article 4.6.2, "assessed value" shall mean the value ascribed to the Willow Creek Property as agreed to by the Reorganized Debtor and Summit Bank and, if no such agreement is reached, such value as determined by the Bankruptcy Court.

All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note. In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

*(c)    Treatment of Summit Bank's Cash Collateral Account.*

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims. Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

**7.    Class 7 (Umpqua Bank)**

Class 7 is impaired. The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described. The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs as allowed by Umpqua Bank's existing loan documents with Debtor as of the Effective Date and allocated in accordance with Article 4.7.15 of the Plan (the "Umpqua Bank Fees"). Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of an Umpqua Bank Loan for events or defaults that occurred before the Effective Date and any such events or

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

defaults shall be deemed waived, released and extinguished, provided that such pre-Effective Date waiver shall not apply to defaults continuing after the Effective Date that materially harm or affect the value of Umpqua Bank's interest in the real property Collateral.  Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral (including assets generated or purchased after the Effective Date but perfected before the Petition Date) with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross-defaulted and cross collateralized.  Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such loan and security documents provided by Debtor to Umpqua Bank as amended, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect. Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan.  Without limiting the foregoing, such amendments will include having the following financial reports provided to Umpqua Bank (all in such form as reasonably required by Umpqua Bank):  45 days after the end of each calendar quarter, internally prepared financial statements (including balance sheet and cash flow statement); 120 days after each year end, internally prepared financial statements; annual financial statements 120 days after year end and copies of corporate tax returns with schedules when filed and copies of non-residential lease agreements after they are signed.  In addition, Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral.  Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

(a)     *Class 7.1 – Westlane Loan.*

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property"). Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property or (c) transfer title to the Westlane Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) reasonable commissions, closing and transaction costs including, without limitation, legal and marketing expenses (collectively, the "Closing Costs"), (b) the applicable Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the Westlane Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.  .

*(b)    Class 7.2 - West 11th Land Loan.*

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under the unpaid principal balance that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property").  Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the applicable Arlie Debt Amount and Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the West 11th Land Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

<em>(c)    Class 7.3 – 2892 Crescent Ave. Loan.</em>

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property and the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Debtor of 2892 Crescent Avenue shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

*(d)     Class 7.4 Woodburn and College Park Loan.*

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred to as 2450 Country Club Road, Marion County (the "Woodburn Property").  Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

The Arlie Debt Amount for the Woodburn Property shall be $845,000 together with 25% of accrued and unpaid interest on the Woodburn and College Park Loan.  Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price for cash at closing in an amount in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the Woodburn Property at a price for cash at closing in an amount in excess of  the Arlie Debt Amount for such property, or (c) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount, Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2 or a Class 7.3 Claim.  Any sale or purchase by Reorganized Debtor of the Woodburn Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount has been or will be paid upon such sale or purchase.

As of the Effective Date, the remainder of the Woodburn and College Park Loan shall have a non-default simple fixed interest rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "College Park Pay Down").  The College Park Pay Down will not include application from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above.  The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate).

*(e)      Class 7.5 – Roseburg Loan #1.*

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property").  Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property.  Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 before the Effective Date shall be deemed waived or released.  Thereafter, the non-default interest will accrue on the Roseburg Loan #1 at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

In accordance with paragraph 4.7.18 of the Plan, Reorganized Debtor may use up to $457,000 of good funds in the Umpqua Cash Collateral Account for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made.

<em>(f)        Class 7.6 – Roseburg Loan #2</em>

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property. Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2.  Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

before the Effective Date shall be deemed waived or released. Thereafter, interest will accrue on the Roseburg Loan #2 at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and applicable Umpqua Bank Fees due on the Maturity Date.

        *(g)*      *Class 7.7 – Oil Can Henry's Loan.*

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property"). Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property. Any default interest , late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan before the Effective Date shall be deemed waived or released. Thereafter, interest will accrue on the Oil Can Henry's Loan at the simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and applicable Umpqua Bank Fees due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

*(h)*     *Class 7.8 – My Coffee Loan.*

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property"). Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the My Coffee Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

*(i)*     *Class 7.9 – Building B Loan.*

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the Building B Loan will accrue at a simple fixed rate of 4.5% per annum. Interest will accrue on the principal amount owing on the Building B Loan at a fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and

including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

*(j)      Class 7.10 – Grumman Hangar Loan.*

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property").  Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest on the Grumman Hangar Loan will accrue at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

*(k)      Class 7.11 – 3032 Kinney Loop Loan.*

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop"). Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the 3032 Kinney Loop Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.11 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

*(l)*      *Class 7.12 - Crescent Village Land Loan.*

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property"). Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the Crescent Village Land Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.12 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

*(m)*      *Refinance of Properties Encumbered by Umpqua Bank's Liens.*

Provided that no Event of Default has occurred that is not timely cured, Reorganized Debtor may satisfy an Arlie Debt Amount through a refinancing of the applicable property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount and Umpqua Bank Fees associated with such

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

property. To the extent that such refinancing is in excess of the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) applicable Umpqua Bank Fees, the net excess financing proceeds shall be distributed in accordance with paragraph 4.7.14 of this Plan.

> *(n)    Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.*

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, and provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may from time to time sell a property for cash at closing free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and Umpqua Bank Fees associated with such property has been paid or will be paid upon such sale. To the extent that the sale proceeds exceed the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "Arlie Excess Proceeds") will be divided as follows: For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of the Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and one-third (1/3) of the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of its liens related to a portion of each parcel that serves as Collateral for Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Amount and the Umpqua Bank Fees associated with such specific portion of parcel (on a pro rata basis determined in light of the comparative value of the portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

*(o)    Payment of Umpqua Bank Fees.*

Unless otherwise provided by the Plan, upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportionate share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

*(p)    Property Taxes.*

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

*(q)    Settlement of Claims by and Among Debtor, Reorganized
Debtor and Umpqua Bank.*

Upon confirmation of this Plan and effective as of the Effective Date, (a) the Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor, (b) Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and employees for any and all actions (or in-actions) that occurred before the Effective Date, (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan, and (d) subject to the provisions of paragraph 4.7 hereof, Umpqua Bank will not make a demand on the Debtor and the guarantors for defaults that occurred before the Effective Date.

Pachulski Stang Ziehl & Jones LLP

Attorneys At Law

*(r)*     *Treatment of Umpqua Bank's Cash Collateral Account.*

With respect to the College Park Sale, the balance of good funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, provided that (i) Umpqua Bank shall have a security interest in such Roseburg improvements, (ii) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (iii) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank, which will be subject to Umpqua Bank's security interest, to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

*(s)*     *Use of Rents Generated From Umpqua Properties.*

Commencing on the Effective Date, all rents generated from the properties securing the Umpqua Bank loans may be used by the Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

**8.     Class 8 (Washington Federal Savings)**

Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal").  Class 8 is impaired.  The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

*(a)      Class 8.1 –Lord Byron Loan.*

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan"). The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral"). The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date as allowed by the Lord Byron Loan documents (the "Washington Claim Amount"). Washington Federal shall have a Secured Class 8 Claim in the aggregate amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

The Washington Federal Secured Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, as follows: the 2909 Lord Byron Note in the principal amount of $279,600, the 2915 Lord Byron Note in the principal amount of $296,000, the 2931 Lord Byron Note in the principal amount of $327,950, the 2977 Lord Byron Note in the principal amount of $269,350, and the 2993 Lord Byron Note in the principal amount of $327,100 (individually, a "Lord Byron Note" and collectively, the "Lord Byron Notes"). Each Lord Byron Note will bear simple interest at a fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date.  Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property.  Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal.

(b)    *Treatment of Washington Federal's Cash Collateral Account.*

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 Claim.   Any amounts remaining in the cash collateral bank account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

(c)    *Treatment of the Washington Federal Unsecured Claim.*

The Washington Federal Unsecured Claim shall bear simple interest at the fixed rate of 3.5% per annum and shall be payable in full on the Maturity Date.

### 9.    Class 9 (BLM Secured Creditors)

Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.  The Class 9 Claims are secured by a deed of trust on Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

(a)    *Class 9.1 – Francis Cline.*

Francis Cline will have an Allowed Class 9.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Cline as of the Effective Date under

that certain loan made by Ms. Cline to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Cline Loan"), which loan is secured by a deed of trust on BLM Office Building. The Class 9.1 Claim shall be treated as follows.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of all obligations owing under the Cline Loan. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested.

(b)        Class 9.2 – William Greenhoot.

William Greenhoot will have an Allowed Class 9.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Mr. Greenhoot as of the Effective Date under that certain loan made by Mr. Greenhoot to Debtor on or about on or about November 4, 2008 in the original principal amount of $347,065 (the "Greenhoot Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Greenhoot Loan and the Class 9.2 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

1    *(c)    Class 9.3 – McKillop II Limited Partnership.*

2    The McKillop II Limited Partnership ("McKillop") will have an Allowed Class 9.3 Claim in

3    the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the

4    Partnership as of the Effective Date under those certain loans made by Herbert McKillop to Debtor

5    on or about on or about November 4, 2008 in the original principal amounts of $120,000 and

6    $1,453,482 (collectively, the "McKillop Loan"), which loan is secured by a deed of trust on the

7    BLM Office Building.

8    On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the

9    BLM Office Building and perform maintenance on the BLM Office Building at a cost to the

10   Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to

11   the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such

12   form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete

13   satisfaction of the all obligations owing under the McKillop Loan and the Class 9.3 Claim.

14   Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized

15   Debtor will market the BLM Office Building for sale and provide tenant improvement and any

16   necessary rezoning services, if requested, upon such terms as may be agreed to by and between the

17   BLM Secured Creditors and the Reorganized Debtor.

18   *(d)    Class 9.4 – Karen Merwin.*

19   Karen Merwin will have an Allowed Class 9.4 Claim in the amount of all principal, accrued

20   non-default interest, and reasonable fees and costs owing to Ms. Merwin as of the Effective Date

21   under that certain loan made by Ms. Merwin to Debtor on or about on or about November 4, 2008 in

22   the original principal amount of $694,130 (the "Merwin Loan"), which loan is secured by a deed of

23   trust on the BLM Office Building.

24   On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes on the

25   BLM Office Building and perform maintenance on the BLM Office Building at a cost to the

26   Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to

27   the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such

28   form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete

satisfaction of the all obligations owing under the Merwin Loan and the Class 9.4 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(e)      Class 9.5 – Alice Smith.*

Alice Smith will have an Allowed Class 9.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Smith as of the Effective Date under that certain loan made by Ms. Smith to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Smith Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Smith Loan and the Class 9.5 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

*(f)      Class 9.6 – Linda Trickey.*

Linda Trickey will have an Allowed Class 9.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Trickey as of the Effective Date under that certain loan made by Ms. Trickey to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Trickey Loan"), which loan is secured by a deed of trust on the BLM Office Building.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Trickey Loan and the Class 9.6 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

### 10.    Class 10 (Property Tax Lien Claims)

Class 10 consists of all Allowed Property Tax Lien Claims. Class 10 is impaired. Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

### 11.    Class 11 (Small Unsecured Claims)

Class 11 consists of all Allowed Small Unsecured Claims. Class 11 is impaired. Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

### 12.    Class 12 (General Unsecured Claims).

Class 12 consists of all Allowed General Unsecured Claims. Class 12 is impaired. Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum. No pre petition or post petition default interest or post petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available. At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

such General Unsecured Claim. Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest. All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

### 13. Class 13 (Interests)

Class 13 consists of all Interests. Class 13 is unimpaired. Existing Interests in Debtor will be preserved.

### C. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code gives the Debtor the right, after commencement of its Chapter 11 Case, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Generally, an "executory contract" is a contract under which material performance (other than the payment of money) is still due by each party. The Plan provides that except as may otherwise be provided in the Plan Supplement, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date. The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for or subject to other Court Order or pending motion. Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date. The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment.

Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner. Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

guarantors of such obligations. Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

### D.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

Article XI of the Plan provides lists of conditions that must occur in order for the Plan to be confirmed and for the Plan become effective. The following are conditions precedent to the confirmation of this Plan: (1) the Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor; (2) the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor; and (3) A written settlement agreement shall have been executed by and among the Debtor, the guarantors of the Debtor's obligations to Umpqua Bank (the "Guarantors") and Umpqua Bank containing the following release terms and agreements not to make a demand, all of which shall be effective as of the Effective Dale: (a) a waiver and release of all claims against Umpqua Bank and its officers and employees by Debtor and the Guarantors; (b) an acknowledgement by the Debtor and the Guarantors that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable; and (c) an agreement by Umpqua Bank that it will not make a demand on the Debtor or the Guarantors for defaults that occurred before the Effective Date.

The following are conditions precedent to the occurrence of the Effective Date: (1) the Confirmation Date shall have occurred; (2) the Confirmation Order shall have become a Final Order; (3) no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending; and (4) the Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

### E.    SOURCES OF FUNDING FOR THE PLAN

The Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, a new loan in the amount of $615,000 to be made on the Effective Date to Reorganized Debtor by Siuslaw Bank, the net operating income generated from the Reorganized Debtor's continued business operations and from the future sale or refinancing of assets of the Reorganized Debtor from time to time. A core aspect of the Debtor's business is marketing

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

and selling real property acquired by the Debtor from time to time.  The Reorganized Debtor will continue to market and sell its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan.  Such sales may occur without further order of the Bankruptcy Court.

Without limiting the preceding and except as set forth with respect to a particular Creditor under the Plan, the Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral the Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral.  Except as set forth with respect to a particular Creditor under the Plan, any excess net proceeds from the sale or refinancing of such Collateral shall be paid to the Reorganized Debtor (or as otherwise directed by the Reorganized Debtor) and may be used by the Reorganized Debtor to fund the Reorganized Debtor's continued business operations and to fund payments required under this Plan.  Such sales or refinancing may occur without further order of the Bankruptcy Court.

In addition to marketing and selling its real property assets in the ordinary course of its business, the Reorganized Debtor may market and sell or refinance its non-core assets on an accelerated basis as is necessary or appropriate to ensure that the Reorganized Debtor will have sufficient funds to make all payments required of the Debtor under this Plan.  Without limiting the preceding, if at any time the Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, the Reorganized Debtor will before such payment is due refinance or sell at public auction one or more of the Reorganized Debtor's non-core assets to raise the funds necessary to make the required Plan payment.  Such auctions and sales may occur without further order of the Bankruptcy Court.

### F.    EFFECT OF CONFIRMATION

#### 1.    Discharge

The treatment of, and consideration received by, holders of Allowed Claims pursuant to the Plan will be in full satisfaction, release and discharge of their respective Claims against the Debtor. Except as otherwise expressly provided in the Plan, the confirmation of the Plan shall, provided that

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

the Effective Date shall have occurred, discharge all Claims to the fullest extent authorized or provided for by the Bankruptcy Code, including, without limitation, to the extent authorized or provided for by Sections 524 and 1141 thereof.

### 2. Revesting, Operation of Business

Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all Arlie Escrow Deposits not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

### 3. Injunction

If the Plan is confirmed, the effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.

### 4. Limitation of Liability and Exculpation

The Debtor and the Reorganized Debtor and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

The Debtor, the Reorganized Debtor and each of their respective Agents, shall not be liable to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Bankruptcy Case or the negotiation, formulation, development, proposal,

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

disclosure, confirmation or implementation of the Plan and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan, provided, however, that the foregoing provisions shall have no affect on the Tonkon Claims or the liabilities of any person that resulted from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted negligence, breach of fiduciary duty or willful misconduct

**5.     Modification of the Plan; Revocation or Withdrawal of the Plan**

The Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order.  After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

**6.     Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:  (a) to resolve controversies and disputes regarding any Avoidance Action, (b) to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests, (c) to determine requests for payment of Claims entitled to priority under Section 507(a) of

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed in this Bankruptcy Case, (d) to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code, (e) to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan, (f) to resolve controversies and disputes regarding the interpretation of this Plan, (g) to implement the provisions of this Plan and enter orders in aid of confirmation, (h) to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and (i) to enter a final decree closing this Bankruptcy Case.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

### 7.  United States Trustee Fees

The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted or dismissed.  After confirmation, the Reorganized Debtor shall serve on the United States Trustee a quarterly financial report for each month, or portion thereof, that the case remains open.  The quarterly financial report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the Plan.

## VI.

## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy Court must determine, with respect to such Class, that each holder of a Claim or Interest will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests Test."

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

The Debtor believes the Plan is in the best interest of creditors because the Debtor's Plan provides for the payment in full to all of its creditors with interest over a relatively short period of time. Consequently, the Plan provides each dissenting or non-voting member of each impaired Class with a recovery not less than the recovery such member would receive if the Debtor was liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 Trustee. Moreover, If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made on account of Allowed Claims than those provided for in the Plan because (i) the Debtor's assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be involved in the appointment and activities of a trustee, (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations; and (iv) the liquidation of the Debtor's assets would be undertaken by personnel lacking the skill and experience of the Debtor's personnel, to say nothing of the lack of familiarity with the specific parcels to be sold.

## VII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

CIRCULAR 230 DISCLAIMER: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

WAS WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.

### A.    GENERAL TAX CONSIDERATIONS

The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan.  This discussion is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of an Allowed Claim or any Interest holder.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.  This discussion does not address aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim subject to special treatment under federal income tax laws (such as foreign taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans, and other tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.  Furthermore, this summary does not address federal taxes other than income taxes.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial or administrative changes or interpretations enacted or promulgated could alter or modify the discussion set forth below with respect to the federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.  No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  This discussion is not binding on the IRS or the courts and no assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.  No representations or assurances are being made to the holders of Allowed Claims or the Interest holders with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

upon the individual circumstances pertaining to a particular holder of an Allowed Claim or an Interest holder.  Each holder of an Allowed Claim or Interest is strongly urged to consult with its own tax advisors regarding the federal, state, local, foreign, and other tax consequences of the Plan.

Any discussion of federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any federal tax penalties that may be imposed on such person.  Each holder of an Allowed Claim and each Interest holder should seek advice based on its particular circumstances from an independent tax advisor.

### B. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR

The Debtor is a corporation that has elected to be treated as an S corporation (as defined in IRC Section 1361) for federal income tax purposes.  As an S corporation, the Debtor is not itself generally subject to federal income tax.  Instead, each Interest holder, as a shareholder of the Debtor, is required to include its pro rata share of the income, gain, loss, and deduction recognized by the Debtor in the Interest holder's own income tax returns.  Accordingly, since it is unlikely there will be any direct federal income tax liability at the Debtor level under the Plan, it appears there are no federal income tax consequences to the Debtor under the Plan.

Under the IRC, a taxpayer generally will recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) satisfied, over (b) the sum of the amount of cash paid and the fair market value of any new consideration given in satisfaction of the indebtedness.  However, IRC Section 108(a) provides an exception to this income recognition rule (the "Bankruptcy Exception") where a taxpayer is in bankruptcy and the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court.  In the case of an entity taxable as a corporation, eligibility for the Bankruptcy Exception is determined at the corporate level.  If the Bankruptcy Exception applies (with the effect

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

that the taxpayer excludes its COD Income from its gross income), the taxpayer is required, under IRC Section 108(b), to reduce certain of its tax attributes by the amount of COD Income excluded from gross income pursuant to the Bankruptcy Exception. The reduction includes any net operating loss for the taxable year of the discharge (which, with respect to an S corporation, includes certain losses that have been blocked at the shareholder level by the basis limitation rule), net operating loss carryovers from prior years, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and foreign tax credit tax carryforwards. Except for the net operating loss and basis reductions, these attribute reductions generally have limited application to S corporations.

Whether the Debtor will realize any COD Income on the debt restructuring contemplated by the Plan depends on whether the restructuring of any debt constitutes a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the corresponding Treasury Regulations. For a deemed taxable exchange to occur with respect to a debt, the modification to the debt must be "significant" as such term is defined in the applicable Treasury Regulations. If the modification to a debt obligation of the Debtor is "significant," the Debtor will realize COD Income in an amount equal to the amount, if any, by which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted issue price" of the old debt. Accordingly, if the restructuring of any debt of the Debtor is treated as a deemed taxable exchange (even though each modified debt will have a principal amount equal to its corresponding old debt), the Debtor will realize COD Income if such modified debt does not bear "adequate stated interest." The realization of COD Income by the Debtor will result in tax attribute reductions because of its exclusion under the Bankruptcy Exception.

## C.    FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF AN ALLOWED CLAIM

Under the Plan, the debt owed by the Debtor to particular holders of Allowed Claims will be restructured. If the modification to the debt is "significant," as such term is defined in the applicable Treasury Regulations, the restructured debt will be treated as received by such holder in a deemed taxable exchange of the underlying debt pursuant to IRC Section 1001.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

With respect to a deemed taxable exchange, a holder of an Allowed Claim will generally recognize gain or loss in connection with the exchange if the holder's adjusted tax basis in the old debt does not equal the issue price of the modified debt. If the issue price of the modified debt is greater than the holder's adjusted tax basis in the debt, the holder will recognize taxable income as a result of the deemed exchange. Since each modified debt will have a principal amount equal to its corresponding old debt, a holder of an Allowed Claim generally should not recognize any gain or loss on a deemed taxable exchange of such debt unless either (1) the modified debt does not have adequate stated interest or (2) the tax basis in the debt is different from the issue price of the modified debt. Any gain or loss recognized will be long-term or short-term capital gain or loss, or ordinary income or loss, depending upon factors specific to each holder of an Allowed Claim, including but not limited to: (1) whether the Claim (or a portion thereof) is attributable to principal or interest, (2) the origin of the Claim, (3) whether the holder of the Claim reports income on the accrual or cash basis method, and (4) whether the holder of the Claim has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The principal amount of certain restructured debt may include accrued but unpaid interest. A holder of an Allowed Claim not previously required to include in its taxable income any accrued but unpaid interest on such Claim may be treated as receiving taxable interest to the extent the modified debt received is allocable to such accrued but unpaid interest.

### D.    CONSEQUENCES TO THE INTEREST HOLDERS

The Interests are not restructured in the Plan. Accordingly, except for any loss attributable to a reduction at the Interest holder level (as discussed above), the Plan has no material federal income tax consequences to the Interest holders.

### E.    INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, under certain circumstances, a holder of a Claim may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

1  correct United States taxpayer identification number and certifies under penalty of perjury that the

2  holder is a United States person, the taxpayer identification number is correct, and that the taxpayer

3  is not subject to backup withholding because of a failure to report all dividend and interest income.

4  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules

5  may be credited against the holder's United States federal income tax liability, and the holder may

6  obtain a refund of any excess amounts withheld under the backup withholding rules by filing an

7  appropriate claim for refund with the IRS.

8  **F.**      **IMPORTANCE OF OBTAINING PROFESSIONAL TAX**

9  **ASSISTANCE**

10  THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF

11  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A

12  SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE

13  ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX

14  ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

15  VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE INTEREST

16  HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH HOLDER OF AN

17  ALLOWED CLAIM AND THE INTEREST HOLDER IS URGED TO CONSULT ITS TAX

18  ADVISOR ABOUT THE FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN,

19  INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

20  **VIII.**

21  **ACCEPTANCE AND CONFIRMATION OF THE PLAN**

22  **A.**      **CONFIRMATION HEARING**

23  The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on April 4, 2011

24  at 10:00 a.m..  The hearing will be held at the United States Bankruptcy Court for the District of

25  Oregon, 405 E. 8th Avenue, Courtroom #6, Eugene, Oregon 97401 before the Honorable Frank R.

26  Alley, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court will consider whether

27  the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible

28  and whether it is in the best interest of creditors and Interest holders of the Debtor.  The Debtor will

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

submit a report to the Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon. Any objection to confirmation of the Plan must be timely filed as stated above.

## B.    REQUIREMENTS OF CONFIRMATION

At the hearing on confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of the Bankruptcy Code have been satisfied. If all of the provisions of Section 1129 are met, then the Bankruptcy Court may enter an order confirming the Plan. The Debtor believes the Plan satisfies all of the requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan has been proposed and is made in good faith.

## C.    FEASIBILITY

The Debtor believes that confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or a need for a further financial reorganization of the Debtor. In addition to the pending sale process for the West Hilo Tree Farm (which is expected to generate sale proceeds to help fund confirmation expenses and Effective Date payments, the Debtor has identified and is marketing for sale most of its non-core assets (see **Exhibit B**) to ensure that the Debtor will have sufficient funds to continue its operations and to fund required Plan payments). The results of the Debtors' operations for the years 2008 through 2010 are appended hereto as **Exhibit C**. The projections of the Debtor's post-confirmation business and sales, attached hereto as **Exhibit D**, show sufficient earnings and cash flow from operations and sales or refinancing of real property to support and meet the ongoing financial needs of the Debtor and the Plan. The projections indicate that the Plan as proposed by the Debtor is feasible and that the Debtor will be financially viable after confirmation of the Plan.

## D.    RISK FACTORS

There are a number of risks associated with the Debtor's proposed Plan. Each creditor should carefully consider those risks in evaluating its vote on the Debtor's Plan. All of the risks associated with the Debtor's Plan are too numerous to identify, however, a few of those risks are set forth below.

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

### 1.    General Financial Market Conditions

The disruption of numerous major financial institutions and the resulting crisis in the financial markets has rippled through the economy, impacting the real estate industry in particular. It is possible that this financial market may continue to make it very difficult for qualified buyers or lessees to obtain affordable financing, which could have a significant adverse impact on the Debtor.

### 2.    Projected Financial Results

The Debtor's projected financial results reflect management's best estimate of the Debtor's future financial performance based on currently known facts and hypothetical assumptions about, among other matters, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, real estate, and general business and economic conditions. Many of these factors are beyond the Debtor's control. As a consequence, the Debtor's actual financial results may differ significantly from the Debtor's projections.

### E.    CRAM DOWN

As discussed previously, a court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the cram down requirements set forth in Section 1129(b) of the Bankruptcy Code. In the event that any impaired Class of Claims does not accept the Plan, the Debtor hereby requests that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise permit the Debtor to modify the Plan.

### F.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed, the Debtor or another party in interest may attempt to formulate or propose a different plan or plans of reorganization. Such plans might involve a reorganization and continuation of the Debtor's business, a sale of the Debtor's business as a going concern, an orderly liquidation of the Debtor's assets or any combination thereof. If no Plan of Reorganization is determined by the Bankruptcy Court to be confirmable, the Chapter 11 case may be converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.

In a liquidation, a Chapter 7 Trustee would be appointed with the purpose of liquidating the assets of the Debtor. Typically in a liquidation, assets are sold for less than their going concern

value and, accordingly, the return to creditors and Interest holders is generally less than the return in a reorganization, which derives the value to be distributed in a Plan from the business as a going concern.  Proceeds from liquidation would be distributed to creditors and Interest holders of the Debtor in accordance with the priorities set forth in the Bankruptcy Code.  Given the nature of Debtor's assets, the Debtor believes that it would be impossible for a trustee to maximize the value of the assets.  The Debtor further believes that a trustee would require two to three years to market, sell and close sales for all of the Debtor's properties.  Therefore, it is unlikely that distributions would be made to unsecured creditors in less than three years and distributions could take five years.

As the Plan is a full payment plan, the Debtor believes there is no currently available alternative that would offer holders of Claims and Interests in the Debtor better treatment or a greater return than the Plan offers such holders of Claims and Interests, and urges all parties entitled to vote on the Plan to vote to accept the Plan.

## IX.

## RECOMMENDATION AND CONCLUSION

Based on the foregoing, the Debtor believes that the Plan is in the best interests of Creditors and urges Creditors to vote to accept the Plan.  After reviewing all the information and making an informed decision, please vote by using the enclosed ballot.


DATED this 14th day of February, 2011.

Respectfully submitted,
ARLIE & COMPANY

By   */s/ Scott Diehl*
     Scott Diehl, Chief Financial Officer

Presented by:

PACHULSKI STANG ZIEHL & JONES LLP
By   */s/ John D. Fiero*
John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
     -and-
BALL JANIK LLP
David W. Criswell (OSB No. 925930)
Brad T. Summers (OSB No. 91111)

PACHULSKI STANG ZIEHL & JONES LLP

ATTORNEYS AT LAW

<table>
<tr><td>Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number<br>John D. Fiero (CA Bar #136557)<br>Linda F. Cantor (CA Bar #153762)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>150 California Street, 15th Floor<br>San Francisco, California 94111-4500<br>Phone: (310) 277-6910; Fax: (310) 201-0760<br>☒ Attorney for: Arlie & Company</td><td>FOR COURT USE ONLY</td></tr>
</table>

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| In re:<br>ARLIE & COMPANY,<br><br>                                        Debtor(s). | CASE NO.:  10-60244-aer11<br>CHAPTER:  11<br>ADV. NO.: |
|---|---|

**ELECTRONIC FILING DECLARATION**
**(CORPORATION/PARTNERSHIP)**

☐ Petition, statement of affairs, schedules or lists        Date Filed: February 14, 2011
☐ Amendments to the petition, statement of affairs, schedules or lists   Date Filed:
☒ Other: Debtor's Second Amended Disclosure Statement (February 14, 2011)   Date Filed:

**PART I - DECLARATION OF AUTHORIZED SIGNATORY OF DEBTOR OR OTHER PARTY**

I, the undersigned, hereby declare under penalty of perjury that: (1) I have been authorized by the Debtor or other party on whose behalf the above-referenced document is being filed (Filing Party) to sign and to file, on behalf of the Filing Party, the above-referenced document being filed electronically (Filed Document); (2) I have read and understand the Filed Document; (3) the information provided in the Filed Document is true, correct and complete; (4) the "/s/," followed by my name, on the signature lines for the Filing Party in the Filed Document serves as my signature on behalf of the Filing Party and denotes the making of such declarations, requests, statements, verifications and certifications by me and by the Filing Party to the same extent and effect as my actual signature on such signature lines; (5) I have actually signed a true and correct hard copy of the Filed Document in such places on behalf of the Filing Party and provided the executed hard copy of the Filed Document to the Filing Party's attorney; and (6) I, on behalf of the Filing Party, have authorized the Filing Party's attorney to file the electronic version of the Filed Document and this Declaration with the United States Bankruptcy Court for the Central District of California.

_____        February 14, 2011
Signature of Authorized Signatory of Filing Party    Date

Scott Diehl
Printed Name of Authorized Signatory of Filing Party

Chief Financial Officer
Title of Authorized Signatory of Filing Party

**PART II - DECLARATION OF ATTORNEY FOR FILING PARTY**

I, the undersigned Attorney for the Filing Party, hereby declare under penalty of perjury that: (1) the "/s/," followed by my name, on the signature lines for the Attorney for the Filing Party in the Filed Document serves as my signature and denotes the making of such declarations, requests, statements, verifications and certifications to the same extent and effect as my actual signature on such signature lines; (2) an authorized signatory of the Filing Party signed the Declaration of Authorized Signatory of Debtor or Other Party before I electronically submitted the Filed Document for filing with the United States Bankruptcy Court for the Central District of California; (3) I have actually signed a true and correct hard copy of the Filed Document in the locations that are indicated by "/s/," followed by my name, and have obtained the signature of the authorized signatory of the Filing Party in the locations that are indicated by "/s/," followed by the name of the Filing Party's authorized signatory, on the true and correct hard copy of the Filed Document; (4) I shall maintain the executed originals of this Declaration, the Declaration of Authorized Signatory of Debtor or Other Party, and the Filed Document for a period of five years after the closing of the case in which they are filed; and (5) I shall make the executed originals of this Declaration, the Declaration of Authorized Signatory of Debtor or Other Party, and the Filed Document available for review upon request of the Court or other parties.

_____        February 14, 2011
Signature of Attorney for Filing Party    Date

Linda F. Cantor
Printed Name of Attorney for Filing Party

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

November 2008
68700-001\DOCS_LA:188588.1

# EXHIBIT A

John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California  94111-4500
Telephone:  415/263-7000
Facsimile:  415/263-7010
Email: jfiero@pszjlaw.com
        lcantor@pszjlaw.com
        tkapur@pszjlaw.com

and

Brad T. Summers (OSB No. 911116)
David W. Criswell (OSB No. 925930)
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone:  503/228-2525
Facsimile:  503/295-1058
Email: tsummers@balljanik.com
        dcriswell@balljanik.com

Attorneys for Debtor Arlie & Company

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| In re | Case No. 10-60244-aer11 |
| **ARLIE & COMPANY,** | Chapter 11 |
| Debtor. | **DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (FEBRUARY 14, 2011)** |
| | **Hearing** |
| | Date:     April 4, 2011 |
| | Time:     10:00 a.m. |
| | Place:    United States Bankruptcy Court |
| |         405 E. 8th Avenue |
| |         Courtroom #6 |
| |         Eugene, Oregon 97401 |
| | Judge:    Honorable Frank R. Alley |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**TABLE OF CONTENTS**

**Page**

**ARTICLE I DEFINITIONS** ................................................................................ 1

1.1   "Administrative Expense Claim". ....................................................... 1

1.2   "Agent". ............................................................................................... 1

1.3   "Allowed". ........................................................................................... 1

1.4   "Avoidance Actions". .......................................................................... 2

1.5   "Bankruptcy Case". ............................................................................ 2

1.6   "Bankruptcy Code". ............................................................................ 2

1.7   "Bankruptcy Court". ........................................................................... 2

1.8   "Bankruptcy Rules". ........................................................................... 2

1.9   "BLM Secured Creditors" ................................................................... 2

1.10  "Building D Value" ............................................................................. 2

1.11  "Business Day". .................................................................................. 3

1.12  "Cash" .................................................................................................. 3

1.13  "Claim". ............................................................................................... 3

1.14  "Class". ................................................................................................ 3

1.15  "Collateral". ........................................................................................ 3

1.16  "Confirmation Date". .......................................................................... 3

1.17  "Confirmation Hearing". .................................................................... 3

1.18  "Confirmation Order". ........................................................................ 3

1.19  "Creditor". ........................................................................................... 3

1.20  "Debtor". ............................................................................................. 3

1.21  "Deficiency Claim" ............................................................................. 3

1.22  "Disclosure Statement". ..................................................................... 4

1.23  "Disputed Claim". ............................................................................... 4

1.24  "Effective Date". ................................................................................. 4

1.25  "Entity" ................................................................................................ 4

1.26  "Excess Sale Proceeds" ...................................................................... 4

1.27  "Filed". ................................................................................................ 4

1.28  "Final Order". ...................................................................................... 4

1.29  "General Unsecured Claim". ............................................................... 4

1.30  "Interests". .......................................................................................... 5

1.31  "Lord Byron Collateral Value" .......................................................... 5

1.32  "Maturity Date". ................................................................................. 5

1.33  "Non-core assets". .............................................................................. 5

| | | |
|---|---|---|
| 1.34 | "Other Priority Claim". | 5 |
| 1.35 | "Petition Date". | 5 |
| 1.36 | "Plan". | 5 |
| 1.37 | "Plan Supplement". | 5 |
| 1.38 | "Priority Tax Claim". | 5 |
| 1.39 | "Pro Rata". | 5 |
| 1.40 | "Property Tax". | 5 |
| 1.41 | "Property Tax Lien Claim". | 6 |
| 1.42 | "Rejection Claim". | 6 |
| 1.43 | "Reorganized Debtor". | 6 |
| 1.44 | "Roberts Distributions". | 6 |
| 1.45 | "Schedules" | 6 |
| 1.46 | "Scheduled Amounts". | 6 |
| 1.47 | "Secured Claim" | 6 |
| 1.48 | "Small Unsecured Claim". | 6 |
| 1.49 | "Tonkon Claims". | 6 |
| 1.50 | "Unsecured Claim". | 6 |

**ARTICLE II UNCLASSIFIED CLAIMS** ... 7

| | | |
|---|---|---|
| 2.1 | Administrative Expense Claims. | 7 |
| 2.2 | Priority Tax Claims. | 7 |
| 2.3 | Bankruptcy Fees. | 7 |

**ARTICLE III CLASSIFICATION** ... 8

| | | |
|---|---|---|
| 3.1 | Class 1 (Other Priority Claims). | 8 |
| 3.2 | Class 2 (BofA).. | 8 |
| 3.3 | Class 3 (Century Bank). | 8 |
| 3.4 | Class 4 (Pioneer).. | 8 |
| 3.5 | Class 5 (Siuslaw Bank). | 8 |
| 3.6 | Class 6 (Summit Bank). | 8 |
| 3.7 | Class 7 (Umpqua Bank). | 8 |
| 3.8 | Class 8 (Washington Federal Savings).. | 8 |
| 3.9 | Class 9 (BLM Secured Creditors). | 8 |
| 3.10 | Class 10 (Property Tax Lien Claims). | 8 |
| 3.11 | Class 11 (Small Unsecured Claims). | 8 |
| 3.12 | Class 12 (General Unsecured Claims). | 9 |
| 3.13 | Class 13 (Interests). | 9 |

**ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** ... 9

| | | |
|---|---|---|
| 4.1 | Class 1 (Other Priority Claims). | 9 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---|
| 4.2 | Class 2 (Allowed Secured Claims of BofA).. | | 9 |
| 4.3 | Class 3 (Allowed Secured Claim of Century Bank) | | 12 |
| 4.4 | Class 4 (Allowed Secured Claim of Pioneer).. | | 12 |
| 4.5 | Class 5 (Allowed Secured Claims of Siuslaw Bank) | | 13 |
| 4.6 | Class 6 (Summit Bank).. | | 20 |
| 4.7 | Class 7 (Umpqua Bank).. | | 23 |
| 4.8 | Class 8 (Washington Federal Savings). | | 37 |
| 4.9 | Class 9 (BLM Secured Creditors). | | 39 |
| 4.10 | Class 10 (Property Tax Lien Claims) | | 42 |
| 4.11 | Class 11 (Small Unsecured Claims).. | | 42 |
| 4.12 | Class 12 (General Unsecured Claims).. | | 43 |
| 4.13 | Class 13 (Interests) | | 43 |

**ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS** ................ 43

| | | | |
|---|---|---|---|
| 5.1 | Distributions by Debtor. | | 43 |
| 5.2 | Disputed Claims; Objections to Claims | | 43 |
| 5.3 | Subsequent Allowance of Disputed Claims. | | 44 |
| 5.4 | Unclaimed Distributions. | | 44 |

**ARTICLE VI MEANS FOR EXECUTION OF PLAN** ................ 44

| | | | |
|---|---|---|---|
| 6.1 | Continued Business Operations. | | 44 |
| 6.2 | Siuslaw Loan. | | 44 |
| 6.3 | Operating Revenues.. | | 45 |
| 6.4 | Sales or Refinancing of Real Property Collateral.. | | 45 |
| 6.5 | Marketing and Sales of Non-Core Assets. | | 46 |
| 6.6 | Setoffs. | | 46 |
| 6.7 | Corporate Action. | | 46 |
| 6.8 | Saturday, Sunday, or Legal Holiday. | | 46 |
| 6.9 | Deposits. | | 47 |
| 6.10 | Event of Default; Remedy.. | | 47 |
| 6.11 | Continuation of Unsecured Creditors' Committee. | | 47 |

**ARTICLE VII EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........ 48

| | | | |
|---|---|---|---|
| 7.1 | Assumption and Rejection.. | | 48 |
| 7.2 | Assignment. | | 49 |
| 7.3 | Rejection Claims. | | 49 |
| 7.4 | Compensation and Benefit Programs. | | 49 |

**ARTICLE VIII EFFECT OF CONFIRMATION** ................ 49

| | | | |
|---|---|---|---|
| 8.1 | Binding Effect. | | 49 |
| 8.2 | Discharge and Permanent Injunction | | 50 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

8.3    Limitation of Liability.................................................................................. 51

8.4    Exculpation.................................................................................................. 51

**ARTICLE IX RETENTION OF JURISDICTION** ................................................ 51

9.1    Jurisdiction of the Bankruptcy Court.......................................................... 51

9.2    Failure of Bankruptcy Court to Exercise Jurisdiction................................. 52

**ARTICLE X ADMINISTRATIVE PROVISIONS**................................................. 52

10.1    Modification or Withdrawal of the Plan...................................................... 52

10.2    Revocation or Withdrawal of Plan.............................................................. 52

10.3    Modification of Payment Terms.................................................................. 53

10.4    Nonconsensual Confirmation....................................................................... 53

10.5    Compromise of Controversies..................................................................... 53

10.6    Final Decree................................................................................................. 53

**ARTICLE XI CONDITIONS PRECEDENT TO CONFIRMATION** ...................... 53

**AND CONSUMMATION OF THE PLAN** ............................................................. 53

11.1    Conditions to Confirmation. ........................................................................ 53

11.2    Conditions to Effective Date....................................................................... 54

11.3    Waiver of Conditions.................................................................................. 54

**ARTICLE XII MISCELLANEOUS PROVISIONS** ............................................... 54

12.1    Revesting..................................................................................................... 54

12.2    Rights of Action.......................................................................................... 55

12.3    Governing Law............................................................................................ 55

12.4    Withholding and Reporting Requirements. ................................................. 55

12.5    Time............................................................................................................ 56

12.6    Section 1146(c) Exemption......................................................................... 56

12.7    Severability................................................................................................. 56

12.8    Successors and Assigns............................................................................... 56

12.9    Notices to Claim and Interest Holders........................................................ 57

12.10    Post Effective-Date Notices........................................................................ 57

12.11    Retiree Benefits. ......................................................................................... 57

12.12    Provisions Enforceable. ............................................................................... 57

12.13    Recordable Order......................................................................................... 57

12.14    Plan Controls............................................................................................... 57

12.15    Delivery of Promissory Notes..................................................................... 58

12.16    Effectuating Documents and Further Transactions..................................... 58

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Arlie & Company, as debtor and debtor-in-possession ("Debtor"), proposes the following Plan of Reorganization (the "Plan") pursuant to Section 1121(a) of Title 11 of the United States Code.

The Plan provides for the repayment in full of Debtor's obligations to its Creditors.  A Disclosure Statement is enclosed herewith to assist you in understanding the Plan and making an informed judgment concerning its terms.

## ARTICLE I

## DEFINITIONS

Definitions of certain terms used in the Plan are set forth below.  Other terms are defined in the text of the Plan or in the text of the Disclosure Statement.  In either case, when a defined term is used, the first letter of each word in the defined term is capitalized.  Terms used and not defined in the Plan or the Disclosure Statement shall have the meanings given in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires.  The meanings of all terms shall be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined.  The words "herein," "hereof," "hereto," "hereunder," and others of similar import, refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  Captions and headings to articles, sections and exhibits are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation of the Plan.  The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.1    "Administrative Expense Claim" means any Claim entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

1.2    "Agent" means any shareholder, director, officer, employee, partner, member, agent, attorney, accountant, advisor or other representative of any person or entity (solely in their respective capacities as such, and not in any other capacity).

1.3    "Allowed" means, when used to modify the term Claim or Administrative Expense Claim, either a proof of which has been properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the Schedules as liquidated in amount and not disputed or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

contingent or an Administrative Expense Claim that the Debtor has received by the applicable bar date, and, in each case, a Claim or Administrative Expense Claim as to which no objection to the allowance thereof, or motion to estimate for purposes of allowance, shall have been Filed on or before any applicable period of limitation that may be fixed by the Bankruptcy Code, the Bankruptcy Rules and/or the Bankruptcy Court, or as to which any objection, or any motion to estimate for purposes of allowance, shall have been so Filed, to the extent (a) such objection is resolved between such claimant and either the Debtor or the Reorganized Debtor or (b) such Claim is allowed by a Final Order.

1.4    "Avoidance Actions" means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law (including, without limitation, Sections 506(c), 510, 542, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code or equivalent provisions of applicable non-bankruptcy law), equity or otherwise.

1.5    "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code with respect to Debtor, pending in the District of Oregon, administered as *In Arlie & Company,* Case No. 10-60244-aer11.

1.6    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

1.7    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any proceeding therein, including the United States District Court for the District of Oregon, to the extent that the reference to the Bankruptcy Case or any proceeding therein is withdrawn.

1.8    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended and promulgated under Section 2075, Title 28, of the United States Code, and the local rules and standing orders of the Bankruptcy Court.

1.9    "BLM Secured Creditors" means each of Francis Cline, William Greenhoot, McKillop II Limited Partnership, Karen Merwin, Alice Smith and Linda Trickey.

1.10    "Building D Value" means $4,000,000.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.11 "Business Day" means a day other than a Saturday, Sunday, any legal holiday as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are authorized or required by law to be closed.

1.12 "Cash" means lawful currency of the United States of America and equivalents, including, without limitation, checks, wire transfers and drafts.

1.13 "Claim" means (a) any right to payment from Debtor arising before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective Date for breach of performance if such breach gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.14 "Class" means one of the classes of Claims or Interests defined in Article III hereof.

1.15 "Collateral" means any property in which Debtor has an interest that is subject to a lien or security interest securing the payment of an Allowed Secured Claim.

1.16 "Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Clerk of the Bankruptcy Court.

1.17 "Confirmation Hearing" means the hearing or hearings to consider confirmation of the Plan under Section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned from time to time.

1.18 "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.19 "Creditor" means any entity holding a Claim against Debtor.

1.20 "Debtor" means Arlie & Company, as Debtor and Debtor-in-Possession in the Bankruptcy Case.

1.21 "Deficiency Claim" has the meaning set forth in the sentence following the definition of "Secured Claim."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.22    "Disclosure Statement" means Debtor's Disclosure Statement as amended, modified, restated or supplemented from time to time, pertaining to the Plan.

1.23    "Disputed Claim" means a Claim with respect to which a Proof of Claim has been timely Filed or deemed timely Filed under applicable law, and as to which an objection, timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for filing such objections by order of the Bankruptcy Court, and has not been denied by a Final Order and which Claim has not been estimated or temporarily allowed by the Bankruptcy Court on timely motion by the holder of such Claim.  If an objection related to the allowance of only a part of a Claim has been timely Filed or deemed timely Filed, such Claim shall be a Disputed Claim only to the extent of the objection.

1.24    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all conditions to the occurrence of the Effective Date set forth in Article 11.2 of this Plan have been either satisfied or waived but in no event later than April 25, 2010.

1.25    "Entity" shall have the meaning ascribed to it by Section 101(15) of the Bankruptcy Code.

1.26    "Excess Sale Proceeds" means proceeds from the sale of property of the Debtor after payment of all debt secured by such property, Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses.

1.27    "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

1.28    "Final Order" means an order or judgment entered on the docket by the Clerk of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties that has not been reversed, stayed, modified or amended and as to which the time for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for rehearing shall have expired.

1.29    "General Unsecured Claim" means any Unsecured Claim that is not otherwise classified under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.30    "Interests" means an equity security of the Debtor within the meaning of Section 101(16) of the Bankruptcy Code.

1.31    "Lord Byron Collateral Value" means $1,500,000.

1.32    "Maturity Date" means the fifth anniversary of the Effective Date.

1.33    "Non-core assets" means those real property assets of Reorganized Debtor identified by Reorganized Debtor on Exhibit B to the Disclosure Statement as assets that are not core to Reorganized Debtor's long-term business success.

1.34    "Other Priority Claim" means any Claim for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

1.35    "Petition Date" means January 20, 2010, the date on which the petition commencing this Bankruptcy Case was Filed.

1.36    "Plan" means this Plan of Reorganization, as amended, modified, restated or supplemented from time to time.

1.37    "Plan Supplement" means such documents, schedules and exhibits to the Plan that are not filed contemporaneously with the filing of the Plan, and any amendments to exhibits filed contemporaneously with the filing of the Plan (or any amendments or supplements to any previously filed Plan Supplement).  The Debtor shall file and serve the Plan Supplement no later than ten days prior to the Plan voting deadline.

1.38    "Priority Tax Claim" means a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.39    "Pro Rata" means a proportionate share, so that the ratio of (a) the amount of property distributed on account of any Allowed Claim, or retained on account of a Disputed Claim, in a Class, to (b) the amount distributed on account of all Allowed Claims, or allocated to on account of all disputed claims, in such Class, is the same as the ratio (x) such Claim bears to (y) the total amount of all Claims (including Disputed Claims in their respective Disputed Claim Amounts) in such Class.

1.40    "Property Tax" means *ad valorem* property taxes or similar impositions by a governmental unit on property of the Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.41    "Property Tax Lien Claim" means the Secured Claim of any governmental unit for Property Taxes that are secured by statutory liens on any of Debtor's property (real or personal).

1.42    "Rejection Claim" means a Claim arising from the rejection of an unexpired lease or executory contract.

1.43    "Reorganized Debtor" means Debtor from and after the Effective Date.

1.44    "Roberts Distributions" means any and all distributions made to Debtor or Reorganized Debtor from the Bankruptcy estate of <u>In re: Roberts Prof. Const. Svcs., Inc</u>. (Case No. 08-60615-fra7).

1.45    "Schedules" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as amended, modified, restated or supplemented from time to time.

1.46    "Scheduled Amounts" means the Claim amounts as set forth in Debtor's Schedules.

1.47    "Secured Claim" means any Claim against Debtor held by any entity, including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code.  Unless otherwise provided in the Plan, the unsecured portion, if any, of such Claim shall be treated as a General Unsecured Claim and shall be referred to herein as "Deficiency Claim."

1.48    "Small Unsecured Claim" means any Unsecured Claim that is equal to or less than $2,000, or that has been reduced by election in writing to $2,000, provided that such written election shall be served on Debtor not later than the first date fixed by the Bankruptcy Court for the filing of acceptances or rejections of the Plan.

1.49    "Tonkon Claims" means all of the Debtor's claims for relief and causes of action, whether legal or equitable, against Tonkon Torp LLP, whether sounding in contract or tort specifically including but not limited to professional negligence related to Tonkon Torp LLP's representation of the Debtor at any time.

1.50    "Unsecured Claim" means a Claim that is not an Administrative Expense

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Claim, a Priority Tax Claim, an Other Priority Claim, a Property Tax Lien Claim, or a Secured Claim.

## ARTICLE II

## UNCLASSIFIED CLAIMS

2.1     <u>Administrative Expense Claims</u>.  Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

2.2     <u>Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed.

2.3     <u>Bankruptcy Fees</u>.  Any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# ARTICLE III

## CLASSIFICATION

For purposes of this Plan, Claims (except those treated under Article II) are classified as provided below.  A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class.

3.1     Class 1 (Other Priority Claims).  Class 1 consists of all Allowed Other Priority Claims.

3.2     Class 2 (BofA).  Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA").

3.3     Class 3 (Century Bank).  Class 3 consists of the Allowed Secured Claims of Century Bank.

3.4     Class 4 (Pioneer).  Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer").

3.5     Class 5 (Siuslaw Bank).  Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.

3.6     Class 6 (Summit Bank).  Class 6 consists of the Allowed Secured Claims of Summit Bank.

3.7     Class 7 (Umpqua Bank).  Class 7 consists of the Allowed Secured Claims of Umpqua Bank.

3.8     Class 8 (Washington Federal Savings).  Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal").

3.9     Class 9 (BLM Secured Creditors).  Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.

3.10     Class 10 (Property Tax Lien Claims).  Class 10 consists of all Allowed Property Tax Lien Claims.

3.11     Class 11 (Small Unsecured Claims).  Class 11 consists of all Allowed Small Unsecured Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

3.12    Class 12 (General Unsecured Claims).  Class 12 consists of all Allowed General Unsecured Claims.

3.13    Class 13 (Interests).  Class 13 consists of all Interests.

## ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.1    Class 1 (Other Priority Claims).  Class 1 is impaired. Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

4.2    Class 2 (Allowed Secured Claims of BofA).  Class 2 is impaired.  The Class 2 Claim of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described.  Each property of Debtor that is Collateral of BofA shall serve as Collateral for each of BofA's Class 2 Claims.  As security for BofA's Class 2 Claims, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

4.2.1    Class 2.1 – Building A Loan.

BofA will have an Allowed Class 2.1 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Effective Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA's Class 2.1 Claim shall be satisfied by delivery of a promissory note to BofA (the "Building A Note") in the amount of the Allowed Class 2.1 Claim.  The Building A Note will

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Building A Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.2.2    Class 2.2 – Building D Loan.

BofA will have an Allowed Class 2.2 Claim in the amount of all principal, accrued interest, and reasonable fees and costs owing to BofA as of the Petition Date (as such amounts are determined by agreement of Debtor and BofA or as determined and Allowed by the Bankruptcy Court) under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,376,088.93 (the "Building D Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D").

BofA's Class 2.2 Claim shall be satisfied by the delivery of two promissory notes – one in the amount of the Building D Value ("Building D Note 1") and one for the difference between the amount of the Allowed Class 2.2 Claim and the Building D Value ("Building D Note 2").

Building D Note 1 shall have the following attributes: (a) it will bear interest at a fixed rate of 4.5% per annum; (b) commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 24th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building D Note 1; (c) commencing on the tenth day of the 25th month after the Effective Date and continuing on the tenth day of each month thereafter until Building D Note 1 has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Building D Note 1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date; (d) to the extent that the loan to value ratio of the loan represented by the Building D Note 1 exceeds 75% of the value of Building D (which, for these purposes shall be valued as of the 24th month following the Effective Date after applying an 8% cap rate to the net operating income of Building D), the Reorganized Debtor shall make a cash paydown of the Building D Note 1 in the amount necessary to reduce such loan to value ratio to 75%; (e) the Reorganized Debtor shall establish on the Effective Date a $405,000 reserve account for tenant improvements associated with future leasing activities related to Building D ("the Building D Reserve") which shall be funded with $205,000 cash derived from the BofA cash collateral account and $200,000 from the Roberts Distributions.  BofA shall retain its liens and security interests in Building D, which shall serve as security for amounts due under the Building D Note 1 only.  Aside from the $200,000 contribution to the Building D Reserve, BofA shall have no claim to any other Roberts Distributions.

The Building D Note 2 shall have the following attributes: (a) it will bear interest at a fixed rate of 3.5% per annum; (b) it will be payable in two installments with the first installment of one half of the principal plus all then accrued interest being due on the tenth day of the 37th month after the Effective Date, and the second installment of all remaining amounts owed thereunder being due on the Maturity Date.  There shall be no security for the Building D Note 2, but it shall be cross-defaulted with the Building D Note 1.

4.2.3    Treatment of Bank of America's Cash Collateral Accounts.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A.  The remainder of the Building A Cash Collateral will be either contributed to the Building D Reserve as described in Article 4.2.2 or retained and used by Reorganized Debtor for its general operating purposes.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral")

for payment of any past due Property Taxes on Building D. The remainder of the Building D Cash Collateral will be either contributed to the Building D Reserve as described in Article 4.2.2 or retained and used by Reorganized Debtor for its general operating purposes.

4.3     Class 3 (Allowed Secured Claim of Century Bank)  Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the Allowed Class 3 Claim (the "3058 Kinney Loop Note"). The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.4     Class 4 (Allowed Secured Claim of Pioneer).  The Class 4 Secured Claim of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Pioneer is disputed.  If and to the extent Pioneer is determined by Final Order to have a valid, perfected security interest in or lien upon property of the Debtor, Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Pioneer to Debtor on or about September 12, 2008 in the original principal amount of $1,500,000 (the "Pioneer Loan').

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Pioneer's Allowed Class 4 Claim shall be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount of the Pioneer Class 4 Claim.  The Pioneer Note will bear interest at a fixed rate of 4.5% per annum.  The Pioneer Note will be payable by Reorganized Debtor as follows:

The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note

If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order, the Pioneer Claim will be treated as a Class 12 Claim.

4.5     <u>Class 5 (Allowed Secured Claims of Siuslaw Bank).</u>  Class 5 is impaired.  The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans.  Each loan is separately classified and treated as hereinafter described.

4.5.1     <u>Class 5.1 – Crescent Village Lots Loan</u>.

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Crescent Village Lots Note.  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Crescent Village Lots Note.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank.

        4.5.2        <u>Class 5.2 – 2850 Kinney Loop Loan</u>.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the Allowed Class 5.2 Claim. The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 2850 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2850 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.5.3        Class 5.3 – 2960 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the Allowed Class 5.3 Claim. The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 2960 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 2960 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.5.4      Class 5.4 – 3082 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtor on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount of the Allowed Class 5.4 Claim.  The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3082 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3082 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.5.5        Class 5.5 – 3108 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount of the Allowed Class 5.5 Claim. The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3108 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3108 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.5.6    Class 5.6 – Florence Medical Building Loan.

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

As Collateral for the Class 5.6 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Florence Medical Building Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.6 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Florence Note") in the amount of the Allowed Class 5.6 Claim. The Florence Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

On the Effective Date, Reorganized Debtor shall pay down the Florence Note to the original principal amount of the Florence Medical Building Loan. Thereafter, commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Florence Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Florence Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Florence Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.5.7    Class 5.7 – Kinney Loop Lots Loan.

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in

2  and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to

3  the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the

4  Collateral in good repair and insure the Collateral to its full usable value.

5  Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to

6  Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the Allowed Class 5.7 Claim,

7  payable by Reorganized Debtor as follows.

8  The Kinney Loop Lots Note will accrue interest at the fixed rate of 4.5% per annum

9  and will be payable in full on the Maturity Date. In addition, within 3 years after the Effective Date,

10  Reorganized Debtor shall have pre-paid at least 50% of the principal of the Kinney Loop Lots Note.

11  At the time of any such pre-payment, Reorganized Debtor shall also pay all accrued but unpaid

12  interest then owing under the Kinney Loop Lots Note.

13  4.5.8    Treatment of Siuslaw Bank's Cash Collateral Account.

14  On the Effective Date, all amounts then held by Debtor in the separate and segregated

15  cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank

16  pursuant to the Cash Collateral Order shall be utilized to pay any past due Property Taxes on the

17  Collateral securing the Class 5 Claims. Any amounts remaining in the account after the payment of

18  such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

19  4.6    Class 6 (Summit Bank). Class 6 is impaired. The Class 6 Claim of Summit

20  Bank includes two subclaims, each of which will be separately classified and treated as hereinafter

21  described.

22  4.6.1    Class 6.1 – Road Radio Tower Loan.

23  Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal,

24  accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the

25  Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as

26  determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to

27  Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio

28

PACHULSKI STANG ZIEHL & JONES LLP  ATTORNEYS AT LAW  SAN FRANCISCO, CALIFORNIA

Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the Allowed Class 6.1 Claim.  The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

### 4.6.2    Class 6.2 – Guaranty Claim.

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek, hereinafter referred to as the "Willow Creek Property").

21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Summit Bank will have an Allowed Class 6.2 claim in the amount owing by Debtor under the Churchill Media Guaranty.  As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value. Summit Bank's Class 6.2 Claim will be satisfied by the delivery of a promissory note to Summit Bank (the "Guaranty Note") payable as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum, and will be payable in full on the Maturity Date.  In addition, Reorganized Debtor shall pre-pay a portion of the Guaranty Note through the sale or turnover of the Willow Creek Property as follows. Reorganized Debtor shall have six (6) months after the Effective Date to enter into a letter of intent for the sale of the Willow Creek Property, provided that any such sale must close within two (2) months after the execution of the letter of intent.  The Willow Creek Property net sale proceeds (after payment of Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses) will be applied to pay down the Guaranty Note.  In the event a sale is not effectuated as set forth above, Reorganized Debtor shall transfer title to the Willow Creek Property to Summit Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Summit Bank, and the amount outstanding under the Guaranty Note shall be reduced by the assessed value of the Willow Creek Property.  For purposes of this Article 4.6.2, "assessed value" shall mean the value ascribed to the Willow Creek Property as agreed to by the Reorganized Debtor and Summit Bank and, if no such agreement is reached, such value as determined by the Bankruptcy Court.

All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank in reduction of the principal owing on the Guaranty Note.  In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.6.3       Treatment of Summit Bank's Cash Collateral Account.

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims. Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

4.7    Class 7 (Umpqua Bank). Class 7 is impaired. The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described. The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs as allowed by Umpqua Bank's existing loan documents with Debtor as of the Effective Date and allocated in accordance with Article 4.7.15 of the Plan (the "Umpqua Bank Fees"). Umpqua Bank shall have no Claims and shall make no demands on Debtor, Reorganized Debtor or any guarantor of an Umpqua Bank Loan for events or defaults that occurred before the Effective Date and any such events or defaults shall be deemed waived, released and extinguished, provided that such pre-Effective Date waiver shall not apply to defaults continuing after the Effective Date that materially harm or affect the value of Umpqua Bank's interest in the real property Collateral. Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral (including assets generated or purchased after the Effective Date but perfected before the Petition Date) with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross-defaulted and cross collateralized. Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such loan and security documents provided by Debtor to Umpqua Bank as amended, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect.

Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan.  Without limiting the foregoing, such amendments will include having the following financial reports provided to Umpqua Bank (all in such form as reasonably required by Umpqua Bank):  45 days after the end of each calendar quarter, internally prepared financial statements (including balance sheet and cash flow statement); 120 days after each year end, internally prepared financial statements; annual financial statements 120 days after year end and copies of corporate tax returns with schedules when filed and copies of non-residential lease agreements after they are signed.  In addition, Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral.  Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

### 4.7.1    Class 7.1 – Westlane Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property").  Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

letter of intent, (b) purchase the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property or (c) transfer title to the Westlane Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) reasonable commissions, closing and transaction costs including, without limitation, legal and marketing expenses (collectively, the "Closing Costs"), (b) the applicable Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). Any sale or purchase by Reorganized Debtor of the Westlane Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

4.7.2     Class 7.2 - West 11th Land Loan.

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property"). Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price for cash at closing in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

an amount that will pay Umpqua Bank the applicable Arlie Debt Amount and Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the West 11th Land Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

4.7.3  <u>Class 7.3 – 2892 Crescent Ave. Loan</u>.

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price for cash at closing in an

amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property and the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of 2892 Crescent Avenue shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

4.7.4      Class 7.4 Woodburn and College Park Loan.

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to as 2450 Country Club Road, Marion County (the "Woodburn Property").  Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

The Arlie Debt Amount for the Woodburn Property shall be $845,000 together with 25% of accrued and unpaid interest on the Woodburn and College Park Loan.  Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price for cash at closing in an amount in excess of the Arlie Debt Amount for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the Woodburn Property at a price for cash at closing in an amount in excess of  the Arlie Debt Amount for such property, or (c) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount, Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2 or a Class 7.3 Claim.  Any sale or purchase by Reorganized Debtor of the Woodburn Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount has been or will be paid upon such sale or purchase.

As of the Effective Date, the remainder of the Woodburn and College Park Loan shall have a non-default simple fixed interest rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "College Park Pay Down").  The College Park Pay Down will not include application from the sale of approximately 315 acres of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.2

28

SECOND AMENDED PLAN OF REORGANIZATION
(FEBRUARY 14, 2011)

College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above. The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate).

4.7.5      <u>Class 7.5 – Roseburg Loan #1</u>.

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property"). Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property. Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 before the Effective Date shall be deemed waived or released. Thereafter, the non-default interest will accrue on the Roseburg Loan #1 at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

In accordance with paragraph 4.7.18 of this Plan, Reorganized Debtor may use up to $457,000 of good funds in the Umpqua Cash Collateral Account for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made.

### 4.7.6    Class 7.6 – Roseburg Loan #2

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property. Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2. Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2 before the Effective Date shall be deemed waived or released. Thereafter, interest will accrue on the Roseburg Loan #2 at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

### 4.7.7    Class 7.7 – Oil Can Henry's Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and

improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can

Henry's Property").  Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash

Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but

then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and

any past due Property Taxes on the Oil Can Henry Property.  Any default interest, late fees, or other

charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil

Can Henry's Loan before the Effective Date shall be deemed waived or released.  Thereafter,

interest will accrue on the Oil Can Henry's Loan at a simple fixed rate of 4.5% per annum.

Commencing on the tenth day of the first month following the Effective Date and continuing on the

tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor

will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan

based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest

and the applicable Umpqua Bank Fees due on the Maturity Date.

4.7.8        Class 7.8 – My Coffee Loan.

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal,

accrued non-default interest and applicable Umpqua Bank Fess under that certain loan made by

Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600

(the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and

improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee

Property").  Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the My Coffee Loan will

accrue at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month

following the Effective Date and continuing on the tenth day of each month thereafter through and

including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of

principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year

amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable

Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.2

31

SECOND AMENDED PLAN OF REORGANIZATION
(FEBRUARY 14, 2011)

the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.7.9    Class 7.9 – Building B Loan.

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the Building B Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.7.10    Class 7.10 – Grumman Hangar Loan.

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property"). Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest on the Grumman Hangar Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.7.11    Class 7.11 – 3032 Kinney Loop Loan.

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop").  Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the 3032 Kinney Loop Loan will be fixed at the simple rate of 4.5% per annum.  The Allowed Class 7.11 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

### 4.7.12    Class 7.12 - Crescent Village Land Loan.

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property").  Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the Crescent Village Land Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.12 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

4.7.13    Refinance of Properties Encumbered by Umpqua Bank's Liens.

Provided that no Event of Default has occurred that is not timely cured, Reorganized Debtor may satisfy an Arlie Debt Amount through a refinancing of the applicable property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount and Umpqua Bank Fees associated with such property. To the extent that such refinancing is in excess of the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) applicable Umpqua Bank Fees, the net excess financing proceeds shall be distributed in accordance with paragraph 4.7.14 of this Plan.

4.7.14    Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, and provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may from time to time sell a property for cash at closing free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and Umpqua Bank Fees associated with such property has been paid or will be paid upon such sale. To the extent that the sale proceeds exceed the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "Arlie Excess Proceeds") will be divided as follows: For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of the Arlie Excess Proceeds will be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

retained by Reorganized Debtor for its own account, and one-third (1/3) of the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  For any sale by Reorganized Debtor that occurs after such date, one-third (1/3) of any Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of its liens related to a portion of each parcel that serves as Collateral for Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt Amount and the Umpqua Bank Fees associated with such specific portion of parcel (on a pro rata basis determined in light of the comparative value of the portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

4.7.15    <u>Payment of Umpqua Bank Fees</u>.

Unless otherwise provided by the Plan, upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportionate share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

4.7.16    <u>Property Taxes</u>.

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.7.17    Settlement of Claims by and among Debtor, Reorganized Debtor and Umpqua Bank.

Upon confirmation of this Plan and effective as of the Effective Date, (a) the Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor, (b) Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and employees for any and all actions (or in-actions) that occurred before the Effective Date, (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan, and (d) subject to the provisions of paragraph 4.7 hereof, Umpqua Bank will not make a demand on the Debtor and the guarantors for defaults that occurred before the Effective Date.

4.7.18    Treatment of Umpqua Bank's Cash Collateral Account.

With respect to the College Park Sale, the balance of good funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, provided that (i) Umpqua Bank shall have a security interest in such Roseburg improvements, (ii) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (iii) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank, which will be subject to Umpqua Bank's security interest, to be used at Reorganized Debtor's discretion

solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.

4.7.19      Use of Rents Generated From Umpqua Properties.

Commencing on the Effective Date, all rents generated from the properties securing the Umpqua Bank loans may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

4.8      Class 8 (Washington Federal Savings).  Class 8 is impaired.  The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

4.8.1      Class 8.1 –Lord Byron Loan.

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan").  The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral").  The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date as allowed by the Lord Byron Loan documents (the "Washington Claim Amount"). Washington Federal shall have a Secured Class 8 Claim in the aggregate amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

The Washington Federal Secured Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, as follows:  the 2909 Lord Byron Note in the principal amount of $279,600 , the 2915 Lord Byron Note in the principal amount of $296,000, the 2931 Lord Byron Note in the principal amount of $327,950, the 2977 Lord Byron Note in the principal amount of $269,350, and the 2993 Lord Byron Note in the principal amount of $327,100 (individually, a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

"Lord Byron Note" and collectively, the "Lord Byron Notes"). Each Lord Byron Note will bear simple interest at a fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date. Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date. Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property. Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal.

4.8.2    Treatment of Washington Federal's Cash Collateral Account.

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 Claim. Any amounts remaining in the cash collateral bank account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **4.8.3    Treatment of the Washington Federal Unsecured Claim**.

2    The Washington Federal Unsecured Claim shall bear simple interest at the fixed rate

3    of 3.5% per annum and shall be payable in full on the Maturity Date.

4    **4.9    Class 9 (BLM Secured Creditors)**.  Class 9 is impaired. Class 9 consists of the

5    Allowed Secured Claims of the BLM Secured Creditors.  The Class 9 Claims are secured by a deed

6    of trust on Debtor's real property and improvements commonly referred to as 2890 Chad Drive,

7    Eugene, Oregon (the "BLM Office Building").

8    Class 9.1 – Francis Cline.

9    Francis Cline will have an Allowed Class 9.1 Claim in the amount of all principal,

10    accrued non-default interest, and reasonable fees and costs owing to Ms. Cline as of the Effective

11    Date under that certain loan made by Ms. Cline to Debtor on or about on or about November 4, 2008

12    in the original principal amount of $347,065 (the "Cline Loan"), which loan is secured by a deed of

13    trust on BLM Office Building.  The Class 9.1 Claim shall be treated as follows.

14    On the Effective Date, Reorganized Debtor shall pay all outstanding property  taxes

15    on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the

16    Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to

17    the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such

18    form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete

19    satisfaction of all obligations owing under the Cline Loan.  Notwithstanding the foregoing, at the

20    request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office

21    Building for sale and provide tenant improvement and any necessary rezoning services, if requested.

22    Class 9.2 – William Greenhoot.

23    William Greenhoot will have an Allowed Class 9.2 Claim in the amount of all

24    principal, accrued non-default interest, and reasonable fees and costs owing to Mr. Greenhoot as of

25    the Effective Date under that certain loan made by Mr. Greenhoot to Debtor on or about on or about

26    November 4, 2008 in the original principal amount of $347,065 (the "Greenhoot Loan"), which loan

27    is secured by a deed of trust on the BLM Office Building.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Greenhoot Loan and the Class 9.2 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

<u>Class 9.3 – McKillop II Limited Partnership</u>.

The McKillop II Limited Partnership ("McKillop") will have an Allowed Class 9.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the Partnership as of the Effective Date under those certain loans made by Herbert McKillop to Debtor on or about on or about November 4, 2008 in the original principal amounts of $120,000 and $1,453,482 (collectively, the "McKillop Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the McKillop Loan and the Class 9.3 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Class 9.4 – Karen Merwin.

Karen Merwin will have an Allowed Class 9.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Merwin as of the Effective Date under that certain loan made by Ms. Merwin to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Merwin Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Merwin Loan and the Class 9.4 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

Class 9.5 – Alice Smith.

Alice Smith will have an Allowed Class 9.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Smith as of the Effective Date under that certain loan made by Ms. Smith to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Smith Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000.  Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Smith Loan and the Class 9.5 Claim.

Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

<u>Class 9.6 – Linda Trickey</u>.

Linda Trickey will have an Allowed Class 9.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Ms. Trickey as of the Effective Date under that certain loan made by Ms. Trickey to Debtor on or about on or about November 4, 2008 in the original principal amount of $694,130 (the "Trickey Loan"), which loan is secured by a deed of trust on the BLM Office Building.

On the Effective Date, Reorganized Debtor shall pay all outstanding property taxes on the BLM Office Building and perform maintenance on the BLM Office Building at a cost to the Reorganized Debtor of not more than $10,000. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to the holders of the Class 9 Claims, by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM Creditors, in full and complete satisfaction of the all obligations owing under the Trickey Loan and the Class 9.6 Claim. Notwithstanding the foregoing, at the request of all of the BLM Secured Creditors, Reorganized Debtor will market the BLM Office Building for sale and provide tenant improvement and any necessary rezoning services, if requested, upon such terms as may be agreed to by and between the BLM Secured Creditors and the Reorganized Debtor.

4.10    <u>Class 10 (Property Tax Lien Claims)</u>. Class 10 is impaired. Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

4.11    <u>Class 11 (Small Unsecured Claims)</u>. Class 11 is impaired. Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.12    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 is impaired.  Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre-petition or post-petition default interest or post-petition contract rate of interest shall be paid on any General Unsecured Claim.  Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

4.13    <u>Class 13 (Interests)</u>.  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

**ARTICLE V**

**PROVISIONS GOVERNING DISTRIBUTIONS**

5.1    <u>Distributions by Debtor</u>.  The Reorganized Debtor shall administer Claims and make distributions in respect of Allowed Claims.  Distributions to be made by the Reorganized Debtor may be made by any person designated or retained by the Reorganized Debtor to serve as disbursing agent without the need for any further order of the Bankruptcy Court.

5.2    <u>Disputed Claims; Objections to Claims</u>  Only Claims that are Allowed shall be entitled to distributions under the Plan.  No Cash or other property shall be distributed under the Plan on account of any Disputed Claim, or a portion of any such Claim, unless and until such Disputed Claim becomes an Allowed Claim.  Debtor reserves the right to contest and object to any Claims and previously Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts that are specifically referenced herein, are not listed in the Schedules, are listed therein as disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount than the Debtor currently believes is validly due and owing.  All Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the Bankruptcy Court may otherwise order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5.3    <u>Subsequent Allowance of Disputed Claims</u>.  The holder of a Disputed Claim that becomes Allowed in full or in part subsequent to the Effective Date shall receive Cash distributions (including any make-up distributions) on the next applicable distribution date following the allowance of such Disputed Claim.

5.4    <u>Unclaimed Distributions</u>.  Any entity which fails to claim any Cash distribution within one hundred twenty (120) days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan and the Reorganized Debtor shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Reorganized Debtor, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor with respect to such funds shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and such Creditors shall have no claim whatsoever against the Reorganized Debtor or any holder of an Allowed Claim to whom distributions are made by the Reorganized Debtor.

**ARTICLE VI**

**MEANS FOR EXECUTION OF PLAN**

6.1    <u>Continued Business Operations</u>  From and after the Effective Date, the Reorganized Debtor shall continue to engage in business with the goal of maximizing the value of its assets and, subject to the provisions of the Plan governing distributions and the retention of jurisdiction provisions hereof, the Reorganized Debtor shall continue such business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Reorganized Debtor shall be authorized, without limitation, to use and dispose of its assets, to insure its assets, to borrow money, to employ and compensate agents, to reconcile and object to Claims, and to make distributions to Creditors in accordance with the Plan.

6.2    <u>Siuslaw Loan</u>  Siuslaw Bank has agreed to make a loan to the Reorganized Debtor on the Effective Date in the amount of $615,000 (the "New Siuslaw Loan").  The New Siuslaw Loan shall bear simple interest at a fixed per annum rate of 5.5% and, as collateral for the New Siuslaw Loan, Reorganized Debtor shall grant Siuslaw Bank liens upon and security interests

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

in the Florence Medical Building (described in Article 4.5.6 hereof) with the same priority as the liens and security interests held by Siuslaw Bank securing the Florence Medical Building Note. On the Funding Date, Reorganized Debtor shall establish a separate cash reserve account at Siuslaw Bank into which will be deposited funds sufficient to satisfy the first six (6) months of payments on account of Class 5 Claims under the Plan. Reorganized Debtor shall make interest only payments on the New Siuslaw Loan commencing on the tenth day of the first month following the date Reorganized Debtor obtains the New Siuslaw Loan (the "Funding Date") and continuing on the tenth day of each month thereafter through and including the 36th month following the Funding Date. Commencing on the tenth day of the 37th month after the Funding Date and continuing on the tenth day of each month thereafter until the New Siuslaw Loan has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the New Siuslaw Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Other than the establishment of the cash reserve account described above, the Reorganized Debtor may use the proceeds of the New Siuslaw Loan for any purpose without restriction.

6.3    Operating Revenues. Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, the net operating income generated from Reorganized Debtor's continued business operations, and from the future sale or refinancing of assets of Reorganized Debtor from time to time. A core aspect of Debtor's business is marketing and selling real property acquired by Debtor from time to time. Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan. Such sales may occur without further order of the Bankruptcy Court.

6.4    Sales or Refinancing of Real Property Collateral. Without limiting Article 6.3 above, and except as set forth with respect to a particular Creditor under the Plan, Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

secured by the Collateral.  Any excess net proceeds from the sale or refinancing of such Collateral shall be paid to Reorganized Debtor (or as otherwise directed by Reorganized Debtor) and may be used by Reorganized Debtor to fund Reorganized Debtor's continued business operations and to fund payments required under this Plan.  Such sales or refinancing may occur without further order of the Bankruptcy Court.

6.5    Marketing and Sales of Non-Core Assets.  In addition to marketing and selling its real property assets in the ordinary course of its business, Reorganized Debtor may market and sell its non-core assets on an accelerated basis as is necessary or appropriate to ensure that Reorganized Debtor will have sufficient funds to make all payments required of Debtor under this Plan.  Without limiting the preceding, if at any time Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, Reorganized Debtor will before such payment is due sell at public auction one or more of Reorganized Debtor's Non-core assets to raise the funds necessary to make the required Plan payment.  Such auctions and sales may occur without further order of the Bankruptcy Court.

6.6    Setoffs.  Reorganized Debtor may, but shall not be required to, set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which Debtor or Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim Debtor or Reorganized Debtor may have against such holder.

6.7    Corporate Action.  Upon entry of the Confirmation Order by the Clerk of the Bankruptcy Court, all actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the execution, delivery, and performance of all documents and agreements relating to the Plan, and any of the foregoing.  On the Effective Date, the appropriate officers of Reorganized Debtor are authorized and directed to execute and deliver any and all agreements, documents, and instruments contemplated by the Plan and/or the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

6.8    Saturday, Sunday, or Legal Holiday.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.9     Deposits.  All utilities holding a utility deposit obtained as a result of this Bankruptcy Case shall immediately after the Effective Date return or refund such utility deposit to Reorganized Debtor.  At the sole option of Reorganized Debtor, Reorganized Debtor may apply any such utility deposit that has not been refunded to Reorganized Debtor in satisfaction of any payments due or to become due from Reorganized Debtor to a utility holding such a utility deposit.  All escrow deposits made by the Debtor for prospective purchases of property which did not close prior to the Effective Date (the "Arlie Escrow Deposits") and which have not been returned to the Debtor as of the Effective Date, shall be turned over to Reorganized Debtor immediately after the Effective Date for its own account.

6.10     Event of Default; Remedy.  Any failure by Reorganized Debtor to perform any term of this Plan, which failure continues for a period of ten Business Days following receipt by Reorganized Debtor of written notice of such default from the holder of an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon the occurrence of an Event of Default, both the holder of an Allowed Claim to whom performance is due and the Reorganized Debtor shall each have all rights and remedies granted by law, this Plan or any agreement between the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with respect to one Creditor shall not be an Event of Default with respect to any other Creditor.  Notwithstanding the foregoing, in the event of a failure to perform any term of this Plan with respect to a Class 11 or Class 12 Claim, the Unsecured Creditors' Committee may provide the Reorganized Debtor with written notice of an Event of Default on behalf of the holder of such Unsecured Claim.

6.11     Continuation of Unsecured Creditors' Committee.  To the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee.  For so long as such Unsecured Creditors' Committee remains in existence, Reorganized Debtor will provide to the Unsecured Creditors'

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Committee a quarterly compliance certificate executed by the Chief Financial Officer of Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan. The first such compliance certificate shall be delivered to the Unsecured Creditors' Committee 45 days after the end of the third month following the Effective Date and each quarterly compliance certificate shall be delivered 45 days after the end of each subsequent three month period, unless another quarterly schedule is agreed to by and between the Reorganized Debtor and the Creditors' Committee. If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan. In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to Reorganized Debtor in its reasonable discretion, Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee. Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist. During the existence of the Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period, in the ordinary course of business, provided that any dispute concerning such fees and expenses shall be resolved by the Bankruptcy Court or other court of competent jurisdiction.

## ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     <u>Assumption and Rejection</u>.  Except as may otherwise be provided in the Plan Supplement, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date. The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for in the Plan Supplement or subject to other Court

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Order or pending motion. Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

7.2    Assignment. To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date. The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment.

7.3    Rejection Claims. Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner. Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations. Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

7.4    Compensation and Benefit Programs. Except to the extent restricted by the Plan, all employee compensation and benefit plans, policies and programs of Debtor applicable generally to its employees as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, stock incentive plans, and life, accidental death and dismemberment insurance plans, shall continue in full force and effect, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate any of the foregoing arrangements.

## ARTICLE VIII

## EFFECT OF CONFIRMATION

8.1    Binding Effect. The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtor and the estate assets, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

commencement of the Bankruptcy Case. The distributions made pursuant to this Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made. Confirmation of the Plan shall bind and govern the acts of the Reorganized Debtor whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

        8.2    <u>Discharge and Permanent Injunction</u>  Except as otherwise set forth in the Plan, confirmation of the Plan shall discharge the Debtor from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan.  As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under Sections 524(a) and 1141 of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtor or the Reorganized Debtor, except as otherwise set forth in this Plan.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.  Nothing contained in the foregoing discharge shall, to the full extent provided under Section 524(e) of the Bankruptcy Code, affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtor that is discharged under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.2

50

SECOND AMENDED PLAN OF REORGANIZATION
(FEBRUARY 14, 2011)

8.3     Limitation of Liability.  The Debtor and the Reorganized Debtor and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

8.4     Exculpation.  The Debtor, the Reorganized Debtor and each of their respective Agents, shall not be liable to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Bankruptcy Case or the negotiation, formulation, development, proposal, disclosure, confirmation or implementation of the Plan and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan, provided, however, that the foregoing provisions shall have no affect on the Tonkon Claims or the liabilities of any person that resulted from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted negligence, breach of fiduciary duty or willful misconduct.

**ARTICLE IX**

**RETENTION OF JURISDICTION**

9.1     Jurisdiction of the Bankruptcy Court.  Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:

(a)     to resolve controversies and disputes regarding any Avoidance Action,

(b)     to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests,

(c)     to determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed in this Bankruptcy Case,

(d)     to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(e)    to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan,

(f)    to resolve controversies and disputes regarding the interpretation of this Plan,

(g)    to implement the provisions of this Plan and enter orders in aid of confirmation,

(h)    to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and

(i)    to enter a final decree closing this Bankruptcy Case.

9.2    Failure of Bankruptcy Court to Exercise Jurisdiction.  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

**ARTICLE X**

**ADMINISTRATIVE PROVISIONS**

10.1    Modification or Withdrawal of the Plan.  Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order.  After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

10.2    Revocation or Withdrawal of Plan.  Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

10.3    Modification of Payment Terms.  The Debtor may modify the treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such Claim or Interest at any time after the Effective Date upon the prior written consent of the person whose Allowed Claim or Interest treatment is being adversely affected.

10.4    Nonconsensual Confirmation.  Debtor shall request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except subsection 1129(a)(8), are met.

10.5    Compromise of Controversies.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distributions, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of Debtor.

10.6    Final Decree.  At any time following the Effective Date, the Reorganized Debtor shall be authorized to file a motion for the entry of a final decree closing the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code.

## ARTICLE XI

### CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

11.1    Conditions to Confirmation.  The following are conditions precedent to the confirmation of this Plan:

11.1.1    The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor;

11.1.2    The Confirmation Order shall be in a form and

substance reasonably acceptable to the Debtor; and

11.1.3    A written settlement agreement shall have been executed by and among the Debtor, the guarantors of the Debtor's obligations to Umpqua Bank (the "Guarantors") and Umpqua Bank containing the following release terms and agreements not to make a demand, all of which shall be effective as of the Effective Dale: (a) a waiver and release of all claims against Umpqua Bank and its officers and employees by Debtor and the Guarantors; (b) an acknowledgement by the Debtor and the Guarantors that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable; and (c) an agreement by Umpqua Bank that it will not make a demand on the Debtor or the Guarantors for defaults that occurred before the Effective Date.

11.2    Conditions to Effective Date.  The following are conditions precedent to the occurrence of the Effective Date:

11.2.1    The Confirmation Date shall have occurred;

11.2.2    The Confirmation Order shall have become a Final Order;

11.2.3    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending;

11.2.4    The Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

11.3    Waiver of Conditions.  Other than paragraph 11.1.3, the Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by the Debtor at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    Revesting.  Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all Arlie Escrow

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Deposits not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

12.2    <u>Rights of Action</u>.  Except as otherwise expressly provided herein, any claims, rights, interests, causes of action, defenses, counterclaims, cross-claims, third-party claims, or rights of offset, recoupment, subrogation or subordination including, without limitation, the Tonkon Claims, claims under Section 550(a) of the Bankruptcy Code or any of the sections referenced therein (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall remain assets of Reorganized Debtor.  Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with what is in its best interests and for its benefit.

12.3    <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal laws are applicable, the laws of the State of Oregon shall govern the construction and implementation of the Plan, and all rights and obligations arising under the Plan.

12.4    <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, Debtor and Reorganized Debtor shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authorities and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification and information requirements.  Entities entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as Reorganized Debtor may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable Reorganized Debtor to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.  Pursuant to Section 346(f) of the Bankruptcy Code, the Reorganized shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  Notwithstanding any other provision of this Plan, each holder of an Allowed Claim that has received a distribution of Cash shall have sole and exclusive responsibility for the satisfaction or payment of any tax

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution.

12.5    Time.  Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of the next succeeding day which is a Business Day.

12.6    Section 1146(c) Exemption.  Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the revesting, transfer or sale of any real property of Debtor or Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan, including without limitation the sale of any real property by Debtor or Reorganization Debtor (in Hawaii, Oregon or otherwise) pursuant to and in performance of Reorganized Debtors obligations under this Plan, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any city, county or governmental unit in which any instrument, including any deed conveying any of Reorganized Debtor's interest in any of its real property, hereunder is to be recorded shall, be ordered and directed to accept such instrument without requiring the payment of any conveyance fee, documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax or fee.

12.7    Severability.  In the event that any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provisions of the Plan.  To the extent that any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the confirmation of the Plan existing by reason of such provision.

12.8    Successors and Assigns.  The provisions of the Plan shall bind Debtor,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Reorganized Debtor and all holders of Claims and Interests, and their respective successors, heirs and assigns.

       12.9    <u>Notices to Claim and Interest Holders.</u>  Notices to Persons holding a Claim or Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if none was filed, at the address set forth in the Schedules.

       12.10    <u>Post Effective-Date Notices.</u>  Following the Effective Date, notices will only be served on the Reorganized Debtor, the Office of the United States Trustee, the Unsecured Creditors' Committee and those persons who file with the Court and serve upon the Reorganized Debtor a request, which includes such person's name, contact person, address, telephone number and facsimile number, that such person receive notice of post-Effective Date matters.  Persons who had previously filed with the Bankruptcy Court requests for special notice of the proceedings and other filings in the Bankruptcy Case will not receive notice of post-Effective Date matters unless such persons file a new request with the Bankruptcy Court.

       12.11    <u>Retiree Benefits.</u>  On or after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code, maintained or established by Debtor prior to the Effective Date, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate the foregoing arrangements.

       12.12    <u>Provisions Enforceable.</u>  The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan is valid and enforceable in accordance with its terms.

       12.13    <u>Recordable Order.</u>  The Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications or other supporting documents.

       12.14    <u>Plan Controls.</u>  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, or any other instrument or agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall control and take precedence.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

12.15   <u>Delivery of Promissory Notes</u>.  To the extent that this Plan provides for Reorganized Debtor to deliver a promissory note to a Secured Creditor in connection with an Allowed Secured Claim, except as otherwise specifically provided in this Plan or in any note or document delivered in connection with this Plan, this Plan and any note or other document delivered in connection herewith shall replace and supersede all pre-petition notes, loan agreements, trust deeds, security documents or other documents executed by Debtor in connection with the obligations giving rise to the Allowed Claim.  The Reorganized Debtor shall provide the Unsecured Creditors' Committee with copies of any such promissory notes or other security documents executed pursuant to the Plan.  Unless otherwise provided in this Plan, each Creditor will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Accordingly, unless otherwise provided in this Plan, the validity and priority of any trust deed or other security document executed in connection with the obligations giving rise to the Creditor's Allowed Claim will not be impaired by this Plan.  However, except as otherwise specifically provided in this Plan, to the extent that any such trust deed or other security document contains any provisions that impose any covenants, requirements or obligations on Debtor or Reorganized Debtor that are not specifically provided for or contained in, or are otherwise inconsistent with, this Plan, then such provisions shall be of no force and effect.

12.16   <u>Effectuating Documents and Further Transactions</u>.  Debtor and Reorganized Debtor shall execute, deliver, file or record such contracts, instruments, assignments, and other agreements or documents, and take or direct such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

DATED this 14th day of February, 2011.

Respectfully submitted,

ARLIE & COMPANY

By  /s/ Scott Diehl
    Scott Diehl, Chief Financial Officer

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP


By  /s/ John D. Fiero
    John D. Fiero, (CA Bar No. 136557)
    Linda F. Cantor, (CA Bar No. 153762)
    Attorneys for Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

<table>
<tr><td>Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number<br>John D. Fiero (CA Bar #136557)<br>Linda F. Cantor (CA Bar #153762)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>150 California Street, 15th Floor<br>San Francisco, California 94111-4500<br>Phone: (310) 277-6910; Fax: (310) 201-0760<br>☒ Attorney for: Arlie & Company</td><td>FOR COURT USE ONLY</td></tr>
</table>

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| In re:<br>ARLIE & COMPANY,<br><br>                                    Debtor(s). | CASE NO.: 10-60244-aer11<br>CHAPTER: 11<br>ADV. NO.: |

## ELECTRONIC FILING DECLARATION
### (CORPORATION/PARTNERSHIP)

☐ Petition, statement of affairs, schedules or lists          Date Filed: __February 14, 2011__
☐ Amendments to the petition, statement of affairs, schedules or lists          Date Filed: _____
☒ Other: _Second Amended Plan of Reorganization (February 14, 2011)_          Date Filed: _____

### PART I - DECLARATION OF AUTHORIZED SIGNATORY OF DEBTOR OR OTHER PARTY

I, the undersigned, hereby declare under penalty of perjury that: (1) I have been authorized by the Debtor or other party on whose behalf the above-referenced document is being filed (Filing Party) to sign and to file, on behalf of the Filing Party, the above-referenced document being filed electronically (Filed Document); (2) I have read and understand the Filed Document; (3) the information provided in the Filed Document is true, correct and complete; (4) the "/s/," followed by my name, on the signature lines for the Filing Party in the Filed Document serves as my signature on behalf of the Filing Party and denotes the making of such declarations, requests, statements, verifications and certifications by me and by the Filing Party to the same extent and effect as my actual signature on such signature lines; (5) I have actually signed a true and correct hard copy of the Filed Document in such places on behalf of the Filing Party and provided the executed hard copy of the Filed Document to the Filing Party's attorney; and (6) I, on behalf of the Filing Party, have authorized the Filing Party's attorney to file the electronic version of the Filed Document and this Declaration with the United States Bankruptcy Court for the Central District of California.

_____          February 14, 2011
Signature of Authorized Signatory of Filing Party          Date

Scott Diehl
Printed Name of Authorized Signatory of Filing Party

Chief Financial Officer
Title of Authorized Signatory of Filing Party

### PART II - DECLARATION OF ATTORNEY FOR FILING PARTY

I, the undersigned Attorney for the Filing Party, hereby declare under penalty of perjury that: (1) the "/s/," followed by my name, on the signature lines for the Attorney for the Filing Party in the Filed Document serves as my signature and denotes the making of such declarations, requests, statements, verifications and certifications to the same extent and effect as my actual signature on such signature lines; (2) an authorized signatory of the Filing Party signed the Declaration of Authorized Signatory of Debtor or Other Party before I electronically submitted the Filed Document for filing with the United States Bankruptcy Court for the Central District of California; (3) I have actually signed a true and correct hard copy of the Filed Document in the locations that are indicated by "/s/," followed by my name, and have obtained the signature of the authorized signatory of the Filing Party in the locations that are indicated by "/s/," followed by the name of the Filing Party's authorized signatory, on the true and correct hard copy of the Filed Document; (4) I shall maintain the executed originals of this Declaration, the Declaration of Authorized Signatory of Debtor or Other Party, and the Filed Document for a period of five years after the closing of the case in which they are filed; and (5) I shall make the executed originals of this Declaration, the Declaration of Authorized Signatory of Debtor or Other Party, and the Filed Document available for review upon request of the Court or other parties.

_____          February 14, 2011
Signature of Attorney for Filing Party          Date

Linda F. Cantor
Printed Name of Attorney for Filing Party

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

American LegalNet, Inc.
www.FormsWorkflow.com

# EXHIBIT B

# ARLIE COMPANY NON-CORE PROPERTIES

| General Information | | | Financial Data | | |
|---|---|---|---|---|---|
| **Property Location** | **Acres** | **Bldg Sq Ft** | **Lender** | **Value** | **Loan** |
| 2892 Crescent Ave (office bldg) — Eugene | 1.16 | 13,681 | Umpqua Bank | $3,250,000.00 | $1,322,165.48 |
| Arlie Hanger #2 (#272) 28737 Grumman Dr (land lease) — Eugene | N/A | | Umpqua Bank | $358,691.00 | $239,176.58 |
| Garden Valley Blvd (2 commercially developed lots) — Roseburg | 2.41 | 17,275 | Umpqua Bank | $5,100,000.00 | $3,168,351.27 |
| Woodburn Vacant Comm. Lot (I-5 @Hwy 214) 2450 Country Club Rd — Woodburn | 4.11 | N/A | Umpqua Bank | $2,200,000.00 | $825,000.00 |
| College Park (Lots south and west of Lane Community College) — Eugene | 623.2 | N/A | Umpqua Bank | $18,808,000.00 | $2,145,000.00 |
| West 11th @ Obie St (3 vacant commercial lots) — Eugene | 4.34 | N/A | Umpqua Bank | $2,500,000.00 | $952,182.84 |
| West Lane Center (Commercial Cntr) — Veneta | 11.11 | 87,419 | Umpqua Bank | $9,600,000.00 | $5,900,000.00 |
| 2843 Lord Byron Place (townhouse) — Eugene | 0.09 | 2,305 | Century Bank | $395,329.63 | $349,863.03 |
| 2853 Lord Byron Place (townhouse) — Eugene | 0.07 | 2,728 | Century Bank | $415,116.73 | $368,590.28 |
| 2863 Lord Byron Place (townhouse) — Eugene | 0.07 | 2,308 | Century Bank | $371,493.47 | $342,012.22 |
| 2873 Lord Byron Place (townhouse) — Eugene | 0.07 | 2,410 | Century Bank | $380,741.79 | $357,502.71 |
| 2883 Lord Byron Place (townhouse) — Eugene | 0.09 | 2,227 | Century Bank | $343,318.00 | $349,880.94 |
| 2890 Chad Drive (office with warehouse) — Eugene | 6.95 | 58,450 | Private Investors | $5,113,062.95 | $4,100,000.00 |
| Hilo Hawaii Timberlands & Akolea Forest — Hilo, HI | 5,226 | N/A | Pioneer Investment Ltd * | $49,700,000.00 | $1,600,000.00 |
| 4480 Hwy 101 N., #G (multi-tenant office building) — Florence | 1.9 | 7,484 | Siuslaw Bank | $1,829,796.00 | $655,590.42 |
| West 11th @ Willow Creek (vacant industrial lot) — Eugene | 7.02 | N/A | Summit Bank | $1,600,000.00 | $1,350,000.00 |
| 650 Goodpasture Island Rd. (radio broadcasting tower) — Eugene | 6.65 | N/A | Summit Bank | $457,562.00 | $336,015.53 |
| 2909 Lord Byron Place (townhouse) — Eugene | 0.07 | 2,319 | Washington Federal | $402,765.61 | $397,561.63 |
| 2915 Lord Byron Place (townhouse) — Eugene | 0.09 | 2,455 | Washington Federal | $405,978.64 | $411,252.23 |
| 2931 Lord Byron Place (townhouse) — Eugene | 0.07 | 2,720 | Washington Federal | $416,490.32 | $421,900.48 |

## ARLIE COMPANY NON-CORE PROPERTIES

| General Information | | | | Financial Data | | |
|---|---|---|---|---|---|---|
| **Property Location** | | **Acres** | **Bldg Sq Ft** | **Lender** | **Value** | **Loan** |
| 2977 Lord Byron Place (townhouse) | Eugene | 0.09 | 2,234 | Washington Federal | $385,681.13 | $389,775.24 |
| 2993 Lord Byron Place (townhouse) | Eugene | 0.06 | 2,713 | Washington Federal | $416,490.32 | $421,900.48 |
| Lord Byron - 18 rowhouse lots on west side of street | Eugene | Lots vary btwn 0.05 - 0.07 acres | N/A | Unsecured | $900,000.00 | N/A |
| Lord Byron - 8 townhouse lots on east side of Street | Eugene | Lots vary btwn 0.07 - 0.13 acres | N/A | Unsecured | $400,000.00 | N/A |
| West Lane Center Adjacent Vacant Land (wetlands) | Veneta | 11.98 | N/A | Unsecured | $120,000.00 | N/A |
| Arlie Hangar (#246) 90363 Boeing Dr. | Eugene | N/A | | Unsecured | $80,000.00 | N/A |

**TOTAL**

$105,950,517.59  $26,403,721.36

*Pioneer Investment Ltd security
interest is being contested.

2/9/2011

# EXHIBIT C

**Arlie & Company**
Historical Income Statement for the Period 2008 thru 2010

| | 2008 | 2009 | 2010 |
|---|---|---|---|
| **CASH RECEIVED:** | | | |
| **Property Revenue** | | | |
| LCC | | | 14,665.94 |
| Hawaii Conservation | | | |
| Hawaii Puuea | | | |
| Woodburn | | | |
| Lex Corp | | 660.00 | |
| Crescent Village | 1,345,250.35 | 2,259,835.08 | 2,360,805.51 |
| W. 11th | | 2,750.00 | 1,000.00 |
| 772 Country Club | 44,790.50 | 5,034.07 | |
| Westlane | 1,002,688.72 | 939,274.71 | 896,924.43 |
| 4048 West 1st | 11,850.69 | | |
| Roseburg (Garden Way) | 385,027.84 | 330,334.89 | 321,413.08 |
| Willow Creek | | | |
| 3443 Hilyard | 75,764.77 | 117,820.07 | 6,956.36 |
| My Coffee / T-Mobile | 52,908.78 | 57,538.95 | 64,718.01 |
| Fairway Inn - Woodburn | | | |
| Goodpasture Tower | 38,192.40 | 34,060.55 | 32,728.52 |
| 875 Country Club | 52,302.78 | | |
| Shadow Ridge | 2,744,558.12 | (7,124.15) | |
| Fairways Revenue | 2,946,645.97 | 6,981.16 | |
| 1236 Garden Way - Qwest Bldg | | | |
| 2890 Kinney Loop | | 530.00 | |
| 2834 Kinney Loop | 6,200.00 | 3,930.00 | 865.00 |
| 2802-2804 Kinney Loop | 16,900.00 | 14,687.20 | 13,295.77 |
| 2743 Coburg Road | 8,453.25 | 8,550.00 | - |
| 2729 Coburg Road | 9,000.00 | 9,750.00 | 8,250.00 |
| 3082 Kinney Loop | 11,717.92 | 13,416.62 | 13,200.00 |
| 3108 Kinney Loop | 11,149.00 | 13,300.00 | 6,825.00 |
| 3018 Kinney Loop - Dog Park | | | |
| Oil Can Henry's | 32,814.74 | 79,611.64 | 76,177.54 |
| 3110 Kinney Loop | | | |
| Natron / Jasper | | | |
| 2960 Kinney Loop | | | |
| 2850 Kinney Loop | 5,016.13 | 14,450.00 | 14,450.00 |
| 2890 Chad Drive | 91,920.52 | 374,599.21 | 3,548.15 |
| 2892 Crescent Avenue | 52,043.81 | | |
| 3032 Kinney Loop | | 900.00 | |
| 2909 Lord Byron | | 10,735.48 | 21,450.00 |
| 2915 Lord Byron | | 4,370.00 | 21,550.00 |
| 2931 Lord Byron | | 8,958.00 | 18,450.00 |
| 2977 Lord Byron | | 17,348.00 | 24,850.00 |
| 2993 Lord Byron | 2,639.99 | 24,400.00 | 30,104.24 |
| 2843 Lord Byron | | 9,160.00 | 24,822.00 |
| 2853 Lord Byron | | 21,737.78 | 32,745.03 |
| 2863 Lord Byron | | 19,517.94 | 28,600.00 |
| 2873 Lord Byron | | 17,914.00 | 29,790.00 |
| 2883 Lord Byron | | 3,974.00 | 24,349.00 |
| 4480 Highway 101 Bldg G | | 68,725.86 | 158,913.01 |
| 2701 Lord Byron | | | |
| 3004 Kinney Loop | | 6,252.00 | 10,800.00 |
| 3058 Kinney Loop | | 4.00 | 13,957.00 |
| 28737 Grumman Rd Hanger | | 2,900.00 | 27,476.00 |
| 90363 Boeing Dr Hanger | | | |
| **Total Property Revenue** | $ 8,947,836.28 | $ 4,496,587.06 | $ 4,304,679.59 |
| | | | |
| **Other Revenue** | | | |
| Crescent Village Apt Rental Fee | | 670.00 | |
| Interest Income | $ 3,273.49 | 39,535.15 | 991.70 |
| Interest Income - N/R | 6,368.89 | 2,948.28 | 2,032.21 |
| Dividend Income | | | |
| Crescent Village Event Income | 449.00 | | |
| Gain / Loss Sale of Assets | 3,894,407.33 | 3,734,762.35 | 525,080.88 |
| APM Revenue | | | 119,839.59 |
| Business Energy Tax Credit Sold | | 4,354.00 | |
| Other Income | 1,023.32 | | |
| **Total Other Revenue** | $ 3,905,522.03 | $ 3,772,269.78 | $ 647,944.38 |
| **Total Revenue** | $ 12,853,358.31 | $ 8,268,856.84 | $ 4,952,623.97 |

**Arlie & Company**

Historical Income Statement for the Period 2008 thru 2010

**CASH DISBURSEMENTS:**

Property Expenses (Including Debt Service in 2008 & 2009)

| | | | |
|---|---:|---:|---:|
| LCC | 11,936.95 | 8,073.32 | 7,823.70 |
| Hawaii Conservation | 149,116.89 | 43,065.71 | 49,805.82 |
| Hawaii Puueo | | | 2,874.74 |
| Woodburn | 349.06 | 218.04 | 171.21 |
| N. Boundary | | | |
| Lex Corp | 900.61 | 252.29 | 42.05 |
| Schnetzky | 31.95 | 215.28 | |
| Crescent Village | 3,995,754.57 | 2,464,701.81 | 846,195.78 |
| W. 11th | 83,355.08 | 82,060.08 | 26,765.85 |
| West 11th WIP | 5,285.20 | 6,671.41 | |
| 722 Country Club | 37,709.11 | 379.51 | |
| Westlane | 825,246.79 | 739,816.72 | 255,616.05 |
| 4048 West 1st | 37,351.92 | | |
| Roseburg (Garden Way) | 325,181.32 | 338,113.65 | 92,045.30 |
| Willow Creek | 6,370.91 | 5,820.36 | 2,363.54 |
| Pine Grove WIP | (1,150.00) | 376.00 | |
| 871 Country Club | 65,528.42 | 405.81 | |
| 3443 Hilyard | 73,788.61 | 119,471.78 | 6,198.33 |
| Savannah | (20.00) | | |
| Sabin S Acres | | 3,250.00 | |
| My Coffee / T-Mobile | 61,034.21 | 61,211.06 | 14,049.43 |
| Pine Grove-206 Bluebird | | (270.39) | |
| Fairway Inn - Woodburn | 22,454.26 | 35,559.24 | 11,277.45 |
| Goodpasture Tower | 41,993.96 | 41,332.38 | 12,064.49 |
| 1236 Garden Way - Qwest Bldg | 4,180.40 | 3,491.40 | 36,289.29 |
| 875 Country Club | 31,943.48 | 93,596.32 | |
| Shadow Ridge | 2,991,068.41 | 677,146.26 | |
| Fairways | 3,188,471.35 | 49,272.63 | |
| 2890 Kinney Loop | 4,295.56 | 2,055.32 | 630.90 |
| 2834 Kinney Loop | 31,902.29 | 42,670.13 | 27,929.64 |
| 2802-2804 Kinney Loop | 35,619.39 | 40,121.58 | 57,196.98 |
| 2743 Coburg Road | 33,102.42 | 31,912.82 | 2,030.20 |
| 2729 Coburg Road | 20,671.83 | 23,097.66 | 1,578.27 |
| Florentine Village | (1,718.47) | | |
| 3082 Kinney Loop | 22,305.04 | 25,611.68 | 16,970.93 |
| 3108 Kinney Loop | 20,765.26 | 22,753.36 | 18,717.63 |
| 3018 Kinney Loop - Dog Park | 2,947.10 | 1,002.78 | 208.95 |
| Oil Can Henry's | 28,622.87 | 71,437.78 | 22,671.02 |
| 3110 Kinney Loop | 15,067.94 | 15,137.76 | 3,839.23 |
| Natron / Jasper | 55,680.56 | 72,143.42 | 69,819.91 |
| 2960 Kinney Loop | 11,675.23 | 12,890.50 | 22,140.04 |
| 2850 Kinney Loop | 18,676.34 | 19,071.51 | 8,205.61 |
| 2890 Chad Drive | 136,468.15 | 248,821.73 | 83,312.76 |
| 2892 Crescent Avenue | 49,429.85 | 269,188.19 | 61,799.69 |
| 3032 Kinney Loop | 1,361.90 | 28,404.49 | 7,276.41 |
| 1909 Lord Byron | 4,661.69 | 38,963.58 | 12,957.61 |
| 2915 Lord Byron | 4,859.60 | 39,913.85 | 11,630.62 |
| 2931 Lord Byron | 4,974.84 | 42,673.23 | 12,258.06 |
| 2977 Lord Byron | 4,528.20 | 37,650.79 | 30,991.43 |
| 2993 Lord Byron | 4,973.91 | 39,904.29 | 13,894.61 |
| 2843 Lord Byron | | 33,336.22 | 29,865.44 |
| 2853 Lord Byron | | 33,970.89 | 11,108.42 |
| 2863 Lord Byron | | 31,478.46 | 9,187.98 |
| 2873 Lord Byron | | 32,642.04 | 9,937.57 |
| 2883 Lord Byron | | 31,723.06 | 8,221.34 |
| 4480 Highway 101 Bldg G | | 70,246.41 | 72,398.95 |
| 2701 Lord Byron | | 2,914.81 | 923.60 |
| 3004 Kinney Loop | | 5,885.16 | 1,372.30 |
| 3058 Kinney Loop | | 26,964.30 | 10,548.95 |
| 28737 Grumman Rd Hanger | 30,369.11 | 33,935.56 | 7,308.86 |
| 90363 Boeing Dr Hanger | 3,257.42 | 9,241.42 | 246,981.66 |
| CV Restaurants | 2,612.00 | | |

| | | | |
|---|---:|---:|---:|
| **Total Property Expenses** | $  12,309,337.30 | $  6,202,007.33 | $  2,217,506.68 |
| | | | |
| **Gross Profit (Loss)** | $  348,020.81 | $  2,066,849.59 | $  2,735,117.29 |
| | | | |
| **Department  & Administrative Expenses** | $  5,434,122.15 | $  4,482,847.12 | $  2,478,743.62 |
| | | | |
| **Accrued Debt Service** | $  - | $  - | $  1,301,918.47 |
| | | | |
| **Net Operating Profit (Loss)** | $  (5,086,101.34) | $  (2,415,997.53) | $  (1,045,544.80) |

# EXHIBIT D

**Arlie & Company**
Income Statement and Cash Flow Projection for the Period 2011 thru 2016
Adjusted Cash Basis

| | Projected 2011 | Projected 2012 | Projected 2013 | Projected 2024 | Projected 2015 | Projected 2016 |
|---|---|---|---|---|---|---|
| **CASH RECEIVED:** | | | | | | |
| **Property Revenue** | | | | | | |
| LCC | | | | | | |
| Hawaii Conservation | | | | | | |
| Hawaii Puueo | | | | | | |
| Woodburn | | | | | | |
| Crescent Village | $ 2,516,023.98 | $ 2,757,489.28 | $ 2,974,839.89 | $ 3,024,308.97 | $ 3,100,432.59 | $ 3,183,979.66 |
| W. 11th | | | | | | |
| Westlane | 581,036.68 | - | - | - | | - |
| Roseburg (Garden Way) | 334,766.67 | 455,144.05 | 462,032.50 | 478,226.30 | 509,063.43 | 514,021.46 |
| Willow Creek | | | | | | |
| My Coffee / T-Mobile | 61,519.46 | 63,095.76 | 64,712.58 | 66,371.01 | 68,485.16 | 70,462.41 |
| Fairway Inn - Woodburn | | | | | | |
| Goodpasture Tower | 31,084.43 | 31,861.55 | 32,658.09 | 33,474.53 | 34,638.21 | 36,307.50 |
| 1236 Garden Way - Qwest Bldg | - | - | - | - | | - |
| 2890 Kinney Loop | - | - | - | - | | - |
| 2834 Kinney Loop | 13,337.50 | 13,670.95 | 14,012.73 | 14,363.01 | 14,749.33 | 15,156.25 |
| 2802-2804 Kinney Loop | 17,185.00 | 17,542.92 | 17,981.40 | 18,430.98 | 19,252.02 | 19,853.40 |
| 2743 Coburg Road | - | - | - | - | | - |
| 2729 Coburg Road | 9,225.00 | 9,455.64 | 9,692.04 | 9,934.32 | 10,524.00 | 10,787.16 |
| 3082 Kinney Loop | 13,530.00 | 13,868.28 | 14,214.96 | 14,570.28 | 15,600.00 | 15,990.00 |
| 3108 Kinney Loop | 13,530.00 | 13,868.28 | 14,214.96 | 14,570.28 | 15,900.00 | 16,297.44 |
| 3018 Kinney Loop - Dog Park | | | | | | |
| Oil Can Henry's | 80,099.19 | 80,456.29 | 83,669.10 | 88,030.94 | 91,006.94 | 92,956.94 |
| 3110 Kinney Loop | | | | | | |
| Natron / Jasper | | | | | | |
| 2960 Kinney Loop | | | | | | |
| 2850 Kinney Loop | 14,760.00 | 15,129.00 | 15,507.24 | 15,894.96 | 17,100.00 | 17,527.56 |
| 2890 Chad Drive | | | | | | |
| 2892 Crescent Avenue | | | | | | |
| 3032 Kinney Loop | | | | | | |
| 2909 Lord Byron | 24,034.97 | 24,635.86 | 25,251.78 | 25,883.09 | 26,568.75 | 27,657.50 |
| 2915 Lord Byron | 25,267.53 | 25,899.21 | 26,546.75 | 27,210.41 | 27,938.29 | 29,160.63 |
| 2931 Lord Byron | 25,320.06 | 25,953.06 | 26,601.94 | 27,266.98 | 28,043.90 | 29,160.63 |
| 2977 Lord Byron | 29,767.50 | 30,511.68 | 31,274.46 | 32,056.32 | 33,026.04 | 34,020.00 |
| 2993 Lord Byron | 28,407.88 | 29,118.10 | 29,846.04 | 30,592.18 | 31,422.40 | 32,535.00 |
| 2843 Lord Byron | 5,898.75 | - | - | - | | - |
| 2853 Lord Byron | 6,900.00 | - | - | - | | - |
| 2863 Lord Byron | 7,800.00 | - | - | - | | - |
| 2873 Lord Byron | 8,302.50 | - | - | - | | - |
| 2883 Lord Byron | 5,996.25 | - | - | - | - | - |
| 4480 Highway 101 Bldg G | 182,457.71 | 186,072.89 | 193,472.96 | 201,652.27 | 206,502.17 | 212,294.11 |
| 2701 Lord Byron | | | | | | |
| 3004 Kinney Loop | 11,070.00 | 11,346.72 | 11,630.40 | 11,921.16 | 12,180.00 | 12,484.56 |
| 3058 Kinney Loop | | | | | | |
| 28737 Grumman Rd Hanger | 36,115.86 | 37,018.74 | 37,944.18 | 38,892.78 | 40,236.48 | 41,613.75 |
| 90363 Boeing Dr Hanger | | | | | | |
| **Total Property Revenue** | **$ 4,083,436.92** | **$ 3,842,158.26** | **$ 4,086,104.00** | **$ 4,179,650.78** | **$ 4,302,669.71** | **$ 4,412,265.96** |
| | | | | | | |
| **Other Revenue** | | | | | | |
| Crescent Village Apt Rental Fee | | | | | | |
| Interest Income | $ 24,000.00 | $ 24,000.00 | $ 24,000.00 | $ 24,000.00 | $ 24,000.00 | $ 24,000.00 |
| Interest Income - N/R | | | | | | |
| Dividend Income | | | | | | |
| Crescent Village Event Income | | | | | | |
| Gain / Loss Sale of Assets | | | | | | |
| APM Revenue | 97,200.00 | 97,200.00 | 97,200.00 | 97,200.00 | 97,200.00 | 97,200.00 |
| Business Energy Tax Credit Sold | | | | | | |
| Other Income | | | | | | |
| **Total Other Revenue** | **$ 121,200.00** | **$ 121,200.00** | **$ 121,200.00** | **$ 121,200.00** | **$ 121,200.00** | **$ 121,200.00** |
| **Total Revenue** | **$ 4,204,636.92** | **$ 3,963,338.26** | **$ 4,207,304.00** | **$ 4,294,850.78** | **$ 4,423,869.71** | **$ 4,533,465.96** |

**Arlie & Company**
Income Statement and Cash Flow Projection for the Period 2011 thru 2016
Adjusted Cash Basis

| | Projected 2011 | Projected 2012 | Projected 2013 | Projected 2014 | Projected 2015 | Projected 2016 |
|---|---|---|---|---|---|---|
| **CASH DISBURSEMENTS:** | | | | | | |
| **Property Expenses (including Debt Service)** | | | | | | |
| LCC | $    8,629.40 | $    7,499.80 | $    7,499.80 | $    7,499.80 | $    7,499.80 | $    7,499.80 |
| Hawaii Conservation | 33,037.00 | 33,037.00 | 33,037.00 | 33,037.00 | 33,037.00 | 33,037.00 |
| Hawaii Puueo | - | - | - | - | - | - |
| Woodburn | 15,449.47 | - | - | - | - | - |
| N. Boundary | 3,358.28 | 1,995.86 | 1,995.86 | 1,995.86 | 1,995.86 | 1,995.86 |
| Crescent Village | 2,248,610.06 | 2,284,219.41 | 2,361,478.18 | 2,542,265.44 | 2,620,092.55 | 2,661,353.76 |
| W. 11th | 11,043.78 | - | - | - | - | - |
| Westlane | 145,948.71 | - | - | - | - | - |
| Roseburg (Garden Way) | 226,629.58 | 265,209.24 | 266,588.44 | 268,463.01 | 270,645.85 | 276,940.11 |
| Willow Creek | 10,073.76 | 6,381.71 | 6,381.71 | 6,381.71 | 6,381.71 | 6,381.71 |
| My Coffee / T-Mobile | 45,284.14 | 51,332.21 | 51,637.91 | 51,952.42 | 52,058.13 | 52,156.99 |
| Fairway Inn - Woodburn | - | - | - | - | - | - |
| Goodpasture Tower | 24,208.83 | 25,193.47 | 25,485.20 | 31,120.58 | 33,025.22 | 33,108.68 |
| 1236 Garden Way - Qwest Bldg | - | - | - | - | - | - |
| Fairways | - | - | - | - | - | - |
| 2890 Kinney Loop | 2,553.94 | 2,144.30 | 2,201.94 | 2,261.06 | 2,427.46 | 2,807.64 |
| 2834 Kinney Loop | 4,034.59 | 2,969.98 | 3,055.56 | 3,143.62 | 3,409.55 | 3,429.89 |
| 2802-2804 Kinney Loop | 5,412.78 | 3,915.99 | 3,996.70 | 4,145.45 | 4,662.60 | 4,692.67 |
| 2743 Coburg Road | 3,706.95 | 2,444.22 | 2,517.55 | 2,593.07 | 2,750.00 | 2,925.00 |
| 2729 Coburg Road | 3,596.45 | 2,506.52 | 2,579.25 | 2,654.10 | 2,998.28 | 3,011.44 |
| 3082 Kinney Loop | 12,236.29 | 12,914.87 | 13,001.87 | 16,635.61 | 18,520.05 | 18,539.55 |
| 3108 Kinney Loop | 10,770.55 | 11,113.45 | 11,200.40 | 14,119.91 | 15,850.98 | 16,020.85 |
| 3018 Kinney Loop - Dog Park | 1,364.81 | 1,068.60 | 1,097.92 | 1,128.06 | 1,226.30 | 1,306.48 |
| Oil Can Henry's | 53,469.18 | 59,227.24 | 59,737.30 | 60,315.39 | 60,464.09 | 60,561.59 |
| 3110 Kinney Loop | 1,509.22 | 2,055.71 | 2,114.63 | 2,128.63 | 2,581.48 | 2,781.48 |
| Natron / Jasper | 9.63 | - | - | - | - | - |
| 2960 Kinney Loop | 10,886.85 | 12,498.35 | 12,540.84 | 16,533.12 | 18,172.95 | 18,397.95 |
| 2850 Kinney Loop | 7,017.50 | 6,951.75 | 6,853.23 | 8,542.45 | 9,450.97 | 9,472.35 |
| 2890 Chad Drive | 50,686.61 | - | - | - | - | - |
| 2892 Crescent Avenue | 38,956.85 | - | - | - | - | - |
| 3032 Kinney Loop | 1,478.96 | 1,540.34 | 1,583.81 | 1,628.53 | 2,081.48 | 2,256.48 |
| 2909 Lord Byron | 20,228.69 | 20,531.27 | 20,736.01 | 25,782.96 | 26,675.72 | 26,730.16 |
| 2915 Lord Byron | 20,892.09 | 21,211.10 | 21,435.91 | 26,503.54 | 27,119.20 | 27,180.32 |
| 2931 Lord Byron | 21,030.83 | 21,233.00 | 21,458.46 | 26,526.75 | 27,349.48 | 27,405.32 |
| 2977 Lord Byron | 20,485.10 | 21,030.94 | 21,249.19 | 26,310.04 | 27,148.59 | 27,198.28 |
| 2993 Lord Byron | 20,939.07 | 21,190.39 | 21,412.70 | 26,477.75 | 27,289.16 | 27,344.79 |
| 2843 Lord Byron | 1,816.08 | - | - | - | - | - |
| 2853 Lord Byron | 1,925.68 | - | - | - | - | - |
| 2863 Lord Byron | 1,882.70 | - | - | - | - | - |
| 2873 Lord Byron | 1,943.27 | - | - | - | - | - |
| 2883 Lord Byron | 1,803.86 | - | - | - | - | - |
| 4480 Highway 101 Bldg G | 114,290.23 | 129,687.36 | 133,382.53 | 137,836.64 | 138,864.00 | 139,153.60 |
| 2701 Lord Byron | 2,199.60 | 2,199.60 | 2,199.60 | 2,199.60 | 2,480.50 | 2,480.50 |
| 3004 Kinney Loop | 2,507.68 | 1,946.31 | 2,001.77 | 2,058.80 | 2,556.08 | 2,571.31 |
| 3058 Kinney Loop | 13,387.53 | 15,046.70 | 15,146.60 | 19,385.99 | 21,272.39 | 21,547.39 |
| 28737 Grumman Rd Hanger | 20,668.91 | 24,593.85 | 24,762.86 | 24,936.71 | 25,738.56 | 15,807.43 |
| 90363 Boeing Dr Hanger | 3,845.17 | 3,431.53 | 3,455.92 | 3,480.90 | 3,755.84 | 3,855.84 |
| **Total Property Expenses** | $  3,249,810.85 | $  3,078,322.07 | $  3,163,826.84 | $  3,400,044.40 | $  3,499,581.83 | $  1,549,952.21 |
| **Gross Profit (Loss)** | $    954,826.07 | $    885,036.18 | $  1,043,477.36 | $    894,806.38 | $    924,287.89 | $    983,513.74 |

## Arlie & Company

Income Statement and Cash Flow Projection for the Period 2011 thru 2016
Adjusted Cash Basis

| | Projected 2011 | Projected 2012 | Projected 2013 | Projected 2014 | Projected 2015 | Projected 2016 |
|---|---|---|---|---|---|---|
| **Department Expenses** | | | | | | |
| Administration Department | $ 1,761,920.16 | $ 1,750,722.49 | $ 1,750,722.49 | 1,714,858.49 | 1,726,056.16 | $ 1,726,056.16 |
| Development Department | 256,488.84 | 256,488.84 | 256,488.84 | 258,168.84 | 253,669.45 | 253,669.45 |
| APM Department | 2,318.65 | 2,318.65 | 2,287.65 | 2,280.00 | 2,280.00 | 2,280.00 |
| Marketing Department | 159,049.35 | 159,049.35 | 159,049.35 | 159,049.35 | 156,984.23 | 156,984.23 |
| **Total Department Expenses** | **$ 2,179,777.00** | **$ 2,168,579.33** | **$ 2,168,543.33** | **$ 2,134,356.68** | **$ 2,138,989.84** | **$ 2,138,989.84** |
| | | | | | | |
| **Other Expenses** | | | | | | |
| Income Tax Expense | - | - | - | - | - | - |
| Interest Expense | - | - | - | - | - | - |
| **Total Other Expenses** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| **Net Operating Profit (Loss)** | **$ (1,224,950.83)** | **$ (1,283,563.15)** | **$ (1,125,065.97)** | **$ (1,239,550.30)** | **$ (1,214,701.95)** | **$ (1,155,476.09)** |
| | | | | | | |
| | | | | | | |
| **CASH FLOW PROJECTIONS** | | | | | | |
| **Cash Flows from Operating Activities** | | | | | | |
| Net Income | $ (1,224,951) $ | (1,283,563) $ | (1,125,066) $ | (1,239,550) $ | (1,214,702) $ | (1,155,476) |
| Net proceeds of Property Sale [Note 3] | - | - | - | - | - | - |
| Sale of Bare Land [Note 2] | 1,200,000 | - | - | - | - | - |
| Sale of Bare Land [Note 1] | 1,356,000 | - | - | - | - | - |
| | | | | | | |
| **Net Cash Flow from Operating Activities** | **$ 1,331,049** | **$ (1,283,563)** | **$ (1,125,066)** | **$ (1,239,550)** | **$ (1,214,702)** | **$ (1,155,476)** |
| | | | | | | |
| **Cash Flows from Investing Activities** | | | | | | |
| Collect on Roberts Bankruptcy | 175,000 | - | - | - | - | - |
| **Net Cash Flows from Investing Activities** | **$ 175,000** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| | | | | | | |
| **Cash Flow from Financing Activities** | | | | | | |
| Replaced Debt [Note 4] | $ - | $ - | $ - | $ - | $ - | - |
| Property Taxes Paid at Reorganization | (745,255) | | | | | |
| Additional Admin Costs at Reorganization | (1,000,000) | | | | | |
| Unsecured Creditors Paid at Reorg | (53,428) | | | | | |
| Debt Reduction [Note 5] | (300,382) | | | | | |
| Reduce debt on LCC Sale | (315,000) | | | | | |
| Roseburg TI fund | (457,000) | | | | | |
| Additional Financing net of Accrued Int | 546,670 | | | | | |
| Cash Flow From Inventory Sales [Note 6] | 3,665,000 | | 17,627,800 | | | 8,908,322 |
| Accrued Interest Paid | | | | (2,946,618) | | (538,517) |
| Deferred Unsecured Interest Paid | | | | (612,636) | | (186,716) |
| Reduce Non-income Debt 50% | | | | (6,051,285) | | (6,051,285) |
| Reduce Unsecured Creditor Debt | | | | (2,667,370) | | (2,667,370) |
| Debt Reduction [Note 7] | (1,032,343) | | | | | |
| **Net Cash Flow from Financing Activities** | **$ 308,262** | **$ -** | **$ 17,627,800** | **$ (12,277,909)** | **$ -** | **$ (535,567)** |
| | | | | | | |
| Increase/Decrease in Cash | $ 1,814,312 | $ (1,283,563) | $ 16,502,734 | $ (13,517,459) | $ (1,214,702) | $ (1,691,043) |
| | | | | | | |
| Cash, Beginning of Period | 1,577,348 | 3,391,660 | 2,108,096 | 18,610,830 | 5,093,371 | 3,878,669 |
| | | | | | | |
| Cash, End of Period | $ 3,391,660 | $ 2,108,096 | $ 18,610,830 | $ 5,093,371 | $ 3,878,669 | $ 2,187,627 |
| | | | | | | |
| | | | | | | |
| Total Debt at Beginning of Reorganization | $ 65,515,269 | | | | | |
| | | | | | | |
| Total Secured Debt at End of Year | 46,889,897 | 47,434,513 | 47,979,128 | 39,323,797 | 39,586,887 | 33,064,229.01 |
| | | | | | | |
| Unsecured Debt at End of Year | 5,527,905 | 5,714,621 | 5,901,337 | 2,737,708 | 2,831,066 | (0.01) |
| | | | | | | |
| Total Debt at End of Year | $ 52,417,802 | $ 53,149,123 | $ 53,880,465 | $ 42,061,505 | $ 42,417,953 | $ 33,064,229 |

Note 1 - Partial Sale of LCC Land
Note 2 - Sale of Natron Land
Note 3 - Sale of Inventory Income Property and subsequent loss of budgeted rental income
Note 4 - Refinancing of Income Property and following increased interest expense
Note 5 - Pay down of Umpqua debt on Income Properties
Note 6 - Cash generated from Inventory Liquidation
Note 7 - Loan Pay Off on Sale of Natron

## CERTIFICATE OF SERVICE

I, Diane H. Hinojosa, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action.  My business address is 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California.

I certify that on February 14, 2011, I caused to be served the **DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION (FEBRUARY 14, 2011)** by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users and by U.S. mail to the attached service list.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on February 14, 2011, at Los Angeles, California.

   ___ /s/ *Diane H. Hinojosa* _____
            Diane H. Hinojosa

Label Matrix for local noticing
0979-6
Case 10-60244-aer11
District of Oregon
Eugene
Mon Feb 14 08:36:04 PST 2011

American Express Bank FSB
c/o becket and Lee LLP
POB 3001
Malvern, PA 19355-0701

Arlie & Company
2911 Tennyson Ave., #400
Eugene, OR 97408-4693

Century Bank
c/o Michael Butler
P.O. Box 769
Eugene, OR 97440-0769

Gartland, Nelson, McCleery, Wade & Walloch,
44 Club Road, Suite 200
Eugene, OR 97401-2460

WmThomas Construction
POB 2409
Florence, OR 97439-0155

405 E 8th Ave #2600
Eugene, OR 97401-2725

2 form Architecture
121 Lawrence St
Eugene, OR 97401-2221

AT&T
Global Imaging Center
POB 1828
Alpharetta, GA 30023-1828

Abdulaziz Al-Sabah
2750 Shadow View Dr.
#425
Eugene, OR 97408-4644

Abee Windows Screens & Glass
795 River Ave #B
Eugene, OR 97404-2539

Acocella Tile Inc
7967 Thurston Rd
Springfield, OR 97478-9680

Adam & Allison Lesh
2750 Shadow View Dr.
#211
Eugene, OR 97408-4641

Adam Grosowsky
1675 Crest Dr
Eugene, OR 97405-1988

Adam H. Falk,
584 Romie Howard Rd
Yoncalla, OR 97499-9704

Ajeet & Kartar Khalsa & William Zaworsk
2751 Shadow View Dr #412
Eugene, OR 97408-4671

Al King Securities, LLC
2745 Shadow View Dr.
Eugene, OR 97408-4610

Alice Smith
32624 Christian Way
Coburg, OR 97408-9255

All Bright Carpet Cleaning
30 Honor Loop
Creswell, OR 97426-9899

Allstate Real Estate
24957 Hwy. 126
Veneta, OR 97487-9459

Amanda Ostrom
2751 Shadow View Dr #333
Eugene, OR 97408-4662

Amanda Porte & Audrey Geib
2751 Shadow View Dr #334
Eugene, OR 97408-4662

American Medical Concepts
2650 Suzanne Way, Suite 130
Eugene, OR 97408-7619

American Medical Concepts Inc
28050 SW Boberg Rd
Wilsonville OR 97070-7200

Amy Miller
POB 1327
Franklin, TN 37065-1327

Andrea Garcia
2751 Shadow View Dr #432
Eugene, OR 97408-4671

Angela Copeland
2750 Shadow View Dr.
#335
Eugene, OR 97408-4643

Anna Gasperowicz
2750 Shadow View Dr.
#332
Eugene, OR 97408-4643

Anna Hu
2750 Shadow View Dr.
#423
Eugene, OR 97408-4644

Apartment Guide
Consumer Source Inc
POB 402039
Atlanta, GA 30384-2039

April Peterson
2751 Shadow View Dr #232
Eugene, OR 97408-4661

Arlene Cancel
2750 Shadow View Dr.
#435
Eugene, OR 97408-4644

Associated Heating & A/C Inc
3981 W 12th Ave
Eugene, OR 97402-5622

B2 Wine Bar
2794 Shadow View Dr
Eugene, OR 97408-4610

Balzhiser & Hubbard Inc
100 West 13th Ave
Eugene, OR 97401-3433

Bank of America NA
c/o Daniel P Pepple
Pepple Johnson Cantu & Schmidt PLLC
1501 Western Ave #600
Seattle WA 98101-3501

Beehive Rental Company
POB 25139
Eugene, OR 97402-0446

Bell Hardware
208 Madison
Eugene, OR 97402-5033

Berry Architects
460 East Second Ave
Eugene, OR 97401-2419

Blink New Media
86152 Garden Valley Rd
Eugene, OR 97405-9640

Bob Cherney
2751 Shadow View Dr #234
Eugene, OR 97408-4661

Bonne Chance Bistro
POB 41707
Eugene OR 97404-0500

Braun Landscape Inc
POB 2671
Eugene, OR 97402-0223

Brent Dorman
2751 Shadow View Dr #331
Eugene, OR 97408-4662

Brittany & Tracy Thompson
2750 Shadow View Dr.
#312
Eugene, OR 97408-4643

Brooke Conlon
2750 Shadow View Dr.
#223
Eugene, OR 97408-4642

Brothers Cleaning Services Inc
582 Shelley St
Springfield, OR 97477-1967

Bruce Moore
2751 Shadow View Dr #212
Eugene, OR 97408-4640

Buck's Sanitary Service
POB 21527
Eugene, OR 97402-0409

Builder's Electric Inc
195 Madison St
Eugene, OR 97402-5030

Burr, Pilger & Mayer LLP
Two Palo Alto Square
Palo Alto, CA 94306-2122

Burrell Bros. Electric
POB 697
Walterville, OR 97489-0697

Buster Messmer
3082 Kinney Lp.
Eugene, OR 97408-5024

C & K Market
615 5th St
Brookings OR 97415-9199

CC Reporting & Videoconferencing
172 E 8th Ave
Eugene, OR 97401-2921

CPM Development Corp. dba Eugene Sand & Grav
c/o Atty Douglas L Gallagher
423 Lincoln St
Eugene OR 97401-2516

Camas Landscaping Service
POB 42284
Eugene, OR 97404-0600

Carolyn R. Chatman
29840 Willow Ck. Rd #23
Eugene, OR 97402-9186

Carter's Window Coverings
4257 Barger Dr #141
Eugene, OR 97402-1310

Casey Torstenson
2750 Shadow View Dr.
#310
Eugene, OR 97408-4656

Cassandra Champion
2802 Kinney Lp.
Eugene, OR 97408-5022

Cavanagh Ent LLC / Century Lighting
550 G Shelley St
Springfield OR 97477-1999

Central Coast Disposal Inc
POB 1629
Florence, OR 97439-0105

Central Lincoln PUD
2129 N. Coast Hwy
Newport, OR 97365-1705

Central Print
47 West 5th
Eugene, OR 97401-2675

Century Bank
POB 769
Eugene, OR 97440-0769

Cessna Aircraft Co
23260 Network Pl
Chicago, IL 60673-1232

Chad Westphal
2750 Shadow View Dr.
#320
Eugene, OR 97408-4643

Chambers Construction
3028 Judkins Rd
Eugene, OR 97403-2226

Charlene & Nykolas Westbrook
2750 Shadow View Dr.
#231
Eugene, OR 97408-4642

Charles Thurston
2863 Lord Byron Pl.
Eugene, OR 97408-4636

Chase Connor & Ashley Delp
2750 Shadow View Dr.
#224
Eugene, OR 97408-4642

Child Center, The
3995 Marcola Rd
Springfield, OR 97477-7948

Chris Blanchard
3108 Kinney Lp.
Eugene, OR 97408-5025

Christenson Electric Inc
POB 13010
Eugene, OR 97440-0032

Christina Friesen
2751 Shadow View Dr #322
Eugene, OR 97408-4662

City of Eugene
Financial Services
Eugene, OR 97440

City of Florence
250 Hwy 101
Florence, OR 97439-7628

City of Veneta
88184 8th St
Veneta, OR 97487-9797

City of Veneta
88184 Eighth St
Veneta, OR 97487-9797

Comcast
POB 34744
Seattle, WA 98124-1744

Comfort Flow Heating
1951 Don St
Springfield, OR 97477-1993

Comstock & Assoc Inc
POB 70690
Eugene, OR 97401-0134

Construction Specialties Inc
POB 415278
Boston, MA 02241-5278

Construction Specialties Inc
c/o Commercial Collection Corp
POB 288
Tonavanda NY 14151-0288

Consumer Source Holding, Inc.
c/o Greg A. Pfister
720 SW Washington St. #750
Portland, OR 97205-3509

Cornerstone Caf
2729 Shadow View Dr
Eugene OR 97408-4610

Costco Credit Account
POB 5219
Carol Stream, IL 60197-5219

County Transfer & Recycling
Dept 1433
Los Angeles, CA 90084-0001

County of Hawaii Finance Dept
25 Aupuni St #2103
Hilo HI 96720-4245

Courtney Jacobs
2750 Shadow View Dr.
#225
Eugene, OR 97408-4642

Creative Commercial Environments Inc
4219 West 5th Ave
Eugene, OR 97402-5306

Crescent Village Restaurants LLC
2911 Tennyson Ave #400
Eugene OR 97408-4693

Cyndy Stechelin
2850 Kinney Lp.
Eugene, OR 97408-5022

Dairy Queen/T&C Investments
24943 Hwy. 126
Veneta, OR 97487-9459

Dave Stearns
2750 Shadow View Dr.
#331
Eugene, OR 97408-4643

David Dowd
2750 Shadow View Dr.
#230
Eugene, OR 97408-4642

Del Oeste Equine Hospital
90238 Prairie Rd
Eugene, OR 97402-9606

Delta Landscape & Irrigation
POB 40217
Eugene, OR 97404-0029

DiMar Real Estate
24957 Hwy 126
Veneta OR 97487-9459

Donald & Christine Wilson
2853 Lord Byron Pl.
Eugene, OR 97408-4636

Donald & Derek Hadley
2750 Shadow View Dr.
#212
Eugene, OR 97408-4641

Donald Kaipus
2750 Shadow View Dr.
#232
Eugene, OR 97408-4642

Douglas County Assessor
1036 SE Douglas Ave
Roseburg, OR 97470-3396

Douglas County Tax Collector
POB 5710
Portland, OR 97228-5710

Douglas County Tax Collector
POB 850
Roseburg OR 97470-0205

Downtown Athletic Club
999 Willamette St
Eugene, OR 97401-3100

Edward Zancanella
2750 Shadow View Dr.
#424
Eugene, OR 97408-4644

Ehler's Construction
1085 Madeira St
Eugene, OR 97402-2087

Electrical Services & Construction Inc
3986 Carnes Rd
Roseburg OR 97471-4522

Elizabeth Brody
2751 Shadow View Dr #336
Eugene, OR 97408-4671

Embarq
POB 660068
Dallas, TX 75266-0068

Emerald Excavating
4250 West 5th Ave
Eugene, OR 97402-5306

Emerald People's Utility Board
33733 Seavey Loop Rd
Eugene, OR 97405-9602

Emerald Valley Sweeping
POB 41113
Eugene, OR 97404-0303

Empire Group
1410 NW Kearney St #1021
Portland, OR 97209-2772

Erica & Joshua Rich
2751 Shadow View Dr #223
Eugene, OR 97408-4661

Erin Lynch & Michael Johnson
2751 Shadow View Dr #213
Eugene, OR 97408-4640

Essential Building Technologies
Attn: Scott Conley
600 SE Maritime Ave #240
Vancouver, WA 98661-9303

Eugene Area Chamber
1401 Willamette St
Eugene, OR 97401-4003

Eugene Magazine
1400 High St #C-3
Eugene, OR 97401-4192

Eugene Rotary Club
132 E Broadway #732
Eugene, OR 97401-3137

Eugene Sand & Gravel Inc
POB 1067
Eugene, OR 97440-1067


Eugene Water & Electric Board
POB Box 10148
Eugene, OR 97440-2148

Evergreen Land Title Co
1651 Centennial Blvd
Springfield OR 97477-3363

Executive Cleaning Service
POB 70606
Eugene, OR 97401-0131


Eye Beam Event Services
POB 427
Springfield, OR 97477-0063

Fabrication & Mechanical Group
POB 42173
Eugene OR 97404-0581

FedEx Customer Information Svc
Attn Revenue Recovery/Bkcy
3965 Airways Blvd Module G 3rd Fl
Memphis TN 38116-5017


Federal Express
POB 7221
Pasadena, CA 91109-7321

Fern Ridge Chamber of Commerce
POB 335
Veneta, OR 97487-0335

Fifth Third Bank
c/o Daniel J Carragher
Day Pitney LLP
One International Plaza
Boston MA 02110-3179


Figaro's Pizza
88340 Territorial Rd
Veneta OR 97487-9401

Firas Abduljawad
2750 Shadow View Dr.
#323
Eugene, OR 97408-4643

Fireman's Fund Insurance
POB 7166
Pasadena, CA 91109-7166


Flightcraft
POB 5077
Portland, OR 97208-5077

Flightcraft Inc
7777 NE Airport Way
Portland OR 97218-1025

Francis G. Cline
c/o Emerald Exchange
240 E. 15th
Eugene, OR 97401-4167


GE Capital Corp
POB 31001-0802
Pasadena, CA 91110-0001

Garrett James
3004 Kinney Lp.
Eugene, OR 97408-5024

Gartland Nelson McCleery
44 Club Rd, # 200
Eugene, OR 97401-2460


Geoffrey & Pearlenna Walser
2751 Shadow View Dr #430
Eugene, OR 97408-4671

George Edward Seaman III
1735 Lexington Ave
Eugene OR 97403-2383

Gerald Druliner
2750 Shadow View Dr.
#336
Eugene, OR 97408-4644


Glumac
Attn: Kevin Dow
320 SW Washington St
Portland, OR 97204-2640

Great Basin Insurance
1140 Willagillespie Rd #15
Eugene OR 97401-6701

Greg Stewart
Consumer Source Holding Co Inc
3585 Engineering Dr
Norcross GA 30092-2831


Guard Publishing
POB 10188
Eugene, OR 97440-2188

Guardian Pest Control
POB 40385
Eugene, OR 97404-0060

HD Supply Facilities Maintenance
POB 509058
San Diego, CA 92150-9058

HS Restaurant, LLC
4351 NW Boxwood Dr.
Corvallis, OR 97330-3382

HSBC Bank Nevada, N.A.
Bass & Associates, P.C.
3936 E. Ft. Lowell Rd., Suite 200
Tucson, AZ 85712-1083

Haas Contracting Inc
4660 Main St #340
Springfield, OR 97478-4015


Harvey & Price
POB 1910
Eugene, OR 97440-1910

Hawaii County Dept of Finance
Real Property Tax Div
Attn: Stanley Sitko, Administator
101 Pauahi St #4
Hilo, HI 96720-4224

Hawaii Forest Industry Assn
POB 5594
Kailua-Kona, HI 96745-5594


Heinke Wholesalers
645 Adams St
Eugene, OR 97402-5120

Herbert D. McKillop
c/o Emerald Exchange
240 E. 15th
Eugene, OR 97401-4167

Hohbach-Lewin Inc
260 Sheridan Ave #150
Palo Alto, CA 94306-2008


Hollywood Video
9275 W Payton Lane
Wilsonville OR 97070-9200

Home Depot
POB 6029
The Lakes, NV 89163-0001

Housing Options
2751 Shadow View Dr #433
Eugene, OR 97408-4671


Hugh McNair Tobin
2873 Lord Byron Pl.
Eugene, OR 97408-4636

IKON Office Services
1516 West 17th St
#103
Tempe, AZ 85281-6218

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346


Ikon Office Solutions
Accounts Receivable Ctr
Attn Bkcy Team
3920 Arkwright Rd #400
Macon GA 31210-1748

Inkwell Medical Gorup, LLC
2911 Tennyson Ave.
#201
Eugene, OR 97408-4393

Integra Telecom
1201 NE Lloyd Blvd
#500
Portland, OR 97232-1259


Interior Technology
POB 80400
Portland, OR 97280-1400

Ipsenault
3791 River Rd North #F
Keizer, OR 97303-4824

Iron Mountain Information Management, Inc.
ATTN: Joseph Corrigan, Esquire
745 Atlantic Avenue, 10th Floor
Boston, MA 02111-2735


Iron Mountain Information Management, Inc.
c/o Frank F. McGinn, Esq.
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110-1610

Iron Mountain Records Mgmt
POB 27128
New York, NY 10087-7128

Ixtapa Mexican Restaurant
24965 Hwy 126
Veneta OR 97487-9459


J.C. Oil Company
3804 West 11th Ave
Eugene OR 97402-3056

JB Electric Inc
4685 Isabelle St
Eugene, OR 97402-9765

JC Laundry West Lane
3561 Crocker Rd
Eugene Or 97404-1696


JRH Engineering
4765 Village Plaza Loop
Eugene, OR 97401-6676

James Heating & Air Conditioning
115 Lawrence St
Eugene, OR 97401-2221

Jeff King Contractor
POB 798
Lebanon, OR 97355-0798

Jeff Markee
2751 Shadow View Dr #414
Eugene, OR 97408-4671

Jennifer Gazo
2751 Shadow View Dr #220
Eugene, OR 97408-4661

Jerry's Home Improvement Center
POB 2611
Eugene, OR 97402-0228

Jesse & Joyce VanHall
2751 Shadow View Dr #236
Eugene, OR 97408-4661

Jessica Foleck
2750 Shadow View Dr.
#430
Eugene, OR 97408-4644

Jessica Pittman
2751 Shadow View Dr #221
Eugene, OR 97408-4661

Jessica Schultz
2750 Shadow View Dr.
#236
Eugene, OR 97408-4642

Jessie Hannah
2751 Shadow View Dr #214
Eugene, OR 97408-4661

Joanna Gonzales & Otto Radke
2751 Shadow View Dr #411
Eugene, OR 97408-4671

John J. Musumeci
2911 Tennyson Ave #400
Eugene OR 97408-4693

John Schwind
2750 Shadow View Dr.
#233
Eugene, OR 97408-4642

Jon & Emily Johnston
2751 Shadow View Dr #238
Eugene, OR 97408-4661

Joon Park Meen & Cho Yoon
2751 Shadow View Dr #235
Eugene, OR 97408-4661

Joseph Noviello
2729 Coburg Rd.
Eugene, OR 97408-4605

Joshua Kermisch
2993 Lord Byron Pl.
Eugene, OR 97408-4638

Joy's Uptown Style
2734 Shadow View Dr.
Eugene, OR 97408-4610

Juan Heredia
2751 Shadow View Dr #337
Eugene, OR 97408-4671

Judith Burke
2751 Shadow View Dr #313
Eugene, OR 97408-4662

Julie Lostritto
2750 Shadow View Dr.
#333
Eugene, OR 97408-4643

KEZI
POB 7009
Eugene, OR 97401-0009

KPFF Consulting Engineers
111 SW Fifth #2500
Portland, OR 97204-3628

Kai Felton
2750 Shadow View Dr.
#325
Eugene, OR 97408-4643

Karen L. Merwin
35379 McKenzie View Dr
Springfield, OR 97478-8709

Katherine Watkinson
2751 Shadow View Dr#237
Eugene, OR 97408-4661

Kathryn & Kenneth Bell
2751 Shadow View Dr #323
Eugene, OR 97408-4662

Keith Schneider
2750 Shadow View Dr.
#321
Eugene, OR 97408-4643

Kelli Fowler
2750 Shadow View Dr.
#330
Eugene, OR 97408-4643

Kimberly Nickelson
2750 Shadow View Dr.
#234
Eugene, OR 97408-4642

Kimberly Rhoades
2750 Shadow View Dr.
#432
Eugene, OR 97408-4644

King County Int'l Airport
7277 Perimeter Rd S
Seattle WA 98108-3844

Kristen Mack
2751 Shadow View Dr #231
Eugene, OR 97408-4661

Kyounga, Connie, Bella & Priya Song
2751 Shadow View Dr #312
Eugene, OR 97408-4662

LDN Comfort LLC
1956 Woodson Loop
Eugene, OR 97405-7019

Lago Blu Gelato
2780 Shadow View Dr.
Eugene, OR 97408-4610

Lamar Advertising Co
Attn Credit Dept
POB 66338
Baton Rouge LA 70896-6338

Lane Council of Government
859 Willamette St
Eugene, OR 97401-2910

Lane County
Solid Waste Management Div
3040 Delta Hwy North
Eugene, OR 97408-1696

Lane County Assessment & Taxation
125 E. 8th Ave
Eugene, OR 97401-2968

Lane County Glass
1369 W. 6th St
Eugene, OR 97402-4576

Lanz Cabinets
3025 W 7th Pl
Eugene, OR 97402-6911

Larry Tardie
2751 Shadow View Dr #423
Eugene, OR 97408-4671

Laurie Cole
2751 Shadow View Dr #436
Eugene, OR 97408-4680

Linda Mccord
2750 Shadow View Dr.
#433
Eugene, OR 97408-4644

Linda S. Trickey
83780 Raintree
Creswell, OR 97426-9439

Lindsey M. Kruger
1784 Cal Young Rd #2013
Eugene, OR 97401-2001

Lucas & Natalie Winder
2750 Shadow View Dr.
#421
Eugene, OR 97408-4644

Lucy Nelson
2750 Shadow View Dr.
#436
Eugene, OR 97408-4645

Lydia & Martin Foster
2751 Shadow View Dr #420
Eugene, OR 97408-4671

MG Midwest/Movie Gallery
24972 Hwy 126
Veneta OR 97487

Macenzi's Too Bar & Grill
POB 40818
Eugene OR 97404-0140

Mackenzie Stewart & Caleb Tommasini
2750 Shadow View Dr.
#311
Eugene, OR 97408-4643

Mailelani Clark
2750 Shadow View Dr.
#334
Eugene, OR 97408-4643

Marion County Assessor
555 Court St Northeast
Salem, OR 97301-3736

Marion County Tax Collector
POB 2511
Salem OR 97308-2511

Marion County Tax Collector
POB 3416
Portland, OR 97208-3416

Mark A. Miksis,
3265 Van Buren
Eugene, OR 97405-2325

Market of Choice
2580 Willakenzie Rd
Eugene, OR 97401-4805

Marsha K. Westling
510 Dartmoor Dr
Eugene, OR 97401-5730

Marti Chaney
2750 Shadow View Dr.
#434
Eugene, OR 97408-4644

Martin Ball
2750 Shadow View Dr.
#220
Eugene, OR 97408-4641

Martina Young; Emily Alison & Lyndsi Ka
2750 Shadow View Dr.
#438
Eugene, OR 97408-4645

Mary LokKesmoe
2750 Shadow View Dr.
#237
Eugene, OR 97408-4642

McCormack Enterprises
PO Box 51600
Eugene, OR 97405-0910


McKenzie Glass Inc
2219 Main St
Springfield, OR 97477-5073

McKenzie River Assoc LLC
1186 Olive St
Eugene, OR 97401-3547

McKillop II Limited Partnership
c/o Hamilton W Budge Jr PC
725 Country Club Rd
Eugene OR 97401-6008


Megan Budge
2751 Shadow View Dr #321
Eugene, OR 97408-4662

Mezza Luna CV, Inc.
2776 Shadow View Dr.
Eugene, OR 97408-4610

Michael Cahn
2931 Lord Byron Pl.
Eugene, OR 97408-4638


Michael K. Cooper
POB 582
Florence, OR 97439-0020

Michael P. Kearney, PC
POB 1758
Eugene, OR 97440-1758

Mid-State Industrial Inc
88696 McVay Hwy
Eugene, OR 97405-9698


Mid-Valley Glass & Millwork
Stephanie Thompson
POB 2666
Eugene, OR 97402-0245

Miller's Custom Services Inc
POB 40023
Eugene, OR 97404-0001

Monica Deshpande
2751 Shadow View Dr #335
Eugene, OR 97408-4662


Monica Tallerday
2035 Alder St
Eugene, OR 97405-2939

My Coffee
POB FF
Springfield OR 97477-0082

NW Farm Credit Services
2911 Tennyson Ave #301
Eugene OR 97408-4693


Nada & Lamees Alharthi
2751 Shadow View Dr #431
Eugene, OR 97408-4671

Napa County Airport
2030 Airport Rd
Napa, CA 94558-6208

National Surety Corp
Attn: Debbie Holstedt
777 San Marin Dr
Novato, CA 94945-1345


Navigators Specialty Ins Co
The Navigators Group Inc
One Penn Plaza
32nd Fl
New York, NY 10119-3299

New Way Electric Inc
POB 21503
Eugene, OR 97402-0409

Nina's Pony Espresso
PO Box 823
Veneta, OR 97487-0823


Nora N. Mitchell,
940 Diamond Hill Rd
Harrisburg, OR 97446-9739

Northwest Elevator Company
Dept LA 21592
Pasadena, CA 91185-0001

Northwest Natural Gas
220 NW 2nd Ave
Portland, OR 97209-3991


Northwest Wall Systems Inc
751 River Ave
Eugene, OR 97404-2514

ODR Bkcy
955 Center NE #353
Salem, OR 97301-2553

Oldfield's Appliance
1465 West 7th Ave
Eugene, OR 97402-4423

Omlid & Swinney
157 S 47th St
Springfield, OR 97478-6625

Oregon Cardiology
4480 Hwy 101 #102
Florence OR 97439-8831

Oregon Water Services Inc
30086 Federal Ln
Eugene OR 97402-9763

Otis Elevator
975 Oak St
Eugene, OR 97401-3136

Otis Elevator Co et al
Attn Treasury Svc-Credit/Coll 1st Fl
1 Farm Springs
Farmington CT 06032-2572

Pacific Air Comfort Inc
POB 790
Roseburg, OR 97470-0161

Pacific Environmental Group Inc
POB 22306
Eugene, OR 97402-0417

Pacific Power
POB 25308
Salt Lake City UT 84125-0308

Pacific Power & Light
825 NE Multnomah
Portland, OR 97232-2135

Pacific Source
2751 Shadow View Dr #233
Eugene, OR 97408-4661

Pacific Source
POB 7068
Eugene, OR 97401-0068

Parties to Go
1022 Green Acres Rd
Eugene, OR 97408-6501

Patricia A. Stroh
734 D St
Springfield, OR 97477-4737

Paul J. Drakes
2 Sawmill Ln.
Ashbury, NJ 08802-1219

Pension Planners Northwest
71 Centennial Loop
Eugene, OR 97401-2443

Pioneer Asset Investment Limited
c/o Wilson C. Muhlheim, Attorney at Law
88 E. Broadway
Eugene, Oregon 97401-3135

Pioneer Asset Investment Ltd.
c/o Joseph Boucher
Neider & Boucher S.C.
440 Science Dr, #300
Madison, WI 53711-1064

Pitney Bowes
1 Elmcroft Rd
Stamford, CT 06926-0700

Pitney Bowes Inc
4901 Belfort Rd #120
Jacksonville FL 32256-6016

Professional Video & Tape Inc
10260 SW Nimbus Ave #M4
Tigard, OR 97223-4344

QBE Specialty Insurance Co
Wall St Plaza
88 Pine St
New York, NY 10005-1801

Qwest
200 Valley River Ctr
Eugene, OR 97401-2174

Qwest Corp
Attn Jane Frey
1801 California St #900
Denver CO 80202-2609

Ready Rooter & Chapman Plumbing
90557 Link Rd
Eugene, OR 97402-9634

Red's Fire Protection Inc
POB 1697
Cottage Grove, OR 97424-0068

Rental Owners Association
POB 51318
Eugene, OR 97405-0905

Rethink LLP
465 California St #310
San Francisco, CA 94104-1839

Rexius
1275 Bailey Hill Rd
Eugene, OR 97402-3002

Richard Guy
2804 Kinney Lp.
Eugene, OR 97408-5022

Rimal Binaya & Pankaja Achakya
2750 Shadow View Dr.
#324
Eugene, OR 97408-4643

Rita Healey
2750 Shadow View Dr.
#338
Eugene, OR 97408-4644

Roadrunner Delivery
POB 25812
Eugene, OR 97402-0460

Roberston Sherwood Architects PC
132 East Broadway #540
Eugene, OR 97401-3176

Robert Gallager
c/o Melanie Hakola
662 NE Stephens St
Roseburg, OR 97470-3151

Robert Liao
2751 Shadow View Dr #410
Eugene, OR 97408-4671

Robert Wilson
2751 Shadow View Dr #230
Eugene, OR 97408-4661

Robinson Plumbing Inc
POB 23753
Eugene, OR 97402-0431

Rodeo Steak House Grill
1200 NW Garden Valley Blvd.
Roseburg, OR 97471-1925

Roger Bingham
2751 Shadow View Dr #211
Eugene, OR 97408-4640

Roseburg Urban Sanitary Authority
POB 1185
Roseburg, OR 97470-0265

Rowell Brokaw Architects PC
1 East Broadway #300
Eugene, OR 97401-3166

Rupa Pillai
2751 Shadow View Dr #330
Eugene, OR 97408-4662

S & S Sweeping
4384 Carnes Rd
Roseburg, OR 97471-4609

SAIF
400 High St SE
Salem, OR 97312-1000

Sadie A. Dressekie
2360 Riverview St
Eugene, OR 97403-2240

Safeco
Liberty Mutual Gorup
175 Berkeley St
Boston, MA 02116-3350

Sanipac
POB 10928
Eugene, OR 97440-2928

Sarah Focht
2750 Shadow View Dr.
#238
Eugene, OR 97408-4642

Sarah Wobbe
32494 Twin Buttes Dr
Halsey, OR 97348-9724

Scott Frost
2977 Lord Byron Pl.
Eugene, OR 97408-4638

Scott M. Diehl
2058 Morning View Dr
Eugene, OR 97405-1632

SecureCom Inc
1940 Don St #100
Springfield OR 97477-5911

Select Medical Corp.
4714 Old Gettysburg Rd.
Gettysburg, PA 17055-4325

ServiceMaster Cleaning Services
POB 42228
Eugene, OR 97404-0591

Shao Yitong
2750 Shadow View Dr.
#337
Eugene, OR 97408-4644

Shawn Wells
143 Stults Ave
Eugene, OR 97404-3270

Siuslaw Bank
POB 11529
Eugene, OR 97440-3729

Siuslaw Bank
c/o John D Albert
POB 968
Salem OR 97308-0968

Sizzler/Double D Foods
302 Shelly St
Springfield OR 97477-5903

Skyview Aerial Surveys Inc
POB 10333
Eugene, OR 97440-2333

Solarc Architecture and Engineering Inc
223 W. 12 Ave
Eugene, OR 97401-3409

Stanley Security Solutions
Dept Ch 10651
Palatine, IL 60055-0001

Staples
POB 95708
Chicago, IL 60694-5708

Staples Inc
Attn Bryan Mannlein
555 W 112th Ave
Northglenn CO 80234-3022

State of Texas
Comptroller of Public Accounts
POB 149348
Austin TX 78714-9348

Structured
12901 SE 97th Ave #400
Clackamas, OR 97015-7907

Stuart Chinn
2750 Shadow View Dr.
#235
Eugene, OR 97408-4642

Summit Bank
c/o Andrew Parks
POB 1758
Eugene OR 97440-1758

Sun Life & Health Ins.
POB 1477
Greenfield, MA 01302-1477

Sunset Heating & Air Inc
5729 Main St
Springfield, OR 97478-5426

Suzanne K. Arlie
2911 Tennyson Ave #400
Eugene OR 97408-4693

Systems West Engineers Inc
411 High St
Eugene, OR 97401-2427

Taco Time
POB 40051
Eugene OR 97404-0004

Tara Carlton
2751 Shadow View Dr #332
Eugene, OR 97408-4662

Taylor Equipment Sales
c/o Donald & Rowdon Catheryn Taylor
2750 Shadow View Dr.
#410
Eugene, OR 97408-4657

Teresa A. Bishow
3520 High St
Eugene, OR 97405-3861

Teresa Courtney
2751 Shadow View Dr #210
Eugene, OR 97408-4640

The Automation Group
2751 Shadow View Dr #438
Eugene, OR 97408-4680

The Carpet Company Inc
1585 W. 7th
Eugene, OR 97402-4462

The Fifth Third Bank
c/o Conrad K. Chiu, Esq.
7 Times Square
Times Square Tower
New York, NY 10036-6524

The Hartford
POB 2907
Hartford, CT 06104-2907

The Keyhole Locksmith
1775 West 11th
Eugene, OR 97402-3713

Third Generation Painting
POB 24728
Eugene, OR 97402-0441

Thompson Landscape Co
POB 11562
Eugene, OR 97440-3762

Thorp Purdy Jewett Urness & Wilkinson PC
1011 Harlow Road, Suite 300
Springfield, OR 97477-1187

Thorp, Purdy, Jewett
1011 Harlow Rd #300
Springfield, OR 97477-1187

Tiffany's Drug Co.
337 Goodpasture Island Rd
Eugene OR 97401-2109

Tim Hanf & Mary Brookes
2751 Shadow View Dr #311
Eugene, OR 97408-4662

Tonkon Torp LLP
888 SW Fifth Ave #1600
Portland OR 97204-2012

Triple J&S Signs
86501 Lorane Hwy
Eugene, OR 97405-9212

Twin Rivers Plumbing
1525 Irving Rd
Eugene, OR 97402-9753

U.S. Forest Service
4480 Hwy 101 #101
Florence OR 97439-8831

US Trustee, Eugene
405 E 8th Ave #1100
Eugene, OR 97401-2728

USAIF
1501 Fourth Ave #1600
Seattle, WA 98101-3613

Umpqua Bank
c/o John Casey Mills
Miller Nash LLP
111 SW 5th Ave #3400
Portland OR 97204-3699

Umpqua Roofing
POB 22424
Eugene, OR 97402-0418

United States Liability Co
190 S. Warner Rd
POB 6700
Wayne, PA 19087-8700

Universal Avionics
Dept 9273
Los Angeles, CA 90084-9273

University of Oregon
POB 3157
Eugene OR 97403-0157

Vanessa Markham
2751 Shadow View Dr #314
Eugene, OR 97408-4662

Velocity
c/o Real Page Inc
POB 671622
Dallas, TX 75267-1622

Veneta Beauty Salon
88920 Lois Lane
Elmira OR 97437-9729

Veneta Gas & Go
24927 Hwy 126
Veneta OR 97487-9459

Veneta Subway
24927-A Hwy 126
Veneta OR 97487

Verb Marketing & PR Inc
446 Charnelton St
Eugene OR 97401-2626

Verizon Wireless
Bankruptcy Administration
POB 3397
Bloomington, IL 61702-3397

Verizon Wireless
PO BOX 3397
Bloomington, IL 61702-3397

Vyanet
748 Goodpasture Island Rd
Eugene, OR 97401-1751

W2005 SVH Realty LLC
875 East Silverado Ranch Rd
Las Vegas, NV 89183-5887

Warren & Donna Harvey
2751 Shadow View Dr #310
Eugene, OR 97408-4679

Washington Federal Savings
300 SW Ellsworth
Albany, OR 97321-2268

Water Flow Specialties
POB 71452
Eugene, OR 97401-0198

Wes & Kara Towne
2751 Shadow View Dr #434
Eugene, OR 97408-4671

Western Asphalt Maintenance Inc
POB 2460
Eugene, OR 97402-0148

Westlane Storage
24945 Hwy 126
Veneta OR 97487-9459

Willamette Media
945 Garfield St
Eugene OR 97402-2780

Willamette Net
1574 Coburg Rd #118
Eugene, OR 97401-4802

William R Greenhoot
14422 N Chronicle St
Mead WA 99021-9400

William R. Greenhoot
1126 Gateway Loop
#100
Springfield, OR 97477-7748

Wooley's Refrigeration Contractors Inc
POB 42025
Eugene, OR 97404-0570

Yvonne Dekayie
2750 Shadow View Dr.
#210
Eugene, OR 97408-4641

Bello Salon & Spa
2746 Shadow View Dr
Eugene OR 97408-4610

BRAD T SUMMERS
101 SW Main #1100
Portland, OR 97204-3219

DOUGLAS R WILKINSON
1011 Harlow Rd #300
Springfield, OR 97477-1187

David E. Bomar
Balzhiser & Hubbard Engineers, Inc.
100 W 13th Ave
Eugene, OR 97401-3433

Gregory Brokaw
Rowell Brokaw Architects, PC
1 East Broadway #300
Eugene, OR 97401-3166

JOHN D FIERO
150 California St - 15th Fl
San Francisco, CA 94111-4554

JONATHAN POLLAND
Rethink LLP
465 California St #310
San Francisco, CA 94104-1839

JUSTIN D LEONARD
101 SW Main St #1100
Portland, OR 97204-3219

James R. Hanks
JRH Transportation Engineering
4765 Village Plaza Lp #201
Eugene, OR 97401-6676

Jerry Vicars
Fabrication & Mechanical Group Inc
POB 42173
Eugene, OR 97404-0581

LINDA F CANTOR
10100 Santa Monica Blvd - 11th Fl
Los Angeles, CA 90067-4003

MICHAEL P KEARNEY
POB 1758
Eugene, OR 97440-1758

Micheal Roberts
1919 Myers Road
Eugene, OR 97401-1940

Mike Broadsword
Eugene Sand & Gravel
POB 1067
Eugene, OR 97440-1067

TEDDY M KAPUR
10100 Santa Monica Blvd 11th Fl
Los Angeles, CA 90067-4003