1  John D. Fiero (CA Bar No. 136557)
2  Linda F. Cantor (CA Bar No. 153762)
   Teddy M. Kapur (CA Bar No. 242486)
3  PACHULSKI STANG ZIEHL & JONES LLP
   150 California Street, 15th Floor
4  San Francisco, California 94111-4500
   Telephone: 415/263-7000
5  Facsimile: 415/263-7010
   Email: jfiero@pszjlaw.com
6         lcantor@pszjlaw.com
7         tkapur@pszjlaw.com

8  and

9  Brad T. Summers (OSB No. 911116)
   David W. Criswell (OSB No. 925930)
10 BALL JANIK LLP
   101 SW Main Street, Suite 1100
11 Portland, Oregon 97204-3219
   Telephone: 503/228-2525
12 Facsimile: 503/295-1058
   Email: tsummers@balljanik.com
13        dcriswell@balljanik.com

14
   Attorneys for Debtor Arlie & Company
15

16          **IN THE UNITED STATES BANKRUPTCY COURT**

17             **FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| 18 In re | Case No. 10-60244-aer11 |
| 19 **ARLIE & COMPANY,** | Chapter 11 |
| 20 Debtor. | **DEBTOR'S ~~THIRD~~FOURTH AMENDED PLAN OF** |
| 21 | **REORGANIZATION (APRIL ~~1,~~11, 2011)** |
| 22 | |
| 23 | **Hearing** |
| | Date:  April ~~4,~~15, 2011 |
| 24 | Time:  10:00 a.m. |
| 25 | Place:  United States Bankruptcy Court |
| | 405 E. 8th Avenue |
| 26 | Courtroom #6 |
| | Eugene, Oregon 97401 |
| 27 | Judge:  Honorable Frank R. Alley |

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................................................ **1**

1.1 "Administrative Expense Claim"~~,~~ ......................................................................... 1

1.2 "Agent"~~,~~ ............................................................................................................... 1

1.3 "Allowed"~~,~~ ........................................................................................................... 1

1.4 "Avoidance Actions"~~,~~ ......................................................................................... 2

1.5 "Bankruptcy Case"~~,~~ ............................................................................................ 2

1.6 "Bankruptcy Code"~~,~~ ........................................................................................... 2

1.7 "Bankruptcy Court"~~,~~ .......................................................................................... 2

1.8 "Bankruptcy Rules"~~,~~ .......................................................................................... 2

1.9 "BLM Secured Creditors"~~,~~ ................................................................................ 2

1.10 ~~"Building D Value",~~[Intentionally omitted] ....................................................... 2

1.11 "Business Day"~~,~~ ................................................................................................. 3

1.12 "Cash"~~,~~ ~~-~~ ......................................................................................................... 3

1.13 "Claim"~~,~~ ............................................................................................................. 3

1.14 "Class"~~,~~ .............................................................................................................. 3

1.15 "Collateral"~~,~~ ...................................................................................................... 3

1.16 "Confirmation Date"~~,~~ ......................................................................................... 3

1.17 "Confirmation Hearing"~~,~~ .................................................................................... 3

1.18 "Confirmation Order"~~,~~ ....................................................................................... 3

1.19 "Creditor"~~,~~ ......................................................................................................... 3

1.20 "Debtor"~~,~~ ........................................................................................................... 3

1.21 "Deficiency Claim" ............................................................................................ 3

1.22 "Disclosure Statement"~~,~~ ..................................................................................... 4

1.23 "Disputed Claim"~~,~~ .............................................................................................. 4

1.24 "Effective Date"~~,~~ ............................................................................................... 4

1.25 "Entity" .............................................................................................................. 4

1.26 "Excess Sale Proceeds"~~-~~ ..................................................................................... 4

1.27 "Filed"~~,~~ ............................................................................................................... 4

1.28 "Final Order"~~,~~ .................................................................................................... 4

1.29 "General Unsecured Claim"~~,~~ .............................................................................. 4

1.30 "Interests"~~,~~ ......................................................................................................... 5

1.31 "Lord Byron Collateral Value" .......................................................................... 5

1.32 "Maturity Date"~~,~~ ................................................................................................ 5

1.33 "Non-core assets"~~,~~ ............................................................................................. 5

1.34  "Other Priority Claim"........................................................................5
1.35  "Petition Date".................................................................................5
1.36  "Plan"..............................................................................................5
1.37  "Plan Supplement"...........................................................................5
1.38  "Priority Tax Claim".........................................................................5
1.39  "Pro Rata".......................................................................................5
1.40  "Property Tax".................................................................................5
1.41  "Property Tax Lien Claim"...............................................................6
1.42  "Rejection Claim"............................................................................6
1.43  "Reorganized Debtor"......................................................................6
1.44  "Roberts Distributions"...................................................................6
1.45  "Schedules".....................................................................................6
1.46  "Scheduled Amounts".......................................................................6
1.47  "Secured Claim"..............................................................................6
1.48  "Small Unsecured Claim".................................................................6
1.49  "Tonkon Claims"..............................................................................6
1.50  "Unsecured Claim"..........................................................................6 7

**ARTICLE II UNCLASSIFIED CLAIMS** ..................................................7
2.1  Administrative Expense Claims........................................................7
2.2  Priority Tax Claims..........................................................................7
2.3  Bankruptcy Fees...............................................................................7

**ARTICLE III CLASSIFICATION** .............................................................8
3.1  Class 1 (Other Priority Claims)........................................................8
3.2  Class 2 (BofA)..................................................................................8
3.3  Class 3 (Century Bank).....................................................................8
3.4  Class 4 (Pioneer)..............................................................................8
3.5  Class 5 (Siuslaw Bank).....................................................................8
3.6  Class 6 (Summit Bank)......................................................................8
3.7  Class 7 (Umpqua Bank).....................................................................8
3.8  Class 8 (Washington Federal Savings)..............................................8
3.9  Class 9 (BLM Secured Creditors)......................................................8
3.10  Class 10 (Property Tax Lien Claims)................................................8
3.11  Class 11 (Small Unsecured Claims).................................................8
3.12  Class 12 (General Unsecured Claims)..............................................9
3.13  Class 13 (Interests).........................................................................9
3.14  Class 14 (Fifth Third Bank).............................................................9

**ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ......................... 9**

4.1     Class 1 (Other Priority Claims).~~.~~..................................................................... 9

4.2     Class 2 (Allowed Secured Claims of BofA).~~.~~ ................................................. 9

4.3     Class 3 (Allowed Secured Claim of Century Bank) ........................................ ~~12~~14

4.4     Class 4 (Allowed Secured Claim of Pioneer).~~.~~................................................ ~~12~~ 15

4.5     Class 5 (Allowed Secured Claims of Siuslaw Bank).~~.~~..................................... ~~13~~ 15

4.6     Class 6 (Summit Bank).~~.~~................................................................................ ~~20~~ 22

4.7     Class 7 (Umpqua Bank).~~.~~.............................................................................. ~~23~~ 24

4.8     Class 8 (Washington Federal Savings).~~.~~......................................................... ~~37~~ 38

4.9     Class 9 (BLM Secured Creditors).~~.~~................................................................ ~~39~~ 40

4.10    Class 10 (Property Tax Lien Claims).~~.~~............................................................ 42

4.11    Class 11 (Small Unsecured Claims).~~.~~.............................................................. 42

4.12    Class 12 (General Unsecured Claims).~~.~~.......................................................... ~~43~~ 42

4.13    Class 13 (Interests).~~.~~. 43

4.14    **Class 14 (Fifth Third Bank)** ........................................................................ 43

**ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS.............................. ~~43~~45**

5.1     Distributions by Debtor.~~.~~............................................................................... ~~43~~ 45

5.2     Disputed Claims; Objections to Claims.~~.~~........................................................ ~~43~~ 45

5.3     Subsequent Allowance of Disputed Claims.~~.~~.................................................. ~~44~~ 45

5.4     Unclaimed Distributions.~~.~~.............................................................................. ~~44~~ 46

**ARTICLE VI MEANS FOR EXECUTION OF PLAN ......................................... ~~44~~46**

6.1     Continued Business Operations.~~.~~.................................................................... ~~44~~ 46

6.2     Siuslaw ~~Loan~~.............................................................................~~44~~**Credit Line** 46

6.3     Operating Revenues.~~.~~...................................................................................... ~~45~~ 47

6.4     Sales or Refinancing of Real Property Collateral.~~.~~.......................................... ~~45~~ 47

6.5     Marketing and Sales of Non-Core Assets.~~.~~...................................................... ~~46~~ 48

6.6     Setoffs.~~.~~......................................................................................................... ~~46~~ 48

6.7     Corporate Action.~~.~~......................................................................................... ~~46~~ 48

6.8     Saturday, Sunday, or Legal Holiday.~~.~~............................................................. ~~46~~ 48

6.9     Deposits.~~.~~....................................................................................................... ~~47~~ 48

6.10    Event of Default; Remedy.~~.~~............................................................................ ~~47~~ 49

6.11    Continuation of Unsecured Creditors' Committee.~~.~~......................................... ~~47~~ 49

**ARTICLE VII ~~EXECUTORY CONTRACTS AND UNEXPIRED LEASES~~ ............ ~~48~~Executory Contracts and Unexpired Leases** ................................................................. **50**

7.1     Assumption and Rejection.~~.~~............................................................................ ~~48~~ 50

7.2     Assignment.~~.~~................................................................................................. ~~49~~ 51

7.3     Rejection Claims................................................................................ 49 51

7.4     Compensation and Benefit Programs................................................ 49 51

**ARTICLE VIII EFFECT OF CONFIRMATION**................................. 49**Effect of Confirmation** .......................................................................................................................................... **51**

8.1     Binding Effect.................................................................................... 49 51

8.2     Discharge and Permanent Injunction 50 52

8.3     Limitation of Liability....................................................................... 51 52

8.4     Exculpation........................................................................................ 51 53

**ARTICLE IX RETENTION OF JURISDICTION** ..................................................... 51**53**

9.1     Jurisdiction of the Bankruptcy Court................................................. 51 53

9.2     Failure of Bankruptcy Court to Exercise Jurisdiction....................... 52 54

**ARTICLE X ADMINISTRATIVE PROVISIONS**........................................................ 52**54**

10.1    Modification or Withdrawal of the Plan............................................ 52 54

10.2    Revocation or Withdrawal of Plan..................................................... 52 54

10.3    Modification of Payment Terms......................................................... 53 54

10.4    Nonconsensual Confirmation............................................................. 53 55

10.5    Compromise of Controversies............................................................ 53 55

10.6    Final Decree........................................................................................ 53 55

**ARTICLE XI CONDITIONS PRECEDENT TO CONFIRMATION**................................. 53 **AND CONSUMMATION OF THE PLAN**..................................................................... 53**55**

11.1    Conditions to Confirmation................................................................ 53 55

11.2    Conditions to Effective Date.............................................................. 54 56

11.3    Waiver of Conditions......................................................................... 54 56

**ARTICLE XII MISCELLANEOUS PROVISIONS** .................................................... 54**56**

12.1    Revesting............................................................................................ 54 56

12.2    Rights of Action................................................................................. 55 56

12.3    Governing Law................................................................................... 55 57

12.4    Withholding and Reporting Requirements......................................... 55 57

12.5    Time.................................................................................................... 56 57

12.6    Section 1146(c) Exemption............................................................... 56 58

12.7    Severability......................................................................................... 56 58

12.8    Successors and Assigns...................................................................... 56 58

12.9    Notices to Claim and Interest Holders............................................... 57 58

12.10   Post Effective-Date Notices............................................................... 57 58

12.11   Retiree Benefits.................................................................................. 57 59

12.12   Provisions Enforceable....................................................................... 57 59

12.13   Recordable Order................................................................................ 57 59

12.14   Plan Controls...................................................................................... 57 59

12.15 Delivery of Promissory Notes......................................................58 59

12.16 Effectuating Documents and Further Transactions......................58 60

Arlie & Company, as debtor and debtor-in-possession ("Debtor"), proposes the following Plan of Reorganization (the "Plan") pursuant to Section 1121(a) of Title 11 of the United States Code.

The Plan provides for the repayment in full of Debtor's obligations to its Creditors. A Disclosure Statement is enclosed herewith to assist you in understanding the Plan and making an informed judgment concerning its terms.

# ARTICLE I

## DEFINITIONS

Definitions of certain terms used in the Plan are set forth below. Other terms are defined in the text of the Plan or in the text of the Disclosure Statement. In either case, when a defined term is used, the first letter of each word in the defined term is capitalized. Terms used and not defined in the Plan or the Disclosure Statement shall have the meanings given in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires. The meanings of all terms shall be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined. The words "herein," "hereof," "hereto," "hereunder," and others of similar import, refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. Captions and headings to articles, sections and exhibits are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation of the Plan. The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply. In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.1     "Administrative Expense Claim" means any Claim entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

1.2     "Agent" means any shareholder, director, officer, employee, partner, member, agent, attorney, accountant, advisor or other representative of any person or entity (solely in their respective capacities as such, and not in any other capacity).

1.3     "Allowed" means, when used to modify the term Claim or Administrative Expense Claim, either a proof of which has been properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the Schedules as liquidated in amount and not disputed or

1

contingent or an Administrative Expense Claim that the Debtor has received by the applicable bar date, and, in each case, a Claim or Administrative Expense Claim as to which no objection to the allowance thereof, or motion to estimate for purposes of allowance, shall have been Filed on or before any applicable period of limitation that may be fixed by the Bankruptcy Code, the Bankruptcy Rules and/or the Bankruptcy Court, or as to which any objection, or any motion to estimate for purposes of allowance, shall have been so Filed, to the extent (a) such objection is resolved between such claimant and either the Debtor or the Reorganized Debtor or (b) such Claim is allowed by a Final Order.

1.4    "Avoidance Actions" means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law (including, without limitation, Sections 506(c), 510, 542, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code or equivalent provisions of applicable non-bankruptcy law), equity or otherwise.

1.5    "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code with respect to Debtor, pending in the District of Oregon, administered as *In Arlie & Company,* Case No. 10-60244-aer11.

1.6    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

1.7    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any proceeding therein, including the United States District Court for the District of Oregon, to the extent that the reference to the Bankruptcy Case or any proceeding therein is withdrawn.

1.8    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended and promulgated under Section 2075, Title 28, of the United States Code, and the local rules and standing orders of the Bankruptcy Court.

1.9    "BLM Secured Creditors" means each of Francis Cline, William Greenhoot, McKillop II Limited Partnership, Karen Merwin, Alice Smith and Linda Trickey.

1.10    [Intentionally omitted].

1.11    "Business Day" means a day other than a Saturday, Sunday, any legal holiday as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are authorized or required by law to be closed.

1.12    "Cash" means lawful currency of the United States of America and equivalents, including, without limitation, checks, wire transfers and drafts.

1.13    "Claim" means (a) any right to payment from Debtor arising before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective Date for breach of performance if such breach gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.14    "Class" means one of the classes of Claims or Interests defined in Article III hereof.

1.15    "Collateral" means any property in which Debtor has an interest that is subject to a lien or security interest securing the payment of an Allowed Secured Claim.

1.16    "Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Clerk of the Bankruptcy Court.

1.17    "Confirmation Hearing" means the hearing or hearings to consider confirmation of the Plan under Section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned from time to time.

1.18    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.19    "Creditor" means any entity holding a Claim against Debtor.

1.20    "Debtor" means Arlie & Company, as Debtor and Debtor-in-Possession in the Bankruptcy Case.

1.21    "Deficiency Claim" has the meaning set forth in the sentence following the definition of "Secured Claim."

1.22    "Disclosure Statement" means Debtor's Disclosure Statement as amended, modified, restated or supplemented from time to time, pertaining to the Plan.

1.23    "Disputed Claim" means a Claim with respect to which a Proof of Claim has been timely Filed or deemed timely Filed under applicable law, and as to which an objection, timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for filing such objections by order of the Bankruptcy Court, and has not been denied by a Final Order and which Claim has not been estimated or temporarily allowed by the Bankruptcy Court on timely motion by the holder of such Claim.  If an objection related to the allowance of only a part of a Claim has been timely Filed or deemed timely Filed, such Claim shall be a Disputed Claim only to the extent of the objection.

1.24    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all conditions to the occurrence of the Effective Date set forth in Article 11.2 of this Plan have been either satisfied or waived but in no event later than April 25, 2010.

1.25    "Entity" shall have the meaning ascribed to it by Section 101(15) of the Bankruptcy Code.

1.26    "Excess Sale Proceeds" means proceeds from the sale of property of the Debtor after payment of all debt secured by such property, Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses.

1.27    "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

1.28    "Final Order" means an order or judgment entered on the docket by the Clerk of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties that has not been reversed, stayed, modified or amended and as to which the time for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for rehearing shall have expired.

1.29    "General Unsecured Claim" means any Unsecured Claim that is not otherwise classified under the Plan.

1.30    "Interests" means an equity security of the Debtor within the meaning of Section 101(16) of the Bankruptcy Code.

1.31    "Lord Byron Collateral Value" means $1,500,000.

1.32    "Maturity Date" means the fifth anniversary of the Effective Date.

1.33    "Non-core assets" means those real property assets of Reorganized Debtor identified by Reorganized Debtor on Exhibit B to the Disclosure Statement as assets that are not core to Reorganized Debtor's long-term business success.

1.34    "Other Priority Claim" means any Claim for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

1.35    "Petition Date" means January 20, 2010, the date on which the petition commencing this Bankruptcy Case was Filed.

1.36    "Plan" means this Plan of Reorganization, as amended, modified, restated or supplemented from time to time.

1.37    "Plan Supplement" means such documents, schedules and exhibits to the Plan that are not filed contemporaneously with the filing of the Plan, and any amendments to exhibits filed contemporaneously with the filing of the Plan (or any amendments or supplements to any previously filed Plan Supplement).  The Debtor shall file and serve the Plan Supplement no later than ten days prior to the Plan voting deadline.

1.38    "Priority Tax Claim" means a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.39    "Pro Rata" means a proportionate share, so that the ratio of (a) the amount of property distributed on account of any Allowed Claim, or retained on account of a Disputed Claim, in a Class, to (b) the amount distributed on account of all Allowed Claims, or allocated to on account of all disputed claims, in such Class, is the same as the ratio (x) such Claim bears to (y) the total amount of all Claims (including Disputed Claims in their respective Disputed Claim Amounts) in such Class.

1.40    "Property Tax" means *ad valorem* property taxes or similar impositions by a governmental unit on property of the Debtor.

1.41   "Property Tax Lien Claim" means the Secured Claim of any governmental unit for Property Taxes that are secured by statutory liens on any of Debtor's property (real or personal).

1.42   "Rejection Claim" means a Claim arising from the rejection of an unexpired lease or executory contract.

1.43   "Reorganized Debtor" means Debtor from and after the Effective Date.

1.44   "Roberts Distributions" means any and all distributions made to Debtor or Reorganized Debtor from the Bankruptcy estate of In re: Roberts Prof. Const. Svcs., Inc. (Case No. 08-60615-fra7).

1.45   "Schedules" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as amended, modified, restated or supplemented from time to time.

1.46   "Scheduled Amounts" means the Claim amounts as set forth in Debtor's Schedules.

1.47   "Secured Claim" means any Claim against Debtor held by any entity, including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code.  Unless otherwise provided in the Plan, the unsecured portion, if any, of such Claim shall be treated as a General Unsecured Claim and shall be referred to herein as "Deficiency Claim."

1.48   "Small Unsecured Claim" means any Unsecured Claim that is equal to or less than $2,000, or that has been reduced by election in writing to $2,000, provided that such written election shall be served on Debtor not later than the first date fixed by the Bankruptcy Court for the filing of acceptances or rejections of the Plan.

1.49   "Tonkon Claims" means all of the Debtor's claims for relief and causes of action, whether legal or equitable, against Tonkon Torp LLP, whether sounding in contract or tort specifically including but not limited to professional negligence related to Tonkon Torp LLP's representation of the Debtor at any time.

1.50    "Unsecured Claim" means a Claim that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Property Tax Lien Claim, or a Secured Claim.

## ARTICLE II

## UNCLASSIFIED CLAIMS

2.1    <u>Administrative Expense Claims</u>.  Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

2.2    <u>Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed.

2.3    <u>Bankruptcy Fees</u>.  Any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

## ARTICLE III

## CLASSIFICATION

For purposes of this Plan, Claims (except those treated under Article II) are classified as provided below.  A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class.

3.4    <u>Class 1 (Other Priority Claims)</u>.  Class 1 consists of all Allowed Other Priority Claims.

3.5    <u>Class 2 (BofA)</u>.  Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA").

3.6    <u>Class 3 (Century Bank)</u>.  Class 3 consists of the Allowed Secured Claims of Century Bank.

3.7    <u>Class 4 (Pioneer)</u>.  Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer").

3.8    <u>Class 5 (Siuslaw Bank)</u>.  Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.

3.9    <u>Class 6 (Summit Bank)</u>.  Class 6 consists of the Allowed Secured Claims of Summit Bank.

3.10    <u>Class 7 (Umpqua Bank)</u>.  Class 7 consists of the Allowed Secured Claims of Umpqua Bank.

3.11    <u>Class 8 (Washington Federal Savings)</u>.  Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal").

3.12    <u>Class 9 (BLM Secured Creditors)</u>.  Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.

3.13    <u>Class 10 (Property Tax Lien Claims)</u>.  Class 10 consists of all Allowed Property Tax Lien Claims.

3.14    <u>Class 11 (Small Unsecured Claims)</u>.  Class 11 consists of all Allowed Small Unsecured Claims.

3.15    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all Allowed General Unsecured Claims.

3.16    <u>Class 13 (Interests)</u>.  Class 13 consists of all Interests.

3.17    <u>Class 14 (Fifth Third Bank)</u>.  Class 14 consists of the Allowed Claim of Fifth Third Bank.

# ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.18    <u>Class 1 (Other Priority Claims)</u>.  Class 1 is impaired. Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

4.19    <u>Class 2 (Allowed Secured Claims of BofA)</u>.  Class 2 is impaired.  The Class 2 Claims of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described.  Except as set forth below, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

4.19.1    <u>Class 2.1 – Building A Loan.</u>

The BofA Class 2.1 Claim arises under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA will have an Allowed Class 2.1 Claim in a principal amount equal to the outstanding principal balance of the Building A Loan ($8,956,961) plus accrued interest at the past due rate (4% over one month LIBOR) from the Petition Date to the Effective Date, plus attorneys

fees and costs allocable to the Building A Loan plus a one-half percent (1/2 %) loan fee on the combined amount of the full amounts owing on the Building A Loan and the Building D Loan.

BofA's Class 2.1 Claim shall be satisfied by the delivery of a promissory note to BofA (the "Building A Note") in the amount of the Allowed Class 2.1 Claim.  The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 12th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note. Thereafter, commencing on the tenth day of the 13th month after the Effective Date and continuing on the tenth day of each month thereafter through and including the 3rd anniversary of the Effective Date (the "BofA Maturity Date"), Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 30 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the BofA Initial Maturity Date, provided that Reorganized Debtor shall have two one-year extensions of the BofA Initial Maturity Date available (each, a "BofA Extended Maturity Date") each extension subject to there being no default under the Building A Note and a loan to value ratio of 75% as established by a FIRREA compliant appraisal approved by BofA, in which case all unpaid principal and interest under the Building A note shall not be due and payable until the applicable BofA Extended Maturity Date.

The Building A Note will be secured by a First Deed of Trust, Assignment of Rents and Leases and Security Agreement on Building A, and the Building A Note will be cross-defaulted and cross-collateralized with the Building D Loan.

### 4.19.2  Class 2.2 – Building D Loan.

The BofA Class 2.2 Claim arises under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,700,000 (the "Building D Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D").

BofA will have an Allowed Class 2.2 Claim in the amount of the outstanding principal balance of the Building D Loan ($5,455,581.38), plus accrued interest at the past due rate (4% over one month LIBOR) from the Petition Date through the Effective Date, plus attorneys fees and costs allocable to the Building D Loan.

BofA's Class 2.2 Claim shall be satisfied by the delivery of two promissory notes. Note A will be in a principal amount of $3,800,000 and Note B will be in the amount of the remaining amounts owing under the Building D Loan. Note B will be "non-recourse."

Note A

Note A shall be due and payable on the BofA Initial Maturity Date, provided that Reorganized Debtor shall have two one-year extensions of the BofA Initial Maturity Date available subject to there being no default under Note A and a loan to value ratio of 75% as established by a FIRREA compliant appraisal approved by BofA, in which case Note A shall be due and payable upon the applicable BofA Extended Maturity Date.

Note A shall bear interest at a variable rate equal to 4.5% over the one month LIBOR from the Effective Date through and including the BofA Initial Maturity Date. During any extension period(s), Note A shall bear interest at a fixed rate of 4.5% per annum. Note A shall be payable as follows:

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the BofA Initial Maturity Date, Reorganized Debtor will make interest only payments on Note A. Provided the BofA Initial Maturity Date of Note A is extended, then commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the extended BofA Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Note A based on a 30 year amortization schedule. Reorganized Debtor shall make a balloon payment of all unpaid principal and interest on the BofA Initial Maturity Date, if the term of Note A is not extended, or on the applicable BofA Extended Maturity Date, if the term of Note A is extended.

Note A will be secured by a First Deed of Trust, Assignment of Rents and Leases and Security Agreement on Building B, and Note A will be cross-defaulted and cross-collateralized with the Building A Loan.

Note B

Note B shall be due and payable on the BofA Initial Maturity Date, provided that Reorganized Debtor shall have two one-year extensions of the BofA Initial Maturity Date available subject to satisfaction of the conditions to extension of the maturity date of Note A and there being no default under Note B, in which case Note B shall be due and payable upon the applicable BofA Extended Maturity Date.

Note B shall bear interest at the fixed rate of 3.5 % per annum.  Note B shall be payable as follows:

Commencing on Effective Date and continuing through and including the BofA Initial Maturity Date, interest shall accrue on Note B.  Provided the BofA Initial Maturity Date of Note B is extended, then commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the BofA Extended Maturity Date, Reorganized Debtor will make interest only payments on Note B.  Reorganized Debtor shall make a balloon payment of all unpaid principal and interest on the BofA Initial Maturity Date, if the term of Note B is not extended, or on the applicable BofA Extended Maturity Date, if the term of Note B is extended.

Note B will be secured by a Second Deed of Trust, Assignment of Rents and Leases and Security Agreement on Building A and Building D.  Note B is a non-recourse obligation of the Reorganized Debtor.

4.19.3  Release of Liens.

BofA will release its liens and security interests in Building D upon payment in full of the Building D notes (both Note A and Note B), provided that the loan to value ratio for the Building A Loan is no more than 80%, as established by a FIRREA compliant appraisal approved by BofA, and the actual debt coverage ratio on Building A is at least one to one.  BofA will release its liens and security interests in Building A upon payment in full of the Building A Note, provided that

12

the Leasing Reserve for Building D has been fully funded, the loan to value ratio for the Building D notes (both Note A and Note B) is no more than 80% as established by a FIRREA compliant appraisal approved by Bof A and the actual debt coverage ratio, including interest payments on Note B, is at least one to one.

### 4.19.4  Leasing Reserve

A leasing reserve (to fund tenant improvements and leasing commissions) in an amount equal to $582,596 will be established (the "Leasing Reserve").  The Leasing Reserve will initially be funded by $200,000 from the Roberts Distributions and with any excess funds in the Building A and Building D cash collateral accounts.  If not then fully funded, net cash flow from Building A and Building D after debt service will be used to fund the Leasing Reserve, unless otherwise funded by Reorganized Debtor from an alternative source.  Funds in the Leasing Reserve will be available to pay leasing costs incurred by Reorganized Debtor with respect to leases reasonably approved by BofA.

### 4.19.5  Net Cash Flow.

After the Leasing Reserve is fully funded, net cash flow (i.e., property income after payment of all expenses including reserves for property taxes and insurance) after debt service is free cash to Reorganized Debtor to be used in its discretion.

### 4.19.6  Roberts Distributions

All amounts in excess of the $200,000 being contributed to the Leasing Reserve from the Roberts Distributions shall be the sole property of Reorganized Debtor and may be used by Reorganized Debtor for any purpose in its discretion.  BofA shall have no claim to any such excess Roberts Distributions.

### 4.19.7  Treatment of Bank of America's Cash Collateral Accounts.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A.  The remainder of the Building A Cash Collateral will be used to fund the Building D Leasing Reserve.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D. The remainder of the Building D Cash Collateral will be used to fund the Building D Leasing Reserve.

    4.20    <u>Class 3 (Allowed Secured Claim of Century Bank).</u> Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the Allowed Class 3 Claim (the "3058 Kinney Loop Note"). The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

4.21    Class 4 (Allowed Secured Claim of Pioneer).  ThePioneer's Class 4 Secured Claim arises out of Pioneer is disputed.  If and to the extent Pioneer is determined by Final Order to have a valid, perfected security interest in or lien upon property of the Debtor, Pioneer will have an Allowed Class 4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Pioneer as of the Effective Date (in such amounts as are determined by agreement of Debtor and Pioneer or as determined and Allowed by the Bankruptcy Court) under that a certain loan made by Pioneer to Debtor on or about September 12, 20082008, in the original principal amount of $1,500,000 (the "Pioneer Loan".").

Class 4 (Allowed Claim of Pioneer).  Pioneer shall have an Allowed Class 4 Claim in the amount of (a) all principal and non-default interest on the Pioneer Loan accrued through and including the Petition Date, (b) interest accrued on the Pioneer Loan from the Petition Date though and until the Effective Date at the rate of 4.5% per annum, and (c) all reasonable attorney fees incurred by Pioneer though the Effective Date.

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan with the same priority and to the same extent such security had as of the Petition Date and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value, which liens and security interests are hereby validated.

Pioneer's Allowed Class 4 Claim shallwill be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note") in the amount of the Pioneer Class 4 Claim.  The Pioneer Note will bear interest at the fixed rate of 4.5% per annum and be payable by Reorganized Debtor as follows:.  The Pioneer Note will accrue interest at the fixed rate of 4.5% per annum and will be payable in full on the Maturity Date.  In addition, within 3 yearsfrom the Effective Date through and including the 3rd anniversary of the Effective Date (the "Accrued Pioneer Interest").  On the 3rd anniversary of the Effective Date, Reorganized Debtor will pay Pioneer the Accrued Pioneer Interest.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor shall have pre-paid at least 50% of the principal of the Pioneer Note.  At the time of any such pre-

~~payment, Reorganized Debtor shall also pay all accrued but unpaid interest then owing under the Pioneer Note~~ make monthly payments of interest only, with a final payment of all outstanding principal and interest payable on the Maturity Date.

~~If and to the extent the Pioneer Secured Claim is avoided or otherwise determined to be unsecured by Final Order, the Pioneer Claim will be treated as a Class 12 Claim.~~

Sale Free and Clear of Pioneer's Liens.  Subject to Pioneer's approval, which shall not be unreasonably withheld, Pioneer shall provide partial releases of its liens related to a portion of the parcel that serves as Pioneer's Collateral, provided that 110% of the Pioneer Class 4 Claim associated with such specific portion of parcel (on a pro rata basis determined in light of the comparative value of the portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) is paid upon such sale.  The relative value of the applicable portions of parcels shall be calculated on a per acre value and shall be based on the composition of the land.  The provisions of this section are in addition to the rights of the Reorganized Debtor to sell property under section 6.3 of the Plan.

Dismissal of Adversary Proceeding.  The adversary proceeding pending before the U.S. Bankruptcy Court, District of Oregon, bearing case number 11-06018, shall be dismissed as to all parties with all sides bearing their own fees and costs, except that Pioneer may add its reasonable attorney fees to the amount of its Allowed Class 4 Claim.

4.22     Class 5 (Allowed Secured Claims of Siuslaw Bank).  Class 5 is impaired.  The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans.  Each loan is separately classified and treated as hereinafter described.

4.22.1   Class 5.1 – Crescent Village Lots Loan.

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor

located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots").  The outstanding principal balance of the Crescent Village Lots Loan is $3,999,977.05 (the "Lots Loan Balance").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum from and including the Effective Date.  By the end of the 15th month after the Effective Date, the amount of interest accrued on the Crescent Village Lots Note will be $224,859.96 (the "Lots Note Accrual Amount").  Beginning on the 10th day of the 16th month after the Effective Date and continuing on the tenth day of each month thereafter until the Lots Note Accrual Amount has been paid in full, Reorganized Debtor will make equal monthly payments to Siuslaw Bank in an amount equal to 1/35th of the Lots Note Accrual Amount.  Further, beginning on the 10th day of the 16th month after the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make payments of interest only on the Lots Loan Balance, with a balloon payment of all unpaid interest and principal under the Crescent Village Lots Note on the Maturity Date.  In addition, on April 1, 2014, Reorganized Debtor will pay, in full, the pre-petition accrued interest on the Crescent Village Lots Loan in the amount of $369,460.90.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building

Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank.

### 4.22.2  Class 5.2 – 2850 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the Allowed Class 5.2 Claim.  The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.22.3  Class 5.3 – 2960 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as

determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the Allowed Class 5.3 Claim.  The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.22.4   Class 5.4 – 3082 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to

the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount of the Allowed Class 5.4 Claim. The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.22.5  Class 5.5 – 3108 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount of the Allowed Class 5.5 Claim. The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.22.6  Class 5.6 – Florence Medical Building Loan.

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

On the Effective Date, or as soon thereafter as sufficient funds are made available to the Reorganized Debtor under the Credit Line (as defined in Section 6.2 below) for such payments, Reorganized Debtor will pay the Class 5.6 Claim and pay current all Property Taxes on the Florence Medical Building.

### 4.22.7  Class 5.7 – Kinney Loop Lots Loan.

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the Kinney Loop Lots Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the Kinney Loop Lots Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

4.22.8  <u>Payment of Accrued Interest and Attorney Fees.</u>

On the Effective Date or as soon thereafter as sufficient funds are made available to the Reorganized Debtor under the Credit Line for such payment, Reorganized Debtor will pay all interest accrued prior to the Effective Date on the Siuslaw Bank loans underlying the Class 5 Claims, other than the loan underlying the Class 5.1 Claim.

On the tenth day of the first month following the Effective Date, Reorganized Debtor will pay all of Siuslaw Bank's accrued attorney fees arising from the Bankruptcy Case.

4.22.9  <u>Treatment of Siuslaw Bank's Cash Collateral Account.</u>

Other than the tax payment set forth in Section 4.5.6 above, on the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay  any past due Property Taxes on the Collateral securing the Class 5 Claims.  Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

4.23    <u>Class 6 (Summit Bank)</u>.  Class 6 is impaired.  The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

4.23.1  <u>Class 6.1 – Road Radio Tower Loan.</u>

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the Allowed Class 6.1 Claim.  The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

### 4.23.2  Class 6.2 – Guaranty Claim.

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank.  In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek)**.**

Summit Bank will have an Allowed Class 6.2 claim in the amount of all principal, accrued non-default interest, and reasonable attorney fees and costs owing by Debtor under the Churchill Media Guaranty.  Summit Bank's Class 6.2 Claim will be satisfied by delivery of a promissory note to Summit Bank (the "Guaranty Note"), payable by Reorganized Debtor as follows.

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum from and including the Effective Date and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty Note.  At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note.  All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank first in reduction of accrued interest, and second n reduction of the principal owing on the Guaranty Note.  In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

### 4.23.3  Sale of Summit Collateral Free and Clear of Liens.

Subject to Summit Bank's approval, and provided that any proposed partition of any portion of property that serves as Collateral for Summit Bank's Class 6 Claims (the "Summit Collateral") does not result in an erosion of the value of the Summit Collateral relative to the remaining loan balance, Summit Bank shall provide partial releases of its liens related to a portion of each parcel that serves as Summit Collateral, provided that 110% of the applicable Summit Debt Amount associated with such specific portion of parcel (on a pro rata basis) has been paid or will be paid to Summit Bank upon such sale.  For purposes of this section only, the Summit Debt Amount for Crescent Village Lot 4 shall be $820,000 and the Summit Debt Amount for the Willow Creek Property shall be $1,250,000, calculated on a square foot basis.  The provisions of this section are in addition to the rights of the Reorganized Debtor under section 6.3 of the Plan.

### 4.23.4  Treatment of Summit Bank's Cash Collateral Account.

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims.  Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

4.24    Class 7 (Umpqua Bank).  Class 7 is impaired.  The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described.  The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs as allowed by Umpqua Bank's existing loan documents with Debtor as of the Effective Date and allocated in accordance with Article 4.7.15 of the Plan (the "Umpqua Bank Fees").  Umpqua Bank shall have no Claims and shall make no demands on Debtor or Reorganized Debtor for events or defaults that occurred before the Effective Date and any such events or defaults shall be deemed waived, released and extinguished, provided that such pre-

Effective Date waiver shall not apply to defaults continuing after the Effective Date that materially harm or affect the value of Umpqua Bank's interest in the real property Collateral. Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral (including assets generated or purchased after the Effective Date but perfected before the Petition Date) with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross-defaulted and cross collateralized. Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such loan and security documents provided by Debtor to Umpqua Bank as amended, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect. Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan. Without limiting the foregoing, such amendments will include having the following financial reports provided to Umpqua Bank (all in such form as reasonably required by Umpqua Bank): 45 days after the end of each calendar quarter, internally prepared financial statements (including balance sheet and cash flow statement); 120 days after each year end, internally prepared financial statements; annual financial statements 120 days after year end and copies of corporate tax returns with schedules when filed and copies of non-residential lease agreements after they are signed. In addition, Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral. Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

### 4.24.1  Class 7.1 – Westlane Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property").  Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property or (c) transfer title to the Westlane Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) reasonable commissions, closing and transaction costs including, without limitation, legal and marketing expenses (collectively, the "Closing Costs"), (b) the applicable Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the Westlane Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided

that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

### 4.24.2  Class 7.2 - West 11th Land Loan.

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property").  Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the applicable Arlie Debt Amount and Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the West 11th Land Property shall

be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

4.24.3  Class 7.3 – 2892 Crescent Ave. Loan.

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property and the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of 2892 Crescent Avenue shall be free and clear of any liens, claims and encumbrances of Umpqua

Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

### 4.24.4  Class 7.4 Woodburn and College Park Loan.

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred to as 2450 Country Club Road, Marion County (the "Woodburn Property").  Umpqua Bank's Class 7.4 Claim shall be satisfied as follows.

The Arlie Debt Amount for the Woodburn Property shall be $845,000 together with 25% of accrued and unpaid interest on the Woodburn and College Park Loan.  Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Woodburn Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the Woodburn Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the Woodburn Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount relating to the Woodburn Property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt Amount, Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by

Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2 or a Class 7.3 Claim. Any sale or purchase by Reorganized Debtor of the Woodburn Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount has been or will be paid upon such sale or purchase.

As of the Effective Date, the remainder of the Woodburn and College Park Loan shall have a non-default simple fixed interest rate of 4.5% per annum and will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes (less any previously paid real estate taxes included therein) (the "College Park Pay Down"). The College Park Pay Down will not include application from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above. The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate).

### 4.24.5  Class 7.5 – Roseburg Loan #1.

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property"). Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the

non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property. Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 before the Effective Date shall be deemed waived or released. Thereafter, the non-default interest will accrue on the Roseburg Loan #1 at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

In accordance with paragraph 4.7.18 of this Plan, Reorganized Debtor may use up to $457,000 of good funds in the Umpqua Cash Collateral Account for the reasonable and necessary costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made.

### 4.24.6  Class 7.6 – Roseburg Loan #2

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property. Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2. Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2

before the Effective Date shall be deemed waived or released.  Thereafter, interest will accrue on the Roseburg Loan #2 at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

4.24.7  <u>Class 7.7 – Oil Can Henry's Loan.</u>

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the "Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property").  Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property.  Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan before the Effective Date shall be deemed waived or released.  Thereafter, interest will accrue on the Oil Can Henry's Loan at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

### 4.24.8  Class 7.8 – My Coffee Loan.

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fess under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property").  Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the My Coffee Loan will accrue at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.24.9  Class 7.9 – Building B Loan.

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the Building B Loan will accrue at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of

principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.24.10 Class 7.10 – Grumman Hangar Loan.

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property").  Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest on the Grumman Hangar Loan will accrue at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.  Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.24.11 Class 7.11 – 3032 Kinney Loop Loan.

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop").  Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the 3032 Kinney Loop Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.11 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

### 4.24.12 Class 7.12 - Crescent Village Land Loan.

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat, Lane County (the "Crescent Village Land Property"). Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the Crescent Village Land Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.12 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

### 4.24.13 Refinance of Properties Encumbered by Umpqua Bank's Liens.

Provided that no Event of Default has occurred that is not timely cured, Reorganized Debtor may satisfy an Arlie Debt Amount through a refinancing of the applicable property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount and Umpqua Bank Fees associated with such property. To the extent that such refinancing is in excess of the sum of (a) the Arlie Debt Amount,

(b) Property Taxes, (c) Closing Costs, and (d) applicable Umpqua Bank Fees, the net excess financing proceeds shall be distributed in accordance with paragraph 4.7.14 of this Plan.

4.24.14 Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, and provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may from time to time sell a property for cash at closing free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and Umpqua Bank Fees associated with such property has been paid or will be paid upon such sale. To the extent that the sale proceeds exceed the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "Arlie Excess Proceeds") will be divided as follows: For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter of intent obtained within such one year period, two-thirds (2/3) of the Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and one-third (1/3) of the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan). Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of its liens related to a portion of each parcel that serves as Collateral for Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt Amount and the Umpqua Bank Fees associated with such specific portion of parcel (on a pro

rata basis determined in light of the comparative value of the portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

### 4.24.15 Payment of Umpqua Bank Fees.

Unless otherwise provided by the Plan, upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportionate share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

### 4.24.16 Property Taxes.

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

### 4.24.17 Settlement of Claims by and among Debtor, Reorganized Debtor and Umpqua Bank.

Upon confirmation of this Plan and effective as of the Effective Date, (a) the Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor, (b) Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and employees for any and all actions (or in-actions) that occurred before the Effective Date, (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan, and (d) subject to the provisions of paragraph 4.7 hereof, Umpqua Bank will not make a demand on the Debtor or Reorganized Debtor for defaults that occurred before the Effective Date.

### 4.24.18 Treatment of Umpqua Bank's Cash Collateral Account.

The good funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's

Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, provided that (i) Umpqua Bank shall have a security interest in such Roseburg improvements, (ii) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (iii) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank, which will be subject to Umpqua Bank's security interest, to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.  On the Effective Date, Reorganized Debtor shall make the payments required under subparagraph (a) and (b) above, the funds required under subparagraph (d) and (f) will be retained by the Reorganized Debtor, Umpqua Bank shall apply the funds described in subparagraph (e) above and the remainder will remain in a deposit account at Umpqua Bank to be used in accordance with this paragraph.

4.24.19  Use of Rents Generated From Umpqua Properties.

Commencing on the Effective Date, all rents generated from the properties securing the Umpqua Bank loans may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

4.25    Class 8 (Washington Federal Savings).  Class 8 is impaired.  The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

### 4.25.1   Class 8.1 –Lord Byron Loan.

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of $2,000,000 (the "Lord Byron Loan").  The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral").  The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date as allowed by the Lord Byron Loan documents (the "Washington Claim Amount"). Washington Federal shall have a Secured Class 8 Claim in the aggregate amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

The Washington Federal Secured Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, as follows:  the 2909 Lord Byron Note in the principal amount of $279,600 , the 2915 Lord Byron Note in the principal amount of $296,000, the 2931 Lord Byron Note in the principal amount of $327,950, the 2977 Lord Byron Note in the principal amount of $269,350, and the 2993 Lord Byron Note in the principal amount of $327,100 (individually, a "Lord Byron Note" and collectively, the "Lord Byron Notes").  Each Lord Byron Note will bear simple interest at a fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date. Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date. Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property. Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal, provided that the loan documents for the assignee shall include an impound for Property Tax and insurance.

### 4.25.2  Treatment of Washington Federal's Cash Collateral Account.

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any past due Property Taxes on the Collateral securing the Class 8 Claim. Any amounts remaining in the cash collateral bank account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

### 4.25.3  Treatment of the Washington Federal Unsecured Claim.

The Washington Federal Unsecured Claim shall be treated as a Class 12 General Unsecured Claim.

4.26     **Class 9 (BLM Secured Creditors)**. Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors. Each of the BLM Secured Creditors made a loan to the Debtor on or about November 4, 2008, as follows: (a) a loan made by Francis Cline in the original principal amount of $347,065; (b) a loan made by William Greenhoot in the original principal amount of $347,065, (c) loans made by Herbert McKillop in the original principal amounts of $120,000 and $1,453,482; (d) a loan made by Karen Merwin in the original principal amount of $694,130; (e) a loan made by Alice Smith in the original principal amount of $694,130, and (f) a

loan made by Linda Trickey in the original principal amount of $694,130 (collectively, the BLM Loans"). The BLM Loans are secured by a deed of trust on the Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

Class 9 shall have an allowed claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the BLM Secured Creditors on the BLM Loans (the "BLM Allowed Secured Claim"). The BLM Allowed Secured Claim shall be treated as follows.

On the Effective Date, Reorganized Debtor shall pay all outstanding and prorated property taxes on the BLM Office Building and shall contribute $10,000 towards the cost of deferred maintenance and repair on the BLM Office Building. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to Chad Drive LLC, an Oregon limited liability company (the "BLM LLC"), whose members shall be the BLM Secured Creditors and whose membership interests in the BLM LLC shall be in direct proportion to the amount of their claims. Title shall be transferred by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM LLC, in full and complete satisfaction of all obligations owing under the BLM Allowed Secured Claim.

Notwithstanding the foregoing, at the request of the BLM LLC, Reorganized Debtor will provide at no cost, management services, assistance with zoning issues, assistance with marketing the property for lease or sale and any other services that Reorganized Debtor and the BLM LLC both agree are in their best interests. Reorganized Debtor will be reimbursed for any out of pocket expenditures paid to non-related parties relating to the services described above.

After the transfer of the BLM Office Building to the BLM LLC, any cash generated from the sale or rental of the BLM Office Building shall be kept by BLM LLC until it shall have received $4,350,000 plus interest at 5.75% from May 4, 2010 until paid (the "BLM Payment"). After the BLM LLC has been paid the BLM Payment, Reorganized Debtor shall be reimbursed for any cash Arlie & Company shall have invested in the BLM Office Building, plus accrued interest at 5.75% from the date the BLM Office Building was transferred to the BLM LLC. The amount due

Reorganized Debtor shall be agreed to by both Reorganized Debtor and the BLM LLC and shall consist of all cash expenditures by Arlie & Co. during its ownership of the BLM Office Building including the down payment less any rent or other money received during their ownership, not including any internal costs charged by Arlie & Co. or related parties (the "Arlie Payment").

The BLM LLC shall have the right to accept or refuse any offers to sell or lease the BLM Office Building provided that Reorganized Debtor shall have the right to purchase the BLM Office Building from the BLM LLC, for cash at the fair market value which can be no less than the outstanding amount of the BLM Payment then owing to the BLM LLC. The right of Reorganized Debtor to purchase the BLM Office Building is not a right of first refusal.

In the event the BLM Office Building is sold, subject to available funds, any debt incurred against the BLM Office Building after its transfer to the BLM LLC shall be paid first, then the BLM LLC will be paid the BLM Payment, then Reorganized Debtor will be paid the Arlie Payment and if there are any excess funds they shall be paid 80% to the BLM LLC and 20% to Reorganized Debtor. If Reorganized Debtor is the purchaser, excess funds after the above payments shall be distributed 60% to the BLM LLC and 40% to Reorganized Debtor.

4.27    Class 10 (Property Tax Lien Claims).  Class 10 is impaired.  Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

4.28    4.9 Class 11 (Small Unsecured Claims).  Class 11 is impaired.  Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

4.29    4.10 Class 12 (General Unsecured Claims).  Class 12 is impaired.  Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre-petition or post-petition default interest or post-petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds

are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

4.30   4.11  Class 13 (Interests).  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

4.31   4.12  Class 14 (Fifth Third Bank).  The Class 14 Claim is impaired.  The Class 14 Claim of Fifth Third Bank ("Fifth Third"), originally filed against the Debtor in the amount of $4,295,055.54 as proof of claim No. 185, arises under a guaranty (the "Guaranty") by the Debtor of the obligations of Arlie Air, LLC (a wholly owned subsidiary of the Debtor) ("Arlie Air").  The Fifth Third Claim was subsequently reduced after the liquidation of Arlie Air's assets and the payment to Fifth Third of the liquidation sale proceeds.  The resulting allowed Fifth Third Claim is based on an agreement with respect to the deficiency balance owed by Debtor to Fifth Third.

Fifth Third will have an allowed general unsecured claim in the amount of $1,009,843.05 (the "Fifth Third Unsecured Claim").  The Fifth Third Unsecured Claim will accrue simple interest at the fixed rate of 3.5% per annum, commencing on the Effective Date.  The Reorganized Debtor will repay the entire balance of the Fifth Third Unsecured Claim in full, including accrued interest, not later than 36 months following the Effective Date (the "Fifth Third Maturity Date"); Reorganized Debtor may, but shall have no obligation to, make periodic payments to Fifth Third prior to the Fifth Third Maturity Date.

Within 30 days following the Effective Date, the Reorganized Debtor will have the option (the "Option"), in its sole discretion, to satisfy the Fifth Third Unsecured Claim by the delivery of a promissory note secured by a first priority perfected security interest and mortgage in and to the Reorganized Debtor's interests in the Puueo Estate and Puueo Forest land in Hawaii (the "Puueo Estate/Forest") in the amount of $600,000 (the "Fifth Third Secured Claim").  (For purposes of clarification, the Puueo Estate and Puueo Forest property is comprised of 363 acres of land in Hawaii and is described in further detail in the Debtor's Second Amended Disclosure Statement

(February 14, 2011) (Docket No. 449) (the "Disclosure Statement").  The  Puueo Estate/Forest is not included within the 5,226 acre property referred to in the Disclosure Statement as the "West Hilo Tree Farm".)  The Fifth Third Secured Claim will accrue simple interest at the fixed rate of 3.5% per annum, commencing on the Effective Date, and will mature on the Fifth Third Maturity Date.  No payments will be due on the Fifth Third Secured Claim prior to the Fifth Third Maturity Date.  The form and substance of the promissory note, the mortgage and related documents and instruments shall be in form and substance reasonably satisfactory to Fifth Third.  In order for the Option to be exercised, the mortgage and all related documents and instruments must be recorded within 60 days after the date the Reorganized Debtor advises Fifth Third that the Reorganized Debtor is exercising the Option.  Fifth Third and the Reorganized Debtor shall each use their best efforts to cooperate with respect to the documentation.  All reasonable fees, costs, title reports, title insurance and taxes to prepare, negotiate and record the mortgage and any related documents and instruments shall be paid by the Reorganized Debtor.  The Reorganized Debtor's counsel shall prepare the form of the promissory note, the mortgage and any related documents and instruments.  Notwithstanding the foregoing, if the Fifth Third Secured Claim comes into being and the Reorganized Debtor sells the Puueo Estate/ Forest prior to the Maturity Date, then Fifth Third will receive the first dollars from the Puueo Estate/Forest sale proceeds up to the amount of the Fifth Third Secured Claim, plus accrued interest.

If the Debtor's pending sale of approximately 5,226 acres of forest properties located in Hilo, Hawaii (see Docket No. 426) (the "West Hilo Tree Farm"), or any portion thereof, generates gross cash proceeds of $10,000,000 or greater, all cash in excess of $10,000,000 will be paid to Fifth Third (up to $600,000, plus accrued interest thereon at a fixed rate of 3.5% per annum from the Effective Date).  Notwithstanding the foregoing, if the Reorganized Debtor has not exercised the Option and performed the other requirements described in the paragraph immediately above (i.e. recorded the mortgage and related documents within 60 days of the Effective Date), and if any portion of any of the proceeds of sale of the West Hilo Tree Farm are paid to any creditors holding Class 12 General Unsecured Claims, the Reorganized Debtor shall immediately pay down or payoff

(as applicable) the Fifth Third Unsecured Claim, to the same extent and percentage as the distribution made to said creditor(s) holding Class 12 General Unsecured Claims.

Following Bankruptcy Court approval of the *Stipulation To Compromise Claim Of Fifth Third Bank* entered March 24, 2011 (the "Stipulation"), Reorganized Debtor and Fifth Third shall execute mutual releases (in form and substance reasonably satisfactory to Fifth Third), pursuant to which Reorganized Debtor and Fifth Third shall, except as provided for in the Stipulation and in this Plan, release, waive and forever discharge any other claims against one another.

## ~~ARTICLE V~~

## ARTICLE V

### PROVISIONS GOVERNING DISTRIBUTIONS

5.32    <u>Distributions by Debtor</u>.  The Reorganized Debtor shall administer Claims and make distributions in respect of Allowed Claims.  Distributions to be made by the Reorganized Debtor may be made by any person designated or retained by the Reorganized Debtor to serve as disbursing agent without the need for any further order of the Bankruptcy Court.

5.33    <u>Disputed Claims; Objections to Claims</u>.  Only Claims that are Allowed shall be entitled to distributions under the Plan.  No Cash or other property shall be distributed under the Plan on account of any Disputed Claim, or a portion of any such Claim, unless and until such Disputed Claim becomes an Allowed Claim.  Debtor reserves the right to contest and object to any Claims and previously Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts that are specifically referenced herein, are not listed in the Schedules, are listed therein as disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount than the Debtor currently believes is validly due and owing.  All Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the Bankruptcy Court may otherwise order.

5.34    <u>Subsequent Allowance of Disputed Claims</u>.  The holder of a Disputed Claim that becomes Allowed in full or in part subsequent to the Effective Date shall receive Cash distributions (including any make-up distributions) on the next applicable distribution date following the allowance of such Disputed Claim.

5.35     Unclaimed Distributions.  Any entity which fails to claim any Cash distribution within one hundred twenty (120) days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan and the Reorganized Debtor shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Reorganized Debtor, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor with respect to such funds shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and such Creditors shall have no claim whatsoever against the Reorganized Debtor or any holder of an Allowed Claim to whom distributions are made by the Reorganized Debtor.

## ARTICLE VI

## MEANS FOR EXECUTION OF PLAN

6.36     Continued Business Operations.  From and after the Effective Date, the Reorganized Debtor shall continue to engage in business with the goal of maximizing the value of its assets and, subject to the provisions of the Plan governing distributions and the retention of jurisdiction provisions hereof, the Reorganized Debtor shall continue such business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Reorganized Debtor shall be authorized, without limitation, to use and dispose of its assets, to insure its assets, to borrow money, to employ and compensate agents, to reconcile and object to Claims, and to make distributions to Creditors in accordance with the Plan.

6.37     Siuslaw Credit Line.  Siuslaw Bank will provide a revolving line of credit to the Reorganized Debtor in the amount of $1,200,000 (the "Credit Line").  Interest is to be paid monthly at a rate of Prime plus 1%. The rate will not be less than 4.5% during the term of the Credit Line nor will the rate ever exceed 9.5%. The rate will be adjusted at each annual renewal.  Siuslaw Bank will renew the Credit Line annually provided that Reorganized Debtor has complied with all provisions of the Plan that pertain to Siuslaw Bank. No loan fee will be paid for the initial term of the Credit Line but the Credit Line will be subject to a $5,000 annual renewal fee. Any expenses

incurred to put the Credit Line in place will be the responsibility of Reorganized Debtor. Such expenses will include appraisals for all properties involving Siuslaw Bank.

The Credit Line will be secured by a first trust deed on the Florence Medical Building (described in Article 4.5.6 hereof) (currently loan #1/214981). In the event that 75% of the appraised value of the Florence Medical Building is less than $1,200,000, then Reorganized Debtor shall provide different or additional collateral reasonably acceptable to Siuslaw Bank. Unless previously paid, the initial advance on the Credit Line will (a) payoff the current first mortgage on the Florence Medical Building at Siuslaw Bank, (b) pay property taxes current on the Florence Medical Building, and (c) pay all accrued interest on all Siuslaw Bank loans except the loan secured by the Crescent Village Lots. (Loan 1/209386).

6.38    <u>Operating Revenues</u>. Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, the net operating income generated from Reorganized Debtor's continued business operations, and from the future sale or refinancing of assets of Reorganized Debtor from time to time. A core aspect of Debtor's business is marketing and selling real property acquired by Debtor from time to time. Reorganized Debtor will continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan. Such sales may occur without further order of the Bankruptcy Court.

6.39    <u>Sales or Refinancing of Real Property Collateral</u>. Without limiting Article 6.3 above, and except as set forth with respect to a particular Creditor under the Plan, Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral. Any excess net proceeds from the sale or refinancing of such Collateral shall be paid to Reorganized Debtor (or as otherwise directed by Reorganized Debtor) and may be used by Reorganized Debtor to fund Reorganized Debtor's continued business operations and to fund payments required under this Plan. Such sales or refinancing may occur without further order of the Bankruptcy Court.

6.40    <u>Marketing and Sales of Non-Core Assets</u>.  In addition to marketing and selling its real property assets in the ordinary course of its business, Reorganized Debtor may market and sell its non-core assets on an accelerated basis as is necessary or appropriate to ensure that Reorganized Debtor will have sufficient funds to make all payments required of Debtor under this Plan.  Without limiting the preceding, if at any time Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, Reorganized Debtor will before such payment is due sell at public auction one or more of Reorganized Debtor's Non-core assets to raise the funds necessary to make the required Plan payment.  Such auctions and sales may occur without further order of the Bankruptcy Court.

6.41    <u>Setoffs</u>.  Reorganized Debtor may, but shall not be required to, set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which Debtor or Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim Debtor or Reorganized Debtor may have against such holder.

6.42    <u>Corporate Action</u>.  Upon entry of the Confirmation Order by the Clerk of the Bankruptcy Court, all actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the execution, delivery, and performance of all documents and agreements relating to the Plan, and any of the foregoing.  On the Effective Date, the appropriate officers of Reorganized Debtor are authorized and directed to execute and deliver any and all agreements, documents, and instruments contemplated by the Plan and/or the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

6.43    <u>Saturday, Sunday, or Legal Holiday</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.44    <u>Deposits</u>.  All utilities holding a utility deposit obtained as a result of this Bankruptcy Case shall immediately after the Effective Date return or refund such utility deposit to Reorganized Debtor.  At the sole option of Reorganized Debtor, Reorganized Debtor may apply any

such utility deposit that has not been refunded to Reorganized Debtor in satisfaction of any payments due or to become due from Reorganized Debtor to a utility holding such a utility deposit. All escrow deposits made by the Debtor for prospective purchases of property which did not close prior to the Effective Date (the "Arlie Escrow Deposits") and which have not been returned to the Debtor as of the Effective Date, shall be turned over to Reorganized Debtor immediately after the Effective Date for its own account.

6.45    Event of Default; Remedy.  Any failure by Reorganized Debtor to perform any term of this Plan, which failure continues for a period of ten Business Days following receipt by Reorganized Debtor of written notice of such default from the holder of an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon the occurrence of an Event of Default, both the holder of an Allowed Claim to whom performance is due and the Reorganized Debtor shall each have all rights and remedies granted by law, this Plan or any agreement between the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with respect to one Creditor shall not be an Event of Default with respect to any other Creditor.  Notwithstanding the foregoing, in the event of a failure to perform any term of this Plan with respect to a Class 11 or Class 12 Claim, the Unsecured Creditors' Committee may provide the Reorganized Debtor with written notice of an Event of Default on behalf of the holder of such Unsecured Claim.

6.46    Continuation of Unsecured Creditors' Committee.  To the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee.  For so long as such Unsecured Creditors' Committee remains in existence, Reorganized Debtor will provide to the Unsecured Creditors' Committee a quarterly compliance certificate executed by the Chief Financial Officer of Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan.  The first such compliance certificate shall be delivered to the Unsecured Creditors' Committee 45 days after the end of the third month following the Effective Date and each quarterly compliance certificate shall

be delivered 45 days after the end of each subsequent three month period, unless another quarterly schedule is agreed to by and between the Reorganized Debtor and the Creditors' Committee.  If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan.  In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to Reorganized Debtor in its reasonable discretion, Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee.  Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist.  During the existence of the Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period, in the ordinary course of business, provided that any dispute concerning such fees and expenses shall be resolved by the Bankruptcy Court or other court of competent jurisdiction.

## ARTICLE VII

### EXECUTORY CONTRACTS AND UNEXPIRED LEA

7.47   <u>Assumption and Rejection</u>.  Except as may otherwise be provided in the Plan Supplement, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date.  The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for in the Plan Supplement or subject to other Court Order or pending motion.  Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

7.48     _Assignment_.  To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment.

7.49     _Rejection Claims_.  Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner.  Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

7.50     _Compensation and Benefit Programs_.  Except to the extent restricted by the Plan, all employee compensation and benefit plans, policies and programs of Debtor applicable generally to its employees as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, stock incentive plans, and life, accidental death and dismemberment insurance plans, shall continue in full force and effect, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate any of the foregoing arrangements.

## ARTICLE VIII

## EFFECT OF CONFIRMATION

8.51     _Binding Effect_.  The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtor and the estate assets, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the commencement of the Bankruptcy Case.  The distributions made pursuant to this Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made.  Confirmation of the Plan shall bind and govern the acts of the Reorganized Debtor whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed

pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

   8.52 <u>Discharge and Permanent Injunction.</u>  Except as otherwise set forth in the Plan, confirmation of the Plan shall discharge the Debtor from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan.  As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under Sections 524(a) and 1141 of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtor or the Reorganized Debtor, except as otherwise set forth in this Plan.  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.  Nothing contained in the foregoing discharge shall, to the full extent provided under Section 524(e) of the Bankruptcy Code, affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtor that is discharged under the Plan.

   8.53 <u>Limitation of Liability</u>.  The Debtor and the Reorganized Debtor and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

8.54    <u>Exculpation</u>.  The Debtor, the Reorganized Debtor and each of their respective Agents, shall not be liable to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Bankruptcy Case or the negotiation, formulation, development, proposal, disclosure, confirmation or implementation of the Plan and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan, provided, however, that the foregoing provisions shall have no affect on the Tonkon Claims or the liabilities of any person that resulted from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted negligence, breach of fiduciary duty or willful misconduct.

## ARTICLE IX

## RETENTION OF JURISDICTION

9.55    <u>Jurisdiction of the Bankruptcy Court</u>.  Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:

(a)    ~~(a)~~    to resolve controversies and disputes regarding any Avoidance Action,

(b)    ~~(b)~~    to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests,

(c)    ~~(c)~~    to determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed in this Bankruptcy Case,

(d)    ~~(d)~~    to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code,

(e)    ~~(e)~~    to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan,

(f)    ~~(f)~~    to resolve controversies and disputes regarding the interpretation of this Plan,

(g)    ~~(g)~~    to implement the provisions of this Plan and enter orders in aid of confirmation,

(h)    ~~(h)~~    to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and

(i)    ~~(i)~~    to enter a final decree closing this Bankruptcy Case.

9.56    <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>.  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

# ARTICLE X

## ADMINISTRATIVE PROVISIONS

10.57    <u>Modification or Withdrawal of the Plan</u>.  Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order.  After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

10.58    <u>Revocation or Withdrawal of Plan</u>.  Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

10.59  <u>Modification of Payment Terms</u>.  The Debtor may modify the treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such Claim or Interest at any time after the Effective Date upon the prior written consent of the person whose Allowed Claim or Interest treatment is being adversely affected.

10.60  <u>Nonconsensual Confirmation</u>.  Debtor shall request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except subsection 1129(a)(8), are met.

10.61  <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distributions, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of Debtor.

10.62  <u>Final Decree</u>.  At any time following the Effective Date, the Reorganized Debtor shall be authorized to file a motion for the entry of a final decree closing the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code.

**ARTICLE XI**

**CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

AND CONSUMMATION OF THE PLAN

11.63  <u>Conditions to Confirmation</u>.  The following are conditions precedent to the confirmation of this Plan:

11.1.1  The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor;

11.1.2  The Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor; and

11.1.3  A written settlement agreement shall have been executed by and among the Debtor, the guarantors of the Debtor's obligations to Umpqua Bank (the "Guarantors") and Umpqua Bank containing the following release terms and agreements not to make a demand, all of which shall be effective as of the Effective Dale:  (a) a waiver and release of all claims against Umpqua Bank and its officers and employees by Debtor and the Guarantors; (b) an acknowledgement by the Debtor and the Guarantors that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable; and (c) an agreement by Umpqua Bank that it will not make a demand on the Debtor or the Guarantors for defaults that occurred before the Effective Date.

11.64   Conditions to Effective Date.  The following are conditions precedent to the occurrence of the Effective Date:

11.1.4   ~~11.2.1~~ The Confirmation Date shall have occurred;

11.1.5   ~~11.2.2~~ The Confirmation Order shall have become a Final Order;

11.1.6   ~~11.2.3~~ No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending;

11.1.7   ~~11.2.4~~ The Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

11.65   Waiver of Conditions.  Other than paragraph 11.1.3, the Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by the Debtor at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

# ARTICLE XII

# MISCELLANEOUS PROVISIONS

12.66   Revesting.  Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all Arlie Escrow Deposits not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date,

and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

     12.67    <u>Rights of Action</u>.  Except as otherwise expressly provided herein, any claims, rights, interests, causes of action, defenses, counterclaims, cross-claims, third-party claims, or rights of offset, recoupment, subrogation or subordination including, without limitation, the Tonkon Claims, claims under Section 550(a) of the Bankruptcy Code or any of the sections referenced therein (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall remain assets of Reorganized Debtor.  Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with what is in its best interests and for its benefit.

     12.68    <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal laws are applicable, the laws of the State of Oregon shall govern the construction and implementation of the Plan, and all rights and obligations arising under the Plan.

     12.69    <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, Debtor and Reorganized Debtor shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authorities and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification and information requirements.  Entities entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as Reorganized Debtor may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable Reorganized Debtor to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.  Pursuant to Section 346(f) of the Bankruptcy Code, the Reorganized shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  Notwithstanding any other provision of this Plan, each holder of an Allowed Claim that has received a distribution of Cash shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution.

12.70   <u>Time</u>.  Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of the next succeeding day which is a Business Day.

12.71   <u>Section 1146(c) Exemption</u>.  Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the revesting, transfer or sale of any real property of Debtor or Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan, including without limitation the sale of any real property by Debtor or Reorganization Debtor (in Hawaii, Oregon or otherwise) pursuant to and in performance of Reorganized Debtors obligations under this Plan, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any city, county or governmental unit in which any instrument, including any deed conveying any of Reorganized Debtor's interest in any of its real property, hereunder is to be recorded shall, be ordered and directed to accept such instrument without requiring the payment of any conveyance fee, documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax or fee.

12.72   <u>Severability</u>.  In the event that any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provisions of the Plan.  To the extent that any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the confirmation of the Plan existing by reason of such provision.

12.73   <u>Successors and Assigns</u>.  The provisions of the Plan shall bind Debtor, Reorganized Debtor and all holders of Claims and Interests, and their respective successors, heirs and assigns.

12.74   <u>Notices to Claim and Interest Holders</u>.  Notices to Persons holding a Claim or Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if none was filed, at the address set forth in the Schedules.

12.75   <u>Post Effective-Date Notices</u>.  Following the Effective Date, notices will only be served on the Reorganized Debtor, the Office of the United States Trustee, the Unsecured Creditors' Committee and those persons who file with the Court and serve upon the Reorganized Debtor a request, which includes such person's name, contact person, address, telephone number and facsimile number, that such person receive notice of post-Effective Date matters.  Persons who had previously filed with the Bankruptcy Court requests for special notice of the proceedings and other filings in the Bankruptcy Case will not receive notice of post-Effective Date matters unless such persons file a new request with the Bankruptcy Court.

12.76   <u>Retiree Benefits</u>.  On or after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code, maintained or established by Debtor prior to the Effective Date, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate the foregoing arrangements.

12.77   <u>Provisions Enforceable</u>.  The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan is valid and enforceable in accordance with its terms.

12.78   <u>Recordable Order</u>.  The Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications or other supporting documents.

12.79   <u>Plan Controls</u>.  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, or any other instrument or agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall control and take precedence.

12.80   <u>Delivery of Promissory Notes</u>.  To the extent that this Plan provides for Reorganized Debtor to deliver a promissory note to a Secured Creditor in connection with an

Allowed Secured Claim, except as otherwise specifically provided in this Plan or in any note or document delivered in connection with this Plan, this Plan and any note or other document delivered in connection herewith shall replace and supersede all pre-petition notes, loan agreements, trust deeds, security documents or other documents executed by Debtor in connection with the obligations giving rise to the Allowed Claim.  The Reorganized Debtor shall provide the Unsecured Creditors' Committee with copies of any such promissory notes or other security documents executed pursuant to the Plan.  Unless otherwise provided in this Plan, each Creditor will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Accordingly, unless otherwise provided in this Plan, the validity and priority of any trust deed or other security document executed in connection with the obligations giving rise to the Creditor's Allowed Claim will not be impaired by this Plan.  However, except as otherwise specifically provided in this Plan, to the extent that any such trust deed or other security document contains any provisions that impose any covenants, requirements or obligations on Debtor or Reorganized Debtor that are not specifically provided for or contained in, or are otherwise inconsistent with, this Plan, then such provisions shall be of no force and effect.

      12.81   <u>Effectuating Documents and Further Transactions</u>.  Debtor and Reorganized Debtor shall execute, deliver, file or record such contracts, instruments, assignments, and other agreements or documents, and take or direct such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

DATED this ~~1st~~11th day of April, 2011.

               Respectfully submitted,

               ARLIE & COMPANY

               By  /s/ Scott Diehl_____
                  Scott Diehl, Chief Financial Officer

PACHULSKI STANG ZIEHL & JONES LLP


By  /s/ John D. Fiero
    John D. Fiero, (CA Bar No. 136557)
    Linda F. Cantor, (CA Bar No. 153762)
    Attorneys for Debtor

Document comparison by Workshare Professional on Monday, April 11, 2011 7:48:46 AM

| Input: | |
|---|---|
| Document 1 ID | pcdocs://docs_la/231180/3 |
| Description | #231180 v3 - Arlie - Fourth Amended Plan of Reorganization |
| Document 2 ID | pcdocs://docs_la/231180/5 |
| Description | #231180 v5 - Arlie - Fourth Amended Plan of Reorganization |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 115 |
| Deletions | 186 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 307 |

John D. Fiero (CA Bar No. 136557)
Linda F. Cantor (CA Bar No. 153762)
Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
Email: jfiero@pszjlaw.com
         lcantor@pszjlaw.com
         tkapur@pszjlaw.com

and

Brad T. Summers (OSB No. 911116)
David W. Criswell (OSB No. 925930)
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone: 503/228-2525
Facsimile: 503/295-1058
Email: tsummers@balljanik.com
         dcriswell@balljanik.com

Attorneys for Debtor Arlie & Company

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| In re | Case No. 10-60244-aer11 |
| **ARLIE & COMPANY,** | Chapter 11 |
| Debtor. | **DEBTOR'S FOURTH AMENDED PLAN OF REORGANIZATION (APRIL 11, 2011)** |
| | **Hearing** |
| | Date: April 15, 2011 |
| | Time: 10:00 a.m. |
| | Place: United States Bankruptcy Court 405 E. 8th Avenue Courtroom #6 Eugene, Oregon 97401 |
| | Judge: Honorable Frank R. Alley |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ............................................................................................ **1**

1.1    "Administrative Expense Claim" ........................................................................ 1

1.2    "Agent" ............................................................................................................... 1

1.3    "Allowed" ........................................................................................................... 1

1.4    "Avoidance Actions" .......................................................................................... 2

1.5    "Bankruptcy Case" ............................................................................................. 2

1.6    "Bankruptcy Code" ............................................................................................ 2

1.7    "Bankruptcy Court" ........................................................................................... 2

1.8    "Bankruptcy Rules" ........................................................................................... 2

1.9    "BLM Secured Creditors" .................................................................................. 2

1.10    [Intentionally omitted] ...................................................................................... 2

1.11    "Business Day" .................................................................................................. 3

1.12    "Cash" ............................................................................................................... 3

1.13    "Claim" .............................................................................................................. 3

1.14    "Class" ............................................................................................................... 3

1.15    "Collateral" ....................................................................................................... 3

1.16    "Confirmation Date" ......................................................................................... 3

1.17    "Confirmation Hearing" .................................................................................... 3

1.18    "Confirmation Order" ....................................................................................... 3

1.19    "Creditor" .......................................................................................................... 3

1.20    "Debtor" ............................................................................................................ 3

1.21    "Deficiency Claim" ........................................................................................... 3

1.22    "Disclosure Statement" ..................................................................................... 4

1.23    "Disputed Claim" .............................................................................................. 4

1.24    "Effective Date" ................................................................................................ 4

1.25    "Entity" .............................................................................................................. 4

1.26    "Excess Sale Proceeds" ..................................................................................... 4

1.27    "Filed" ............................................................................................................... 4

1.28    "Final Order" ..................................................................................................... 4

1.29    "General Unsecured Claim" .............................................................................. 4

1.30    "Interests" .......................................................................................................... 5

1.31    "Lord Byron Collateral Value" ......................................................................... 5

1.32    "Maturity Date" ................................................................................................. 5

1.33    "Non-core assets" .............................................................................................. 5

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.34 "Other Priority Claim" ..................................................................................... 5

1.35 "Petition Date" ........................................................................................................ 5

1.36 "Plan" ......................................................................................................................... 5

1.37 "Plan Supplement" ................................................................................................ 5

1.38 "Priority Tax Claim" .............................................................................................. 5

1.39 "Pro Rata" ................................................................................................................ 5

1.40 "Property Tax" ......................................................................................................... 5

1.41 "Property Tax Lien Claim" ................................................................................... 6

1.42 "Rejection Claim" .................................................................................................. 6

1.43 "Reorganized Debtor" .......................................................................................... 6

1.44 "Roberts Distributions" ....................................................................................... 6

1.45 "Schedules" ............................................................................................................. 6

1.46 "Scheduled Amounts" .......................................................................................... 6

1.47 "Secured Claim" ..................................................................................................... 6

1.48 "Small Unsecured Claim" .................................................................................... 6

1.49 "Tonkon Claims" .................................................................................................... 6

1.50 "Unsecured Claim" ............................................................................................... 7

**ARTICLE II UNCLASSIFIED CLAIMS** .......................................................................... **7**

2.1 Administrative Expense Claims .......................................................................... 7

2.2 Priority Tax Claims ................................................................................................ 7

2.3 Bankruptcy Fees ..................................................................................................... 7

**ARTICLE III CLASSIFICATION** ................................................................................... **8**

3.1 Class 1 (Other Priority Claims) .......................................................................... 8

3.2 Class 2 (BofA) ......................................................................................................... 8

3.3 Class 3 (Century Bank) ......................................................................................... 8

3.4 Class 4 (Pioneer) .................................................................................................... 8

3.5 Class 5 (Siuslaw Bank) ......................................................................................... 8

3.6 Class 6 (Summit Bank) ......................................................................................... 8

3.7 Class 7 (Umpqua Bank) ........................................................................................ 8

3.8 Class 8 (Washington Federal Savings) ............................................................. 8

3.9 Class 9 (BLM Secured Creditors) ...................................................................... 8

3.10 Class 10 (Property Tax Lien Claims) ................................................................ 8

3.11 Class 11 (Small Unsecured Claims) .................................................................. 8

3.12 Class 12 (General Unsecured Claims) .............................................................. 9

3.13 Class 13 (Interests) ................................................................................................ 9

3.14 Class 14 (Fifth Third Bank) ................................................................................. 9

**ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** ............ **9**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---:|
| 4.1 | Class 1 (Other Priority Claims) | .......................................................... | 9 |
| 4.2 | Class 2 (Allowed Secured Claims of BofA) | ..................................... | 9 |
| 4.3 | Class 3 (Allowed Secured Claim of Century Bank) | ................... | 14 |
| 4.4 | Class 4 (Allowed Secured Claim of Pioneer) | ................................ | 15 |
| 4.5 | Class 5 (Allowed Secured Claims of Siuslaw Bank) | ................ | 16 |
| 4.6 | Class 6 (Summit Bank) | ................................................................ | 22 |
| 4.7 | Class 7 (Umpqua Bank) | ................................................................ | 25 |
| 4.8 | Class 8 (Washington Federal Savings) | ..................................... | 39 |
| 4.9 | Class 9 (BLM Secured Creditors) | ............................................. | 41 |
| 4.10 | Class 10 (Property Tax Lien Claims) | ......................................... | 43 |
| 4.11 | Class 11 (Small Unsecured Claims) | ........................................... | 43 |
| 4.12 | Class 12 (General Unsecured Claims) | ......................................... | 43 |
| 4.13 | Class 13 (Interests) | ..................................................................... | 43 |
| 4.14 | Class 14 (Fifth Third Bank) | ...................................................... | 43 |
| **ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS** | | **.......................** | **45** |
| 5.1 | Distributions by Debtor | ............................................................. | 45 |
| 5.2 | Disputed Claims; Objections to Claims | ..................................... | 46 |
| 5.3 | Subsequent Allowance of Disputed Claims | ............................... | 46 |
| 5.4 | Unclaimed Distributions | ............................................................. | 46 |
| **ARTICLE VI MEANS FOR EXECUTION OF PLAN** | | **...............................** | **46** |
| 6.1 | Continued Business Operations | ................................................... | 46 |
| 6.2 | Siuslaw Credit Line | ..................................................................... | 47 |
| 6.3 | Operating Revenues | ..................................................................... | 47 |
| 6.4 | Sales or Refinancing of Real Property Collateral | ....................... | 48 |
| 6.5 | Marketing and Sales of Non-Core Assets | ................................... | 48 |
| 6.6 | Setoffs | ......................................................................................... | 48 |
| 6.7 | Corporate Action | ......................................................................... | 49 |
| 6.8 | Saturday, Sunday, or Legal Holiday | ........................................... | 49 |
| 6.9 | Deposits | ....................................................................................... | 49 |
| 6.10 | Event of Default; Remedy | ........................................................... | 49 |
| 6.11 | Continuation of Unsecured Creditors' Committee | ..................... | 50 |
| **ARTICLE VII Executory Contracts and Unexpired Leases** | | **..................** | **51** |
| 7.1 | Assumption and Rejection | ........................................................... | 51 |
| 7.2 | Assignment | ................................................................................... | 51 |
| 7.3 | Rejection Claims | ......................................................................... | 51 |
| 7.4 | Compensation and Benefit Programs | ........................................... | 51 |
| **ARTICLE VIII Effect of Confirmation** | | **.............................................** | **52** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| 8.1 | Binding Effect | 52 |
| 8.2 | Discharge and Permanent Injunction | 52 |
| 8.3 | Limitation of Liability | 53 |
| 8.4 | Exculpation | 53 |

**ARTICLE IX RETENTION OF JURISDICTION** ............................................................. **53**

| 9.1 | Jurisdiction of the Bankruptcy Court | 53 |
| 9.2 | Failure of Bankruptcy Court to Exercise Jurisdiction | 54 |

**ARTICLE X ADMINISTRATIVE PROVISIONS** ............................................................... **54**

| 10.1 | Modification or Withdrawal of the Plan | 54 |
| 10.2 | Revocation or Withdrawal of Plan | 55 |
| 10.3 | Modification of Payment Terms | 55 |
| 10.4 | Nonconsensual Confirmation | 55 |
| 10.5 | Compromise of Controversies | 55 |
| 10.6 | Final Decree | 55 |

**ARTICLE XI CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ................................................................................................................ **56**

| 11.1 | Conditions to Confirmation | 56 |
| 11.2 | Conditions to Effective Date | 56 |
| 11.3 | Waiver of Conditions | 56 |

**ARTICLE XII MISCELLANEOUS PROVISIONS** ........................................................... **57**

| 12.1 | Revesting | 57 |
| 12.2 | Rights of Action | 57 |
| 12.3 | Governing Law | 57 |
| 12.4 | Withholding and Reporting Requirements | 57 |
| 12.5 | Time | 58 |
| 12.6 | Section 1146(c) Exemption | 58 |
| 12.7 | Severability | 58 |
| 12.8 | Successors and Assigns | 59 |
| 12.9 | Notices to Claim and Interest Holders | 59 |
| 12.10 | Post Effective-Date Notices | 59 |
| 12.11 | Retiree Benefits | 59 |
| 12.12 | Provisions Enforceable | 59 |
| 12.13 | Recordable Order | 60 |
| 12.14 | Plan Controls | 60 |
| 12.15 | Delivery of Promissory Notes | 60 |
| 12.16 | Effectuating Documents and Further Transactions | 60 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Arlie & Company, as debtor and debtor-in-possession ("Debtor"), proposes the following Plan of Reorganization (the "Plan") pursuant to Section 1121(a) of Title 11 of the United States Code.

The Plan provides for the repayment in full of Debtor's obligations to its Creditors. A Disclosure Statement is enclosed herewith to assist you in understanding the Plan and making an informed judgment concerning its terms.

## ARTICLE I

## DEFINITIONS

Definitions of certain terms used in the Plan are set forth below.  Other terms are defined in the text of the Plan or in the text of the Disclosure Statement.  In either case, when a defined term is used, the first letter of each word in the defined term is capitalized.  Terms used and not defined in the Plan or the Disclosure Statement shall have the meanings given in the Bankruptcy Code or Bankruptcy Rules, or otherwise as the context requires.  The meanings of all terms shall be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined.  The words "herein," "hereof," "hereto," "hereunder," and others of similar import, refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  Captions and headings to articles, sections and exhibits are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation of the Plan.  The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.1     "Administrative Expense Claim" means any Claim entitled to the priority afforded by Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

1.2     "Agent" means any shareholder, director, officer, employee, partner, member, agent, attorney, accountant, advisor or other representative of any person or entity (solely in their respective capacities as such, and not in any other capacity).

1.3     "Allowed" means, when used to modify the term Claim or Administrative Expense Claim, either a proof of which has been properly Filed or, if no Proof of Claim was so Filed, which was or hereafter is listed on the Schedules as liquidated in amount and not disputed or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

contingent or an Administrative Expense Claim that the Debtor has received by the applicable bar date, and, in each case, a Claim or Administrative Expense Claim as to which no objection to the allowance thereof, or motion to estimate for purposes of allowance, shall have been Filed on or before any applicable period of limitation that may be fixed by the Bankruptcy Code, the Bankruptcy Rules and/or the Bankruptcy Court, or as to which any objection, or any motion to estimate for purposes of allowance, shall have been so Filed, to the extent (a) such objection is resolved between such claimant and either the Debtor or the Reorganized Debtor or (b) such Claim is allowed by a Final Order.

1.4     "Avoidance Actions" means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law (including, without limitation, Sections 506(c), 510, 542, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code or equivalent provisions of applicable non-bankruptcy law), equity or otherwise.

1.5     "Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code with respect to Debtor, pending in the District of Oregon, administered as *In Arlie & Company,* Case No. 10-60244-aer11.

1.6     "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended from time to time, set forth in Sections 101 et seq. of Title 11 of the United States Code.

1.7     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon, or such other court that exercises jurisdiction over the Bankruptcy Case or any proceeding therein, including the United States District Court for the District of Oregon, to the extent that the reference to the Bankruptcy Case or any proceeding therein is withdrawn.

1.8     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended and promulgated under Section 2075, Title 28, of the United States Code, and the local rules and standing orders of the Bankruptcy Court.

1.9     "BLM Secured Creditors" means each of Francis Cline, William Greenhoot, McKillop II Limited Partnership, Karen Merwin, Alice Smith and Linda Trickey.

1.10    [Intentionally omitted].

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.11    "Business Day" means a day other than a Saturday, Sunday, any legal holiday as defined in Bankruptcy Rule 9006(a), or other day on which banks in Portland, Oregon are authorized or required by law to be closed.

1.12    "Cash" means lawful currency of the United States of America and equivalents, including, without limitation, checks, wire transfers and drafts.

1.13    "Claim" means (a) any right to payment from Debtor arising before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy against Debtor arising before the Effective Date for breach of performance if such breach gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.14    "Class" means one of the classes of Claims or Interests defined in Article III hereof.

1.15    "Collateral" means any property in which Debtor has an interest that is subject to a lien or security interest securing the payment of an Allowed Secured Claim.

1.16    "Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Clerk of the Bankruptcy Court.

1.17    "Confirmation Hearing" means the hearing or hearings to consider confirmation of the Plan under Section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned from time to time.

1.18    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.19    "Creditor" means any entity holding a Claim against Debtor.

1.20    "Debtor" means Arlie & Company, as Debtor and Debtor-in-Possession in the Bankruptcy Case.

1.21    "Deficiency Claim" has the meaning set forth in the sentence following the definition of "Secured Claim."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.22    "Disclosure Statement" means Debtor's Disclosure Statement as amended, modified, restated or supplemented from time to time, pertaining to the Plan.

1.23    "Disputed Claim" means a Claim with respect to which a Proof of Claim has been timely Filed or deemed timely Filed under applicable law, and as to which an objection, timely Filed, has not been withdrawn on or before the Effective Date or any date fixed for filing such objections by order of the Bankruptcy Court, and has not been denied by a Final Order and which Claim has not been estimated or temporarily allowed by the Bankruptcy Court on timely motion by the holder of such Claim.  If an objection related to the allowance of only a part of a Claim has been timely Filed or deemed timely Filed, such Claim shall be a Disputed Claim only to the extent of the objection.

1.24    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all conditions to the occurrence of the Effective Date set forth in Article 11.2 of this Plan have been either satisfied or waived but in no event later than April 25, 2010.

1.25    "Entity" shall have the meaning ascribed to it by Section 101(15) of the Bankruptcy Code.

1.26    "Excess Sale Proceeds" means proceeds from the sale of property of the Debtor after payment of all debt secured by such property, Property Taxes, commissions, closing and transaction costs including, without limitation, legal and marketing expenses.

1.27    "Filed" means filed with the Bankruptcy Court in the Bankruptcy Case.

1.28    "Final Order" means an order or judgment entered on the docket by the Clerk of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties that has not been reversed, stayed, modified or amended and as to which the time for filing a notice of appeal, or petition for certiorari or request for certiorari, or request for rehearing shall have expired.

1.29    "General Unsecured Claim" means any Unsecured Claim that is not otherwise classified under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.30    "Interests" means an equity security of the Debtor within the meaning of Section 101(16) of the Bankruptcy Code.

1.31    "Lord Byron Collateral Value" means $1,500,000.

1.32    "Maturity Date" means the fifth anniversary of the Effective Date.

1.33    "Non-core assets" means those real property assets of Reorganized Debtor identified by Reorganized Debtor on Exhibit B to the Disclosure Statement as assets that are not core to Reorganized Debtor's long-term business success.

1.34    "Other Priority Claim" means any Claim for an amount entitled to priority in right of payment under Section 507(a)(3), (4), (5) (6) or (7) of the Bankruptcy Code.

1.35    "Petition Date" means January 20, 2010, the date on which the petition commencing this Bankruptcy Case was Filed.

1.36    "Plan" means this Plan of Reorganization, as amended, modified, restated or supplemented from time to time.

1.37    "Plan Supplement" means such documents, schedules and exhibits to the Plan that are not filed contemporaneously with the filing of the Plan, and any amendments to exhibits filed contemporaneously with the filing of the Plan (or any amendments or supplements to any previously filed Plan Supplement).  The Debtor shall file and serve the Plan Supplement no later than ten days prior to the Plan voting deadline.

1.38    "Priority Tax Claim" means a Claim of a governmental unit of the kind entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.39    "Pro Rata" means a proportionate share, so that the ratio of (a) the amount of property distributed on account of any Allowed Claim, or retained on account of a Disputed Claim, in a Class, to (b) the amount distributed on account of all Allowed Claims, or allocated to on account of all disputed claims, in such Class, is the same as the ratio (x) such Claim bears to (y) the total amount of all Claims (including Disputed Claims in their respective Disputed Claim Amounts) in such Class.

1.40    "Property Tax" means *ad valorem* property taxes or similar impositions by a governmental unit on property of the Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.5

5

FOURTH AMENDED PLAN OF REORGANIZATION
(APRIL 11, 2011)

1.41    "Property Tax Lien Claim" means the Secured Claim of any governmental unit for Property Taxes that are secured by statutory liens on any of Debtor's property (real or personal).

1.42    "Rejection Claim" means a Claim arising from the rejection of an unexpired lease or executory contract.

1.43    "Reorganized Debtor" means Debtor from and after the Effective Date.

1.44    "Roberts Distributions" means any and all distributions made to Debtor or Reorganized Debtor from the Bankruptcy estate of <u>In re: Roberts Prof. Const. Svcs., Inc</u>. (Case No. 08-60615-fra7).

1.45    "Schedules" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs Filed by Debtor pursuant to Section 521 of the Bankruptcy Code, as amended, modified, restated or supplemented from time to time.

1.46    "Scheduled Amounts" means the Claim amounts as set forth in Debtor's Schedules.

1.47    "Secured Claim" means any Claim against Debtor held by any entity, including, without limitation, an affiliate or judgment creditor of Debtor, to the extent such Claim constitutes a secured Claim under Sections 506(a) or 1111(b) of the Bankruptcy Code.  Unless otherwise provided in the Plan, the unsecured portion, if any, of such Claim shall be treated as a General Unsecured Claim and shall be referred to herein as "Deficiency Claim."

1.48    "Small Unsecured Claim" means any Unsecured Claim that is equal to or less than $2,000, or that has been reduced by election in writing to $2,000, provided that such written election shall be served on Debtor not later than the first date fixed by the Bankruptcy Court for the filing of acceptances or rejections of the Plan.

1.49    "Tonkon Claims" means all of the Debtor's claims for relief and causes of action, whether legal or equitable, against Tonkon Torp LLP, whether sounding in contract or tort specifically including but not limited to professional negligence related to Tonkon Torp LLP's representation of the Debtor at any time.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1.50 "Unsecured Claim" means a Claim that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Property Tax Lien Claim, or a Secured Claim.

## ARTICLE II

## UNCLASSIFIED CLAIMS

2.1    Administrative Expense Claims.  Each holder of an Allowed Administrative Expense Claim shall be paid by Reorganized Debtor in full in Cash on the later of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in any documentation, statute or regulation governing such Claim); provided, however, that Administrative Expense Claims representing obligations incurred in the ordinary course of business by Debtor during the Bankruptcy Case shall be paid by Debtor or Reorganized Debtor in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto.

2.2    Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim shall be paid by Reorganized Debtor the full amount of its Allowed Priority Tax Claim as allowed by 11 U.S.C. § 1129(a)(9)(C) and (D), together with interest as provided in 11 U.S.C. § 511, over a period ending not later than five years after the date on which such claim was assessed.

2.3    Bankruptcy Fees.  Any then outstanding fees payable by Debtor under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date.  After confirmation, Reorganized Debtor shall continue to pay quarterly fees of the Office of the United States Trustee and will continue to file quarterly reports with the Office of the United States Trustee until this case is closed by the Bankruptcy Court, dismissed or converted except as otherwise ordered by the Bankruptcy Court.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# ARTICLE III

## CLASSIFICATION

For purposes of this Plan, Claims (except those treated under Article II) are classified as provided below.  A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of such Class, and is classified in a different Class to the extent that such Claim qualifies within the description of such different Class.

3.1    <u>Class 1 (Other Priority Claims)</u>.  Class 1 consists of all Allowed Other Priority Claims.

3.2    <u>Class 2 (BofA)</u>.  Class 2 consists of the Allowed Secured Claims of Bank of American, N.A. ("BofA").

3.3    <u>Class 3 (Century Bank)</u>.  Class 3 consists of the Allowed Secured Claims of Century Bank.

3.4    <u>Class 4 (Pioneer)</u>.  Class 4 consists of the Allowed Secured Claim of Pioneer Asset Investment Ltd. ("Pioneer").

3.5    <u>Class 5 (Siuslaw Bank)</u>.  Class 5 consists of the Allowed Secured Claims of Siuslaw Bank.

3.6    <u>Class 6 (Summit Bank)</u>.  Class 6 consists of the Allowed Secured Claims of Summit Bank.

3.7    <u>Class 7 (Umpqua Bank)</u>.  Class 7 consists of the Allowed Secured Claims of Umpqua Bank.

3.8    <u>Class 8 (Washington Federal Savings)</u>.  Class 8 consists of the Allowed Secured Claims of Washington Federal Savings ("Washington Federal").

3.9    <u>Class 9 (BLM Secured Creditors)</u>.  Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors.

3.10    <u>Class 10 (Property Tax Lien Claims)</u>.  Class 10 consists of all Allowed Property Tax Lien Claims.

3.11    <u>Class 11 (Small Unsecured Claims)</u>.  Class 11 consists of all Allowed Small Unsecured Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

3.12    <u>Class 12 (General Unsecured Claims)</u>.  Class 12 consists of all Allowed General Unsecured Claims.

3.13    <u>Class 13 (Interests)</u>.  Class 13 consists of all Interests.

3.14    <u>Class 14 (Fifth Third Bank)</u>.  Class 14 consists of the Allowed Claim of Fifth Third Bank.

**ARTICLE IV**

**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

4.1    <u>Class 1 (Other Priority Claims)</u>.  Class 1 is impaired. Each Class 1 Claimant will be paid in full in Cash the amount of its Class 1 Claim on the latter of (a) the Effective Date or (b) the date on which such Claim becomes Allowed, unless such Class 1 Claimant shall agree or has agreed to a different treatment of its Class 1 Claim (including any different treatment that may be provided for in any documentation, agreement, contract, statute, law or regulation creating and governing such Claim).

4.2    <u>Class 2 (Allowed Secured Claims of BofA)</u>.  Class 2 is impaired.  The Class 2 Claims of BofA includes Claims for amounts owing under two separate loans, each of which will be separately classified and treated as hereinafter described.  Except as set forth below, BofA will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

4.2.1    <u>Class 2.1 – Building A Loan.</u>

The BofA Class 2.1 Claim arises under that certain loan made by BofA to Debtor on or about February 27, 2007 in the original principal amount of $9,000,000 (the "Building A Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building A ("Building A").

BofA will have an Allowed Class 2.1 Claim in a principal amount equal to the outstanding principal balance of the Building A Loan ($8,956,961) plus accrued interest at the past due rate (4% over one month LIBOR) from the Petition Date to the Effective Date, plus attorneys

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

fees and costs allocable to the Building A Loan plus a one-half percent (1/2 %) loan fee on the combined amount of the full amounts owing on the Building A Loan and the Building D Loan.

BofA's Class 2.1 Claim shall be satisfied by the delivery of a promissory note to BofA (the "Building A Note") in the amount of the Allowed Class 2.1 Claim.  The Building A Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 12th month following the Effective Date, Reorganized Debtor will make interest only payments on the Building A Note. Thereafter, commencing on the tenth day of the 13th month after the Effective Date and continuing on the tenth day of each month thereafter through and including the 3rd anniversary of the Effective Date (the "BofA Maturity Date"), Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Building A Note based on a 30 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the BofA Initial Maturity Date, provided that Reorganized Debtor shall have two one-year extensions of the BofA Initial Maturity Date available (each, a "BofA Extended Maturity Date") each extension subject to there being no default under the Building A Note and a loan to value ratio of 75% as established by a FIRREA compliant appraisal approved by BofA, in which case all unpaid principal and interest under the Building A note shall not be due and payable until the applicable BofA Extended Maturity Date.

The Building A Note will be secured by a First Deed of Trust, Assignment of Rents and Leases and Security Agreement on Building A, and the Building A Note will be cross-defaulted and cross-collateralized with the Building D Loan.

4.2.2    Class 2.2 – Building D Loan.

The BofA Class 2.2 Claim arises under that certain loan made by BofA to Debtor on or about November 2, 2007 in the original principal amount of $5,700,000 (the "Building D Loan"), which loan is secured by, among other things, Debtor's real property and improvements located in Eugene, Oregon commonly known as Crescent Village Building D ("Building D").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

BofA will have an Allowed Class 2.2 Claim in the amount of the outstanding principal balance of the Building D Loan ($5,455,581.38), plus accrued interest at the past due rate (4% over one month LIBOR) from the Petition Date through the Effective Date, plus attorneys fees and costs allocable to the Building D Loan.

BofA's Class 2.2 Claim shall be satisfied by the delivery of two promissory notes. Note A will be in a principal amount of $3,800,000 and Note B will be in the amount of the remaining amounts owing under the Building D Loan. Note B will be "non-recourse."

Note A

Note A shall be due and payable on the BofA Initial Maturity Date, provided that Reorganized Debtor shall have two one-year extensions of the BofA Initial Maturity Date available subject to there being no default under Note A and a loan to value ratio of 75% as established by a FIRREA compliant appraisal approved by BofA, in which case Note A shall be due and payable upon the applicable BofA Extended Maturity Date.

Note A shall bear interest at a variable rate equal to 4.5% over the one month LIBOR from the Effective Date through and including the BofA Initial Maturity Date. During any extension period(s), Note A shall bear interest at a fixed rate of 4.5% per annum. Note A shall be payable as follows:

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the BofA Initial Maturity Date, Reorganized Debtor will make interest only payments on Note A. Provided the BofA Initial Maturity Date of Note A is extended, then commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the extended BofA Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Note A based on a 30 year amortization schedule. Reorganized Debtor shall make a balloon payment of all unpaid principal and interest on the BofA Initial Maturity Date, if the term of Note A is not extended, or on the applicable BofA Extended Maturity Date, if the term of Note A is extended.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

11

Note A will be secured by a First Deed of Trust, Assignment of Rents and Leases and Security Agreement on Building B, and Note A will be cross-defaulted and cross-collateralized with the Building A Loan.

Note B

Note B shall be due and payable on the BofA Initial Maturity Date, provided that Reorganized Debtor shall have two one-year extensions of the BofA Initial Maturity Date available subject to satisfaction of the conditions to extension of the maturity date of Note A and there being no default under Note B, in which case Note B shall be due and payable upon the applicable BofA Extended Maturity Date.

Note B shall bear interest at the fixed rate of 3.5 % per annum. Note B shall be payable as follows:

Commencing on Effective Date and continuing through and including the BofA Initial Maturity Date, interest shall accrue on Note B. Provided the BofA Initial Maturity Date of Note B is extended, then commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the BofA Extended Maturity Date, Reorganized Debtor will make interest only payments on Note B. Reorganized Debtor shall make a balloon payment of all unpaid principal and interest on the BofA Initial Maturity Date, if the term of Note B is not extended, or on the applicable BofA Extended Maturity Date, if the term of Note B is extended.

Note B will be secured by a Second Deed of Trust, Assignment of Rents and Leases and Security Agreement on Building A and Building D. Note B is a non-recourse obligation of the Reorganized Debtor.

4.2.3    Release of Liens.

BofA will release its liens and security interests in Building D upon payment in full of the Building D notes (both Note A and Note B), provided that the loan to value ratio for the Building A Loan is no more than 80%, as established by a FIRREA compliant appraisal approved by BofA, and the actual debt coverage ratio on Building A is at least one to one. BofA will release its liens and security interests in Building A upon payment in full of the Building A Note, provided that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Leasing Reserve for Building D has been fully funded, the loan to value ratio for the Building D notes (both Note A and Note B) is no more than 80% as established by a FIRREA compliant appraisal approved by Bof A and the actual debt coverage ratio, including interest payments on Note B, is at least one to one.

### 4.2.4    Leasing Reserve

A leasing reserve (to fund tenant improvements and leasing commissions) in an amount equal to $582,596 will be established (the "Leasing Reserve").  The Leasing Reserve will initially be funded by $200,000 from the Roberts Distributions and with any excess funds in the Building A and Building D cash collateral accounts.  If not then fully funded, net cash flow from Building A and Building D after debt service will be used to fund the Leasing Reserve, unless otherwise funded by Reorganized Debtor from an alternative source.  Funds in the Leasing Reserve will be available to pay leasing costs incurred by Reorganized Debtor with respect to leases reasonably approved by BofA.

### 4.2.5    Net Cash Flow.

After the Leasing Reserve is fully funded, net cash flow (i.e., property income after payment of all expenses including reserves for property taxes and insurance) after debt service is free cash to Reorganized Debtor to be used in its discretion.

### 4.2.6    Roberts Distributions

All amounts in excess of the $200,000 being contributed to the Leasing Reserve from the Roberts Distributions shall be the sole property of Reorganized Debtor and may be used by Reorganized Debtor for any purpose in its discretion.  BofA shall have no claim to any such excess Roberts Distributions.

### 4.2.7    Treatment of Bank of America's Cash Collateral Accounts.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building A (the "Building A Cash Collateral") for payment of any past due Property Taxes on Building A.  The remainder of the Building A Cash Collateral will be used to fund the Building D Leasing Reserve.

On the Effective Date, Debtor will utilize the cash collateral in the bank account established and maintained by Debtor with respect to Building D (the "Building D Cash Collateral") for payment of any past due Property Taxes on Building D. The remainder of the Building D Cash Collateral will be used to fund the Building D Leasing Reserve.

4.3    Class 3 (Allowed Secured Claim of Century Bank).  Class 3 is impaired. Century Bank will have an Allowed Class 3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Century Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Century Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Century Bank to Debtor on or about April 10, 2009 in the original principal amount of $236,000 (the "3058 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3058 Kinney Loop.

As Collateral for the Class 3 Claim, Century Bank will retain its security interests in and liens upon its Collateral that secures the 3058 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Century Bank's Class 3 Claim shall be satisfied by delivery of a promissory note to Century Bank in the amount of the Allowed Class 3 Claim (the "3058 Kinney Loop Note"). The 3058 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the 3058 Kinney Loop Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the 3058 Kinney Loop Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the 3058 Kinney Loop Note based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.5

14

FOURTH AMENDED PLAN OF REORGANIZATION
(APRIL 11, 2011)

4.4    Class 4 (Allowed Secured Claim of Pioneer).  Pioneer's Class 4 Claim arises out of a certain loan made by Pioneer on or about September 12, 2008, in the original principal amount of $1,500,000 (the "Pioneer Loan").

Class 4 (Allowed Claim of Pioneer).  Pioneer shall have an Allowed Class 4 Claim in the amount of (a) all principal and non-default interest on the Pioneer Loan accrued through and including the Petition Date, (b) interest accrued on the Pioneer Loan from the Petition Date though and until the Effective Date at the rate of 4.5% per annum, and (c) all reasonable attorney fees incurred by Pioneer though the Effective Date.

As Collateral for the Pioneer Allowed Class 4 Claim, Pioneer will retain its security interest and liens upon its Collateral that secures the Pioneer Loan, which liens and security interests are hereby validated.

Pioneer's Allowed Class 4 Claim will be satisfied by delivery of a promissory note to Pioneer (the "Pioneer Note").  The Pioneer Note will bear interest at the fixed rate of 4.5% per annum and be payable by Reorganized Debtor as follows.  The Pioneer Note will accrue interest from the Effective Date through and including the 3rd anniversary of the Effective Date (the "Accrued Pioneer Interest").  On the 3rd anniversary of the Effective Date, Reorganized Debtor will pay Pioneer the Accrued Pioneer Interest.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor shall make monthly payments of interest only, with a final payment of all outstanding principal and interest payable on the Maturity Date.

Sale Free and Clear of Pioneer's Liens.  Subject to Pioneer's approval, which shall not be unreasonably withheld, Pioneer shall provide partial releases of its liens related to a portion of the parcel that serves as Pioneer's Collateral, provided that 110% of the Pioneer Class 4 Claim associated with such specific portion of parcel (on a pro rata basis determined in light of the comparative value of the portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) is paid upon such sale.  The relative value of the applicable portions of parcels shall be calculated on a per acre value and shall be based on the composition of the land.  The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.5

15

FOURTH AMENDED PLAN OF REORGANIZATION
(APRIL 11, 2011)

provisions of this section are in addition to the rights of the Reorganized Debtor to sell property under section 6.3 of the Plan.

Dismissal of Adversary Proceeding. The adversary proceeding pending before the U.S. Bankruptcy Court, District of Oregon, bearing case number 11-06018, shall be dismissed as to all parties with all sides bearing their own fees and costs, except that Pioneer may add its reasonable attorney fees to the amount of its Allowed Class 4 Claim.

4.5     Class 5 (Allowed Secured Claims of Siuslaw Bank). Class 5 is impaired. The Class 5 Claims of Siuslaw Bank includes Claims for amounts owing under eight separate loans. Each loan is separately classified and treated as hereinafter described.

4.5.1    Class 5.1 – Crescent Village Lots Loan.

Siuslaw Bank will have an Allowed Class 5.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 17, 2006 in the original principal amount of $4,000,000 (the "Crescent Village Lots Loan"), which loan is secured by real property and improvements owned by Debtor located in Eugene, Oregon commonly referred to as Crescent Village Lots 10, 11, 12 and 13 (the "Crescent Village Lots"). The outstanding principal balance of the Crescent Village Lots Loan is $3,999,977.05 (the "Lots Loan Balance").

As Collateral for the Class 5.1 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Crescent Village Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.1 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Crescent Village Lots Note") in the amount of the Allowed Class 5.1 Claim, payable by Reorganized Debtor as follows.

The Crescent Village Lots Note will accrue interest at the fixed rate of 4.5% per annum from and including the Effective Date. By the end of the 15th month after the Effective Date,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the amount of interest accrued on the Crescent Village Lots Note will be $224,859.96 (the "Lots Note Accrual Amount").  Beginning on the 10th day of the 16th month after the Effective Date and continuing on the tenth day of each month thereafter until the Lots Note Accrual Amount has been paid in full, Reorganized Debtor will make equal monthly payments to Siuslaw Bank in an amount equal to 1/35th of the Lots Note Accrual Amount.  Further, beginning on the 10th day of the 16th month after the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make payments of interest only on the Lots Loan Balance, with a balloon payment of all unpaid interest and principal under the Crescent Village Lots Note on the Maturity Date.  In addition, on April 1, 2014, Reorganized Debtor will pay, in full, the pre-petition accrued interest on the Crescent Village Lots Loan in the amount of $369,460.90.

Notwithstanding the foregoing, in the event Reorganized Debtor consummates a sale of the Crescent Village Lots to the U.S. Department of Veterans Affairs (the "VA Sale") prior to the Maturity Date, the Reorganized Debtor shall pay off the Crescent Village Lots Note, including all accrued and unpaid interest then owing under the Crescent Village Lots Note, and shall utilize twenty percent (20%) of the Excess Sale Proceeds (the "Siuslaw Payoff Proceeds") to pre-pay such other Allowed Class 5 Secured Claim(s) of Siuslaw Bank (other than the Florence Medical Building Note, as hereinafter defined) as shall be determined by agreement of Reorganized Debtor and Siuslaw Bank.

### 4.5.2    Class 5.2 – 2850 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.2 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about July 10, 2008 in the original principal amount of $88,318 (the "2850 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2850 Kinney Loop.

As Collateral for the Class 5.2 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2850 Kinney Loop Loan with the same priority and to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.2 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2850 Kinney Loop Note") in the amount of the Allowed Class 5.2 Claim. The 2850 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 2850 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2850 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.5.3   Class 5.3 – 2960 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.3 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about August 20, 2008 in the original principal amount of $245,000 (the "2960 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2960 & 3100 Kinney Loop.

As Collateral for the Class 5.3 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 2960 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.3 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "2960 Kinney Loop Note") in the amount of the Allowed Class 5.3 Claim. The 2960 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 2960 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 2960 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.5.4    Class 5.4 – 3082 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.4 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about October 15, 2007 in the original principal amount of $219,910 (the "3082 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3082 Kinney Loop.

As Collateral for the Class 5.4 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3082 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.4 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3082 Kinney Loop Note") in the amount of the Allowed Class 5.4 Claim. The 3082 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 3082 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date. Notwithstanding the foregoing, the 3082 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 4.5.5    Class 5.5 – 3108 Kinney Loop Loan.

Siuslaw Bank will have an Allowed Class 5.5 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about October 15, 2007 in the original principal amount of $180,000 (the "3108 Kinney Loop Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3108 Kinney Loop.

As Collateral for the Class 5.5 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the 3108 Kinney Loop Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.5 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "3108 Kinney Loop Note") in the amount of the Allowed Class 5.5 Claim.  The 3108 Kinney Loop Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the 3108 Kinney Loop Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the 3108 Kinney Loop Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

### 4.5.6    Class 5.6 – Florence Medical Building Loan.

Siuslaw Bank will have an Allowed Class 5.6 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about March 27, 2009 in the original principal amount of $611,250 (the "Florence

Medical Building Loan"), which loan is secured by Debtor's real property and improvements in Florence, Oregon commonly referred to as 4480 Hwy. 101 N., Florence (the "Florence Medical Building").

On the Effective Date, or as soon thereafter as sufficient funds are made available to the Reorganized Debtor under the Credit Line (as defined in Section 6.2 below) for such payments, Reorganized Debtor will pay the Class 5.6 Claim and pay current all Property Taxes on the Florence Medical Building.

### 4.5.7    Class 5.7 – Kinney Loop Lots Loan.

Siuslaw Bank will have an Allowed Class 5.7 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Siuslaw Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Siuslaw Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Siuslaw Bank to Debtor on or about March 20, 2007 in the original principal amount of $1,087,500 (the "Kinney Loop Lots Loan"), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2802/2804 & 2834 Kinney Loop and 2729 & 2743 Coburg Road.

As Collateral for the Class 5.7 Claim, Siuslaw Bank will retain its security interests in and liens upon its Collateral that secures the Kinney Loop Lots Loan with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Siuslaw Bank's Class 5.7 Claim shall be satisfied by delivery of a promissory note to Siuslaw Bank (the "Kinney Loop Lots Note") in the amount of the Allowed Class 5.7 Claim, payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make interest only payments on the Kinney Loop Lots Note, with a balloon payment of all unpaid principal and interest due on the Maturity Date.  Notwithstanding the foregoing, the Kinney Loop Lots Note may be prepaid, in whole or in part, by Reorganized Debtor from the Siuslaw Payoff Proceeds.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

05437-001\DOCS_LA:231180.5

21

FOURTH AMENDED PLAN OF REORGANIZATION
(APRIL 11, 2011)

**4.5.8    Payment of Accrued Interest and Attorney Fees.**

On the Effective Date or as soon thereafter as sufficient funds are made available to the Reorganized Debtor under the Credit Line for such payment, Reorganized Debtor will pay all interest accrued prior to the Effective Date on the Siuslaw Bank loans underlying the Class 5 Claims, other than the loan underlying the Class 5.1 Claim.

On the tenth day of the first month following the Effective Date, Reorganized Debtor will pay all of Siuslaw Bank's accrued attorney fees arising from the Bankruptcy Case.

**4.5.9    Treatment of Siuslaw Bank's Cash Collateral Account.**

Other than the tax payment set forth in Section 4.5.6 above, on the Effective Date, all amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Siuslaw Bank pursuant to the Cash Collateral Order shall be utilized to pay any past due Property Taxes on the Collateral securing the Class 5 Claims. Any amounts remaining in the account after the payment of such taxes shall be utilized by the Reorganized Debtor for its general operating purposes.

**4.6    Class 6 (Summit Bank).** Class 6 is impaired. The Class 6 Claim of Summit Bank includes two subclaims, each of which will be separately classified and treated as hereinafter described.

**4.6.1    Class 6.1 – Road Radio Tower Loan.**

Summit Bank will have an Allowed Class 6.1 Claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Summit Bank as of the Effective Date (as such amounts are determined by agreement of Debtor and Summit Bank or as determined and Allowed by the Bankruptcy Court) under that certain loan made by Summit Bank to Debtor on or about November 4, 2004 in the original principal amount of $331,946 (the "Radio Tower Loan "), which loan is secured by Debtor's real property and improvements in Eugene, Oregon commonly referred to as 650 Goodpasture Island Road.

As Collateral for the Class 6.1 Claim, Summit Bank will retain its security interests in and liens upon its Collateral that secures the Radio Tower Loan with the same priority and to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

Summit Bank's Class 6.1 Claim shall be satisfied by delivery of a promissory note to Summit Bank (the "Radio Tower Note") in the amount of the Allowed Class 6.1 Claim. The Radio Tower Note will bear interest at a fixed rate of 4.5% per annum and will be payable by Reorganized Debtor as follows.

Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Radio Tower Note. Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Radio Tower Note has been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Radio Tower Note based on a 25 year amortization schedule, with a balloon payment due of all principal and interest due on the Maturity Date.

### 4.6.2    Class 6.2 – Guaranty Claim.

Debtor executed in favor of Summit Bank a guaranty dated June 7, 2006 (the "Churchill Media Guaranty") pursuant to which Debtor guaranteed the obligations of Churchill Media, LLC (an affiliate of Debtor) to Summit Bank. In connection with such guaranty and such indebtedness, including a promissory note in the original principal amount of $3,000,000 dated May 8, 2007 from Churchill Media, LLC to Summit Bank, Debtor granted Summit Bank a security interest in Debtor's real property in Eugene, Oregon generally known as NNK Crescent Drive (Crescent Village Lot 4) and in Debtor's real property in Eugene, Oregon commonly known as NNK Willow Creek Road (W. 11th & Willow Creek).

Summit Bank will have an Allowed Class 6.2 claim in the amount of all principal, accrued non-default interest, and reasonable attorney fees and costs owing by Debtor under the Churchill Media Guaranty. Summit Bank's Class 6.2 Claim will be satisfied by delivery of a promissory note to Summit Bank (the "Guaranty Note"), payable by Reorganized Debtor as follows.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Guaranty Note will accrue interest at the fixed rate of 4.5% per annum from and including the Effective Date and will be payable in full on the Maturity Date.  In addition, within 3 years after the Effective Date, Reorganized Debtor or Churchill shall have pre-paid at least 50% of the principal of the Guaranty Note.  At the time of any such pre-payment, Reorganized Debtor or Churchill shall also pay all accrued but unpaid interest then owing under the Guaranty Note.  All payments received by Summit Bank from Churchill or any successor to or trustee or receiver for Churchill will be applied by Summit Bank first in reduction of accrued interest, and second n reduction of the principal owing on the Guaranty Note.  In the event that Reorganized Debtor pays or satisfies the Guaranty Note, then Reorganized Debtor will be subrogated to the position of Summit Bank with respect to the obligations of Churchill and Summit Bank will execute and deliver such documents as may be necessary or appropriate to evidence such payment and subrogation.

As security for the Class 6.2 Claim, Summit Bank will retain its security interest in and liens upon its Collateral securing the Churchill Media Guaranty with the same priority and to the same extent such security had as of the Petition Date, and Reorganized Debtor will maintain the Collateral in good repair and insure the Collateral to its full usable value.

### 4.6.3    Sale of Summit Collateral Free and Clear of Liens.

Subject to Summit Bank's approval, and provided that any proposed partition of any portion of property that serves as Collateral for Summit Bank's Class 6 Claims (the "Summit Collateral") does not result in an erosion of the value of the Summit Collateral relative to the remaining loan balance, Summit Bank shall provide partial releases of its liens related to a portion of each parcel that serves as Summit Collateral, provided that 110% of the applicable Summit Debt Amount associated with such specific portion of parcel (on a pro rata basis) has been paid or will be paid to Summit Bank upon such sale.  For purposes of this section only, the Summit Debt Amount for Crescent Village Lot 4 shall be $820,000 and the Summit Debt Amount for the Willow Creek Property shall be $1,250,000, calculated on a square foot basis.  The provisions of this section are in addition to the rights of the Reorganized Debtor under section 6.3 of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

4.6.4    Treatment of Summit Bank's Cash Collateral Account.

On the Effective Date, Reorganized Debtor shall utilize the amounts maintained in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Summit Bank pursuant to the Cash Collateral Order towards payment by Reorganized Debtor of any past due Property Taxes on the Collateral securing the Class 6 Claims. Any amounts remaining in the account after payment of such taxes shall be retained by Reorganized Debtor to be used for general operating purposes.

4.7    Class 7 (Umpqua Bank). Class 7 is impaired. The Class 7 Claim of Umpqua Bank includes Claims for amounts owing under twelve separate loans, each of which will be classified and treated as hereinafter described. The total amount of each Umpqua Bank Allowed Claim includes the principal balance owing under the Umpqua Bank loan, together with all accrued and unpaid non-default interest owing under the loan as of the Effective Date and such fees (excluding any late payment fees) and costs as allowed by Umpqua Bank's existing loan documents with Debtor as of the Effective Date and allocated in accordance with Article 4.7.15 of the Plan (the "Umpqua Bank Fees"). Umpqua Bank shall have no Claims and shall make no demands on Debtor or Reorganized Debtor for events or defaults that occurred before the Effective Date and any such events or defaults shall be deemed waived, released and extinguished, provided that such pre-Effective Date waiver shall not apply to defaults continuing after the Effective Date that materially harm or affect the value of Umpqua Bank's interest in the real property Collateral. Except to the extent specifically modified by this Plan, Umpqua Bank will retain its pre-Petition Date security interests in and liens upon its Collateral (including assets generated or purchased after the Effective Date but perfected before the Petition Date) with the same priority and to the same extent such security had as of the Petition Date, all of which liens and security interests are and will continue to be cross-defaulted and cross collateralized. Notwithstanding the foregoing, Umpqua Bank shall have no claim against, lien on or security interest in the Roberts Distributions.

Reorganized Debtor will conform to the requirements set forth in such loan and security documents provided by Debtor to Umpqua Bank as amended, other than any financial covenant requirements or financial reporting requirements which shall be of no force or effect.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Notwithstanding the foregoing, Debtor and/or Reorganized Debtor shall execute and deliver to Umpqua Bank such amendments to the existing loan documents as Umpqua Bank generally requires to conform the loan documents to the terms of this Plan.  Without limiting the foregoing, such amendments will include having the following financial reports provided to Umpqua Bank (all in such form as reasonably required by Umpqua Bank):  45 days after the end of each calendar quarter, internally prepared financial statements (including balance sheet and cash flow statement); 120 days after each year end, internally prepared financial statements; annual financial statements 120 days after year end and copies of corporate tax returns with schedules when filed and copies of non-residential lease agreements after they are signed.  In addition, Reorganized Debtor shall provide such financial reports to Umpqua Bank as it reasonably requests in light of the treatment of Umpqua's Claims under the Plan and the nature of Umpqua Bank's Collateral.  Without limiting the preceding, in the event and to the extent that any provision of the Plan is inconsistent with the provisions set forth in any Umpqua Bank loan document, the provisions of the Plan shall control and take precedence.

As used below, the "Arlie Debt Amount" as to any property securing an Umpqua Bank loan is the amount of principal and the then accrued and outstanding non-default interest owing on the Umpqua loan associated with such property.

### 4.7.1    Class 7.1 – Westlane Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about February 12, 2002 in the original principal amount of $5,910,000 (the "Westlane Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Veneta, Oregon commonly referred to as 88330 N. Territorial Road (the "Westlane Property").  Umpqua Bank's Class 7.1 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

letter of intent, (b) purchase the Westlane Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property or (c) transfer title to the Westlane Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven. Provided that Reorganized Debtor effectuates a sale of the Westlane Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) reasonable commissions, closing and transaction costs including, without limitation, legal and marketing expenses (collectively, the "Closing Costs"), (b) the applicable Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, or 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the Westlane Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

### 4.7.2   Class 7.2 - West 11th Land Loan.

Umpqua Bank will have an Allowed Class 7.2 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 29, 2003 in the original principal amount of $1,404,650 (the "West 11th Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3802, 3810 and 3838 W. 11th. Avenue, Eugene, Oregon (the "West 11th Land Property").  Umpqua Bank's Class 7.2 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of the West 11th Land Property at a price for cash at closing in

an amount that will pay Umpqua Bank the applicable Arlie Debt Amount and Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase the West 11th Land Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the West 11th Land Property to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount for such property and the applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of the West 11th Land Property within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of the West 11th Land Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

### 4.7.3   Class 7.3 – 2892 Crescent Ave. Loan.

Umpqua Bank will have an Allowed Class 7.3 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about October 27, 2008 in the original principal amount of $2,000,000 (the "2892 Crescent Ave. Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2892 Crescent Avenue ("2892 Crescent Avenue"). Umpqua Bank's Class 7.3 Claim shall be satisfied as follows.

Reorganized Debtor shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale of 2892 Crescent Avenue at a price for cash at closing in an

amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must close within two (2) months after the execution of the letter of intent, (b) purchase 2892 Crescent Avenue at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt Amount and the Umpqua Bank Fees for such property, or (c) transfer title to 2892 Crescent Avenue to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case any remaining liability for the Arlie Debt Amount  for such property and the Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that Reorganized Debtor effectuates a sale of 2892 Crescent Avenue within the time limits set forth in the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the sum of (a) Closing Costs, (b) the Arlie Debt Amount, (c) Property Taxes paid from proceeds at closing, and (d) the applicable Umpqua Bank Fees, will be retained by Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Any sale or purchase by Reorganized Debtor of 2892 Crescent Avenue shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and applicable Umpqua Bank Fees have been or will be paid upon such sale or purchase.

### 4.7.4    Class 7.4 Woodburn and College Park Loan.

Umpqua Bank will have an Allowed Class 7.4 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain line of credit loan made by Umpqua Bank to Debtor on or about July 29, 1999 in the original principal amount of $600,000 (with 1/20/2006 Change in Terms Agreement increasing principal amount to $4,000,000) (the "Woodburn and College Park Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 85701 Scharen Road, Lane County, Northside of Cemetery Road near Lorane Highway, Lane County (the "College Park Property"), and Debtor's real property and improvements in Woodburn, Oregon commonly referred

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to as 2450 Country Club Road, Marion County (the "Woodburn Property").  Umpqua Bank's Class

7.4 Claim shall be satisfied as follows.

The Arlie Debt Amount for the Woodburn Property shall be $845,000 together with

25% of accrued and unpaid interest on the Woodburn and College Park Loan.  Reorganized Debtor

shall have six (6) months after the Effective Date to either (a) enter into a letter of intent for the sale

of the Woodburn Property at a price for cash at closing in an amount that will pay Umpqua Bank the

Arlie Debt Amount and the Umpqua Bank Fees for such property, provided that any such sale must

close within two (2) months after the execution of the letter of intent, (b) purchase the Woodburn

Property at a price for cash at closing in an amount that will pay Umpqua Bank the Arlie Debt

Amount and the Umpqua Bank Fees for such property, or (c) transfer title to the Woodburn Property

to Umpqua Bank, subject to any and all past due and current Property Taxes, by non-merger deed in

lieu in such form as reasonably agreeable to Reorganized Debtor and Umpqua Bank, in which case

any remaining liability for the Arlie Debt Amount relating to the Woodburn Property and the

applicable Umpqua Bank Fees, shall be deemed satisfied, waived and forgiven.  Provided that

Reorganized Debtor effectuates a sale of the Woodburn Property within the time limits set forth in

the immediately preceding sentence, two-thirds (2/3) of any sale proceeds in excess of the Arlie Debt

Amount, Property Taxes, Closing Costs and applicable Umpqua Bank Fees will be retained by

Reorganized Debtor for its own account, and one-third (1/3) of such excess sale proceeds will be for

the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than

a Class 7.1, 7.2 or a Class 7.3 Claim.  Any sale or purchase by Reorganized Debtor of the Woodburn

Property shall be free and clear of any liens, claims and encumbrances of Umpqua Bank provided

that the Arlie Debt Amount has been or will be paid upon such sale or purchase.

As of the Effective Date, the remainder of the Woodburn and College Park Loan shall

have a non-default simple fixed interest rate of 4.5% per annum and will be payable in full on the

Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the

Woodburn and College Park Loan within three years of the Effective Date in the aggregate amount

of 50% of the Arlie Debt Amount for the College Park Property plus all past due real estate taxes

(less any previously paid real estate taxes included therein) (the "College Park Pay Down").  The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

College Park Pay Down will not include application from the sale of approximately 315 acres of the College Park Property approved by the Bankruptcy Court in the Bankruptcy Case or from the disposition of the Woodburn Property described above.  The Arlie Debt Amount for the College Park Property shall be the balance of the Woodburn and College Park Loan including accrued and unpaid interest (at the non-default rate).

### 4.7.5    Class 7.5 – Roseburg Loan #1.

Umpqua Bank will have an Allowed Class 7.5 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about January 16, 2004 in the original principal amount of $2,630,000 (the "Roseburg Loan #1"), which loan is secured by, among other things, Debtor's real property and improvements in Roseburg, Oregon commonly referred to as 1156, 1176 and 1200 N.W. Garden Valley Boulevard (the "Roseburg Property").  Umpqua Bank's Class 7.5 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the cash collateral bank account established and maintained by Debtor with respect to Umpqua Bank pursuant to the Bankruptcy Court's cash collateral order (the "Umpqua Cash Collateral Account") to bring current the Roseburg Loan #1 by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) and any past due Property Taxes on the Roseburg #1 Property.  Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #1 before the Effective Date shall be deemed waived or released.  Thereafter, the non-default interest will accrue on the Roseburg Loan #1 at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Roseburg Loan #1 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

In accordance with paragraph 4.7.18 of this Plan, Reorganized Debtor may use up to $457,000 of good funds in the Umpqua Cash Collateral Account for the reasonable and necessary

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

costs of removing the fascia from the Hollywood Video building, erecting a demising wall and otherwise provide the tenant improvements required by the prospective tenants for such building, provided that (a) Umpqua Bank shall have a security interest in such improvements, (b) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (c) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made.

### 4.7.6    Class 7.6 – Roseburg Loan #2

Umpqua Bank will have an Allowed Class 7.6 Claim in the amount of all principal, accrued non-default interest and the applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about April 1, 2008 in the original principal amount of $1,720,000 (the "Roseburg Loan #2"), which loan is secured by, among other things, the Roseburg Property. Umpqua Bank's Class 7.6 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to make all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Roseburg Loan #2.  Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to Roseburg Loan #2 before the Effective Date shall be deemed waived or released.  Thereafter, interest will accrue on the Roseburg Loan #2 at a simple fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on Roseburg Loan #2 based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

### 4.7.7    Class 7.7 – Oil Can Henry's Loan.

Umpqua Bank will have an Allowed Class 7.1 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about July 31, 2008 in the original principal amount of $668,000 (the

"Oil Can Henry's Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3804 W. 11th Avenue (the "Oil Can Henry's Property"). Umpqua Bank's Class 7.7 Claim shall be satisfied as follows.

On the Effective Date, Reorganized Debtor will use good funds in the Umpqua Cash Collateral Account to bring current the Oil Can Henry's Loan by making all regularly scheduled but then unpaid payments of interest (at the non-default contract rate) on the Oil Can Henry's Loan and any past due Property Taxes on the Oil Can Henry Property. Any default interest, late fees, or other charges (other than the Umpqua Bank Fees) that could have been asserted with respect to the Oil Can Henry's Loan before the Effective Date shall be deemed waived or released. Thereafter, interest will accrue on the Oil Can Henry's Loan at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Oil Can Henry's Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date.

### 4.7.8    Class 7.8 – My Coffee Loan.

Umpqua Bank will have an Allowed Class 7.8 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fess under that certain loan made by Umpqua Bank to Debtor on or about August 22, 2005 in the original principal amount of $661,600 (the "My Coffee Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3808 W. 11th Avenue (the "My Coffee Property"). Umpqua Bank's Class 7.8 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the My Coffee Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the My Coffee Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on the My Coffee Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.7.9    Class 7.9 – Building B Loan.

Umpqua Bank will have an Allowed Class 7.9 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about August 10, 2006 in the original principal amount of $8,265,000 (as subsequently increased to $10,150,000) (the "Building B Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lot 6 Crescent Village, Phase I, Lane County ("Building B"). Umpqua Bank's Class 7.9 Claim shall be satisfied as follows.

As of the Effective Date, the non-default interest rate on the Building B Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Building B Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on the Building B Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.7.10   Class 7.10 – Grumman Hangar Loan.

Umpqua Bank will have an Allowed Class 7.10 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 27, 2007 in the original principal amount of $245,000 (the "Grumman Hangar Loan "), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 28737 Grumman Drive (the "Grumman Hangar Property"). Umpqua Bank's Class 7.10 Claim shall be satisfied as follows.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

As of the Effective Date, the non-default interest on the Grumman Hangar Loan will accrue at a simple fixed rate of 4.5% per annum. Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the Maturity Date, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the outstanding principal amount of the Grumman Hangar Loan based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest and the applicable Umpqua Bank Fees due on the Maturity Date. Additionally, the non-default interest that accrued on the Grumman Hangar Loan between the Petition Date and the Effective Date shall be due and payable on the Maturity Date.

### 4.7.11  Class 7.11 – 3032 Kinney Loop Loan.

Umpqua Bank will have an Allowed Class 7.11 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about December 23, 2008 in the original principal amount of $184,000 (the "3032 Kinney Loop Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as 3032 Kinney Loop ("3032 Kinney Loop"). Umpqua Bank's Class 7.11 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the 3032 Kinney Loop Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.11 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the 3032 Kinney Loop Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Kinney Loop Pay Down").

### 4.7.12  Class 7.12 - Crescent Village Land Loan.

Umpqua Bank will have an Allowed Class 7.12 Claim in the amount of all principal, accrued non-default interest and applicable Umpqua Bank Fees under that certain loan made by Umpqua Bank to Debtor on or about March 15, 2002 in the original principal amount of $5,286,000 (the "Crescent Village Land Loan"), which loan is secured by, among other things, Debtor's real property and improvements in Eugene, Oregon commonly referred to as Lots 1 and 2 Cone Plat,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Lane County (the "Crescent Village Land Property"). Umpqua Bank's Class 7.12 Claim shall be satisfied as follows.

As of the Effective Date, the non-default rate of interest on the Crescent Village Land Loan will be fixed at the simple rate of 4.5% per annum. The Allowed Class 7.12 Claim will be payable in full on the Maturity Date, provided that Reorganized Debtor shall make a mandatory pay down of the Crescent Village Land Loan within three years of the Effective Date in the aggregate amount of 50% of the Arlie Debt Amount plus all past due real estate taxes for such property (less any previously paid real estate taxes included therein) (the "Crescent Village Pay Down").

### 4.7.13  Refinance of Properties Encumbered by Umpqua Bank's Liens.

Provided that no Event of Default has occurred that is not timely cured, Reorganized Debtor may satisfy an Arlie Debt Amount through a refinancing of the applicable property of the Debtor that is the Collateral of Umpqua Bank at any time after the Reorganized Debtor has made the Kinney Loop Pay Down, the Crescent Village Pay Down and the College Park Pay Down, provided that Umpqua Bank receives the Arlie Debt Amount and Umpqua Bank Fees associated with such property. To the extent that such refinancing is in excess of the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) applicable Umpqua Bank Fees, the net excess financing proceeds shall be distributed in accordance with paragraph 4.7.14 of this Plan.

### 4.7.14  Sale of Collateral Free and Clear of Umpqua Bank's Liens and Application of Excess Proceeds.

Notwithstanding that each property of Debtor that is Collateral of Umpqua Bank serves as Collateral for all of Umpqua Bank's Class 7 Claims, and provided no Event of Default has occurred that is not timely cured, Reorganized Debtor may from time to time sell a property for cash at closing free and clear of any liens, claims and encumbrances of Umpqua Bank provided that the Arlie Debt Amount and Umpqua Bank Fees associated with such property has been paid or will be paid upon such sale. To the extent that the sale proceeds exceed the sum of (a) the Arlie Debt Amount, (b) Property Taxes, (c) Closing Costs, and (d) the applicable Umpqua Bank Fees, such excess proceeds (the "Arlie Excess Proceeds") will be divided as follows: For any sale by Reorganized Debtor that occurs within one year of the Effective Date, or within 2 months of a letter

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

of intent obtained within such one year period, two-thirds (2/3) of the Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and one-third (1/3) of the Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Bank Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  For any sale by Reorganized Debtor that occurs after such date, one -third (1/3) of any Arlie Excess Proceeds will be retained by Reorganized Debtor for its own account, and two-thirds (2/3) of any Arlie Excess Proceeds will be for the account of Umpqua Bank to be credited against any Umpqua Allowed Class 7 Claim, other than a Class 7.1, 7.2, 7.3 Claim or a Class 7.4 Claim (solely with respect to the Woodburn Loan).  Notwithstanding the foregoing, upon tender of the Arlie Debt Amount and the Umpqua Bank Fees associated with the 3032 Kinney Loop Property, Umpqua Bank will consent to the release of its liens and security interests against the 3032 Kinney Loop Property.

Umpqua Bank shall provide partial releases of its liens related to a portion of each parcel that serves as Collateral for Umpqua Bank's Class 7 Claims, provided that 110% of the Arlie Debt Amount and the Umpqua Bank Fees associated with such specific portion of parcel (on a pro rata basis determined in light of the comparative value of the portion of parcel to be sold with the value of the remaining portion of the parcel not being sold) has been paid or will be paid to Umpqua Bank upon such sale.

### 4.7.15    Payment of Umpqua Bank Fees.

Unless otherwise provided by the Plan, upon the sale or refinance of any property of the Debtor that is Collateral of Umpqua Bank, Reorganized Debtor shall pay a proportionate share of the Umpqua Bank Fees on a pro rata basis so that the ratio of (a) the Umpqua Bank Fees being paid, to (b) the aggregate Umpqua Bank Fees, is the same ratio as (x) the Arlie Debt Amount for the property being sold or refinanced, to (y) the aggregate Arlie Debt Amount.

### 4.7.16    Property Taxes.

Other than Property Taxes relating to the Roseburg Property and the Oil Can Henry's Property (which taxes shall remain current under the Plan), Property Taxes on any property owned

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

by the Debtor that is Collateral of Umpqua Bank shall at no time be no more than two years past due.

4.7.17  <u>Settlement of Claims by and among Debtor, Reorganized Debtor and Umpqua Bank.</u>

Upon confirmation of this Plan and effective as of the Effective Date, (a) the Arlie Debt Amount and the Umpqua Bank Fees shall not be subject to reduction by defense, counterclaim, or claim of recoupment by Debtor or Reorganized Debtor, (b) Debtor and Reorganized Debtor will be deemed to have waived any and all claims against Umpqua Bank and its present directors, officers and employees for any and all actions (or in-actions) that occurred before the Effective Date, (c) all guarantees that guaranty the obligations of Debtor to Umpqua Bank shall continue to guaranty the obligations of Reorganized Debtor to Umpqua Bank, as such obligations have been modified by this Plan, and (d) subject to the provisions of paragraph 4.7 hereof, Umpqua Bank will not make a demand on the Debtor or Reorganized Debtor for defaults that occurred before the Effective Date.

4.7.18  <u>Treatment of Umpqua Bank's Cash Collateral Account.</u>

The good funds in the Umpqua Cash Collateral Account shall be allocated as follows (and in the following order):  (a) payment of past due Property Taxes on the Oil Can Henry's Property and the Roseburg Property, (b) payments of all regularly scheduled but then unpaid payments of non-default interest on Roseburg Loan #1 and #2 and on the Oil Can Henry's Loan, (c) $457,000 to be used for tenant improvements for Roseburg as such improvements are made, provided that (i) Umpqua Bank shall have a security interest in such Roseburg improvements, (ii) Debtor shall provide Umpqua Bank copies of invoices and documents pertaining to the work performed when the draw for such work is made, and (iii) Debtor shall assure that no liens are asserted against the property on account of the work performed and, upon request by Umpqua Bank, will obtain lien releases as payments are made, (d) $211,374 to be reserved by Reorganized Debtor for payment of Debtor's income taxes associated with the College Park Sale, (e) $315,000 to be paid to Umpqua Bank to be applied to the principle balance of the obligation associated with the College Park Property, (f) $150,000 to be used by Reorganized Debtor for any purpose without restriction, and (g) the remainder to be held in an account at Umpqua Bank, which will be subject to Umpqua

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Bank's security interest, to be used at Reorganized Debtor's discretion solely for debt service or taxes on property held by Reorganized Debtor that is the Collateral of Umpqua Bank and not subject to a sale or refinance agreement.  On the Effective Date, Reorganized Debtor shall make the payments required under subparagraph (a) and (b) above, the funds required under subparagraph (d) and (f) will be retained by the Reorganized Debtor, Umpqua Bank shall apply the funds described in subparagraph (e) above and the remainder will remain in a deposit account at Umpqua Bank to be used in accordance with this paragraph.

### 4.7.19  Use of Rents Generated From Umpqua Properties.

Commencing on the Effective Date, all rents generated from the properties securing the Umpqua Bank loans may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

**4.8**    **Class 8 (Washington Federal Savings)**.  Class 8 is impaired.  The Class 8 Claim of Washington Federal Savings includes Claims for amounts owing under five separate loans, each of which will be separately classified and treated as hereinafter described.

### 4.8.1    Class 8.1 –Lord Byron Loan.

On or about November 14, 2008, Washington Federal made a loan to Debtor in the original principal amount of  $2,000,000 (the "Lord Byron Loan").  The Lord Byron Loan is secured by deeds of trust on the Debtor's real property and improvements in Eugene, Oregon commonly referred to as 2909 Lord Byron Place, 2915 Lord Byron Place, 2931 Lord Byron Place, 2977 Lord Byron Place and 2993 Lord Byron Place (collectively, the "Lord Byron Collateral").  The Lord Byron Collateral Value is less than the amounts owing under the Lord Byron Loan.

Washington Federal will have Allowed Claims in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to Washington Federal as of the Effective Date as allowed by the Lord Byron Loan documents (the "Washington Claim Amount").  Washington Federal shall have a Secured Class 8 Claim in the aggregate amount of the Lord Byron Collateral Value, and an Unsecured Claim in an amount representing the difference between Lord Byron Collateral Value and the Washington Claim Amount (the "Washington Federal Unsecured Claim").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Washington Federal Secured Class 8 Claim shall be satisfied by the delivery of five promissory notes to Washington Federal, as follows:  the 2909 Lord Byron Note in the principal amount of $279,600 , the 2915 Lord Byron Note in the principal amount of $296,000, the 2931 Lord Byron Note in the principal amount of $327,950, the 2977 Lord Byron Note in the principal amount of $269,350, and the 2993 Lord Byron Note in the principal amount of $327,100 (individually, a "Lord Byron Note" and collectively, the "Lord Byron Notes").  Each Lord Byron Note will bear simple interest at a fixed rate of 4.5% per annum.  Commencing on the tenth day of the first month following the Effective Date and continuing on the tenth day of each month thereafter through and including the 36th month following the Effective Date, Reorganized Debtor will make interest only payments on the Lord Byron Notes.  Commencing on the tenth day of the 37th month after the Effective Date and continuing on the tenth day of each month thereafter until the Lord Byron Notes have been paid in full, Reorganized Debtor will make equal monthly amortizing payments of principal and interest on the Lord Byron Notes based on a 25 year amortization schedule, with a balloon payment of all unpaid principal and interest due on the Maturity Date.

Each Lord Byron Note will be secured by a security interest in and lien upon its separate Lord Byron Property, pursuant to deeds of trust to be delivered to Washington Federal on the Effective Date.  Each such deed of trust will have the same priority that Washington Federal had in such Collateral as of the Petition Date.  Reorganized Debtor will maintain the Lord Byron Collateral in good repair and insure the Lord Byron Collateral to its full usable value.

Washington Federal will release its liens, claims and security interests in any Lord Byron Property upon payment of all principal and accrued interest then owing on the Lord Byron Note applicable to such property.  Each Lord Byron Note shall be assumable by a purchaser of the applicable Lore Byron Property, subject to reasonable approval by Washington Federal, provided that the loan documents for the assignee shall include an impound for Property Tax and insurance.

### 4.8.2    Treatment of Washington Federal's Cash Collateral Account.

On the Effective Date, amounts then held by Debtor in the separate and segregated cash collateral bank account established and maintained by Debtor with respect to Washington Federal pursuant to the Cash Collateral Order may be utilized by the Reorganized Debtor to pay any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

past due Property Taxes on the Collateral securing the Class 8 Claim. Any amounts remaining in the cash collateral bank account after the payment of such taxes may be used by Reorganized Debtor for any purpose without restriction including, without limitation, for general overhead and general administrative expenses.

           4.8.3   Treatment of the Washington Federal Unsecured Claim.

           The Washington Federal Unsecured Claim shall be treated as a Class 12 General Unsecured Claim.

           4.9   Class 9 (BLM Secured Creditors). Class 9 is impaired. Class 9 consists of the Allowed Secured Claims of the BLM Secured Creditors. Each of the BLM Secured Creditors made a loan to the Debtor on or about November 4, 2008, as follows: (a) a loan made by Francis Cline in the original principal amount of $347,065; (b) a loan made by William Greenhoot in the original principal amount of $347,065, (c) loans made by Herbert McKillop in the original principal amounts of $120,000 and $1,453,482; (d) a loan made by Karen Merwin in the original principal amount of $694,130; (e) a loan made by Alice Smith in the original principal amount of $694,130, and (f) a loan made by Linda Trickey in the original principal amount of $694,130 (collectively, the BLM Loans"). The BLM Loans are secured by a deed of trust on the Debtor's real property and improvements commonly referred to as 2890 Chad Drive, Eugene, Oregon (the "BLM Office Building").

           Class 9 shall have an allowed claim in the amount of all principal, accrued non-default interest, and reasonable fees and costs owing to the BLM Secured Creditors on the BLM Loans (the "BLM Allowed Secured Claim"). The BLM Allowed Secured Claim shall be treated as follows.

           On the Effective Date, Reorganized Debtor shall pay all outstanding and prorated property taxes on the BLM Office Building and shall contribute $10,000 towards the cost of deferred maintenance and repair on the BLM Office Building. Thereafter, Reorganized Debtor shall transfer title to the BLM Office Building to Chad Drive LLC, an Oregon limited liability company (the "BLM LLC"), whose members shall be the BLM Secured Creditors and whose membership interests in the BLM LLC shall be in direct proportion to the amount of their claims. Title shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

transferred by non-merger deed in lieu, in such form as reasonably agreeable to Reorganized Debtor and the BLM LLC, in full and complete satisfaction of all obligations owing under the BLM Allowed Secured Claim.

Notwithstanding the foregoing, at the request of the BLM LLC, Reorganized Debtor will provide at no cost, management services, assistance with zoning issues, assistance with marketing the property for lease or sale and any other services that Reorganized Debtor and the BLM LLC both agree are in their best interests. Reorganized Debtor will be reimbursed for any out of pocket expenditures paid to non-related parties relating to the services described above.

After the transfer of the BLM Office Building to the BLM LLC, any cash generated from the sale or rental of the BLM Office Building shall be kept by BLM LLC until it shall have received $4,350,000 plus interest at 5.75% from May 4, 2010 until paid (the "BLM Payment"). After the BLM LLC has been paid the BLM Payment, Reorganized Debtor shall be reimbursed for any cash Arlie & Company shall have invested in the BLM Office Building, plus accrued interest at 5.75% from the date the BLM Office Building was transferred to the BLM LLC. The amount due Reorganized Debtor shall be agreed to by both Reorganized Debtor and the BLM LLC and shall consist of all cash expenditures by Arlie & Co. during its ownership of the BLM Office Building including the down payment less any rent or other money received during their ownership, not including any internal costs charged by Arlie & Co. or related parties (the "Arlie Payment").

The BLM LLC shall have the right to accept or refuse any offers to sell or lease the BLM Office Building provided that Reorganized Debtor shall have the right to purchase the BLM Office Building from the BLM LLC, for cash at the fair market value which can be no less than the outstanding amount of the BLM Payment then owing to the BLM LLC. The right of Reorganized Debtor to purchase the BLM Office Building is not a right of first refusal.

In the event the BLM Office Building is sold, subject to available funds, any debt incurred against the BLM Office Building after its transfer to the BLM LLC shall be paid first, then the BLM LLC will be paid the BLM Payment, then Reorganized Debtor will be paid the Arlie Payment and if there are any excess funds they shall be paid 80% to the BLM LLC and 20% to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Reorganized Debtor. If Reorganized Debtor is the purchaser, excess funds after the above payments shall be distributed 60% to the BLM LLC and 40% to Reorganized Debtor.

4.10    Class 10 (Property Tax Lien Claims).  Class 10 is impaired.  Class 10 Claimants will retain their security interest with the same priority to which it is entitled by law. Each Class 10 Claimant shall be paid the full amount of its Allowed Class 10 Claim in full in accordance with 11 U.S.C. §1129(a)(9)(d), but no later than the earlier of (i) 5 years after the Petition Date, or (ii) upon a sale of the property securing the Claim.

4.11    Class 11 (Small Unsecured Claims).  Class 11 is impaired.  Each holder of an Allowed Small Unsecured Claim will be paid in Cash the full amount of their Small Unsecured Claim in Cash, without interest, within 60 days following the Effective Date.

4.12    Class 12 (General Unsecured Claims).  Class 12 is impaired.  Class 12 General Unsecured Claims shall accrue interest from the Petition Date until such Claims are paid in full at a uniform annual interest rate of 3.5% per annum.  No pre-petition or post-petition default interest or post-petition contract rate of interest shall be paid on any General Unsecured Claim. Reorganized Debtor shall make periodic payments to holders of Class 12 Claims as and when funds are available.  At the time Reorganized Debtor makes any principal payment on a General Unsecured Claim, Reorganized Debtor shall also pay all accrued but unpaid interest then owing on such General Unsecured Claim.  Within 3 years after the Effective Date, Reorganized Debtor shall have paid at least 50% of the principal amount of each General Unsecured Claim plus accrued interest.  All Class 12 Claims shall be paid, in full with interest, no later than the Maturity Date.

4.13    Class 13 (Interests).  Class 13 is unimpaired.  Existing Interests in Debtor will be preserved.

4.14    Class 14 (Fifth Third Bank).  The Class 14 Claim is impaired.  The Class 14 Claim of Fifth Third Bank ("Fifth Third"), originally filed against the Debtor in the amount of $4,295,055.54 as proof of claim No. 185, arises under a guaranty (the "Guaranty") by the Debtor of the obligations of Arlie Air, LLC (a wholly owned subsidiary of the Debtor) ("Arlie Air").  The Fifth Third Claim was subsequently reduced after the liquidation of Arlie Air's assets and the payment to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Fifth Third of the liquidation sale proceeds. The resulting allowed Fifth Third Claim is based on an agreement with respect to the deficiency balance owed by Debtor to Fifth Third.

Fifth Third will have an allowed general unsecured claim in the amount of $1,009,843.05 (the "Fifth Third Unsecured Claim"). The Fifth Third Unsecured Claim will accrue simple interest at the fixed rate of 3.5% per annum, commencing on the Effective Date. The Reorganized Debtor will repay the entire balance of the Fifth Third Unsecured Claim in full, including accrued interest, not later than 36 months following the Effective Date (the "Fifth Third Maturity Date"); Reorganized Debtor may, but shall have no obligation to, make periodic payments to Fifth Third prior to the Fifth Third Maturity Date.

Within 30 days following the Effective Date, the Reorganized Debtor will have the option (the "Option"), in its sole discretion, to satisfy the Fifth Third Unsecured Claim by the delivery of a promissory note secured by a first priority perfected security interest and mortgage in and to the Reorganized Debtor's interests in the Puueo Estate and Puueo Forest land in Hawaii (the "Puueo Estate/Forest") in the amount of $600,000 (the "Fifth Third Secured Claim"). (For purposes of clarification, the Puueo Estate and Puueo Forest property is comprised of 363 acres of land in Hawaii and is described in further detail in the Debtor's Second Amended Disclosure Statement (February 14, 2011) (Docket No. 449) (the "Disclosure Statement"). The Puueo Estate/Forest is not included within the 5,226 acre property referred to in the Disclosure Statement as the "West Hilo Tree Farm".) The Fifth Third Secured Claim will accrue simple interest at the fixed rate of 3.5% per annum, commencing on the Effective Date, and will mature on the Fifth Third Maturity Date. No payments will be due on the Fifth Third Secured Claim prior to the Fifth Third Maturity Date. The form and substance of the promissory note, the mortgage and related documents and instruments shall be in form and substance reasonably satisfactory to Fifth Third. In order for the Option to be exercised, the mortgage and all related documents and instruments must be recorded within 60 days after the date the Reorganized Debtor advises Fifth Third that the Reorganized Debtor is exercising the Option. Fifth Third and the Reorganized Debtor shall each use their best efforts to cooperate with respect to the documentation. All reasonable fees, costs, title reports, title insurance and taxes to prepare, negotiate and record the mortgage and any related documents and instruments shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

paid by the Reorganized Debtor. The Reorganized Debtor's counsel shall prepare the form of the promissory note, the mortgage and any related documents and instruments. Notwithstanding the foregoing, if the Fifth Third Secured Claim comes into being and the Reorganized Debtor sells the Puueo Estate/ Forest prior to the Maturity Date, then Fifth Third will receive the first dollars from the Puueo Estate/Forest sale proceeds up to the amount of the Fifth Third Secured Claim, plus accrued interest.

If the Debtor's pending sale of approximately 5,226 acres of forest properties located in Hilo, Hawaii (see Docket No. 426) (the "West Hilo Tree Farm"), or any portion thereof, generates gross cash proceeds of $10,000,000 or greater, all cash in excess of $10,000,000 will be paid to Fifth Third (up to $600,000, plus accrued interest thereon at a fixed rate of 3.5% per annum from the Effective Date). Notwithstanding the foregoing, if the Reorganized Debtor has not exercised the Option and performed the other requirements described in the paragraph immediately above (i.e. recorded the mortgage and related documents within 60 days of the Effective Date), and if any portion of any of the proceeds of sale of the West Hilo Tree Farm are paid to any creditors holding Class 12 General Unsecured Claims, the Reorganized Debtor shall immediately pay down or payoff (as applicable) the Fifth Third Unsecured Claim, to the same extent and percentage as the distribution made to said creditor(s) holding Class 12 General Unsecured Claims.

Following Bankruptcy Court approval of the *Stipulation To Compromise Claim Of Fifth Third Bank* entered March 24, 2011 (the "Stipulation"), Reorganized Debtor and Fifth Third shall execute mutual releases (in form and substance reasonably satisfactory to Fifth Third), pursuant to which Reorganized Debtor and Fifth Third shall, except as provided for in the Stipulation and in this Plan, release, waive and forever discharge any other claims against one another.

## ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS

5.1    Distributions by Debtor. The Reorganized Debtor shall administer Claims and make distributions in respect of Allowed Claims. Distributions to be made by the Reorganized Debtor may be made by any person designated or retained by the Reorganized Debtor to serve as disbursing agent without the need for any further order of the Bankruptcy Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5.2     Disputed Claims; Objections to Claims.  Only Claims that are Allowed shall be entitled to distributions under the Plan.  No Cash or other property shall be distributed under the Plan on account of any Disputed Claim, or a portion of any such Claim, unless and until such Disputed Claim becomes an Allowed Claim.  Debtor reserves the right to contest and object to any Claims and previously Scheduled Amounts, including, without limitation, those Claims and Scheduled Amounts that are specifically referenced herein, are not listed in the Schedules, are listed therein as disputed, contingent and/or unliquidated in amount, or are listed therein at a different amount than the Debtor currently believes is validly due and owing.  All Disputed Claims shall be resolved by the Bankruptcy Court, except to the extent that (a) Debtor may otherwise elect consistent with the Plan and the Bankruptcy Code or (b) the Bankruptcy Court may otherwise order.

5.3     Subsequent Allowance of Disputed Claims.  The holder of a Disputed Claim that becomes Allowed in full or in part subsequent to the Effective Date shall receive Cash distributions (including any make-up distributions) on the next applicable distribution date following the allowance of such Disputed Claim.

5.4     Unclaimed Distributions.  Any entity which fails to claim any Cash distribution within one hundred twenty (120) days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan and the Reorganized Debtor shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Reorganized Debtor, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor with respect to such funds shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and such Creditors shall have no claim whatsoever against the Reorganized Debtor or any holder of an Allowed Claim to whom distributions are made by the Reorganized Debtor.

**ARTICLE VI**

**MEANS FOR EXECUTION OF PLAN**

6.1     Continued Business Operations.  From and after the Effective Date, the Reorganized Debtor shall continue to engage in business with the goal of maximizing the value of its

assets and, subject to the provisions of the Plan governing distributions and the retention of jurisdiction provisions hereof, the Reorganized Debtor shall continue such business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Reorganized Debtor shall be authorized, without limitation, to use and dispose of its assets, to insure its assets, to borrow money, to employ and compensate agents, to reconcile and object to Claims, and to make distributions to Creditors in accordance with the Plan.

6.2     Siuslaw Credit Line.  Siuslaw Bank will provide a revolving line of credit to the Reorganized Debtor in the amount of $1,200,000 (the "Credit Line").  Interest is to be paid monthly at a rate of Prime plus 1%. The rate will not be less than 4.5% during the term of the Credit Line nor will the rate ever exceed 9.5%. The rate will be adjusted at each annual renewal.  Siuslaw Bank will renew the Credit Line annually provided that Reorganized Debtor has complied with all provisions of the Plan that pertain to Siuslaw Bank. No loan fee will be paid for the initial term of the Credit Line but the Credit Line will be subject to a $5,000 annual renewal fee. Any expenses incurred to put the Credit Line in place will be the responsibility of Reorganized Debtor.  Such expenses will include appraisals for all properties involving Siuslaw Bank.

The Credit Line will be secured by a first trust deed on the Florence Medical Building (described in Article 4.5.6 hereof) (currently loan #1/214981).  In the event that 75% of the appraised value of the Florence Medical Building is less than $1,200,000, then Reorganized Debtor shall provide different or additional collateral reasonably acceptable to Siuslaw Bank.   Unless previously paid, the initial advance on the Credit Line will (a) payoff the current first mortgage on the Florence Medical Building at Siuslaw Bank, (b) pay property taxes current on the Florence Medical Building, and (c) pay all accrued interest on all Siuslaw Bank loans except the loan secured by the  Crescent Village Lots.  (Loan 1/209386).

6.3     Operating Revenues.  Reorganized Debtor will fund payments to its Creditors from proceeds of asset sales implemented during the Bankruptcy Cases, the net operating income generated from Reorganized Debtor's continued business operations, and from the future sale or refinancing of assets of Reorganized Debtor from time to time.  A core aspect of Debtor's business is marketing and selling real property acquired by Debtor from time to time.  Reorganized Debtor will

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

continue to market and sell real its real property assets in the ordinary course of business to fund continued business operations and to fund payments required under this Plan. Such sales may occur without further order of the Bankruptcy Court.

6.4    <u>Sales or Refinancing of Real Property Collateral</u>. Without limiting Article 6.3 above, and except as set forth with respect to a particular Creditor under the Plan, Reorganized Debtor may at any time sell or refinance Collateral that secures a Secured Claim free and clear of any lien of the Creditor in such Collateral provided that on or before the closing of the sale of such Collateral Reorganized Debtor pays in full the Allowed Secured Claim of such Creditor that is secured by the Collateral. Any excess net proceeds from the sale or refinancing of such Collateral shall be paid to Reorganized Debtor (or as otherwise directed by Reorganized Debtor) and may be used by Reorganized Debtor to fund Reorganized Debtor's continued business operations and to fund payments required under this Plan. Such sales or refinancing may occur without further order of the Bankruptcy Court.

6.5    <u>Marketing and Sales of Non-Core Assets</u>. In addition to marketing and selling its real property assets in the ordinary course of its business, Reorganized Debtor may market and sell its non-core assets on an accelerated basis as is necessary or appropriate to ensure that Reorganized Debtor will have sufficient funds to make all payments required of Debtor under this Plan. Without limiting the preceding, if at any time Reorganized Debtor determines in its discretion that it may not have sufficient funds to make any upcoming payment required under this Plan, Reorganized Debtor will before such payment is due sell at public auction one or more of Reorganized Debtor's Non-core assets to raise the funds necessary to make the required Plan payment. Such auctions and sales may occur without further order of the Bankruptcy Court.

6.6    <u>Setoffs</u>. Reorganized Debtor may, but shall not be required to, set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which Debtor or Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim Debtor or Reorganized Debtor may have against such holder.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

6.7    <u>Corporate Action</u>.  Upon entry of the Confirmation Order by the Clerk of the Bankruptcy Court, all actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the execution, delivery, and performance of all documents and agreements relating to the Plan, and any of the foregoing.  On the Effective Date, the appropriate officers of Reorganized Debtor are authorized and directed to execute and deliver any and all agreements, documents, and instruments contemplated by the Plan and/or the Disclosure Statement in the name of and on behalf of Reorganized Debtor.

6.8    <u>Saturday, Sunday, or Legal Holiday</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.9    <u>Deposits</u>.  All utilities holding a utility deposit obtained as a result of this Bankruptcy Case shall immediately after the Effective Date return or refund such utility deposit to Reorganized Debtor.  At the sole option of Reorganized Debtor, Reorganized Debtor may apply any such utility deposit that has not been refunded to Reorganized Debtor in satisfaction of any payments due or to become due from Reorganized Debtor to a utility holding such a utility deposit.  All escrow deposits made by the Debtor for prospective purchases of property which did not close prior to the Effective Date (the "Arlie Escrow Deposits") and which have not been returned to the Debtor as of the Effective Date, shall be turned over to Reorganized Debtor immediately after the Effective Date for its own account.

6.10    <u>Event of Default; Remedy</u>.  Any failure by Reorganized Debtor to perform any term of this Plan, which failure continues for a period of ten Business Days following receipt by Reorganized Debtor of written notice of such default from the holder of an Allowed Claim to whom performance is due, shall constitute an Event of Default.  Upon the occurrence of an Event of Default, both the holder of an Allowed Claim to whom performance is due and the Reorganized Debtor shall each have all rights and remedies granted by law, this Plan or any agreement between the holder of such Claim and Debtor or Reorganized Debtor.  An Event of Default with respect to one Creditor shall not be an Event of Default with respect to any other Creditor.  Notwithstanding

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the foregoing, in the event of a failure to perform any term of this Plan with respect to a Class 11 or Class 12 Claim, the Unsecured Creditors' Committee may provide the Reorganized Debtor with written notice of an Event of Default on behalf of the holder of such Unsecured Claim.

6.11    Continuation of Unsecured Creditors' Committee. To the extent that one or more members of the Unsecured Creditors' Committee agrees to continue to serve on the Unsecured Creditors' Committee following the Effective Date, the Unsecured Creditors' Committee will continue in existence following the Effective Date for so long as any such members continue to agree to serve on such Unsecured Creditors' Committee. For so long as such Unsecured Creditors' Committee remains in existence, Reorganized Debtor will provide to the Unsecured Creditors' Committee a quarterly compliance certificate executed by the Chief Financial Officer of Reorganized Debtor that certifies that either (i) the Reorganized Debtor is in full compliance with the Plan, or (ii) the Reorganized Debtor is not in full compliance with the Plan. The first such compliance certificate shall be delivered to the Unsecured Creditors' Committee 45 days after the end of the third month following the Effective Date and each quarterly compliance certificate shall be delivered 45 days after the end of each subsequent three month period, unless another quarterly schedule is agreed to by and between the Reorganized Debtor and the Creditors' Committee. If the Reorganized Debtor is not in full compliance with the Plan, the Reorganized Debtor shall state what steps are being taken to remedy or cure any non-compliance with the Plan. In addition, provided that the members of the continuing Unsecured Creditors' Committee have executed in favor of Reorganized Debtor a confidentiality and non-disclosure agreement in form and substance satisfactory to Reorganized Debtor in its reasonable discretion, Reorganized Debtor shall provide annual reviewed financial statements to the Unsecured Creditors' Committee. Upon payment in full of all Allowed General Unsecured Claims, the Unsecured Creditors' Committee shall automatically cease to exist. During the existence of the Unsecured Creditors' Committee, the Unsecured Creditors' Committee may retain legal or other advisors to assist the Unsecured Creditors' Committee, and Reorganized Debtor will pay the fees and expenses of such advisors, not to exceed $10,000 in the aggregate in any 12 month period, in the ordinary course of business, provided that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

any dispute concerning such fees and expenses shall be resolved by the Bankruptcy Court or other court of competent jurisdiction.

## ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     <u>Assumption and Rejection</u>.  Except as may otherwise be provided in the Plan Supplement, all executory contracts and unexpired leases of Debtor which are not otherwise subject to a prior Bankruptcy Court order or pending motion before the Bankruptcy Court are assumed by Reorganized Debtor on the Effective Date.  The Confirmation Order shall constitute an order authorizing assumption of all executory contracts and unexpired leases except for those otherwise specifically rejected or otherwise provided for in the Plan Supplement or subject to other Court Order or pending motion.  Reorganized Debtor shall promptly pay all amounts required under Section 365 of the Bankruptcy Code to cure any monetary defaults for executory contracts and unexpired leases being assumed and shall perform its obligations under such assumed executory contracts and unexpired leases from and after the Effective Date in the ordinary course of business.

7.2     <u>Assignment</u>.  To the extent necessary, all assumed executory contracts and unexpired leases shall be deemed assigned to Reorganized Debtor as of the Effective Date.  The Confirmation Order shall constitute an order authorizing such assignment of assumed executory contracts and unexpired leases, and no further assignment documentation shall be necessary to effectuate such assignment.

7.3     <u>Rejection Claims</u>.  Rejection Claims must be Filed no later than 30 days after the entry of the order rejecting the executory contract or unexpired lease or 30 days after the entry of the Confirmation Order, whichever is sooner.  Any such Rejection Claim not Filed within such time shall be forever barred from asserting such Claim against Debtor, Reorganized Debtor, its property, estates, and any guarantors of such obligations.  Each Rejection Claim resulting from such rejection shall constitute a General Unsecured Claim or a Small Unsecured Claim, as applicable.

7.4     <u>Compensation and Benefit Programs</u>.  Except to the extent restricted by the Plan, all employee compensation and benefit plans, policies and programs of Debtor applicable generally to its employees as in effect on the Effective Date, including, without limitation, all

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, stock incentive plans, and life, accidental death and dismemberment insurance plans, shall continue in full force and effect, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate any of the foregoing arrangements.

## ARTICLE VIII

## EFFECT OF CONFIRMATION

8.1    <u>Binding Effect</u>.  The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtor and the estate assets, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the commencement of the Bankruptcy Case.  The distributions made pursuant to this Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made.  Confirmation of the Plan shall bind and govern the acts of the Reorganized Debtor whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

8.2    <u>Discharge and Permanent Injunction</u>.  Except as otherwise set forth in the Plan, confirmation of the Plan shall discharge the Debtor from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan.  As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under Sections 524(a) and 1141 of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtor or the Reorganized Debtor, except as otherwise set forth in this Plan.  Except as otherwise provided in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Plan or in the Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to entities against (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against Reorganized Debtor that was or could have been commenced before the entry of the Confirmation Order, (b) the enforcement against Reorganized Debtor or its assets of a judgment obtained before the Petition Date, and (c) any act to obtain possession of or to exercise control over, or to create, perfect or enforce a lien upon all or any part of the assets.  Nothing contained in the foregoing discharge shall, to the full extent provided under Section 524(e) of the Bankruptcy Code, affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtor that is discharged under the Plan.

8.3     Limitation of Liability.  The Debtor and the Reorganized Debtor and each of their respective Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

8.4     Exculpation.  The Debtor, the Reorganized Debtor and each of their respective Agents, shall not be liable to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Bankruptcy Case or the negotiation, formulation, development, proposal, disclosure, confirmation or implementation of the Plan and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan, provided, however, that the foregoing provisions shall have no affect on the Tonkon Claims or the liabilities of any person that resulted from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted negligence, breach of fiduciary duty or willful misconduct.

# ARTICLE IX

# RETENTION OF JURISDICTION

9.1     Jurisdiction of the Bankruptcy Court.  Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(a)     to resolve controversies and disputes regarding any Avoidance Action,

(b)     to classify the Claim or Interest of any Creditor or stockholder, reexamine Claims or Interests which have been owed for voting purposes and determine any objections that may be Filed to Claims or Interests,

(c)     to determine requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses in favor of professionals employed in this Bankruptcy Case,

(d)     to avoid transfers or obligations to subordinate Claims under Chapter 5 of the Bankruptcy Code,

(e)     to approve the assumption, assignment or rejection of an executory contract or an unexpired lease pursuant to this Plan,

(f)     to resolve controversies and disputes regarding the interpretation of this Plan,

(g)     to implement the provisions of this Plan and enter orders in aid of confirmation,

(h)     to adjudicate adversary proceedings and contested matters pending or hereafter commenced in this Bankruptcy Case, and

(i)     to enter a final decree closing this Bankruptcy Case.

9.2    Failure of Bankruptcy Court to Exercise Jurisdiction. If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in, or related to this Bankruptcy Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## ARTICLE X

## ADMINISTRATIVE PROVISIONS

10.1    Modification or Withdrawal of the Plan. Debtor may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the time that the Bankruptcy Court has signed the Confirmation Order. After such time, and prior to the substantial consummation of the Plan, Debtor may, so long as the treatment of holders of

Claims and Interests under the Plan is not adversely affected, institute proceedings in Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

10.2    Revocation or Withdrawal of Plan.  Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against Debtor or any other Entity or to prejudice in any manner the rights of Debtor or any Entity in any further proceeding involving Debtor.

10.3    Modification of Payment Terms.  The Debtor may modify the treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such Claim or Interest at any time after the Effective Date upon the prior written consent of the person whose Allowed Claim or Interest treatment is being adversely affected.

10.4    Nonconsensual Confirmation.  Debtor shall request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except subsection 1129(a)(8), are met.

10.5    Compromise of Controversies.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distributions, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of Debtor.

10.6    Final Decree.  At any time following the Effective Date, the Reorganized Debtor shall be authorized to file a motion for the entry of a final decree closing the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**ARTICLE XI**

**CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

11.1    <u>Conditions to Confirmation</u>.  The following are conditions precedent to the confirmation of this Plan:

11.1.1  The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtor;

11.1.2  The Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor; and

11.1.3  A written settlement agreement shall have been executed by and among the Debtor, the guarantors of the Debtor's obligations to Umpqua Bank (the "Guarantors") and Umpqua Bank containing the following release terms and agreements not to make a demand, all of which shall be effective as of the Effective Dale:  (a) a waiver and release of all claims against Umpqua Bank and its officers and employees by Debtor and the Guarantors; (b) an acknowledgement by the Debtor and the Guarantors that the obligations to Umpqua Bank (as revised by the Plan) are without defense and counterclaim and that the guaranties are fully enforceable; and (c) an agreement by Umpqua Bank that it will not make a demand on the Debtor or the Guarantors for defaults that occurred before the Effective Date.

11.2    <u>Conditions to Effective Date</u>.  The following are conditions precedent to the occurrence of the Effective Date:

11.1.4  The Confirmation Date shall have occurred;

11.1.5  The Confirmation Order shall have become a Final Order;

11.1.6  No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, of made, remains pending;

11.1.7  The Debtor shall have determined that it has sufficient Cash reserves necessary to make all payments required to be made on the Effective Date.

11.3    <u>Waiver of Conditions</u>.  Other than paragraph 11.1.3, the Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by the Debtor at any time

without notice, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

**ARTICLE XII**

**MISCELLANEOUS PROVISIONS**

12.1    <u>Revesting</u>.  Except as otherwise expressly provided herein, on the Effective Date, all property and assets of the estate of Debtor including, without limitation, all Arlie Escrow Deposits not yet returned to Debtor, shall revest in Reorganized Debtor, free and clear of all claims, liens encumbrances, charges and other Interests of Creditors arising on or before the Effective Date, and Reorganized Debtor may operate, from and after the Effective Date, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

12.2    <u>Rights of Action</u>.  Except as otherwise expressly provided herein, any claims, rights, interests, causes of action, defenses, counterclaims, cross-claims, third-party claims, or rights of offset, recoupment, subrogation or subordination including, without limitation, the Tonkon Claims, claims under Section 550(a) of the Bankruptcy Code or any of the sections referenced therein (including, without limitation, any and all Avoidance Actions) accruing to Debtor shall remain assets of Reorganized Debtor.  Reorganized Debtor may pursue such rights of action, as appropriate, in accordance with what is in its best interests and for its benefit.

12.3    <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal laws are applicable, the laws of the State of Oregon shall govern the construction and implementation of the Plan, and all rights and obligations arising under the Plan.

12.4    <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, Debtor and Reorganized Debtor shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authorities and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification and information requirements.  Entities entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as Reorganized Debtor may reasonably require to ensure compliance with such withholding and reporting requirements, and to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

enable Reorganized Debtor to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.  Pursuant to Section 346(f) of the Bankruptcy Code, the Reorganized shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  Notwithstanding any other provision of this Plan, each holder of an Allowed Claim that has received a distribution of Cash shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution.

12.5    Time.  Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of the next succeeding day which is a Business Day.

12.6    Section 1146(c) Exemption.  Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the revesting, transfer or sale of any real property of Debtor or Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan, including without limitation the sale of any real property by Debtor or Reorganization Debtor (in Hawaii, Oregon or otherwise) pursuant to and in performance of Reorganized Debtors obligations under this Plan, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any city, county or governmental unit in which any instrument, including any deed conveying any of Reorganized Debtor's interest in any of its real property, hereunder is to be recorded shall, be ordered and directed to accept such instrument without requiring the payment of any conveyance fee, documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax or fee.

12.7    Severability.  In the event that any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

any other provisions of the Plan. To the extent that any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the Confirmation Order, the Bankruptcy Court, on the request of Debtor, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the confirmation of the Plan existing by reason of such provision.

　　　　12.8    <u>Successors and Assigns</u>. The provisions of the Plan shall bind Debtor, Reorganized Debtor and all holders of Claims and Interests, and their respective successors, heirs and assigns.

　　　　12.9    <u>Notices to Claim and Interest Holders</u>. Notices to Persons holding a Claim or Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if none was filed, at the address set forth in the Schedules.

　　　　12.10    <u>Post Effective-Date Notices</u>. Following the Effective Date, notices will only be served on the Reorganized Debtor, the Office of the United States Trustee, the Unsecured Creditors' Committee and those persons who file with the Court and serve upon the Reorganized Debtor a request, which includes such person's name, contact person, address, telephone number and facsimile number, that such person receive notice of post-Effective Date matters. Persons who had previously filed with the Bankruptcy Court requests for special notice of the proceedings and other filings in the Bankruptcy Case will not receive notice of post-Effective Date matters unless such persons file a new request with the Bankruptcy Court.

　　　　12.11    <u>Retiree Benefits</u>. On or after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, Reorganized Debtor shall continue to pay all retiree benefits (if any) as that term is defined in Section 1114 of the Bankruptcy Code, maintained or established by Debtor prior to the Effective Date, without prejudice to Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend or terminate the foregoing arrangements.

　　　　12.12    <u>Provisions Enforceable</u>. The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan is valid and enforceable in accordance with its terms.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

12.13  <u>Recordable Order</u>.  The Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications or other supporting documents.

12.14  <u>Plan Controls</u>.  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, or any other instrument or agreement contemplated to be executed pursuant to the Plan, the provisions of the Plan shall control and take precedence.

12.15  <u>Delivery of Promissory Notes</u>.  To the extent that this Plan provides for Reorganized Debtor to deliver a promissory note to a Secured Creditor in connection with an Allowed Secured Claim, except as otherwise specifically provided in this Plan or in any note or document delivered in connection with this Plan, this Plan and any note or other document delivered in connection herewith shall replace and supersede all pre-petition notes, loan agreements, trust deeds, security documents or other documents executed by Debtor in connection with the obligations giving rise to the Allowed Claim.  The Reorganized Debtor shall provide the Unsecured Creditors' Committee with copies of any such promissory notes or other security documents executed pursuant to the Plan.  Unless otherwise provided in this Plan, each Creditor will retain its security interests in and liens upon its Collateral with the same priority and to the same extent such security had as of the Petition Date.  Accordingly, unless otherwise provided in this Plan, the validity and priority of any trust deed or other security document executed in connection with the obligations giving rise to the Creditor's Allowed Claim will not be impaired by this Plan.  However, except as otherwise specifically provided in this Plan, to the extent that any such trust deed or other security document contains any provisions that impose any covenants, requirements or obligations on Debtor or Reorganized Debtor that are not specifically provided for or contained in, or are otherwise inconsistent with, this Plan, then such provisions shall be of no force and effect.

12.16  <u>Effectuating Documents and Further Transactions</u>.  Debtor and Reorganized Debtor shall execute, deliver, file or record such contracts, instruments, assignments, and other agreements or documents, and take or direct such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DATED this 11th day of April, 2011.

Respectfully submitted,

ARLIE & COMPANY

By /s/ Scott Diehl
    Scott Diehl, Chief Financial Officer

PACHULSKI STANG ZIEHL & JONES LLP

By /s/ John D. Fiero
    John D. Fiero, (CA Bar No. 136557)
    Linda F. Cantor, (CA Bar No. 153762)
    Attorneys for Debtor